ORAL ARGUMENT SCHEDULED FOR JANUARY 28, 2025
No. 25-1009

UNITED STATES COURT OF APPEALS FOR
THE DISTRICT OF COLUMBIA CIRCUIT

_____

In re UNITED STATES, Petitioner

_____

RESPONDENT WALID BIN 'ATASH'S RESPONSE TO GOVERNMENT'S
PETITION FOR MANDAMUS AND PROHIBITION

MATTHEW L. ENGLE
*Learned Counsel for Mr. bin 'Atash*

EDWIN A. PERRY
WILLIAM R. MONTROSS Jr.
ANISHA P. GUPTA
TASNIM MOTALA
LTC DANIEL M. GOLDBERG, JA, USA
CPT MARIAN D. MESSING, JA, USAR
LT AUSTIN W.R. RIDGEWAY, JAGC, USN
*Counsel for Mr. bin 'Atash*

Military Commissions Defense Organization
1620 Defense Pentagon
Washington DC 20301-1620
edwin.a.perry5.civ@mail.mil
757-975-4946

## CERTIFICATE AS TO PARTIES AND RELATED CASES

**Parties and Amici Appearing Below**

Except for James A. Young, Colonel (retired), USAF, amicus, all parties and intervenors appearing in the Court of Military Commission Review and the Military Commission are listed in the Government's Petition at page ii.

**Parties and Amici Appearing in This Court**

Except for Mr. Ali Abdul Aziz Ali, putative intervenor, all parties and intervenors appearing in this Court are listed in the Government's Petition at page ii.

**Ruling Under Review**

References to the ruling under review (the Military Commission's November 6, 2024 order) and a related ruling (the Court of Military Commission Review's December 30, 2024 ruling denying the Government's mandamus petition) appear in the Government's Petition at page ii.

**Related Cases**

References to related cases appear in the Government's Petition at page iii.

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES AND RELATED CASES ................................. i

TABLE OF AUTHORITIES .................................................................... iii

GLOSSARY OF ABBREVIATIONS .................................................... viii

ISSUE PRESENTED ............................................................................ 1

STATEMENT OF THE CASE ............................................................... 1

SUMMARY OF ARGUMENT ............................................................... 1

ARGUMENT ........................................................................................ 3

    I.    The Secretary Has No Clear and Indisputable Right to Withdraw from Pretrial Agreements in Contravention of His Own Rules ............................ 4

        A.    The Secretary Had No Legal Basis to Cancel a Decision the Convening Authority Made in Her "Sole Discretion." ..................... 5

        B.    The Secretary's Withdrawal from the PTA Was Untimely Because Mr. bin 'Atash Had Already Begun Performance. ......................... 11

    II.    The Government Fails to Show Interlocutory Appeal to the CMCR Was an Inadequate Alternative Remedy. ............................................ 22

    III.    Mandamus Would Inappropriately Reward the Government for Its Underhanded and Dilatory Tactics While Further Postponing Justice ...... 25

CONCLUSION .................................................................................... 32

CERTIFICATE OF COMPLIANCE ...................................................... 34

CERTIFICATE OF SERVICE .............................................................. 35

# TABLE OF AUTHORITIES

*Authorities on which Mr. bin 'Atash principally relies are marked with an asterisk.*

**Cases**

Air Line Pilots Ass'n, Int'l v. Dep't of Transp., 880 F.2d 491 (D.C. Cir. 1989)....21

Crandon v. United States, 494 U.S. 152 (1990) .......................................................11

Director, Office of Workers' Compensation Programs, Dep't of Labor v. Newport
   News Shipbuilding and Dry Dock Co., 514 U.S. 122 (1995).............................26

Dufur v. U.S. Parole Comm'n, 34 F.4th 1090 (D.C. Cir. 2022) ............................25

Hamdan v. Rumsfeld, 548 U.S. 557 (2006)............................................................15

In re al-Tamir, 993 F.3d 906 (D.C. Cir. 2021) .......................................................25

In re GTE Service Corp., 762 F.2d 1024 (D.C. Cir. 1985).....................................25

In re Stone, 940 F.3d 1332 (D.C. Cir. 2019) ..........................................................25

In re Thornburgh, 869 F.2d 1503 (D.C. Cir. 1989) ...................................................3

In re Trade and Commerce Bank, 890 F.3d 301 (D.C. Cir. 2018) ..........................22

Navajo Nation v. U.S. Dep't of Interior, 852 F.3d 1124 (D.C. Cir. 2017)..............30

Niz-Chavez v. Garland, 593 U.S. 155 (2021).........................................................28

Noyd v. Bond, 395 U.S. 683 (1969) ........................................................................21

Rompilla v. Beard, 545 U.S. 374 (2005) .................................................................31

Service v. Dulles, 354 U.S. 363 (1957) .....................................................................5

Shepardson v. Roberts, 14 M.J. 354 (C.M.A. 1983) ........................................ 17, 18

United States v. Acosta-Martinez, 252 F.3d 13 (1st Cir. 2001) ....................... 23, 24

United States v. Al-Nashiri, 62 F. Supp. 3d 1305 (C.M.C.R. 2014) ............... 22, 25

United States v. Barry, 78 M.J. 70 (C.A.A.F. 2018) .................................................6

United States v. Bass, 266 F.3d 532 (6th Cir. 2001) ...............................................23

United States v. Blaycock, 15 M.J. 190 (C.M.A. 1983) ......................................7, 30

United States v. Cheely, 36 F.3d 1439 (9th Cir. 1994) ...........................................23

\*   United States v. Dean, 67 M.J. 224 (C.A.A.F. 2009) ......... 13, 14, 15, 16, 17, 20, 21

United States v. Didonna, 866 F.3d 40 (1st Cir. 2017) ...........................................28

United States v. Fokker Services B.V., 818 F.3d 733 (D.C. Cir. 2016)..................26

United States v. Gore, 60 M.J. 178 (C.A.A.F. 2004) ................................................6

\*   United States v. Hardy, 4 M.J. 20 (C.M.A. 1977) ................................................7, 30

United States v. Johnson, 982 F.2d 1192 (8th Cir. 1992).......................................29

United States v. Lewis, 63 M.J. 405 (C.A.A.F. 2006)...............................................6

United States v. Lopez de Victoria, 66 M.J. 67 (C.A.A.F. 2008) ...........................23

United States v. Mohammad, 398 F. Supp. 3d 1233 (C.M.C.R. 2019)...................30

United States v. Moussaoui, 382 F.3d 453 (4th Cir. 2004) ....................................23

United States v. Oakar, 111 F.3d 146 (D.C. Cir. 1997)..........................................24

United States v. Olds, 426 F.2d 562 (3d Cir. 1970) ...............................................30

United States v. Quinones, 313 F.3d 49 (2d Cir. 2002)...........................................23

United States v. Riesbeck, 77 M.J. 154 (C.A.A.F. 2018)...........................................6

iv

United States v. Thomas, 22 M.J. 388 (C.M.A. 1988) ...............................................6

United States v. Woolard, 981 F.2d 756 (5th Cir. 1993) .................................. 23, 24

Univ. of D.C. Faculty Ass'n v. D.C. Fin. Responsibility & Mgmt. Assistance

Authority, 163 F.3d 616 (D.C. Cir. 1998) ...........................................................10

Waterkeepers Chesapeake v. Fed. Energy Reg. Comm'n, 56 F.4th 45 (D.C. Cir.

2022) ....................................................................................................................10

*Statutes, rules, and regulations on which Mr. bin 'Atash principally relies are provided in an addendum.*

## Statutes

10 U.S.C. § 113(d) ....................................................................................................9

U.C.M.J. art. 62 (10 U.S.C. § 862) ................................................................... 22, 23

10 U.S.C. § 948h ........................................................................................................9

10 U.S.C. § 949a(d) .................................................................................................26

10 U.S.C. § 949b ..................................................................................................6, 11

\* 10 U.S.C. § 950d ........................................................................... 2, 22, 23, 24

10 U.S.C. § 950d(e) .................................................................................................25

10 U.S.C. § 1107(f)(3)(A) .......................................................................................10

10 U.S.C. § 1370(b)(2) ............................................................................................10

18 U.S.C. § 3731 ............................................................................. 2, 22, 23, 24

50 U.S.C. § 1804(d)(1) ............................................................................................10

**Rules**

R.C.M. 705 ................................................................................ 15, 20

R.C.M. 705(d)(4)(B) .................................................................. 13, 14

R.C.M. 705(d)(4)(B) (2005 ed.) ......................................................13

R.C.M. 705(e)(4)(B) (2019 ed.) .......................................................15

R.C.M. 705(e)(4)(B)(i) (2024 ed.) ...................................................15

R.M.C. 103(a)(10) ..........................................................................9

R.M.C. 104(a)(2)(B) .......................................................................6

R.M.C. 501(a) ..............................................................................24

R.M.C. 705 .......................................................................... 14, 15, 26

R.M.C. 705(a) ..............................................................................14

R.M.C. 705(b)(1) ..........................................................................15

R.M.C. 705(c)(2)(A) ......................................................................16

\* R.M.C. 705(d)(3) .............................................. 1, 4, 5, 7, 9, 14, 27

\* R.M.C. 705(d)(4)(B) ....................... 2, 4, 11, 13, 14, 15, 19, 20, 21

R.M.C. 705(e) ..............................................................................14

R.M.C. 805(b) ..............................................................................24

R.M.C. 908(b)(4) ..........................................................................24

**Regulations**

R.T.M.C. 1-4 ...................................................................................6

R.T.M.C. 2-3.a.9 ..............................................................................5

R.T.M.C. 12-3.a ..............................................................................28

**Other Authorities**

Am. Bar Ass'n, Guidelines for the Appointment and Performance of Defense

    Counsel in Death Penalty Cases, *reprinted in* 31 <u>Hofstra L. Rev.</u> 913 (2003) ....31

Manual for Courts-Martial (1984 ed.), Appendix 21 ...............................................14

The Judge Advocate General's Legal Center and School, U.S. Army, <u>Criminal

    Law Deskbook</u>, https://tjaglcs.army.mil/Criminal-Law-Deskbook ....................15

# GLOSSARY OF ABBREVIATIONS

AE – Appellate Exhibit

BG – Brigadier General

CAAF – United States Court of Appeals for the Armed Forces

CMCR – United States Court of Military Commission Review

M.C.A. – Military Commissions Act of 2009

PTA – Pretrial Agreement

R.C.M. – Rules for Courts-Martial

R.M.C. – Rules for Military Commissions

R.T.M.C. – Regulation for Trial by Military Commission

U.C.M.J. – Uniform Code of Military Justice

## ISSUE PRESENTED

Whether the Government meets the strict standard for the drastic remedy of mandamus and prohibition (hereinafter "mandamus") to vacate the Military Commission's order holding, ***first***, that the Secretary of Defense had no authority to reverse the Convening Authority's decision to enter into a pretrial agreement ("PTA") with Mr. bin 'Atash when that decision was committed to her "sole discretion" under the Rules for Military Commissions ("R.M.C."),[1] and, ***second***, that even if he had such a right, the Secretary's attempt to withdraw from Mr. bin 'Atash's PTA was untimely because Mr. bin 'Atash had begun performing on the promises he made therein.

## STATEMENT OF THE CASE

The basic facts are undisputed and set out in the Commission's ruling.[2] Mr. bin 'Atash supplements those facts below where necessary.

## SUMMARY OF ARGUMENT

Secretary of Defense Lloyd Austin had no clear and indisputable right to reverse the Convening Authority's decision to enter into a PTA with Mr. bin 'Atash, which R.M.C. 705(d)(3) reserves to her "sole discretion." Ratifying the Secretary's illegal *post hoc* intervention would gut the protections

---

[1]    R.M.C. 705(d)(3).

[2]    Pet. Ex. A ("MC Ruling") at 4-10.

against unlawful influence enshrined in the Military Commissions Act of 2009

("M.C.A.") and vitiate the "sole discretion" that the Convening Authority, retired

Brigadier General ("BG") Susan Escallier, was required to exercise.  Moreover,

even if the Secretary could reverse her decision, R.M.C. 705(d)(4)(B) made it too

late for him to withdraw from the PTA because Mr. bin 'Atash had already begun

performing on his promises therein.

The Government has also failed to show it lacked an adequate alternative

remedy in an interlocutory appeal to the Court of Military Commission Review

("CMCR") under 10 U.S.C. § 950d(a)(1).  This statute is broader than the

analogous federal statute, 18 U.S.C. § 3731, which federal courts unanimously

have held to permit the Government to take an interlocutory appeal from an order

removing capital punishment.  Yet the Government waived its right to seek

interlocutory review.

Finally, the equities strongly disfavor mandamus.  Relying on prosecutorial

assurances that the Convening Authority was fully empowered to enter into a PTA,

Mr. bin 'Atash signed a highly incriminating stipulation admitting to all elements

of the charged offenses—including elements for which the Government has no

evidence other than coerced statements that have been the subject of six years of

unresolved pretrial suppression litigation.[3]  Then, 48 hours after the Convening

---

[3]    MC Ruling at 7 n.35, 26 n.113.

2

Authority accepted Mr. bin 'Atash's PTA and confessional stipulation, the Secretary attempted to strip her of PTA authority retroactively and withdraw from an agreement that the parties had spent 27 months negotiating. This sort of bait-and-switch tactic makes a mockery of the "fairness, transparency, and justice" that are ostensibly the hallmark of the military commissions.[4]

The Government's own prosecutors have called the PTAs "the best path to finality and justice"[5] in a case where convictions have eluded the Government for 23 years and counting. In fact, PTAs are the *only* path to finality and justice in this case. This Court should reject Secretary Austin's unlawful attempt to renege on the agreement.

## ARGUMENT

"[A] drastic remedy to be invoked only in extraordinary situations," mandamus "may issue only to correct those exceptional circumstances where there has been a clear abuse of discretion or usurpation of judicial power."[6] The Government has failed to satisfy the "strict standards"[7] for obtaining the writ as set out in <u>Cheney v. U.S. District Court for the District of Columbia</u>.[8] It cannot show that the Secretary had a "clear and indisputable" right to undo a decision

---

[4]  https://www.mc.mil.
[5]  AE 926 (AAA 2nd Sup), Attach. B, at 2 (J.A. 204).
[6]  <u>In re Thornburgh</u>, 869 F.2d 1503, 1506 (D.C. Cir. 1989).
[7]  <u>Id.</u> at 1512.
[8]  542 U.S. 367 (2004).

committed to the Convening Authority's sole discretion; has not proven that an

interlocutory appeal to the CMCR was unavailable as an alternative "adequate

means to attain the relief [it] desires"; and offers no persuasive explanation as to

why it would be "appropriate under the circumstances" for this Court to bless the

Secretary's blatant unlawful influence after he created the current mess by sitting

idly for more than three years while the parties negotiated and agreed upon the

PTA.[9]  Any of these failures, standing alone, warrants denial of mandamus.[10]

## I.    The Secretary Has No Clear and Indisputable Right to Withdraw from Pretrial Agreements in Contravention of His Own Rules.

The Government lacks even a colorable claim that Secretary Austin's

purported withdrawal from Mr. bin 'Atash's PTA was lawful, let alone that he had

a clear and indisputable right to withdraw.  At its core, this dispute comes down to

whether the Secretary could reverse a decision that R.M.C. 705(d)(3) committed to

the Convening Authority's "sole discretion" and, if so, whether his attempt to

withdraw was timely under R.M.C. 705(d)(4)(B).  As to both issues, the

Commission and a unanimous CMCR panel correctly concluded that the

Secretary's actions were unlawful.

---

[9]  Id. at 380-381.

[10]  See id. at 380 ("As the writ is one of the most potent weapons in the judicial arsenal, three conditions must be satisfied before it may issue." (internal quotation marks omitted)).

**A.    The Secretary Had No Legal Basis to Cancel a Decision the Convening Authority Made in Her "Sole Discretion."**

The Secretary must comply with his own rules.[11]  One such rule—which is dispositive of the instant petition yet cited nowhere by the Government—is R.M.C. 705(d)(3).  That rule provides, "The decision whether to accept or reject an offer [of a PTA] is within the sole discretion of the convening authority."  The Government has never disputed that entering into a PTA with Mr. bin 'Atash was a lawful exercise of the Convening Authority's discretion.[12]

The Convening Authority's exercise of independent decision-making with respect to Mr. bin 'Atash's PTA comported with Secretary Austin's directive, upon her appointment, that she "shall exercise her independent legal discretion with regard to judicial acts and other duties of the Convening Authority."[13]  It was also consistent with the Secretary's response to congressional opposition to any deal that would remove the death penalty.  Four days before BG Escallier's appointment became effective, a senior aide to the Secretary wrote to members of Congress that the M.C.A. "makes the delegated Convening Authority responsible

---

[11]  See Service v. Dulles, 354 U.S. 363, 372 (1957).

[12]  MC Ruling at 7, 19.

[13]  AE 956D (GOV), Attach. C (J.A. 262); see also MC Ruling at 5.  Those duties include "[a]pprov[ing] or disapprov[ing] plea agreements."  R.T.M.C. 2-3.a.9.  Because she oversees every aspect of the case, the Convening Authority is the only official capable of making an informed appraisal of how to bring it to a fair and just resolution.  See id.

5

for accepting or rejecting pre-trial agreements. It would therefore not be appropriate for the Secretary or any other supervising official to comment further."[14]

As the Commission correctly noted, protecting the convening authority's independent discretion is essential to prevent unlawful influence,[15] the "mortal enemy of military justice."[16] Under the M.C.A., "[n]o person may attempt to coerce or, by any unauthorized means, influence . . . the action of any convening . . . authority with respect to their judicial acts[.]"[17] Presciently, the morning before the Secretary attempted to nix the PTAs, trial counsel expressed to the Commission the "genuine desire [of] both the prosecution and the defense" to schedule entries of pleas expeditiously to "insulate the proceedings from any unlawful influence."[18]

---

[14]  AE 926A (GOV), Attachs. D, E (J.A. 2-3).

[15]  MC Ruling at 21-22, 24 & n.108.

[16]  United States v. Thomas, 22 M.J. 388, 393 (C.M.A. 1988); see also United States v. Barry, 78 M.J. 70, 79 (C.A.A.F. 2018) (dismissing charge with prejudice due to unlawful influence); United States v. Riesbeck, 77 M.J. 154, 167 (C.A.A.F. 2018) (same); United States v. Lewis, 63 M.J. 405, 416 (C.A.A.F. 2006) (same); United States v. Gore, 60 M.J. 178, 189 (C.A.A.F. 2004) (upholding dismissal of charges with prejudice due to unlawful influence).

[17]  10 U.S.C. § 949b(a)(2)(B); see also R.M.C. 104(a)(2)(B) (same); R.T.M.C. 1-4 ("all persons" must be "vigilant and vigorous" to prevent unlawful influence).

[18]  Unofficial/Unauthenticated Tr. 49418:11-15 (Aug. 2, 2024) (J.A. 234); MC Ruling at 8.

6

Granting mandamus would nullify the M.C.A.'s prohibition on unlawful influence. It would be fundamentally at odds with the longstanding military justice principle that "[w]here, as here, the superior commander seeks to affect a particular case by countermanding a discretionary judicial decision of a subordinate [convening authority] which the latter made pursuant to [her] then existing powers under the [governing statute], the superior has injected the spectre of unlawful command control over the judicial act of the subordinate."[19] And it would render wholly illusory the "discretion" that R.M.C. 705(d)(3) reserves "sole[ly]" to the Convening Authority to decide "whether to accept or reject an offer" for a PTA.

The pall of unlawful influence now hovering over the 9/11 case is obvious to any lay observer, as illustrated by the following exchange between a reporter and the deputy Pentagon press secretary three days after the Secretary purported to axe the PTAs:

> Q: He clearly knew there was some discussion about plea deals if he rejected some of the agreements ahead of time . . . . So did he think about or consider or anything taking that convening authority then when he originally rejected some of the terms of the agreement?

---

[19] United States v. Hardy, 4 M.J. 20, 24 (C.M.A. 1977), *abrogated on other grounds*, United States v. Blaycock, 15 M.J. 190 (C.M.A. 1983); see also MC Ruling at 20-21 ("[A] superior is not permitted 'in a specific case and after-the-fact, to influence directly the action of [the] subordinate convening authority with respect to the latter's judicial acts already properly taken in that case.'" (quoting Hardy, 4 M.J. at 23)).

7

MS. SINGH: . . . [N]o. And the reason why is, this was an independent authority that was in charge of managing the case and he did not want to exert undue influence over a judicial process . . . .

Q: So, he had originally not wanted to take back authority because it was an independent process and he wanted to play out.

MS. SINGH: Right.

Q: Now he has decided it should no longer be an independent process and he needs to be more involved?

MS. SINGH: [H]e established the convening authority to oversee the case. Taking back authority or influencing the case in either way is not something that he wanted to do. . . . So he made the decision that when this announcement happened, that he needed to take back the authorities and that now it's back in the courts and he believes that there should be a trial.

Q: So it's okay if it's independent, as long as they do what he wants them to do. That's pretty much what we're coming down to, right?

MS. SINGH: No, I would actually say that he allowed the entire process to play out before he—

Q: Before he exerted his undue command influence over it.

MS. SINGH: Before he influenced the process in any way.[20]

The Government tries to whitewash the stain of unlawful influence by arguing that the Secretary may take over certain responsibilities while leaving

---

[20]  AE 926 (AAA 2nd Sup), Attach. R at 13-15 (J.A. 23-25).

others in the hands of the subordinate convening authority.[21]  Mr. bin 'Atash agrees with the Commission that such piecemeal withholding lacks any legal basis in the statute, rules, structure of the military commissions, and precedent in courts-martial.[22]

**But the Court need not reach this issue to decide the instant petition in Mr. bin 'Atash's favor.**[23]  Even if piecemeal withholding by the Secretary is allowed, he may exercise this power only prospectively, i.e., for PTAs entered into after he issued his memo.[24]  Were it otherwise, the Convening Authority would enjoy no real discretion, contrary to R.M.C. 705(d)(3), the prohibitions on unlawful influence, and the Secretary's own directive to BG Escallier.

Next, the Government highlights[25] a statute permitting the Secretary to delegate his responsibilities "[u]nless specifically prohibited by law."[26]  This statute is not a blank check conferring near-plenary power on the Secretary to meddle in the military commissions.  It merely authorizes him to delegate his vast responsibilities to ensure the smooth functioning of the world's largest military,

---

[21]  Pet. at 11-13 (citing R.M.C. 103(a)(10) and 10 U.S.C. § 948h).
[22]  See MC Ruling at 21-25.
[23]  See Mr. al Baluchi's Motion to Intervene at 11 n.27.
[24]  MC Ruling at 20, 22-23.  The Secretary never attempted to withhold from BG Escallier the authority to enter into PTAs before she accepted Mr. bin 'Atash's PTA offer.  Id. at 6, 15, 19-20, 23-24.
[25]  Pet. at 12-13.
[26]  10 U.S.C. § 113(d).

9

unless Congress has identified specific responsibilities he must discharge personally.[27]

The Government also invokes various M.C.A. provisions empowering the Secretary of Defense to convene military commissions or designate a subordinate official to convene commissions, promulgate rules related to the detailing of judges, commission procedures, and evidence, and remove subordinate convening authorities.[28]  It then asserts that the "interlocking" of these provisions somehow equates to the Secretary retaining the power to override a decision committed to the sole discretion of the Convening Authority.[29]  This position is untenable as a matter of constitutional and administrative law.[30]  And it is impossible to square

---

[27] See, e.g., 50 U.S.C. § 1804(d)(1) (requiring Secretary to "personally review" certain surveillance applications and barring him from delegating this authority except when he is disabled); 10 U.S.C. § 1370(b)(2) (disallowing Secretary from delegating authority to reduce time-in-service requirements for commissioned officers to retire); 10 U.S.C. § 1107(f)(3)(A) (prohibiting Secretary from delegating authority to request Presidential waiver of requirement to obtain service member's consent before administering non-FDA-approved drug).

[28] Pet. at 12-14.

[29] Id. at 12 (internal quotation marks omitted).

[30] See, e.g., Waterkeepers Chesapeake v. Fed. Energy Reg. Comm'n, 56 F.4th 45, 49 (D.C. Cir. 2022) ("Our court has repeatedly rejected the notion that the absence of an express proscription allows an agency to ignore a proscription implied by the limiting language of a statute." (internal quotation marks omitted)); Univ. of D.C. Faculty Ass'n v. D.C. Fin. Responsibility & Mgmt. Assistance Authority, 163 F.3d 616, 621 (D.C. Cir. 1998) (rejecting as "tortured statutory interpretation" argument that "essentially boils down to a claim that because Congress never said that the Control Board could *not* unilaterally modify existing agreements, the power to do so is implicit in the Act").

such an expansive view of the Secretary's power with the M.C.A.'s prohibition on unlawful influence.[31]  Unless it is beyond dispute that "interlocking" authorities endow the Secretary with the heretofore unrecognized power to overturn the Convening Authority's discretionary decision to accept an accused's PTA offer, the Government is not entitled to mandamus.

### B.    The Secretary's Withdrawal from the PTA Was Untimely Because Mr. bin 'Atash Had Already Begun Performance.

To secure mandamus, the Government must also show that Secretary Austin's attempt to withdraw from Mr. bin 'Atash's PTA was timely.  Under R.M.C. 705(d)(4)(B), the "convening authority" may withdraw, even absent a breach by the accused, up until the time the accused "begins performance of promises contained in the agreement."  The Government cannot meet this burden because, as four out of four judges have already concluded, Mr. bin 'Atash began performing on promises in his PTA before the Secretary announced his purported withdrawal.

---

[31]  10 U.S.C. § 949b(a)(2)(B); see also Crandon v. United States, 494 U.S. 152, 158 (1990) ("In determining the meaning of [a] statute, [courts] look not only to the particular statutory language, but to the design of the statute as a whole and to its object and policy.").

First, pursuant to Paragraphs 6 and 7 of his PTA, Mr. bin 'Atash entered into a stipulation of fact[32] to be used during his plea colloquy and provided to the military jury.  His entry into the stipulation fulfilled a "material term" of the PTA, breach of which would entitle the Convening Authority to withdraw under Paragraphs 6, 43.d, and 43.e.  Second, pursuant to his promises in Paragraphs 6, 12.b, 13, 22, and 26 not to "attack, contradict, or otherwise challenge" his stipulation of fact, to "waive[] all waivable motions," and "not to make any future motions," Mr. bin 'Atash refrained from questioning any witnesses to support, among other things, his pending motion to suppress statements he made to law enforcement in 2007 – 2008[33] and future motions.  Mr. bin 'Atash's abstention complied with trial counsel's admonition, prior to the next witness taking the stand, that "with the waiver of all motions . . . , they *can't actively continue to participate* in any of the contested litigation *based on the pretrial agreements*."[34] Third, pursuant to Paragraphs 22 and 26, Mr. bin 'Atash has refrained from filing new motions and requesting new discovery.  Again, these promises are all

---

[32]  AE 956 (GOV) at 30-53 (under seal in Commission).  Mr. bin 'Atash negotiated and entered into a stipulation of fact counter-signed by trial counsel.  Id. at 53. He did not merely sign a draft stipulation.  Contra Pet. at 16; Stay Reply at 6.

[33]  AE 631L (WBA).

[34]  Unofficial/Unauthenticated Tr. 49317:21 – 49318:1 (Aug. 1, 2024) (J.A. 144-145) (emphases added); see also MC Ruling at 8 n.41 (factual finding that "Trial Counsel took the position that the waive all waivable motions provisions in the three PTAs would not permit Counsel for Mr. Mohammad, Mr. bin 'Atash, and Mr. Hawsawi to examine the witness").

"material term[s]" of his PTA, breach of which would entitle the Convening

Authority to withdraw under Paragraphs 22 and 43.d.

United States v. Dean,[35] an opinion of the U.S. Court of Appeals for the

Armed Forces ("CAAF"), the military's highest appellate court, underscores the

conclusion that Mr. bin 'Atash had already begun performing on his PTA promises

before Secretary Austin tried to withdraw.  In Dean, the parties executed a PTA,

but the convening authority withdrew because the accused refused to modify the

incorporated stipulation of fact to reflect additional uncharged misconduct

unknown to the convening authority when the PTA was executed.[36]  Rejecting the

Government's argument that the withdrawal was timely under Rule 705(d)(4)(B)

of the Rules for Courts-Martial ("R.C.M."),[37] CAAF noted that the accused had

already chosen trial by military judge alone *at the time of arraignment* (months

before he submitted his PTA offer), entered into a stipulation of fact, and amended

his witness list—at least partially in furtherance of promises he made in his PTA.[38]

In other words, the accused "either performed or began to perform several of the

promises listed in the agreement before the convening authority announced his

---

[35]  67 M.J. 224 (C.A.A.F. 2009).

[36]  Id. at 225-226.

[37]  At the time, R.C.M. 705(d)(4)(B) (2005 ed.) was identical to R.M.C. 705(d)(4)(B).

[38]  67 M.J. at 228.

withdrawal," thereby making the convening authority's withdrawal untimely under R.C.M. 705(d)(4)(B).[39]

Mr. bin 'Atash's case is on all fours with <u>Dean</u>. Just as election of trial by judge alone, entrance into a stipulation, and amendment of his witness list by the accused in <u>Dean</u> established that he had begun performance for purposes of R.C.M. 705(d)(4)(B), Mr. bin 'Atash's entry into a stipulation of fact, abstention from questioning witnesses relevant to his motion to suppress his statements to law enforcement and future motions, and forbearance from filing new motions or requesting new discovery establish that he had begun performance for purposes of R.M.C. 705(d)(4)(B). Therefore, even if it was lawful for the Secretary to claw back, *post hoc*, from the Convening Authority the decision to withdraw from PTAs,[40] it was too late for him to pull out of Mr. bin 'Atash's PTA.

Meeting the threshold of "begins performance" in R.M.C. 705(d)(4)(B) is a very low bar designed to "afford[] the accused an additional measure of protection against prosecutorial abuse."[41] The lenient nature of the standard becomes even

---

[39] <u>Id.</u>

[40] As the Commission rightly noted, Secretary Austin purported to pry away from the Convening Authority only the power to "enter into" PTAs, not the power to "withdraw from" them. MC Ruling at 25. These are distinct powers under R.M.C. 705. <u>Compare</u> R.M.C. 705(a), (d)(3), (e) ("enter into"), <u>with</u> R.M.C. 705(d)(4)(B) ("withdraw from"). Thus, by his memo's plain terms, the Secretary has not taken from the Convening Authority the power to withdraw from PTAs.

[41] M.C.M. (1984 ed.), at A21-36.

more apparent when contrasted with subsequent (post-<u>Dean</u>) amendments to the corresponding court-martial rule, as the Commission and CMCR both recognized.[42]  In 2019, Rule 705 of the Rule for Courts-Martial was updated to permit the convening authority to withdraw from a PTA "at any time before *substantial performance* by the accused of promises contained in the agreement."[43] Thus, under the pre-2019 "[l]egacy system" for courts-martial, i.e., the basis for R.M.C. 705(d)(4)(B), "[p]erformance will often take the form of entry into a stipulation of fact."[44]  That R.M.C. 705 has not been updated to match the post-2019 Rule 705 of the Rules for Courts-Martial bolsters the conclusion that <u>Dean</u>'s interpretation of "begins performance" remains compelling.

None of the Government's attempts to undermine R.M.C. 705(d)(4)(B)'s "begins performance" standard and <u>Dean</u> succeeds.  First, the Government avers that because entering into the stipulation of fact "was part of the process through which the agreement[] w[as] formed," Mr. bin 'Atash's entry into the stipulation does not count as "promise" on which he began performance.[45]  This argument

---

[42]  MC Ruling at 17, 27 n.116; Pet., Ex. B at 18-19.

[43]  R.C.M. 705(e)(4)(B) (2019 ed.) (emphasis added); <u>see also</u> R.C.M. 705(e)(4)(B)(i) (2024 ed.) (same).

[44]  The Judge Advocate General's Legal Center and School, U.S. Army, <u>Criminal Law Deskbook</u>, ch. 15, ¶ V.D.1.a, https://tjaglcs.army.mil/Criminal-Law-Deskbook (J.A. 208); <u>see also</u> <u>Hamdan v. Rumsfeld</u>, 548 U.S. 557, 631 n.63 (2006) (citing manual published by The Judge Advocate General's Legal Center and School).

[45]  Pet. at 16.

defies the text of the PTA, the rules, and logic.  R.M.C. 705(b)(1) and R.M.C. 705(c)(2)(A) refer to entry into a stipulation as a possible "promise" that may be included in a PTA.  And the Government cannot negotiate a PTA designating Mr. bin 'Atash's entry into a stipulation as a "material term" of the agreement, non-fulfillment of which would justify the Convening Authority's withdrawal,[46] and then argue that Mr. bin 'Atash's fulfillment of this "material term" is not performance.

The Government attempts to circumvent this inconvenient language from the PTA by arguing that performance must post-date entry into the PTA.[47]  In Dean, however, CAAF had no hesitation in concluding that the accused had begun performance even though two of his three qualifying acts occurred weeks before the convening authority accepted the PTA offer[48]:

| 8 July 2005 | At arraignment, the accused elected trial by judge alone. |
| 29 Aug. 2005 | The accused and trial counsel entered into a stipulation of fact. |
| 14 Sept. 2005 | The convening authority accepted the accused's PTA offer, requiring him to elect trial by judge alone (which he had already done), enter into a stipulation, and waive the personal appearance of certain witnesses. |
| 3 Oct. 2005 | The accused filed an amended witness list. |

---

[46]  Pet., Ex. E at ¶¶ 6, 43.d, 43.e.

[47]  Pet. at 17; Stay Reply at 6-7.

[48]  67 M.J. at 225-26, 228.

16

11 Oct. 2005    The convening authority withdrew from the PTA.

Again faced with these inconvenient facts, the Government next observes that the

court in <u>Dean</u> "did not rely on the stipulation alone."[49]  True, but <u>Dean</u> also did not

hold that there is some minimum number of promises an accused must complete to

show he has begun performance.

More importantly, tallying promises fulfilled is beside the point.  It is

difficult to imagine a more significant step toward performance on a PTA than the

accused voluntarily admitting to every element of capital offenses in stark

confessional detail and implicating a co-accused.  By entering into the stipulation,

Mr. bin 'Atash has provided the Government the precise narrative of how, why,

and by whom the death-eligible crimes were committed, which the Government

can now use to prepare witnesses, develop witness examination questions, and

craft opening and closing statements.[50]  He has admitted foreknowledge of the

object of the conspiracy—murdering American civilians—a crucial element of the

crimes for which the Government otherwise has no evidence except for

uncounseled custodial statements derived from torture.  The stipulation is a bell

---

[49]  Pet. at 17-18.

[50]  <u>See</u> <u>Shepardson v. Roberts</u>, 14 M.J. 354, 358 (C.M.A. 1983) (describing
significance of accused providing "detailed information—perhaps in the form
of a confessional stipulation—which was not previously available to the
Government and would materially aid its case").

that cannot be un-rung[51] and undeniably qualifies as beginning performance on his PTA promises.

The Government goes on to contend that abstaining from questioning witnesses does not equate to Mr. bin 'Atash's promises to "move to withdraw all pending motions."[52]  But the prosecutor argued precisely the opposite in front of the Commission, informing the judge before the next witness was called that "with the waiver of all motions . . . , they *can't actively continue to participate* in any of the contested litigation *based on the pretrial agreements*."[53]  Moreover, contrary to the Government's arguments that "[t]he promise" was "to move to withdraw all pending motions,"[54] there were actually many promises in the PTAs, including promises not to make future motions[55]  or new discovery requests[56] and not to challenge any facts in his stipulation.[57]  Forbearance from litigation fulfilled all of these promises.  And when counsel for Mr. al-Hawsawi informed the Commission that his abstention from questioning the witness currently on the stand counted as

---

[51]  See id. ("[A]n accused who has once 'let the cat out of the bag' may practically and psychologically be in an inferior position[.]").

[52]  Pet. at 8, 18-19.

[53]  Unofficial/Unauthenticated Tr. 49317:21 – 49318:1 (Aug. 1, 2024) (J.A. 144-145) (emphases added); see also MC Ruling at 26 ("Trial Counsel himself insisted upon that course of action so that the Defense teams did not violate a material term of their agreements.").

[54]  Pet. at 8, 18.

[55]  Pet., Ex. E at ¶ 22.

[56]  Id. at ¶ 26.

[57]  Id. at ¶ 6.

performance on his PTA, no one from the prosecution voiced disagreement.[58]  It is disingenuous for the Government to argue to this Court that refraining from litigation was not performance of Mr. bin 'Atash's PTA after it took the position that his PTA prohibited him from participating.[59]

Furthermore, the witness whom Mr. bin 'Atash abstained from questioning was highly relevant to his motion to suppress his 2007 – 2008 statements to law enforcement—"some of the most critical evidence in this case," according to the prosecution[60]—and to future motions, e.g., to dismiss the charges or the capital referral based on outrageous Government conduct and to compel discovery.[61]  By refraining from questioning this witness, Mr. bin 'Atash deprived himself of the opportunity to gather facts to support these motions.[62]  This is sufficient to qualify as *beginning* performance on the various PTA provisions requiring him, effectively, to cease litigation.[63]

In addition, the Government argues[64] that if Mr. bin 'Atash's actions and forbearance constitute performance for purposes of R.M.C. 705(d)(4)(B)'s first

---

[58]  Unofficial/Unauthenticated Tr. 49421:1-5 (Aug. 2, 2024) (J.A. 237).
[59]  Contra Stay Reply at 8.
[60]  Unofficial/Unauthenticated Tr. 21594:13-14 (Nov. 15, 2018) (J.A. 122); see also id. at 21594:22-23 ("very important, very critical statements"); id. at 21605:18 (J.A. 123) ("critical government evidence").
[61]  See id. at 44293:8 – 44295:23 (Apr. 17, 2024) (J.A. 137-139).
[62]  See MC Ruling at 26-27.
[63]  See supra notes 55-57 and accompanying text.
[64]  Pet. at 8, 20.

clause, it would render superfluous the rule's second clause, which permits the convening authority to withdraw "upon the failure by the accused to fulfill any material promise or condition in the agreement." This is a mystifying argument. Under the first clause of R.M.C. 705(d)(4)(B), before an Accused begins performance, the convening authority can withdraw "at any time" for any reason. Under the second clause, after the Accused has begun performance, the convening authority can withdraw if the Accused commits a material breach. The fact that the rule provides two different mechanisms for withdrawal does not make either of them superfluous.

The Government's final counterargument is that if entry into a stipulation of fact constituted performance, then convening authorities would never be able to go back on their word after accepting a PTA.[65] But when the Convening Authority accepted Mr. bin 'Atash's PTA offer, the Government had been on notice for 15 years (Dean was issued in 2009) that an accused's entry into a stipulation ends the convening authority's ability to withdraw under R.M.C. 705(d)(4)(B)'s first clause. If the Government wants to enlarge this safe harbor for future PTAs, it could update the rule to match R.C.M. 705's "substantial performance" standard. Or it could change its "common practice" and dispense with entry into a stipulation as a prerequisite for acceptance of a PTA offer.

---

[65] Stay Reply at 7.

Ultimately, in interpreting R.M.C. 705(d)(4)(B), this Court should bear in mind that it is a uniquely military creation with an analog in the courts-martial system but not in federal criminal law.[66]  Dean has been settled law in the military for almost 16 years.  And four judges, each with substantial military justice experience,[67] have agreed that, based on the plain text of R.M.C. 705(d)(4)(B) and Dean, Mr. bin 'Atash began performance of promises in his PTA, thereby precluding the Secretary from withdrawing from the PTA.  In this "area[] of law peculiar to the military branches," these judges' decisions, and the CAAF opinion in Dean on which they rely, should be accorded "great deference."[68]

\*　　\*　　\*

Establishing a clear and indisputable right to undo the PTAs is the "irreducible minimum" to obtain mandamus relief.[69]  In this case, the Government fails to show that Secretary Austin had *any* right—let alone a right clearly beyond dispute—to overturn a decision committed to the Convening Authority's "sole

---

[66]  See Noyd v. Bond, 395 U.S. 683, 696 (1969) (counseling federal courts to defer to military courts when interpreting "provisions of the Uniform Code [of Military Justice] which have no analogs in civilian jurisprudence" and resist urge to "blaze a trail on unfamiliar ground").

[67]  See Mr. bin 'Atash's Response to Government's Motion for a Stay at 3.

[68]  Middendorf v. Henry, 425 U.S. 25, 43 (1976); see also Noyd, 395 U.S. at 694 (military justice involves "distinctive problems and legal traditions" that are "radically different from that which is common in civil courts").

[69]  Air Line Pilots Ass'n, Int'l v. Dep't of Transp., 880 F.2d 491, 503 (D.C. Cir. 1989).

discretion" and, if he had such a right, that he timely exercised it before

Mr. bin 'Atash began performance.  On this basis alone, the Court should deny the

Government's petition.[70]

## II.    The Government Fails to Show Interlocutory Appeal to the CMCR Was an Inadequate Alternative Remedy.

To secure mandamus, the Government must establish that it had no adequate

alternative remedy via 10 U.S.C. § 950d(a)(1), which enables the Government to

take an interlocutory appeal to the CMCR from an order that "terminates

proceedings of the military commission with respect to a charge or specification."

This statute and its nearly identical analog in the Uniform Code of Military Justice

("U.C.M.J.") are modeled on 18 U.S.C. § 3731,[71] which permits interlocutory

appeals from orders "dismissing an indictment or information . . . as to any one or

more counts, or any part thereof."

Six federal courts of appeals have interpreted 18 U.S.C. § 3731 to allow

interlocutory appeals from orders striking the death penalty, even though, like

---

[70] See, e.g., In re Trade and Commerce Bank, 890 F.3d 301, 303-304 (D.C. Cir. 2018) (declining to address other mandamus factors because petitioner had no clear and indisputable right to relief).

[71] See United States v. Al-Nashiri, 62 F. Supp. 3d 1305, 1309 n.3, 1310 (C.M.C.R. 2014) ("MCA section 950d was modeled after Article 62, UCMJ," which "was designed to be similar to the interlocutory government appellate procedure in federal civilian criminal proceedings under 18 U.S.C. § 3731").

10 U.S.C. § 950d(a)(1), the statute contains no explicit reference to it.[72]  No federal court has held otherwise.  And the U.C.M.J.'s and M.C.A.'s interlocutory appeal statutes are broader than their federal counterpart ("terminates proceedings" vs. "dismissing an indictment or information").  Thus, because the U.C.M.J. "ensures that the Government has the same opportunity to appeal adverse trial rulings that the prosecution has in federal civilian criminal proceedings,"[73] § 950d(a)(1) would likely also permit an interlocutory appeal.[74]

Interlocutory appeals are permitted from orders removing the death penalty because "[b]y striking a statutorily authorized penalty," a court "effectively dismisse[s] a significant portion of the counts."[75]  Such an order "materially alter[s] the conduct of trial" and "upset[s] those procedures" that would otherwise apply in a capital case.[76]  Because the effect of such an order "is sufficiently like

---

[72]  See United States v. Moussaoui, 382 F.3d 453, 462-463 (4th Cir. 2004); United States v. Quinones, 313 F.3d 49, 56-57 (2d Cir. 2002); United States v. Bass, 266 F.3d 532, 535 (6th Cir. 2001), rev'd on other grounds, 536 U.S. 862 (2002); United States v. Acosta-Martinez, 252 F.3d 13, 16-17 (1st Cir. 2001); United States v. Cheely, 36 F.3d 1439, 1441 (9th Cir. 1994); United States v. Woolard, 981 F.2d 756, 757 (5th Cir. 1993).

[73]  United States v. Lopez de Victoria, 66 M.J. 67, 71 (C.A.A.F. 2008).

[74]  This conclusion is not undermined by the fact that 10 U.S.C. § 950d lacks a liberal construction clause.  Long before Congress added such a clause to U.C.M.J. art. 62 in 2016, it was interpreted to be as permissive as 18 U.S.C. § 3731.  See Lopez de Victoria, 66 M.J. at 70-71.

[75]  Acosta-Martinez, 252 F.3d at 17.

[76]  Id.

23

the effects from the categories of orders to which § 3731 permits an appeal," it "falls well within the scope of Congress' intent in § 3731."[77]

Similarly, the consequences of the Commission's order enforcing Mr. bin 'Atash's PTA are "every bit as important as the consequences from striking a count in an indictment" in a federal case.[78]  Without question, the Commission's order "materially altered the conduct of trial."[79]  It changes the number of members that will be required.[80]  It permits a non-unanimous verdict.[81] Ultimately, it eliminates the guilt/innocence phase of trial.  In sum, the rationales supporting interlocutory appeals from district court orders dismissing death notices are equally persuasive with respect to the Commission's order, which cancels a "discrete basis"—indeed the entire basis—for imposing capital punishment.[82]

Seeking interlocutory review in the CMCR would have automatically stayed proceedings in the Commission, preserving the status quo.[83]  If the CMCR had interpreted 10 U.S.C. § 950d(a)(1) not to permit interlocutory appeal, the

---

[77] Id.

[78] Id.

[79] Id.; see also Woolard, 981 F.2d at 757 ("Circuit courts have found jurisdiction to review . . . orders that did not dismiss an entire count but altered it in a significant way from the grand jury's charge.").

[80] R.M.C. 501(a)(1), (2); see also R.M.C. 805(b).

[81] R.M.C. 1006(e)(4).

[82] United States v. Oakar, 111 F.3d 146, 150 (D.C. Cir. 1997) (permitting § 3731 appeal from order cancelling "discrete basis for the imposition of criminal liability").

[83] R.M.C. 908(b)(4).

24

Government could still have sought mandamus relief, this time with proof positive that no adequate alternative remedy was available. But the Government, "a frequent and sophisticated litigant capable of enforcing its own procedural rights and defenses,"[84] waived its right to seek interlocutory review by allowing the "mandatory and jurisdictional" deadline for noticing an appeal to lapse.[85] It should not now be permitted to invoke the extraordinary remedy of mandamus to compensate for its failure to pursue an alternative path to relief.[86]

## III. Mandamus Would Inappropriately Reward the Government for Its Underhanded and Dilatory Tactics While Further Postponing Justice.

The Government's arguments about the appropriateness of mandamus relief are wholly unpersuasive. It suggests that the Commission's order "improperly curtailed the Secretary's statutory and regulatory authorities regarding military commissions."[87] But requiring the Secretary to abide by his own rules cannot be said to hinder his ability to carry out his duties. If the Secretary dislikes the

---

[84] Dufur v. U.S. Parole Comm'n, 34 F.4th 1090, 1097 (D.C. Cir. 2022).

[85] 10 U.S.C. § 950d(e); Al-Nashiri, 62 F. Supp. 3d at 1308 (internal quotation marks omitted).

[86] See In re al-Tamir, 993 F.3d 906, 913 (D.C. Cir. 2021) (no need to consider remaining factors where petitioner has adequate alternative remedy); In re Stone, 940 F.3d 1332, 1339 (D.C. Cir. 2019) (denying mandamus where Roger Stone "failed to avail himself" of alternative remedy "in a timely fashion"); In re GTE Service Corp., 762 F.2d 1024, 1027 (D.C. Cir. 1985) (denying mandamus because petitioners "did not attempt to make th[e] showing" that alternative "mode of relief is inadequate").

[87] Pet. at 21.

25

wording of R.M.C. 705, he can change it without notice-and-comment

procedures.[88]  The Secretary made his own bed; now he must lie in it.

The Government also argues that the 9/11 prosecution has "unique national

importance."[89]  This is undoubtedly true, but it is without *legal* significance.  When

this Court has determined that the circumstances were so extraordinary as to merit

mandamus, it was because the erroneous lower court ruling had "potentially far-

reaching consequences," posed an "unwarranted impairment of another branch in

the performance of its constitutional duties," or introduced "novelty . . . in an

important area of law."[90]  In contrast, the legal issues presented in the instant

petition are run-of-the-mill questions about whether the rules mean what they say

and whether Mr. bin 'Atash began performing the promises in his PTA.[91]

---

[88]  The Secretary need only submit the proposed modifications to Congress 60
days before they go into effect.  10 U.S.C. § 949a(d); see also Director, Office
of Workers' Compensation Programs, Dep't of Labor v. Newport News
Shipbuilding and Dry Dock Co., 514 U.S. 122, 134 (1995) ("[The agency
director] retains the rulemaking power, . . . which means that if her problem
with the present decision of the [agency review] [Board] is that it has
established an erroneous rule of law, . . . she has full power to alter that rule.").

[89]  Pet. at 21.

[90]  United States v. Fokker Services B.V., 818 F.3d 733, 750 (D.C. Cir. 2016)
(internal quotation marks omitted).

[91]  Denying mandamus would affect only the respondents in this action.  In the
only three other ongoing commissions, the Convening Authority has not entered
into PTAs with Messrs. al Baluchi, Al-Nashiri, and Nurjaman, and the
Secretary has purported to preemptively withhold authority over that decision.
See Secretary of Defense Memorandum for Susan Escallier (Nov. 25, 2024),
https://static01.nyt.com/newsgraphics/documenttools/258dd2abbf1ad779/aaed4
217-full.pdf.  The legality of that action remains to be seen, but it will not be

Moreover, emphasizing the gravity of 9/11 exposes the Secretary's *post hoc* justification for his actions as pretextual.[92]  If Secretary Austin felt that the case was too important to delegate PTA authority to a subordinate, he could have decided not to appoint BG Escallier.  Or perhaps he could have sought to withhold PTA authority in the three-plus years he was in office before she accepted Mr. bin 'Atash's offer for a PTA.  But he never did.  The government is asking this Court to validate a process in which the Secretary issues a rule committing the decision to accept or reject a PTA offer to the "sole discretion" of the Convening Authority,[93] commands her to exercise independent legal judgment with respect to PTAs, and then overrules her when she does so.  This is not an appropriate use of the writ.

Furthermore, issuing mandamus would be highly inappropriate in this case, for four reasons.  First, granting the writ would legitimize Secretary Austin's bait-and-switch and irreparably deplete public confidence in the military commissions.  For years, the Government assured the commission, Mr. bin 'Atash, and the public, including family members of 9/11 victims, that BG Escallier had sole authority to

---

affected by leaving intact the lower courts' rulings that the Secretary cannot withdraw PTA authority after it has been exercised and after the accused has begun performance.

[92]  <u>Accord</u> MC Ruling at 29.

[93]  R.M.C. 705(d)(3).

enter into PTAs in the 9/11 case.[94]  Only after the ink had dried on the

agreements—the product of 27 months of negotiations[95]—did Secretary Austin

announce that the PTA decision should have been his all along.  Ironically, the

Secretary's own regulations caution that "[t]he Convening Authority should

exercise this [PTA withdrawal] authority with due regard for fairness."[96]  There is

nothing fair about luring Mr. bin 'Atash to enter into a PTA and sign a confession[97]

after assuring him that the person with whom he is negotiating has the power to

bind the Government, only to have Lloyd Austin pull the rug out from beneath

everyone.[98]

---

[94]  See, e.g., MC Ruling at 8 (quoting prosecution letter to victim family members
calling BG Escallier "the United States Government official empowered by the
Secretary of Defense with authority to . . . enter into pre-trial agreements on
behalf of the United States"); AE 926A (GOV) at 9,
https://www.mc.mil/Portals/0/pdfs/KSM2/KSM%20II%20(AE926A(Gov)).pdf
(government response to motion to dismiss for unlawful influence) ("The
Secretary of Defense has delegated his authority as the Convening Authority in
this case to Brigadier General Escallier . . . . [T]he judicial acts ascribed to the
Convening Authority under the law lie in the discretion of Brigadier General
Escallier alone.  Although the Secretary of Defense could withdraw his
delegation of authority and assume responsibilities as the Convening Authority,
he has not done so in this case.").

[95]  See AE 926 (AAA), Attach. D (J.A. 26) (Mar. 9, 2022 prosecution email to
defense).

[96]  R.T.M.C. 12-3.a.

[97]  See J.A. 198 (July 20, 2023 prosecution email to defense) (stipulation of fact
one of "the two most important aspects of the Prosecution's willingness to
endorse any pre-trial agreements").

[98]  See Niz-Chavez v. Garland, 593 U.S. 155, 172 (2021) ("If men must turn
square corners when they deal with the government, it cannot be too much to
expect the government to turn square corners when it deals with them."); United

Second, through his dilatoriness, Secretary Austin has waived his alleged right to renege on the PTA.  The Secretary was personally involved at an earlier stage of negotiations, having counseled the President to reject certain conditions of post-conviction confinement, known as "Policy Principles," at the heart of initial versions of the PTAs.[99]  The fact that negotiations continued after President Biden's rejection of the Policy Principles was not a secret.[100]  It was announced in open session in the commission[101] and reported in the *New York Times*.[102]  After the Policy Principles were rejected, a senior aide to the Secretary wrote to members of Congress that it would "not be appropriate" for the Secretary to comment on the negotiations because the M.C.A. "makes the delegated Convening Authority responsible for accepting or rejecting pre-trial agreements."[103]  If the Secretary believed he needed to (and lawfully could) seize control of the negotiations, he could have done so at any point in the "years and years and years

---

States v. DiDonna, 866 F.3d 40, 50 (1st Cir. 2017) ("In dealing with criminal defendants, the government . . . cannot use bait-and-switch tactics[.]"); United States v. Johnson, 982 F.2d 1192, 1198 (8th Cir. 1992) ("[T]he defense should be able to trust in the government's assurances[.]").

[99]  See AE 926 (GOV) at 10, https://www.mc.mil/Portals/0/pdfs/KSM2/KSM%20II%20(AE926A(Gov)).pdf; AE 926 (AAA 2nd Sup), Attach. R at 5, 13-14 (J.A. 15, 23-24).

[100]  See MC Ruling at 6, 23-24.

[101]  See Unofficial/Unauthenticated Tr. 45780 – 45782 (1 May 2024) (J.A. 140-142).

[102]  AE 926 (AAA Sup), Attach. B (J.A. 202).

[103]  AE 926A (GOV), Attachs. D, E (J.A. 2-3).

and years" during which the Pentagon acknowledged that PTA negotiations had been underway.[104]  But he never did.[105]  Mandamus is not appropriate to undo an action that the Secretary could have—at least in his own view of the law—preempted but chose not to.[106]

Third, granting mandamus in this case will provoke a new morass of litigation in a case that has been bogged down in nearly *17 years* of pretrial proceedings.[107]  Having sought "to affect a particular case by countermanding a discretionary judicial decision of a subordinate commander which the latter made pursuant to [her] then existing powers under the [governing statute]," Secretary Austin "has injected the spectre of unlawful command control" into this case.[108]  If the Court grants mandamus, years of discovery and motions practice will ensue over unlawful influence, the Government's breach of the PTAs due to its

---

[104]  AE 926 (AAA 2nd Sup), Attach. K at 120-122, https://www.cnn.com/2024/08/07/politics/guantanamo-bay-hearing-lloyd-austin/index.html.

[105]  MC Ruling at 23-24.

[106]  Cf. Navajo Nation v. U.S. Dep't of Interior, 852 F.3d 1124, 1130 (D.C. Cir. 2017) (faulting agency for failing to act by 90-deadline and noting that "[t]he Court will not reward [the government]'s lack of diligence in the name of 'equity'"); see also United States v. Olds, 426 F.2d 562, 566 (3d Cir. 1970) (denying mandamus where government waited almost three months to seek writ and failed to "proceed with reasonable dispatch under the circumstances").

[107]  The Convening Authority dismissed the original charges without prejudice. United States v. Mohammad, 398 F. Supp. 3d 1233, 1237 (C.M.C.R. 2019).

[108]  United States v. Hardy, 4 M.J. 20, 24 (C.M.A. 1977), *abrogated on other grounds*, United States v. Blaycock, 15 M.J. 190 (C.M.A. 1983); see also MC Ruling at 20-21 (citing Hardy).

withdrawal in direct violation of their terms,[109] the proper remedy for that breach, and the legality of a system of concurrent convening authorities.  All of these issues would need to be resolved before defense counsel could ethically resume other pretrial litigation.[110]  Secretary Austin's stated reason for withdrawing from the PTAs is his belief that the case should go to trial,[111] but issuing the writ will only further delay trial, the sentencing hearing, or any other resolution of this interminable case.

Fourth and finally, mandamus is inappropriate because the Government suffers no harm as a result of the Commission's ruling.  In exchange for forsaking the death penalty, the Government will secure convictions that, in its own admission, it would be unlikely to secure otherwise.[112]  This is exactly the outcome that its own prosecutors have described as the "best path to finality and justice in

---

[109] See MC Ruling at 28-29 & n.122.

[110] Guideline 10.9.1.A of Am. Bar Ass'n, Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, *reprinted in* 31 Hofstra L. Rev. 913, 1035 (2003) ("Counsel at every stage of the case have an obligation to take all steps . . . to achieve an agreed-upon disposition."); Rompilla v. Beard, 545 U.S. 374, 387 (2005) (relying on ABA Guidelines "as guides to determining what is reasonable") (internal quotation marks omitted).

[111] See AE 926 (AAA 2nd Sup), Attach. K at 120-122, https://www.cnn.com/2024/08/07/politics/guantanamo-bay-hearing-lloyd-austin/index.html; id., Attach. R at 8, 14 (J.A. 18, 24).

[112] See Unofficial/Unauthenticated Tr. 42938:22 – 42939:3 (Mar. 4, 2024) (J.A. 136-137) (trial counsel:  "[I]f this case doesn't go to trial in 2025, it may never go to trial.  I'm being completely honest with you[.]").

this case."[113]  The United States cannot plausibly claim to be harmed by being required to abide by its own promises.

For these reasons, even if it concludes that the first two mandamus factors are satisfied, this Court should nevertheless deny mandamus as inequitable, inappropriate, and contrary to the interests of justice.

## CONCLUSION

This Court should deny the Government's petition and motion for a stay and lift the administrative stay imposed on January 9, 2025.

Respectfully submitted,

---

[113] AE 926 (AAA 2nd Sup), Attach. B at 2 (J.A. 204).

/s/
MATTHEW L. ENGLE
Learned Counsel

/s/
WILLIAM R. MONTROSS Jr.
Detailed Defense Counsel

/s/
TASNIM MOTALA
Detailed Defense Counsel

/s/
MARIAN D. MESSING
Captain, JA, USAR
Detailed Military Defense Counsel

/s/
EDWIN A. PERRY
Detailed Defense Counsel

/s/
ANISHA P. GUPTA
Detailed Defense Counsel

/s/
DANIEL M. GOLDBERG
Lieutenant Colonel, JA, USA
Detailed Military Defense Counsel

/s/
AUSTIN W.R. RIDGEWAY
Lieutenant, JAGC, USN
Detailed Military Defense Counsel

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT,
TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS**

1. This response complies with the word-volume limit of Fed. R. App. P. 21(d)(1) because, excluding parts exempted by Fed. R. App. P. 32(f):

   This response contains 7,793 words.

2. This response complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because:

   This response has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

   /s/
   EDWIN A. PERRY
   Counsel for Mr. bin 'Atash
   Dated:  17 January 2025

## CERTIFICATE OF SERVICE

I certify that on January 17, 2025, this response and its addendum were served via this Court's electronic filing system on:

BRIAN H. FLETCHER
MELISSA N. PATTERSON
Counsel for United States, Petitioner

MICHEL D. PARADIS
WILLIAM XU, Lieutenant, JAGC, USN
Counsel for Mr. Mohammad, Respondent

WALTER B. RUIZ
SUZANNE LACHELIER
SEAN M. GLEASON
Counsel for Mr. al-Hawsawi, Respondent

RITA RADOSTITZ
Counsel for Mr. al Baluchi, Putative Intervenor

/s/
EDWIN A. PERRY
Counsel for Mr. bin 'Atash
Military Commissions Defense Organization
1620 Defense Pentagon
Washington, D.C. 20301-1620
edwin.a.perry5.civ@mail.mil
757-975-4946