ORAL ARGUMENT SCHEDULED FOR JANUARY 28, 2025
**Case No. 25-1009**

---

# UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

IN RE: UNITED STATES,

*Petitioner.*

On petition for a writ of mandamus from a decision of the
Court of Military Commission Review

**CORRECTED**
**Joint Appendix**
**Volume 1 of 2**

Walter B. Ruiz
Suzanne M. Lachelier
Sean M. Gleason
Maj. Kerry A. Mawn, JA, USAF
Maj. Patrick C. Tipton, JA, USAF
Military Commission Defense
Organization
1620 Defense Pentagon
Washington, DC 20301-1620

*Counsel for Respondent,*
*Mustafa Al Hawsawi*

Michel Paradis
Gary Sowards
Denny LeBoeuf
Delphine Lourtau
Nicholas McCue
Gabriela McQuade
Melanie Partow
Maj. Michael Leahy, USAF
Maj. Elspeth Theis, USAF
LT William Xu, JAGC, USN
Military Commission Defense
Organization
1620 Defense Pentagon
Washington, DC 20301-1620

*Counsel for Respondent,*
*Khalid Sheikh Mohammed*

Matthew Engle
William Montrose
Tasnim Motala
Marian Messing
Ediwn Perry
Anisha Gupta
Daniel Goldberg
Austin Ridgeway
Military Commission Defense
Organization
1620 Defense Pentagon
Washington, DC 20301-1620

*Counsel for Respondent,*
*Walid bin Attash*

Matthew G. Olsen
Assistant Attorney General
for National Security

Brian H. Fletcher
Principal Deputy Solicitor
General

Mark R. Freeman
Melissa N. Patterson
Attorney, Appellate Staff
Civil Division, Room 7259
U.S. Department of Justice
950 Pennsylvania Ave. NW
Washington, D.C.  20530
(202) 514-1201

*Counsel for Petitioner*

# TABLE OF CONTENTS
## VOLUME 1

AE 004 (MAH)................................................................................1

AE 926A (GOV), Attachments D ......................................................2

AE 926A (GOV), Attachment E ........................................................3

AE 926 (AAA Sup), Attachment B ...................................................4

AE 926 (AAA 2nd Sup), Attachment K (excerpt) .............................8

AE 926 (AAA 2nd Sup), Attachment R ...........................................11

AE 926 (AAA), Attachment D .........................................................26

AE 555 (AAA), Attachment E ..........................................................27

AE 555 (AAA), Attachment F ...........................................................28

AE 555EEE .......................................................................................29

AE 889D (4th Am) ............................................................................62

AE 899 ...............................................................................................64

AE 899A (GOV) / AE 901B (GOV) .................................................68

AE 901E (GOV) ................................................................................76

AE 902A (GOV) ................................................................................81

AE 902B (GOV) ................................................................................84

AE 902L (GOV) ................................................................................87

AE 926, Attachment I .......................................................................90

AE 926, Attachment Z ......................................................................91

AE 950BBB ......................................................................................92

AE 950CCC ......................................................................................97

AE 950CCC ....................................................................................103

Tr 20805 - 20806, 11 Sep 18 .........................................................109

Tr 20897 - 20898, 12 Sep 18 .........................................................111

Tr 20903, 12 Sep 18 .......................................................................113

Tr 21174, 13 Nov 18 .......................................................................114

Tr 21188, 13 Nov 18 .......................................................................115

Tr 21203, 13 Nov 18 ................................................................................116

Tr 21317, 13 Nov 18 ................................................................................117

Tr 21331 - 21332, 13 Nov 18 ...................................................................118

Tr 21360, 13 Nov 18 ................................................................................120

Tr 21363, 13 Nov 18 ................................................................................121

Tr 21594, 15 Nov 18 ................................................................................122

Tr 21605, 15 Nov 18 ................................................................................123

Tr 21863 - 21866, 15 Nov 18 ...................................................................124

Tr 36758 - 36760, 25 Sep 23 ...................................................................128

Tr 36762, 25 Sep 23 ................................................................................131

Tr 36868, 25 Sep 23 ................................................................................132

Tr 36870, 25 Sep 23 ................................................................................133

Tr 42393, 27 Feb 24 ................................................................................134

Tr 42937 - 42938, 4 Mar 24 .....................................................................135

Tr 44293- 44295, 17 Apr 24 .....................................................................137

Tr 45780 - 45782, 1 May 24 .....................................................................140

Tr 49312, 1 Aug 24 ..................................................................................143

Tr 49317 - 49319, 1 Aug 24 .....................................................................144

Tr 49421 - 49322, 1 Aug 24 .....................................................................147

Tr 49479 - 49487, 7 Aug 24 .....................................................................149

Tr 49509, 7 Aug 24 ..................................................................................158

Tr 49579, 7 Aug 24 ..................................................................................159

Tr 49585 - 49597, 8 Aug 24 .....................................................................160

Tr 49797 - 49798, 16 Sep 24 ...................................................................173

Tr 49944 - 49951, 17 Sep 24 ...................................................................175

Tr 50424 - 50425, 20 Sep 24 ...................................................................183

Tr 50517 - 50518, 23 Sep 24 ...................................................................185

Tr 50548 - 50551, 23 Sep 24 ...................................................................187

Tr 50555 - 50556, 23 Sep 24 ...................................................................191

Tr 51079 - 51080, 8 Nov 24 ...................................................................193

Tr 51642 - 51644, 8 Jan 25 .....................................................................195

Email, "Status Update and Setting of Deadlines for PTAs," 20 Jul 23 ................198

Email "Update on Pre-Trial Negotiations and Setting of Final Deadline," 8 Sep 23 ...........................................................................................200

AE 926 (AAA), Attachment B ...............................................................202

Letter to VFMs .......................................................................................203

TJAGLCS Crim. Law Digital Deskbook, ch. 15 .....................................205

Tr. 8-9, 15 May 12 .................................................................................216

Tr 49311 - 49324, 1 Aug 24 ...................................................................218

Tr 49416 - 49422, 2 Aug 24 ...................................................................232


## VOLUME 2

AE 959 (AAA) .......................................................................................239

AE 630 (KSM Sup) ................................................................................354

Tr 51684 - 51685, 8 Jan 25 .....................................................................406

Tr 49325 - 49326, 1 Aug 24 ...................................................................408

Tr 49413 - 49415, 2 Aug 24 ...................................................................410

Tr 49423, 2 Aug 24 ................................................................................413

Tr 49501, 7 Aug 24 ................................................................................414

Tr 49759, 9 Aug 24 ................................................................................415

Tr 51683 - 51694. 8 Jan 25 .....................................................................416

United States v. Al-Nashiri, AE 467CCC .............................................428

Email "Proposed Stipulations of Fact," 18 May 2022 .........................478

Senator Ted Cruz, Statement, 6 Sept. 23 ..............................................481

AE 926A (GOV) .....................................................................................483

AE 926 (AAA 2nd Sup), Attachment K (excerpt). ...............................498

SecDef Memo, 25 Nov. 2025 .................................................................501

AE 926 (AAA), Attachment X ...............................................................502

McConnell Remarks on Support for Israel, Justice for Terrorists........505

# CHRONOLOGICAL INDEX
## BY DOCUMENT TYPE

**Military Commission Pleadings & Exhibits**

AE 004 (MAH)................................................................................................1

AE 555 (AAA), Attachment E ...............................................................27

AE 555 (AAA), Attachment F ...............................................................28

AE 555EEE .........................................................................................29-61

AE 630 (KSM Supp) ........................................................................354-405

AE 899 Docket Order ..........................................................................64-67

AE 899A (GOV) / AE 901B (GOV) ....................................................68-75

AE 889D (4th Amend) ........................................................................62-63

AE 901E (GOV) ..................................................................................76-80

AE 902A (GOV)..................................................................................81-83

AE 902B (GOV)..................................................................................84-86

AE 902L (GOV) ..................................................................................87-89

AE 926, Attachment B .............................................................................202

AE 926, Attachment D ...............................................................................26

AE 926, Attachment I .................................................................................90

AE 926, Attachment X .......................................................................502-504

AE 926, Attachment Z.................................................................................91

AE 926 (AAA 2nd Sup), Attachment K....................................................498-500

AE 926A (GOV)..............................................................................483-497

AE 926A (GOV), Attachments D & E ..................................................... 2-3

AE 926A (AAA Sup), Attachment B ....................................................... 4-7

AE 926A (AAA Sup), Attachment R (excerpt)...............................................11-25

AE 950BBB ........................................................................................92-96

AE 950CCC .....................................................................................97-102

AE 959 (AAA) ...............................................................................239-353

## Record of Trial (excerpts)

Tr 8 - 9, 15 May 12.................................................................216-217

Tr 20805 - 20806, 11 Sep 18 ................................................109-110

Tr 20897 - 20898, 12 Sep 18 ................................................111-112

Tr 20903, 12 Sep 18 ..............................................................113

Tr 21174, 13 Nov 18 ..............................................................114

Tr 21188, 13 Nov 18 ..............................................................115

Tr 21203, 13 Nov 18 ..............................................................116

Tr 21317, 13 Nov 18 ..............................................................117

Tr 21331 - 21332, 13 Nov 18 ................................................118-119

Tr 21360, 13 Nov 18 ..............................................................120

Tr 21363, 13 Nov 18 ..............................................................121

Tr 21594, 15 Nov 18 ..............................................................122

Tr 21605, 15 Nov 18 ..............................................................123

Tr 21863 - 21866, 15 Nov 18 ................................................124-127

Tr 36758 - 36760, 25 Sep 23 ................................................128-130

Tr 36762, 25 Sep 23 ..............................................................131

Tr 36868, 25 Sep 23 ..............................................................132

Tr 36870, 25 Sep 23 ..............................................................133

Tr 42393, 27 Feb 24 ..............................................................134

Tr 42397 - 42938, 4 Mar 24 ................................................135-136

Tr 44293 - 44295, 17 Apr 24 ................................................137-139

Tr 45780 -45782, 1 May 24 ................................................140-142

Tr 49312, 1 Aug 24 ..............................................................143

Tr 49317 - 49319, 2 Aug 24 ................................................144-146

Tr 49421 - 49322, 2 Aug 24 ................................................147-148

Tr 49311- 49324, 1 Aug 24 ................................................218-231

Tr 49416- 49422, 2 Aug 24 ................................................232-238

Tr 49479 - 49487, 7 Aug 24 ................................................149-157

Tr 49501, 7 Aug 24 ................................................................414

Tr 49509, 7 Aug 24 ................................................................158

Tr 49579, 7 Aug 24 ................................................................159

Tr 49585 - 49597, 8 Aug 24 .......................................... 160-172

Tr 49759, 9 Aug 24 ................................................................415

Tr 49797 - 49798, 16 Sep 24 ......................................... 173-174

Tr 49944 - 49951, 17 Sep 24 ......................................... 175-182

Tr 50424 - 50425, 20 Sep 24 ......................................... 183-184

Tr 50517 - 50518, 23 Sep 24 ......................................... 185-186

Tr 50548 - 50551, 23 Sep 24 ......................................... 187-190

Tr 50555 - 50556, 23 Sep 24 ......................................... 191-192

Tr 51079 - 51080, 8 Nov 24 .......................................... 193-194

Tr 51642 - 51644, 8 Jan 25 ........................................... 195-197

Tr 51683 - 51694, 8 Jan 25........................................... 416-427

**Miscellaneous**

TJAGLCS Crim Law Digital Deskbook, ch. 15............................ 205-215

Email, "Proposed Stipulations of Fact," 18 May 2022 ................. 478-480

Email, "Status Update and Setting of Deadlines for PTAs," 20 Jul. 2023.... 198-199

*United States v. Al-Nashiri*, AE 467CCC...................................... 428-477

Senator Ted Cruz, Statement, 6 Sep 23 ...................................... 481-482

Email, "Update on Pre-Trial Negotiations and Setting of Final Deadline," 8 Sept. 2023 ............................................. 200-201

McConnell Remarks on Support for Israel, Justice for Terrorists.........................505

Letter to VFMs ................................................................ 203-204

Secretary of Defense Memorandum to BG Escallier, 25 Nov 25 .........................501

**JA.1**



**DEPARTMENT OF DEFENSE**
**OFFICE OF THE CHIEF DEFENSE COUNSEL**
1620 DEFENSE PENTAGON
WASHINGTON, DC 20301-1620

18 April 2012

MEMORANDUM FOR CDR WALTER RUIZ, JAGC, USN

Subject:  Detailing as Detailed Learned Counsel in the Military Commission Case
of *United States v. Hawsawi (10011)*

    Pursuant to Military Commission Rules 503(c) and 506(b) and in accordance with Chapter 9
of the 2011 Regulation for Trial by Military Commissions, I hereby detail you as Detailed Learned
Counsel in the military commission case of *United States v. Hawsawi.*

J.P. COLWELL
Colonel, U.S. Marine Corps
Chief Defense Counsel

JA.2



THE ASSISTANT SECRETARY OF DEFENSE
WASHINGTON, DC 20301-1300

LEGISLATIVE
AFFAIRS

OCT 0 4 2023

The Honorable Ted Cruz
United States Senate
Washington, DC 20510

Thank you for your letter of August 28, 2023, to the Secretary of the Department of Defense, Lloyd J. Austin, III regarding proceedings in *United States v. Mohammed et al.* I am responding on the Secretary's behalf.

On September 6, 2023, the Office of the Chief Prosecutor noticed the military commission that "the Administration declines to accept the terms of the proposed joint policy principles offered by the accused in the military commission case, *United States v. Mohammed et al.*" I have enclosed this filing for your information.

Regarding the proposed joint policy principles referenced in this filing, the specific terms of pre-trial negotiations are confidential in order facilitate open communications between the parties. Terms of those negotiations remain confidential unless and until an agreement is reached and the terms are entered into the public record by the court.

The Military Commissions Act makes the delegated Convening Authority responsible for accepting or rejecting pre-trial agreements. It would therefore not be appropriate for the Secretary or any other supervising official to comment further.

The Secretary is committed to ensuring that the military commissions process is fair and delivers justice to the victims, survivors, families, and those accused of crimes. I am sending a similar letter to Rep. Malliotakis.

Sincerely,

HON Rheanne E. Wirkkala

Enclosure:
As stated

**JA.3**



THE ASSISTANT SECRETARY OF DEFENSE
WASHINGTON, DC 20301-1300

DEPARTMENT OF DEFENSE

LEGISLATIVE
AFFAIRS

OCT 0 4 2023

The Honorable Nicole Malliotakis
U.S. House of Representatives
Washington, DC 20510

Thank you for your letter of August 28, 2023, to the Secretary of the Department of Defense, Lloyd J. Austin, III regarding proceedings in *United States v. Mohammed et al.* I am responding on the Secretary's behalf.

On September 6, 2023, the Office of the Chief Prosecutor noticed the military commission that "the Administration declines to accept the terms of the proposed joint policy principles offered by the accused in the military commission case, *United States v. Mohammed et al.*" I have enclosed this filing for your information.

Regarding the proposed joint policy principles referenced in this filing, the specific terms of pre-trial negotiations are confidential in order facilitate open communications between the parties. Terms of those negotiations remain confidential unless and until an agreement is reached and the terms are entered into the public record by the court.

The Military Commissions Act makes the delegated Convening Authority responsible for accepting or rejecting pre-trial agreements. It would therefore not be appropriate for the Secretary or any other supervising official to comment further.

The Secretary is committed to ensuring that the military commissions process is fair and delivers justice to the victims, survivors, families, and those accused of crimes. I am sending a similar letter to Sen. Cruz.

Sincerely,

HON Rheanne E. Wirkkala

Enclosure:
As stated

**JA.4**

5/6/24, 8:33 AM                    Sept. 11 Trial Plea Negotiations Still Underway at Guantánamo Bay - The New York Times

**The New York Times** | https://www.nytimes.com/2024/05/01/us/politics/sept11-case-plea-negotiations.html

# Sept. 11 Trial Plea Negotiations Still Underway at Guantánamo Bay

The lead prosecutor briefed the judge on the talks in an effort to fend off a claim that members of Congress had unlawfully meddled in the negotiations.

▶ Listen to this article · 6:15 min  Learn more



**By Carol Rosenberg**
Reporting from Guantánamo Bay

May 1, 2024

Prosecutors and defense lawyers are still negotiating toward a plea agreement for the men accused of plotting the Sept. 11, 2001, attacks despite the Biden administration's refusal to endorse certain proposed conditions, the lead prosecutor said in court on Wednesday at Guantánamo Bay.

"This is all whirling around us," said Clayton G. Trivett Jr., the prosecutor, discussing key details of the negotiations in open court for the first time. He added that "around the edges we have agreed to do things" and that "the positions that we took at the time are still available."

In mostly secret negotiations in 2022 and 2023, prosecutors offered to drop the death penalty from the case in exchange for detailed admissions by the accused architect, Khalid Shaikh Mohammed, and four other men who are charged as his accomplices in the hijackings that killed nearly 3,000 people. Since then, one of the five men has been ruled not mentally competent to stand trial.

**JA.5**

The occasion of the briefing was a legal filing by lawyers for Ammar al-Baluchi, one of the defendants and Mr. Mohammed's nephew, asking the judge to dismiss the case or at least the possibility of a death penalty because of real or apparent political interference by Senator Ted Cruz, Republican of Texas, and other members of Congress last summer.

In August 2023, those members of Congress began urging relatives of Sept. 11 victims on social media to pressure President Biden to derail any deal that would prevent capital punishment.

At the time, the White House was deciding whether to endorse certain conditions sought through the talks, most related to addressing the physical and psychological damage the men had from torture in their early years of incommunicado custody by the C.I.A.

On Sept. 6, 2023, the White House declined to get involved.

Rita J. Radostitz, a lawyer for Mr. Baluchi, said that Mr. Cruz then took "a victory lap."

"The Biden administration was prepared to give them a plea deal," Mr. Cruz posted on social media. He went on, using the acronym for the Defense Department, "After I pressed the DoD, they reversed course & rejected the plea deal. Big win for justice."

But both defense and prosecution lawyers told the judge on Wednesday that the White House position did not derail the talks.

When Mr. Cruz got involved, defense lawyers were "working with the prosecution streamlining all the litigation to present, in an open setting, a full examination of the events of 9/11 and answer all the victim family members' questions about what happened," said Gary D. Sowards, Mr. Mohammed's lawyer.

Any deal would take the death penalty off the table and require a mini-trial and airing of the facts of the attack, he said.

5/6/24, 8:33 AM                    Sept. 11 Trial Plea Negotiations Still Underway at Guantánamo Bay - The New York Times

The defendants want guarantees of trauma care for head injuries, gastrointestinal damage and mental illnesses blamed on their C.I.A. detention; to continue to eat and pray together communally, rather than be held in solitary confinement; and to get better communication with their families rather than recorded video calls.

But Mr. Trivett said those demands, called "policy principles," require infrastructure, funding and executive branch approval. So he forwarded them to the general counsel of the Defense Department while his team secretly negotiated how a plea agreement would play out in the Guantánamo court.

He said Congress had legitimate interests in that aspect of the negotiations, because some assurances would require funding — and Congress decides the Pentagon's budget.

Mr. Sowards said a negotiated settlement at Guantánamo would not resemble one in federal court, where a defendant comes to plead guilty and is sentenced without a trial.

These negotiations between prosecution and defense lawyers were working toward a lengthy, open court process that would involve a detailed plea, presentation of the crime, testimony by victims and possibly an opportunity for family members to have the defendants answer their questions, Mr. Sowards said.

In military commissions, that process can last months.

Mr. Trivett told the judge that about 20,000 people can be counted as relatives of the victims of the attacks, and there was no agreement "on what is justice in this case, what is an appropriate punishment." He made the presentation on a rare week when only one relative was watching in the spectators' gallery.

"I'm glad to hear they're still talking, and that there's an openness to bringing a plausible resolution that will give some sort of finality to everyone involved," said Colleen Kelly, whose brother Bill was killed at the World Trade Center.

By "everyone," she said, she meant the Sept. 11 families, the prosecution and the defense lawyers, some who have been shouldering this responsibility for two decades. Ms. Kelly, a founder of the Sept. 11th Families for Peaceful Tomorrows movement, came to Guantánamo on Saturday to watch a week of hearings as a court-approved "nongovernmental observer."

This is the third week of a five-week pretrial hearing session, and as it happened, the prosecutors sponsored no family members as guest observers.

Last month, when family members were watching the proceedings, another prosecutor told the judge that, regardless of the outcome of their trial, Mr. Mohammed and the others could be held forever in a form of preventive detention.

In disclosing the details of the continuing talks, Mr. Trivett said there had been no unlawful influence on his team. "Nobody has threatened me," he said, adding that he was under no pressure "not to negotiate consistent with what we consider to be a just result."

On Wednesday, Darin Miller, a spokesman for Mr. Cruz, said the senator would continue his efforts.

"During his time in the Senate, Senator Cruz has led efforts to combat terrorists, from the Iran-controlled Houthis to the Revolutionary Armed Forces of Colombia (FARC) to Hamas, in addition to advocating against plea deals for terrorists being charged for plotting and planning 9/11. He will continue to do so," Mr. Miller said.

*A correction was made on May 1, 2024: An earlier version of this article misstated when mostly secret negotiations over the Sept. 11 case took place. They were in 2022 and 2023, not 2022 and 2003.*

———

When we learn of a mistake, we acknowledge it with a correction. If you spot an error, please let us know at nytnews@nytimes.com.    Learn more

**Carol Rosenberg** reports on the wartime prison and court at Guantánamo Bay. She has been covering the topic since the first detainees were brought to the U.S. base in 2002. More about Carol Rosenberg

**JA.8**

PAGE INTENTIONALLY LEFT BLANK

**JA.9**

**PAGE INTENTIONALLY LEFT BLANK**

**JA.10**

**PAGE INTENTIONALLY LEFT BLANK**

## TRANSCRIPT

# Deputy Pentagon Press Secretary Sabrina Singh Holds an Off-Camera, On-the-Record Press Briefing

**Aug. 5, 2024**

DEPUTY PRESS SECRETARY SABRINA SINGH: So, as we discussed late last week, US military forces continue to posture across the Middle East region to improve US force protection, to increase support for the defense of Israel, and to ensure the United States is prepared to respond to various contingencies.

Secretary Austin spoke with Israeli Minister of Defense Yoav Gallant yesterday to reiterate the United States's ironclad support for Israel's security and self-defense against threats from Iran, Lebanese Hezbollah, the Houthis, and other Iranian backed terrorist groups. They discussed US force posture moves that the department is taking for defense and deterrence and reinforced the need to de-escalate broader tensions in the region, to include strong support for a Gaza ceasefire and hostage release deal.

Switching gears, earlier today the department and the Ministry of National Defense of the Republic of Niger announced that the withdrawal of US forces and assets from Air Base 201 in Agadez is complete. This effort began on May 19th following the mutual establishment of withdrawal conditions, and coordination will continue between US and Nigerian Armed Forces over the coming weeks to ensure the full withdrawal is complete as planned. US forces are still on track to meet the September 15th deadline of a full withdrawal from Niger.

**JA.12**

And switching gears to tomorrow, Secretary Austin and Secretary of State Blinken will co-host Australian Minister for Foreign Affairs Penny Wong and Deputy Prime Minister and Minister of Defense Richard Marles in Annapolis, Maryland for the 34th Australia-US Ministerial Consultations.

The ministerial and related bilateral meetings will build on the commitments made during the official visit of the prime minister to the United States in October 2023 and last year's AUSMINs. Secretary Austin and Secretary Blinken look forward to strengthening our cooperation on the full range of global and regional issues and deepening the US-Australia alliance with their Australian counterparts.

And finally, I'd like to take a moment to congratulate General Hokanson, the 29th chief of the National Guard Bureau and member of the Joint Chiefs of Staff, on his retirement last Friday after nearly four decades of service. General Hokanson graduated from the US

Military Academy at West Point in 1986, spending most of the next ten years on active duty as an Army aviator.

In 1995, Hokanson left active duty, joining the Oregon Army National Guard. Over the next three decades, Hokanson would amass more than 2,600 flight hours, including more than 50 combat flight hours as a command pilot. Hokanson served as the deputy commander of NORTHCOM, the vice chief of the National Guard Bureau, and finally as the 29th chief of the National Guard Bureau. We thank General Hokanson and his wife Kelly for their service to our nation and wish them all the best on his next chapter.

And if you have a question, if you don't mind, we'll kick it over to Luis. Putting you on the spot, but if you have nothing?

Q: I actually do have one.

MS. SINGH: Okay, great.

Q: If I stand, you can see me.

MS. SINGH: Yeah. He's just so —

**JA.13**

Q: I'm confused. In Niger, I thought that was — today's announcement was a complete withdrawal. Was it only for the base. Is there still more to come?

MS. SINGH: It was for the base. There's still some more work to be done to finalize the full withdrawal process. There's about, I'd say, less than two dozen folks still on the ground in Niger. But we're still on track to meet that September 15th deadline.

Q: So, those two-dozen people will stay there until the 15th of September?

MS. SINGH: We'll keep you updated as we have. If — you know, if completed before September 15th, we'll let you know. But we're still on track to meet that September 15th deadline right now. There's still some administrative tasks that just need to be fully completed. And then once that's done, the withdrawal will be complete.

Q: Great. And thank you.

Q: Thank you. Can you tell us whether all of the military plus-ups in the Middle East have been completed? Were any — other than land-based fighter jets, were any fighter jets moved off any of the ships, either the ARG or the carrier? Can you say?

MS. SINGH: So, it wouldn't be — thank you, Lita, for the question. Wouldn't be best practice to kind of give you a full lay down right now, so I don't really have an update on — for you on where things are other than that — what we have already said publicly from Friday, which is that we did commit additional assets to the region. And, you know, the — I just won't get

into, you know, where they are, if they're in position right now. But we will be ready to defend Israel if needed and, of course, to defend our forces there.

Q: Can you at least say roughly the number of troops that are involved in the process? I believe that you all done that in the past.

MS. SINGH: I can't right now, but I'll keep you updated if that changes.

Q: OK. I'm just gonna pass on here for a second.

**JA.14**

MS. SINGH: Anyone? Yeah, Dan.

Q: Thank you. Two questions.

MS. SINGH: Sure.

Q: One, can you give us any kind of naval update? I know we had carrier that was in the Gulf of Oman. It appeared maybe it would be coming farther west toward Israel.

And then secondly, the announcement Friday night with Secretary Austin becoming the convening authority for the KSM trial and these other two kind of overturning the plea deal. Can you give us a sense for where that's going, how you see that progressing, whether we have hearings coming, and how he's going to manage that with his — the rest of his duties?

MS. SINGH: So, in terms of the convening authority, right now that — that's an ongoing process, so I don't have much for you right now. That is back with the courts, so we'll keep you updated on that. But at this moment right now, I just don't have more for you.

In terms of where the — I think what you're referring to is where is the TR [USS Theodore Roosevelt], I would refer you to CENTCOM more or to speak to her movements. But as we did say on Friday, we are positioning assets to move closer to Israel should we need to come to the defense of Israel, so you should, you know, assume that she'll be moving closer to that direction. But I don't have her exact position right now.

Hailey?

Q: Thanks. Also on the plea deal, can you say, before Friday's statement, when did the secretary learn that the plea deal had been agreed to? And when was the last time that he was briefed on those cases? Was this — has he been getting regular updates, or has it been several weeks or months since he got an update? What was the timeline?

MS. SINGH: So, you have to — so, just separating out your two questions, you have to remember that the convening authority is independent, so it's not like he was receiving regular updates.

**JA.15**

At the very beginning of the year, there was a set of policy principles that was presented to the department, which he rejected. That was at the very beginning of the year. But it's not something that he receives regular updates on, as it is, you know, independent, and as he shouldn't, as you know, not wanting to exert undue influence over an independent process.

In terms of when did the secretary find out, July 31st, we were flying back from the Philippines, and I believe that was a Wednesday. That was the day that we all found out, when it was made public.

Q: Okay. And then has he spoken to President Biden or Vice President Harris about these cases or about his decision to revoke the plea deal and become the convening authority, or retake that authority, I guess?

MS. SINGH: Not to my knowledge. But, of course, we made that — his decision to take back the authority public on Friday, but not to my knowledge on conversations with the White House. This was something that he decided on his own.

Felicia?

Q: Just wondering if you could give us a sense, I assume that Secretary Austin will be in this meeting at the White House later. Do you have any — is there anything you can say about what he might — I mean, I'm sure you don't want to, like, totally get ahead of it, but can you give us any sense of what to expect or what he might be going to say?

MS. SINGH: He will be in the meeting later today at the White House. Certainly, wouldn't want to get ahead of a meeting with the president and other members of the National Security Council, so I'll just leave it at that. But I think you can expect that, of course, on the table for discussion is ongoing tensions within the Middle East. I'll just leave it at that.

Idris.

Q: Where is General Kurilla right now?

MS. SINGH: I know that he's in the CENTCOM AOR, but I don't know —

**JA.16**

Q: In the Middle East?

MS. SINGH: In the Middle East, yeah.

Q: OK. Is part of his trip and the broader Pentagon effort to coordinate with allies, and in a similar way you did pre-April 13? Is that an ongoing effort? Can you talk a bit about that?

MS. SINGH: Yeah. So, as you can appreciate, just not going to speak to anything regarding any potential operations. But in terms of his travel to the region, I'd refer you to CENTCOM for more details on that. I don't have them, so I'd refer you to CENTCOM to speak to it.

Well, — Courtney, I have not forgotten about you.

Q: On Niger, on the couple dozen people who are still there, can you say where they're located at this point?

MS. SINGH: Yeah, they're located at the embassy.

Q: At the embassy. And can you say any more about what they're going to be doing in the kind of next couple of weeks or — to prepare for the withdrawal or —

MS. SINGH: Just administrative work in preparing for the completion of the withdrawal. I don't really have more details other than that. If you want more, I'd refer you to AFRICOM to speak to just more roles and responsibilities of what they're doing on a day to day. But it's mainly administrative.

MS. SINGH: OK. Courtney?

Q: The KSM. So, if it's going back to — or the three of them, if the plea — if it's going back to the court, does that mean that the — there's no way forward for more plea agreements then, or — is that — that's over? There's no chance for the three of them to have a plea agreement?

MS. SINGH: That's correct. The secretary has taken that decision off the table for plea agreements, or for what was presented.

**JA.17**

Q: What about the other two who were part of the plea agreements that didn't agree to this one? Are they now off the table for plea agreements as well? Because the statement only mentioned the three.

MS. SINGH: The three? Let me take that question.

Q: Okay. And then is — I believe — I may be wrong about this, but I think the general counsel has the authority to appoint a new convening authority to that case. Is that what's likely to happen here? I may be wrong about this because this is so unnecessarily confusing, this process — the process.

MS. SINGH: It is.

Q: And especially throwing a wrench in it like this.

MS. SINGH: Yeah.

Q: So, is that what's likely to happen, or is Secretary Austin going to start traveling to get to oversee these as the Superior supreme commander?

MS. SINGH: As I mentioned — To Dan, right now the cases are back, you know, in the court. It's still early on. So, when we have more details, let us provide that for you. But right now, I just don't have a further update on things that you're asking. But we will get back to it.

Q: Because it just seems like to make the decision to withdraw the plea or to revoke the plea agreement without a plan for how it moves forward seems — that just doesn't seem like that would have been the case. There's gotta someone who knows how this is going to go forward.

MS. SINGH: I think there are paths forward, but it's also an ongoing judicial process that I just don't know how much we — or can speak to just yet. But when we have more, and certainly when I have more information, I will do my due diligence to make sure that you are kept informed on that, as I know this is of interest to many folks in this room. But I just don't have more right now on, you know, exactly how — the next steps.

**JA.18**

Q: But to Courtney's question, does this preclude any plea agreement in the future?

MS. SINGH: The secretary has withdrawn from pretrial agreements that were signed in those cases.

Q: Right, that were signed. Does this preclude a future plea agreement?

MS. SINGH: He wants to see these, I mean, in — and I think — let me just make sure that I have this, the statement.

Q: No, I mean he —

MS. SINGH: No, I understand.

Q: Does he go back to negotiations?

MS. SINGH: Right. Exactly.

Q: Or does he just want to take a look at it?

MS. SINGH: He believes that the families and the American public deserve the opportunity to see military commission trials carried out in this case. So, he does if we can move to the trials. And it has been ongoing. It has been many, many years. But that is what he believes is the best course of action forward.

Q: OK.

MS. SINGH: Yeah.

Q: So, sort of following off that point, he believes that the American public should — I mean, we're talking about legal process that has taken decades and has been one of the most

**JA.19**

closed off and secretive processes on a base that is one of the most secretive and closed. I mean, square the circle here, like Secretary Austin believes the American people deserve all this stuff, but do we get to see these televised, and when?

MS. SINGH: Well, this a case of such significance that the secretary felt it was appropriate for the authority to rest with him. So again, in terms of future trials, what that looks like, I don't have that for you. But obviously, this was a decision that was made on Friday, and as I committed to Courtney and Lita, as we have more details to share, I will share that with you. I just don't have that right now.

Q: Can you also ask—sorry. Assuming there's a change in administration or even if there isn't, Secretary Austin is—I'm assuming that that will then move to the next Secretary of defense or does the next—the process forward is interesting here. Is there any chance that someone else could come in and allow for negotiations to restart under a new convening authority?

How would that look? Or is literally the only way that this moves forward was at the trial, which is never going to happen?

MS. SINGH: Yeah. So I think there's still a few unanswered questions that I understand folks want answers to. I don't have that right now.

Q: Sorry. I didn't mean to interrupt. Is there anyone that can just walk us through the legal process, Sabrina?

MS. SINGH: So as soon as we have more information to provide, I certainly will. If there's someone that is available and willing—

Q: I mean, just to walk us through, what is—

MS. SINGH: Yep. Understand. Understand. I will—

Q: Not what's going to happen, just—

**JA.20**

MS. SINGH: I will certainly see if someone is available, but again, this is a—I understand the frustration and I and I understand that I don't have all the answers for you right now. But as I get more, we will share it and if there's someone that can be made available, I will look into that.

OK. Brad?

Q: Yeah, just really quick on Niger. Did US troops leave any equipment behind, weapons, military equipment, anything when they left the bases?

MS. SINGH: I'd refer you to AFRICOM to speak to that. Noah?

Q: Thank you. I'm sorry if I missed this, but do we have a final cost on JLOTS yet?

MS. SINGH: The initial cost that we had quoted, I think was $230 million. I don't have an updated cost for you right now. Some of the folks that had initially gone out on the JLOTS mission have been redeployed and have come back home. JLOTS is still in the process of being redeployed, so you might remember Vice-Admiral Cooper said that the cost of JLOTS is likely to come under that number, but I don't have the final, final for you yet as that redeployment is still ongoing.

Q: So we'll know that when the redeployment is more settled? When will we actually know that?

MS. SINGH: You'll know that when I have the number.

Q: OK.

Q: Hi. Thank you. You mentioned contingencies around Israel and Lebanon, and I know you have the capacity with the wasp [USS Wasp] there. Are you planning on evacuation of US citizens out of Lebanon?

MS. SINGH: So we are a planning organization and as you've heard us say, we plan for a range of different contingencies. I'm certainly not going to go into details on every type of scenario and plan that has been laid out. But the ARG/MEU that's in the Eastern Med has a

**JA.21**

range of capabilities, to include other things other than an evacuation if needed.

So I'll just leave it at that. Yeah.

Q: A couple of questions on the KSM, and then I had a Middle East question. What was the secretary's initial reaction? You said the July 31st, you heard about it coming back. Was he shocked or whatever? And has he called any of the families?

MS. SINGH: The secretary was certainly surprised, as we all were. And I think you have to remember throughout this entire process, this is not something that the secretary was consulted on or briefed. It was independent. And we were not aware that the prosecution or defense would enter the terms of the plea agreement.

So I think when it came through on Wednesday is when we learned about it, and he was surprised. I don't have any calls to share or to read out to you on folks that he's spoken with, other than to say that on Friday you saw the memo that he issued and leave it at that.

Q: OK. Middle East, a reality check. Do any of the assets you announced Friday, would they have any relevance if Iraq attack today tomorrow or Wednesday? You seem all weeks away. Can you give a reality check on that? And on the ARG/MEU, they had helicopters basically

and Ospreys. They don't have combat capability, but what actually would be resonant now if Iran attacked in the next two or three days?

MS. SINGH: A lot of hypotheticals that I just wouldn't get into and in terms of asking on timing, look, I don't have anything for you on that.

Q: I'm not asking when Iran's going to attack, but what would be relevant now? What defense assets are in the region that could help them with missile defense, versus on the way in a week or two?

MS. SINGH: So as you saw from the statement that that we released on Friday, the secretary has directed additional air assets to move to the region, along with a combination of destroyers and cruisers to move closer to Israel for the defense of Israel. Beyond that, I'm not going to get into more specifics.

**JA.22**

You're also going to have the TR eventually leave the CENTCOM AOR and—

Q: Eventually.

MS. SINGH: —the ABE [USS Abraham Lincoln] will come and backfill the TR. You are very familiar with the range of capabilities on a carrier strike group, part of a carrier strike group. So, I don't need to go into those details, but should Israel be attacked, the president, the secretary, have committed to come to the defense of Israel and of course we're postured to always protect our forces in the region as well.

Q: I'm just trying to push back. The TR is in the Gulf of Oman. I mean, I'm not sure destroyers can attack missiles fired from Lebanon into Israel at that range. I mean—

MS. SINGH: Yeah, I'm just not going to get into more [inaudible].

Q: The fighter squadron, is that going to be arriving in the next day or two, because that's tangible?

MS. SINGH: Appreciate the question, Tony, but I'm just not going to get into timelines. Thank you. Jared.

Q: I don't know if you can answer this, but are the TR and the ABE expected overlap in the Eastern Mediterranean on the TR's way home?

MS. SINGH: Look, I don't have a timeline for you right now, but the ABE will be backfilling, replacing the TR. So could there be overlap, there could be, but I don't have an exact timeline for you on when one's leaving and one's coming in.

Q: Then kind of big picture, does the government have any indication that Iran and its proxies may avoid attacking or targeting US personnel and forces like they did in April during this retaliation?

MS. SINGH: I really can't speak for Iran, so I refer you to them.

**JA.23**

Q: It's a pretty quick—

MS. SINGH: OK. Yeah.

Q: Quick follow up. Do you believe an attack by Iran and its proxies is imminent, against Israel to be clear?

MS. SINGH: I mean, all we can go off of, Idris, is the public statements that Iran has made. We certainly don't want to see that. We believe that the best way for tensions to calm in the region is for the ceasefire deal to be put in place to see American hostages come home. We don't want to see a wider regional conflict and that's why, over the course of time, I mean since October 8th, we have moved additional assets to the region to project a message of deterrence. We still believe that a wider regional war is not imminent. And yeah, we'll leave it at that.

Q: And then have you raised alert levels for troops in Iraq and Syria?

MS. SINGH: I'd refer you to CENTCOM to speak more on that. Kiely.

Q: One more GTMO, keep the good times going.

MS. SINGH: It's very unsatisfactory. I'm sorry. I know. I will do my best.

Q: You said that the secretary, I mean, it was kind of surprise, didn't know that the council was putting in these plea deal agreements. He clearly knew there was some discussion about plea deals if he rejected some of the agreements ahead of time at the beginning of the year, like you said. So did he think about or consider or anything taking that convening authority then when he originally rejected some of the terms of the agreement?

MS. SINGH: So there were not terms presented to him. It was policy principles, basically parameters that were presented up to the secretary, which he rejected. To your question of did he think about taking back his authority then, no. And the reason why is, this was an independent authority that was in charge of managing the case and he did not want to exert undue influence over a judicial process, but he did reject their parameters of what they had laid out.

**JA.24**

So that kind of leads to where we got to last week. Because he rejected those policy principles to begin with, he believes that the families, the

these folks go on trial, knowing it has been a long process, but still, that is something that he believes strongly.

Q: So, he had originally not wanted to take back authority because it was an independent process and he wanted to play out.

MS. SINGH: Right.

Q: Now he has decided it should no longer be an independent process and he needs to be more involved?

MS. SINGH: Because, I mean, you have to remember, first, he established the convening authority to oversee the case. Taking back authority or influencing the case in either way is not something that he wanted to do. And frankly, we didn't know what type of agreement was going to happen if there was ever going to be one.

And I think no one knew what was announced on Wednesday was something that both sides would have agreed to in the first place. I mean, this has been ongoing for many, many years. So he made the decision that when this announcement happened, that he needed to take back the authorities and that now it's back in the courts and he believes that there should be a trial.

I know that this has been ongoing for a very, very long time. Many people here in this building have followed this, but that is where we are today.

Q: So it's okay if it's independent, as long as they do what he wants them to do. That's pretty much what we're coming down to, right?

MS. SINGH: No, I would actually say that he allowed the entire process to play out before he —

Q: Before he exerted his undue command influence over it.

**JA.25**

MS. SINGH: Before he influenced the process in any way.

Q: Just to clarify, the policy parameters, who submitted those? Who made those recommendations? And I think I heard you say January, right?

MS. SINGH: I did not say that. It was earlier this year.

Q: OK.

MS. SINGH: Let me see. Let me just take that question on who submitted them. Matt.

Q: Thanks. On Iran, if Iran was to launch another large scale series of attacks like we saw in April, do you expect that to be telegraphed? Do you expect to see personnel and equipment being moved much like we saw in April, or do you assess that things are more or less still in place since April and so it might not get the same sort of forewarning? Can you speak to that at all?

MS. SINGH: On Iran's assets?

Q: Right.

MS. SINGH: Yeah. No, I wouldn't speak to any intel, anything like that.

Q: OK.

MS. SINGH: OK. Anything else? All right. Thanks, everyone.

Hosted by Defense Media Activity - WEB.mil

**JA.26**

## Radostitz, Rita J CIV OSD MCDO (USA)

| | |
|---|---|
| **From:** | Trivett, Clayton G CIV OSD OMC OCP (USA) |
| **Sent:** | Wednesday, March 9, 2022 1:58 PM |
| **To:** | OSD NCR MCDO List MCDO Team Mohammad; OSD NCR MCDO List MCDO Team Bin Attash; OSD NCR MCDO List MCDO Team RBAS; OSD NCR MCDO List MCDO Team Al Baluchi; OSD NCR MCDO List MCDO Team Hawsawi |
| **Cc:** | Ryan, Edward R CIV (USA); Groharing, Jeffrey D CIV OSD OMC OCP (USA); Dykstra, Christopher M CIV DLSA (USA); O'Sullivan, Michael J CIV OSD OMC OCP (USA); Kraehe, George C COL USARMY OSD OMC OCP (USA); Gibbs, Rudolph P Jr CIV OSD OMC OCP (USA); Cox, Dale J (John) CIV OSD OMC OCP (USA) |
| **Subject:** | Proposal Going Forward for the Remainder of the Session and Offer to Commence Plea Negotiations |

Defense Counsel,

Please let me know if your teams are amenable to cancelling at least the next week of hearings (through next Friday), and possibly the remainder of this session, so that we can begin to negotiate whether pre-trial agreements are possible for all five cases (if your team had planned on pursuing such an agreement). While I cannot guarantee that we will come to terms over these next two weeks, putting in a concerted effort focused solely on possible agreements while we are all onboard Guantanamo, where your clients and teams are present, may be our best chance of at least determining if deals can be reached. I am willing to do this in whatever manner you prefer, including meeting and discussing in the court room, together with all five teams, or individually by team. I will defer to each team to set the parameters for such discussions. Please let me know and if you are willing to pursue these discussions and if your team is willing to join a request to the judge to postpone through at least next Friday (and possibly longer depending on how the pre-trial agreements may be progressing). The Prosecution will only request to cancel the next week (7 court days) of hearings after hearing from all of the Defense teams, and only if there is sufficient interest from enough of the Teams. Otherwise, we will plan to proceed with court tomorrow at 0900. Please let me know.

If you are amenable, I envision requesting either sending an email to the trial judiciary or requesting an RMC 802 session with the Military Judge tonight to inform him of an attempt to come to an alternate resolution and ask to remain in recess for the next seven days.

Regards,

Clay Trivett
Managing Trial Counsel
United States v. Mohammad, et al.

1

**JA.27**



**SECRETARY OF DEFENSE**
1000 DEFENSE PENTAGON
WASHINGTON, DC 20301-1000

APR 0 4 2017

MEMORANDUM FOR DEPUTY SECRETARY OF DEFENSE
                                SECRETARIES OF THE MILITARY DEPARTMENTS
                                CHAIRMAN OF THE JOINT CHIEFS OF STAFF
                                UNDER SECRETARIES OF DEFENSE
                                GENERAL COUNSEL OF THE DEPARTMENT OF DEFENSE
                                ASSISTANT SECRETARIES OF DEFENSE

SUBJECT:  Designation of Harvey Rishikof as Convening Authority for Military Commissions

        Pursuant to chapter 47A of title 10, U.S.C., section 948h, Harvey Rishikof is designated

as Convening Authority for Military Commissions.  This designation is effective as of

April 3, 2017, and will continue until a new convening authority is designated.  In his role as

Convening Authority, and in accordance with the applicable Rules for Military Commission,

provisions of the Regulation for Trial by Military Commission, and applicable judicial orders,

Mr. Rishikof is to receive legal advice relating to military commissions solely from an

appropriately designated Legal Advisor to the Convening Authority and members of the

appropriately designated Legal Advisor's staff as necessary.

cc:
Legal Advisor to the Convening Authority for Military Commissions
Chief Prosecutor, Office of the Chief Prosecutor
Chief Defense Counsel, Office of the Chief Defense Counsel
Chief Judge, Military Commissions Trial Judiciary

OSD003926-17/CMD005601-17

**JA.28**



**SECRETARY OF DEFENSE**
1000 DEFENSE PENTAGON
WASHINGTON, DC 20301-1000

2/3/2018

MEMORANDUM FOR DEPUTY SECRETARY OF DEFENSE
SECRETARIES OF THE MILITARY DEPARTMENTS
CHAIRMAN OF THE JOINT CHIEFS OF STAFF
UNDER SECRETARIES OF DEFENSE
CHIEFS OF MILITARY SERVICES
GENERAL COUNSEL OF THE DEPARTMENT OF DEFENSE
ASSISTANT SECRETARIES OF DEFENSE

SUBJECT:  Designation of James Coyne as Acting Convening Authority for Military
Commissions

Pursuant to chapter 47A of title 10, U.S.C., section 948h, James Coyne is designated as
Acting Convening Authority for Military Commissions.  This designation is effective as of
February 3, 2018, and will continue until a new convening authority is designated.  In his role as
Convening Authority, and in accordance with the applicable Rules for Military Commission,
provisions of the Regulation for Trial by Military Commission, and applicable judicial orders,
Mr. Coyne is to receive legal advice relating to military commissions solely from an
appropriately designated Legal Advisor to the Convening Authority and members of the
appropriately designated Legal Advisor's staff as necessary.

The memorandum, subject:  Designation of Harvey Rishikof as the Convening Authority
for Military Commissions, dated April 4, 2017, is hereby rescinded.

cc:
Acting Legal Advisors to the Convening Authority for Military Commissions
Chief Prosecutor, Office of the Chief Prosecutor
Chief Defense Counsel, Office of the Chief Defense Counsel
Chief Judge, Military Commissions Trial Judiciary

OSD001421-18/CMD001764-18

**JA.29**

MILITARY COMMISSIONS TRIAL JUDICIARY
GUANTANAMO BAY, CUBA

| | |
|---|---|
| UNITED STATES OF AMERICA | AE 555EEE |
| v. | RULING |
| KHALID SHAIKH MOHAMMAD, WALID MUHAMMAD SALIH MUBARAK BIN 'ATTASH, RAMZI BIN AL SHIBH, ALI ABDUL AZIZ ALI, MUSTAFA AHMED ADAM AL HAWSAWI | **Mr. al Baluchi's Motion to Dismiss** For Unlawful Influence over Convening Authority and Legal Advisor |
| | **10 January 2019** |

1. **Procedural History**.

a. On 9 February 2018, Mr. Ali (a.k.a. al Baluchi) moved to dismiss all charges,[1]

claiming (1) the terminations of Mr. Harvey Rishikof and Mr. Gary D. Brown from their

positions as Convening Authority (CA) and CA's Legal Advisor, respectively, had been in

retaliation for certain decisions in those capacities; and (2) the terminations, therefore,

constituted unlawful influence (UI) over Messrs. Rishikof and Brown by then-Secretary of

Defense (SecDef) James N. Mattis[2] and then-Department of Defense Acting General Counsel

(DoD AGC) William S. Castle.[3] The Government responded on 26 February 2018, arguing the

Defense had not met its initial burden and, in any event, had not alleged acts constituting UI.[4]

---

[1] AE 555 (AAA), Mr. al Baluchi's Motion to Dismiss for Unlawful Influence over Convening Authority and Legal Advisor, filed 9 February 2018, p. 1.

[2] The Commission takes judicial notice that SecDef Mattis submitted a letter of resignation on 20 December 2018, and no longer served as SecDef as of 1 January 2019. *See* Jeremy Diamond, et al., *Mattis quits, says his views aren't 'aligned' with Trump's*, https://www.cnn.com/2018/12/20/politics/donald-trump-james-mattis-out/index.html (last updated 21 December 2018, 4:46 PM); Holly Rosenkrantz, *Trump ousts Mattis 2 months early, taps Shanahan as acting defense secretary*, CBS News Online, https://www.cbsnews.com/news/trump-expected-to-order-mattis-to-leave-job-immediately-appoint-patrick-shanahan-defense-secretary/ (last updated 23 December 2018, 4:02 PM). As Mr. Mattis was SecDef throughout the events relevant to this motion series, for simplicity he will be referred to by that title herein.

[3] The Commission notes Mr. Castle relinquished the AGC role in August 2018. *See* fn 26, *infra*, and accompanying text. However, as he was AGC throughout the events relevant to this motion series, for simplicity he will be referred to by that title herein.

[4] AE 555A (GOV) (Corrected Copy), Government Response To Mr. Ali's Motion to Dismiss for Unlawful Influence over Convening Authority and Legal Advisor, filed 26 February 2018 (original filed 23 Feb 2018), para. 3.

1

JA.30

b. Since the initial motion and response, filings in this series have been many and voluminous.[5] The parties have presented witness testimony and engaged in substantial argument regarding many of the procedural and substantive issues identified. The Commission has considered all of the filings,[6] argument, and evidence in the AE 555 series. This ruling will address the following:

(i) AE 555P (GOV),[7] a motion by the Government for the Commission to reconsider a prior order (AE 555O).[8] The only remaining question in that motion is whether the Commission should fully grant reconsideration by permanently rescinding its directive in AE 555O for the Government to (1) disclose the CA's monthly status reports, and (2) produce Mr. Rishikof to testify.[9]

---

[5] The filings include declarations submitted by Secretary Mattis, AGC Castle, and Messrs. Rishikof and Brown, filed at the Commission's request. AE 555B, Trial Conduct Order: Mr. al Baluchi's Motion to Dismiss For Unlawful Influence Over Convening Authority and Legal Advisor, dated 27 February 2018; AE 555E (GOV), Government Notice Of Declarations Requested By The Military Commission, filed 19 March 2018, Attach.'s B (hereinafter, "Mattis Declaration"), C (hereinafter, "Castle Declaration"); AE 555G, Notice of Receipt: Declaration of Harvey Rishikof and Gary D. Brown, filed 20 March 2018, Attach. A (hereinafter, "Rishikof & Brown Declaration 1"); AE 555L, Notice of Receipt: Second Declaration of Harvey Rishikof and Gary D. Brown, filed 30 April 2018, Attach. A (hereinafter, "Rishikof & Brown Declaration 2").

[6] This includes Mr. Mohammad's recent supplement, and the Government's response. AE 555CC (KSM Sup), Mr. Mohammad's Supplement to AE 555CC, filed 2 January 2019; and AE 555DDD (GOV), Government Response To AE 555CC (KSM Sup), Mr. Mohammad's Supplement to AE 555CC (KSM), filed 4 January 2019. The Commission's analysis herein is unaltered even when assuming the facts proffered in Mr. Mohammad's latest supplement are accurate. *See* fn 25, 33, *infra*. Accordingly, the Commission finds no Defense reply to the Government's response to be necessary.

[7] AE 555P (GOV), (U) Government Combined Motion To Reconsider AE 555O, Order, Defense Motion to Compel Discovery Regarding the Firing of the Convening Authority and Legal Advisor, and (U) Response To AE 555 (AAA 2nd Sup), AE 555 (KSM 2nd Sup) Defense Supplemental Motions to Dismiss for Unlawful Influence Over the Convening Authority and Legal Advisor, filed 6 June 2018.

[8] AE 555O, Order: Defense Motion to Compel Discovery Regarding the Firing of the Convening Authority and Legal Advisor, dated 23 May 2018.

[9] In AE 555O, the Commission granted Defense motions (a) to compel production of certain materials, and (b) to compel production of Messrs. Rishikof and Castle as witnesses, while (c) denying a request to compel production of Mr. Brown. AE 555O, para. 4. The Government in AE 555P (GOV) moved the Commission to reconsider that ruling regarding (a) certain specified documents (the CA's monthly status reports and Tabs 4-7 of the December 2017 Management Memorandum) and (b) both witnesses. AE 555P (GOV), para. 2. On 21 June 2018, following *in camera* review of the documents, the Commission issued an interim ruling in which it (a) directed production of the memo tabs, but (b) granted reconsideration regarding the CA's monthly status reports and the witnesses, while (c) deferring final ruling regarding those reports and witnesses. AE 555S, Interim Ruling: Government Motion To Reconsider AE 555O, Order, Defense Motion to Compel Discovery Regarding the Firing of the Convening Authority and Legal Advisor, dated 21 June 2018, para. 5. On 1 November 2018, the Commission issued a further ruling in which it directed the production of Mr. Castle, but continued to defer with regard to the status reports and

2

(ii) AE 555 (AAA 2nd Sup),[10] AE 555R (AAA),[11] and AE 555CC (AAA),[12] in which Mr. Ali moved to compel certain witnesses;

(iii) AE 555GG (KSM),[13] Mr. Mohammad's motion for a conclusion of law regarding whether the Defense has met its initial burden of production regarding UI; and

(iv) AE 555 (AAA), the base motion seeking dismissal based on alleged UI.

c. Further oral argument is unnecessary for the Commission to resolve these matters.[14]

2. **Findings of Fact**. The Commission makes the following findings of relevant fact based on the evidence presented; the undisputed assertions of the parties; and/or, where appropriate, the assumption that certain Defense allegations are true.

a. On 3 April 2017, Mr. Harvey Rishikof was designated as CA and Director, Office of the CA (OCA).[15] On 28 April 2017, Mr. Gary Brown was appointed as CA's Legal Advisor.[16]

b. On 5 May 2017, Mr. Rishikof met with then-Deputy Secretary of Defense (DepSecDef) Robert O. Work and informed him of a perceived need for realignment of

---

Mr. Rishikof. AE 555AAA, Ruling: Government Motion To Reconsider AE 555O, Order, Defense Motion to Compel Discovery Regarding the Firing of the Convening Authority and Legal Advisor, dated 1 November 2018, paras. 5-6. Mr. Castle testified on 13 November 2018 by video teleconference (VTC). Unofficial/Unauthenticated Transcript of the *US v. Khalid Shaikh Mohammad, et al.*, Motions Hearing Dated 13 November 2018 from 9:03 A.M. to 9:36 A.M. at p. 21128 (start of AGC Castle's testimony). (Note that, for brevity's sake, subsequent cites to the unofficial transcript in this ruling will simply be by page number, *e.g.*, "Transcript 21128.")

[10] AE 555 (AAA 2nd Sup), Mr. al Baluchi's Second Supplement to Mr. al Baluchi's Motion to Dismiss for Unlawful Influence over Convening Authority and Legal Advisor, filed 21 May 2018, para. 4, Attach. B. This supplement had been filed prior to the Commission's initial ruling regarding certain discovery requested by the Defense (AE 555O); however, as the briefing cycle for the supplement was not complete, the Order did not address it. AE 555O, fn 8.

[11] AE 555R (AAA), Mr. al Baluchi's Motion to Compel Production of Witnesses Whose Testimony is Relevant and Necessary to Address the Pending Interlocutory Question in AE 555 (AAA), filed 18 June 2018.

[12] AE 555CC (AAA), Mr. al Baluchi's Second Motion to Compel Production of Witnesses Whose Testimony is Relevant and Necessary to Address the Pending Interlocutory Question in AE 555 (AAA), filed 26 July 2018.

[13] AE 555GG (KSM), Motion for a Conclusion of Law that the Defense Has Provided 'Some Evidence' Of Unlawful Influence in the Firing of the Convening Authority, filed 29 August 2018.

[14] The opportunity to present oral argument regarding pretrial motions is afforded at the sole discretion of the Military Judge. R.M.C. 905(h); R.C. 3.5.m.

[15] The SecDef memorandum designating Mr. Rishikof as CA was signed 4 April 2017, but by its terms was effective as of 3 April 2017. AE 555P (GOV), Attach. K, Tab B, Tab 1; Mattis Declaration para. 3.

[16] AE 555A (GOV), p. 3; AE 555P (GOV), Attach. I.

3

authorities and additional spending associated with military commissions.[17] DepSecDef Work subsequently "requested [Mr. Rishikof] provide his views on paths forward in a written document," and the two "had a mutual understanding that [as] Mr. Work was Mr. Rishikof's direct supervisor . . . no formal coordination was expected."[18]

c. Sometime in May 2017, Mr. Rishikof informed the Chief Defense Counsel (CDC), Military Commissions Defense Organization, that he wished to meet with Learned Counsel to discuss, *inter alia*, potential for pretrial agreements (PTAs).[19] On 30 May 2017, Messrs. Rishikof and Brown met with the CDC and six learned counsel, and Mr. Rishikof "invited interested defense counsel to contact him regarding plea negotiations."[20] On 27 June 2017, Messrs. Rishikof and Brown discussed potential for a PTA with Counsel for Mr. Mohammad.[21]

d. On 6 July 2017, Messrs. Rishikof and Brown met with then-DepSecDef Work and his incoming replacement, Mr. Patrick Shanahan,[22] and briefed them on the possibility of resolving the cases by PTA[23] and the perceived need for realignment of military commissions authorities.[24]

---

[17] AE 555BB (KSM AAA), Mr. al Baluchi's and Mr. Mohammad's Combined Position Regarding Motion to Dismiss for Unlawful Influence over Convening Authority and Legal Advisor and Related Pleadings, filed 25 July 2018, pp. 18, 32; AE 555CC (AAA), Attach. B, pp. 3, 12.

[18] AE 555CC (AAA), Attach. B, pp. 3, 13; *see also* Transcript 20801-03 (Defense investigator describing interview in which former DepSecDef Work said "he gave direct instructions to . . . Mr. Rishikof[] to report only to him on paths forward [regarding] the suggested reorganization . . . of OMC," and email in which former DepSecDef Work said that because he "did not want a lot of chatter" in DoD, "I would not have expected [Mr. Rishikof] to discuss this across the department, given the political ramifications[, a]nd if he had not discussed things with the GC, I would have . . . called a meeting to discuss.")

[19] AE 555BB (KSM AAA), pp. 18, 28.

[20] AE 555BB (KSM AAA), p. 28; AE 555CC (AAA), Attach. B, p. 3; AE 555UU (AAA), p. 4.

[21] AE 555BB (KSM AAA), pp. 9, 28.

[22] DepSecDef Work relinquished the office to Mr. Shanahan on 19 July 2017. AE 555T (GOV), Government Response To Mr. Ali's Motion to Compel Production of Witnesses Whose Testimony is Relevant and Necessary to Address the Pending Interlocutory Question in AE 555 (AAA), filed 2 July 2018, p. 6; AE 555EE (GOV), Government Response To Mr. Ali's Second Motion to Compel Production of Witnesses Whose Testimony is Relevant and Necessary to Address the Pending Interlocutory Question in AE 555 (AAA), filed 9 August 2018, p. 4.

[23] AE 555BB (KSM AAA), p. 28; AE 555UU (AAA), Mr. al Baluchi's Closing Argument Memorialized for AE 555P (GOV), AE 555R (AAA), and AE 555CC (AAA), filed 27 September 2018, p. 4.

[24] AE 555BB (KSM AAA), p. 32.

4

e. On 15 August 2017, counsel for Mr. Mohammad forwarded a proposed PTA to the

OCA.[25]

f. On 27 August 2017, Mr. Castle was appointed as Principal Deputy General Counsel

(PDGC) for the DoD, and assumed the role of DoD AGC the same day.[26]

g. In early September 2017, during a routine meeting, Mr. Castle's staff advised him that

Messrs. Rishikof and Brown had requested to meet with him.[27] Mr. Castle asked OGC attorneys

for background information, and was told about some issues with the CA.

> At that time, I had little specific knowledge about the ongoing Military Commissions. Prior to holding that meeting, I spoke to attorneys within [OGC about] what Mr. Rishikof and Mr. Brown might want to discuss. I recall that around this time I asked for and received OGC attorneys' view of Mr. Rishikof and Mr. Brown's performance in managing the OMC. Their general view was that Mr. Rishikof and Mr. Brown alternated between not coordinating administrative aspects of their jobs and coordinating in a needlessly disruptive and divisive manner. This caused me to question whether Mr. Rishikof and Mr. Brown were the right individuals to manage . . . OMC.[28]

The specific performance issues cited by the OGC attorneys included an attempt to use

unauthorized air transportation to U.S. Naval Station, Guantanamo Bay (NSGB) and a change to

boat transportation at NSGB that had resulted in cancellation of a commissions hearing session.[29]

Mr. Castle's staff also advised him that (1) the CA was exploring potential non-capital PTAs

with the Defense,[30] a process that was "well under way;"[31] (2) it was imperative he not

---

[25] AE 555VV (KSM), Mr. Mohammad's Closing Argument Memorialized for AE 555P (GOV), AE 555R (AAA), and AE 555CC (AAA), filed 27 September 2018, p. 15. In his recent supplement, Mr. Mohammad cites to a prior proffer of this fact made on the record and, in light of the Government's contesting of that proffer, argues that the testimony of Mr. Rishikof is necessary to establish it. AE 555CC (KSM Sup), pp. 1-2. Accepting that proffered fact as true, however, will not change the decision the Commission renders here. Accordingly, the Commission has entered a finding of fact consistent with the Defense proffer, and finds Mr. Rishikof's testimony in that regard unnecessary.

[26] Castle Declaration para. 3; Transcript 20902, 21131, 21137. He remained AGC until August 2018, after which he continued to serve as DoD PDGC. Transcript 21131.

[27] Transcript 21170-74.

[28] Castle Declaration, para. 10.

[29] Transcript 21175-76.

[30] That is, "agreements to take the death penalty off the table in exchange for a guilty plea and life in prison." Transcript 21335.

[31] Transcript 21174, 21360.

5

substantively discuss or attempt to influence those negotiations in any way;[32] and (3) the Defense had indicated they would not agree to any PTA unless the CA first obtained concurrence from the Department of Justice (DOJ).[33]

h. The requested meeting with Mr. Rishikof was held sometime in late September or early October 2017.[34] During that meeting, AGC Castle shut down any substantive discussion of PTAs in order to avoid UI issues: "[A]nytime [Mr. Rishikof] would try and bring up anything . . . to do with plea agreements, I . . . literally would physically wave him off. I mean, I was literally moving my arms back and forth saying, 'That is not my business. That is . . . what you do. I don't have any role in that.'"[35]

i. On 29 September 2017, Messrs. Rishikof and Brown met with counsel for Mr. Ali to discuss "possible disposition" of the case, to include potential for a PTA.[36]

---

[32] Transcript 21174 ("[My staff] explained to me what the [CA] was, and they explained . . . Mr. Rishikof was actively exploring the possibility of [PTAs] . . . and they also explained to me the concept of [UI] and how it was absolutely essential that I not discuss . . . plea agreements with him at all." *Id.*); Transcript 21301 (AG Castle testifying that "my staff was very . . . concerned about me saying anything or doing anything that would have to do with a UI," and that "I was not supposed to say anything that could be construed one way or the other as supporting or not supporting" PTA negotiations. *Id.*)

[33] Transcript 21302, 21306, 21345, 21360-61, 21368. The Commission notes that, in his supplement to AE 555CC, Mr. Mohammad proffered (and cited to prior proffers made by him on the record) that (1) he "caused a confidential . . . proposed PTA . . . to be served on Mr. Rishikof on August 15, 2017, and (2) that, while that document "did not require that the Attorney General sign the document," it did "require that the [CA] *agree that Mr. Mohammad would not be prosecuted elsewhere.*" AE 555CC (KSM Sup), pp. 1, 5-6 (emphasis added). Even assuming those proffers to be true, they do not materially contradict AGC Castle's testimony that he and other OGC attorneys were advised (and in fact believed) that Defense Counsel in this case would not accept a PTA absent some formal affirmation that DOJ would not prosecute. Accordingly, the Commission is not persuaded that Mr. Rishikof's testimony is needed to resolve any perceived inconsistency between these proffers and AGC Castle's testimony.

[34] Transcript 21170, 21179-80. Sometime in the fall of 2017, AGC Castle's staff also arranged a brief introductory meeting between him and the Chief Prosecutor. Transcript 21325-26. AGC Castle ultimately met with the Chief Prosecutor "a couple of times," and could not recall details of what was discussed, though the focus was apparently on a military commissions case other than this one. Transcript 21356-60. AGC Castle did not meet with the Chief Defense Counsel. Transcript 21360.

[35] Transcript 21301.

[36] AE 555BB (KSM AAA), pp. 29-30; AE 555CC (AAA), Attach. B, pp. 5, 10.

    j. In early- to mid-October 2017, Attorney General (AG) Jeff Sessions called SecDef Mattis's office to express his position regarding the conclusion of PTAs in this case.[37] Secretary Mattis was called out of a meeting with high-level DoD officials (including AGC Castle) to take AG Sessions's call.[38] Shortly after, AGC Castle was called out to join Secretary Mattis.[39] AGC Castle did not know why Secretary Mattis had been called out.[40] After AGC Castle arrived in Secretary Mattis's office, the AG was connected via speakerphone.[41] The SecDef had difficulty determining the nature of the AG's concerns.[42] AG Sessions stated he wanted "no deal."[43] Secretary Mattis asked AGC Castle, "What is [AG Sessions] talking about?"[44] AGC Castle replied that he "didn't entirely understand what was going on."[45] However, certain at least that DoD had concluded no recent agreements that would substantially involve the AG, AGC Castle confirmed to Secretary Mattis that there was "no deal."[46] The call was very brief—about 3 or 4 minutes[47]—after which the SecDef and AGC Castle returned to the original meeting.[48] They did not substantively discuss the AG's call again.[49] Though AGC Castle gleaned the AG's call was in some way related to terrorism,[50] the specific source of his consternation was sufficiently unclear that AGC Castle did not immediately understand the "deal" referred to was potential

---

[37] AE 555BB (KSM AAA), pp. 7, 31; AE 555EE (GOV), p. 7; AE 555UU (AAA), pp. 4-5, 12; AE 555WW (GOV), Government Written Memorialization of Its Intended Oral Argument, filed 27 September 2018, p. 19; AE 555ZZ (KSM), Mr. Mohammad's Response to AE 555WW (GOV) Government Written Memorialization of Its Intended Oral Argument, filed 11 October 2018, p. 3; Transcript 20803-20806, 21186-88. Secretary Mattis was SecDef throughout the course of events at issue here. Mattis Declaration para. 3; fn 2, *supra*.
[38] Transcript 21186-87.
[39] Transcript 21186-88.
[40] Transcript 21187.
[41] Transcript 21315-17, 21362.
[42] Transcript 21190.
[43] Transcript 21188, 21317, 21331-32, 21363.
[44] Transcript 21190, 21331.
[45] Transcript 21190.
[46] Transcript 21191-93, 21318-20, 21331-32, 21364.
[47] Transcript 21192, 21318, 21364.
[48] Transcript 21332.
[49] Transcript 21333. Secretary Mattis never communicated with Mr. Rishikof or Mr. Brown directly regarding this, or any other, matter. Rishikof & Brown Declaration 1, para. 4.
[50] Transcript 21317-18.

PTAs in this case.[51] AGC Castle did not suspect this until after he returned to his office and

discussed the matter with other OGC attorneys.[52] He subsequently directed his staff to arrange a

meeting with Mr. Rishikof (described in more detail below), at which he would discuss the

importance of coordination within the department, but not the substance of any PTAs.[53]

     k. On or about 16 October 2017, AGC Castle and Deputy General Counsel-Legal

Counsel (DGC (LC)) Robert Easton met with Messrs. Rishikof and Brown.[54] They informed

Messrs. Rishikof and Brown of the call by AG Sessions to SecDef Mattis[55] and expressed

concern[56] that OGC had not been informed of the CA's contacting DOJ to discuss pleas.[57]

Messrs. Rishikof and Brown advised AGC Castle that they had attempted to brief him on prior

occasions regarding their activities, but had been ignored.[58] AGC Castle repeatedly asked

Mr. Rishikof, "Who authorized you to go over and speak to [DOJ]?"[59] Mr. Rishikof responded

that DepSecDef Shanahan had authorized the contact.[60] AGC Castle stressed that "all of our

ships have to be heading in [*sic*] the same place at the same time," by which he meant "we need

to be properly coordinating what's going on."[61] When Mr. Rishikof attempted to substantively

discuss potential PTAs at the 16 October meeting, however, AGC Castle changed the subject to

---

[51] Transcript 21191-92, 21319-20, 21364. During his testimony, AGC Castle stressed that, given the breadth of his portfolio, a "deal" between the DoD and DOJ could mean any number of things. Transcript 21191, 21320.
[52] Transcript 21193-97, 21334-35, 21365.
[53] Transcript 21199-21200.
[54] AE 555BB (KSM AAA), pp. 7, 31; AE 555CC (AAA), Attach. B, pp. 5, 10, 15; AE 555UU (AAA), p. 5.
[55] AE 555BB (KSM AAA), pp. 7, 31; AE 555CC (AAA), Attach. B, p. 5, 10, 15; Transcript 20804, 21198.
[56] Apparently this concern was of a sufficient degree that Messrs. Rishikof and Brown perceived AGC Castle as being "clearly agitated" or "angry" about the incident. AE 555CC (AAA), Attach. B, pp. 5, 15; Transcript 20804.
[57] Transcript 20805-06, 20897-98, 20903; AE 555CC (AAA), Attach. B, pp. 1, 5, 11, 15 (anticipating testimony that AGC Castle "said . . . the DOD all needs to move together and the OGC needs to be informed." *Id.*) AGC Castle and Mr. Easton also expressed concern about Mr. Rishikof engaging in uncoordinated direct contact with members of Congress. AE 555CC (AAA), Attach. B, pp. 5, 10.
[58] Transcript 20805-06.
[59] Transcript 21199, 21349.
[60] Transcript 21199.
[61] Transcript 21199-21200.

avoid intruding on the CA's authority (as was his consistent practice in conversations with Mr. Rishikof when the subject arose).[62]

    l. Shortly after the 16 October 2017 meeting, AGC Castle met with DepSecDef Shanahan, and asked whether he had in fact authorized Mr. Rishikof to contact DOJ.[63] The DepSecDef stated that he had.[64] While AGC Castle had begun seriously considering seeking Mr. Rishikof's termination from the CA position due to "improper coordination because of the [AG] phone call," upon learning the DepSecDef had authorized contact with the DOJ, he decided this was not an appropriate basis for termination.[65] At Mr. Rishikof's request, AGC Castle then arranged for a meeting between Messrs. Rishikof and Brown, the DepSecDef, and himself.[66]

    m. At that meeting, which occurred on or about 18 October 2017, Messrs. Rishikof and Brown briefed the DepSecDef and AGC Castle on various Commissions-related issues, to include potential pursuit of PTAs in this case.[67] Specifically, they briefed on three proposed overall courses of action (COAs) for future management of the military commissions writ large, which were: (1) resolving cases by means of PTA; (2) reorganizing various DoD entities to consolidate commissions-related functions under the authority of the CA; or (3) continuing with the status quo.[68] Before the meeting, AGC Castle advised DepSecDef Shanahan to be in "receive mode," meaning "to not indicate approval or disapproval of anything that [Mr. Rishikof] had to

---

[62] Transcript 20903-04, 21301, 21349-50, 21353, 21371-72. During this meeting, DGC (LC) Easton asserted that OGC "own[s] commissions," a remark he would clarify and apologize for on 27 October 2018 (stating he only meant the OMC structure had been set up by OGC). AE 555BB (KSM AAA), p. 31; AE 555CC (AAA), Attach. B, pp. 5-6, 11, 15-16; Transcript 20806. (AGC Castle remembered that Mr. Easton made the "ownership" remark, but was unable to recall if it was at the 16 December 2017 meeting. Transcript 21200-01. The Commission will assume the Defense assertions in this regard are accurate.) Sometime in October 2017, Easton was replaced as DGC (LC) by Mr. Ryan Newman. AE 555 (AAA 2nd Sup), Attach. B, p. 4; AE 555R (AAA), Attach. B, p. 4.
[63] Transcript 21202.
[64] Transcript 21202.
[65] Transcript 21202.
[66] Transcript 21202.
[67] AE 555P (GOV), Attach. D; AE 555BB (KSM AAA), pp. 33-34; AE 555CC (AAA), Attach. B, p. 6; Transcript 21203.
[68] Transcript 21203.

JA.38

say, especially when it came to [PTAs]."[69] DepSecDef Shanahan followed that advice, saying very little during the meeting.[70]

n. "Sometime before Thanksgiving" of 2017, as part of internal OGC discussions regarding the management of Military Commissions as a whole, AGC Castle again began to consider whether Mr. Rishikof should be terminated.[71] In Mr. Castle's words, "all of these different . . . concerns . . . were still out there . . . dealing with fast boat [and] other issues. . . . I'm really starting to be concerned that things are not going well. So we then spun up again the possibility of . . . terminating Harvey."[72] AGC Castle asked his subordinate counsel to consider the issue of replacing Mr. Rishikof as CA, and the subject was discussed at a number of internal OGC meetings.[73]

o. On 1 December 2017, Messrs. Rishikof and Brown again met with counsel for Mr. Mohammad to discuss the potential for a PTA.[74]

p. On 12 December 2017, the CA's office submitted for DepSecDef signature a memorandum, subject: "Oversight and Management of Military Commissions."[75] The body of the memo read as follows:

---

[69] Transcript 21204.
[70] Transcript 21204.
[71] Transcript 21207-08.
[72] Transcript 21206.
[73] Transcript 21208-09.
[74] AE 555BB (KSM AAA), pp. 9, 31.
[75] AE 555P (GOV), Attach. D. Also on 12 December 2017, OCA returned charges in *U.S. v. Encep Nurmajen, a.k.a. Hambali* (hereinafter, "*U.S. v. Hambali*"), "because the transmittal package lacked the required coordination with [the Office of the Director of National Intelligence (ODNI)] and also included no supporting evidence." AE 555P (GOV), p. 370 of 425. On 15 December 2017, the Office of the Chief Prosecutor (OCP) asked OCA to dismiss the charges without prejudice in order to allow OCP to re-prefer. AE 555P (GOV), pp. 370-371 of 425. OCP forwarded this second set of charges to OCA for referral on 19 December 2017. AE 555P (GOV), p. 393 of 425. On 21 December 2017, Messrs. Rishikof and Brown met with outgoing DGC (LC) Newman and discussed, *inter alia*, OCA's anticipated return of the *Hambali* charges to OCP. AE 555CC (AAA), pp. 14, 19, 24 of 33. On 22 December 2017, OCA returned the *Hambali* charges to OCP "because they lacked the required ODNI coordination." AE 555P (GOV) p. 371 of 425. On 4 January 2018, Messrs. Rishikof and Brown met with (DGC (LC)) Newman and discussed, *inter alia*, the return of the *Hambali* charges. AE 555CC (AAA), pp. 5, 19, 24 of 33.

10

JA.39

1.    In our prior meeting with you in October 2017, we discussed the three courses of action to address Military Commissions cases at [NSGB]: (1) Continue the status quo at ever-increasing costs presently over $100M per annum; (2) Consolidate authority for more cohesive operations; *(3) Entertain guilty pleas, speeding resolution of the cases and bringing closure to the victims and families. We have continued to press ahead on COA (3) (and will update you),* but at this point are recommending you sign the attached memorandum for COA (2), consolidating control over Military Commissions in order to significantly improve the effectiveness of the Commissions mission moving forward. See Tab 1.

2.    The attached draft memorandum for your signature at Tab 1 would greatly improve the ability of Military Commissions to carry out its core functions and operate with a unity of effort and authority. This memo would restore the status quo that existed at the outset of the Commissions and is similar to memoranda issued by prior Deputy Secretaries of Defense in May 2014 and May 2008 (see Tab 2). For various reasons, the authorities have eroded over the last sixteen years. The memo for your signature addresses the areas of concern such as lack of coherent C2; growing personnel, transportation, and infrastructure costs; protracted timeline of past and future litigation; an aging and resource-demanding detainee population; ballooning prosecution and defense costs; and national security implications which both slow information flow and increase costs due to spills or unauthorized disclosures of classified information.

3.    Also attached is an appendix of substantiating documentation outlining in more detail the various issues and suggestions for improvement. I look forward to discussing this issue with you. My sense is that the sooner the memorandum is executed the better for the process, given the situation we now find ourselves in.[76]

The packet, which was approximately 65 pages long, contained no reference to PTAs in this case beyond the italicized language above (emphasis added by the Commission).[77] This brief mention of PTAs essentially repeated information the DepSecDef and AGC had already known for some time.[78] Provided in the packet was a memorandum for DepSecDef signature that, had it been signed, would have had immediate and substantial cross-cutting effects within DoD on supervision, coordination, manpower, resourcing, and funding related to the military

---

[76] AE 555P (GOV), Attach. D (emphasis added).

[77] *Id.*

[78] The DepSecDef was aware of potential PTAs as of 6 July 2017—over 5 months before the 12 Dec 2017 memorandum was signed. *See* para. 2.d, *supra*. AGC Castle's staff made him aware of potential PTAs in this case virtually on his arrival at DoD OGC—certainly not later than September 2017. *See* para. 2.g, *supra*. Calculating from mid-September 2017, AGC Castle had already known of potential PTAs in this case for nearly three months.

11

JA.40

commissions.[79] No advance copy was provided to DoD OGC.[80] There is no indication that any

substantial, formal coordination with DoD OGC and potentially affected stakeholders had taken

place before the memo was submitted for signature.[81] The Office of the DepSecDef returned the

---

[79] *See* AE 555P (GOV), Attach.'s D-G. For example, the proposed DepSecDef memo stated that "[a]ll DoD organizations *will provide* sufficient manpower and resourcing assistance to the Military Commissions . . . as outlined in the attached document." *Id.* (emphasis added). The attachment was a table of recommended changes to the DoD military commissions structure writ large. AE 555P (GOV), Attach. D, Tab 3. It expressly purported to make the CA supervisor of OCP; make the CA "sole 'owner'" of military commissions-related Detainee Affairs, Periodic Review Board, prosecution, information technology, security, and personnel functions; and directed reallocation of considerable DoD funding to military commissions efforts (to include approximately $27 million in construction). *Id.*; *see also* Transcript 21244 (AGC Castle's testimony that the memorandum would have effectuated "a whole series of changes" that amounted to "fundamentally . . . reorganiz[ing]" the OCA and related organizations). At least one longtime OCA senior staff member (the Deputy Chief of Operations) apparently recognized the profound degree of authority the memorandum would have placed under Mr. Rishikof, colloquially referring to the document as the "King Me" memo. Transcript 20813, 72, 83-84.
[80] Transcript 21246, 21351-52; Castle Declaration para. 11.a.
[81] There were apparently a number of meetings between OCA and OGC in which they discussed the realignment of authorities the 12 December 2017 memo was eventually drafted to effectuate. *See* AE 555BB (KSM AAA) (asserting "Mr. Rishikof and/or Mr. Brown had no less than twenty-five in-person and electronic meetings with members of OGC between 28 April 2017 and the submission of the memorandum in December 2017," and that "[m]any of these . . . addressed" the three COAs recited in the memorandum. *Id.* at pp. 32-33); AE 555CC (AAA), Attach. B, pp. 6, 11, 16 (anticipating testimony that Mr. Rishikof discussed the forthcoming memo with DoD OGC personnel in several teleconferences prior to the memorandum's submission); Transcript 20807, 20909 (Defense investigator relaying statement by Mr. Brown that "The predominant method [OCA used] to keep [OGC] informed . . . was a weekly . . . video teleconference." *Id.* at 20807); *see also* Rishikof & Brown Declarations 1 and 2 (describing weekly meetings and status reports). AGC Castle acknowledged in his testimony that Mr. Rishikof "was always talking about" and "advocating for his COAs;" that while he "[didn't] know the specifics," there was "constant communication" between OCA and OGC, to include weekly meetings; and that Mr. Rishikof might well have advised AGC Castle at some point that he planned to reduce those COAs to "some sort of written document." Transcript 21205, 21243-44, 21353. There are also indications that OCA personnel discussed the proposal with at least some non-OGC stakeholders in various calls and meetings. *See, e.g.*, AE 555BB (KSM AAA), pp. 18, 32 (noting Messrs. Rishikof and Brown discussing need for reorganization with former DepSecDef Work); AE 555CC (AAA), Attach. B, p. 12 (anticipating Mr. Brown would testify that "he discussed the changes proposed in the 13 December 2017 memorandum extensively with representatives of affected organizations." *Id.*). However, it is notable that in the wake of the memorandum's rejection, an OGC attorney apparently suggested to Mr. Rishikof that he begin having regular monthly meetings with stakeholders from the organizations that would have been affected by the memorandum (AE 555CC (AAA), Attach. B, pp. 7, 17 (anticipated testimony of Mr. Rishikof))—which indicates that such regular broad-based coordination had not been conducted before. Significantly, Messrs. Rishikof and Brown themselves expressly acknowledged they had not formally staffed the document, claiming they viewed it as a mere "vehicle to begin discussions" (despite the profound effects it would have had), which therefore did not require formal staffing. Rishikof & Brown Declaration 2, para. 1.b; fn 79, *supra*. In short, nothing presented materially conflicts with AGC Castle's declarations that "Mr. Rishikof and Mr. Brown never provided DoD OGC a copy [of the 12 December 2017 memo] in advance of its submission to DepSecDef" and that they "failed to appropriately [(*i.e.*, formally)] coordinate with any of these potentially impacted entities in advance of submitting the memorandum." Castle Declaration, para. 11.a-b. During his testimony before the Commission, AGC Castle stressed the significance of this failing, stating uncategorically that he viewed it as a "major process foul." *See* fn 187, *infra*.

12

memorandum unsigned, and advised AGC Castle that the CA "[had] submitted a memorandum .
. . directly to the DepSecDef without prior notice to OGC."[82]

q. On 15 December 2017, AGC Castle drafted and signed a memorandum to the SecDef,
subject: "Plan for the Disposition of Future Unprivileged Enemy Belligerent Cases."[83] The
document provided "a four-part plan for current and future legal actions involving unprivileged
enemy belligerents."[84] The first proposal was to replace the military commissions CA and Legal
Advisor,[85] in order to "enhance the prospect for a cohesive effort for the disposition of pending
cases"[86]—a reference to AGC Castle's concern regarding lack of sufficient coordination by
Mr. Rishikof.[87] The proposal states that the CA "serves at the pleasure of the Secretary and can
be removed at any time," and that the CA's legal advisor "can be removed . . . by the General
Counsel."[88] The proposal makes no apparent reference to PTAs.[89]

r. On 4 January 2018, DGC (LC) Newman drafted an action memorandum for
consideration by AGC Castle, recommending termination of Mr. Brown and subsequent
appointment of Acting Legal Advisors.[90] The proffered rationale for the action was "[t]o
effectuate a more cohesive effort by the [DoD] for the administration of military commissions."[91]

---

[82] Transcript 21352; Castle Declaration para. 11; AE 555P (GOV), Attach. D, Tab 1.
[83] AE 555DD (GOV), Government Reply to AE 555W (WBA); AE 555X (RBS); AE 555BB (AAA, KSM)
Defense Response to Government's Motion to Reconsider AE 555O, Order, Defense Motion to Compel Discovery
Regarding the Firing of the Convening Authority and Legal Advisor, filed 6 August 2018, Attach. L.
[84] AE 555DD (GOV), Attach. L, p. 1. The copy of this document provided by the Government is heavily redacted,
based on a Government assertion that the redacted portions "are not relevant to the Unlawful Influence allegation in
this case." AE 555DD (GOV), fn 1. The Prosecution was apparently conveying an assertion of privilege made by
DoD OGC, as OGC, not the Prosecution, had redacted the document based on grounds of both privilege and
relevance. Transcript 21341-43.
[85] AE 555DD (GOV), Attach. L, pp. 1, 2.
[86] AE 555DD (GOV), Attach. L, p. 1.
[87] Transcript 21221.
[88] AE 555DD (GOV), Attach. L, p. 2.
[89] During his testimony, Mr. Castle answered in the affirmative when asked if "one of the provisions" of the
December 15, 2017 memorandum noted "the Secretar[ial] . . . authority to take away the [PTA] power of the [CA]."
Transcript 21365. This appears to have been in error, however, as no such provision is apparent in the document.
[90] AE 555D (GOV), Attach. C.
[91] *Id.*

13

JA.42

The memorandum specified that the Acting Legal Advisors "will inform and coordinate with the [DGC (LC)] on all matters of law and policy that may require the attention of the DoD [GC], except . . . those . . . that impact the Office of the [CDC]."[92] The document does not mention PTAs.

s. By early January 2018, OGC was actively searching for an interim or successor CA.[93] As part of this process, AGC Castle had engaged in at least three preliminary conversations about the role with a potential candidate: RADM James E. McPherson.[94] In one of these conversations, however, AGC Castle mentioned as a concern the unexpected phone call by AG Sessions to Secretary Mattis.[95] Concerned RADM McPherson might misconstrue this comment as disagreement with Mr. Rishikof's pursuit of PTAs (rather than his failure to notify OGC of his engagement with DOJ), AGC Castle ceased considering RADM McPherson as a candidate.[96] By 12 January 2018, AGC Castle had decided instead to recommend Mr. James M. Coyne as Mr. Rishikof's successor.[97]

t. On 12 January 2018, AGC Castle drafted an action memorandum for consideration by SecDef Mattis recommending Mr. Rishikof's removal.[98] The memorandum recommended the Secretary rescind Mr. Rishikof's designations as CA and Director, terminate his DoD employment, and designate Mr. Coyne to act in his stead.[99] The basis cited for the action was

_____

[92] *Id.*
[93] Transcript 21254 (AGC Castle noting that he'd engaged in conversation with at least one potential successor CA prior to 12 January 2018).
[94] Transcript 21253-54.
[95] Transcript 21240-43.
[96] Transcript 21242-43, 21337-39 (AGC Castle's testimony that "I told [RADM McPherson] . . . why [Mr. Rishikof] was . . . talking to the Department of Justice," but "shortly thereafter . . . realized . . . that could be misinterpreted as . . . coming down or trying to push the scales . . . one way or the other on PTAs," such that he determined to "find somebody else." *Id.* at 21339); AE 555DD (GOV), paras. 3.k-l.
[97] AE 555DD (GOV), Attach. D.
[98] *Id.*
[99] *Id.*

14

"[t]o effectuate a more cohesive effort by the [DoD] for the administration of military commissions."[100] The document did not mention PTAs.[101] On or about that same day, however, AGC Castle withdrew this memorandum before action.[102] AGC Castle directed the memorandum's withdrawal because (1) having little or no military justice experience, his understanding of UI was limited, and (2) he "didn't think the information [he] was getting on the law regarding UIs was complete."[103] In order to ensure the legal footing of the proposed termination was sound, AGC Castle "created [a] panel . . . of experts" to reexamine the matter.[104] Two weeks later (26 January 2018), this panel would produce for AGC Castle a memorandum (discussed in greater detail below) advising that termination of Mr. Rishikof was legally supportable.[105] When Mr. Rishikof was ultimately terminated, AGC Castle "completely disregarded" the 12 January 2018 memorandum in recommending that action, and instead, relied solely on the 26 January 2018 "panel of experts" memorandum.[106] Regardless, as noted above, the 12 January 2018 memorandum makes no reference to PTAs.

   u. On or about 23 January 2018, Messrs. Rishikof and Brown held a conference call with ADM Kurt W. Tidd, the then-Commander of U.S. Southern Command (CDR, USSOUTHCOM), in which they sought (among other things) more recent imagery of the Expeditionary Legal Center (ELC) at NSGB.[107] The most current imagery then available was 10 years old,[108] and

---

[100] *Id.*
[101] *Id.*
[102] AE 555DD (GOV), p. 11. The Government initially asserted this to be the case "on information and belief." *Id.* This assertion was later confirmed by AGC Castle, who testified that he "pulled down" the memo for further consideration due to concerns regarding its legal footing. Transcript 21230-36.
[103] Transcript 21228.
[104] Transcript 21228, 21230-33.
[105] AE 555DD (GOV), Attach. E. This matter is discussed in greater detail below. *See* para. 2.w, *infra*, and accompanying text.
[106] Transcript 21228.
[107] AE 555 (AAA 2nd Sup), p. 10, Attach. B, pp. 1-3, 5; AE 555R (AAA), Attach. B, pp 1-3, 5; AE 555BB (KSM AAA), pp. 5, 37; AE 555CC (AAA), Attach. B, p. 2; AE 555UU (AAA), p. 12; Transcript 20816-24.
[108] Transcript 20815.

Mr. Rishikof believed having up-to-date imagery would help in his efforts to obtain additional facilities funding.[109] More recent imagery was not forthcoming.[110] ADM Tidd neither prohibited Messrs. Rishikof and Brown from continuing to seek updated imagery, nor encouraged them to do so.[111] At the time of the conference call (and at present), the Regulation for Trial by Military Commission (R.T.M.C.) stated with regard to the CA's responsibilities: "Communications to the Commanders of the Combatant Commands, except in unusual circumstances, shall be transmitted through the Chairman of the Joint Chiefs of Staff."[112] There is no indication that OCA personnel coordinated with the Office of the Chairman of the Joint Chiefs of Staff prior to initiating direct contact with CDR, USSOUTHCOM.

v. On or about 24 January 2018, Messrs. Rishikof and Brown held a conference call with Rear ADM (RADM) Kevin Lunday, U.S. Coast Guard (USCG), and requested he obtain updated ELC imagery for them.[113] Mr. Rishikof made no apparent effort to determine whether there were any specific coordination or approval requirements with regard to USSOUTHCOM or CDR, NSGB; rather, he assumed "all relevant coordination [would] be handled by parties with relevant subject matter knowledge."[114] RADM Lunday first checked whether existing current imagery of the ELC already existed within USCG and certain other U.S. Government entities; it did not.[115] RADM Lunday then reached out to RADM Peter J. Brown, who was at that time the commander of USCG District 7 (the USCG operational subdivision containing NSGB), for assistance.[116] On

---

[109] Transcript 20814.
[110] AE 555 (AAA 2nd Sup), p. 10; Rishikof & Brown Declaration 2 para. 1.a; AE 555CC (AAA), Attach. B, p. 2; Transcript 20817.
[111] AE 555 (AAA 2nd Sup), p. 10; AE 555CC (AAA), Attach. B, p. 2; Transcript 20817-21.
[112] R.T.M.C. (2011) para. 2-3.a(16).
[113] AE 555 (AAA 2nd Sup), p. 10; AE 555BB (KSM AAA), p. 5, 37-38, Attach's L-M; AE 555CC (AAA), Attach. B, p. 7; AE 555UU (AAA), pp. 12-14; Rishikof & Brown Declaration 2 para. 1.a; Transcript 20824-31, 20838-52.
[114] AE 555CC (AAA), Attach. B, p. 7.
[115] Transcript 20840-41.
[116] Transcript 20842.

or about 26 January 2018, pursuant to the request made to RADM Lunday, a DoD employee aboard a USCG helicopter photographed the ELC.[117] While it remains somewhat unclear from the record whether this action was, in fact, properly authorized,[118] any ambiguity regarding this issue is not germane to the Commission's ultimate analysis.[119]

      w. On 26 January 2018, Mr. Chris Jenks, Special Counsel to the DoD General Counsel,[120] submitted a memorandum to AGC Castle, subject: "Legal Considerations on Potential Military Commissions Personnel Action."[121] The most salient parts of the memorandum for purposes of this matter are recited below; a comprehensive summary is not provided.

      (i) The memorandum was a report of a group of legal expert consultants assembled at AGC Castle's request.[122] The report was "inten[ded] and expect[ed] . . . [to be] a confidential communication made for the purpose of . . . formulat[ing] legal advice."[123]

---

[117] AE 555 (AAA 2nd Sup), p. 10; AE 555BB (KSM AAA), pp. 5, 38-40; Attach's L-M; AE 555UU (AAA), pp. 12-14; Transcript 20824-31, 20838-52.

[118] A Defense investigator providing a proffer of expected testimony for the Defense stated that: (a) RADM Lunday and the then-Chief of Incident Management for USCG District 7 told him the USCG had authority to conduct the flight and no USSOUTHCOM policies had been violated; (b) the then-commander of JTF-GTMO (RADM Edward Cashman) said he had been unaware of the overflight and that USSOUTHCOM would have had to authorize it; and (c) the CA's Office apparently coordinated the action with OMC-South Security personnel and JTF-GTMO Public Affairs (who RADM Cashman acknowledged had some role in approving photography of NSGB facilities). Transcript 20826-28, 20841-42, 20844-46, 20850-52. The investigator's notes (which were received as an exhibit during his testimony) indicate that on 25 January 2018 the Naval Station Guantanamo Bay (NAVSTA GTMO) Public Affairs Officer (PAO) notified a number of people—including a Washington Headquarters Service security representative and two USSOUTHCOM PAO personnel—of the overflight. AE 555SS (WBA), In-Court Submission (Defense Investigator's Notes), filed 12 September 2018, p. 325 of 341. It is not clear, however, whether any of these USSOUTHCOM personnel could authorize the overflight or aerial photography of the ELC, or whether they obtained or arranged such authorization. Neither Mr. Rishikof nor Mr. Brown themselves received any complaints following the 26 January 2018 overflight. Rishikof & Brown Declaration 2, para 1.a.

[119] *See* para. 5.g, *infra*.

[120] The "Special Counsel to the DoD General Counsel" is a law professor hired annually by DoD OGC as a special assistant to the GC. Transcript 21172.

[121] AE 555DD (GOV), Attach. E.

[122] AE 555DD (GOV), Attach. E, para. 1.

[123] AE 555DD (GOV), Attach. E, para. 1.

It provided (1) advice as to how to replace Mr. Rishikof while minimizing legal and public relations risk, and (2) an assessment of associated legal risks.[124] The report recognized that the primary potential risk of this action was "subsequent allegation of [UI]," because "there are indications [the CA] may entertain a [PTA] if offered by an accused."[125]

        (ii) The report also (a) noted Mr. Rishikof had "displayed questionable judgment . . . temperament and . . . decision making" from the beginning of his tenure;[126] (b) noted AGC Castle "spoke with the CA on several occasions but did not discuss PTAs;"[127] (c) recognized the CA's independent authority to conclude PTAs absent Secretarial withholding;[128] (d) cited failure to provide notice of engagement with DOJ, the 12 December 2017 memo, the ELC imagery request and several other instances of poorly-coordinated actions as reasons justifying the CA's removal;[129] and (e) noted that a potential replacement CA had been dropped from consideration specifically due to concern that a conversation with AGC Castle regarding the AG Sessions phone call might be interpreted as asserting a restriction on CA authority to enter PTAs.[130]

        (iii) Ultimately, the report concluded that "you may appropriately recommend that the Secretary rescind Mr. Rishikoff's [sic] designation . . . and designate someone else."[131] The report also cautioned, "in order to minimize . . . risk of misperceptions . . . you should . . . clarify[] to the Secretary the factors you did and did not consider . . . and . . . advise the Secretary [of] factors [he] should and should not consider."[132] The memo also recommended AGC Castle

---

[124] AE 555DD (GOV), Attach. E, para. 1.
[125] AE 555DD (GOV), Attach. E., para. 2.
[126] AE 555DD (GOV), Attach. E, para. 3.e.
[127] AE 555DD (GOV), Attach. E, para. 3.g.
[128] AE 555DD (GOV), Attach. E, para. 3.g.
[129] AE 555DD (GOV), Attach. E, paras. 3.i, 3.j(1), (3).
[130] AE 555DD (GOV), Attach. E, paras. 3.k-l. This refers to AGC Castle's conversations with RADM McPherson, which are the subject of separate findings, above. *See* para. 2.s, *supra*.
[131] AE 555DD (GOV), Attach. E, para. 2.
[132] AE 555DD (GOV), Attach. E., para. 2.

"[c]ontinue the approach of not saying anything to [potential successor CAs] about the potential performance of judicial or quasi-judicial actions as Acting CA."[133]

      x. On or about 2 February 2018, AGC Castle briefed DepSecDef Shanahan and the Chief of Staff (CoS) regarding his intent to (a) seek removal of the CA from SecDef, and (b) terminate Mr. Brown's appointment as Legal Advisor.[134] In a supporting memorandum to the DepSecDef, AGC Castle cited a litany of badly-coordinated actions by the CA, including the 12 December 2017 memorandum and the ELC imagery request.[135] He primarily referenced those events in his verbal briefing to the DepSecDef and CoS.[136] In the memorandum, AGC Castle recommended Mr. Rishikof be removed "because of his escalating pattern of either not properly coordinating actions or coordinating in a manner that is needlessly disruptive," and remarked that "[i]f we don't replace [him], it is not a question of if he will do something that jeopardizes the conduct of the military commissions, but when."[137] By this, AGC Castle meant that Mr. Rishikof "was a loose cannon[, ]that we did not know what he was going to do, and that . . . he was not properly coordinating."[138]

      y. Shortly after briefing the DepSecDef and CoS, AGC Castle submitted to the DoD Executive Secretariat an action memorandum for Secretary Mattis's consideration,[139] subject: "Removal of Mr. Harvey Rishikof as Convening Authority for Military Commission and Designation of an Acting Convening Authority."[140] AGC Castle recommended this action "[t]o

---

[133] AE 555DD (GOV), Attach. E., para. 8.a.
[134] AE 555DD (GOV), Attach. F; Transcript 21272-74.
[135] AE 555DD (GOV), Attach. G.
[136] Transcript 21276-78. AGC Castle did not have personal knowledge of the ELC imagery request and its circumstances, but relied on the reports of subordinate senior counsel regarding CAO activities. Transcript 21290-95.
[137] AE 555DD (GOV), Attach. G.
[138] Transcript 21275.
[139] AE 555DD (GOV), Attach. G; Castle Declaration para. 3; Transcript 21281.
[140] AE 555P (GOV), Attach. K.

effectuate a more cohesive effort by the [DoD] for the administration of military commissions."[141] AGC Castle noted that, in making this recommendation, he considered Mr. Rishikof's "professional judgment, temperament and decision-making," but "not . . . his performance of any judicial or quasi-judicial actions."[142] In the memorandum, AGC Castle advised SecDef Mattis to do the same in deciding whether to follow that recommendation.[143] In accordance with DoD staffing procedures, the action memo was submitted for the SecDef's signature through the Executive Secretariat, and the DepSecDef and CoS (with the benefit of AGC Castle's earlier input) briefed Secretary Mattis and obtained his decision.[144] AGC Castle did not, to his recollection, personally brief the SecDef on the matter.[145]

z. On 3 February 2018, SecDef Mattis signed memoranda removing Mr. Rishikof's designations and replacing him with Mr. Coyne as Acting CA and Director, OCA, pending designation of a new CA.[146] In doing so, Secretary Mattis relied on the supporting information and advice provided by AGC Castle, as conveyed by the DepSecDef and Chief of Staff.[147] On 5 February 2018, AGC Castle signed the memo terminating Mr. Brown's employment and appointment as CA's Legal Advisor.[148]

aa. On 5 February 2018, Messrs. Rishikof and Brown were notified of their dismissal by AGC Castle.[149] The notifications did not list any reasons for the terminations, nor were any

---

[141] Id.
[142] AE 555DD (GOV), Attach. G.
[143] Id.
[144] Transcript 21281.
[145] Transcript 21281, 21287.
[146] AE 555DD (GOV), p. 77-78, 92 of 117; Castle Declaration para. 3.
[147] Mattis Declaration para. 5-6; AE 555P (GOV), Attach. K; Transcript 21281.
[148] AE 555DD (GOV), p. 94 of 117. Secretary Mattis had no involvement in Mr. Brown's termination. Mattis Declaration para. 9.
[149] Rishikof & Brown Declaration 1, p. 1.

recited by AGC Castle.[150] On the same day, Mr. Mark W. Toole was appointed acting Legal

Advisor for this case.[151]

bb. There is no indication that any person in authority over either Mr. Rishikof or

Mr. Brown at any point throughout their tenure discouraged them from exploring potential PTAs

with Defense Counsel in this case.[152]

cc. On 6 August 2018, Mr. Coyne in a sworn declaration stated:

I have had no discussions with anyone, to include personnel from the DoD Office of the General Counsel (to include the former Acting General Counsel, William Castle), the Office of Secretary of Defense (to include the Secretary of Defense), the Office of the Deputy Secretary of Defense (to include the Deputy Secretary of Defense), or personnel from the Executive Branch officials outside of DoD (to include the Attorney General of the United States), regarding the topic of entering into pre-trial agreements in any present or future Military Commission case, to include *United States v. Mohammad, et al*. When I assumed my current duties, I had no awareness of whether there had been any consideration by my predecessor of plea agreements in *United States v. Mohammad*, et al, or any other active military commission case prior to my appointment.[153]

The parties have neither asserted nor presented evidence that counsel for the Accused have

approached OCA regarding potential PTAs since Messrs. Rishikof's and Brown's termination.

---

[150] AE 555DD (GOV), pp. 77, 94 of 117; Rishikof & Brown Declarations 1 and 2.

[151] AE 555DD (GOV), p. 47 of 117.

[152] *See* Rishikof & Brown Declaration 1 para. 2, 7 (Speculating that a long list of actions they undertook as CA and Legal Advisor, to include guilty pleas, might have been the motivation for their firing, but acknowledging that "[t]here was never any attempt made at any time to approach us about any issue concerning out duty performance during our tenure," and that "[i]t is unknown to us if [these actions] played a role in our removal"); Rishikof & Brown Declaration 2 (stating nothing that contradicts the language quoted above); Transcript 21349 (AGC Castle noting his reluctance to "have much contact" with the CA about issues, due to concerns about UI).

[153] AE 555DD (GOV), Attach. M, para. 2. The Commission takes notice of the facts that (1) Mr. Coyne retired from his position as General Counsel for the Defense Logistics Agency (DLA) in mid-August 2018, and (2) on 9 August 2018 was replaced as CA / Director, OCA by his successor at DLA, Ms. Melinda L. Perritano. Chris Erbe, *DLA General Counsel Coyne retires after 38 years with DoD*, http://www.dla.mil/AboutDLA/News/NewsArticleView/Article/1601330/dla-general-counsel-coyne-retires-after-38-years-with-dod/ (14 August 2018); SecDef Memorandum, Subj: Removal of Designation as Convening Authority for Military Commissions, dated 9 August 2018 (removing Mr. Coyne's designations); SecDef Memorandum, Subj: Designation of Melinda L. Perritano as Director of the Office of the Convening Authority for Military Commissions, dated 9 August 2018; SecDef Memorandum, Subj: Designation of Melinda L. Perritano as Convening Authority for Military Commissions, dated 9 August 2018.

21

dd. On 11 and 12 September 2018, Lieutenant Douglas R. Newman, U.S. Navy, an investigator supporting Mr. Ali's Defense Team, testified before the Commission regarding the anticipated testimony of persons he had interviewed.[154] Based on his demeanor and the manner and content of his testimony, the Commission found this witness to be highly credible.

ee. On 13 November 2018, AGC Castle testified before the Commission.[155] Based on his demeanor and the manner and content of his testimony, the Commission found this witness to be highly credible. AGC Castle expressly reaffirmed under oath the statement made in his 29 January 2018 memorandum to Secretary Mattis that, in advising Mr. Rishikof's removal, he "considered Mr. Rishikof's professional judgment, temperament, and decision-making. . . . not . . . his performance of any judicial or quasi-judicial actions."[156]

3. **Law**.

a. **Burden of Proof**. Generally, a party moving the Commission for relief bears the burden of proving any prerequisite facts by a preponderance.[157] This applies to all motions addressed by this ruling, save for the motion to dismiss based on UI. The burden for that motion is described in the discussion of law regarding UI, below.

b. **Reconsideration**. The Commission may reconsider any ruling prior to authentication of the record of trial, except the equivalent of a finding of not guilty.[158] Either party may move for reconsideration, but grant of the request is in the Military Judge's discretion. Generally, reconsideration should be based on a change in the facts or law, or instances where the ruling is inconsistent with case law not previously briefed. Reconsideration may also be appropriate to

---

[154] Transcript 20768-20956.
[155] Transcript 21128-21377.
[156] Transcript 21376-77.
[157] R.M.C. 905(c)(1)-(2).
[158] R.M.C. 905(f).

22

correct a clear error or prevent manifest injustice.[159] Motions for reconsideration are not

appropriate to raise arguments that could have been, but were not, raised previously and

arguments the Commission has previously rejected.[160] Nor are motions for reconsideration

appropriate for the proffer of evidence available when the original motion was filed, but, for

unexplained reasons, not proffered at that time.[161]

    c. **Unlawful Influence**.

        (i) **UI Generally**. UI is prohibited by section 949b of the Military Commissions

Act of 2009 (M.C.A. 2009), which states in pertinent part: "No person may attempt to coerce or,

by any unauthorized means, influence . . . the action of any convening . . . authority with respect

to their judicial acts."[162] This language mirrors that of Article 37 of the Uniform Code of

Military Justice (U.C.M.J.), which addresses Unlawful Command Influence (UCI).[163] UCI is the

court-martial equivalent of UI, and is substantially similar (save that UCI can only be committed

by persons subject to the U.C.M.J.).[164] Accordingly, military UCI case law (discussed further

below) provides a useful framework for analyzing UI claims.[165]

---

[159] *See U.S. v. Libby*, 429 F. Supp. 2d 46 (D.D.C. 2006); *U.S. v. McCallum*, 885 F. Supp. 2d 105 (D.D.C. 2012).
[160] *See U.S. v. Booker*, 613 F. Supp. 2d 32 (D.D. C. 2009); *U.S. v. Bloch*, 794 F. Supp. 2d 15, 19 (D.D.C. 2011).
[161] *See Bloch*, 794 F. Supp. 2d at 19-20.
[162] 10 U.S.C. § 949b(a)(2). The statute prohibits a much broader range of UI than that directed at CAs; however, the quoted language is that germane to the issues raised here. The Commission notes that, while the various Defense motions are styled as motions to dismiss based on UI of the CA *and his legal advisor*, neither party has identified any authority specifically extending UI protections to the latter. By contrast, the M.C.A. 2009 elsewhere expressly protects "the military commission [and] any member, military judge, *or counsel thereof*" from UI with regard to their functions, including any findings or sentence adjudged. 10 U.S.C. § 949a(a) (emphasis added). 10 U.S.C. § 949a(a)(2)(B), on the other hand, protects "convening, approving, or reviewing authorit[ies]," but makes no reference to their counsel. At present, the Commission assumes (without so deciding) (a) that the M.C.A. 2009's protection of CAs from UI extends equally to a CA's primary legal advisor, or at least (b) that evidence of UI directed at the CA's legal advisor may be evidence of UI directed at the CA.
[163] Article 37, U.C.M.J. states in pertinent part: "No person subject to [the U.C.M.J] may attempt to coerce, or, by any unauthorized means, influence the action of . . . any convening . . . authority with respect to his judicial acts." 10 U.S.C. § 837(a).
[164] *Id.*
[165] *See* 10 U.S.C. § 948b(c) (stating that military appellate precedent is persuasive authority before M.C.A. 2009 military commissions).

23

(ii) **UCI Generally**. UCI has long been characterized as "the mortal enemy of military justice,"[166] as it tends to denigrate both critical rights of the accused[167] and public confidence in the military justice system as a whole.[168] There are two overall types of UCI—actual and apparent[169]—and the litigation framework for each differs somewhat.

(iii) **Actual UCI**. Actual UCI "occur[s] when there is an improper manipulation of the criminal justice process which negatively affects the fair handling and/or disposition of a case."[170] If an accused makes a sufficient initial showing of UCI, the burden shifts to the Government to disprove the UCI, or show it to be harmless.

> [T]he military judge engages in a two-stage process to permit the parties to establish the factual predicate related to any issues of unlawful command influence. The military judge initially requires the defense to carry the burden of raising an unlawful command influence issue. This threshold showing must be more than mere "command influence in the air" or speculation. But because of the congressional prohibition against unlawful command influence and its invidious impact on the public perception of a fair trial, we have stated that this threshold is low. The test is "some evidence" of facts which, if true, constitute unlawful command influence, and that the alleged unlawful command influence has a logical connection to the court-martial in terms of its potential to cause unfairness in the proceedings.

> If the military judge concludes that the defense has raised the issue of unlawful command influence, the burden shifts to the government to show either that there was no unlawful command influence or that the unlawful command influence did not affect the proceedings. [There are] three options available to the government: The Government must prove beyond a reasonable doubt: (1) that the predicate facts do not exist; or (2) that the facts do not constitute unlawful command influence; or (3) that the unlawful command influence will not prejudice the proceedings or did not affect the findings and sentence.[171]

---

[166] *U.S. v. Reisbeck*, 77 M.J. 154, 166 (C.A.A.F. 2018) (quoting *U.S. v. Thomas*, 22 M.J. 388, 393 (C.M.A. 1986)).

[167] *U.S. v. Thomas*, 22 M.J. 388, 393 (C.M.A. 1986).

[168] *U.S. v Harvey*, 64 M.J. 13 (C.A.A.F. 2006) (noting that "vigilan[ce] in protecting a court-martial from improper influence" was necessary to "foster public confidence in court-martial proceedings." *Id.* at 20) (quoting *U.S. v Rosser*, 6 M.J. 267, 273 (C.M.A. 1976)) (internal quotation marks omitted).

[169] "Congress and [the Court of Appeals for the Armed Forces] are concerned not only with eliminating actual [UCI], also . . . even the appearance of [UCI] at courts-martial." *U.S. v Lewis*, 63 M.J. 405, 415 (C.A.A.F. 2006) (quoting *Rosser*, 6 M.J. at 271) (internal quotation marks omitted); *see also U.S. v. Boyce*, 76 M.J. 242 (C.A.A.F. 2017) ("Two types of unlawful command influence can arise in the military justice system: *actual* unlawful command influence and *the appearance of* unlawful command influence." *Id.* at ___, *6 (slip op.)(emphasis in original)).

[170] *Barry*, 70 M.J. at 77 (quoting *Boyce*, 76 M.J. at 247) (alteration in original).

[171] *Harvey*, 64 M.J. at 18 (internal footnotes omitted; some internal quotation marks omitted).

24

JA.53

If the Government is unable to do so, the Military Judge must craft an appropriate remedy.[172]

(iv) **Apparent UCI**. The litigation framework for apparent UCI is similar, but there are key differences.

> [U]nlike actual unlawful command influence, where prejudice to the accused is required, no such showing is required for a meritorious claim of an appearance of unlawful command influence. . . . [I]t is sufficient for an accused to demonstrate the following factors in support of a claim of an appearance of unlawful command influence: (a) facts, which if true, constitute unlawful command influence; and (b) this unlawful command influence placed an "intolerable strain" on the public's perception of the military justice system because "an objective, disinterested observer, fully informed of all the facts and circumstances, would harbor a significant doubt about the fairness of the proceeding."
>
> In light of these two factors, the following process ensues when an appellant asserts there was an appearance of unlawful command influence. The appellant initially must show "some evidence" that unlawful command influence occurred. This burden on the defense is low, but the evidence presented must consist of more than "mere allegation or speculation."
>
> Once an appellant presents "some evidence" of unlawful command influence, the burden then shifts to the government to rebut the allegation. Specifically, the government bears the burden of proving beyond a reasonable doubt that either the predicate facts proffered by the appellant do not exist, or the facts as presented do not constitute unlawful command influence. If the government meets its burden, the appellant's claim of unlawful command influence will be deemed to be without merit and no further analysis will be conducted.
>
> If the government does not meet its burden of rebutting the allegation at this initial stage, then the government may next seek to prove beyond a reasonable doubt that the unlawful command influence did not place "an intolerable strain" upon the public's perception of the military justice system and that "an objective, disinterested observer, fully informed of all the facts and circumstances, would [not] harbor a significant doubt about the fairness of the proceeding." If the government meets its evidentiary burden at this stage of the analysis, then . . . no relief [based on] appearance of unlawful command influence [is merited].[173]

Again, if the Government is unable to refute the claim, the Military Judge fashions an appropriate remedy.[174]

---

[172] *Id.* at 21 (noting trial judge was responsible to provide an appropriate remedy for actual UI).
[173] *Boyce*, 76 M.J. at ___, *10-12.
[174] *Lewis*, 63 M.J. at 416.

25

    (v) **Judicial Acts**. As with UCI, UI is actionable only "with respect to [a CA's]

judicial acts."[175] With regard to the scope of the term "judicial acts," the Commission finds the

following discussion by the Court of Military Appeals (C.M.A.) instructive:

> In military law, the convening authority performs a number of judicial functions. Initially, he has been authorized . . . to appoint and convene courts-martial, including the appointment of the judicial officers necessary to the conduct thereof. . . .. [to] decide[] whether to refer charges to trial and the grade of courtmartial [*sic*] to which the charges should be referred. Prior to trial, any defense or objection which is capable of determination without trial of the issue may be raised by reference to the convening authority. Subsequent to trial, he is empowered to act on the findings and sentence of the court-martial, and while he may approve only such findings of guilty and the sentence, or such part or amount of the sentence, as he finds correct in law and fact, he may, in the exercise of his discretion, disapprove a finding and sentence for any reason or for no reason.[176]

The Commission finds it appropriate to rely on this language as an instructive (though not

exhaustive) list of examples of judicial acts in which a CA may engage. Mere administrative,

organizational and/or resource management decisions, on the other hand, do not rise to the level

of "judicial acts," even if they may have some measure of practical impact on litigation of a

particular case or cases.[177]

---

[175] 10 U.S.C. § 949b(a)(2); 10 U.S.C. § 837(a).

[176] *U.S. v. Nix*, 36 C.M.R. 76, 78-79 (C.M.A. 1965)(internal cites omitted). Note that the C.M.A. also gave the court-martial CA's grant or denial of search authorizations as an example of a "judicial act." *Id.* This was not included in the quoted language above, however, as military commission CAs are not empowered to approve searches.

[177] *See, e.g., Ayestas v. Davis*, ___ U.S. ___, 138 S.Ct. 1080 (2018) (noting that "[a]dministering judicial operation[s] requires many 'decisions' in the ordinary sense . . . about such things as facilities, personnel, equipment, supplies, and rules of procedure," and that it would be "absurd to suggest" that every such decision is "made in a judicial capacity." *Id.* at __, 1090); *see also U.S. v. Williams*, 28 C.M.R. 789 (1959) (Air Force Board of Review's act of forwarding a request for a psychiatric examination "as an administrative matter," where there was "no assignment or issue raised before the Board," was "not a judicial act" of the board. *Id.* at 792). The Commission expressly declines to adopt the Defense's proposed *Murray's Lessee*-based definition of judicial acts (see AE 555J (AAA, KSM), Mr. al Baluchi's and Mr. Mohammad's Reply to Government Combined Response, filed 10 April 2018, p. 12 (citing *Den ex dem. Murray v. Hoboken Land & Improvement Co.* ("*Murray's Lessee*"), 59 U.S. 272 (1856)). The Defense asserts that this case stands for a principle that would require treating as a judicial act any decision of the CA "that involves inquiry into the existence of facts and the application of law thereto." Transcript 19630. This would essentially rewrite 10 U.S.C. 948b(a)(2) to reach virtually *any* act of the CA, rather than his genuinely *judicial* ones. The Commission declines to find that the statute was intended to be so broad.

26

d. **Discovery and Witness Production**. With regard to this subject, the Commission adopts and incorporates the discussion of law from its 23 May 2018 Order in this series (AE 555O).[178]

4. **Analysis: Judicial Acts**.

a. Over the course of litigation, the Defense has claimed that (1) a number of decisions involving Messrs. Rishikof and/or Brown were "judicial acts;" (2) their termination was motivated by one or more of those decisions; and (3) their terminations therefore constituted UI. The Commission finds, however, that the Defense has identified here only two matters genuinely qualifying as "judicial acts:" (1) Mr. Rishikof's discussion of the potential for PTAs in this case; and (2) his refusal to refer charges in *U.S. v Hambali*. In the Commission's view, the other matters identified by the Defense are ancillary administrative decisions not falling within the ambit of "judicial acts" for UI purposes.

b. Regarding the *Hambali* charges, the Commission finds their rejection, while a judicial act, is not an act *in this case*—and is therefore not an appropriate basis for relief here.[179] The only "judicial act" forming a possible basis for a UI claim in this case is discussion of potential

---

[178] AE 555O, para. 2.

[179] The Defense asserts the CA's rejection of the *Hambali* charges is relevant as potential circumstantial evidence of UI, in that it tends to show, *e.g.*, (a) animosity between OCP and Messrs. Rishikof and Brown, and/or (b) a willingness or tendency on the part of senior DoD officials to engage in improper retaliatory behavior. To the extent this may be so, the Commission will give such information the weight and consideration it is due. These considerations do not, however, transform the rejection of the *Hambali* charges into an appropriate independent basis for relief in this case. Furthermore, the Commission notes that, well before the initial return of the *Hambali* charges on 12 December 2017, OGC had been seriously considering Mr. Rishikof's removal. *See* para. 2.n, *supra* (finding AGC Castle had tasked OGC personnel to look into the possibility, in his words, "before Thanksgiving" of 2017). As early as October 2017, AGC Castle had already expressed serious concerns regarding the CA's poor coordination. *See* para. 2.k, *supra*. AGC Castle's 15 December 2017 memo regarding future disposition of commissions cases, signed three days after the *Hambali* charges' first return, makes no mention of them. AE 555DD (GOV), Attach. L. Similarly, DGC (LC) Newman's 4 January 2018 action memo concerning removal of Mr. Brown (drafted the same day he met with Messrs. Rishikof and Brown regarding the *Hambali* charges, and only two weeks after the new charges were returned by OCA) makes no mention of *Hambali*, instead repeating the coordination-focused "cohesive effort" language of AGC Castle's 15 December 2017 memo, and expressly stressing that the CA "will inform and coordinate with" OGC. AE 555DD (GOV), Attach. C. In short, whatever their relevance, there is no indication the *Hambali* charges factored into any decision regarding Messrs. Rishikof and Brown's termination (or at least nothing amounting to more than speculation).

PTAs. Accordingly, the Commission concludes the Defense could not have met their initial burden of proof with regard to UI unless and until they made a sufficient showing (in light of all available information) that the termination of Mr. Rishikof and/or AGC Castle was, at least in part, due to their discussion of potential PTAs with counsel for the Accused in this case.

5. **Analysis: Proof of UI**.

a. Having determined that there is only one "judicial act" at issue here (potential PTA discussions), the Commission will next address whether remediable UI associated with this act has been shown. The Defense argues, in essence, that (1) Mr. Rishikof and Mr. Brown were terminated due to their having discussed potential PTAs regarding the Accused in this case, and (2) that the reasons advanced by Secretary Mattis and AGC Castle are pretextual. The evidence presented by the Defense in this regard is largely speculative. Even assuming *arguendo* that the Defense has made its required initial showing of UI, however, the full evidence before the Commission demonstrates beyond reasonable doubt that there was none.

b. Leaving aside the long, complex mesh of crisscrossing meetings, messages, and memoranda that ultimately resulted in the terminations of Messrs. Rishikof and Brown, two critical overarching facts remain: (1) Mr. Castle became aware of the pursuit of pleas in this case virtually upon his arrival at DoD (and his staff even before that);[180] and (2) they could at any time have simply asked the SecDef to limit or withhold the CA's authority to conclude such agreements.[181] Furthermore, DoD OGC was well aware that DOJ did not support the agreements,

---

[180] *See* para 2.g, *supra*.

[181] R.M.C. 705(a) ("*Subject to such limitations as the [SecDef] may prescribe*, an accused and the [CA] may enter into a [PTA] in accordance with this rule." *Id*. (emphasis added); R.T.M.C. para. 12-1. The Defense argues that, despite the language of R.M.C. 705(a) and R.T.M.C. para. 12-1, there is in fact no authority to withhold PTA authority from the CA, because (a) the UI provisions of the M.C.A. 2009 protect the CA's "judicial acts" from such interference, and (b) R.T.M.C. para. 12-1 reserves PTA decisional authority to "the sole discretion of the [CA] who referred the case to trial." AE 555BB (KSM AAA), pp. 47-49 of 467. In light of the clear language of R.M.C. 705(a) and R.T.M.C. § 12-1, the Commission finds there is no merit in these arguments. Even assuming *arguendo* that there was, it is clear AGC Castle and his subordinate counsel believed the SecDef had the power to withhold PTA

28

which made it highly unlikely the Defense would follow through with them (given their negotiating posture).[182]

c. The Defense advances the theory that AGC Castle and other OGC attorneys wished to prevent Messrs. Rishikof and Brown from securing guilty pleas with unacceptable terms, and that to attain this end they had the duo pretextually fired. However, such a scheme would have been wholly unnecessary, given (1) the known and readily-available avenue of having the SecDef partially or entirely withhold the CA's power to enter into PTAs (which would have required action at no higher a level than firing did),[183] and (2) the strong unlikelihood of any PTA's successful conclusion, given DOJ's clear non-concurrence and the Defense's negotiating posture.[184]

d. Given the speculative nature of the Defense's evidence of any such intent, to believe senior DoD officials would willfully violate the law, perjure themselves, and risk potentially upending a historic capital trial in this manner—when (1) a known and completely safe alternate method was readily available, and (2) the Defense's own negotiating posture already rendered the risk of unacceptable PTAs essentially nil—simply beggars credence. Viewed through this lens, the actions of AGC Castle and his associates are entirely consistent with the Government's claimed motivation, specifically: (1) that they sought termination of Messrs. Rishikof and Brown due to duty performance issues having nothing to do with PTA negotiations, while (2) taking careful steps to avoid any actual or apparent UI from arising due to their knowledge that such negotiations were ongoing.

---

authority. *See, e.g.*, AE 555DD (GOV), Attach. E; Transcript 21267. Accordingly, nothing Defense offers in this regard undercuts the Commission's finding that AGC Castle and his subordinates would have seen no need to pursue a high-risk avenue to prevent PTAs when, in their view, low- or no-risk methods to do so were readily available, and PTAs were highly unlikely in any event.

[182] *See* paras. 2.g, j-k, *supra*.
[183] R.M.C. 705(a); R.T.M.C. para. 12-1.
[184] *See* paras. 2.g, j-k, *supra*.

e. The Commission is likewise unpersuaded that AG Sessions' displeasure with a proposed PTA spurred Secretary Mattis or AGC Castle to commit UI. The evidence indicates that both were initially caught off guard by AG Sessions's mid-October 2017 phone call—not knowing what the AG was referring to when he said he wanted "no deal." Even upon learning the call related to pretrial negotiations in this case, neither Secretary Mattis nor AGC Castle gave any indication they were displeased, beyond AGC Castle expressing dissatisfaction at what he perceived as a lack of appropriate coordination. Neither AGC Castle nor any other entity took action after this October 2017 phone call to derail the pretrial negotiations; rather, AGC Castle made overt efforts to keep at arms' length from discussions with the CA on the topic. Finally, any argument that the SecDef, when presented by his senior staff with discrete, specific justifications for Mr. Rishikof's termination that were unrelated to PTAs, instead based his decision on a brief, vague telephone conversation from several months prior, raises no doubt that may be described as "reasonable."

f. The Commission finds beyond reasonable doubt that, whatever their motivations may have been, AGC Castle and the other OGC personnel who coordinated the firing of Messrs. Rishikof and Brown were not prompted to do so by the potential for conclusion of PTAs in this case; nor did they say or do anything that Messrs. Rishikof and Brown could have misconstrued as discouraging them from pursuing such agreements.[185] The Commission also finds beyond reasonable doubt that SecDef Mattis's 3 February 2018 decision to terminate Mr. Rishikof was

---

[185] Messrs. Rishikof and Brown themselves had no clear idea as to why they were terminated, and claimed to have received no negative feedback or discouragement whatsoever during their tenure. Rishikof & Brown Declaration 2, para. 1.c. The only contrary indication is a Defense proffer that, if called, Messrs. Rishikof and Brown would essentially confirm Mr. Castle's testimony that, at their 16 October 2018 meeting, he expressed dissatisfaction regarding OCA's failure to coordinate with OGC regarding contact with DOJ. AE 555BB (KSM AAA), pp. 5, 15 (stating that, if called, Messrs. Rishikof and Brown would testify that "Mr. Castle was clearly agitated" about AG Sessions's call, "wanted to know why Mr. Rishikof was coordinating with people . . . in the DOJ" and "said that the DOD all needs to move together and the OGC needs to be informed." *Id.*). The Defense investigator's testimony was consistent with this proffer. Transcript 20805-06.

based on the rationale presented to him at that time, and not on a brief, vague phone call from AG Sessions that occurred three months before. Furthermore, the Commission finds beyond reasonable doubt that no objective, disinterested observer, fully informed of the relevant facts and circumstances, would harbor any significant doubt about the fairness of these proceedings. Accordingly, neither actual nor apparent UI has been shown.

g. To the extent the Defense contests the facts underlying the incidents relied on by the SecDef and AGC Castle as the bases for termination of Messrs. Rishikof and Brown (*e.g.*, the coordination of Mr. Rishikof's 12 Dec 2017 memo and the ELC imagery request), the Commission finds that, given (1) the evidence that the terminations were not predicated on PTAs; (2) the lack of any other relevant judicial act of the CA on which UI could have been based; and (3) the equivocal (at best) evidence of any impropriety in those asserted bases (which are themselves *non*-judicial acts),[186] to the extent these events may be relevant, they provide no evidence of any pretext that is sufficient to warrant any differing result or further inquiry. [187]

---

[186] *See* paras. 2.p, u-v, *supra*.

[187] The Commission finds very credible the assertions of AGC Castle that the inadequate coordination of the 12 December 2017 memo was a primary factor motivating the termination of Messrs. Rishikof and Brown. In his testimony before the Commission, Mr. Castle emphatically affirmed his statement that, informal discussion of a potential implementing document notwithstanding, given the need in DoD for thorough advance coordination of significant actions, Mr. Rishikof's failure to provide DoD OGC an advance copy of the 12 December 2017 memorandum and formally staff it with affected stakeholders was "a huge process foul." Transcript 21245-48. Messrs. Rishikof and Brown themselves expressly acknowledged that formal coordination had not occurred, claiming they thought it premature because the memorandum was just "a vehicle to begin discussions." Rishikof & Brown Declaration 2, para. 1.b; *see also* Transcript 20910. This view is neither reasonable nor credible, however, in light of the immediate, profound effects the memorandum would have had, had it been signed. *See* fn 79, *supra*. This also undercuts any assertion this memorandum would have been subject to any invitation by DepSecDef Work for Mr. Rishikof to submit "his views on paths forward in a written document" for which "no formal coordination was expected." *See* para. 2.b, *supra*. The 12 December 2017 memorandum went far beyond merely expressing "views on a path forward"—it would have immediately implemented an aggressive strategy of consolidation of authority and resources under the CA. This is further underscored by the memorandum's rejection. Furthermore, to the extent Mr. Rishikof may have been given such dispensation, AGC Castle was apparently not aware of it. Defense proffers indicate OGC was rebuffed regarding such concerns with statements that DepSecDef was the CA's direct supervisor, not by reference to any special dispensation by the DepSecDef regarding staffing. AE 555CC (AAA), Attach. B, pp. 3, 10, 14, 20. Even senior OCA staff apparently found direct, informal coordination between the CA and DepSecDef highly unusual (*See* Transcript 20815, 20875-77, 20879-82). Even assuming AGC Castle mistakenly believed Messrs. Rishikof and Brown owed OGC greater coordination than DepSecDef Work would have in fact required, any such erroneous belief would still be consistent with his asserted bases for termination. In

31

JA.60

h. Based on evidence adduced (a significant portion of which was received after AE 555O, the Commission's interim ruling on discovery), there is no reasonable likelihood further discovery or testimony will produce information relevant and necessary to resolution of this matter. Accordingly, (1) no proper basis for any of the relief requested by the Defense exists; and (2) reconsideration of the Commission's earlier ruling in that regard is appropriate.

6. **Ruling**.

a. That portion of AE 555P (GOV) previously deferred is now **GRANTED**. The Commission will compel production of neither the CA's monthly status reports nor Mr. Rishikof's testimony.

b. AE 555GG (KSM) is **DENIED**. Resolution of this matter does not require the Commission to make a definitive ruling as to whether the Defense met its initial burden of production, as the evidence in any event demonstrates beyond reasonable doubt that there was no UI.

c. The relief requested in AE 555 (AAA), AE 555 (AAA 2nd Sup), AE 555R (AAA), and AE 555CC (AAA) is **DENIED**.

---

January 2018, when he sought the CA's termination, AGC Castle would first provide an advisory memorandum to DepSecDef Shanahan in which he listed the 12 December 2017 memo as one supporting reason—undercutting any notion AGC Castle in fact believed the DepSecDef would have been satisfied with the 12 December 2017 memorandum's coordination. AE 555DD (GOV), Attach. F. Regardless, by the time the 12 December 2017 memorandum was submitted, DepSecDef Work had been replaced by DepSecDef Shanahan, rendering Mr. Work's informal views regarding workplace coordination requirements of limited relevance. DepSecDef Shanahan's administrative staff apparently had received no instruction that the CA was empowered to submit memoranda of this nature for his signature without formal, documented staffing through OGC—as they rejected the 12 December 2017 memorandum packet without action, and alerted AGC Castle. Castle Declaration para. 11; AE 555P (GOV), Attach. D, Tab 1; Transcript at p. 21352.

**JA.61**

d. All requests for oral argument in this series, to the extent not already granted, are

**DENIED**.


So **ORDERED** this 10th day of January, 2019.


//s//
K. A. PARRELLA
Colonel, U. S. Marine Corps
Military Judge

33

JA.62

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **AE 889D (4ⁿᵈ Amend)** |
| **v.** | *Fourth Amended* |
| **KHALID SHAIKH MOHAMMAD, WALID MUHAMMAD SALIH MUBARAK BIN 'ATTASH, RAMZI BIN AL SHIBH, ALI ABDUL AZIZ ALI, MUSTAFA AHMED ADAM AL HAWSAWI** | **DOCKET ORDER** |
| | **17 March 2022** |

1. On 10 March 2022, at the request of the parties, the Commission moved the start of the hearing in this case (originally scheduled for 7-25 March 2022)[1] from 0900 on Friday, 11 March 2022 to 0900 on Monday, 21 March 2022.[2]

2. On 15 March 2022, the Prosecution informed the Commission that "significant enough progress" had "been made in exploring possible plea agreements for the parties to extend [their] joint request to remain in recess until the May 2022 Hearings."

3. The Commission is inclined to grant the joint request to enable the parties to make further progress in exploring possible plea agreements. The Military Judge, however, will remain on Naval Station Guantanamo Bay, Cuba (NSGB) for the duration of the previously-scheduled March hearing in order to be available to reconvene in open, closed, or *ex parte* sessions as needed, in accordance with Rules for Military Commissions 802, 803 and 806, to address any issues that may arise during the negotiations.

4. The Commission tentatively cancels the hearing session currently scheduled to begin 21 March 2022.

---

[1] AE 889D Docket Order, dated 10 February 2022.
[2] AE 889D (3rd Amend) *Third Amended* Docket Order, dated 10 March 2022.

JA.63

5. All Detailed Counsel who have made an appearance in this case shall remain on NSGB and be prepared to be present in Courtroom #2 from 21-25 March 2022, unless they have been specifically authorized to be absent by the Commission.

6. In the event the Commission deems it necessary to reconvene in Courtroom #2 during that time, the Commission intends to provide notice to the Parties in the form of an Amended Docket Order at least one day prior to the beginning of such a session.[3]

7. The administrative and logistics briefing[4] (originally scheduled to be presented by the Prosecution during the March hearing) is postponed until the hearing scheduled for 9-27 May 2022.[5] **No later than 25 March 2022**, the Prosecution will provide the Commission and the parties with a written copy of the presentation that was to be used for the briefing.

8. The Commission finds that the interests of justice are served by granting the continuances during the March 2022 hearings, for the resolution of interlocutory and other pretrial issues and the exploration of possible pretrial agreements, and that the resolution of these issues outweighs the interests of the public and the accused in a prompt trial.

So **ORDERED** this 17th day of March 2022.

*//s//*
MATTHEW N. MCCALL, Colonel, USAF
Military Judge
Military Commissions Trial Judiciary

[3] The Remote Hearing Room in Arlington Virginia remains an extension of the well of the Courtroom for authorized participants in this case and should be available for use by authorized participants.
[4] AE 889D Docket Order.
[5] AE 847 (Amend) *Amended* Scheduling Order, dated 3 January 2022.

JA.64

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>v.<br><br>**KHALID SHAIKH MOHAMMAD,<br>WALID MUHAMMAD SALIH<br>MUBARAK BIN 'ATTASH,<br>RAMZI BIN AL SHIBH,<br>ALI ABDUL AZIZ ALI,<br>MUSTAFA AHMED ADAM<br>AL HAWSAWI** | **AE 899**<br><br>**DOCKET ORDER**<br><br>November 2022 Hearings<br><br><br>**13 October 2022** |

1. On 7 June 2022, the Commission issued an Amended Scheduling Order providing for hearings to take place at Naval Station Guantanamo Bay, Cuba (NSGB) from 7 - 18 November 2022.[1]

2. On 12 September 2022, Mr. Mohammad suggested the Commission cancel the hearings scheduled for November 2022 in order "to permit the parties to continue further negotiations, and permit counsel for Mr. Mohammad to address any severance issues once the negotiations have run their course."[2]

3. On 12 September 2022, the Prosecution indicated it remained committed to a joint trial for all five Accused, but implied[3] that it would be willing to acquiesce in cancellation of the November 2022 hearings in order to allow Mr. bin Attash's new Learned Counsel to prepare for the resumption of hearings in January of 2023.[4] The Prosecution, however, also suggested that an

---

[1] *See* AE 847 (3rd Amend), Third Amended Scheduling Order, dated 7 June 2022.
[2] *See* AE 896C (KSM), Mr. Mohammad's Response to AE 299G / AE 896 SPECIFIED ISSUE ORDER, filed 12 September 2022 at 2.
[3] *See* AE 896E (GOV), Government Response to Specified Issue Order, Defense Motion to Reconsider AE 299E, Order Denying Mr. Hawsawi's Motion to Sever filed 12 September 2022.
[4] *See* AE 895 Scheduling Order, dated 21 July 2022.

JA.65

issue specific to just one of the Accused nonetheless could be argued at NSGB in November 2022 with just that Accused and his Counsel to be present.[5]

4. On 19 September 2022, Mr. Ali (a.k.a. al Baluchi) joined Mr. Mohammad's request to cancel the November 2022 hearings and further requested the Commission issue the cancellation order prior to 21 September 2022 in order to allow Mr. Ali's Defense Team to schedule case-related foreign travel during the November 2022 hearing dates.[6] Mr. Ali's requested timeline was based upon the fact that the current Convening Authority (CA) and Military Commissions Defense Organization (MCDO) Travel Office procedures require Defense Teams to "submit requests for overseas travel at least 45 days prior to the travel absent exigent circumstances."[7]

5. On 19 September 2022, Mr. Hawsawi reiterated his previous request for severance, arguing that his case should not be delayed by the requested cancellations of hearing dates submitted by his Co-Accused.[8]

2. **Analysis**.

a. As previously recognized by this Commission, certain aspects of the plea negotiations involve "policy principles" which are beyond the CA to approve and which are therefore pending decision by United States policy makers.[9] The Prosecution has estimated that a decision on these

---

[5] *See* AE 896E (GOV) at 10.
[6] *See* AE 896G (AAA), Mr. al Baluchi's Consolidated Reply to Specified Issue Order Responses, filed 19 September 2022. Mr. Ali noted that the Prosecution declined the opportunity to state a position as to the cancellation request. Mr. Ali also indicated that Mr. bin 'Attash concurred in his cancellation request and that Mr. bin al Shibh does not oppose said request.
[7] *Id*. at 2.
[8] *See* AE 896F (MAH), Defense Reply to AE 896E, Government Response to Specified Issue Order, filed 19 September 2022.
[9] AE 893G Order Cancelling June/July 2022 Hearings, dated 7 June 2022, at 3.

"policy principles" may be reached prior to the scheduled January 2023 hearings, but not before the beginning of the November 2022 hearings.[10]

b. It is impracticable for this Commission to convene in an open session while a decision on the "policy principles" remains pending and while Mr. bin 'Attash's new Learned Counsel continues to build a relationship with his client and become familiar with the case. Likewise, it is not practicable for the Commission to hear oral argument at NSGB on a single issue concerning a single Accused as suggested by the Prosecution.

c. Accordingly, the Commission will cancel the hearings currently scheduled for November 2022.

d. This cancellation order is not issued in accordance with Mr. Ali's requested timeline to enable him to submit a foreign travel request within 45 days of the beginning of the previously-scheduled November 2022 hearing. It appears to the Commission that such a travel request, if filed soon after the issuance of this order, should be deemed by the CA and the MCDO Travel Office to constitute "exigent circumstances," thereby allowing for an exception to the normal processing guidelines.

e. Additionally, because further progress in the ongoing plea negotiations is somewhat dependent on the outcome of the "policy principles" decision, the Commission will also require the Prosecution to provide the Commission with updates as to the status of the "policy principles" decision, beginning on 16 December 2022 and continuing every two weeks until such time as the Prosecution has been informed that a decision has been reached.

---

[10] AE 895C (WBA), Defense Motion to Cancel Hearings Scheduled for September – October 2022, filed 19 August 2022, at 9 (containing the Prosecution response to a prior motion to cancel hearings in September – October 2022).

**JA.67**

3. **Order**.

    a. The Commission hearings currently scheduled for 7 – 18 November 2022 are

**CANCELLED**.

    b. The Prosecution will provide the Commission with an update as to the status of the

decision on the "policy principles." The first such status update will be due **No Later Than**

**Friday, 16 December 2022,** and shall be supplemented **every two weeks thereafter** by further

status updates until such time as the Prosecution has been notified of a final decision on said

"policy principles."

So **ORDERED** this 13th day of October, 2022.

                                              *//s//*
                                              MATTHEW N. MCCALL, Colonel, USAF
                                              Military Judge
                                              Military Commissions Trial Judiciary

JA.68

**MILITARY COMMISSIONS TRIAL JUDICIARY**
**GUANTANAMO BAY, CUBA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **AE 899A (GOV) / AE 901B (GOV)** |
| **v.** | **Government Consolidated Response** To Defense Motion to Cancel Pretrial Hearings Scheduled for 16 January–3 February 2023 |
| **KHALID SHAIKH MOHAMMAD; WALID MUHAMMAD SALIH MUBARAK BIN 'ATTASH; RAMZI BINALSHIBH; ALI ABDUL AZIZ ALI; MUSTAFA AHMED ADAM AL HAWSAWI** | *And* **Notice** Of First Status Update Regarding Defense Joint Policy Principles 16 December 2022 |

1. <u>**Timeliness**</u>

    The Prosecution timely files this consolidated Response and Notice in accordance with AE 899, Docket Order, and AE 901A, Expedited Briefing Order.

2. <u>**Requested Relief**</u>

    The Prosecution respectfully does not oppose the requested relief set forth within AE 901 (WBA), Defense Motion to Cancel Pretrial Hearings Scheduled for 16 January –3 February 2023. Further, the Prosecution requests that the Commission make specific findings that all delay accrued as a result of the cancellation of the five hearings since March 2022 was in the interests of justice and thus excludable from the mandates of R.M.C. 707.

3. <u>**Burden of Proof**</u>

    As the moving party the Defense must demonstrate by a preponderance of the evidence that the requested relief is warranted. *See* R.M.C. 905(c)(1)–(2).

**JA.69**

4.  <u>Facts</u>

The Prosecution provides the following facts pertaining to Mr. Engle's other case

commitments and time on *United States v. Mohammad, et al.*

Mr. Engle was appointed by the Convening Authority as Learned Counsel for

Mr. Bin 'Attash on 1 June 2022. *See* AE 893E (GOV) at 1.

Based on discussions between Mr. Engle and Managing Trial Counsel, since his

appointment, Mr. Engle has met with Mr. Bin 'Attash on four separate week-long trips to Naval

Station Guantanamo Bay, Cuba; meeting with him on multiple occasions during each trip.

*United States v. White,* a federal criminal case where Mr. Engle is lead defense counsel,

was previously scheduled for a three-week trial beginning on 9 January 2023 and was docketed

on 22 June 2022. However, defense counsel now represents that Mr. Engle's client in that case

has entered a plea of guilty and that sentencing is scheduled for 23 January 2023. Despite this,

Mr. Engle still requires time to prepare and meet with his client in advance of the sentencing

hearing.

*United States v. Simpson,* a federal criminal case where Mr. Engle is lead defense

counsel, is scheduled for trial on 1–23 March 2023 and was docketed on 3 February 2022.

The Commission's calendar for 2023 was issued on 21 July 2022, and the scheduled

hearing dates of 16 January–3 February 2023 (3 weeks) and 6–24 March 2023 (3 weeks) conflict

with *United States v. White* and *United States v. Simpson*, respectively. *Compare* AE 895,

Scheduling Order *with* AE 901 (WBA), Attachs. B–C. Both federal trials were scheduled prior

to the 2023 Commission hearings being scheduled.

Mr. Engle has possessed the necessary clearances to meet and confer with

Mr. Bin 'Attash at Joint Task Force-Guantanamo-controlled attorney-client meeting spaces, as

well as through video-teleconferences between Courtroom II and the Remote Hearing Room,

since on or about 26 July 2022. *See* AE 894A (WBA, GOV) at 3.

Mr. Engle had his Sensitive Compartmented Information (SCI) read-ons and the

capability to review the overwhelming amount of classified discovery (and all unclassified

2

JA.70

discovery) provided in this case since on or about 26 July 2022. *See* AE 894A (WBA, GOV) at 3.

Mr. Engle was read-on to the relevant Special Access Programs (SAP) on 1 November 2022, which allowed him access to the small amount of remaining classified discovery in this case that still requires SAP access. *See* AE 901 (WBA) at 2; *see also* AE 894C (GOV) (stating that "National Programs Special Management Staff was currently in the process of coordinating with Mr. Engle to schedule his read-ons to the appropriate [SAPs]" as of 4 October 2022). It is not clear to the Prosecution why Mr. Engle was not granted access to the classified discovery in this case until 18 November 2022, as was averred in the instant motion. *See* AE 901 (WBA) at 2.

Mr. Engle was detailed to this case by the Chief Defense Counsel on 16 December 2022. *See* AE 004HHH (WBA).

Following the January/February 2023 hearing dates, Mr. Engle will have been appointed as Mr. Bin 'Attash's Learned Counsel for a full eight months.

Following the March 2023 hearing dates, it will have been a year since Ms Bormann was permitted to withdraw as Learned Counsel for Mr. Bin 'Attash and Mr. Engle will have been on the case for over ten months.

**5. Law and Argument**

> **I. The Prosecution's Position on Mr. Engle's Motion to Cancel the January/February 2023 Hearings**

While the Prosecution stands ready to continue with litigation of the Defense suppression motions in January 2023, in light of Mr. Engle's notice that he has previously scheduled trials in January and March 2023, and due to the almost certain need for further discovery litigation surrounding the issues raised in AE 152FFFF, Order, and AE 152AAAAAA, *Ex Parte, Under Seal* Order, on which Mr. Bruck requires additional time to consult with Mr. Binalshibh, the Prosecution does not oppose the Defense motion to cancel the January/February 2023 Hearings.

3

In taking this position, the Prosecution also respectfully requests that the Military Judge make specific findings that all delay accrued because of the cancellation of the five hearings since March 2022 was in the interests of justice and thus excludable from the mandates of R.M.C. 707.

### II.  The Prosecution Reserves Its Position Regarding the March 2023 Hearings

While the Prosecution does not oppose cancelling the January/February 2023 Hearings,[1] it reserves its position regarding the March 2022 Hearings, and can envision issues surrounding the report ordered in AE 152FFFF, Order, to be ripe for litigation by that time, regardless of whether Mr. Engle still has a conflict on those dates and is participating in *United States v. Simpson.*  There should be no requirement[2] for the other four defense teams to be present to litigate issues that are solely related to Mr. Binalshibh's claims in the AE 152 motion series should litigation be necessary.

### III. The Prosecution's First "Policy Principle" Update Pursuant to AE 899, Docket Order

Recognizing that further progress in the ongoing plea negotiations is substantially inter-related to determinations on the "policy principles," the Commission ordered the Prosecution to provide the Commission with updates as to the status of the "policy principles" beginning 16 December 2022 and continuing every two weeks until such time as the Prosecution has been informed that a decision has been reached.  *See* AE 899, Docket Order.

---

[1] The Prosecution's position to not oppose the cancellation of the January/February 2023 Hearings is made with the assumption that Mr. Engle will not have any other case conflicts following his participation in *United States v. White* and *United States v. Simpson.*  The Commission should require Mr. Engle to immediately inform the Commission and the parties should the trial dates move for either of his two previous federal cases.

[2] To be clear, the Prosecution is not requesting Mr. Binalshibh's case be severed to consider the issues surrounding AE 152, *et seq*., and would not oppose other Defense teams and other Accused attending any such hearing.  However, it would not be required that Mr. Engle (or any other defense counsel from any of the other teams) participate (such that Learned Counsel's unavailability should impact proceedings being scheduled).

4

JA.72

In accordance with AE 899, Docket Order, the Prosecution provides its first update to the Commission:  Senior U.S. Government policy officials continue their discussions regarding the proposed "policy principles."  It is anticipated that these discussions will continue for some time.

**6.  Conclusion**

For the reasons listed above, the Prosecution does not oppose the cancellation of the January/February 2023 Hearings.  The Prosecution reserves its position on the March 2023 Hearings, as it is possible that the *Simpson* case may move its trial date, and, if not, that litigation surrounding Mr. Binalshibh's claims in the AE 152 motion series can begin.  The Prosecution also respectfully requests that the Commission make specific findings that all delay accrued as a result of the cancellation of the five hearings since March 2022 was in the interests of justice and thus excludable from the mandates of R.M.C. 707.

**7.  Oral Argument**

The Prosecution does not request oral argument.  However, if the Commission decides to grant oral argument to the Defense, the Prosecution requests an opportunity to respond.

**8.  Witnesses and Evidence**

The Prosecution will not rely on any witnesses or additional evidence in support of this pleading.

**9.  Conference with Opposing Parties**

Even though the motion to cancel the January/February 2023 Hearings was filed by Mr. Bin 'Attash, the Prosecution consulted with the other Defense teams before deciding on what position it would take.  The Defense provided the following responses:

Mr. Mohammad's Defense Team joins the request to cancel the January/February 2023 Hearings as they are awaiting a response to the policy principles and will need the opportunity to review them with Mr. Mohammad once received.

Mr. Ali's Defense Team does not object to Mr. Bin 'Attash's motion to cancel the January/February 2023 Hearings.

5

**JA.73**

Mr. Binalshibh's Defense Team does not oppose Mr. Bin 'Attash's motion to cancel the January/February 2023 Hearings.

Mr. Hawsawi's Defense Team defers to the Military Judge on whether to cancel the January/February 2023 Hearings.

**10. <u>Additional Information</u>**

The Prosecution has no additional information.

**11. <u>Attachments</u>**

A.  Certificate of Service, dated 16 December 2022.

Respectfully submitted,

_____//s//_____
Clay Trivett
Managing Trial Counsel
Office of the Chief Prosecutor
Office of Military Commissions

6

JA.74

# ATTACHMENT A

**JA.75**

## CERTIFICATE OF SERVICE

I certify that on the 16th day of December 2022, I filed AE 899A (GOV) / AE 901B (GOV),
Government Consolidated Response To Defense Motion to Cancel Pretrial Hearings Scheduled
for 16 January–3 February 2023 *and* Notice Of First Status Update Regarding Defense Joint
Policy Principles, with the Office of Military Commissions Trial Judiciary and I served a copy
on counsel of record.


_____//s//_____
Christopher M. Dykstra
Deputy Managing Trial Counsel
Office of the Chief Prosecutor
Office of Military Commissions

JA.76

**MILITARY COMMISSIONS TRIAL JUDICIARY**
**GUANTANAMO BAY, CUBA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **AE 901E (GOV)** |
| **v.** | **Government Motion** |
| | To Lift Administrative Notice Requirement |
| **KHALID SHAIKH MOHAMMAD;** | Ordered in AE 901D, Ruling |
| **WALID MUHAMMAD SALIH** | |
| **MUBARAK BIN 'ATTASH;** | |
| **RAMZI BINALSHIBH;** | 14 June 2023 |
| **ALI ABDUL AZIZ ALI;** | |
| **MUSTAFA AHMED ADAM** | |
| **AL HAWSAWI** | |

1. **Timeliness**

   This Motion is timely filed pursuant to Military Commissions Trial Judiciary Rules of Court ("R.C.") 3.7.

2. **Relief Sought**

   The Prosecution respectfully requests that the Commission lift the Prosecution's notice requirement "to provide the Commission with updates as to the status of the 'policy principles' every two weeks . . . until such time as the Prosecution has been informed that a decision has been reached."  AE 901D, Ruling, ¶ 5.c.

3. **Burden of Proof**

   As the moving party, the Prosecution must demonstrate by a preponderance of the evidence that the requested relief is warranted.  R.M.C. 905(c)(1)-(2).

4. **Facts**

   On 21 December 2022, the Commission issued AE 901D, Ruling, Defense Motion to Cancel Pretrial Hearings Scheduled for 16 January – 3 February 2023.  In so doing, the Commission ordered the Prosecution "to provide the Commission with updates as to the status of the 'policy principles' every two weeks . . . until such time as the Prosecution has been informed that a decision has been reached."  AE 901D, Ruling, ¶ 5.c.

On 8 March 2023, the Commission issued AE 905D, Order, Status of Prosecution Proposed Summary/Substitution Discovery Currently on Extension of Time.  Within this Order, the Commission stated, "[i]n light of the fact that more than nine months have passed without a decision on these 'policy principles,' [it] is disinclined to continue canceling Commission hearings solely because of a lack of a decision as to these 'policy principles.'"  AE 905D, Order, ¶ 7.

Pursuant to AE 901D, Ruling, the Prosecution has filed 13 updates with the Commission, with the most recent stating, "[t]he Prosecution has been advised that U.S. government officials are continuing to discuss the proposed policy principles . . . , [and] [i]t is anticipated that these discussions will continue for some time."  AE 902K (GOV).

5.  **Law and Argument**

In light of the above facts, the Prosecution hereby requests that the Commission lift the Prosecution's bi-weekly notice requirement regarding the status of any "Joint Policy Principles" as established by AE 901D, Ruling, paragraph 5.c.  Consistent with the Commission's expressed desires in AE 905 to return to hearings as scheduled, and the Government's representations in AE 299H (GOV), the Prosecution requests substitution of bi-weekly updates with a requirement to provide notice to the Parties and the Commission of new developments related to the Defense's "Joint Policy Principles" request as they may occur.

6.  **Oral Argument**

The Prosecution does not request oral argument.

7.  **Witnesses and Evidence**

The Prosecution will not rely on any witnesses or additional evidence in support of this motion.

8.  **Conference with Opposing Party**

On 13 June 2023, the Prosecution consulted with the Defense regarding the instant motion.  Counsel for Messrs. Mohammad, Bin 'Attash, and Binalshibh stated they "defer

2

JA.78

articulating a position until after we have reviewed the motion." Counsel for Mr. Ali stated they

"will oppose your motion to end the bi-weekly updates on the status of the policy principles.

Counsel for Mr. Hawsawi did not respond within the 24-hour timeframe established by Military

Commissions Trial Judiciary Rule of Court 3.5.k.

**9. <u>Additional Information</u>**

     The Prosecution has no additional information.

**10. <u>Attachments</u>**

    A.  Certificate of Service, dated 14 June 2023.


                             Respectfully submitted,


                              _____//s//_____

                              Clay Trivett
                              Managing Trial Counsel

                              Christopher M. Dykstra
                              Deputy Managing Trial Counsel
                              Office of the Chief Prosecutor
                              Office of Military Commissions

**JA.79**

# ATTACHMENT A

**JA.80**

### CERTIFICATE OF SERVICE

I certify that on the 14th day of June 2023, I filed AE 901E (GOV), Government Motion To Lift Administrative Notice Requirement Ordered in AE 901D, Ruling, with the Office of Military Commissions Trial Judiciary and I served a copy on counsel of record.

_____//s//_____
Christopher M. Dykstra
Deputy Managing Trial Counsel
Office of the Chief Prosecutor
Office of Military Commissions

JA.81

**MILITARY COMMISSIONS TRIAL JUDICIARY**
**GUANTANAMO BAY, CUBA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **AE 902A (GOV)** |
| **v.** | **Government Third Notice** |
| | Of Status Update Regarding |
| **KHALID SHAIKH MOHAMMAD;** | Defense Joint Policy Principles |
| **WALID MUHAMMAD SALIH** | |
| **MUBARAK BIN 'ATTASH;** | |
| **RAMZI BINALSHIBH;** | **13 January 2023** |
| **ALI ABDUL AZIZ ALI;** | |
| **MUSTAFA AHMED ADAM** | |
| **AL HAWSAWI** | |

1. **Timeliness**

    The Prosecution timely files this Notice in accordance with AE 901D, Ruling and Order, paragraph 5.c.

2. **Government Third Update on Status of Defense Joint Policy Principles**

    In accordance with AE 901D, Ruling and Order, the Prosecution provides its third update to the Commission on the status of the United States' consideration of the "Joint Policy Principles" put forward by the Defense as part of the proposed pre-trial agreements.

    The Prosecution has been advised that Senior U.S. Government policy officials continue their discussions regarding the proposed "policy principles." It is anticipated that these discussions will continue for some time.

3. **Attachments**

    A. Certificate of Service, dated 13 January 2023.

                                        Respectfully submitted,

                                    _____//s//_____
                                    Clay Trivett
                                    Managing Trial Counsel
                                    Office of the Chief Prosecutor
                                    Office of Military Commissions

**JA.82**

# ATTACHMENT A

**JA.83**

## <u>CERTIFICATE OF SERVICE</u>

I certify that on the 13th day of January 2023, I filed AE 902A (GOV), Government Third Notice Of Status Update Regarding Defense Joint Policy Principles, with the Office of Military Commissions Trial Judiciary and I served a copy on counsel of record.

_____//s//_____
Christopher M. Dykstra
Deputy Managing Trial Counsel
Office of the Chief Prosecutor
Office of Military Commissions

JA.84

**MILITARY COMMISSIONS TRIAL JUDICIARY**
**GUANTANAMO BAY, CUBA**

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>v.<br><br>**KHALID SHAIKH MOHAMMAD;**<br>**WALID MUHAMMAD SALIH**<br>**MUBARAK BIN 'ATTASH;**<br>**RAMZI BINALSHIBH;**<br>**ALI ABDUL AZIZ ALI;**<br>**MUSTAFA AHMED ADAM**<br>**AL HAWSAWI** | **AE 902B (GOV)**<br><br>**Government Fourth Notice**<br>Of Status Update Regarding<br>Defense Joint Policy Principles<br><br><br>27 January 2023 |

1. **Timeliness**

　　The Prosecution timely files this Notice in accordance with AE 901D, Ruling and Order, paragraph 5.c.

2. **Government Fourth Update on Status of Defense Joint Policy Principles**

　　In accordance with AE 901D, Ruling and Order, the Prosecution provides its fourth update to the Commission on the status of the United States' consideration of the "Joint Policy Principles" put forward by the Defense as part of the proposed pre-trial agreements.

　　The Prosecution has been advised that U.S. government officials are continuing to discuss the proposed policy principles in connection with extremely complex cases involving numerous interagency equities.

3. **Attachments**

　　A.  Certificate of Service, dated 27 January 2023.

　　　　　　　　　　　　　　　　Respectfully submitted,


　　　　　　　　　　　　　　　　＿＿＿＿＿＿＿//s//＿＿＿＿＿＿＿＿＿＿＿＿
　　　　　　　　　　　　　　　　Clay Trivett
　　　　　　　　　　　　　　　　Managing Trial Counsel
　　　　　　　　　　　　　　　　Office of the Chief Prosecutor
　　　　　　　　　　　　　　　　Office of Military Commissions

**JA.85**

# ATTACHMENT A

**JA.86**

## <u>CERTIFICATE OF SERVICE</u>

I certify that on the 27th day of January 2023, I filed AE 902B (GOV), Government Fourth Notice Of Status Update Regarding Defense Joint Policy Principles, with the Office of Military Commissions Trial Judiciary and I served a copy on counsel of record.

<u>            //s//               </u>
Christopher M. Dykstra
Deputy Managing Trial Counsel
Office of the Chief Prosecutor
Office of Military Commissions

JA.87

**MILITARY COMMISSIONS TRIAL JUDICIARY**
**GUANTANAMO BAY, CUBA**

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>**v.**<br><br>**KHALID SHAIKH MOHAMMAD;**<br>**WALID MUHAMMAD SALIH**<br>**MUBARAK BIN 'ATTASH;**<br>**RAMZI BINALSHIBH;**<br>**ALI ABDUL AZIZ ALI;**<br>**MUSTAFA AHMED ADAM**<br>**AL HAWSAWI** | **AE 902L (GOV)**<br><br>**Government Fourteenth Notice**<br>Of Status Update Regarding<br>Defense Joint Policy Principles<br><br>6 September 2023 |

1. **Timeliness**

    The Prosecution timely files this Notice in accordance with AE 901D (Sup),

*Supplemental* Ruling, paragraph 4.

2. **Government Fourteenth Update on Status of Defense Joint Policy Principles**

    In accordance with AE 901D (Sup), Supplemental Ruling, the Prosecution provides its

Fourteenth update to the Commission on the status of the United States' consideration of the

"Joint Policy Principles" put forward by the Defense as part of the proposed pre-trial agreements.

    The Prosecution has been advised that "the Administration declines to accept the terms of

the proposed joint policy principles offered by the accused in the military commissions case,

*United States v. Mohammed, et al.*"

3. **Attachments**

    A.  Certificate of Service, dated 6 September 2023.

<div style="text-align:right">

Respectfully submitted,

_____//s//_____
Clay Trivett
Managing Trial Counsel
Office of the Chief Prosecutor
Office of Military Commissions

</div>

JA.88

# ATTACHMENT A

**JA.89**

## CERTIFICATE OF SERVICE

I certify that on the 6th day of September 2023, I filed AE 902L (GOV), Government Fourteenth Notice of Status Update Regarding Defense Joint Policy Principles, with the Office of Military Commissions Trial Judiciary and I served a copy on counsel of record.

_____//s//_____
Clay Trivett
Managing Trial Counsel
Office of the Chief Prosecutor
Office of Military Commissions

**JA.90**



07.31.24

# McConnell Condemns Biden-Harris Admin. Plea Deal with 9/11 Terrorists

**WASHINGTON, D.C.** – *U.S. Senate Republican Leader Mitch McConnell (R-KY) released the following statement today regarding the Biden-Harris Administration's reported plea deal with 9/11 terrorists*:

"The Biden-Harris Administration's weakness in the face of sworn enemies of the American people apparently knows no bounds. The plea deal with terrorists – including Khalid Sheik Mohammed, the mastermind of the 9/11 attacks that killed thousands of Americans – is a revolting abdication of the government's responsibility to defend America and provide justice.

"The only thing worse than negotiating with terrorists is negotiating with them after they are in custody. The families of their victims and the American people deserve real justice. In the same week that Israel eliminated some of Iran's most trusted terrorist proxies, the Administration's decision to spare these mass-murderers from the death penalty is an especially bitter pill.

"Meanwhile, the Biden-Harris Administration still seeks to release other Guantanamo terrorists back into the world. The Administration's cowardice in the face of terror is a national disgrace."

**Related Issues: War on Terror, Guantanamo Detention Facility, National Security, Al Qaeda**

JA.91

RELEASE

IMMEDIATE RELEASE

# Secretary of Defense Lloyd J. Austin III Designates New Convening Authority for Military Commissions

Aug. 28, 2023

Secretary of Defense Lloyd J. Austin III has designated Brigadier General (Ret.) Susan Escallier to serve as the Convening Authority for Military Commissions, effective October 8, 2023. BG Escallier will succeed Colonel Jeffrey D. Wood, who will continue serving as Convening Authority until October 8 before his voluntary departure from federal service. The Department of Defense thanks Col. Wood for his dedicated service to our Nation.

The Secretary of Defense established the position of the Convening Authority for Military Commissions consistent with the Military Commissions Act of 2009.

BG (Ret.) Escallier served as a judge advocate during 32 years of active duty, serving most recently as the Commander of the Army Legal Services Agency and Chief Judge of the U.S. Army Court of Criminal Appeals from 2019 until her retirement in 2021. In that role, she oversaw all civil litigation and supervised all trial judges within the U.S. Army.

Hosted by Defense Media Activity - WEB.mil

JA.92

UNCLASSIFIED//FOR PUBLIC RELEASE

**Sims, Martin L CIV OSD OMC TJ (USA)**

| | |
|---|---|
| **From:** | Sims, Martin L CIV OSD OMC TJ (USA) |
| **Sent:** | Tuesday, August 6, 2024 3:03 PM |
| **To:** | Ruiz, Walter B Jr CDR USN (USA); Montross, William CIV OSD MCDO (USA); Engle, Matthew L CIV OSD MCDO (USA) |
| **Cc:** | OSD Pentagon OMC List 911 Prosecution Team; OSD NCR MCDO List MCDO Team Bin Attash; OSD NCR MCDO List MCDO Team Al Baluchi; OSD NCR MCDO List MCDO Team Mohammad; OSD NCR MCDO List MCDO Team Hawsawi; OSD NCR MCDO List MCDO Team RBAS; OSD Pentagon OMC List Trial Judiciary; Thompson, Jackie L Jr BG USARMY DLSA (USA) |
| **Subject:** | RE: Request to delay |
| **Signed By:** | martin.l.sims.civ |

I have informed the Military Judge of your objection. He said you can place it on the record tomorrow when we have an open session starting at 0900.  We are still having the M.C.R.E. 505(h) hearing today at 1600.  Counsel for all four Accused are required to be present.

Martin L. Sims
Senior Attorney Advisor
Office of Military Commissions, Trial Judiciary
martin.l.sims.civ
Office
NSGB Office

**From:** Ruiz, Walter B Jr CDR USN (USA) <walter.b.ruiz.mi
**Sent:** Tuesday, August 6, 2024 2:51 PM
**To:** Sims, Martin L CIV OSD OMC TJ (USA) <martin.l.sims.civ          Montross, William CIV OSD MCDO (USA) <william.montross3.civ          Engle, Matthew L CIV OSD MCDO (USA) <matthew.l.engle.civ
**Cc:** OSD Pentagon OMC List 911 Prosecution Team <osd.pentagon.OMC.list.911-prosecution-team          OSD NCR MCDO List MCDO Team Bin Attash <osd.ncr.mcdo.list.mcdo-team-bin-attash          OSD NCR MCDO List MCDO Team Al Baluchi <osd.ncr.mcdo.list.mcdo-team-al-baluchi          OSD NCR MCDO List MCDO Team Mohammad <osd.ncr.mcdo.list.mcdo-team-mohammad          OSD NCR MCDO List MCDO Team Hawsawi <osd.ncr.mcdo.list.mcdo-team-hawsawi          OSD NCR MCDO List MCDO Team RBAS <osd.ncr.mcdo.list.mcdo-team-rbas          OSD Pentagon OMC List Trial Judiciary <osd.pentagon.OMC.list.trial-judiciary          Thompson, Jackie L Jr BG USARMY DLSA (USA) <jackie.l.thompson18.mi
**Subject:** RE: Request to delay

Mr. Sims,

We object to going into a closed session this afternoon. We feel that there are matters that first need to be addressed in a non-classified setting on the public record, that relate to our ability to comply with the military judge's directive to actively participate as if there were no pretrial agreement.

Thank you
Walter Ruiz

1

Appellate Exhibit 950BBB
Page 1 of 5

UNCLASSIFIED//FOR PUBLIC RELEASE

**JA.93**

UNCLASSIFIED//FOR PUBLIC RELEASE

From: Sims, Martin L CIV OSD OMC TJ (USA) <martin.l.sims.civ███████>
Sent: Tuesday, August 6, 2024 1:18 PM
To: Montross, William CIV OSD MCDO (USA) <william.montross3.civ███████ Engle, Matthew L CIV OSD MCDO (USA)
<matthew.l.engle.civ████
Cc: OSD Pentagon OMC List 911 Prosecution Team <osd.pentagon.OMC.list.911-prosecution-team███████ OSD NCR
MCDO List MCDO Team Bin Attash <osd.ncr.mcdo.list.mcdo-team-bin-attash████ OSD NCR MCDO List MCDO
Team Al Baluchi <osd.ncr.mcdo.list.mcdo-team-al-baluchi█████ OSD NCR MCDO List MCDO Team Mohammad
<osd.ncr.mcdo.list.mcdo-team-mohammad███ OSD NCR MCDO List MCDO Team Hawsawi
<osd.ncr.mcdo.list.mcdo-team-hawsawi██████ OSD NCR MCDO List MCDO Team RBAS <osd.ncr.mcdo.list.mcdo-
team-rbas████ OSD Pentagon OMC List Trial Judiciary <osd.pentagon.OMC.list.trial-judiciary████████
Thompson, Jackie L Jr BG USARMY DLSA (USA) <jackie.l.thompson18.mil████
Subject: RE: Request to delay

The Military Judge has decided to cancel today's open session in order to permit Counsel for Mr. bin "Attash to have more time to meet with him.

However, the Commission intends to hold an M.C.R.E. 505(h) Hearing with Counsel for all four Accused present, starting at 1600 this afternoon, to discuss any outstanding M.C.R.E 505 notices pertaining to Agent McFadden and/or Dr. WK5I.

Based on Mr. Mohammad's motion in AE 955C and Mr. Montross' statement that Mr. bin 'Attash's team considers themselves to be in an "observer status," it appears some of the defense teams' position may be that the pretrial agreement is still in force. As such, some defense teams may have concerns about filing motions or questioning witnesses as they do not want to be in breach of the agreement. It is the Commission's intent to rule on the issue of whether the pretrial agreement is still in force once the briefing cycle is complete and oral argument has been heard.

Until then, the parties are expected to actively participate in this case as if there were no pretrial agreement. Such participation will not be considered a breach of the agreement by the Commission. The Commission will put this on the record once we are in an open session.

Martin L. Sims
Senior Attorney Advisor
Office of Military Commissions, Trial Judiciary
martin.l.sims.civ████
Office █████████████
NSGB Office ████

2

Appellate Exhibit 950BBB
Page 2 of 5

UNCLASSIFIED//FOR PUBLIC RELEASE

**JA.94**

UNCLASSIFIED//FOR PUBLIC RELEASE

**From:** Montross, William CIV OSD MCDO (USA) <william.montross3.civ
**Sent:** Tuesday, August 6, 2024 12:54 PM
**To:** Sims, Martin L CIV OSD OMC TJ (USA) <martin.l.sims.civ          Engle, Matthew L CIV OSD MCDO (USA)
<matthew.l.engle.civ
**Cc:** OSD Pentagon OMC List 911 Prosecution Team <osd.pentagon.OMC.list.911-prosecution-team          OSD NCR
MCDO List MCDO Team Bin Attash <osd.ncr.mcdo.list.mcdo-team-bin-attash          OSD NCR MCDO List MCDO
Team Al Baluchi <osd.ncr.mcdo.list.mcdo-team-al-baluchi          OSD NCR MCDO List MCDO Team Mohammad
<osd.ncr.mcdo.list.mcdo-team-mohammad          OSD NCR MCDO List MCDO Team Hawsawi
<osd.ncr.mcdo.list.mcdo-team-hawsawi          OSD NCR MCDO List MCDO Team RBAS <osd.ncr.mcdo.list.mcdo-
team-rbas          OSD Pentagon OMC List Trial Judiciary <osd.pentagon.OMC.list.trial-judiciary
**Subject:** Re: Request to delay

Dear Mr. Sims,

We are writing from ECHO II. We started the meeting with the client shortly before 9:20 am. At this point, we are still
working to answer his questions about the status of the PTA and the path forward. We need more time.

Our position is that we are currently in "observer status" and prohibited from participating under the terms of our PTA.
We will have an observer present in the courtroom at 1:30 pm. That person will likely be Mr. Perry. We do not see
reason to delay the start of the hearing beyond 1:30 pm. We appreciate your understanding as we attempt to work
through the many questions and concerns expressed by our client.

Sincerely,
William Montross and Matthew Engle



**From:** "Sims, Martin L CIV OSD OMC TJ (USA)" <martin.l.sims.civ
**Date:** Tuesday, August 6, 2024 at 10:30:17 AM
**To:** "Engle, Matthew L CIV OSD MCDO (USA)" <matthew.l.engle.civ
**Cc:** "OSD Pentagon OMC List 911 Prosecution Team" <osd.pentagon.OMC.list.911-prosecution-
team          "OSD NCR MCDO List MCDO Team Bin Attash" <osd.ncr.mcdo.list.mcdo-team-bin-
attash          "OSD NCR MCDO List MCDO Team Al Baluchi" <osd.ncr.mcdo.list.mcdo-team-al-
baluchi          "OSD NCR MCDO List MCDO Team Mohammad" <osd.ncr.mcdo.list.mcdo-team-
mohammad          "OSD NCR MCDO List MCDO Team Hawsawi" <osd.ncr.mcdo.list.mcdo-team-
hawsawi          "OSD NCR MCDO List MCDO Team RBAS" <osd.ncr.mcdo.list.mcdo-team-
rbas          "OSD Pentagon OMC List Trial Judiciary" <osd.pentagon.OMC.list.trial-
judiciary
**Subject:** RE: Request to delay

The Military Commission has been informed that counsel for Mr. bin 'Attash will likely not
return from meeting with his client in time for the Commission to begin at 1100. Therefore, the Military
Judge has decided to delay the start time of today's session until after the lunch/prayer
break. Accordingly, the Commission will be back on the record in an open session at 1330 this
afternoon.

3

Appellate Exhibit 950BBB
Page 3 of 5

UNCLASSIFIED//FOR PUBLIC RELEASE

**JA.95**

UNCLASSIFIED//FOR PUBLIC RELEASE

Martin L. Sims

Senior Attorney Advisor

Office of Military Commissions, Trial Judiciary

martin.l.sims.civ

Office

NSGB Office

**From:** Sims, Martin L CIV OSD OMC TJ (USA) <martin.l.sims.civ
**Sent:** Tuesday, August 6, 2024 8:39 AM
**To:** Engle, Matthew L CIV OSD MCDO (USA) <matthew.l.engle.civ
**Cc:** OSD Pentagon OMC List 911 Prosecution Team <osd.pentagon.OMC.list.911-prosecution-team    OSD NCR MCDO List MCDO Team Bin Attash <osd.ncr.mcdo.list.mcdo-team-bin-attash    OSD NCR MCDO List MCDO Team Al Baluchi <osd.ncr.mcdo.list.mcdo-team-al-baluchi    OSD NCR MCDO List MCDO Team Mohammad <osd.ncr.mcdo.list.mcdo-team-mohammad    OSD NCR MCDO List MCDO Team Hawsawi <osd.ncr.mcdo.list.mcdo-team-hawsawi    OSD NCR MCDO List MCDO Team RBAS <osd.ncr.mcdo.list.mcdo-team-rbas    OSD Pentagon OMC List Trial Judiciary <osd.pentagon.OMC.list.trial-judiciary
**Subject:** RE: Request to delay

The Military Judge has decided to delay the start of this morning's open session until 1100 in order to allow time for counsel to consult with Mr. Bin 'Attash.

Martin L. Sims

Senior Attorney Advisor

Office of Military Commissions, Trial Judiciary

martin.l.sims.civ

Office

NSGB Office

4

Appellate Exhibit 950BBB
Page 4 of 5

UNCLASSIFIED//FOR PUBLIC RELEASE

**JA.96**

UNCLASSIFIED//FOR PUBLIC RELEASE

**From:** Engle, Matthew L CIV OSD MCDO (USA) <matthew.l.engle.civ
**Sent:** Tuesday, August 6, 2024 8:30 AM
**To:** Sims, Martin L CIV OSD OMC TJ (USA) <martin.l.sims.civ
**Cc:** OSD Pentagon OMC List 911 Prosecution Team <osd.pentagon.OMC.list.911-prosecution-
team                OSD NCR MCDO List MCDO Team Bin Attash <osd.ncr.mcdo.list.mcdo-team-bin-
attash            OSD NCR MCDO List MCDO Team Al Baluchi <osd.ncr.mcdo.list.mcdo-team-al-
baluchi          OSD NCR MCDO List MCDO Team Mohammad <osd.ncr.mcdo.list.mcdo-team-
mohammad          OSD NCR MCDO List MCDO Team Hawsawi <osd.ncr.mcdo.list.mcdo-team-
hawsaw          OSD NCR MCDO List MCDO Team RBAS <osd.ncr.mcdo.list.mcdo-team-
rbas
**Subject:** Request to delay

Mr. Sims,

Although Mr. Montross and I were present at ELC at 0700 to meet with Mr. bin 'Atash, we just received word that he had declined to attend Commissions today and had accepted AM and PM legal visits off site.

Mr. bin 'Atash only received notice (via attorney-client mail) yesterday about Secretary Lloyd's action on Friday. As the Commission is aware, we have had no opportunity to meet or consult with him since last Thursday.

Our intention is to meet with Mr. bin 'Atash beginning at 0900. We anticipate that, given the complexity of the issues raised by Secretary Lloyd's action and our client's unknown response to that action, our meeting will take considerable time. We will advise the Commission when we return to ELC. Accordingly, we request an indefinite delay to the commencement of today's hearing.

Thank you,

Matthew Engle

5

Appellate Exhibit 950BBB
Page 5 of 5

JA.97

**Sims, Martin L CIV OSD OMC TJ (USA)**

| | |
|---|---|
| **From:** | Sims, Martin L CIV OSD OMC TJ (USA) |
| **Sent:** | Tuesday, August 6, 2024 3:06 PM |
| **To:** | McQuade, Gabriela M CIV OSD MCDO (USA) |
| **Cc:** | OSD Pentagon OMC List 911 Prosecution Team; OSD NCR MCDO List MCDO Team Bin Attash; OSD NCR MCDO List MCDO Team Al Baluchi; OSD NCR MCDO List MCDO Team Mohammad; OSD NCR MCDO List MCDO Team Hawsawi; OSD NCR MCDO List MCDO Team RBAS; OSD Pentagon OMC List Trial Judiciary; Thompson, Jackie L Jr BG USARMY DLSA (USA) |
| **Subject:** | RE: Request to delay |
| **Signed By:** | martin.l.sims.civ@mail.mil |

I have informed the Military Judge of your objections. He said you can place it on the record tomorrow when we have an open session starting at 0900. We are still having the M.C.R.E. 505(h) hearing today at 1600. Counsel for all four Accused are required to be present.

Martin L. Sims
Senior Attorney Advisor
Office of Military Commissions, Trial Judiciary
martin.l.sims.civ@mail.mil
Office (703) 545-3086, DSN 865-3086, Mobile (757) 975-4971
NSGB Office (703) 545-4753

**From:** McQuade, Gabriela M CIV OSD MCDO (USA) <gabriela.m.mcquade.civ@mail.mil>
**Sent:** Tuesday, August 6, 2024 2:57 PM
**To:** Sims, Martin L CIV OSD OMC TJ (USA) <martin.l.sims.civ@mail.mil>
**Cc:** OSD Pentagon OMC List 911 Prosecution Team <osd.pentagon.OMC.list.911-prosecution-team@mail.mil>; OSD NCR MCDO List MCDO Team Bin Attash <osd.ncr.mcdo.list.mcdo-team-bin-attash@mail.mil>; OSD NCR MCDO List MCDO Team Al Baluchi <osd.ncr.mcdo.list.mcdo-team-al-baluchi@mail.mil>; OSD NCR MCDO List MCDO Team Mohammad <osd.ncr.mcdo.list.mcdo-team-mohammad@mail.mil>; OSD NCR MCDO List MCDO Team Hawsawi <osd.ncr.mcdo.list.mcdo-team-hawsawi@mail.mil>; OSD NCR MCDO List MCDO Team RBAS <osd.ncr.mcdo.list.mcdo-team-rbas@mail.mil>; OSD Pentagon OMC List Trial Judiciary <osd.pentagon.OMC.list.trial-judiciary@mail.mil>; Thompson, Jackie L Jr BG USARMY DLSA (USA) <jackie.l.thompson18.mil@mail.mil>
**Subject:** RE: Request to delay

Dear Mr. Sims,

Thank you for your email. I am writing on behalf of learned counsel who is consulting with Mr. Mohammad regarding today's developments.

To resolve any uncertainty the Commission may have with respect to our position, it is, unequivocally, that the pretrial agreement is still in full force and effect. That is because, as set forth in AE 955C (KSM), there are no circumstances that reasonably warrant a contrary view of its current vitality. Neither has the government suggested any reason nor cited any authority to doubt it.

While we, of course, do not presume to foretell how the Commission ultimately will decide the issue, we respectfully submit that the affected defense teams should not be "expected to actively participate in this case as if there were no pretrial agreement." First, irrespective of whether the *Commission* will consider such participation a breach, there is no guarantee that appellate courts will share the same view. For example, must Mr. Mohammad not only satisfy the

Commission's expectation, but also expend valuable time and resources seeking mandamus review to preserve the issue of compelled participation?

Second, compelling Mr. Mohammad's participation in proceedings would deny him the opportunity to further demonstrate his specific performance and strengthen his motion to proceed with the plea hearing in compliance with the agreement. Equally important, such compulsion prematurely deprives him of a benefit of his bargain – cessation of litigation to permit preparation of his sentencing case – before the government has raised any legitimate reason to suggest the agreement is not enforceable.

Third, there is no equitable justification for favoring the government's *ultra vires* "withdrawal" of the agreement rather than preserving the status quo ante that existed at the time the Commission indicated it would allow the entry of pleas on a workable schedule and agreed with the need to proceed with alacrity.

Accordingly, rather than favor the government's unsupported (and unsupportable) view of the situation, Mr. Mohammad suggests the Commission order expedited briefing of this very simple and straightforward issue and permit argument before the parties depart NSGB.

V/r,

Gabriela McQuade
Defense Counsel
Military Commissions Defense Organization
C: 757-927-9828
ELC 33: 571-372-0726
Gabriela.M.McQuade.civ@mail.mil

**From:** Sims, Martin L CIV OSD OMC TJ (USA) <martin.l.sims.civ@mail.mil>
**Sent:** Tuesday, August 6, 2024 1:18 PM
**To:** Montross, William CIV OSD MCDO (USA) <william.montross3.civ@mail.mil>; Engle, Matthew L CIV OSD MCDO (USA) <matthew.l.engle.civ@mail.mil>
**Cc:** OSD Pentagon OMC List 911 Prosecution Team <osd.pentagon.OMC.list.911-prosecution-team@mail.mil>; OSD NCR MCDO List MCDO Team Bin Attash <osd.ncr.mcdo.list.mcdo-team-bin-attash@mail.mil>; OSD NCR MCDO List MCDO Team Al Baluchi <osd.ncr.mcdo.list.mcdo-team-al-baluchi@mail.mil>; OSD NCR MCDO List MCDO Team Mohammad <osd.ncr.mcdo.list.mcdo-team-mohammad@mail.mil>; OSD NCR MCDO List MCDO Team Hawsawi <osd.ncr.mcdo.list.mcdo-team-hawsawi@mail.mil>; OSD NCR MCDO List MCDO Team RBAS <osd.ncr.mcdo.list.mcdo-team-rbas@mail.mil>; OSD Pentagon OMC List Trial Judiciary <osd.pentagon.OMC.list.trial-judiciary@mail.mil>; Thompson, Jackie L Jr BG USARMY DLSA (USA) <jackie.l.thompson18.mil@mail.mil>
**Subject:** RE: Request to delay

The Military Judge has decided to cancel today's open session in order to permit Counsel for Mr. bin "Attash to have more time to meet with him.

However, the Commission intends to hold an M.C.R.E. 505(h) Hearing with Counsel for all four Accused present, starting at 1600 this afternoon, to discuss any outstanding M.C.R.E 505 notices pertaining to Agent McFadden and/or Dr. WK5I.

**JA.99**

Based on Mr. Mohammad's motion in AE 955C and Mr. Montross' statement that Mr. bin 'Attash's team considers themselves to be in an "observer status," it appears some of the defense teams' position may be that the pretrial agreement is still in force. As such, some defense teams may have concerns about filing motions or questioning witnesses as they do not want to be in breach of the agreement. It is the Commission's intent to rule on the issue of whether the pretrial agreement is still in force once the briefing cycle is complete and oral argument has been heard.

Until then, the parties are expected to actively participate in this case as if there were no pretrial agreement. Such participation will not be considered a breach of the agreement by the Commission. The Commission will put this on the record once we are in an open session.

Martin L. Sims
Senior Attorney Advisor
Office of Military Commissions, Trial Judiciary
martin.l.sims.civ@mail.mil
Office (703) 545-3086, DSN 865-3086, Mobile (757) 975-4971
NSGB Office (703) 545-4753

**From:** Montross, William CIV OSD MCDO (USA) <william.montross3.civ@mail.mil>
**Sent:** Tuesday, August 6, 2024 12:54 PM
**To:** Sims, Martin L CIV OSD OMC TJ (USA) <martin.l.sims.civ@mail.mil>; Engle, Matthew L CIV OSD MCDO (USA) <matthew.l.engle.civ@mail.mil>
**Cc:** OSD Pentagon OMC List 911 Prosecution Team <osd.pentagon.OMC.list.911-prosecution-team@mail.mil>; OSD NCR MCDO List MCDO Team Bin Attash <osd.ncr.mcdo.list.mcdo-team-bin-attash@mail.mil>; OSD NCR MCDO List MCDO Team Al Baluchi <osd.ncr.mcdo.list.mcdo-team-al-baluchi@mail.mil>; OSD NCR MCDO List MCDO Team Mohammad <osd.ncr.mcdo.list.mcdo-team-mohammad@mail.mil>; OSD NCR MCDO List MCDO Team Hawsawi <osd.ncr.mcdo.list.mcdo-team-hawsawi@mail.mil>; OSD NCR MCDO List MCDO Team RBAS <osd.ncr.mcdo.list.mcdo-team-rbas@mail.mil>; OSD Pentagon OMC List Trial Judiciary <osd.pentagon.OMC.list.trial-judiciary@mail.mil>
**Subject:** Re: Request to delay

Dear Mr. Sims,

We are writing from ECHO II. We started the meeting with the client shortly before 9:20 am. At this point, we are still working to answer his questions about the status of the PTA and the path forward. We need more time.

Our position is that we are currently in "observer status" and prohibited from participating under the terms of our PTA. We will have an observer present in the courtroom at 1:30 pm. That person will likely be Mr. Perry. We do not see

3

**JA.100**

reason to delay the start of the hearing beyond 1:30 pm. We appreciate your understanding as we attempt to work through the many questions and concerns expressed by our client.

Sincerely,
William Montross and Matthew Engle

**From:** "Sims, Martin L CIV OSD OMC TJ (USA)" <martin.l.sims.civ@mail.mil>
**Date:** Tuesday, August 6, 2024 at 10:30:17 AM
**To:** "Engle, Matthew L CIV OSD MCDO (USA)" <matthew.l.engle.civ@mail.mil>
**Cc:** "OSD Pentagon OMC List 911 Prosecution Team" <osd.pentagon.OMC.list.911-prosecution-team@mail.mil>, "OSD NCR MCDO List MCDO Team Bin Attash" <osd.ncr.mcdo.list.mcdo-team-bin-attash@mail.mil>, "OSD NCR MCDO List MCDO Team Al Baluchi" <osd.ncr.mcdo.list.mcdo-team-al-baluchi@mail.mil>, "OSD NCR MCDO List MCDO Team Mohammad" <osd.ncr.mcdo.list.mcdo-team-mohammad@mail.mil>, "OSD NCR MCDO List MCDO Team Hawsawi" <osd.ncr.mcdo.list.mcdo-team-hawsawi@mail.mil>, "OSD NCR MCDO List MCDO Team RBAS" <osd.ncr.mcdo.list.mcdo-team-rbas@mail.mil>, "OSD Pentagon OMC List Trial Judiciary" <osd.pentagon.OMC.list.trial-judiciary@mail.mil>
**Subject:** RE: Request to delay

      The Military Commission has been informed that counsel for Mr. bin 'Attash will likely not return from meeting with his client in time for the Commission to begin at 1100.  Therefore, the Military Judge has decided to delay the start time of today's session until after the lunch/prayer break.  Accordingly, the Commission will be back on the record in an open session at 1330 this afternoon.

Martin L. Sims

Senior Attorney Advisor

Office of Military Commissions, Trial Judiciary

martin.l.sims.civ@mail.mil

Office (703) 545-3086, DSN 865-3086, Mobile (757) 975-4971

NSGB Office (703) 545-4753

**From:** Sims, Martin L CIV OSD OMC TJ (USA) <martin.l.sims.civ@mail.mil>
**Sent:** Tuesday, August 6, 2024 8:39 AM
**To:** Engle, Matthew L CIV OSD MCDO (USA) <matthew.l.engle.civ@mail.mil>
**Cc:** OSD Pentagon OMC List 911 Prosecution Team <osd.pentagon.OMC.list.911-prosecution-team@mail.mil>; OSD NCR MCDO List MCDO Team Bin Attash <osd.ncr.mcdo.list.mcdo-team-bin-attash@mail.mil>; OSD NCR MCDO List MCDO Team Al Baluchi <osd.ncr.mcdo.list.mcdo-team-al-baluchi@mail.mil>; OSD NCR MCDO List MCDO Team Mohammad <osd.ncr.mcdo.list.mcdo-team-mohammad@mail.mil>; OSD NCR MCDO List MCDO Team Hawsawi <osd.ncr.mcdo.list.mcdo-team-

4

**JA.101**

hawsawi@mail.mil>; OSD NCR MCDO List MCDO Team RBAS <osd.ncr.mcdo.list.mcdo-team-rbas@mail.mil>; OSD Pentagon OMC List Trial Judiciary <osd.pentagon.OMC.list.trial-judiciary@mail.mil>
**Subject:** RE: Request to delay


The Military Judge has decided to delay the start of this morning's open session until 1100 in order to allow time for counsel to consult with Mr. Bin 'Attash.



Martin L. Sims

Senior Attorney Advisor

Office of Military Commissions, Trial Judiciary

martin.l.sims.civ@mail.mil

Office (703) 545-3086, DSN 865-3086, Mobile (757) 975-4971

NSGB Office (703) 545-4753



**From:** Engle, Matthew L CIV OSD MCDO (USA) <matthew.l.engle.civ@mail.mil>
**Sent:** Tuesday, August 6, 2024 8:30 AM
**To:** Sims, Martin L CIV OSD OMC TJ (USA) <martin.l.sims.civ@mail.mil>
**Cc:** OSD Pentagon OMC List 911 Prosecution Team <osd.pentagon.OMC.list.911-prosecution-team@mail.mil>; OSD NCR MCDO List MCDO Team Bin Attash <osd.ncr.mcdo.list.mcdo-team-bin-attash@mail.mil>; OSD NCR MCDO List MCDO Team Al Baluchi <osd.ncr.mcdo.list.mcdo-team-al-baluchi@mail.mil>; OSD NCR MCDO List MCDO Team Mohammad <osd.ncr.mcdo.list.mcdo-team-mohammad@mail.mil>; OSD NCR MCDO List MCDO Team Hawsawi <osd.ncr.mcdo.list.mcdo-team-hawsawi@mail.mil>; OSD NCR MCDO List MCDO Team RBAS <osd.ncr.mcdo.list.mcdo-team-rbas@mail.mil>
**Subject:** Request to delay


Mr. Sims,

**JA.102**

Although Mr. Montross and I were present at ELC at 0700 to meet with Mr. bin 'Atash, we just received word that he had declined to attend Commissions today and had accepted AM and PM legal visits off site.

Mr. bin 'Atash only received notice (via attorney-client mail) yesterday about Secretary Lloyd's action on Friday.  As the Commission is aware, we have had no opportunity to meet or consult with him since last Thursday.

Our intention is to meet with Mr. bin 'Atash beginning at 0900.  We anticipate that, given the complexity of the issues raised by Secretary Lloyd's action and our client's unknown response to that action, our meeting will take considerable time.  We will advise the Commission when we return to ELC.  Accordingly, we request an indefinite delay to the commencement of today's hearing.

Thank you,

Matthew Engle

6

**JA.103**

**PAGE INTENTIONALLY LEFT BLANK**

**JA.104**

**PAGE INTENTIONALLY LEFT BLANK**

**PAGE INTENTIONALLY LEFT BLANK**

**PAGE INTENTIONALLY LEFT BLANK**

**JA.107**

**PAGE INTENTIONALLY LEFT BLANK**

**JA.108**

**PAGE INTENTIONALLY LEFT BLANK**

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

1    A.    According to Mr. Brown, it is.

2    Q.    And your testimony was that, in response to that, he

3    then contacts the Secretary of Defense?

4    A.    That is what Mr. Brown related to me.

5    MTC [MR. TRIVETT]:  Objecting based on this is four levels

6    of hearsay now.  This is a conversation about what the

7    Attorney General told the Secretary of Defense, who told

8    Mr. Castle, who told Mr. Rishikof, which Mr. Brown heard.

9    MJ [Col PARRELLA]:  I understand.  The objection is

10    overruled.  However, Counsel, I've got these facts, so

11    let's -- I don't need the recap.  Let's move on.

12    ADC [Capt ANDREU]:  Yes, sir.

13    Q.    What happens at the meeting that General -- or that

14    Mr. Castle then holds?

15    A.    Well, there was two.  The first one was with

16    Mr. Castle.  Mr. Brown told me an individual by the name of

17    Bob Easton, who I believe was the deputy general counsel at

18    the time, and Mr. Rishikof were there.  Mr. Castle was

19    concerned that the Office of General Counsel was not made

20    aware of this.  Mr. Brown and Mr. Rishikof responded by

21    saying, "We tried to inform you of this in a previous meeting,

22    but you didn't want to hear it."

23        And then they, according to Mr. Brown, provided

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

1  electronic documentation of that meeting that occurred to

2  refresh Mr. Castle's memory.  And the gist of it that

3  Mr. Brown told me was that Mr. Castle had said, "Moving

4  forward, you're going to -- you need to keep us in the loop.

5  You need to coordinate -- you need to coordinate with us."

6      Q.  You mentioned that there was a Mr. Easton at that

7  meeting?

8      A.  According to Mr. Brown, yes, sir.

9      Q.  And again, who is he?

10     A.  I believe from memory he is -- at the time, he was

11  the -- I think he was a deputy within the Office of General

12  Counsel.

13     Q.  Did anything of note happen with Mr. Easton at that

14  meeting?

15     A.  Either during or shortly after the meeting, Mr. Brown

16  told me that Mr. Easton made a comment to him, and the comment

17  was, quote, We own the commissions.  Mr. Brown made note of

18  that, made that comment several times to me in the course of

19  our interview.  I asked him why that was concerning, and he

20  said, you know, based on the context of the conversation,

21  it -- he felt that was an inappropriate comment.

22     Q.  What, if anything, could Mr. Brown tell you about

23  efforts that the convening authority's office was taking to

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

1    A.   No.

2    Q.   It happens.

3    A.   There's a reason why I'm an LDO.  It takes me a

4    while.

5    Q.   All right.  Did Mr. Brown ever indicate that before

6    he was hired as legal advisor concerns were raised to him

7    about his ability to work in the interagency process and his

8    behavior so far since he was hired in January?

9    A.   I do not recall that, sir.

10    Q.   Okay.  At some point I believe you discussed with

11    Mr. Castle that the attorney -- the conversation Mr. Castle

12    had with Mr. Rishikof regarding the Attorney General's phone

13    call to the Secretary of Defense.  Do you recall that?

14    A.   I do, sir.

15    Q.   Okay.  And did he specifically tell you that the main

16    reason Mr. Castle was upset was because he didn't know that

17    Mr. Rishikof was going over to the Department of Justice at

18    all?

19    A.   I don't think he put it like that, but -- I don't

20    think he phrased it like that.

21    Q.   Do you recall how he may have phrased it?

22    A.   The -- from my recollection sitting here, it was

23    Mr. Castle was -- I don't know if I'd use the term upset, but

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

1  was concerned that the Office of General Counsel was not

2  informed about the issue of pleas, communication with the

3  process of pleas ----

4      Q.   So ----

5      A.   ---- examining pleas.

6      Q.   Okay.  Do you recall Mr. Brown at all saying that

7  Mr. Castle had asked Mr. Rishikof who gave him approval to go

8  over to the Department of Justice?

9      A.   One more time.  I'm sorry.

10     Q.   Sure.

11     A.   I was distracted.

12     Q.   That's all right.

13     MTC [MR. TRIVETT]:  Sir, just so I know for my planning

14  purposes, were you planning on doing a normal 10:30 break

15  or ----

16     MJ [Col PARRELLA]:  I'm going to flip the question on you.

17  How long do you anticipate going?

18     MTC [MR. TRIVETT]:  Probably another half hour or so, sir.

19     MJ [Col PARRELLA]:  Okay.  We'll go ahead and take a

20  break.  The commission is in recess until 1045.

21  **[The R.M.C. 803 session recessed at 1031, 12 September 2018.]**

22  **[The R.M.C. 803 session was called to order at 1050,**

23  **12 September 2018.]**

**JA.113**

1    Q.   How do you recall it?

2    A.   I don't recall Mr. Castle asking who approved it.  I

3    recall Mr. Castle wanting to know why he -- why he wasn't kept

4    informed.

5    Q.   Of the trip to the Department of Justice?

6    A.   I don't recall them discussing a trip to the

7    Department of Justice specifically.  I know the communication

8    between the CA and the Department of Justice came up, but I

9    don't -- I didn't ask about a specific meeting.  That never

10   came up.

11   Q.   Okay.  So you have no -- your investigation did not

12   reveal that Mr. Brown had had authority to go over to the

13   Department of Justice that Mr. Castle wasn't aware of?

14   A.   I didn't exam -- again, and I'm sorry, can you

15   rephrase the question?

16   Q.   Sure.  As part of your investigation, did you come to

17   learn that Mr. Brown and Mr. Rishikof had authority to go over

18   to the Department of Justice but that Mr. Castle did not know

19   that?

20   A.   I didn't examine that aspect of it.  I think that is

21   part of what was murky, but I didn't examine that aspect of

22   that.

23   Q.   Fair enough.  Isn't it true that Mr. Brown indicated

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

**1**    Q.   All right.  And ----

**2**    A.   Oh, and -- I'm sorry.  And Mr. Allen, who was --

**3** played a temporary role at the very beginning was -- also sat

**4** in on some of these meetings.

**5**    Q.   All right.  Was -- so when you say "meetings" -- when

**6** you say that you spoke to this list of attorneys within OGC,

**7** was that a formal meeting or was that you just walking around

**8** the hallway?

**9**    A.   No, this was -- well, it was a meeting in this

**10** conference room that we would have and have discussions.

**11**    Q.   All right.  And what did you ask them, the assembled

**12** group?

**13**    A.   Well, I mean, I -- well, during this meeting they

**14** said to me that, you know, "Harvey Rishikof wants to come in

**15** and talk to you," and they explained to me that he was the

**16** convening authority.  They explained to me what the convening

**17** authority was, and they explained to me that Mr. Rishikof was

**18** actively exploring the possibility of plea agreements and that

**19** it was -- and they also explained to me the concept of

**20** unlawful influence and how it was absolutely essential that I

**21** not discuss with those -- that plea agreements with him at

**22** all.

**23**    Q.   All right.  So if I -- tell me, do I have this

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

1  Secretary Mattis was pulled out were you asked to join the

2  Secretary?

3      A.   It was a couple of minutes later.

4      Q.   And what did you do in response to that request?

5      A.   I went into the Secretary's office.

6      Q.   And what happened then?

7      A.   They -- if I remember correctly -- I very well might

8  not -- they connect -- there was -- you know, the Secretary

9  was looking -- might have -- might have looked at me and said,

10  you know, "What's going on?"

11          And I said, "Sir, I -- I don't know" or something

12  like that, that happened.

13          And then if I remember it -- and once again, this

14  is -- I'm not saying I have the best memory on this -- is that

15  they then connected the Attorney General to the Secretary.

16      Q.   All right.  On speakerphone, sir?

17      A.   On speakerphone.

18      Q.   And what conversation was then had?

19      A.   I don't remember what -- the specifics about it.  I

20  do remember the Attorney General, then-Attorney General,

21  saying "No deal," but -- and I remember the Secretary looking

22  at me like, "Well, what is he talking about?"  And to be frank

23  with you, I didn't know what he was talking about there -- and

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

1  AG call.

2      Q.   The meeting between Mr. Shanahan, you, and

3  Mr. Rishikof, would the 18th of October sound correct?

4      A.   Like I said, those -- that -- those are really tight

5  times.  But is that possible?  Yes.

6      Q.   Okay.  And at that meeting Mr. Rishikof briefed the

7  Deputy Secretary of Defense and yourself on his proposed

8  courses of action; is that right?

9      A.   That's correct.

10      Q.   And those proposed courses of action involved, number

11  one, resolving this case by plea agreement or pretrial

12  agreement, correct?

13      A.   Correct.

14      Q.   Number two, reorganizing the convening authority's

15  office to increase the amount of control that the convening

16  authority had, correct?

17      A.   Yes.  Well, not reorganizing.  Bringing things into,

18  I think is a better way of putting it, bringing other equities

19  and other organizations into under -- under Mr. Rishikof's

20  control, yes.

21      Q.   And then the third COA was business as usual,

22  correct?

23      A.   I think that's right.

**JA.117**

1  was some conversation between you and the Secretary about what

2  is up with this call from the Attorney General, why is the

3  Attorney General calling, that you and the Secretary

4  discussed; is that correct?

5      A.  I remember walking in.  I remember that -- that there

6  was something to do with the Attorney General and I remember

7  the -- and then I think the -- the call was placed, and I

8  think -- you know, and I remember it being on speakerphone.

9  But like I said, I'm -- this -- it -- you know, it's a

10  fuzzy -- as I think I've said before, it is a fuzzy -- it's

11  not a very crisp memory.

12      Q.  Right.  But in any event, at some point in the

13  conversation, the Attorney General said the words "No deals"?

14      A.  Yes, I remember him saying "No deal."

15      Q.  And that was ----

16      A.  No, I remember him saying "No deal," not "No deals."

17      Q.  I see.

18      A.  I believe he said "No deal."  If I remember

19  correctly, he said "No deal."

20      Q.  And is it your testimony that he didn't say what he

21  was referring to?

22      A.  There might have been some comment about, you know,

23  about terrorists or terrorism, but I honestly don't remember

JA.118

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

1  the call that you overheard between Secretary of Defense

2  Mattis and AG Sessions.  It's clear that you don't remember,

3  you are not clear on the date as we sit here today, right?

4      A.  I'm not -- I'm not clear on most of what happened.

5      Q.  Okay.  But one of the things that you are clear on is

6  that Secretary Mattis indicated to you in some way, "What is

7  AG Sessions talking about," right?

8      A.  I sort of remember that, yeah.

9      Q.  And did ----

10     A.  I'm not quite ----

11     Q.  I'm sorry?

12     A.  Not crisp.  I'm not crisp at all.

13     Q.  Do you remember how he communicated that to you?

14     TC [MR. RYAN]:  Objection, Your Honor.  Asked and answered

15  twice now.

16     MJ [Col PARRELLA]:  Overruled.

17     A.  I -- you know, he might have looked at me, he might

18  have asked me something.  I -- like I said, it is not a crisp

19  memory.

20     Q.  Now, after he communicated that to you, did you

21  provide him an answer?

22     A.  I said, you know -- and the only time that I -- the

23  only thing I remember saying is "No deal" after the

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

1  Attorney General had said "No deal."  And like I said again,

2  it was -- it -- you know, I basically said that because I sort

3  of didn't remember making any deals with anybody during that

4  period of time.

5      Q.   Do you know what conversations were had between

6  Secretary Mattis and AG Sessions prior to your being invited

7  to the office that day?

8      A.   I don't know that they -- I don't know that they had

9  one on that day.  Like I said, they -- I think he -- Secretary

10  might have even dialed the number or he was told to pick up.

11  I don't remember.

12      Q.   Certainly.  So it's possible that there was a

13  conversation that occurred before you arrived, which would

14  explain why there was a little confusion?

15      A.   I -- I don't know if I -- if I came away with that

16  impression, but I don't know.

17      Q.   Certainly.  After the conversation with

18  Attorney General Sessions ended, where did you go?

19      A.   I went -- I believe I went back into the meeting.

20      Q.   And where did Secretary Mattis go?

21      A.   I think he rejoined the meeting.

22      Q.   Did you rejoin the meeting at the same time or

23  separately?

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

1  I don't remember any kind of conversation from -- about the

2  9/11 case.  Could he have said something about that?  Yes, but

3  I don't remember it.

4      Q.  Did you ever meet with Brigadier General John Baker?

5      TC [MR. RYAN]:  Objection, Judge.

6      A.  No, sir, I have never ----

7      MJ [Col PARRELLA]:  The objection is overruled.

8          You can go ahead and finish your answer, Mr. Castle.

9      A.  I apologize.  No, I don't believe I ever met

10  General Baker.

11      Q.  Mr. Castle, when you took over as the acting general

12  counsel, did you learn that this potential plea agreement

13  process was well under way before you took over?

14      A.  Yes, that was my understanding, that the plea

15  agreement process was well under way.

16      Q.  And you testified a little bit earlier to one of the

17  other counsel that you had an understanding that the defense

18  had come back to Mr. Rishikof and said that they wanted some

19  assurance that the Department of Justice would be on board

20  with a plea agreement and not be -- not be a double

21  prosecution; is that right?

22      A.  That would -- that was my understanding, that the

23  defense was -- wasn't willing to go along unless there was

**JA.121**

1  end because you were right there; is that right?

2      A.   Because I was standing -- I was standing about six

3  feet away from him, yes.

4      Q.   And those are two of the most important and powerful

5  officeholders in the country; is that right?

6      A.   That is correct.

7      Q.   And a very unusual ----

8      A.   At the time, yes.

9      Q.   A very unusual situation; is that right?

10     A.   Yes.

11     Q.   And the only words in those -- in that conversation

12  that you can recall, "No deal"?

13     A.   Yeah.   Those are the only specific things.   As I

14  said, six weeks on the job, not expecting to be called into --

15  into the meeting.   I wasn't -- I -- I -- it was -- it was a

16  new experience.

17     Q.   And when the words "No deal" came from

18  Attorney General Sessions, did Secretary Mattis say anything

19  in response that you recall?

20     A.   I don't -- I honestly don't -- I honestly don't

21  remember him saying anything.   I remember saying myself "No

22  deal," but that's just because I didn't -- you know, I didn't

23  remember making any deal.

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

1  with respect to AE 524L (Gov).  And it's inconsistent with

2  CIPA practice.  It's inconsistent with what CIPA cases have

3  taught us to do in cases involving classified information.

4  It's at that point that the iterative process is essential.

5          It was premature -- premature to immediately jump to

6  sanctions.  At that point is when a judge's decision that

7  classified information has to be disclosed to the defense,

8  that triggers actions by the government.  At that point the

9  judge says you have to disclose classified -- you have to

10  disclose the identities of CIA persons.  The government then

11  has options.  We could certainly appeal, but more

12  appropriately, we'd engage in the iterative process.

13          There had to be a way, short of suppressing some of

14  the most critical evidence in this case, to protect this

15  information while still allowing the defense to proceed and

16  investigate where appropriate.

17          Judge, the defense won the lottery without even

18  buying a ticket.  They hadn't even moved for -- to suppress

19  the statements.  And certainly we might get to that point in

20  this litigation, and we invite that motion and we invite that

21  litigation as it would be appropriate to appropriately analyze

22  the circumstances of these very important, very critical

23  statements, to take testimony, to present evidence as

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

1  the identities, explaining how they are unable to locate all

2  of these folks and interview them.  So it's difficult to

3  imagine them being able to do this successfully without some

4  assistance from the government, some involvement from the

5  government.

6          And another option that I didn't specifically mention

7  earlier, if the concern is that the defense is having to show

8  much -- too much information to do this, it's certainly

9  possible to make those -- to set up a process to make those

10  requests without specific prosecution involvement.  You know,

11  it would add another layer.

12          Frankly, I don't know that they have the right --

13  that that somehow is privileged; that if they are making a

14  request to a third party to speak to them about, you know,

15  matters that, frankly, it's obvious that they want to learn

16  and that they want to present in this court.

17          But that's yet another option, short of suppressing

18  critical government evidence, that the commission could

19  explore if it found, and it doesn't necessarily -- we don't

20  believe it needs to find that access to this classified CIA

21  information, the identities of CIA persons is necessary.

22          Judge, one of the errors that we point out in our

23  filing is that 524LL applies the wrong evidentiary standard.

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

1   recognized, if they had known, that on August the 15th he had
2   a pretrial offer in hand and that having been done and his
3   right to -- his unfettered right to accept or reject a
4   pretrial agreement offer, at that point -- the authority to
5   enter into pretrial agreements not having been taken away, at
6   that point now you would not be able to take it away, because
7   when that was on the table it was entirely within his
8   authority to accept or reject.
9       MJ [Col PARRELLA]:  So, Mr. Nevin, I apologize if you
10  mentioned it.  What was the approximate time -- you have
11  proffered to the court that you delivered this pretrial
12  agreement.  What is the approximate time you proffer that you
13  delivered it; that it was signed, I guess?
14      LDC [MR. NEVIN]:  The -- I don't know the answer to that
15  as I stand here.  It was in a responsive pleading in the 555
16  series, and I don't remember the exact day.
17      MJ [Col PARRELLA]:  I mean, are we talking August of '17
18  or are we talking January of '18?
19      LDC [MR. NEVIN]:  Oh, no.  It would be -- I would guess it
20  would be in the summer of 2018.
21      MJ [Col PARRELLA]:  I'm sorry, I'm not referring to the
22  pleading.  I'm referring to you have proffered that there was
23  a pretrial agreement.  My question is:  When are you saying

1  this pretrial agreement was presented to the convening

2  authority?

3      LDC [MR. NEVIN]:  Ah.  August the 15th of 2017.

4      MJ [Col PARRELLA]:  So your position is, then, from

5  August the 15th forward, because the Secretary had not

6  previously withheld that authority from the convening

7  authority, then until that pretrial agreement was either

8  accepted or rejected, they lacked the authority to remove

9  Mr. Rishikof?

10     LDC [MR. NEVIN]:  No, that they lacked the authority to

11 withhold his authority to enter a pretrial agreement.  So let

12 me read from 12-1 of the Rule for Trial by -- Chapter 12-1 of

13 the Rule for -- Regulation for Trial by Military Commission:

14         "Unless such authority is withheld by a superior

15 competent authority, the convening authority is authorized to

16 enter into, or reject offers to enter into, pretrial

17 agreements with the accused."

18         And then the next sentence says that, "The decision

19 to enter or reject a PTA offer submitted by an accused is

20 within the sole discretion of the convening authority who

21 referred the case to trial."

22         So I read those two sentences to say that a superior

23 competent authority may withhold the convening authority's

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

1   authorization to enter into or reject offer -- plea offers,

2   but that the decision to accept or reject a PTA offer

3   submitted by an accused is within the sole discretion of the

4   convening authority who referred the case to trial.

5       MJ [Col PARRELLA]:  I don't know that that's how it's

6   typically applied in the military practice, but I don't know

7   that that's really important because there's no indication

8   here that the Secretary made any attempt to withhold the

9   authority from -- or anybody else -- from Mr. Rishikof.  So I

10  think I understand your point, though.

11      LDC [MR. NEVIN]:  Could I say just one other thing to make

12  sure the record is clear?

13          This pretrial agreement, this PTA offer, was signed

14  by me.  It was not signed by Mr. Mohammad.  And I understood

15  that in order to be a pretrial agreement it needs to be signed

16  by all the parties.  But that's the -- we have sometimes in

17  discussion referred to this as -- in different ways, and I

18  think the record should reflect that.

19          I will also say that the record -- that the pretrial

20  agreement offer, the PTA offer did require that the convening

21  authority agree that Mr. Mohammad would not be prosecuted

22  elsewhere, but it did not require that the Attorney General

23  sign the document or give or not give his approval.

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

1       In fact, my recollection is that it -- the intention
2  was to effectuate that agreement by an agreement that he would
3  not -- that Mr. Mohammad would not be transferred out of the
4  custody of the Department of Defense.
5    MJ [Col PARRELLA]:  Okay.  Well -- and I think I made this
6  point during the last session of court when the government was
7  attempting to argue why the commission shouldn't allow
8  Mr. Connell to put Lieutenant Newman on the stand, and the
9  essence being they had proffered the information, so why
10 should the commission take evidence.
11      And I will just say that from the commission's
12 standpoint, proffers are not evidence.  So if the parties want
13 the commission to consider evidence, they should present
14 evidence.  There may be times when a proffer of the party is
15 appropriate.  And it's not to say that I don't trust the
16 veracity of any party.  It's simply that that's just not the
17 way the commission views the process to be designed.
18      So let's go ahead and move on to the next point,
19 please.
20   LDC [MR. NEVIN]:  Well, I'm at the end of what I want to
21 say, Your Honor.  But I will say that we have had -- there has
22 been at times in the past an understanding that
23 representations made by counsel were treated as having been

**JA.128**

```
1        A.  Absolutely not.

2        Q.  You stayed in New York?

3        A.  Yes, I did.

4        Q.  Now, based on your experience at that time, it would seem

5   that you must have been consulted a good amount by PENTTBOM there?

6        A.  Yes.  Yes.

7        Q.  However, during that same time period, post-September 11,

8   2001, did you continue your own caseload?

9        A.  I did.

10       Q.  And those were separate from the 9/11 investigation?

11       A.  They were separate.  Ended up related, but they were

12  separate.

13       Q.  And did that time period, post-September 11th, 2001,

14  require a good deal of work on your part in Southeast Asia?

15       A.  Yes, it did.

16       Q.  Special Agent Pellegrino, I'm going to direct your

17  attention now to early 2007.

18          At that time, were you assigned to become part of an

19  interview team of the accused Khalid Shaikh Mohammad?

20       A.  Yes.  Actually we were assigned in the fall of 2006.

21       Q.  The interview took place in early 2007?

22       A.  Yes.

23       Q.  Okay.  When the interview occurred -- first of all, did it
```

**JA.129**

1    occur?

2          A.   Yes, it did.

3          Q.   Where?

4          A.   In Guantanamo Bay.

5          Q.   Okay.  And tell us who else was on the interview team.

6          A.   With me, it was Brian Antol and Elmer Mason.

7          Q.   And say again, I'm sorry.

8          A.   Brian Antol from the FBI, an analyst, and Elmer Mason from

9    the Criminal Investigative Division of the military.

10         Q.   All right.  Did you identify him as Elmer Mason?

11         A.   Yes.

12         Q.   Okay.  Brian Antol from the FBI was somebody known to you?

13         A.   Yes.

14         Q.   You had worked with him before?

15         A.   Since '93, since the first World Trade Center bombing.

16         Q.   What was his rank within the FBI?

17         A.   He was an analyst.

18         Q.   Fair to say you worked very closely with Brian Antol?

19         A.   Yes.

20         Q.   The interview in early 2007 of Khalid Shaikh Mohammad, was

21    it documented?

22         A.   Yes, it was.

23         Q.   And in what sort of an FBI format was it documented?

UNCLASSIFIED//FOR PUBLIC RELEASE

1          A.  We used an LHM, or letterhead memorandum, to document the
2    interview.
3          TC [MR. RYAN]:  Your Honor, for the record I'm referring now
4    to what is in the record as 630C Attachment F.
5          Q.  Special Agent Pellegrino, in the course of your career
6    when interviewing someone, in what format was the interview
7    documented?
8          A.  Generally when you do an interview, you document it in an
9    FD302.
10         Q.  That's an FBI form?
11         A.  Yes, it is.
12         Q.  And in this case, it was done as an LHM?
13         A.  Yes.
14         Q.  Do you know why?
15         A.  The LHM is a more formal document that's meant to be
16    passed on to other agencies, both domestic and foreign.  So it's a
17    more formal document, although the content doesn't change.
18         Q.  The LHM, in this particular case, takes up about 32 pages;
19    am I correct ----
20         A.  That's right.
21         Q.  ---- in the record?
22             And what was -- what would be the difference to an outside
23    observer between a 302 and an LHM?

UNCLASSIFIED//FOR PUBLIC RELEASE

1          Q.  Special Agent Pellegrino, it is documented on the LHM when

2     these interviews took place; am I correct?

3          A.  Yes.

4          Q.  And those dates were what?

5          A.  January 12th, 13th, 14th, and 16th of 2007.

6          Q.  And during the course of the interview over those four

7     days, how is it being documented at that time in the room?

8          A.  Well, while the interview is taking place, Brian Antol was

9     taking notes of Mr. Khalid Shaikh Mohammad's answers.  And then at

10    the end of each day, we would go and type up what we had written.

11         Q.  Okay.  And who did most of the talking directly to Khalid

12    Shaikh Mohammad?

13         A.  I did.

14         Q.  Vast majority of the time?

15         A.  Yes.

16         Q.  And when you went every day for the purpose of taking the

17    information, the notes, into a typewritten form, who was doing the

18    typing?

19         A.  I was.

20         Q.  And how were you collaborating, in terms of how the

21    information was being set forth, typewritten, between the three of

22    you?

23         A.  We all sat in a room at a desk together ----

UNCLASSIFIED//FOR PUBLIC RELEASE

1      TC [MR. RYAN]:  Thank you, Your Honor.  My apologies.

2      MJ [Col McCALL]:  Okay.

3      Q.  Okay, sir.  You're free.

4      A.  I never worked with -- I won't say with.  I never worked

5  for the CIA at any time.

6      Q.  Okay.  And when you were making yourself available to

7  speak with Mr. Mohammad, were you aware at that time that he was in

8  CIA custody?

9      A.  When we were preparing for the interview in January of

10  2007, we believed he was at that point in military custody in

11  Guantanamo Bay.

12      Q.  And where -- who or how had you been given that

13  impression?

14      A.  Well, President Bush gave a speech in the beginning of

15  September of 2006 saying they were transferring a certain number of

16  high-value detainees to Guantanamo Bay.  I knew Khalid Shaikh

17  Mohammad was one of those detainees.

18      Q.  And let me ask if you have the binder in front of you to

19  look at ----

20      MJ [Col McCALL]:  Mr. Sowards, let me just make sure the

21  record is clear that it's AE 630GGGG that you're referencing and the

22  witness is also referencing.

23      LDC [MR. SOWARDS]:  Absolutely correct, Your Honor.  Thank you

UNCLASSIFIED//FOR PUBLIC RELEASE

**JA.133**

1    does current military policy.

2         Were you -- first of all, sir, did you have any awareness of

3    this discrepancy between the policies of the CIA in conducting

4    interrogations as compared to those of the FBI?

5         A.  At what point in time?

6         Q.  At any time before you saw Mr. Mohammad in 2007.

7         A.  Well, in the fall of 2006, when we were preparing, we were

8    advised by the CIA of a limited number of enhanced interrogation

9    techniques that were used during their time in CIA custody.

10        Q.  And when you say you were advised of those, can you tell

11   me exactly what that consisted of, that advice?

12        A.  They described maybe 10 or 11, a dozen different

13   techniques that they had gotten approval to use, which included

14   pushing someone against a wall or hitting them with an open hand.  I

15   can't remember the number, but they were all of that kind of -- you

16   know, that level of technique.  They may have said some sleep

17   deprivation, but, you know, that was -- it was limited to about, I

18   guess, less than a dozen different techniques that they told us

19   about.

20        Q.  Okay.  And I believe you also mentioned this morning that

21   at or about that time, you were briefed on some techniques to be used

22   in the interview when you were going down to Guantanamo.

23        Do you remember that?

**JA.134**

UNCLASSIFIED//FOR PUBLIC RELEASE

UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT

1  several photographs would be representations of some portions of each

2  area that encompassed Mr. Mohammad's universe at the time he was at

3  camp -- I'm sorry -- at black site 7?

4        A.  I believe that to be true.

5        Q.  Sir?

6        A.  I believe that to be true.

7        Q.  Okay.  And in the room where ████████████████████████

8  Mr. Mohammad was, at that point in his debriefing/cooperation mode,

9  he was actually giving you, or you and your colleagues, lectures on

10  sort of the tradecraft of al Qaeda?

11        A.  Yes, he was.  In fact, he told me at one point that I

12  would soon be on the no-fly list because I had been at Khalid Shaikh

13  Mohammad's training camp.

14        LDC [MR. SOWARDS]:  Your Honor, that actually completes the

15  photographic presentation I have today.

16        And I don't know if I could ask the court's indulgence, but

17  I don't know if I have to go test, but I'm feeling a little scratchy

18  of throat and not great, but it may just be all the excitement.

19        MJ [Col McCALL]:  Okay.  We can -- we can go ahead and recess

20  for the day.  It will give you a chance to confer with Mr. Mohammad.

21        LDC [MR. SOWARDS]:  Thank you.

22        MJ [Col McCALL]:  So we'll go ahead and recess.  I understand

23  you will stay.  I've conferred with the guard force.  It sounds like

                                    42393

UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

1   very least, see how well we could posture the case for the next

2   judge.  With just the complexity of this case, the number of years

3   that have gone on, the more that we could do to get the witnesses

4   wrapped up and then fresh briefings from the parties to show what was

5   still in dispute I thought would help a new judge rolling in.

6           I'm in the position, again, that nothing has changed since

7   the parties voir dired me on my retirement.  I'm still somewhat

8   ambivalent about whether or not I want to work after I retire.  I

9   have not applied for any jobs, so that gives me a great deal of

10  flexibility.  When I look at the amount of progress that we're

11  making, I am able to adjust fire and extend.

12          I don't know that I could or would do that any further than

13  I have.  At a certain point there's reasons that I wanted to retire

14  and those are still out there, as far as just personal reasons.  I'll

15  just leave it at that.

16          So I don't imagine I will be the trial judge.  I don't think

17  that that is going to work because I don't think that we're that

18  close to trial.  But because we're not that close to trial, after

19  having gone for so long, is why we're going to continue at this pace.

20          So I understand that I'm pushing the parties and that we

21  are -- with the motions practice and the witnesses and all the

22  logistical hurdles, it is a lot of work, and I understand that.  It's

23  a lot of work for my team as well.  But the government decided to do

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

 1   this case down here, and -- with this level of complexity, and I

 2   understand that.

 3           But the answer is, talk to your leadership and get more

 4   people on your teams, both for the defense or the government, if need

 5   be, because we're going to continue at this pace, at least while I'm

 6   the judge.  So the 2024 schedule is going to -- we're going to be

 7   filling up those weeks.

 8           And this summer I intend to put out a 2025 schedule.  Again,

 9   that's not any type of hinting that I'm going to be the judge for

10   those.  I don't think that I will be.  But, again, I want to block

11   off the parties' calendars in case the commission -- the chief judge

12   of the commissions is able to detail a new judge that can get up to

13   speed quickly, I want them to have that ability to continue on.

14           So anyway, if what I've said gives you additional questions,

15   please feel free to ask me.  You don't have to do it right now, but

16   you can ask me later this week if that ----

17           MTC [MR. TRIVETT]:  So ----

18           MJ [Col McCALL]:  Go ahead.

19           MTC [MR. TRIVETT]:  ---- our main concern, sir, is that we're

20   making strategic prosecutorial decisions based on the information

21   that you're providing us as to when you're leaving.  And it's

22   primarily based on do we file -- if this case doesn't go to trial in

23   2025, it may never go to trial.  I'm being completely honest with

UNCLASSIFIED//FOR PUBLIC RELEASE
UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT

1    recall COBALT, Location 2, was described as the dungeon.  Locations 7

2    and 8 were described by Dr. Mitchell as newer facilities, similar to

3    each other.  Location Number 5 was third-party custody, as described

4    by Special Agent Butsch and in the SSCI Report.

5         So there's a lot more insight that SG1 may have about the

6    potential coercive factors at the different sites as well as the

7    commonalities.

8         With regards to Special Agent Jocys, according to Special

9    Agent Drucker's unclassified testimony, she is one of the FBI agents,

10   along with Special Agent Drucker, who worked on the FBI

11   investigation, number one; second, was -- second, was detailed to the

12   RDI program to the CIA for several years; and third, assisted with

13   the LHM interviews at Guantanamo Bay.

14        On the first issue, she was involved in the investigation

15   into Iyman Faris, which is significant in the construction of several

16   of the information loops involving Mr. al Baluchi.  She was also

17   generally involved in the sending and receiving of requirements

18   cables according to unclassified testimony from Special Agents

19   Fitzgerald, Perkins, and Drucker.

20        In fact, Special Agent Drucker discussed a December 2004 and

21   December 2005 cable -- cables -- excuse me -- where she was on the

22   pass line of requirements with SG1.  But during his testimony,

23   Special Agent Drucker actually didn't recall taking any action with

UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT

1   regards to photographs mentioned in those cables.

2           So she may have more detailed information for us about that

3   process of creating the information loops to and from the black

4   sites, as well as more information about the other CIA personnel.

5   And the transcript cites for that, sir, just to close the loop, is

6   December 2004 was October 30th, 2019, at page 28047.  And the second

7   was February 2005 -- the February 2005 cable was October 30th, 2019,

8   at 28059.

9           There was also, in the spring of 2003, an FBI conference

10  about the exploitation of Mr. Mohammad and other detainee reporting,

11  which appears in the SSCI Report and about which we have some

12  discovery.  But so far, it's been a little bit mysterious.  No one

13  seems to remember any details about it at all.  This is clearly

14  something that when we found out about it, seemed very significant to

15  us.  But -- and that includes Special Agent Drucker, whose office

16  allegedly made a presentation there, and he talked about that on

17  October 31st, 2019, in the redacted public transcript at

18  page -- around page 28278.

19          And this is something that Special Agent Jocys may be able

20  to speak to and, frankly, would be pretty significant, if so, to know

21  how detainee reporting was being treated by the intelligence

22  community at that early date in the lifespan of the black sites.

23  This is March 2003.

UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT

1       And, finally, in October 2019, we said on the record that

2   the mystery of who was actually PENTTBOM and not PENTTBOM was pretty

3   opaque.  And, you know, you can tell from some of the questions we're

4   asking now that we're still trying to sort of nail that down.

5       Special Agent Drucker testified that Special Agent Jocys was

6   not PENTTBOM, in his opinion.  He categorized himself as

7   PENTTBOM-retired.  And, again, this is something that, I think, as we

8   go through and we try to figure out the threads of who was involved

9   with what with the black sites, this is something that we could use

10  Special Agent Jocys' lived experience and opinion on.

11      On the second issue, detailing to the black sites, she may

12  have more detailed information, as Special Agent Drucker actually

13  said during his testimony, about any debriefing courses she may have

14  done, as well as any actual black sites she may have visited.  And

15  for more details on that, I'll refer the military commission to AE

16  538I Attachment B.

17      And then, of course, we've had a few witnesses on the LHM

18  interrogations here at Guantanamo, but only one other CIA detailee,

19  and that's Adam Drucker, and still no one who saw or experienced the

20  black sites where the men actually were before, right?  Mitchell and

21  Jessen weren't here for the LHM interrogations.  So in terms of

22  bridging witnesses, we really haven't had any, and so she may be very

23  valuable for that.

UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT

UNCLASSIFIED//FOR PUBLIC RELEASE

UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT

1  were then not going to ----

2        MTC [MR. TRIVETT]:  Right.

3        MJ [Col McCALL]:  ---- be agreed to.  But then the prosecution

4  principles was another negotiation that was going on and it sounds

5  like may be still -- or at least it's open for negotiation.

6        But give me the government's analysis as far as whether

7  there was any unlawful influence on the prosecution principles.

8        MTC [MR. TRIVETT]:  Right.  There was not, because -- and how

9  I know this is because we established what it is that we were

10  requiring to do, what we thought was necessary in order to positively

11  endorse a case.

12        We had been negotiating with the defense counsel on that

13  piece of it.  Ours has not changed.  Ours did not change from March

14  when we started this.  It did not change after any statements were

15  made by Congress.  It remained static as far as the important things.

16        Now, we have negotiated with them in good faith.  And so

17  we've -- you know, around the edges we've agreed to do things.  But

18  our principles, as far as what we had asked for, have not changed in

19  any way.

20        So -- and I know that the convening authority is still

21  willing to consider any pretrial agreement that we positively endorse

22  based on the prosecution principles.

23        So this is all whirling around us, but it's not impacting

**JA.141**

1  us.  And I know that because I know the positions we took, and I know

2  that the positions that we took at the time are still available.

3          So I know for certain that I haven't been unlawfully

4  influenced in any way.  No one has threatened me to take away my job.

5  No one has told me not to negotiate consistent with what we believe

6  is a just result.

7          I believe that the Office of the Chief -- or the chief

8  prosecutor, who has given me the authority to do this, has not tried

9  to influence me in any way, and nor has he indicated that he's being

10 influenced in any way on the prosecution principle piece of it,

11 right?

12         So this was -- I mean, it became a little bit of a -- there

13 was some media furor on it, but it hasn't impacted us and it hasn't

14 impacted the convening authority.  And it wasn't directed at us

15 either, right?

16         Even -- I think it was clear that the White House came back

17 and in a subsequent statement said, hey, the decision on whether or

18 not to enter into a pretrial agreement is up to the convening

19 authority alone.  So we're not going to in any way make any further

20 comments about that.

21         I know that that's in the record.  I don't have the exact

22 record cite to it.

23         So what I can say is that there has been absolutely zero

UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT

1  unlawful influence that I have felt.  The convening authority's

2  office has not communicated to me in any way that they feel under

3  pressure to do anything other than to consider what we would

4  positively endorse as a pretrial agreement.

5       Now, work continues on the -- to try to hammer out what

6  was -- is within the power of the JTF commander or the willingness to

7  do things for recommendations.  And Admiral Rugh continues to work on

8  those.

9       But I can say, as an officer of the court, that I haven't

10  been influenced in any way by anything I've read.  I haven't changed

11  my mind on this.  But it's not up to me ultimately, right?

12       So the accused get a vote on this.  They'd be waiving an

13  important trial right that they have.  And it's going to be up to

14  them at the end of the day if they agree to do it.  But it's not for

15  lack of trying, and it's not for lack of willingness on the Office of

16  the Chief Prosecutor or the Office of the Convening Authority.

17       MJ [Col McCALL]:  All right.

18       MTC [MR. TRIVETT]:  And the piece about Congress, which needs

19  to be remembered as well -- and this is not in any way intended to

20  disparage any congressman, but there were hearings held on pretrial

21  agreements in this case that were attended by the chief defense

22  counsel at the time and were chaired by a senator at the time.

23       So we didn't say that that was inappropriate.  We didn't say

UNCLASSIFIED//FOR PUBLIC RELEASE

1    receiving classified testimony in closed sessions from the first Camp

2    VII commander.  That testimony concluded yesterday afternoon.

3           Although the commission had intended to begin hearing

4    unclassified testimony from Special Agent Maria Jocys yesterday

5    afternoon, the commission did not so after being informed that there

6    had been some developments in regard to a possible pretrial agreement

7    with some of the accused in this case.

8           So today we'll do some housekeeping, address some of those

9    issues, and then I intend to go forward with the open testimony of

10    Special Agent Jocys.

11           All right.  Anything from the parties?

12           Mr. Trivett?

13           MTC [MR. TRIVETT]:  Yes, sir.

14           Sir, I rise to announce that the convening authority has

15    reached pretrial agreements in this case with Mr. Khalid Shaikh

16    Mohammad, Mr. Walid Bin'Attash, and Mr. Mustafa al Hawsawi.

17           The signed pretrial agreements will be filed this morning

18    under the following appellate exhibit numbers:

19           The pretrial agreement for Khalid Shaikh Mohammad will be

20    AE 955 (Gov).

21           The pretrial agreement for Walid Bin'Attash will be AE 956

22    (Gov).

23           And the pretrial agreement for Mr. Mustafa al Hawsawi will

UNCLASSIFIED//FOR PUBLIC RELEASE

1        MTC [MR. TRIVETT]:  Yes, sir.

2        MJ [Col McCALL]:  What about Mr. Ali?  Have the parties

3    discussed the plan ----

4        MTC [MR. TRIVETT]:  We plan on proceeding -- we plan on

5    proceeding in a contested capital case against Mr. Ali, and we're

6    prepared to examine the witness that remains that Mr. Ali would like

7    to call today on his motion to suppress.

8        MJ [Col McCALL]:  All right.  And I guess what I'm getting

9    at -- I assumed that to be the case, but the question of severing

10   Mr. Ali from this case, holding off until after the guilty pleas are

11   accepted.  Again, I wanted to get the parties -- if there was any

12   positions on that issue before I made a decision.

13       MTC [MR. TRIVETT]:  I understand.  So we're not moving for

14   formal severance at this time of anyone.  Part of the pretrial

15   agreement does permit individual sentencing for Mr. Mohammad.

16       However, if something should happen before individual

17   sentencing, we believe that the joint referral would still apply and

18   that we would be able to rejoin them to wherever we are in the

19   process.

20       So that would be our position in that regard, that there is

21   no severance.  But at this point, with the waiver of all motions from

22   three of the four accused, they can't actively continue to

23   participate in any of the contested litigation based on the pretrial

UNCLASSIFIED//FOR PUBLIC RELEASE

1    agreement.

2           So Mr. Ali would be the only one who still has a plea of not

3    guilty having been entered and will continue to contest whatever

4    issues he wants to continue to contest.  But we don't see it as a

5    severed trial necessarily.  It's just that three have resolved

6    through plea, and that may advance through sentencing separately at

7    some point in the future.

8           MJ [Col McCALL]:  All right.  Understood.

9           Mr. Connell?

10          LDC [MR. CONNELL]:  Sir, our -- we see it pretty much the same

11   way.  There could be some nuances to that.  I don't know that the

12   other defendants should be required to appear for the first day of

13   each session anymore.  But, I mean, that seems like minor issues.

14          I would -- to me -- and they can say their own position, but

15   to me it seems like it would -- they would be in in some -- a

16   somewhat analogous position to Mr. Binalshibh at the moment, that

17   their attorneys should be able to observe; that if they wish to

18   observe, that they should be able to observe.

19          And it could be that they have a legal -- you know, they

20   haven't abandoned all legal rights by pleading guilty.  They may have

21   some legal position on something that happens that is separate from

22   pursuing relief under a motion.  They may have an objection or a

23   privilege or something else that they may wish to assert.

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

1       So it seems to me that they're still a part of the case,

2   just in a much different posture.

3       MJ [Col McCALL]:  All right.  And I agree with Mr. Trivett and

4   you, Mr. Connell.  That would be my way forward, that I see this

5   somewhat similar to Mr. Binalshibh.  Not quite, because that -- once

6   he was -- he was actually -- his case was severed off.

7       LDC [MR. CONNELL]:  Right.

8       MJ [Col McCALL]:  I seeing this being more akin to -- I know

9   we had the one time where Mr. Ruiz was unable to come down, and we

10  wanted to have oral argument, and so I proceeded on with oral

11  argument without him saying that they would be able to ask questions.

12      I think that's how I would go forward, is that if for some

13  reason I'm not able to accept a guilty plea from one of the accused

14  and we've gone on with witness testimony, I'm going to give that team

15  a chance to question that witness if they can demonstrate that they

16  actually have additional matters to present.

17      So that way I don't think that there's a reason for

18  the -- all the teams to be here every day if we're pressing on, which

19  is my intention with the Ali case.

20      MTC [MR. TRIVETT]:  Yes, sir.  Understood.

21      MJ [Col McCALL]:  All right.  Mr. Connell?

22      LDC [MR. CONNELL]:  Thank you, sir.

23      The other thing that I want to put into the scheduling mix

UNCLASSIFIED//FOR PUBLIC RELEASE

1  pleas.  If things have to move, that's fine.

2          So the last observation I want to make is globally.  I think

3  you know that our position is that we are joined with others in

4  pushing as hard as possible to get to a place where the government

5  has called all of its case-in-chief witnesses on the motion to

6  suppress.

7          We still don't have any clarity from the government on

8  whether Dr. Welner is a case-in-chief witness or a rebuttal witness.

9  I am treating him at this point -- I'm assuming that he's a

10  case-in-chief witness, which means that really there are three

11  witnesses left that we have to cover in order to be on track for

12  arguments in November on the question of whether the government has

13  carried its burden of proof to demonstrate voluntariness.  That is

14  McFadden, who doesn't seem like too much of a problem; WK5I, who is a

15  scheduling issue but otherwise very doable; and then Dr. Welner.

16          I have told the government that we are willing and able to

17  call Dr. Hanrahan in advance of Dr. Welner if they want us to.  But

18  the most important thing from our point of view is clearing the

19  government's -- getting through the government's set of witnesses for

20  their case in chief on the motion to suppress.

21          MJ [Col McCALL]:  All right.  And that seems similar to how

22  I'm viewing things.

23          Mr. Trivett?

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

1        MTC [MR. TRIVETT]:  Right.  I would have to consult with

2    Mr. Connell, and we'll have to figure out the Dr. I piece of it.

3        MJ [Col McCALL]:  All right.  Yeah, I'm open.  I know that

4    next week seems fairly busy now to try to still handle Dr. WK5I and

5    Agent McFadden, but I'm open to attempting to doing that while we're

6    working on accomplishing the guilty pleas.

7        Yeah.  So if the parties can talk and let me know, again,

8    how long they think Dr. Hanrahan and Dr. Welner would take if we're

9    going to handle the two of them in the September/October session.

10       MTC [MR. TRIVETT]:  Yes, sir.

11       And just to clarify from the government's perspective, we

12   believe that we should prioritize the entry of pleas next week, but

13   we stand ready to do whatever the commission wants to do on the Ali

14   case.  So I want to make sure that that's clear.

15       MJ [Col McCALL]:  Yeah, and I think that's my position as

16   well, is I'd like to prioritize those.  But, again, having not had a

17   chance to look at the agreements, I think I'll have a better

18   understanding maybe by Friday on whether I think that is actually

19   doable.  And so I definitely don't want Agent McFadden and Dr. WK5I

20   turned off.

21       MTC [MR. TRIVETT]:  Yes, sir.  Understood.

22       MJ [Col McCALL]:  All right.  Anything else to take up before

23   we call Special Agent Jocys?

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

1  courtroom this morning, so we don't have to go through matters of

2  determining their waiver of appearance.

3          So before we move on, there's some administrative matters to

4  discuss.  So in light of the recent developments over the weekend,

5  there was a bit of e-mail traffic yesterday.  I've made that part of

6  the record in AE 950BBB and AE 950CCC.

7          My initial position was going to be that during this state

8  of a question on whether or not there is an effective pretrial

9  agreement in effect, I wanted to press forward with all four accused

10  with their motions to suppress the letterhead memoranda.  I've

11  decided to reconsider my position.

12          So what I'm going to do is we're going to go back to what we

13  were doing last week.  So as we go through this process of -- I

14  understand that there's going to be some motions filed by the defense

15  teams regarding the pretrial agreement, regarding potential unlawful

16  influence.  As we're going through that, we're going to go back to

17  what we were doing last week.

18          At least for this week, with the two witnesses that we have,

19  the defense teams that had entered into the pretrial agreement -- so

20  this is Mr. Mohammad's team, Mr. Bin'Attash's team, and

21  Mr. al Hawsawi's team -- I need one attorney to be present for every

22  court session.  The rest of the counsel don't need to be present.

23  You're obviously welcome to.

UNCLASSIFIED//FOR PUBLIC RELEASE

1        And the accused, we're going to continue to do the same
2   process that we have always done.  So this is their court-martial.
3   They need to be here.  If they don't, then I need a voluntary waiver.
4   All right?
5        So going -- so any questions on that process?  Again, we
6   went through it last week.  I know we had a little bit of hiccups as
7   we figured out whether or not somebody was going to be here or not.
8   I don't want to have to wait on proceedings if the other defense
9   teams, who are not actively participating, maybe aren't showing up.
10       So I need at least one attorney.  And, again, I'm going to
11  need a waiver from the accused if they're not present.
12       Any questions/clarifications on that?
13       Mr. Sowards?
14       LDC [MR. SOWARDS]:  Yes, Your Honor.  You had mentioned
15  before, I believe it was on August 2nd, that you compared this to the
16  arrangement that we have with Mr. Bruck on behalf of Mr. Binalshibh.
17       MJ [Col McCALL]:  No.  So I think one of the defense teams had
18  said this would be similar to what we've done with Mr. Bruck and his
19  team.  So the big difference is with them, they've actually -- his
20  case has been severed.  And although there's -- you know, I'm still
21  the judge in that case, I've, as a courtesy, allowed them to still be
22  present.
23       The big difference is that the three accused that have the

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

1   pretrial agreement issue -- I'll just call it from now on -- pending

2   are still accused in this case, and so that's what's different.

3        So to me it's more analogous to how I handled -- there was

4   an issue that arose where Mr. Ruiz couldn't come down for one

5   session, where we were going to be arguing various AEs, and I allowed

6   his team to not participate in those oral arguments.  But -- so it's

7   a little bit different.

8        But bottom line, though, is, look, if -- at the end of the

9   day, after we've had these motions filed, the briefing cycle has been

10  dealt with, oral argument, if I need it, has been handled and I've

11  issued rulings, if at that point it's determined that there is no

12  longer a pretrial agreement and that -- let's say for Team Mohammad,

13  that you're still in a litigated case, then anything that we're doing

14  I'll give you a chance to, like, re-ask -- re-question those

15  witnesses.

16       So my intent though is to go forward with Special Agent

17  McFadden today and Dr. WK5I later this week.  And then during the

18  break, we'll see what the motions are and if they can be readily

19  resolved.  If not, I'm pressing on with Mr. Ali's motion to suppress

20  the letterhead memoranda.

21       LDC [MR. SOWARDS]:  Yes, the latter part of that, Your Honor,

22  was exactly our intent as well.  And I should say you answered the

23  second part of my question ----

UNCLASSIFIED//FOR PUBLIC RELEASE

1       MJ [Col McCALL]:  All right.

2       LDC [MR. SOWARDS]:  ---- which was going to be to allude to

3  Mr. Ruiz's analogous situation at one time due to a family emergency,

4  so that the record is clear that that does not constitute, as much as

5  we can, any sort of participation in the proceedings or substantive

6  hearings.  We're merely observers.

7       MJ [Col McCALL]:  Sure.  Again, I don't -- I honestly don't

8  see the prejudice to the parties if we pressed forward and had you

9  participate, but I also -- I understand that you want to focus on the

10  pretrial agreement and you're concerned on an appellate court might

11  disagree with me.

12      So, honestly, I don't see, really, any harm in allowing you

13  to be -- if you want to use the term "observers," we'll use that, but

14  basically not actively participating as we progress with the motion

15  to suppress the letterhead memoranda for Mr. Ali's case.

16      LDC [MR. SOWARDS]:  Sure.  And just so the record's clear,

17  we're trying to help the commission move along with the salient

18  business at hand without jeopardizing Mr. Mohammad's rights in a

19  death penalty case.

20      And so we thought the most efficient way to do that is the

21  way you outlined previously, to allow someone to have real-time eyes

22  on the case.  And if something should later develop down the road

23  that shows we don't have a pretrial agreement and we're back in this

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

**JA.153**

1    case, we don't have to waste any additional time coming up to speed.

2        MJ [Col McCALL]:  Right.

3        LDC [MR. SOWARDS]:  But otherwise, we treat ourselves as

4    governed by the pretrial agreement.

5        MJ [Col McCALL]:  Right.  I understand your position.

6        All right.  Any other defense teams need to be heard

7    or -- go ahead, Mr. Sowards.

8        LDC [MR. SOWARDS]:  I know you asked for another defense team,

9    but let me just say that ----

10       MJ [Col McCALL]:  Sure.

11       LDC [MR. SOWARDS]:  ---- the other thing that we wanted to

12   clarify is we -- or at least I had come -- in light of the events and

13   the traffic, e-mail traffic, that settles one issue, at least to my

14   satisfaction.

15       But there is the question about timing of the disposition of

16   AE 995C.  And I would like to be heard on that, not as to the merits

17   of the motion, but necessarily they will have to be alluded to in

18   terms of what equitably we should be entitled to from the perspective

19   that the pretrial agreement should be presumed to be in effect rather

20   than having been subject to the Secretary's withdrawal.

21       MJ [Col McCALL]:  All right.  I'll allow ----

22       LDC [MR. SOWARDS]:  I'd like a little ----

23       MJ [Col McCALL]:  ---- you to be heard on that ----

UNCLASSIFIED//FOR PUBLIC RELEASE

1        LDC [MR. SOWARDS]:  Thank you, sir.

2        MJ [Col McCALL]:  ---- after we get through the rest of the

3   administrative processes.

4        LDC [MR. SOWARDS]:  Very good, sir.  Thank you.

5        MJ [Col McCALL]:  Mr. Ruiz.

6        LDC [MR. RUIZ]:  Judge, on the issue of the way forward ----

7        MJ [Col McCALL]:  Yeah.

8        LDC [MR. RUIZ]:  ---- my understanding -- and I had gone and

9   taken a look at the transcript from when you made your comments about

10  the way forward -- was that it was at our discretion whether we could

11  come in and observe, akin to Mr. Bruck's situation.

12       I don't think at that point you indicated that we had to

13  have at least one attorney in the courtroom, but I understand ----

14       MJ [Col McCALL]:  That's an adjustment.  Again, if we don't

15  have anyone here, I don't want somebody being stuck going through

16  some of the security and then they're delayed getting in and we've

17  already started.

18       And so if a team wants to be here, I think it's easier.  And

19  plus, I think it will help and make sure that there's good avenues of

20  communication as we're going through this that if something needs to

21  get passed from the commission to counsel, if I have one counsel

22  here, then that's the person that I can tag to make sure that

23  messages are being relayed.

UNCLASSIFIED//FOR PUBLIC RELEASE

1        LDC [MR. RUIZ]:  I understand that.  And the significant

2   difference that I see from where we are today from where we were last

3   week is that we have had, quite frankly, an unprecedented act by a

4   government official to pull back what was a valid agreement that was

5   entered into with an official who had the authority to do that.

6        That act, in and of itself, demonstrates and raises a number

7   of significant and troubling issues, as you know, that we are going

8   to be briefing, including unlawful influence at the highest levels of

9   government, including whether the plea agreement remains in effect.

10        All of these issues are raised as of now.  But an additional

11   issue that it raised for us when we were looking at the analysis is

12   whether we can ethically continue to engage in this system when

13   there's been such an action that has been taken that goes right at

14   the heart of the integrity of the system itself.

15        For years, the parties worked to try to get to this result,

16   in good faith.  And I will add, very clearly, that the prosecutors on

17   this side of the courtroom put in a lot of time, put in a lot of

18   effort, also working in good faith, working and communicating with

19   the official who was in a position of authority to make these

20   decisions only to have that taken away.

21        The reason I say that is because for us it raises very

22   serious questions about continuing to engage in a system that seems

23   so obviously corrupt and rigged at this moment in time.  What I can

UNCLASSIFIED//FOR PUBLIC RELEASE

1    tell you that is we have reached out and are seeking ethical guidance

2    as to whether we can continue to participate.

3         Now, I hear what you're saying about active participation

4    and I think that's helpful.  But for us, there is a legal

5    significance to being present in this courtroom.

6         Now, actual presence in this courtroom does raise, I think,

7    additional possible avenues of argument on an appeal as to whether

8    Mr. al Hawsawi's team, whether he was in a position to be

9    represented, whether there was counsel in the courtroom who could

10   articulate, raise objections, and participate in the proceedings.

11        Whereas, our ability to raise those arguments, that he is

12   not actually participating, that he is not actually being properly

13   represented at this moment in time is significantly different if

14   counsel is not in this courtroom.

15        For that reason, what I'm asking to you do is to consider

16   and reconsider at least a portion of having counsel being present in

17   the courtroom.  What I can tell you is that we can and will be

18   monitoring proceedings from outside of the courtroom.

19        But at least for us now, having counsel inside of the

20   courtroom is legally significant and can have legal consequences for

21   Mr. al Hawsawi in terms of future appeals on this particular issue.

22   So it is a decision that we have to think about very carefully.

23        So what I'm asking you to do is simply allow the status quo

UNCLASSIFIED//FOR PUBLIC RELEASE

1  as of last week but remove the requirement to have one attorney in

2  the courtroom, because that raises issues for us that are important.

3       MJ [Col McCALL]:  All right.  I'll consider it.

4       LDC [MR. RUIZ]:  Thank you.

5       MJ [Col McCALL]:  Any other defense team or the prosecution?

6        Mr. Trivett?

7       MTC [MR. TRIVETT]:  Can I just have a second to consult, sir?

8       MJ [Col McCALL]:  Of course.

9  **[Counsel conferred.]**

10      MTC [MR. TRIVETT]:  Nothing from the government, sir.

11      MJ [Col McCALL]:  A few more procedural matters just to make

12  sure we're on the same page.

13       So, again, I understand that there's going to be some be

14  motions filed, some have already been filed, regarding the Secretary

15  of Defense's actions.  To the extent that those motions might be a

16  motion to compel discovery, the parties will not be required to file

17  motions for leave to file out of time, as is normally required

18  pursuant to the commission's interim order in AE 788 (5th Sup), as it

19  is clear that this is a new issue that's come up.

20       That being said, if there are going to be any motions to

21  compel discovery, I'd like them filed by 13 August, with the

22  prosecution responses due by 20 August, and any replies due by 23

23  August.

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

1    that we still feel that we need to be heard on.

2        MJ [Col McCALL]:  Okay.  That's what I thought, but I just

3    wanted to make it clear.  All right.  And, again, that has nothing to

4    do with the pretrial agreement.  And so we'll try to set that up once

5    we figure out what the way forward is going to mean.

6        Mr. Ruiz.

7        LDC [MR. RUIZ]:  And, Judge, is it your intention to let us

8    know if my request to be absent from the courtroom, if we can

9    effectuate that?

10       MJ [Col McCALL]:  I've thought it over as we were discussing

11   the way forward on the motions.

12       I need an attorney here, because, again, if I'm going to

13   have an accused and we're going to do the potential waiver of their

14   presence, again, I want the attorneys here just to be -- at least one

15   attorney.  I understand that they are considered not participating.

16   I am ordering you to be here.

17       So, again, if any appellate court is reading this record,

18   this should have nothing to do with the pretrial agreement and

19   whether you are in violation of it.  I think you're here because

20   there is a continuing hearing with one of your co-accused at this

21   point, but I don't anticipate any participation.

22       All right.  Any other matters?  And otherwise we'll go ahead

23   and take a recess and allow a little bit of a changeover.

UNCLASSIFIED//FOR PUBLIC RELEASE

**JA.159**

```
 1        A.  At what time?

 2        Q.  So let's start with ever.

 3        A.  After the fact, yes, sir.

 4        Q.  Okay.  And so by "after the fact," you mean after 12

 5   September 2001?

 6        A.  That's correct.

 7        Q.  Okay.  Have you ever seen this document, this CIR?

 8        A.  Not that I recall.

 9        Q.  Now, you testified earlier that one of the men depicted in

10   the Malaysia surveillance photographs was Suhayl al Sharabi.

11        A.  Yes, sir.

12        Q.  Okay.  And after you interviewed Mr. Quso in 2001, did you

13   continue to work on issues involving Yemen?

14        A.  Yes.

15        Q.  And so did you become aware that Suhayl al Sharabi had

16   been captured in early 2002?

17        A.  I don't recall.

18        Q.  Okay.  Did you become aware that he was captured?

19        A.  Can't -- can't recall just at this time.

20        Q.  Okay.  Did you follow the reporting from him taken in

21   Guantanamo?

22        A.  Also can't recall.

23        Q.  Do you know Special Agent Ricardo Grave de Peralta?
```

**JA.160**

1  **[The R.M.C. 803 session was called to order at 1004, 8 August 2024.]**

2      MJ [Col McCALL]:  The commission's called to order.

3      Good morning, Mr. Trivett.  Could you please identify who's

4  here on behalf of the United States both here in the courtroom and at

5  the RHR?

6      MTC [MR. TRIVETT]:  Yes, sir.  Good morning.

7      Representing the United States today in the courtroom is

8  myself, Mr. Clay Trivett; Major Neville Dastoor; Mr. Christopher

9  Dykstra; Colonel Joshua Bearden.  Also present, Staff Sergeant

10  Samantha Resendiz, Mr. Rudolph Gibbs.  From the FBI present is

11  Supervisory Special Agent Justin Zuccolotto.

12      Representing the United States today from the courtroom at

13  the Remote Hearing Room is Mr. Jeffrey Groharing, Ms. Nicole Tate.

14  Also present, Mr. John Cox; and the prosecution's expert consultant,

15  Dr. Michael Welner; and Ms. Karissa Grippando.

16      Your Honor, these proceedings are being broadcast to CCTV

17  sites in the continental United States pursuant to the commission's

18  orders.

19      MJ [Col McCALL]:  All right.  Thank you, Mr. Trivett.

20      Good morning, Major Theis.

21      DC [Maj THEIS]:  Good morning, Your Honor.

22      I am here representing Mr. Mohammad.  I am observing.

23      MJ [Col McCALL]:  Okay.

JA.161

1          DC [Maj THEIS]:  Thank you.

2          MJ [Col McCALL]:  Understood.

3              Good morning, Captain Messing.

4          DDC [CPT MESSING]:  Good morning, Your Honor.

5              On behalf of Mr. Bin'Attash, I, Captain Marian Messing, and

6      Investigator Chris Pipe are here to observe in compliance with the

7      commission's order from yesterday.  Because we still have an intact

8      pretrial agreement, we will not be participating.

9          MJ [Col McCALL]:  Understood.

10             Good morning, Mr. Connell.

11         LDC [MR. CONNELL]:  Good morning, sir.

12             On behalf of Mr. al Baluchi, myself, James Connell, and

13     Defne Ozgediz.

14             Appearing from the continental United States are Rita

15     Radostitz and Lieutenant Jennifer Joseph.

16         MJ [Col McCALL]:  All right.  Thank you.

17             Good morning, Ms. Lachelier.

18         ADC [MS. LACHELIER]:  Good morning, Judge.

19             Suzanne Lachelier on behalf of Mr. Hawsawi in observer

20     status because of the existence of a PTA.  Thank you.

21         MJ [Col McCALL]:  Understood.

22             All right.  So I see Mr. Ali is here, but the other three

23     accused are not present, although I understand that Mr. Mohammad may

**JA.162**

1   be en route or joining us later this morning.

2          Government, do you have a witness to account for these

3   absences?

4          DMTC [MR. DYKSTRA]:  Yes, Your Honor.

5          MJ [Col McCALL]:  Go ahead, Mr. Dykstra.

6   **MAJOR, U.S. Army, was called as a witness for the prosecution, was**

7   **previously sworn, and testified as follows:**

8                            **DIRECT EXAMINATION**

9   **Questions by the Deputy Managing Trial Counsel [MR. DYKSTRA]:**

10         Q.  Major, if you want to have a seat.  Good morning.

11         A.  Good morning, sir.

12         Q.  Now, did you have the chance to advise the accused of

13  their right to attend today's proceedings?

14         A.  Yes, I did.

15         Q.  And did you use any particular form when you did so?

16         A.  Yes, their statement of understanding.

17         DMTC [MR. DYKSTRA]:  Your Honor, if I may approach the

18  witness, I'm going to hand her what has been previously marked as

19  Appellate Exhibit 954M (KSM), 954N (WBA), and 954O (MAH).

20         MJ [Col McCALL]:  Go ahead.

21         Q.  Are these the forms that you used to advise the accused

22  this morning?

23         A.  Yes.

JA.163

1          Q.  And at approximately what time did you advise

2    Mr. Mohammad, Mr. Bin'Attash, and Mr. al Hawsawi?

3          A.  I began at 0719 hours, and I completed those three

4    readings at 0736 hours.

5          Q.  And in what language did you advise them?

6          A.  I advised them in English, but Mr. Bin'Attash used his

7    form that's translated into Arabic.

8          Q.  And when you advised them, what was their response?

9          A.  They indicated they did not wish to attend.

10         Q.  Did you have any concerns about the voluntariness of their

11   waivers this morning?

12         A.  No, I did not.

13         Q.  And for purposes of the record ----

14         DMTC [MR. DYKSTRA]:  And I -- Your Honor, I apologize.

15         Q.  What is your pseudonym that you go by?

16         A.  Kimball.

17         DMTC [MR. DYKSTRA]:  Thank you, Your Honor.  No further

18   questions.

19         MJ [Col McCALL]:  Do any attorneys have questions for this

20   witness?

21            Apparently not.

22            All right.  Thank you for your testimony.  You're excused.

23         WIT:  Yes, sir.

JA.164

1  **[The witness was excused and withdrew from the courtroom.]**

2      MJ [Col McCALL]:  The commission finds that Mr. Mohammad,

3  Mr. Bin'Attash, and Mr. al Hawsawi have knowingly and voluntarily

4  waived their right to be present at today's session.

5      All right.  Yesterday, the commission completed receiving

6  testimony from Agent McFadden as that testimony related to Mr. Ali's

7  suppression motion.  So today we're going to receive testimony

8  relating, again, to the suppression motion for Mr. Ali.

9      The commission's intent this morning is to have the

10 testimony of Dr. 1/WK5I, and then afterwards, perhaps later today,

11 having an ex parte presentation from the Bin'Attash defense team.

12 But we'll see, like, how that's -- whether they're ready and if we

13 have time today.

14     All right.  Before we recall this witness, I did have my

15 staff send out an e-mail last night to the parties just to confirm

16 there were a few 505(g) notices that -- I don't know that the record

17 was clear on whether or not -- what the government's position was as

18 to those notices and whether or not we're going to need a 505(h)

19 before we went into the classified portion of the testimony.

20     Where are we at on that?

21     TC [MAJ DASTOOR]:  Sir, we have no objection to the material

22 that's been noticed in those notices.

23     MJ [Col McCALL]:  All right.  Got it.  Perfect.

JA.165

1          Any other housekeeping matters to take up before we call the

2    witness back in?

3          Apparently not.

4          All right.  If we can get the witness there in the RHR.

5          CDC [MS. OZGEDIZ]:  Your Honor?

6          MJ [Col McCALL]:  Yes.

7          CDC [MS. OZGEDIZ]:  I'm sorry.  Before we begin, we actually

8    had an objection regarding the scope of expert testimony by

9    Dr. WK5I ----

10         MJ [Col McCALL]:  All right.

11         CDC [MS. OZGEDIZ]:  ---- and it may ----

12         MJ [Col McCALL]:  Yeah, let's go ahead and do that.

13         CDC [MS. OZGEDIZ]:  ---- make more sense to do it before she

14   begins.

15         MJ [Col McCALL]:  So I know we already sent somebody to go get

16   the witness.  If we can turn that off and have the witness wait in

17   the witness waiting room or wherever they have them wait up at the

18   RHR.

19         ADC [MS. RADOSTITZ]:  Your Honor, this is Rita Radostitz.  The

20   prosecution has turned her off coming into the room.

21         MJ [Col McCALL]:  All right.  Perfect.

22          I'm ready for any argument.

23         CDC [MS. OZGEDIZ]:  Thank you, Your Honor.

JA.166

1         Your Honor, we informed the court yesterday that we

2    don't ----

3         MJ [Col McCALL]:  Yeah, no, I was -- my CISO said that -- was

4    saying that somebody had their badge out.  If you can just -- I'm not

5    sure -- I can't see you at the podium, but if you can just -- yeah.

6    I know we all do it, so thank you, Ms. Ozgediz.

7         CDC [MS. OZGEDIZ]:  All right.  Your Honor, we informed the

8    military commission yesterday that we don't intend to object to

9    Dr. WK5I's qualification as an expert in psychiatry.  But there were

10   some issues that came up at the last hearing session and that have

11   been briefed regarding the scope of her expert testimony.  And I

12   would just like to raise those issues for the military commission

13   before she begins.

14        MJ [Col McCALL]:  Sure.

15        CDC [MS. OZGEDIZ]:  So by way of background, in AE 949D, the

16   military commission ordered the government to provide notice required

17   by AE 245B AMENDED TRIAL CONDUCT ORDER.  And that included any

18   reports that Dr. 1 intends to reference in her testimony.  And the

19   government was required to provide that notice no later than 21 June.

20        And under the notice rules, the government had to offer a

21   written summary that describes two primary things.  One is the

22   witness' opinions and the second is the bases and reasons for those

23   opinions.

JA.167

1          On 21 June, the government filed 949E.  And in that, they

2     noticed five categories of expert testimony they expect Dr. WK5I to

3     offer.

4          On 28 June, Mr. al Baluchi filed a notice of objection to

5     the government's notice.  That was AE 949F.  And we objected to three

6     main areas of proffered expert testimony, and I'd like to highlight

7     two of those areas right now.

8          One is that the government's indicated that they intend to

9     have Dr. WK5I explain her bases for, quote, ruling out certain

10    diagnoses, including *inter alia* post-traumatic stress disorder.  And

11    I'm quoting from AE 949E.

12         And there are two main issues with this notice.  One is that

13    we don't actually know what Dr. WK5I's opinion was with respect to

14    Mr. al Baluchi's diagnosis.

15         I don't know whether the language from this notice means

16    that it was her opinion in 2006 and '7 that Mr. al Baluchi didn't

17    have PTSD or if it means she didn't have enough information in 2006

18    and '7 to make a determination with respect to whether he had PTSD,

19    or if it's her opinion now in 2024, having access to more

20    information, that Mr. al Baluchi didn't have PTSD in 2006 and '7, or

21    if it's her opinion now that Mr. al Baluchi never had PTSD and that

22    later PTSD diagnoses were wrong.

23         And I know those differences might sort of seem minor at

1    first blush, but they are clinically very significant, and they're

2    important to the issue before Your Honor about voluntariness.  And

3    each of these possible opinions would call for a different line of

4    cross-examination, and we frankly just don't know what that opinion

5    is.

6           And in addition to not knowing what her opinion is on this

7    issue, we don't know the basis for it either.  The records that we

8    have from her time treating Mr. al Baluchi don't contain any mention

9    of PTSD.  There is no record of her conducting a PTSD screening or

10   assessment ever.  There is no record of her considering PTSD as a

11   differential diagnosis or ruling it out.

12          So while I understand as a psychiatrist, as an expert, she

13   can testify about PTSD generally, we object to her testifying about

14   any diagnostic decisions or other opinions regarding Mr. al Baluchi's

15   PTSD.  That is one.

16          The second objection to the government's notice is that the

17   government said they intend to elicit Dr. WK5I's opinion about the

18   forensic analysis done by the defense witness, Dr. Morgan.

19          And my objection to this is rooted in the same basis as my

20   objection to her opinion regarding PTSD rule-outs.  One is that the

21   government hasn't provided us notice of what that opinion is.  And

22   the second is that, in addition to not knowing what the opinion is,

23   the government hasn't provided us the bases or the reasons for that

1  opinion.

2          So, again, we are not in a position to cross-examine her

3  intelligently on this issue based on the government's notice that was

4  ordered by the military commission.  And in light of that, I would

5  object to those two areas being covered in their direct.

6          MJ [Col McCALL]:  All right.

7          Government?  And if you need a minute, that's fine.

8          TC [MAJ DASTOOR]:  Good morning, sir.

9          MJ [Col McCALL]:  Good morning.

10          TC [MAJ DASTOOR]:  First time not at a virtual podium with

11  you.

12          So, sir, first of all, going to the second category that was

13  just raised, we don't intend to elicit Dr. WK5I's opinion regarding

14  any specific assessment of Dr. Morgan's forensic analysis that he

15  might have conducted.

16          We do believe that the testimony that she provided in

17  May 2024 about how a forensic exam should be conducted generally is

18  appropriate based now on Mr. Ali's concession that she's a qualified

19  expert forensic psychiatrist.

20          And just to be clear, we heard they're okay with qualifying

21  her as a psychiatrist, which, based on her experience, education, and

22  training, is both in the fields of forensic psychiatry and clinical

23  psychiatry.  But we won't be having her do a deep dive into

JA.170

1  Dr. Morgan's analysis.

2        Second, regarding the issue of whether she ruled out PTSD

3  and the basis and rationale for that.  Her medical treatment of the

4  accused includes her assessments of how she came out to rule out

5  countless disorders, including, but not limited to, PTSD.

6        There's no surprise here for the defense.  Her diagnoses are

7  detailed -- the diagnoses she made under the DSM-IV rubric and manual

8  are detailed in the psych progress notes and detailed in the

9  psychiatric technician progress notes that they've had in discovery

10  for years.

11        This discovery includes her detailed observations of the

12  accused systems -- and I promise you'll see a lot of these

13  today -- ongoing notes on Mr. Ali's condition, any prescribed

14  medications, diagnoses, and treatment plans.

15        And the defense has also been on notice, at least as early

16  as May 2024 and in 949E, but I'm assuming much earlier, based on an

17  understanding of how psychiatrists work, that the tools she used in

18  treating Mr. Ali was the DSM-IV Manual, which is the medical

19  authority in the field.  And it's a tool that psychs around the world

20  use to come to certain conclusions on whether particular conditions

21  should be diagnosed and they rule out others.

22        These forms don't list a rule-out diagnosis of arachnophobia

23  either, but that's what doctors do, right?  Based on their experience

1   and their education, they assess an individual through interviews,

2   consultations, and they come to the reasonable conclusions as to what

3   should be considered as a primary diagnosis, what should be

4   considered as reasonable rule-out diagnoses, and then they're

5   not -- they're not writing in the 300 other diagnoses that

6   potentially could be assessed based on the DSM manual.

7           And not to be lost in all of this, sir, is that she was

8   their intended witness for years to testify on this very subject of

9   what Mr. Ali experienced regarding his mental treatment in -- between

10  2006 and 2007.

11          I was about to do a cross-examination in May 2024 when she

12  was their witness, and I didn't have any report based on 245B

13  regarding what her basis of her opinion was going to be in discussing

14  what informed her assessments.  And it's not a leap to suggest that

15  that's -- that was going to be what they were going to ask her about,

16  her treatment of the accused and how she came to certain conclusions

17  and didn't come to other conclusions.

18          She's a hybrid witness here.  She's a doctor who had

19  intimate interaction with the accused.  She's using scientific

20  knowledge to explain those intimate interactions that she had with

21  the accused.

22          This isn't a classic sort of expert.  This isn't Dr. Morgan

23  or Dr. Hanrahan or Dr. Welner who come in after the fact, review

JA.172

1   documents, and then make an assessment.  She was on the ground in

2   real time generating reports.

3          Sir, based on what counsel just averred were the two

4   objections they're raising here, that's all I have, sir.

5        MJ [Col McCALL]:  All right.  Ms. Ozgediz, go ahead.  And I'll

6   let you respond.

7        CDC [MS. OZGEDIZ]:  Thank you.  As the court well knows, when

8   Dr. WK5I was a defense witness, we were calling her as a fact

9   witness, not an expert witness.  There was no notice required under

10  245B.

11         We intended to elicit from her information about her time at

12  Camp VII and her interactions with the accused that was factual and

13  not in any way an expert opinion or expert testimony.  She was

14  essentially going to be a testimonial sponsor for documents that she

15  had prepared as well as for providing information about her time at

16  Camp VII.

17         So we in no way intended to treat her as an expert.  And so

18  the fact that the government did not have any sort of report or

19  summary of opinions from us shouldn't really be of any importance to

20  the military commission.

21         The second issue is that Major Dastoor still did not answer

22  the question of what her opinion -- what the opinion they intend to

23  elicit from her is.  Again, they're calling her as an expert.  And

**JA.173**

1   contents of a prior Rule for Military Commission, R.M.C. 802 session,

2   where we usually discuss administrative matters, such as scheduling

3   and witness availability.  However, we did not have a session this

4   time.  So instead I'm only going to be covering administrative

5   matters this morning that -- on the record.

6          Again, if there are any administrative matters after I cover

7   what I want to cover, I'll open it up to the parties and just make

8   sure that we're all on the same page.

9          So it's the commission's intent to spend the majority of

10  this session focusing on witnesses and issues pertaining to Mr. Ali's

11  suppression motion.  We may handle any issues pertaining to the

12  pretrial agreements if something comes up, but at this point I know

13  that the briefing cycle is still ongoing.

14         So if there is any pending litigation pertaining to the

15  pretrial agreements that were previously signed by Mr. Mohammad,

16  Mr. Bin'Attash, and Mr. al Hawsawi, we'll take those up as -- you

17  know, if the parties raise them.  But again, I understand that those

18  are still in the briefing cycle.

19         Again, just like we did last session, while that issue is

20  out there pending, my plan is to -- I'll permit the members of those

21  three defense teams to absent themselves from these proceedings

22  provided that they have at least one counsel of record present at all

23  times to act as an observer as we are dealing with the matters

UNCLASSIFIED//FOR PUBLIC RELEASE

1    pertaining to Mr. Ali.

2          All right.  This morning, after we take a short break to

3    allow those accused and defense teams who wish to absent themselves

4    from the proceedings to do so, then we'll continue on with the

5    testimony of Dr. 1/WK5I.

6          All right.  That's all I have.  And I was going to take that

7    recess, but I want to turn it over to the parties.

8          Any housekeeping matters, administrative issues to raise

9    with me at this point?

10         Mr. Connell.

11         LDC [MR. CONNELL]:  Sir, I just wanted to let you know that at

12   some appropriate time, we do need to request a short ex parte with

13   the military commission.  It's not an urgent matter, so it doesn't

14   have to be this week when we're under witness pressure, but sometime

15   later in the hearing when there's white space.

16         MJ [Col McCALL]:  Okay.  Perfect.

17         And just, while that issue has been raised, we do have some

18   white space this session as opposed to normally where we have

19   witnesses or AEs lined up the full time.  Again, I'm trying to have

20   some flexibility as we're getting closer to that date where we're

21   trying to have the oral argument on the motion to suppress the

22   letterhead memorandum.

23         And so if that white space ends up being where we have to,

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

**JA.175**

UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT

1          Good morning, Mr. Sowards.

2          LDC [MR. SOWARDS]:  Good morning, Your Honor.

3          Appearing in the courtroom on behalf of Mr. Mohammad, who is

4    present, are Gary Sowards and Mr. Nicholas McCue.

5          And we're also joined by Major Elspeth Theis, United States

6    Air Force, from the Remote Hearing Room.

7          MJ [Col McCALL]:  All right.  Thank you.

8          LDC [MR. SOWARDS]:  You're very welcome.  Thank you, sir.

9          MJ [Col McCALL]:  Good morning, Captain Messing.

10         DDC [CPT MESSING]:  Good morning, Your Honor.

11         Captain Marian Messing on behalf of Mr. Bin'Attash, in

12   observer status only.

13         MJ [Col McCALL]:  All right.  Thank you.

14         Good morning, Mr. Connell.

15         LDC [MR. CONNELL]:  Good morning, sir.

16         In Courtroom 2 are Ms. Defne Ozgediz and Rita Radostitz.

17         In the Remote Hearing Room are myself, James Connell, and

18   Lieutenant Jennifer Joseph.

19         MJ [Col McCALL]:  All right.  Thank you.

20         Good morning, Mr. Gleason.

21         DC [MR. GLEASON]:  Good morning, Your Honor.  How are you?

22         MJ [Col McCALL]:  Good.

23         DC [MR. GLEASON]:  Your Honor, I'm Sean Gleason.  I'm here

UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT
UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

**JA.176**

UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT

1   representing Mr. al Hawsawi in an observer status pursuant to your

2   order in AE 960.

3          MJ [Col McCALL]:  All right.  Thank you.  All right.

4          I note for the record Mr. Mohammad is present.  The other

5   three accused are absent.

6          Mr. Dykstra, do you have a witness to account for these

7   absences?

8          DMTC [MR. DYKSTRA]:  Yes, Your Honor.

9          MJ [Col McCALL]:  All right.  Proceed.

10  **CAPTAIN, U.S. Air Force, was called as a witness for the prosecution,**

11  **was previously sworn, and testified as follows:**

12         WIT:  Your Honor.

13         MJ [Col McCALL]:  Good morning.

14         DMTC [MR. DYKSTRA]:  Please have a seat.

15                       **DIRECT EXAMINATION**

16  **Questions by the Deputy Managing Trial Counsel [MR. DYKSTRA]:**

17         Q.  And for purposes of the record, what is your pseudonym,

18  Captain?

19         A.  Doc.

20         Q.  And have you previously testified in these proceedings?

21         A.  Yes, sir, I have.

22         Q.  I just remind you that you remain under oath.

23         A.  Yes, sir.

UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT
UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

**JA.177**

UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT

1      Q.  Now, did you have the opportunity to advise the accused of

2   their right to be present this morning?

3      A.  Yes, sir.  Between approximately 0630 and 0636 I advised

4   each of the accused of their respective right to attend today's

5   session.

6      Q.  And was there any particular form that you used to advise

7   them?

8      A.  Yes, sir.  I used the English version of the Statement of

9   Right of Understanding -- Statement of Understanding of Right to be

10  Present at Commission Proceedings.  I also had an Arabic translation

11  and a linguist present with me when I did so.

12      DMTC [MR. DYKSTRA]:  Your Honor, if I may approach the

13  witness.  I'm going to hand him what has previously been marked as

14  Appellate Exhibit 962 (WBA), Appellate Exhibit 962A (AAA), and

15  Appellate Exhibit 962B (MAH).

16      MJ [Col McCALL]:  Go ahead.

17      Q.  Are these the forms that you used to advise the accused of

18  their right to be present this morning?

19      A.  Yes, sir.

20      Q.  And when you so advised them, did you do it in English or

21  Arabic?

22      A.  I advised them in English.  I had a linguist with me

23  present.

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT

1      Q.  And when you so advised them, what was their choice as far
2  as being present -- present this morning or doing other activities
3  today?
4      A.  Mr. al Hawsawi, Mr. Ali, and Mr. Bin'Attash, all declined
5  to be present for today's session.
6      Q.  And did you have any concern regarding the voluntariness
7  of their decision this morning?
8      A.  No, sir.
9      DMTC [MR. DYKSTRA]:  Your Honor, I have no further questions
10  for this witness.
11      MJ [Col McCALL]:  All right.  Thank you.
12        Do any of the defense counsel have questions for this
13  witness?  Mr. Sowards?
14                          **CROSS-EXAMINATION**
15  **Questions by the Learned Defense Counsel [MR. SOWARDS]:**
16      Q.  Good morning, sir.
17      A.  Morning, sir.
18      Q.  Were you also the person who advised the defendants of
19  their right to be present yesterday?
20      A.  No, sir.
21      LDC [MR. SOWARDS]:  Okay.  Thank you very much.
22      MJ [Col McCALL]:  All right.  Thank you for your testimony.
23  You can go ahead and leave the witness stand.

UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT
UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT

1      WIT:  Thank you.

2   **[The witness was excused and withdrew from the courtroom.]**

3      MJ [Col McCALL]:  The commission finds Mr. Bin'Attash,

4   Mr. Ali, and Mr. al Hawsawi have knowingly and voluntarily waived

5   their right to be present at today's session.

6          All right.  Yesterday we heard testimony from Dr. 1/WK5I.

7   Today we'll continue with her testimony.  It sounds like we have

8   approximately two hours or so of open testimony.  And when we

9   conclude that, we will recess, reconfigure the courtroom for a closed

10  session and have a closed session for the rest of today to take some

11  closed testimony from Dr. 1/WK5I.

12         I know there was one issue that was remaining from yesterday

13  where the parties were going do a little bit more research and I

14  assume confer over the one time that we had to cut the feed because

15  of a question that came from Ms. Ozgediz that the government believed

16  constituted -- involved classified material.

17         Has there been any either resolution from the parties on

18  this, or did you have anything more to present, Ms. Ozgediz?

19         CDC [MS. OZGEDIZ]:  I can say there has not been resolution.

20  We do have a brief record to make, if I can have a moment to confer

21  with Mr. Connell.

22         LDC [MR. CONNELL]:  Yeah, that's fine.

23  **[Counsel conferred.]**

UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT
UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT

1    CDC [MS. OZGEDIZ]:  Your Honor, the record is brief.  I can

2    actually just do it from here.

3    MJ [Col McCALL]:  Okay.  That's fine.

4    CDC [MS. OZGEDIZ]:  We conferred with the government, and I

5    understand the government maintains their objection.  We've reviewed

6    the classification guidance and it does not appear to prohibit that

7    question.

8    We also did locate the transcript citation where this

9    question was permitted to be asked and answered.  That transcript was

10    from 1 November 2019.  It was during the testimony of the former

11    Camp VII commander, and it is at pages 28658 through 28661.

12    And based on that previous testimony, we do believe this was

13    an appropriate question for this witness as well.

14    MJ [Col McCALL]:  All right.  And the commission as well did

15    some research and found the same citations that you're referencing,

16    that this issue did come up before, it was brought out in testimony

17    in open court.  But then I believe my understanding is that

18    the -- since then the government's classification guidance has

19    changed.  And so maybe this area has become an area that the

20    government is invoking national security privilege over.

21    Is that correct, Mr. Dykstra?

22    DMTC [MR. DYKSTRA]:  Sir, we're not invoking the national

23    security privilege over it.

UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT
UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

**JA.181**

UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT

1        MJ [Col McCALL]:  You are just ----

2        DMTC [MR. DYKSTRA]:  We are saying it's classified.

3        MJ [Col McCALL]:  Okay.  I've also reviewed the classification

4    guide that the government has submitted.  I understand the defense's

5    view that this would not run contrary to that, but I understand the

6    nuance that the government is attempting to protect.  And, again,

7    this is one where the government's interpretation prevails.

8        So I'm not going to allow it.  I'll allow you to ask that

9    question in closed session.

10        Do you need more clarification, Ms. Ozgediz?

11        CDC [MS. OZGEDIZ]:  No.

12        MJ [Col McCALL]:  All right.  Are you ready to proceed if we

13    bring the witness in?

14        CDC [MS. OZGEDIZ]:  Yes.

15        MJ [Col McCALL]:  All right, if we can get the witness back on

16    the witness stand.

17        LDC [MR. SOWARDS]:  Your Honor?

18        MJ [Col McCALL]:  Yes, Mr. Sowards.

19        LDC [MR. SOWARDS]:  I beg your pardon.

20        CDC [MS. OZGEDIZ]:  Sure.

21        LDC [MR. SOWARDS]:  I just have two housekeeping

22    administrative matters.

23        MJ [Col McCALL]:  Oh, perfect.  Go ahead.  I normally open it

UNCLASSIFIED//FOR PUBLIC RELEASE

UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT

1    to the parties.  I'm getting into this habit of not expecting the

2    other teams to have anything.  But please, go ahead, if you have an

3    issue I'd like to go ahead and address it.

4         LDC [MR. SOWARDS]:  Yes.  And this is just speaking to our

5    limited role as observers.  But I know also the commission was trying

6    to be sensitive to balancing that with any of the accused's right to

7    also observe the proceedings.

8            The first thing ----

9         MJ [Col McCALL]:  If I could stop you for a second,

10   Mr. Sowards.

11        LDC [MR. SOWARDS]:  Yes.

12        MJ [Col McCALL]:  It looks like the Ali defense team here in

13   the courtroom is trying to get the attention of the Ali defense team

14   in the RHR, if they could put on their headset.

15        LDC [MR. SOWARDS]:  Sure.

16        MJ [Col McCALL]:  All right.  Go ahead, Mr. Sowards.

17        LDC [MR. SOWARDS]:  I can wave, too.

18            Yeah, first, I just wanted to, as a mea culpa, explain that

19   I don't -- never quite learned the lesson that, of course, you and

20   your staff were right yesterday about the first of the evening prayer

21   schedule for this equatorial latitude, and it is, in fact, 7:05.  The

22   other time that I proposed for you is a conflation of the up north

23   later evening ----

UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT
UNCLASSIFIED//FOR PUBLIC RELEASE

JA.183

1  **[The R.M.C. 803 session was called to order at 0900, 20 September**

2  **2024.]**

3       MJ [Col McCALL]:  Commission is called to order.

4          Good morning, Mr. Trivett.  Can you please identify who's

5  here on behalf of the United States both in the courtroom and at the

6  RHR?

7       MTC [MR. TRIVETT]:  Yes, sir.  Good morning.  Representing the

8  United States today in the courtroom in Guantanamo is myself,

9  Mr. Clay Trivett; Mr. Christopher Dykstra; Ms. Nicole Tate.  Also

10 present, paralegal Rudolph Gibbs, Supervisory Special Agent Ryan

11 McDonald.

12         Representing the United States today in the courtroom -- in

13 the RHR is Colonel Joshua Bearden, Mr. Jeffrey Groharing.  Also

14 present are paralegals Ms. Karissa Grippando, Staff Sergeant Samantha

15 Resendiz.

16         We also anticipate Dr. Welner will be present, along with

17 Dr. Thomas Guilmette.

18         Your Honor, these proceedings are being broadcast to CCTV

19 sites in the continental United States pursuant to the commission's

20 orders.

21      MJ [Col McCALL]:  All right.  Thank you, Mr. Trivett.

22         Good morning, Ms. LeBoeuf.

23      CDC [MS. LeBOEUF]:  Good morning, Your Honor.  Denise LeBoeuf,

JA.184

1   representing Mr. Mohammad.  I'll be observing today.

2           MJ [Col McCALL]:  All right.  Thank you.

3           Good morning, Mr. Montross.

4           DC [MR. MONTROSS]:  Good morning, sir.  William Montross.

5   I'll be observing on behalf of Mr. Bin'Attash today.

6           MJ [Col McCALL]:  All right.

7           Good morning, Mr. Connell.

8           LDC [MR. CONNELL]:  Good morning, sir.  In Courtroom 2 is

9   Defne Ozgediz.

10          In the Remote Hearing Room is myself, James Connell; Alka

11  Pradhan; and Lieutenant Jennifer Joseph.

12          MJ [Col McCALL]:  All right.  Thank you.

13          Good morning, Mr. Gleason.

14          DC [MR. GLEASON]:  Good morning, sir.  How are you?

15          MJ [Col McCALL]:  I'm good.

16          DC [MR. GLEASON]:  Sir, I am representing Mr. Hawsawi in

17  observer status pursuant to your order in AE 960.

18          MJ [Col McCALL]:  All right.  Thank you.

19          All right.  I note that Mr. Mohammad and Mr. Ali are

20  present.  Mr. Bin'Attash and Mr. al Hawsawi are not present.

21          Mr. Dykstra, do you have a witness to account for these

22  absences?

23          DMTC [MR. DYKSTRA]:  Yes, Your Honor.

**JA.185**

UNCLASSIFIED//FOR PUBLIC RELEASE

UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT

1  **[The R.M.C. 803 session was called to order at 0901,**

2  **23 September 2024.]**

3      MJ [Col McCALL]:  The commission is called to order.

4          Good morning, Mr. Trivett.  Can you please identify who's

5  here on behalf of the United States.

6      MTC [MR. TRIVETT]:  Yes, sir.  Good morning.

7          Representing the United States today in the courtroom is

8  myself, Mr. Clay Trivett; Mr. Christopher Dykstra.  Also present,

9  paralegal Rudolph Gibbs.

10         Representing the United States today from the Remote Hearing

11 Room is Mr. Jeffrey Groharing, Colonel Joshua Bearden, Ms. Nicole

12 Tate.  Also present, paralegal Karissa Grippando and DoD Analyst

13 Megan Gentry.

14         Your Honor, these proceedings are being broadcast to CCTV

15 sites in the continental United States pursuant to the commission's

16 orders.

17     MJ [Col McCALL]:  All right.  Thank you, Mr. Trivett.

18         Good morning, Mr. Sowards.

19     LDC [MR. SOWARDS]:  Good morning, Your Honor.

20         Appearing on behalf of Mr. Mohammad, who is present in the

21 courtroom, are Gary Sowards and Nicholas McCue.

22         We have no one present in the Remote Hearing Room.

23     MJ [Col McCALL]:  All right.  Thank you.

50517

UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT

UNCLASSIFIED//FOR PUBLIC RELEASE

**JA.186**

UNCLASSIFIED//FOR PUBLIC RELEASE
UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT

```
 1        LDC [MR. SOWARDS]:  You're welcome, sir.

 2        MJ [Col McCALL]:  Good morning, Mr. Montross.

 3        DC [MR. MONTROSS]:  Good morning, Judge.

 4          Observing on behalf of Mr. Bin'Attash, William Montross.

 5        MJ [Col McCALL]:  All right.  Thank you.

 6          Good morning, Mr. Connell.

 7        LDC [MR. CONNELL]:  Good morning, sir.

 8          At Courtroom 2 are Alka Pradhan and Rita Radostitz.  Here in

 9   the Remote Hearing Room are myself, James Connell; Defne Ozgediz; and

10   Lieutenant Jennifer Joseph.

11        MJ [Col McCALL]:  All right.  Thank you.

12          Good morning, Mr. Ruiz.

13        LDC [MR. RUIZ]:  Good morning, Judge.

14          I'm here on behalf of Mr. al Hawsawi, along with Major

15   select Patrick Tipton.

16        MJ [Col McCALL]:  All right.  Thank you.

17          So I note that Mr. Mohammad is present.  The other three

18   accused are not present this morning.

19          Mr. Dykstra, do you have a witness to account for these

20   absences?

21        DMTC [MR. DYKSTRA]:  I do, Your Honor.

22        MJ [Col McCALL]:  Go ahead.

23                            **[END OF PAGE]**
```

50518
UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT

UNCLASSIFIED//FOR PUBLIC RELEASE

**JA.187**

UNCLASSIFIED//FOR PUBLIC RELEASE
UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT

1  be maybe tomorrow.

2       LDC [MR. CONNELL]:  All right, sir.

3       MJ [Col McCALL]:  Anything else to take up before we -- and I

4  guess Mr. Sowards had an issue we can take up before we bring the

5  witness in.

6       LDC [MR. CONNELL]:  May I just make one parting comment?

7       MJ [Col McCALL]:  Sure.

8       LDC [MR. CONNELL]:  Which is that with guidance, you know, it

9  is often true that the government and us can work it out.  At various

10  times there had been this myth that we don't talk, but we talk all

11  the time.  You know, we don't agree all the time and that's

12  appropriate, both sides being advocates.

13       But with guidance as to what the military commission

14  intends, it may be that we could work out, you know, a November or

15  January schedule or something else.

16       So I just wanted to say that there is flexibility,

17  willingness to talk, and willingness to reach reasonable

18  accommodations on all sides.

19       MJ [Col McCALL]:  All right.  I appreciate that.  Thank you,

20  Mr. Connell.

21       LDC [MR. CONNELL]:  Thank you.

22       MJ [Col McCALL]:  Mr. Sowards.

23       LDC [MR. SOWARDS]:  Thank you, Your Honor.  I appreciate you

UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT

UNCLASSIFIED//FOR PUBLIC RELEASE

**JA.188**

1  remembering.  I'd sort of lost track through all that.

2      I just wanted to bring to the commission's attention, Your

3  Honor, and also notice for the government that this morning,

4  Mr. Mohammad was subjected to what he regarded as an incident of

5  sexual harassment in that female guards were detailed to not only, I

6  guess, escort him, but ████████████████████████████████████

7  ████████████████████████████████████████████████████████████

8  ████████████████████████████████████████████████████████████

9      And I know that, of course, the commission recalls that

10  we've heard extensive earlier testimony about correlations to this

11  sort of thing occurring in the black site, of course much more

12  intrusive and humiliating experiences.  But the notion of having

13  female individuals ██████████████████████████████████████████

14  ███████████████████████████████████████  even the presence of females

15  during such activities.

16      We're also aware, of course, that there has been an

17  extensive history previously, some years ago, of litigating -- which

18  we're past objecting to -- the use of female guards in the course of

19  escorting him, which involves minimal contact with the shoulder.

20      So this particular change, which, you know, I must say I

21  sort of immediately thought of that -- because those of us involved

22  in the case, of course, do a lot of air travel -- that when TSA

23  suspects something amiss that requires personal touching and frisking

**JA.189**

UNCLASSIFIED//FOR PUBLIC RELEASE
UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT

1    with us, as passengers, they offer you, first, the opportunity to

2    leave the line and go to some remote location to have it done in

3    private which, of course, no one takes them up on because you're

4    trying to make a plane.  But what they always do is have a member of

5    the same gender, to the extent it can be determined, perform the

6    physical contact.

7          So at this point, Mr. Mohammad was keen on having the record

8    reflect that this can potentially interfere with his presence at

9    future hearings ███████████████████████████████████  They

10   have alternative means, █████████████████████████████████

11   █████████████

12         But if this is done, it may interfere.  And then we may have

13   to get complicated about, you know, is this a voluntary decision or

14   is it compelled?  And, you know, well, it's voluntary to avoid this,

15   but what does that mean?

16         So what he's hoping is not asking you to do anything to

17   intervene at this point, but with notice to the government, he very

18   much hopes that this will not reoccur.

19         MJ [Col McCALL]:  All right.  Thank you, Mr. Sowards.

20         LDC [MR. SOWARDS]:  Thank you, sir.

21         MJ [Col McCALL]:  And, Mr. Dykstra, can you just find out with

22   the JTF if there has been any kind of change in this procedure?

23         DMTC [MR. DYKSTRA]:  Yes, Your Honor.  I'm kind of confused on

UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT

UNCLASSIFIED//FOR PUBLIC RELEASE

**JA.190**

UNCLASSIFIED//FOR PUBLIC RELEASE
UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT

1   how to take this.  Are they requesting relief, or what is the status?

2          MJ [Col McCALL]:  Mr. Sowards didn't say he was requesting

3   relief.  He said he was bringing it -- putting the government on

4   notice that Mr. Mohammad was unhappy with how the process was done

5   this morning with -- that there were female guards.

6          So maybe offline touch base with him, find out if there has

7   been any change to the process, and then we'll see if they would like

8   to raise an issue at that point.

9          DMTC [MR. DYKSTRA]:  All right.  I would just note that a lot

10  of this has been litigated in the 254 series.  So...

11         MJ [Col McCALL]:  I'm well aware.  It was before my time, but

12  I have spent a lot of time reading that.  So I'm tracking.

13         DMTC [MR. DYKSTRA]:  So did I, sir.

14         MJ [Col McCALL]:  All right.

15         DTC [COL BEARDEN]:  Your Honor, this is Colonel Bearden from

16  the RHR.

17         MJ [Col McCALL]:  Yes, Colonel Bearden?

18         DTC [COL BEARDEN]:  Might I recommend a comfort break for

19  everyone?  That way, once we get started, maybe perhaps we don't have

20  to stop until the lunch break?

21         MJ [Col McCALL]:  That's fine.  I don't mind that.

22          Ms. Radostitz?

23         ADC [MS. RADOSTITZ]:  Your Honor, I have a brief thing before

50551
UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT

UNCLASSIFIED//FOR PUBLIC RELEASE

**JA.191**

UNCLASSIFIED//FOR PUBLIC RELEASE
UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT

1  examination, you're asking to start the cross-examination tomorrow.

2      But the second piece as far as the documents being

3  displayable to the public, were you asking for a remedy on that or

4  were you bringing that to the court's attention?

5      ADC [MS. RADOSTITZ]:  I'm bringing that to the court's

6  attention at this point.

7      MJ [Col McCALL]:  So I'm going to hold off on deciding when

8  we're going to start the cross-examination.  Let's see how this plays

9  out.  I appreciate Colonel Bearden's flexibility that he doesn't have

10  any objection.  I haven't asked him, but I take your word for that.

11      But let's see how far we get today.  It may be moot based on

12  how long the government goes, and I'll make a decision at that point.

13      ADC [MS. RADOSTITZ]:  Okay.  I will tell you that I don't

14  expect my exam to be more than two hours.  However, I did not provide

15  notice to the CISO of the documents I do want to use this morning

16  because I had understood that I wouldn't be starting today.

17      MJ [Col McCALL]:  All right.

18      ADC [MS. RADOSTITZ]:  So I would need accommodation on that if

19  you're -- if I'm going to have to start my cross today.

20      MJ [Col McCALL]:  Understood.

21      ADC [MS. RADOSTITZ]:  Okay.

22      MJ [Col McCALL]:  Mr. Sowards.

23      LDC [MR. SOWARDS]:  Judge, just to assist Mr. Dykstra in his

UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT

UNCLASSIFIED//FOR PUBLIC RELEASE

**JA.192**

UNCLASSIFIED//FOR PUBLIC RELEASE
UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT

1  inquiry, Your Honor, I apologize.  Earlier I was trying to be brief

2  and perhaps I was too quick and wasn't clear, that -- but to confirm

3  that, you are correct, that Mr. Mohammad specifically is not

4  requesting relief from the commission.

5         What he is trying to do is alert, in a very respectful

6  manner, the prosecution and other government agencies as to what

7  impact this particular practice is having, and may have in the

8  future, on his ability to attend.

9         And that I thought -- but perhaps I, again, was too quick

10  about it -- to distinguish from the focus of 254 litigation, which

11  was a general involvement of guards other than the gender of the

12  defendants, to be involved in escorting and presence as opposed to

13  ████████████████████████████████████ which cross the

14  line, as far as Mr. Mohammad is concerned.  And, as we say, we

15  certainly have a sensitivity to bring up recollections of earlier

16  mistreatment in the black sites.

17         But the reason for bringing it to the commission's attention

18  at the same time we are giving notice to the prosecution, hoping to

19  enlist their assistance or some communication, is that one of the

20  unhelpful developments that has occurred recently is that, in

21  contrast to previous practices, when an issue arises during the time

22  that Doc and the other folks approach the defendants to advise them

23  or request whether they want to attend the commission proceedings, if

UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT

UNCLASSIFIED//FOR PUBLIC RELEASE

JA.193

UNCLASSIFIED//FOR PUBLIC RELEASE

UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT

1    **[The R.M.C. 803 session was called to order at 0901, 8 November**

2    **2024.]**

3            MJ [Col McCALL]:  The commission's called to order.

4            Good morning, Mr. Trivett.  Could you please identify who's

5    here on behalf of the United States both here in the courtroom and at

6    the Remote Hearing Room.

7            MTC [MR. TRIVETT]:  Yes, sir.  Good morning.

8            Representing the United States today in the courtroom in

9    Guantanamo is myself, Mr. Clay Trivett; Mr. Christopher Dykstra.

10    Also present is Legalman Chief Trevis Howard, Mr. Rudolph Gibbs, and

11    Ms. Megan Gentry.

12            Representing the United States today from the Remote Hearing

13    Room is Mr. Jeffrey Groharing, Colonel Joshua Bearden, and Ms. Nicole

14    Tate.  Also present are paralegals Karissa Grippando, Staff Sergeant

15    Samantha Resendiz.

16            Dr. Welner is on the premises and ready to begin his

17    testimony.

18            These proceedings are being broadcast to CCTV sites in the

19    continental United States pursuant to the commission's orders.

20            MJ [Col McCALL]:  All right.  Thank you, Mr. Trivett.

21            Good morning, Mr. Sowards.

22            LDC [MR. SOWARDS]:  Good morning, Your Honor.

23            Present with Mr. Mohammad, who is in the courtroom today,

UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT

UNCLASSIFIED//FOR PUBLIC RELEASE

JA.194

UNCLASSIFIED//FOR PUBLIC RELEASE

UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT

1    are Mr. Nicholas McCue, Ms. Denise LeBoeuf, and myself.

2         MJ [Col McCALL]:  All right.

3         LDC [MR. SOWARDS]:  And no one representing us in the Remote

4    Hearing Room.

5         MJ [Col McCALL]:  All right.  Thank you, Mr. Sowards.

6         LDC [MR. SOWARDS]:  Thank you, sir.

7         MJ [Col McCALL]:  You're welcome.

8          Good morning, Mr. Engle.

9         LDC [MR. ENGLE]:  Good morning, Your Honor.

10         Matthew Engle observing on behalf of Mr. Bin'Attash.

11         MJ [Col McCALL]:  All right.  Good morning, Mr. Connell.

12         LDC [MR. CONNELL]:  Good morning, sir.

13         On behalf of Mr. al Baluchi are myself, James Connell; Alka

14    Pradhan; Rita Radostitz.  And in the RHR, Defne Ozgediz and

15    Lieutenant Jennifer Joseph.

16         MJ [Col McCALL]:  All right.  Good morning Mr. Gleason.

17         DC [MR. GLEASON]:  Good morning, Your Honor.

18         In the courtroom today in observer status pursuant to your

19    order is myself, Sean Gleason.  Mr. Walter Ruiz is observing from the

20    RHR.

21         MJ [Col McCALL]:  All right.  Thank you.

22         All right.  I note that Mr. Mohammad is present.  Mr. Ali

23    was here, but then he stepped out.  Is he going to rejoin us later,

UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT

UNCLASSIFIED//FOR PUBLIC RELEASE

**JA.195**

UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT

1    **[The R.M.C. 803 session was called to order at 0903, 08 January**

2    **2025.]**

3          MJ [Col McCALL]:  The commission's called to order.

4              Good morning, Mr. Trivett.  Could you please identify who's

5    here on behalf of the United States.

6          MTC [MR. TRIVETT]:  Yes, sir.  Good morning.

7              Representing the United States today in the courtroom in

8    Guantanamo is myself, Mr. Clay Trivett; Colonel Joshua Bearden.  Also

9    present, Supervisory Intelligence Analyst Kimberly Waltz, Mr. Rudolph

10   Gibbs, Navy Legalman Chief Trevis Howard, Navy Legalman Second Class

11   Matthew Estes, and DoD Analyst Megan Gentry, paralegals Karissa

12   Grippando, and Mr. John Cox.

13             We have no one currently in the Remote Hearing Facility.

14             And, Your Honor, these proceedings are being transmitted via

15   closed-circuit television to sites in the continental United States

16   pursuant to the commission's orders.

17        MJ [Col McCALL]:  All right.  Thank you, Mr. Trivett.

18             Good morning, Mr. Sowards.

19        LDC [MR. SOWARDS]:  Good morning, Your Honor.  And Happy New

20   Year.

21        MJ [Col McCALL]:  Happy New Year.

22        LDC [MR. SOWARDS]:  I'm Gary Sowards appearing on behalf of

23   Mr. Mohammad, who is present in court, joined by Nicholas McCue,

51642
UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT

JA.196

1  Gabriela McQuade, Denise LeBoeuf.  We will be joined shortly by Major

2  Elspeth Theis.  She's attending to a matter for me.  And we're also

3  joined by Major Michael Leahy, also United States Air Force major.

4        MJ [Col McCALL]:  All right.

5        LDC [MR. SOWARDS]:  And we have no one, as far as I know,

6  viewing us from the Remote Hearing Room.

7        MJ [Col McCALL]:  All right.  Thank you, Mr. Sowards.

8        LDC [MR. SOWARDS]:  You're welcome, sir.  Thank you.

9        MJ [Col McCALL]:  Good morning, Lieutenant Ridgeway.  It looks

10  like you have the stick for team Bin'Attash.

11        DC [LT RIDGEWAY]:  By process of elimination, sir, that's

12  right.  Appearing in the courtroom today on behalf of Mr. Bin'Attash

13  is myself.  In the RHR we have Mr. Edwin Perry and Lieutenant Colonel

14  Daniel Goldberg.

15        MJ [Col McCALL]:  All right.  Thank you.

16         Good morning, I see Mr. Connell up in the RHR.

17        LDC [MR. CONNELL]:  Good morning, sir.  Appearing in

18  Courtroom 2 on behalf of Mr. al Baluchi is Rita Radostitz.  Appearing

19  from the Remote Hearing Room is myself, James Connell, and Defne

20  Ozgediz.

21        MJ [Col McCALL]:  All right.  Thank you, Mr. Connell.

22         Good morning Mr. Gleason.

23        DC [MR. GLEASON]:  Good morning, Your Honor.  I hope you had a

**JA.197**

1  good holiday.

2      MJ [Col McCALL]:  I did.

3      DC [MR. GLEASON]:  Appearing on behalf of Mr. Hawsawi is

4  myself, Sean Gleason.  In the RHR we have Ms. Lachelier.  We are

5  appearing as observers pursuant to your order in AE 970A.

6      Mr. Hawsawi is not present today and he has waived his

7  appearance so that he can attend a separate legal meeting.

8      MJ [Col McCALL]:  All right.  Understood.

9      All right.  Well, let's lead off from that.  I did note that

10  we have Mr. Mohammad and Mr. Bin'Attash and Mr. Ali present but

11  Mr. al Hawsawi is not present.

12      Just going through our normal procedures, though,

13  Government, do you have a witness to account for the absence?

14      MTC [MR. TRIVETT]:  We do, sir.

15      Please raise your right hand.

16  **LIEUTENANT COLONEL, U.S. Army, was called as a witness for the**

17  **prosecution, was sworn, and testified as follows:**

18      MTC [MR. TRIVETT]:  Please be seated.

19                          **DIRECT EXAMINATION**

20  **Questions by the Managing Trial Counsel [MR. TRIVETT]:**

21      Q.  Have you testified previously in these military

22  commissions proceedings under the alias Russell?

23      A.  I have.

JA.198

**Perry, Edwin A CIV OSD MCDO (USA)**

| | |
|---|---|
| **From:** | Trivett, Clayton G CIV OSD OMC OCP (USA) |
| **Sent:** | Thursday, July 20, 2023 5:21 PM |
| **To:** | OSD NCR MCDO List MCDO Team Mohammad; OSD NCR MCDO List MCDO Team Bin Attash; OSD NCR MCDO List MCDO Team RBAS; OSD NCR MCDO List MCDO Team Al Baluchi; OSD NCR MCDO List MCDO Team Hawsawi; Thompson, Jackie L Jr BG USARMY DLSA (USA) |
| **Cc:** | Rugh, Aaron C RDML USN OSD OMC OCP (USA); Amy Hilton; Hilton, Amy C CIV OSD OMC OCP (USA); Arndt, Tara J CPT USARMY OSD OMC OCP (USA); Arndt, Tara J CPT USARMY OSD OMC OCP (USA); Bearden, Joshua S LTC USARMY OSD OMC OCP (USA); Dykstra, Christopher M CIV OSD OMC OCP (USA); Trivett, Clayton G CIV OSD OMC OCP (USA); Clay Trivett; Clay Trivett; Cox, Dale J (John) CIV OSD OMC OCP (USA); Ed Ryan; Ryan, Edward R CIV (USA); Ed Ryan; Jeff Groharing; Groharing, Jeffrey D CIV OSD OMC OCP (USA); Jeff Groharing; Grippando, Karissa M CIV OSD OMC OCP (USA); Layus, Jacqueline; Layus, Jacqueline C CTR (USA); Gentry, Megan L (Mego) CIV OSD OMC OCP (USA); Megan Gentry; Mia Tarallo; Modha, Devi CTR OSD OMC OCP (USA); Modha GDIT; Modha PTF; Dastoor, Neville F MAJ USARMY OSD OMC OCP (USA); Neville Dastoor; Nicole Tate; Tate, Nicole A CIV OSD OMC OCP (USA); Pratt, Kristin N TSgt USAF OSD OMC OCP (USA); Colyar, Robert M CTR OSD OMC OCP (USA); Rob Colyar; Rob Colyar; Baxter, Robert L LT USN OSD OMC OCP (USA); Gibbs, Rudolph P Jr CIV OSD OMC OCP (USA); Rudy Gibbs; Sanders, Joleen L CTR OSD OMC OCP (USA); Spence, Sean D PO1 USN OSD OMC OCP (USA); Tarallo, Mia R CTR (USA); Lindsay, Victoria L TSgt USAF OSD OMC OCP (USA) |
| **Subject:** | Status Update and the Prosecution's Setting of Deadlines for Final Negotiations on Pre-Trial Agreements ico United States v. Mohammad, et al. |

Defense Counsel ico United States v. Mohammad, et al.,

Thank you for meeting with us over the last few weeks to continue to negotiate potential pre-trial agreements in the case. Because we met with every Defense team before the 15 July deadline to discuss terms of a possible PTA, we are advancing with the understanding that all five Defense teams are willing to enter into pre-trial agreements without the Policy Principles. If that is not correct, please advise us immediately. I am also writing to update you with some recent information we received, cross-level some Prosecution positions so all Defense teams are on the same page, and establish new deadlines going forward if your client wants to continue to move forward with a pre-trial agreement.

As an initial manner, we updated the Convening Authority on the status of all the negotiations on 14 July. He informed us that he intends to leave his position no later than the first week of October, but that it could be sooner if another Convening Authority is appointed before then. As such, we believe it is imperative to set deadlines going forward to ensure any agreement we reach will in fact be signed off by this Convening Authority, and to ensure we don't lose any additional court time negotiating.

The stipulation of fact (proposed as Attachment A in the DRAFT pre-trial agreements) and admissibility of the LHMs establishing the Accused's conduct were identified in March of 2022 as the two most important aspects of the Prosecution's willingness to endorse any pre-trial agreements in this case, and that has not changed. While we have been willing to consider amending our proposed stipulations if they were inaccurate or something to which your clients couldn't providently plead, the proposed stipulations must accurately reflect the full criminality of the conduct of the accused and accurately reflect how that conduct fit within the 9/11 conspiracy. The Convening Authority agrees that any pre-trial agreement in this case must include the admissibility of the statements documented in the LHMs presented through the testimony of the FBI witnesses, and that the stipulations of fact must include an admission as to the truth of the statements and the names of all of the co-conspirators who were working in concert with one another. While we are amenable to avoiding admissions or facts that involve non-Accused and uncharged conduct, due to the nature of the 9/11 conspiracy and each Accused's involvement, we are not willing to enter into stipulations or elicit testimony that

1

**JA.199**

would exclude the involvement of the other Accused, by name. We ask all Defense teams to communicate these requirements to the Accused so they understand that the Convening Authority requires these provisions in the "Attachment A" Stip to the PTA, and so the Accused understand that they will not be unequally implicating one another or harming each other's cases. We are willing to bolster the language limiting use of the stipulation or LHM testimony in the PTA for other cases or proceedings if that is the driving concern.

Please let us know by 28 July if any of the Accused are willing to enter into a PTA that includes the above terms. If we do not hear from you by that date, we will operate under the understanding that those terms are unacceptable to the Accused and an agreement cannot be reached.

We have also not received any proposed "Attachment B" stipulations to consider from any of the teams. As we anticipate these stipulations will require the parties to meet and negotiate, we request that you send your draft proposed "Attachment B" stipulation (and for teams who haven't sent proposed edits to "Attachment A" stipulations) to the Prosecution no later than 4 August. The deadline to have signed offers to plead from your client for the Convening Authority's consideration will be 1 September. We plan to utilize days in the September hearings for the entry of any guilty pleas for those who sign a PTA and if we don't reach agreement by 1 September with all or some of the Accused we will no longer engage in negotiations over possible PTAs. We intend to return to active litigation in the September hearings against any Accused with whom we do not reach agreement by 1 September.

In the coming days we will follow up with individual teams on the status of our individual negotiations and send along our comments on documents reflecting the parties' discussions from our previous meetings. We will also be sending updated proposed Pre-Trial Agreements to all five Defense teams, as we identified a prosecution error in all five PTAs regarding the charges, and will also include new proposals for the CA to recommend, and the CP to positively endorse, certain conditions of confinement for post-conviction Detention. The updated PTAs will also include a proposed work around the issue of identification of Defense experts and lay witnesses (which was an issue raised in several of our meetings with the Defense).

To recap on the deadlines:

28 July deadline to inform us if your client is willing to accept a PTA with the Stips (as described above) and the admission of the statements made to the FBI agents as set forth in the LHM;

4 August deadline to provide proposed Attachment B Stips (and proposed "Attachment A" edits if your team has not sent an initial proposed edit);

1 September deadline to have a signed offer by your client to enter into a pre-trial agreement sent to the Prosecution for forwarding to the Convening Authority for his consideration.


Regards,

Clay Trivett

Edward Ryan

Jeffrey Groharing

2

**JA.200**

## Theis, Elspeth G Maj USAF OSD MCDO (USA)

| | |
|---|---|
| **From:** | Trivett, Clayton G CIV OSD OMC OCP (USA) |
| **Sent:** | Friday, September 8, 2023 12:26 PM |
| **To:** | OSD NCR MCDO List MCDO Team Mohammad; OSD NCR MCDO List MCDO Team Bin Attash; OSD NCR MCDO List MCDO Team RBAS; OSD NCR MCDO List MCDO Team Hawsawi; Connell, James G III CIV (USA); Pradhan, Alka CIV (USA); Krzan, Corey M LT USN OSD MCDO (USA); Thompson, Jackie L Jr BG USARMY DLSA (USA) |
| **Cc:** | Brown, Andrew T CPT USARMY OSD OMC OCP (USA); Rugh, Aaron C RDML USN OSD OMC OCP (USA); Amy Hilton; Hilton, Amy C CIV OSD OMC OCP (USA); Arndt, Tara J CPT USARMY OSD OMC OCP (USA); Arndt, Tara J CPT USARMY OSD OMC OCP (USA); Bearden, Joshua S LTC USARMY OSD OMC OCP (USA); Dykstra, Christopher M CIV OSD OMC OCP (USA); Trivett, Clayton G CIV OSD OMC OCP (USA); Clay Trivett; Clay Trivett; Cox, Dale J (John) CIV OSD OMC OCP (USA); edwardr; Ryan, Edward R CIV (USA); Ed Ryan; Jeff Groharing; Groharing, Jeffrey D CIV OSD OMC OCP (USA); Jeff Groharing; Grippando, Karissa M CIV OSD OMC OCP (USA); Layus, Jacqueline; Layus, Jacqueline C CTR (USA); Gentry, Megan L (Mego) CIV OSD OMC OCP (USA); Megan Gentry; Mia Tarallo; Modha DOD; Modha GDIT; Modha PTF; Dastoor, Neville F MAJ USARMY OSD OMC OCP (USA); Neville Dastoor; Nicole Tate; Tate, Nicole A CIV OSD OMC OCP (USA); Pratt, Kristin N TSgt USAF OSD OMC OCP (USA); Colyar, Robert M CTR OSD OMC OCP (USA); Rob Colyar; Rob Colyar; Baxter, Robert L LT USN OSD OMC OCP (USA); Gibbs, Rudolph P Jr CIV OSD OMC OCP (USA); Rudy Gibbs; Sanders, Joleen L CTR OSD OMC OCP (USA); Spence, Sean D PO1 USN OSD OMC OCP (USA); Tarallo, Mia R CTR (USA); Lindsay, Victoria L TSgt USAF OSD OMC OCP (USA) |
| **Subject:** | Update on Pre-Trial Negotiations and Setting of 18 September 2023 Final Deadline by the Convening Authority |

Defense Counsel ico United States v. Mohammad, et al.

While I understand that open negotiations only continue with three of the five teams, I am sending this message out to cross-level it with all of the teams so everyone has the same information.

The Prosecution's 1 September deadline has now passed with no signed offers to enter into a pre-trial agreement. During the month of August, the Prosecution continued good faith negotiations with three of the Defense teams, all of which indicated that they needed to meet with their clients regarding the documents and agreements during the first week of September, prior to completion of the necessary documents and a final decision by the Accused. Although the Prosecution never formally extended the 1 September 2023 deadline, since the Prosecution assessed that these three defense teams appeared to still be genuinely working in good faith to resolve any final outstanding issues, it has continued to meet with, and receive final documents from, the Defense. We informed the Convening Authority of these continued negotiations.

The current Convening Authority's term ends on 7 October 2023 and a new Convening Authority has been named as his replacement. In recognition of this, and to give him adequate time to review any PTA that may be forwarded, he has now established a final 18 September deadline for his consideration of any pre-trial agreement offers from the Accused that the Prosecution would agree to positively endorse. If there are no signed offers to enter into a pre-trial agreements by that time, he will leave the issue to his successor.

Although the Prosecution had made clear that any actions that Admiral Rugh and General Thompson may have been working on regarding modifications to the SOP, family communications, or the creation of a detainee handbook, would not be made a formal part of the deal (other than via recommendations) and would not likely meet with success in any event before a PTA would need to be signed, it appears that some Defense teams are still waiting to see what results from those efforts. While I am also aware that JTF-GTMO has sought input from the Tier Leaders on what should be

1

JA.201

included in a detainee handbook, it is still uncertain when or if a detainee handbook will be issued, or whether the Administration's decision on the Joint Policy Principles will restrict the Commander's discretion going forward.

We have been negotiating since March 2022, and while I understand that much of the delay was caused awaiting a decision on the Joint Policy Principles request, now that the Defense Joint Policy Principle request has been answered, and the conditions of confinement will not be made a formal part of any PTA, there is nothing additional to explore. Either your clients want the deal we have negotiated without the conditions of confinement or they don't, and we just need to know either way.

It was an emotional experience for the Victim Family Members to be consulted on the possible pre-trial agreements, and the United States owes them a definitive answer as to whether the agreements are going to happen or if we are going to trial. If we don't hear from you by the 18th of September (10 days from today) we will assume that the Accused are not interested in further pursuing a deal, and we will so inform the family members. Should you still be interested in the Pre-Trial Agreement with the previously discussed material terms, you must have a completed and signed offer to enter into a pre-trial agreement to the Prosecution by 18 September.

Regards,

Clay Trivett

**JA.202**

**PAGE INTENTIONALLY LEFT BLANK**

**JA.203**



## DEPARTMENT OF DEFENSE
### OFFICE OF THE CHIEF PROSECUTOR FOR MILITARY COMMISSIONS
### 1610 DEFENSE PENTAGON
### WASHINGTON, DC 20301-1610

31 July 2024

To the Families of the September 11, 2001 Victims,

This letter provides an update from the Office of the Chief Prosecutor and the Director of the Office of Military Commissions Victim Witness Assistance Program (VWAP) in the military commission case of *United States v. Khalid Shaikh Mohammad, et al.*

In March 2022, this office notified you that it had entered into negotiations with the defense counsel in this case regarding possible pre-trial agreements. As we entered into these negotiations, members of the Prosecution team and the Director of VWAP sent you a letter, and then later met with groups of you in several locations, to discuss the possibility of pre-trial agreements in the case and answer any questions you may have had. The Prosecution did so also to solicit your various views and comments on the pre-trial agreements as Victim Family Members (VFMs) of the September 11 attacks, as required by law and regulation. The VFM comments you provided were then communicated by our office to the Convening Authority, the United States Government official empowered by the Secretary of Defense with authority to, among other things, enter into pre-trial agreements on behalf of the United States government. These negotiations have been on-going for the past 27 months, and this letter is sent to inform you that the negotiations have reached resolution with three of the Accused agreeing to plead guilty in this case.

During the July/August 2024 session of the Commission, Khalid Shaikh Mohammad, Walid Bin 'Attash, and Mustafa al Hawsawi entered into pre-trial agreements in this case with the Convening Authority. In exchange for the removal of the death penalty as a possible punishment, these three Accused have agreed to plead guilty to all of the charged offenses, including the murder of the 2,976 people listed in the charge sheet, and to be later sentenced by a panel of military officers. As part of the pre-trial agreement, the Accused have also agreed to a process to respond to questions submitted by VFMs regarding their roles and reasons for conducting the September 11 attacks, should you have any unanswered questions about the attacks you would like answered. This process requires that you submit any questions you want to ask the Accused to our office no later than 45 days from this notification (14 September 2024), so that we can consolidate and submit them to the Accused through their defense counsel. The Accused have agreed to respond to your questions within 90 days of receipt, so we anticipate that answers will begin to be provided by the end of this calendar year. For this reason, we ask that you submit any questions you may have on the password-protected website referenced below within the next 45 days.

As a verified victim family member, most of you already have access to the Victim Notification System (VNS), a password-protected site for VFMs that can be accessed by clicking here. For your ease of access, we created a link that can be found on the Office of the Chief Prosecutor letter located in VNS through which you can submit any questions you may have to the three September 11 co-conspirators, as well as access all notifications regarding the case, view any additional documents provided during the case, and update your personal contact information. If you have any issues with access, please contact the VNS Help Desk at (866)

**JA.204**

625-1631. If you do not already have access to VNS, please submit an access-request email by clicking here. In addition, the VWAP webpage can be found at https://www.mc.mil/Victims-Witness-Assistance/Victim-Witness-Assistance, which contains additional information regarding your rights and the services offered by VWAP.

We currently anticipate that the taking of the guilty pleas will be scheduled either the week of 5 August 2024 or during the September/October 2024 session of the Commission, and we will provide more specifics for you as soon as the Military Judge sets a schedule for the entry of the guilty pleas. Following the entry of the guilty pleas, a sentencing hearing will be scheduled where the parties will have an opportunity to present evidence and argue for an appropriate sentence. Under the pre-trial agreement, the earliest the first sentencing hearing will occur is Summer 2025.

During the sentencing hearings in this case, there may be an opportunity for a member of your family to testify about the impact the September 11 attacks have had on you and your loved ones, and to provide a victim impact statement that will be considered by the military jury in determining a sentence. Our office will contact you in the coming months to solicit your interest in providing victim impact evidence. Our Prosecution team also plans to travel again to various locations in Fall 2024 to speak with you in person (as well as to arrange for a virtual meeting for those unable to attend in person) to provide more details to you about the pre-trial agreements, and to answer any additional questions you may have.

We recognize that the status of the case in general, and this news in particular, will understandably and appropriately elicit intense emotion, and we also realize that the decision to enter into a pre-trial agreement will be met with mixed reactions amongst the thousands of family members who lost loved ones. The decision to enter into a pre-trial agreement after 12 years of pre-trial litigation was not reached lightly; however, it is our collective, reasoned, and good-faith judgment that this resolution is the best path to finality and justice in this case.

Our VWAP Office has grief counselors available to assist you should you want to speak with someone, and our thoughts continue to be with you during this time.

| //s// | //s// | //s// | //s// |
|---|---|---|---|
| Aaron Rugh | Clay Trivett | Jeffrey Groharing | Charles Zelnis |
| Chief Prosecutor | Managing Trial Counsel | Trial Counsel | VWAP Director |

JA.205



**The Judge Advocate General's Legal Center and School**



HOME

ABOUT US

STUDENTS

OTHER RESOURCES

QUICK LINKS

→SIGN IN



Faculty Login

### Contribute to the Digital Deskbook!

Submit your comments here for evaluation by the TJAGLCS Criminal Law Department and possible fast-track in-clusion in the Digital Deskbook!

NEW      🖨 VIEW/PRINT ENTIRE DESKBOOK      🖨 PRINT CURRENT PAGE

View Topic History

**JA.206**



🏠 Home      🔍 Search      📄 Recent Changes      📑 Show All Pages

Last Updated: 1/19/21

CHAPTER 15

PLEA AGREEMENTS

I.      Introduction

II.     Basic Components of a PA

III.    Negotiation and Form of Agreement

IV.     Military Judge's Inquiry at Trial

V.      Withdrawal from PA

VI.     Content

VII.    Remedies

VIII.   Post-Trial Issues and Defects

I. INTRODUCTION

A. Defined.  A plea agreement (PA) is an agreement between the convening authority and the accused. Only the convening authority can bind the government. PAs are governed by R.C.M. 705.  Practitioners should note that prior to the 2016 Military Justice Act, the terminology used for an agreement was a "pretrial agreement."  To the extent that older case law is discussed herein, this chapter will use the older terminology to avoid confusion about which law was applied.

B. Major changes made by the 2016 Military Justice Act (2016 MJA).  The 2016 MJA introduced a new article–Article 53a–which serves as the authority to enter into plea agreements.  Among other things, the Article specifies what may be the subject of agreement, stipulates when the military judge must reject an agreement, makes certain exceptions for agreements affecting a mandatory minimum, and provides that a court-martial is bound by the limitations expressed in the agreement once the military judge accepts the agreement.

C. Significant differences between the 2016 MJA and the legacy system.

1. Legacy system.  Under the legacy system, a convening authority's power to grant clemency under Article 60, UCMJ forms the basis upon which the agreement rested.  Under that system, a typical pretrial agreement includes an accused's promises to plead guilty in exchange for the convening authority's agreement to limit the sentence imposed at trial when the case reaches her for initial action. After the accused enters a plea of guilty at trial, the military judge examines the agreement and ensure the accused understands it.  After the judge accepts the plea as providently made, the sentencing authority (the military judge or panel) will proceed to sentencing without knowledge of the sentence limitation the convening authority has agreed to. To facilitate this, the PTA is physically separated into two parts (i.e. separate pieces of paper): the agreement (or Part I) and the quantum (or Part II). The accused will get the benefit of the lesser sentence - that contained within the agreement or that announced at trial. For example, suppose the accused agrees to plead guilty to larceny in exchange for an approved sentence no greater than 8 months confinement.  Assume that at trial the military judge adjudges a sentence of only 6 months confinement.  In that case, the agreement has no effect on the sentence because the convening authority may only approve a sentence of 6 months confinement. On the other hand, if the military judge had sentenced the accused to 12 months of confinement, then the accused would receive a benefit from the agreement because the convening authority would only be able to approve 8 months of confinement.  Because the basis for the agreement is the clemency power, post-trial agreements are possible, and the convening authority is responsible for monitoring and enforcing any term required to be performed after adjournment.

2. The 2016 MJA.  Under the 2016 MJA, the plea agreement is to a sentence limitation that acts directly on the power of the court-martial.  Under this system, once the plea agreement is accepted by the judge, the court is bound.  The court will know the agreement and sentence within the limitations imposed by the agreement. Because the agreement is a limitation expressed ab initio, rather than an agreement to exercise clemency over a previously adjudged sentence, practitioners should take care to understand the full sentencing landscape before proposing or agreeing to a term.

3. Straddling cases.  Straddling cases exist when crimes charged pre and postdate 1 January 2019. Practitioners must understand both systems.  The old Article 60 and R.C.M. 705 apply by default in straddling cases.  However, the accused may elect to opt-in to to the new sentencing system and the new Article 53a and R.C.M. 705.  If the accused chooses to opt-in, the new sentencing and plea agreement system will apply to all charges and specifications.

View Topic History

II. BASIC COMPONENTS OF A PA

A. A promise by the accused to plead guilty to, or to enter a confessional stipulation as to one or more charges and specifications, and to fulfill such additional terms or conditions which may be included in the agreement and which are not prohibited under R.C.M. 705.

B. Per R.C.M. 705, a PA is a promise by the convening authority to do one or more of the following:

1. Refer the charges to a certain type of court-martial;

2. Refer a capital offense as non-capital;

3. Withdraw one or more charges or specifications from the court-martial;

4. Have the trial counsel present no evidence as to one or more specifications or portions thereof; and/or

5. Limit the sentence that may be adjudged by the court-martial.

NOTE: Per AR 27-10, para. 5–27.c (Interim, 1 Jan 19), and subject to certain restrictions, the CA may agree to a specific sentence.

C. The following cases help to flesh out the nature of pretrial agreements and their basic use at trial *United States v. Brice*, 38 C.M.R. 134 (C.M.A. 1967); *United States v. Monett*, 36 C.M.R. 335 (C.M.A. 1966); *United States v. Neal*, 12 M.J. 522 (N.M.C.M.R. 1981).

III. NEGOTIATION AND FORM OF AGREEMENT

A. **Negotiations**.  PA negotiations may be initiated by the accused, defense counsel, trial counsel, the staff judge advocate, convening authority, or their duly authorized representatives. Either the defense or government may propose any term or condition not prohibited by law or public policy. Government representatives must negotiate with defense counsel unless the accused has waived the right to counsel.  Under Article 53a, the military judge may not participate in discussions between the parties concerning prospective terms and conditions of a PA.

B. **Proposal**.  If the accused elects to propose a PA, the defense shall submit a written offer. All terms, conditions, and promises between the parties shall be written. Unwritten, or *sub rosa*, agreements are prohibited. The proposed agreement shall be signed by the accused and defense counsel, if any. If the agreement contains any specified action on the adjudged sentence, such action shall be set forth on a page separate from the other portions of the agreement.

1. **Terms not in writing**.  *United States v. Mooney*, 47 M.J. 496 (C.A.A.F. 1997).  Military judge erred by accepting accused's guilty plea and pretrial agreement after it was clear that the pretrial agreement was not in writing as required by R.C.M. 705(d)(2) [now R.C.M. 705(e)(2)]. However, while CAAF criticized counsels' and the judge's disregard for the rule, court held that reversal of conviction was not required where the specific terms of the oral agreement were placed on the record, all parties acknowledged and complied with terms of agreement, and accused received the benefit of the bargain.

2. **Terms contained in stipulation of fact**. *United States v. Forrester*, 48 M.J. 1 (C.A.A.F. 1998).  Term in stipulation of fact which required the accused to waive his right to "any and all defenses" did not violate R.C.M. 705 or public policy. CAAF cautions the Government not to attempt to avoid the requirements of R.C.M. 705(c)(1)(B) by including terms in a document other than the pretrial agreement itself (terms must not be in a stipulation of fact).  The reasoning in this case may be impacted by the new waiver/forfeiture rules in R.C.M. 905(e).

3. **Cases straddling the effective date of Military Justice Act of 2016**.  In a case where at least one charged offense occurred before 1 January 2019 and at least one charged offense occurred on or after 1 January 2019, to ensure that any sentence limitation contained in the agreement will be in compliance with R.C.M. 705, the plea agreement will contain a term stating whether or not the accused agrees to elect to have the Military Justice Act of 2016 (MJA 16) sentencing rules apply.  AR 27-10, para. 5–27d.(1) (Interim, 1 Jan 19).  The trial counsel, VWL, or other government representative will consult with victims of crimes, and when applicable, the victim's SVC, concerning, among other things, negotiations of plea agreements and their potential terms.  AR 27-10, para. 17–5.a.(4) (Interim, 1 Jan 19).

C. **Acceptance**.  The convening authority may either accept or reject an offer of the accused to enter into a pretrial agreement or may propose by counteroffer any terms or conditions not prohibited by law or public policy. The decision whether to accept or reject an offer is within the sole discretion of the convening authority. When the convening authority has accepted a pretrial agreement, the agreement shall be signed by the convening authority or by a person, such as the staff judge advocate or trial counsel, who has been authorized by the convening authority to sign.

D. **Victim input**.  Pursuant to R.C.M. 705(e)(3)(b), whenever practicable, the government will provide the victim an opportunity for input as to the pretrial agreement and their potential terms.  Prior to approving a plea agreement in a case in which a person has suffered personal injury or property loss/damage as a result of an offense, the convening authority will consider the appropriate-ness of requiring victim restitution as a term of the plea agreement.  AR 27-10, para. 5-27.a. (Interim, 1 Jan 19).

IV. MILITARY JUDGE'S INQUIRY AT TRIAL

A. **General**.  The military judge is required to ensure the accused understands each provision of the PA and that entry into the agreement was *knowing* and *voluntary*.  Additionally, the military judge has an implied duty to determine whether there exists a mandatory basis to reject the agreement.  See Art 53a(b)(1)-(5).

B. **Judicial Responsibility**.  The following cases help to flesh out this requirement.

1. **Waiver of Motions**.  *United States v. Felder*, 59 M.J. 444 (C.A.A.F. 2004).  MMilitary judge did not inquire into a term of the PTA regarding defense's waiver of any motions for sentence credit based on Article 13 and/or restriction tantamount to confinement. Accused's counsel did inform the military judge that no punishment under Article 13 or restriction tantamount to confinement had occurred. While the judge's failure to discuss the term was error, the accused failed to show the error materially prejudiced a substantial right.  The reasoning in this case may be impacted by the new waiver/forfeiture rules in R.C.M. 905(e).

2. **Meeting of the minds**.  *United States v. Dunbar*, 60 M.J. 748 (A. Ct. Crim. App. 2004). The accused's PTA stated "[a]ny adjudged confinement of three (3) months or more shall be converted into a [BCD], which may be approved; any adjudged confinement of less than three (3) months shall be disapproved upon submission by the accused [of a Chapter 10]" with a handwritten annotation stating "with an Other Than Honorable (OTH) discharge." The MJ sentenced the accused to a BCD, two months confinement, and reduction to PFC, causing the parties to disagree whether the convening authority could approve the BCD. Defense argued the convening authority could not approve both an OTH and a BCD discharge. The government's position was that the accused could submit a Chapter 10 and the convening authority must disapprove the two months confinement but the PTA did not require the convening authority's approval of the Chapter 10. R.C.M. 910(h)(3) provides, after the sentence is announced, if the parties disagree with the PTA terms the MJ shall "conform, with the consent of the Government, the agreement to the accused's understanding or permit the accused to withdraw the plea." The MJ did not clarify the accused's understanding or attempt to conform the agreement. Court granted rescission for lack of meeting of the minds; findings and sentence set aside.

| View Topic History |

**JA.208**

3. *Misconduct clause.* *United States v. Sheehan*, 62 M.J. 568 (C.G. Ct. Crim. App. 2005). Military judge failed to cover a misconduct clause and "specially negotiated provisions" of the accused's PTA and provided an incorrect explanation as to another provision. CGCCA found that the military judge erred but that his omissions and misleading explanation did not prejudice the accused's substantial personal rights.

4. *Responsibility to 'police' terms.* *United States v. Sharper*, 17 M.J. 803 (A.C.M.R. 1984) ("While the military judge may not have the authority to directly intervene in the pretrial negotiations between an accused and a convening authority, he does have the responsibility to police the terms of pretrial agreements to insure compliance with statutory and decisional law as well as adherence to basic notions of fundamental fairness.").

V. WITHDRAWAL FROM PA

A. *General.* Under R.C.M. 705(e)(4), "[t]he accused may withdraw from a plea agreement at any time prior to the sentence being announced," but shall be permitted to withdraw the plea after acceptance only for good cause shown. The convening authority may withdraw "at any time before substantial performance by the accused of promises contained in the agreement," and under certain other limited conditions. Additionally, the accused may withdraw a plea of guilty or a confessional stipulation entered pursuant to a pretrial agreement only as provided in R.C.M. 910(h) or 811(d)."

B. *Entry into a new PTA subsequent to withdrawal.* *United States v. Bray*, 49 M.J. 300 (C.A.A.F. 1998). A convening authority may increase the sentence cap of a pretrial agreement when an accused withdraws a guilty plea after successful completion of a providence inquiry and, in the same court-martial, later reenters pleas of guilty to the same charges. The accused entered guilty pleas to assault and battery on a child, communicating a threat, and drunk driving. During extenuation and mitigation, a defense witness testified that the accused could have committed the offenses after being exposed to insecticide poisoning. Accused withdrew his guilty plea and from the pretrial agreement, which limited confinement to 20 years to pursue the "bug spray" defense. Accused obtained a new pretrial agreement after changing his mind. The sentence cap under the new PTA limited confinement to 30 years. Neither case law nor RCM 705 prohibit a convening authority from increasing a sentence cap in a new pretrial agreement after the convening authority properly withdraws from the original pretrial agreement. Accused chose to reopen the initial providence inquiry based on the "bug spray" defense and voluntarily withdrew from the original agreement after full consultation with counsel. The consequences of withdrawal were addressed in the original agreement, explained on the record, and the accused failed to object at trial.

C. *Accused's post-trial withdrawal of plea.* *United States v. Olson*, 25 M.J. 293 (C.M.A. 1987), was decided under the legacy system. This case is likely no longer good law because under the 2016 MJA the convening authority fully performs on the agreement upfront. Accused had right to withdraw his guilty plea in light of additional, unanticipated subtraction from pay, if he had good-faith belief that he had fully settled his liability to reimburse Government for overpayment under allegedly false travel vouchers and if that belief had induced accused's entry of his pleas.

D. *CA withdrawal*

1. **General.** The standard for government withdrawal under R.C.M. 705 has changed under the 2016 MJA.

a) **Legacy system.** Under legacy RCM 705(d)(5)(b), the convening authority could withdraw from a pretrial agreement at any time before the accused *begins performance* of promises contained in the agreement, upon the failure by the accused to fulfill any material promise or condition in the agreement, when inquiry by the military judge discloses a disagreement as to a material term in the agreement, or if findings are set aside because a plea of guilty entered pursuant to the agreement is held improvident on appellate review. As a practical matter, once the accused begins performance, the convening authority has limited opportunity to withdraw from the PTA. *United States v. Dean*, 67 M.J. 224 (C.A.A.F. 2009); *United States v. Manley*, 25 M.J. 346 (C.M.A. 1987) (once accused completed performance of pretrial agreement, as modified by parties at trial, the convening authority was not authorized to unilaterally withdraw from the agreement). Performance will often take the form of entry into a stipulation of fact. The basic rationale for this rule is to protect an accused who is in the midst of performing in reliance on the convening authority's agreement to exercise clemency after trial. While the convening authority may not have performed yet, he is still legally obligated to do so at the appropriate time. Courts have strictly construed this rule. See, e.g., *United States v. Dean*, 67 M.J. 224 (C.A.A.F. 2009). *See also United States v. Pruner*, 37 M.J. 573 (A.C.M.R. 1993). (convening authority withdrawal effective when performance of pretrial agreement was not commenced because the accused had not yet signed proposed stipulation of fact and had not yet requested witnesses); *United States v. Villareal*, 52 M.J. 27 (C.A.A.F. 1999) (Convening authority could lawfully withdraw from pretrial agreement based upon pressure from victim's family members, where the accused had not relied to his detriment on the agreement in any manner that would prejudice his right to a fair trial.)

b) **2016 MJA.** The new rule, expressed at R.C.M. 705(e)(4)(B), modifies the language concerning 'beginning of performance,' and provides that the convening authority may withdraw "at any time before *substantial performance* by the accused of promises contained in the agreement." The basic rationale behind this rule appears to be to protect the convening authority. Under the 2016 MJA, the convening authority's performance occurs at the outset, in directing the court to sentence in accordance with the limitations expressed in the agreement. The term requiring substantial performance therefore appears to protect a convening authority from a situation where an accused obtains the favorable sentence limitation without having substantially performed.

2. *Where no Meeting of the minds.* *United States v. Williams*, 60 M.J. 360 (C.A.A.F. 2004). Accused's pretrial agreement required him to reimburse his victim(s) "once those individuals and the amounts owed have been ascertained." On the day of trial the government withdrew from the PTA reasoning, under R.C.M. 705(d)(4)(B), that the accused's failure to reimburse his victim breached a material PTA term. Defense argued he was not in breach because the term failed to establish a time limit, allowing for restitution after trial. Defense requested specific performance of the PTA arguing (also under R.C.M. 705(d)(4)(B)) that his execution of a stipulation of fact with the government constituted performance and he had not otherwise breached any material term. CAAF did not rule whether entrance into a stipulation of fact constitutes performance or whether the accused failed to fulfill a material term. CAAF, focusing on the parties' failure to establish a meeting of the minds for the restitution time limit, held, under R.C.M. 705(d)(4)(B), that the government can withdraw from a PTA if the MJ "discloses a disagreement as to a material term in the agreement."

3. *Accused fails to perform material term.* *United States v. Parker*, 62 M.J. 459 (C.A.A.F. 2006). Accused entered into a PTA to plead guilty to AWOL and missing movement by neglect in return for the CA suspending any adjudged BCD or confinement in excess of thirty days. The military judge, however, rejected the accused's plea to missing movement by neglect because the accused said he only overheard statements from his NCOs, as opposed to a direct or official conveyance, regarding the place and time of the movement. When the military judge rejected the accused's plea, the government withdrew from the PTA and moved forward to trial before the military judge alone on the charge of missing movement by design. The military judge found the accused guilty of miss-

[View Topic History]

judge alone on the charge of missing movement by design. The military judge found the accused guilty of missing movement by design and sentenced him to a BCD and five months confinement. After trial, the accused submitted a clemency letter stating he did not desire suspension of his BCD. CAAF held that the MJ did not erroneously reject the accused's plea and defense never requested the MJ to reopen the plea. Therefore, PTA failed to exist and the accused's express and repeated request for a non-suspended BCD during his unsworn statement and clemency matters controls.

E. Withdrawal by Government before beginning of performance.

VI. CONTENT

A. Permissible Terms/Conditions

1. **Stipulation of fact**. A promise to enter into a stipulation of fact concerning offenses to which a plea of guilty is entered or as to which a confessional stipulation will be entered. *United States v. Bertelson*, 3 M.J. 314 (C.M.A. 1977). Stipulations of fact are governed by R.C.M. 811.

a) Aggravation evidence. Government can require the accused to stipulate to aggravation evidence or refuse to accept pretrial agreement. *United States v. Harrod*, 20 M.J. 777 (A.C.M.R. 1985); *United States v. Sharper,* 17 M.J. 803 (A.C.M.R. 1984). The Government can also require accused to agree to both truth and admissibility of matters contained in the stipulation of fact. The stipulation should be unequivocal that counsel and the accused agree not only to the truth of the matters stipulated but that such matters are admissible in evidence against the accused.

b) Uncharged misconduct. *United States v. Vargas*, 29 M.J. 968 (A.C.M.R. 1990). Defense counsel objected at trial to the inclusion of the uncharged misconduct and indicated that the accused only agreed to the stipulation out of fear of losing the deal. Military judge gave the accused an opportunity to withdraw, but the accused elected to adhere to the stipulation; no overreaching by the Government. See also *United States v. Mezzanatto*, 513 U.S. 196 (1995) (agreement to waive evidentiary provisions are subject to waiver by voluntary agreement of the parties). The reasoning in this case may be impacted by the new waiver/forfeiture rules in R.C.M. 905(e).

2. **Promise to testify**. Accused may agree to testify or provide assistance to investigators as a witness in the trial of another person. However, it is likely impermissible to require an accused to testify without a grant of immunity. See *United States v. Profitt*, 1997 WL 165434 (A.F. Ct. Crim. App. 1997) (unpub); *United States v. Rivera*, 46 M.J. 52 (C.A.A.F. 1997), affirming 44 M.J. 527 (A.F. Ct. Crim. App. 1996) (term which required accused to "testify in any trial related in my case without a grant of immunity" did not violate public policy, under facts of this case as the accused had not been called to testify. Both cases discussed supra.

3. **Provide restitution**. *United States v. Mitchell*, 46 M.J. 840 (N-M. Ct. Crim. App. 1997). Accused who fails to make full restitution pursuant to a defense proposed term in PTA is not unlawfully deprived of the benefit of the PTA where the failure to comply with the restitution obligation is based on indigency. Accused uttered bad checks and defrauded financial institutions of $30,733. The defense proposed a term that required accused to make full restitution in exchange for suspension of confinement in excess of 60 months. The accused was sentenced, inter alia, to 10 years confinement. While in jail, the accused made partial restitution until his business failed. The accused, now indigent, cannot necessarily use indigency to negate operation of PTA term requiring full restitution. CA properly vacated suspension under PTA.

4. **Conform accused's conduct to certain conditions of probation**. Generally, the period of suspension acceptable relates to the length of the sentence adjudged.

a) **Before entry of judgment**. While this term is authorized under the 2016 MJA, it appears that the military judge, and not the convening authority, will have the obligation to enforce the agreement. The following two cases were decided under the legacy system in which the convening authority declined to exercise the agreed upon clemency post-trial.

(1) *United States v. Bulla*, 58 M.J. 715 (C.G. Ct. Crim. App. 2003). Pretrial agreement included a misconduct provision "that permitted the convening authority, among other things, to disregard the sentence limiting part of the pretrial agreement if the [accused] committed a violation of the UCMJ between the time the sentence was announced at her court-martial and the time the convening authority acted on the sentence." Accused was in an unauthorized absence status for two days shortly after the end of court-martial proceedings. Relying on the misconduct provision, the convening authority approved the sentence as adjudged, rather than as would have been limited by the PTA (which would have suspended the BCD for twelve months from action). Although CGCCA had "reservations about some of the potential results of this misconduct provision, it held that [the] provision [did] not violate public policy," at least as applied to a sentence element that the convening authority only agreed to suspend. Further, accused's two-day AWOL was a "material breach" of the PTA that released the convening authority from the agreement. Finally, court finds that prior to finding accused violated the misconduct provision, convening authority should hold a proceeding similar to that provided for by Article 72, UCMJ and R.C.M. 1109 (vacation proceedings) and apply a preponderance of the evidence burden of proof. Although convening authority applied a lesser, incorrect burden of proof, the error was harmless.

(2) *United States v. Tester*, 59 M.J. 644 (A. Ct. Crim. App. 2003). Pretrial agreement contained deferral of confinement provision and misconduct provision similar to that in *Bulla, supra.* Court held procedures of R.C.M. 1109 (vacation of suspension) must be complied with before an alleged violation of such terms may relieve the convening authority of the obligation to fulfill the agreement. Convening authority followed provisions to rescind deferral of confinement.

b) ***15 year suspension***. *United States v. Spriggs*, 40 M.J. 158 (C.M.A. 1994) (an indeterminate term of suspension of up to 15 years to complete sex offender program was inappropriate).

View Topic History

c) ***31 year suspension***. *United States v. Wallace*, 58 M.J. 759 (N-M. Ct. Crim. App. 2003). Accused sentenced to life without parole. In accordance with his pretrial agreement, the convening authority suspended all confinement in excess of 30 years for the period of confinement plus 12 months after accused's release. Accused argued that the period of suspension could only be 5 years from the date sentence was announced. HELD: Pretrial agreement provision imposing a suspension period for the period of confinement and one year from date of release does not violate public policy. R.C.M. 1108 states that a period of suspension should not be unreasonably long. "It is this Court's opinion that placing Accused on probation for 31 years of an adjudged life sentence without possibility of parole is not unreasonably long and does not violate public policy."

5. **Waive unreasonable multiplication of charges**. *United States v. Mitchell*, 62 M.J. 673 (N-M. Ct. Crim. App. 2006). The accused agreed in his PTA to waive a motion alleging unreasonable multiplication of charges. The military judge reviewed this provision with the accused but did not ask him if he had an unreasonable multiplication of charges motion to make. On appeal, defense argued that the term violated public policy, requiring the...

JA.210

tion of charges motion to make. On appeal, defense argued that the term violated public policy, requiring the nullification of the accused's PTA under R.C.M. 705(c)(1)(B). Based on the facts of the accused's case, the provision did not violate public policy. See also *United States v. Hardy*, 77 M.J. 438 (CAAF 2018) (finding waiver where accused failed to raise UMC and there was no term in the PTA specifically addressing the issue). The reasoning in this case may be impacted by the new waiver/forfeiture rules in R.C.M. 905(e).

6. **Waive Article 32 Preliminary Hearing and other procedural protections**. Accused may waive the Article 32 as well as the right to trial by court-martial composed of members or the right to request trial by military judge alone, or the opportunity to obtain the personal appearance of witnesses at sentencing proceedings. R.C.M. 705(c)(2)(E). The reasoning in this case may be impacted by the new waiver/forfeiture rules in R.C.M. 905(e).

7. **Waiver of admin board in subsequent separation proceedings**. *United States v. Gansemer*, 38 M.J. 340, (C.M.A. 1993) (upholding term requiring accused to waive separation board if punitive discharge was not adjudged; term does not violate public policy or fundamental fairness, as accused can ask for discharge in lieu of court-martial and there was no overreaching).

8. **Forfeiture of personal property used in the commission of a crime**. *United States v. Henthorn*, 58 M.J. 556 (N-M. Ct. Crim. App. 2003). Accused convicted of receiving child pornography in violation of 18 U.S.C. § 2252A. Court holds that provision in pretrial agreement that required accused "to forfeit his personal property (laptop computer) pursuant to 18 U.S.C. §2253 did not constitute an unauthorized forfeiture or fine and was not an excessively harsh punishment." Because the computer was used in the commission of the crime, its forfeiture was consistent with the application of the federal forfeiture statute, and was not a "punishment." "Needless to say, if the [accused] found his agreement too onerous, he could have withdrawn from it."

9. **Waiver of accusatory phase unlawful command influence**. *United States v. Weasler*, 43 M.J. 15 (C.A.A.F. 1995). Waiver of UCI was not against public policy where the alleged UCI motion originated with defense, concerned a matter not affecting the fairness of the adjudicative process, and where the waiver also originated with the defense. The reasoning in this case may be impacted by the new waiver/forfeiture rules in R.C.M. 905(e).

10. **Fines**. *United States v. Smith*, 44 M.J. 720 (A. Ct. Crim. App. 1996). Including fines as a term in pretrial agreements is a recognized "good reason" for imposing same, where agreement is freely and voluntarily assented to avoid some more dreaded lawful punishment. Accused was convicted of felony murder. Military judge imposed a fine as part of the sentence which required the accused to pay the $100,000 by the time he is considered for parole (sometime in the next century) or be confined for an additional 50 years or until he dies, whichever comes first. The court held the fine was permissible but the contingent confinement provision was not, as it circumvented Secretary of Army's parole authority. (The agreement here was for non-capital referral. The issue was that the sentence itself violated public policy.)

11. **Article 13 punishment**. *United States v. McFadyen*, 51 M.J. 289 (C.A.A.F. 1999). Accused's waiver of Article 13 issue as part of pretrial agreement does not violate public policy. For all cases in which "a military judge is faced with a pretrial agreement which contains an Article 13 waiver, the military judge should inquire into the circumstances of the pretrial confinement and the voluntariness of the waiver, and ensure that the accused understands the remedy to which he would be entitled if he made a successful motion." Here, accused agreed to plead guilty and, in exchange for a sentence limitation, to waive his right to challenge his pretrial treatment under Article 13. Accused was an airman who complained about his treatment in pretrial confinement at a Navy brig (where he was stripped of rank, prevented from contacting his attorney, and had his phone calls monitored). While announcing a prospective rule only, the court found no reason to disturb the waiver here: Accused did not contest the voluntariness of waiver, an inquiry was conducted by the military judge, the accused was allowed to raise and argue in mitigation his claims of ill-treatment at the hands of the Navy, and the military judge was able, if he wished, to consider the nature of pretrial confinement in determining the sentence. The reasoning in this case may be impacted by the new waiver/forfeiture rules in R.C.M. 905(e).

12. **Waive comparative sentencing information**. *United States v. Oaks*, 2003 CCA LEXIS 301 (A.F. Ct. Crim. App. Dec. 10, 2003 ) (unpub.). Term waiving right to present comparative sentencing information in unsworn statement does not impermissibly limit right to present a full sentence case to the sentencing authority. *Compare United States v. Grill*, 48 M.J. 131 (C.A.A.F. 1998) (error where judge precluded accused from presenting sentence comparison material, but where there was no agreement to waive his right in exchange for the benefits of a pretrial agreement). The reasoning in this case may be impacted by the new waiver/forfeiture rules in R.C.M. 905(e).

13. **Enrollment in a sexual offender treatment program**. *United States v. Cockrell*, 60 M.J. 501 (C.G. Ct. Crim. App. 2004). MJ failed to discuss with the accused a provision in the PTA requiring the accused to enroll in a sexual offender treatment program following his release from confinement and the ramifications if he failed to comply with that requirement. While the ramifications of failing to comply with the terms of the sexual offender treatment program were unclear in the PTA, and left unexplained by the MJ, requiring an accused to enroll in a sexual offender treatment program is not a per se impermissible term.

14. **Agreement not to discuss alleged constitutional violation**. *United States v. Edwards*, 58 M.J. 49 (C.A.A.F. 2003). As part of PTA, accused agreed not to discuss, in his unsworn statement, any circumstances surrounding potential constitutional violations occurring during AFOSI's interrogation of him (interrogation after detailing of defense counsel without first notifying defense counsel). If a provision is not contrary to public policy or R.C.M. 705, accused may knowingly and voluntarily waive it. R.C.M. 705 does not prohibit this pretrial term, and the term did not deprive the accused of the right to a complete sentencing proceeding. Military judge conducted detailed inquiry of the accused to determine if he knowingly and voluntarily agreed to it, and whether he understood the implications of his waiver. The reasoning in this case may be impacted by the new waiver/forfeiture rules in R.C.M. 905(e).

View Topic History

15. **Forum selection (military judge alone)**. Practitioners should be aware that under the 2016 MJA, there is no longer a default panel composition. It is unlikely that this change would impact the line of cases involving waiver of any panel right in a request for trial by judge alone. However, the reasoning in this case may be impacted by the new waiver/forfeiture rules in R.C.M. 905(e). *United States v. Burnell*, 40 M.J. 175 (C.M.A. 1994). Government would not agree to a two-year sentencing limitation unless accused waived members. Accused's voluntary and intelligent waiver did not violate public interest. See also *United States v. Andrews*, 38 M.J. 650 (A.C.M.R. 1993). Government indicated during pre-trial negotiations that if accused elected trial with members, "then the quantum portion would be higher than if we went with military judge alone." Court ruled, "[W]e hold that the absence in R.C.M. 705 now permits the government to propose as a term of the pretrial agreement, that

Criminal Law Deskbook > 15. Plea Agreements

that the change to R.C.M. 705 now permits the government to propose as a term of the pretrial agreement, that the [accused] elect trial by military judge alone, and the amount of the sentence limitation may depend on that election." See also *United States v. McClure*, A.C.M.R. No. 9300748 (A.C.M.R. Nov. 23, 1993) (unpub.) (convening authority's handwritten counter-offer on pretrial agreement stated: "The foregoing is accepted only if the accused elects to be tried by military judge alone."). But see *United States v. Young*, 35 M.J. 541 (A.C.M.R. 1992) (Appellate courts might invalidate a pretrial agreement if accused asserts (s)he was "coerced" into waiving trial by members.) Ultimately, a variance or command policy, such as standardized pretrial agreements, which undermines the legislative intent of Article 18 "will be closely scrutinized." But, agreements are permissible if waivers contained in them are a "freely conceived defense product." *United States v. Zelenski*, 24 M.J. 1 (C.M.A. 1987).

16. When applicable, a provision requiring that the sentences to confinement adjudged by the military judge for two or more charges or specifications be served concurrently or consecutively.  R.C.M. 705(c)(2)(F).

B. **Prohibited Terms/Conditions**

1. Terms which are not voluntarily.

2. Terms which deprive the accused of certain Constitutional protections, such as: the right to counsel; the right to due process; the right to challenge the jurisdiction of the court-martial; the right to a speedy trial; the right to complete sentencing proceedings; and the complete and effective exercise of post-trial and appellate rights.

a) **Complete sentencing proceedings (request BCD).**  This prohibited term is likely to be the most hotly litigated term under the 2016 MJA because of the likely tendency that direct sentence limitations will have to truncate sentencing proceedings.  See R.C.M. 705(d).  In the event the military judge has no discretion to decide upon a sentence that deviates from the one agreed upon by the convening authority and the accused, this issue is likely to come up on appeal.  Under pre-existing case law, a term cannot term the sentencing proceeding into an "empty ritual."  *United States v. Davis*, 50 MJ 426 (CAAF 1999)("A fundamental principle underlying this Court's jurisprudence on pretrial agreements is that "the agreement *cannot transform the trial into an empty ritual."*)(citing *United States v. Allen*, 8 USCMA 504, 507 (1957).

(1) *United States v. Libecap*, 57 M.J. 611 (C.G. Ct. Crim. App. 2002). Accused contended that the pretrial agreement, requiring him to request a bad conduct discharge at trial, was unenforceable. The appellate court concluded that R.C.M. 705(c)(1) prohibited the provision because it deprived the accused of a complete sentencing proceeding by negating the value of putting on a defense sentencing case. Moreover, the requirement to request a bad conduct discharge improperly placed the accused in the position of either giving up a favorable pretrial agreement or forgoing a complete sentence proceeding. The provision was against public policy for similar reasons. The accused was prejudiced by the provision, even though he had not requested a bad conduct discharge at trial, because he was precluded from telling the military judge that he wanted a second chance and from arguing for a sentence that did not include a punitive discharge. Since the accused had specifically stated that the error did not affect the voluntariness of his pleas, the appellate court determined that the appropriate remedy was a rehearing on sentence.

b) **Waive speedy trial.**

(1) *When issue not raised by facts.*  The language of RCM 705 prohibits waiver of a speedy trial.  R.C.M. 707 specifies speedy trial rights in the military.  *United States v. McLaughlin*, 50 M.J. 217 (C.A.A.F. 1999) addresses a case where the accused offered to waive a speedy trial issue in his pretrial agreement. The accused had been in pretrial confinement for 95 days.  The accused later claimed that waiver was impermissible under R.C.M. 705.  CAAF held that under the MCM this waiver was unenforceable.  The  military judge should have declared it impermissible, upheld the remainder of the agreement, and then asked the accused if he wished to litigate the issue.  The military judge did not do that, so the case was unclear as to whether the accused would have waived the issue anyway, even without a PTA.  Nevertheless, the accused did not make a prima facie showing or colorable claim of a speedy trial violation.  Despite the 95-day delay, the accused failed to show prejudice, that he had demanded trial, or that the amount of time to investigation was unreasonable. The reasoning in this case may be impacted by the new waiver/forfeiture rules in R.C.M. 905(e).

(2) *When issue raised by facts.*  The accused had been in pretrial confinement for 117 days at the time of arraignment.  Accused offered to waive all non-constitutional and non-jurisdictional motions. The military judge determined there was a speedy trial issue, and that the term was proposed by the government. The court held that there was a colorable speedy trial claim and that waiver was not harmless error. Finding and sentence set aside.  *United States v. Benitez*, 49 M.J. 539 (N.M. Ct. Crim. App. 1998).  The reasoning in this case may be impacted by the new waiver/forfeiture rules in R.C.M. 905(e).

3. **Term involving individual military counsel.**  Agreement to an increase in the confinement cap from 12 to 13 months to allow a delay so the accused could obtain individual military counsel "inferentially implicated appellant's right to individual military counsel," and violated public policy. Court reassessed sentence and affirmed only 11 months confinement. *United States v. Cogley*, No. 20011015 (A. Ct. Crim. App. Feb. 26, 2004) (unpub.).

4. **Waiver of clemency or parole.**  A PTA term limiting the accused's right to clemency or parole violates the R.C.M. 705(c) right to a complete and effective exercise of post-trial and appellate rights. *United States v. Tate*, 64 M.J. 269 (C.A.A.F. 2007). In that case, the accused agreed to decline any clemency or parole offered to him for a period of twenty years. The MJ sentenced the accused to life without parole but the PTA limited the accused's confinement to fifty years, which, but for his PTA term, would have made him eligible for clemency in five years and parole in ten years. Allowing such a term would improperly impede the ability of service secretaries to exercise their clemency and parole powers, "as well as ultimate control of sentence uniformity" throughout their respective service. CAAF struck the PTA's specific term but ruled the stricken term did not impair the balance of the agreement and the plea. See also *United States v. Thomas*, 60 M.J. 521 (N-M. Ct. Crim. App. 2004) (violating public policy where PTA precluded an accused from accepting clemency and the accused's sentence could include death and required a mandatory minimum of confinement for life).  The reasoning in this case may be impacted by the new waiver/forfeiture rules in R.C.M. 905(e).

5. **Terms which deprive the accused of a complete sentencing proceeding.**  It is permissible to waive personal appearance of sentencing witnesses, so long as other methods are available for presenting that evidence to the factfinder (like telephonic testimony or stipulations of expected testimony).  A term, originating with accused, that prohibited accused from presenting testimony of witnesses located outside of Hawaii either in person, by telephone, letter, or affidavit, violated public policy because it impermissibly deprived the accused of a complete sentencing proceeding.  *United States v. Sunzeri*, 59 M.J. 758 (N-M. Ct. Crim. App. 2004).

6. The military judge of a general or special court-martial shall reject a plea agreement that (1) contains a provision that has not been accepted by both parties; (2) contains a provision that is not understood by the accused; (3) contains a provision for a sentence that is less than the mandatory minimum sentence (with exceptions);(4)

View Topic History

is prohibited by law; or (5) is contrary to, or is inconsistent with, a regulation.  M.C.M. Art. 53a.

**7. Terms which are fundamentally unfair.**

a) **Terms which incentivize counterintuitive sentencing argument.**  Accused pled guilty in exchange for a pretrial agreement which would suspend an adjudged bad-conduct discharge, provided confinement for more than four months was adjudged. Confinement adjudged was for less than four months, and convening authority did not suspend the discharge. Agreement found to be contrary to public policy and fundamentally unfair.  *United States v. Cassity*, 36 M.J. 759 (N.M.C.M.R. 1992).

b) **Retirement eligibility.**  A provision requiring the accused not to request transfer to the reserves if a punitive discharge was not adjudged violated public policy based on the accused's eligibility for retirement.  *United States v. Schmelze*, No. 200400007, 2004 CCA LEXIS 148 (N-M. Ct. Crim. App. July 14, 2004) (unpub)

c) **Immunity/Court "tax."**  Pretrial agreement in which the quantum portion was increased if the accused raised claims of de facto immunity encumbered the accused's due process right to challenge the jurisdiction of the court-martial. The litigation of non-frivolous claims of lack of jurisdiction and immunity are not the proper subjects for plea bargaining.  *United States v. Conklan*, 41 M.J. 800 (A. Ct. Crim. App. 1995).

d) **Impartial tribunal.**  Improper to have accused waive military judge's disqualification in pretrial agreement after judge's impartiality is reasonably questioned.  *United States v. Keys*, 33 M.J. 567 (N.M.C.M.R. 1991).  The reasoning in this case may be impacted by the new waiver/forfeiture rules in R.C.M. 905(e).

## C. Problematic Terms/Conditions

**1. Waive all waivable motions.**  A "waive all waivable motions" provision raises an issue as to whether the accused *knowingly waived* the issue. While it is legally permissible and may have the impact of waiving motions not specifically articulated, it may also result in a prolonged discussion between the judge, the accused, and the accused's counsel.  Under R.C.M. 910(f)(4), the military judge must ensure the accused understands the pretrial agreement. If the accused and counsel did not anticipate a motion at trial, yet purported to waive all motions, the waiver of the unanticipated motion was arguably unknowing. In *Gladue*, the court addressed this issue.  The accused pled guilty pursuant to a pretrial agreement agreeing to "waive any waiveable [sic] motions." At trial, military judge asked the defense what motions were waived by this provision; defense counsel stated the only contemplated motions were for a continuance, suppression of evidence, change of venue, and entrapment.  On appeal (and for the first time), the accused argued multiplicity or, alternatively, unreasonable multiplication of charges. The CAAF found the accused waived those issues in the pretrial agreement. Implicit in the court's reasoning was that the facts giving rise to a motion for multiplicity or unreasonable multiplication of charges were known at the time of the plea.  Even though counsel did not list those motions as being waived, the accused in fact waived the right to make that motion in the PTA, and also by not raising them at trial.  The court found that "if an accused waives a right at trial, it is "extinguished" and will not be reviewed on appeal." *United States v. Gladue*, 67 M.J. 311 (C.A.A.F. 2009).

Despite the CAAF's decision in *Gladue*, military judges, in an abundance of caution, should ask defense counsel what specific motions are being waived under a "waive all waivable motions" provision. This practice precludes challenges on appeal that an accused was unaware of other motions or (more problematic) believed he was waiving a non-waivable motion (like speedy trial).  Additionally, judges should be aware of the new waiver/forfeiture rules in R.C.M. 905(e).

Practitioners should also review *United States v. Rivera*, 46 M.J. 52 (C.A.A.F. 1997), affirming 44 M.J. 527 (A.F. Ct. Crim. App. 1996) (term in PTA which required that accused waive "all pretrial motions" was too broad, and purported to deprive accused of right to make motions that could not be bargained away); *United States v. Jennings*, 22 M.J. 837, 838-39 (N.M.C.M.R. 1986) (provision in pretrial agreement to "waive any pretrial motion I may be entitled to raise" is "null and void" as "contrary to public policy"); and *United States v. Silva*, 1997 CCA LEXIS 267 (N-M. Ct. Crim. App. 1997) (unpub.) (Term in PTA, which required accused to "waive all waiveable motions" not contrary to public policy and R.C.M. 705(c)(1)(B). Such a term does not include motions that are non-waivable under R.C.M. 705(c)(1)(B)).

**2. Testifying without immunity.**  A PTA is valid where, *inter alia*, the accused promised to testify without grant of immunity against any other military members and where the MJ questioned the accused extensively during providence.  *United States v. Profitt*, 1997 CCA LEXIS 117 (A.F. Ct. Crim. App. Apr. 4, 1997) (unpub.).  *See also United States v. Rivera*, 46 M.J. 52 (C.A.A.F. 1997), affirming 44 M.J. 527 (A.F. Ct. Crim. App. 1996) (term which required accused to "testify in any trial related in my case without a grant of immunity" did not violate public policy, under facts of this case as accused had not yet been called to testify).

**3. Waive any and all defenses where no defenses existed.**  A term which required the accused to waive his right to "any and all defenses" did not violate R.C.M. 705 or public policy. The accused was charged with attempted housebreaking, attempted larceny, violation of a lawful general regulation, and aggravated assault. Requirement to waive all defenses was not overly broad, considering that the accused failed to raise any defense during the providence inquiry or sentencing.  *United States v. Forrester*, 48 M.J. 1 (C.A.A.F. 1998).  The reasoning in this case may be impacted by the new waiver/forfeiture rules in RCM 905(e).

**4. Vacation of suspension term.**  Government argued that a term in the PTA permitted the SPCMCA to execute vacation of suspension without forwarding the case to GCMCA for action. Court held that although PTA does not indicate that accused wanted to waive those rights; Congressional intent was to grant accused an important procedural due process right for vacation actions and it is doubtful whether such rights are waivable. *United States v. Perlman*, 44 M.J. 615 (N-M. Ct. Crim. App. 1996), 48 M.J. 353 (C.A.A.F. 1998) (sum. disp.) (affirming but expressing no opinion on whether term was lawful).  *See also United States v. Smith*, 46 M.J. 263 (C.A.A.F. 1997) holding that PTA term providing for vacation proceedings and processing under Article 72 and R.C.M. 1109 in the event of future misconduct cannot be interpreted as waiver of the GCMCA's authority to review and take action on vacation).

View Topic History

**5. Confessional Stipulations.**

a) **Problematic.**  Accused offered a PTA in which he agreed to plead not guilty and, in exchange for a sentence limitation, to enter into a confessional stipulation and present no evidence. The stipulation admitted basically all elements of the offenses except the wrongfulness of marijuana use and the intent to defraud concerning the bad check offenses. CAAF found the provision violated the prohibition against accepting a confessional stipulation as part of a pretrial agreement promising not to raise any defense.  *United States v. Davis*, 50 M.J. 426 (C.A.A.F. 1999).

b) **Limitations on use.**

(1) If the accused fails to satisfy the military judge's inquiry into the providency of his plea, a confessional stipulation may be used at trial with consent of the accused. Otherwise military judge would not be at liberty to consider matters presented in the unsuccessful attempt to plead guilty. *United States v. Matlock*, 35 M.J. 895 (A.C.M.R. 1992). Prosecution could receive the benefit of the stipulation without the concomitant limitations of the pretrial agreement. See *United States v. Cunningham*, 36 M.J. 1011 (A.C.M.R. 1993).

(2) Unless otherwise agreed to by the accused, confessional stipulation in connection with guilty pleas may not be considered by military judge as to those charges to which accused has pled not guilty (contested charges). *United States v. Banks*, 36 M.J. 1003 (A.C.M.R. 1993). Confessional stipulation is the equivalent of entering a guilty plea to a charged offense; accused must knowingly and voluntarily consent to any use of stipulation beyond the limited purpose of facilitating providence inquiry. *United States v. Rouviere*, No. 9200242 (A.C.M.R. Aug. 24, 1993) (unpub.).

(3) *United States v. Craig*, 48 M.J. 77 (C.A.A.F. 1998). Military judge erred by advising the accused that her confessional stipulation (which contained facts substantiating both guilty and not guilty pleas to drug offenses) waived her constitutional rights against self-incrimination, to a trial of by the facts, and to confront and cross-examine witnesses against her.

(4) *United States v. Dixon*, 45 M.J. 104 (C.A.A.F. 1996). Where a stipulation leaves room for the defense to reasonably contest certain elements, and the defense in fact does so, a stipulation is not confessional. Accused entered mixed pleas to stealing mail. He entered into a stipulation of fact, in conjunction with his pretrial agreement, regarding two uncontested specifications, and the Government presented evidence on the remaining two specifications. Specification 3 involved a larceny of mail matter. The stipulation established that accused removed mail matter from its lawful place and did not intend to return the mail matter to the addressee. There was no requirement to do a *United States v. Bertelson*, 3 M.J. 314 (C.M.A. 1977) inquiry. The stipulation was not "confessional" because it did not effectively establish an express admission that accused's removal of mail matter was done with an intent to steal.

VII. REMEDIES

A. **General.** The remedy for a breached PTA depends on the breach. Depending on the issue, withdrawal, specific performance, or rescission may be available. Additionally, an unenforceable term may be declared void.

B. **Unenforceable Terms. The usual remedy is to declare the term void and unenforceable.** Whether the remainder of the PA remains enforceable depends on the existence and language of any severance clause in the PA. See generally *United States v. McLaughlin*, 50 M.J. 217 (C.A.A.F. 1999) (a term requiring accused to "waive the speedy trial issue" is impermissible under R.C.M. 705(c)(1)(B) and the military judge should have declared it void and unenforceable, while upholding the rest of the agreement; judge should have also asked the accused if he wanted to raise the issue).

C. **Specific performance.**

1. *United States v. Lundy*, 60 M.J. 52 (C.A.A.F. 2004). Accused entered into PTA term, whereby the convening authority agreed to defer any and all reductions and forfeitures until the sentence was approved and suspend all adjudged and waive any and all automatic reductions and forfeitures. For sexually assaulting his children, the accused (a SSG) was sentenced to a DD, confinement for 23 years, and reduction to E-1, which subjected him to automatic reduction and forfeitures.

The convening authority attempted to suspend the automatic reduction IAW the PTA to provide the accused's family with waived forfeitures at the E-6, as opposed to the E-1, rate. The parties, however, overlooked AR 600-8-19 which precludes a CA from suspending an automatic reduction unless the convening authority also suspends any related confinement or discharge which triggered the automatic reduction. ACCA stated no remedial action was required because the accused's family was adequately compensated with transitional compensation (TC), which ACCA concluded the accused's family was not entitled to because they were receiving waived forfeitures, albeit at the E-1 rate.

CAAF reversed, holding if a material term of a PTA is not met by the government, three options exist: (1) the government's specific performance of the term; (2) withdrawal by the accused from the PTA, or (3) alternative relief, if the accused consents to such relief. Additionally, CAAF held an accused's family could receive TC while receiving either deferred or waived forfeitures if the receipt of TC was based on a discharge and if the receipt of TC was based only on the accused receiving forfeitures, the family could receive TC if not actively receiving the deferred or waived forfeitures. On remand, ACCA, ruled specific performance was "more appropriate because the [accused] has not indicated he would consent to any particular alternative relief." In January 2005, the Secretary of the Army (SECARMY) granted an exception to AR 600-8-19 allowing the suspension of the rank reduction and the provision of forfeitures at the E6 rate without requiring the CA to suspend the discharge or confinement triggering the automatic reduction. SECARMY did not approve interest on the E6 forfeiture amount and ACCA ruled it did not have the authority to provide the approximately $3,000 in interest on the original amount owed to the accused and remanded the case to the SA to approve the interest payment or to otherwise return the case to ACCA to set aside the findings and sentence.

In Fall 2005, SECARMY made the interest payment. In Summer 2006, CAAF issued another Lundy opinion, holding that the accused bore the burden to show that the timing of the payment was material to his decision to plead guilty.

2. *United States v. Perron*, 58 M.J. 78 (C.A.A.F. 2003). In *Perron*, the accused agreed to plead guilty in exchange for sentence limitations that included pay and allowances going to his family. However, prior to trial the accused's term of service expired and once convicted he entered into a no-pay status. As a matter of clemency the accused's counsel asked the convening authority to release Perron from confinement "to gain immediate employment . . . to allow for the financial relief his family desperately needs." The convening authority did not grant the request, opting instead to grant alternative relief. A tortured set of appeals and remands followed concerning the adequacy of the alternative relief. The issue that finally reached CAAF was whether convening authorities and appellate courts may "fashion an alternative remedy of [their] own choosing" against the accused's wishes. CAAF said no: "It is fundamental to a knowing and intelligent plea that where an accused pleads guilty in reliance on the promises made by Government in a pretrial agreement, the voluntariness of that plea depends on the fulfillment of those promises by the Government . . . Imposing alternative relief on an unwilling [accused] to rectify a mutual misunderstanding of a material term in a pretrial agreement violates the [accused]'s Fifth Amendment Right to due process."

View Topic History

**D. Withdrawal.** *United States v. Sheffield*, 60 M.J. 591 (A.F. Ct. Crim. App. 2004). Accused pled guilty to numerous military offenses and was sentenced to a BCD, four months confinement, and reduction to E-1. The accused's PTA contained a term that the CA would "waive automatic forfeitures in the amount of five hundred dollars, which sum was to be paid to the guardian appointed by the accused to care for his minor dependents." The SJAR failed to mention this term and the CA did not pay the five hundred dollars to the accused's dependents. On appeal, the accused requested the court to disapprove his adjudged BCD, or in the alternative, to allow him to withdraw from the plea. The government contended specific performance was appropriate. AFCCA held the government could not specifically perform because the accused could not receive the benefit of his PTA bargain (for his dependents to receive five hundred dollars per month during his incarceration). Likewise, the court failed to approve the accused's request to disapprove his BCD because the government did not agree to the alternative relief. The original PTA was null and findings and sentence set aside.

## VIII. POST-TRIAL ISSUES AND EFFECTS

A. Article 53a of the 2016 MJA does not contemplate post-trial agreements. However, because convening authorities still have clemency powers they can exercise apart from an agreement under Article 53a, it is possible that post-trial agreements could continue to arise under the limited powers still articulated in Article 60. The following paragraphs relate explicitly to the legacy system.

B. **[Legacy] Approved sentence not explicitly conforming to the terms of the pre-trial agreement.** Generally, convening authority action not conforming explicitly to the terms of the PTA may be acceptable if the approved sentence is of lesser severity than the one agreed to in the PTA.

1. *Suspended sentences.* *United States v. Barraza*, 44 M.J. 622 (N.M. Ct. Crim. App. 1996) (extending suspension of confinement from 12 months (agreed) to 36 months (approved) did not increase severity of sentence where the CA also decreased unsuspended confinement from 46 months (agreed) to 14 months (approved)); *United States v. Hayes*, No. 9002521 (A.C.M.R. Aug. 29, 1991) (unpub). In pretrial agreement, convening authority would suspend for 12 months any confinement over 20 months. The adjudged sentence was confinement for 5 years, total forfeiture of all pay and allowances, reduction to E-1, and dishonorable discharge. At action, convening authority approved confinement for 36 months (confinement over 18 months suspended for 18 months), TF, reduction to E-1, and dishonorable discharge. HELD: Reducing confinement by two months and increasing the period of suspension by six months is more favorable to the accused than the pretrial agreement, so action was proper.

2. *Forfeitures.* *United States v. Sparks*, 15 M.J. 895 (A.C.M.R 1983) (approving adjudged sentence which included an additional two months forfeiture of pay was less severe than the PTA where the confinement adjudged was also two months less than the PTA)

3. *Discharges.* *United States v. Barratt*, 42 M.J. 734 (A. Ct. Crim. App. 1995). No PTA. Adjudged sentence was 16 months confinement, total forfeiture of all pay and allowances, and reduction to E-1. Accused requested convening authority substitute bad-conduct discharge for reduction in confinement to 6 months. At action, convening authority approved new sentence of bad-conduct discharge and 6 months confinement. HELD: CA may not approve a punitive discharge when punitive discharge not adjudged at trial. Punitive discharge, as a matter of law, is not a LIO punishment to confinement. See 10 U.S.C § 3811.

C. **[Legacy] Post-Trial Agreement.** It is permissible for the accused and convening authority to enter into a post-trial agreement, even though this eliminates any judicial scrutiny of the agreement, as would happen at trial.

1. *Renegotiation of Pre Trial Agreement.* *United States v. Pilkington*, 51 M.J. 415 (C.A.A.F. 1999). An accused has the right to enter into an enforceable post-trial agreement with the convening authority when the parties decide that such an agreement is mutually beneficial. Accused pled guilty to conspiracy to maltreat subordinates, maltreatment, false official statements, and assault. In a pretrial agreement, the convening authority agreed to suspend the bad-conduct discharge for 12 months. Accused and the convening authority agreed, in a post-trial agreement, that the latter could approve the punitive discharge as long as he "limited confinement to 90 days." On appeal, the accused argued that the post-trial agreement should be invalidated because it prevented judicial scrutiny of the terms and conditions. The court refused to invalidate the agreement, noting that the accused proposed the agreement after full consultation with counsel, stated that he voluntarily entered the agreement, and the post-trial agreement was directly related to the convening authority's obligations under the sentencing provisions of the pretrial agreement. Additionally, the court held that while the trial court did not review the post-trial agreement, the intermediate appellate court always have the opportunity to review such agreements. *Post-Trial Agreement.* *United States v. Dawson*, 51 M.J. 411 (C.A.A.F. 1999). Accused and CA agreed to a PTA in which they first 30 days of any adjudged punishment would be converted into 15 days' restriction. Confinement in excess of 30 days would be suspended. The accused received 100 days confinement and a BCD. She was placed on restriction, missed a muster, and was notified of pending vacation proceedings. She went AWOL, but was later apprehended and placed in confinement. Accused entered a new agreement with the CA where she agreed to waive the right to appear at a hearing to vacate the suspension of her sentence (the SJA had opined the one held in her absence was illegal), to waive any claims she might have concerning post-apprehension confinement, and to release the CA from the prior agreement. In return, the CA would withdraw the new absence charge, and provide day-for-day credit toward her time served in "pretrial confinement" (on the new charge). The SJA advised that, based on the errors that occurred in the first trial, he should disapprove all confinement. The CA approved the BCD and disapproved the confinement. CAAF held that this was a valid post-trial agreement that did not involve post-trial renegotiation of an approved PTA. The agreement related to proceedings collateral to the original trial, and did not require the approval of a military judge.

D. Court-martial convening authorities will consider whether the offender has made restitution to the victim when taking post-trial action. AR 27-10, para. 17–6.c (Interim, 1 Jan 19).

View Topic History

---

**Contribute to the Digital Deskbook!**

---

Submit your comments  here for evaluation by the TJAGLCS Criminal Law Department and possible fast-track in-clusion in the Digital Deskbook!

The Judge Advocate General's Legal Center & School

600 Massie Rd Charlottesville, VA 22903

Accessibility/Section 508    FOIA    External Links Disclaimer    No FEAR Act    Privacy Program

**CONTACT US**

Main Reception Desk:
(434) 971-3300
Lodging:
(434) 972-6450



**SCHOOL DEPARTMENTS**

Administrative & Civil Law
Criminal Law
Contract & Fiscal Law
National Security Law
Leadership
Warrant Officer Education

**LEGAL CENTER**

Future Concepts Directorate
Training Developments Directorate
Center for Law and Military Operations

**NCOA & 27D AIT**

Resident NCOA
Online Paralegal
27D AIT

View Topic History

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

1  COUNSEL;

2              MS. CHERYL BORMANN, CIVILIAN LEARNED

3  DEFENSE COUNSEL.

4          Your Honor, I have a note that Major William

5  Hennessy, Detailed Defense Counsel, is detailed but not

6  present.

7      DC [CPT SCHWARTZ]:  Hennessy is present.

8      MJ [COL POHL]:  So I'm clear.  Here currently, I will go

9  through the counsel rights -- is Major Hennessy and Captain

10  Schwartz are detailed counsel --

11      DC [CPT SCHWARTZ]:  Both detailed.

12      MJ [COL POHL]:  -- and Ms. Bormann, learned counsel for

13  Mr. Walid Mohammad Salih Mubarak Bin'Attash.

14      TC [BG MARTINS]: As to Ramzi Binalshibh:

15              LIEUTENANT COMMANDER KEVIN BOGUCKI,

16  DETAILED DEFENSE COUNSEL;

17              AND MR. JAMES HARRINGTON, CIVILIAN LEARNED

18  DEFENSE COUNSEL.

19          As to Ali Abdul Aziz Ali:

20              LIEUTENANT COLONEL STERLING THOMAS,

21  DETAILED DEFENSE COUNSEL;

22              AND MR. JAMES CONNELL, CIVILIAN LEARNED

23  DEFENSE COUNSEL.

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

8

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

1           As to Mustafa Ahmed Adam al Hawsawi:

2                COMMANDER WALTER RUIZ, DETAILED DEFENSE

3    COUNSEL, ALSO SERVING AS LEARNED COUNSEL.

4           All other members are absent.

5           Court reporters have been detailed reporters for

6    this Commission and have been previously sworn.

7        MJ [COL POHL]:  As Chief Judge of the Military

8    Commissions Trial Judiciary I detailed myself to this case.

9    Previously sworn in accordance with R.M.C. 807.  I'm certified

10   qualified in accordance with Articles 26 Bravo and Charlie and

11   42 Alpha, Uniform Code of Military Justice, as well as Rule

12   For Military Commissions 503.

13          The court security officer has been previously

14   sworn in accordance with Rule 10, Military Commissions Rules

15   of court.

16          Each of the accused will now be advised of their

17   rights to counsel and elect how they wish to be represented.

18   Mr. Nevin, so I'm clear before I talk to Mr. Mohammad, you are

19   learned counsel in this case; and Captain Wright is detailed

20   counsel; Major Poteet is other detailed counsel, correct?

21       DC [MR. NEVIN]:  That's correct, Your Honor.

22       MJ [COL POHL]:  Mr. Connell?

23       DC [MR. CONNELL]:  James Connell on behalf of Mr. Ali.

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

UNCLASSIFIED//FOR PUBLIC RELEASE

1      DMTC [MR. DYKSTRA]:  Thank you.

2      MJ [Col McCALL]:  Do any defense counsel have questions for

3  this witness?

4      Apparently not.

5      All right.  You're excused.  Thank you for your testimony.

6      WIT:  Thank you, Your Honor.

7  **[The witness was excused and withdrew from the courtroom.]**

8      MJ [Col McCALL]:  The commission finds that Mr. Bin'Attash,

9  Mr. Ali, and Mr. al Hawsawi have knowingly and voluntarily waived

10  their right to be present at today's session, although it sounds like

11  Mr. Ali and Mr. Bin'Attash may join us later this afternoon.

12      All right.  Before we get started, I'd like to summarize the

13  last R.M.C. 802 conference that we had.  It's been a while since

14  we've had an open session.

15      So on 22 July of 2024, the commission conducted a brief

16  administrative conference with counsel for the prosecution and each

17  of the defense teams to discuss scheduling matters.  We primarily

18  discussed changes to the scheduling of witnesses and potential ex

19  parte presentations.  Thereafter, the commission issued an amended

20  docket order that reflected the changes that were discussed.

21      Anything to add or correct to my summary of that 802?

22      Apparently not.

23      All right.  Throughout this week, the commission has been

UNCLASSIFIED//FOR PUBLIC RELEASE

1  receiving classified testimony in closed sessions from the first Camp

2  VII commander.  That testimony concluded yesterday afternoon.

3       Although the commission had intended to begin hearing

4  unclassified testimony from Special Agent Maria Jocys yesterday

5  afternoon, the commission did not so after being informed that there

6  had been some developments in regard to a possible pretrial agreement

7  with some of the accused in this case.

8       So today we'll do some housekeeping, address some of those

9  issues, and then I intend to go forward with the open testimony of

10 Special Agent Jocys.

11      All right.  Anything from the parties?

12      Mr. Trivett?

13      MTC [MR. TRIVETT]:  Yes, sir.

14      Sir, I rise to announce that the convening authority has

15 reached pretrial agreements in this case with Mr. Khalid Shaikh

16 Mohammad, Mr. Walid Bin'Attash, and Mr. Mustafa al Hawsawi.

17      The signed pretrial agreements will be filed this morning

18 under the following appellate exhibit numbers:

19      The pretrial agreement for Khalid Shaikh Mohammad will be

20 AE 955 (Gov).

21      The pretrial agreement for Walid Bin'Attash will be AE 956

22 (Gov).

23      And the pretrial agreement for Mr. Mustafa al Hawsawi will

UNCLASSIFIED//FOR PUBLIC RELEASE

**JA.220**

1  be 957 (Gov).

2        I've consulted with the three defense teams for these three

3  accused, and we will be jointly seeking that the pretrial agreements

4  be filed under seal until the assembly of the members, and that the

5  sealing order be from the general public, with the notable exception

6  that the prosecution has obligations under DoD instructions, attorney

7  general instructions, and criminal law to continue to consult with

8  victim family members on the pretrial agreement to answer any

9  questions they may have.  So that's going to be excepted out from the

10  request for the sealing order.

11        All of this will be provided with the filings this morning

12  with the pretrial agreements.

13        MJ [Col McCALL]:  All right.  So let me stop you there and ask

14  some clarification.

15        So when you're asking that the pretrial agreements be filed

16  under seal until assembly, before we can get to assembly, I'm going

17  to have to go through a guilty plea inquiry with the accused where

18  I'm going to be going line by line ----

19        MTC [MR. TRIVETT]:  Yes, sir.  That's ----

20        MJ [Col McCALL]:  ---- and that's fine in an open session.

21  It's just the idea is not that the -- is that the written documents

22  be kept under seal ----

23        MTC [MR. TRIVETT]:  Yes, sir.

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

1      MJ [Col McCALL]:  ---- but they can be disclosed in an open

2  session?

3      MTC [MR. TRIVETT]:  Yes, sir.

4      MJ [Col McCALL]:  Okay.

5      MTC [MR. TRIVETT]:  All right.  We're also going to seek to

6  docket, for the plea entry, Mr. Mohammad next Wednesday;

7  Mr. Bin'Attash potentially following that on Thursday, although the

8  parties are still working and it's at least possible they may ask for

9  it to be together.  That will be a -- something that we continue to

10 talk to the defense counsel about over the next couple of days.

11 Mr. Hawsawi has asked to enter his plea in the first week of the

12 September hearings.

13      And so we would ask that the military judge docket those

14 entry-of-plea sessions.

15      MJ [Col McCALL]:  All right.  So the issue with attempting to

16 do the guilty plea next week -- and I'm not saying it's not possible.

17 I think the parties may be a little optimistic.

18      Just having looked at what other commissions have gone

19 through on having a care inquiry with an accused on cases that I feel

20 are much simpler still were very convoluted and took quite a bit of

21 time.

22      And I've looked at the transcripts on those proceedings and

23 some of the issues that, again -- and for accepting a guilty

UNCLASSIFIED//FOR PUBLIC RELEASE

1  plea -- again, it's rife with many issues that can -- ambiguities

2  that, if they're not clarified at that stage, are then going to lead

3  to further problems that could delay a potential sentencing.

4         So I'm not saying no.  But just for expectation management,

5  I need the parties to understand my staff and I will work through the

6  weekend and do everything we can to be ready for next week, but we'll

7  see.  I haven't had a chance to look at these pretrial agreements.

8         MTC [MR. TRIVETT]:  Yes, sir.

9         MJ [Col McCALL]:  I need to digest them, and I'm sure there's

10 going to be many questions that I'm going to have the parties that

11 I'm going to need answers for before we can go forward.

12        I mean, the one that first comes to mind, just from the

13 brief description that the parties had mentioned before about the

14 potential pretrial agreements, I know the government, I believe, had

15 said that perhaps motions were being waived as part of the agreement.

16        So then that asks -- that asks the question of what motions

17 are waivable, which I'm going to need the parties to be prepared to

18 address that.  I'm planning on putting out something asking for some

19 clarification on that.

20        And, again, so I'm not saying no, but I need to look at the

21 pretrial agreements before I can promise you that we can go next

22 week.

23        MTC [MR. TRIVETT]:  Yes, sir.  Understood.  And we're

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

1  going -- working to get those filed ----

2       MJ [Col McCALL]:  Okay.

3       MTC [MR. TRIVETT]:  ---- as soon as we can this morning, and

4  so hopefully your staff will have it.

5       The parties are also going to work together on a potential

6  trial guide, and including in Arabic, for the commission's

7  consideration.

8       We're also considering filing a joint filing that was

9  similar to one that was filed in one of the recent cases that just

10 took pretrial agreements as far as our position on the necessity of a

11 full care inquiry under the Military Commissions Act.

12      MJ [Col McCALL]:  Okay.

13      MTC [MR. TRIVETT]:  So we'll provide all of that to you within

14 the coming days.  You know, this is obviously coming together very

15 quickly now at the end of what's, you know, a four-week session.

16      MJ [Col McCALL]:  Sure.

17      MTC [MR. TRIVETT]:  So we're cognizant of that.  We're

18 cognizant of your need to prepare for this in advance, and we're

19 going to try to get you as much information as possible on this to

20 make it as seamless as possible for the commission's consideration.

21      MJ [Col McCALL]:  Perfect.  I also understand the reason that

22 the parties would want some alacrity with getting this done.  So all

23 right.

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

1        MTC [MR. TRIVETT]:  Yes, sir.

2        MJ [Col McCALL]:  What about Mr. Ali?  Have the parties

3   discussed the plan ----

4        MTC [MR. TRIVETT]:  We plan on proceeding -- we plan on

5   proceeding in a contested capital case against Mr. Ali, and we're

6   prepared to examine the witness that remains that Mr. Ali would like

7   to call today on his motion to suppress.

8        MJ [Col McCALL]:  All right.  And I guess what I'm getting

9   at -- I assumed that to be the case, but the question of severing

10  Mr. Ali from this case, holding off until after the guilty pleas are

11  accepted.  Again, I wanted to get the parties -- if there was any

12  positions on that issue before I made a decision.

13       MTC [MR. TRIVETT]:  I understand.  So we're not moving for

14  formal severance at this time of anyone.  Part of the pretrial

15  agreement does permit individual sentencing for Mr. Mohammad.

16       However, if something should happen before individual

17  sentencing, we believe that the joint referral would still apply and

18  that we would be able to rejoin them to wherever we are in the

19  process.

20       So that would be our position in that regard, that there is

21  no severance.  But at this point, with the waiver of all motions from

22  three of the four accused, they can't actively continue to

23  participate in any of the contested litigation based on the pretrial

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

1    agreement.

2         So Mr. Ali would be the only one who still has a plea of not

3    guilty having been entered and will continue to contest whatever

4    issues he wants to continue to contest.  But we don't see it as a

5    severed trial necessarily.  It's just that three have resolved

6    through plea, and that may advance through sentencing separately at

7    some point in the future.

8         MJ [Col McCALL]:  All right.  Understood.

9         Mr. Connell?

10    LDC [MR. CONNELL]:  Sir, our -- we see it pretty much the same

11    way.  There could be some nuances to that.  I don't know that the

12    other defendants should be required to appear for the first day of

13    each session anymore.  But, I mean, that seems like minor issues.

14         I would -- to me -- and they can say their own position, but

15    to me it seems like it would -- they would be in in some -- a

16    somewhat analogous position to Mr. Binalshibh at the moment, that

17    their attorneys should be able to observe; that if they wish to

18    observe, that they should be able to observe.

19         And it could be that they have a legal -- you know, they

20    haven't abandoned all legal rights by pleading guilty.  They may have

21    some legal position on something that happens that is separate from

22    pursuing relief under a motion.  They may have an objection or a

23    privilege or something else that they may wish to assert.

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

1        So it seems to me that they're still a part of the case,

2   just in a much different posture.

3        MJ [Col McCALL]:  All right.  And I agree with Mr. Trivett and

4   you, Mr. Connell.  That would be my way forward, that I see this

5   somewhat similar to Mr. Binalshibh.  Not quite, because that -- once

6   he was -- he was actually -- his case was severed off.

7        LDC [MR. CONNELL]:  Right.

8        MJ [Col McCALL]:  I seeing this being more akin to -- I know

9   we had the one time where Mr. Ruiz was unable to come down, and we

10  wanted to have oral argument, and so I proceeded on with oral

11  argument without him saying that they would be able to ask questions.

12       I think that's how I would go forward, is that if for some

13  reason I'm not able to accept a guilty plea from one of the accused

14  and we've gone on with witness testimony, I'm going to give that team

15  a chance to question that witness if they can demonstrate that they

16  actually have additional matters to present.

17       So that way I don't think that there's a reason for

18  the -- all the teams to be here every day if we're pressing on, which

19  is my intention with the Ali case.

20       MTC [MR. TRIVETT]:  Yes, sir.  Understood.

21       MJ [Col McCALL]:  All right.  Mr. Connell?

22       LDC [MR. CONNELL]:  Thank you, sir.

23       The other thing that I want to put into the scheduling mix

UNCLASSIFIED//FOR PUBLIC RELEASE

**JA.227**

1    is that the military commission had invited us to talk about the

2    remaining witnesses in this phase of the motion to suppress at one

3    point, and it seems like there is a mix -- that it is in the mix with

4    what days or however other things are going to be scheduled.

5        So I just wanted to lay out what our position on that is and

6    give you an update on what we think's going on with the witnesses.

7        MJ [Col McCALL]:  All right.

8        LDC [MR. CONNELL]:  All right.  So Jocys today, excellent.  I

9    think that we will finish by tomorrow, shouldn't be a problem.

10       Right now we have two witnesses scheduled for next week:

11   McFadden -- our cross-examination of McFadden, and WK5I.

12       I've looked at our cross-examination of McFadden, and it

13   would surprise me if the -- I think that the open part will be half a

14   day and the closed part will be less.  So I really think that we

15   could do McFadden in a day.  I don't know how that goes into the mix,

16   but it seems that that's possible.  He's also, as I understand it,

17   fairly easy to move around.

18       WK5I is different.  She's not easy to move around, that she

19   is committed to Thursday and Friday.  And the one thing that

20   Mr. Trivett and I haven't had a chance to discuss is how the idea of

21   a plea on Thursday would intersect with the hard scheduling of WK5I.

22   We haven't had a chance to discuss that yet.  I don't know what their

23   position is.  We don't want to do anything to interfere with the

UNCLASSIFIED//FOR PUBLIC RELEASE

1  pleas.  If things have to move, that's fine.

2          So the last observation I want to make is globally.  I think

3  you know that our position is that we are joined with others in

4  pushing as hard as possible to get to a place where the government

5  has called all of its case-in-chief witnesses on the motion to

6  suppress.

7          We still don't have any clarity from the government on

8  whether Dr. Welner is a case-in-chief witness or a rebuttal witness.

9  I am treating him at this point -- I'm assuming that he's a

10  case-in-chief witness, which means that really there are three

11  witnesses left that we have to cover in order to be on track for

12  arguments in November on the question of whether the government has

13  carried its burden of proof to demonstrate voluntariness.  That is

14  McFadden, who doesn't seem like too much of a problem; WK5I, who is a

15  scheduling issue but otherwise very doable; and then Dr. Welner.

16          I have told the government that we are willing and able to

17  call Dr. Hanrahan in advance of Dr. Welner if they want us to.  But

18  the most important thing from our point of view is clearing the

19  government's -- getting through the government's set of witnesses for

20  their case in chief on the motion to suppress.

21      MJ [Col McCALL]:  All right.  And that seems similar to how

22  I'm viewing things.

23          Mr. Trivett?

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

1          MTC [MR. TRIVETT]:  Right.  I would have to consult with

2    Mr. Connell, and we'll have to figure out the Dr. I piece of it.

3          MJ [Col McCALL]:  All right.  Yeah, I'm open.  I know that

4    next week seems fairly busy now to try to still handle Dr. WK5I and

5    Agent McFadden, but I'm open to attempting to doing that while we're

6    working on accomplishing the guilty pleas.

7          Yeah.  So if the parties can talk and let me know, again,

8    how long they think Dr. Hanrahan and Dr. Welner would take if we're

9    going to handle the two of them in the September/October session.

10         MTC [MR. TRIVETT]:  Yes, sir.

11         And just to clarify from the government's perspective, we

12   believe that we should prioritize the entry of pleas next week, but

13   we stand ready to do whatever the commission wants to do on the Ali

14   case.  So I want to make sure that that's clear.

15         MJ [Col McCALL]:  Yeah, and I think that's my position as

16   well, is I'd like to prioritize those.  But, again, having not had a

17   chance to look at the agreements, I think I'll have a better

18   understanding maybe by Friday on whether I think that is actually

19   doable.  And so I definitely don't want Agent McFadden and Dr. WK5I

20   turned off.

21         MTC [MR. TRIVETT]:  Yes, sir.  Understood.

22         MJ [Col McCALL]:  All right.  Anything else to take up before

23   we call Special Agent Jocys?

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

**JA.230**

1       MTC [MR. TRIVETT]:  Sir, if we could have maybe a 15-minute

2   break, we'll go get her from the trailer and then we'll work to file

3   those pretrial agreements.

4       MJ [Col McCALL]:  All right.  Let's do that.  Let's take an

5   open-ended recess.  I don't want to, like, push people and then we're

6   not ready to go on.

7       So let my staff know when you're ready to go back on and

8   we'll go from there.

9       All right.  The commission's in recess.

10  **[The R.M.C. 803 session recessed at 0929, 1 August 2024.]**

11  **[The R.M.C. 803 session was called to order at 1053, 1 August 2024.]**

12      MJ [Col McCALL]:  The commission is called to order.

13      Parties are present, to include Mr. Mohammad.

14      All right.  Just a -- I want to just clarify what we talked

15  about earlier this morning.  So going forward, when we're dealing

16  with, like, this witness and we're dealing with what would be part of

17  the Ali case, even though the other defense teams have not been

18  severed, I don't need to know that -- I'm going to continue on and

19  have hearings if the other defense teams are not present.

20      So I'm going to treat you just like we do with the

21  Binalshibh defense team.  If they're present in a closed session,

22  I'll put it on -- have them put it on the record.  But otherwise, I'm

23  not going to clarify on the record.

UNCLASSIFIED//FOR PUBLIC RELEASE

Any concerns or need for clarification?

I'm seeing head shakes.

All right. Anything to take up before we proceed with the witness?

Apparently not.

All right. If we can get ----

Yeah, Mr. Connell? I'm sorry. I can't see you there. Peripheral vision. Go ahead.

**[No audio feed.]**

MJ [Col McCALL]: We can't hear you. If we can get the mic turned on at the podium at the RHR.

Try again, Mr. Connell. All right. Go ahead.

LDC [MR. CONNELL]: Thank you, sir. Sorry, I'm behind a pole. I'm hard to see.

I wanted to ask about the scope of the sealing request this morning. I had understood that it would be sealed from the public, that -- not that the PTAs would be sealed from Mr. al Baluchi's defense team.

Could we have some clarity on that, what the military commission's intention was?

MJ [Col McCALL]: Well, I guess I'll first ask for a clarification from the parties.

What is the government requesting and the other defense

UNCLASSIFIED//FOR PUBLIC RELEASE

1    going to have.

2        And, again -- so I'm basing this on the fact that I've

3    looked at the record on the bin Amin and bin Lep guilty pleas and the

4    one for Mr. Hadi and how much problems that they had on the record.

5    I want to make sure that we have it clean and I want to make sure

6    that we actually do it right and focus on that.

7        Again, I'll -- I'll hear from the parties.  I understand the

8    urgency once there's an agreement that's been met and that wanting to

9    get it kind of solidified.  But I feel like if we speed on this

10   issue, we're going to end up causing us a lot more problems later as

11   we get into the -- further into the presentencing phrase.

12       But go ahead.

13   MTC [MR. TRIVETT]:  No, I understand.  So we had similar

14   concerns, and we think that there's a way to address those up front.

15       So this was the plan that we had come up with amongst the

16   defense teams, is that we move Special Agent McFadden and Dr. I to

17   the September hearings.  So we take them off the table.

18       We're going to have a proposal to the defense today what we

19   think the trial guide should like and supported by some law about not

20   requiring a full care inquiry and all of those things.

21       We did spend a lot of time on the Stipulations of Fact.  And

22   I don't know if you've been able to review the Stipulations of Fact,

23   but we're stipulating to specific elements that are occurring.  And

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

1  we're citing back to the charges, which is somewhat unique, at least
2  in my military justice practice, on how to do it.
3        So it's a very belt-and-suspenders approach on the way we
4  worked the Stipulations of Fact specifically in order to get through
5  what we believe is a limited inquiry on the colloquy.
6        MJ [Col McCALL]:  Sure.
7        MTC [MR. TRIVETT]:  So what the plan would be is, after we get
8  that to the defense this -- sometime today, then we will meet with
9  them tomorrow to come to see if we can come to a joint agreement on
10  what it needs to look like.  And that then gives the parties
11  and -- their opportunity to talk with their clients over Saturday and
12  Sunday and Monday.
13        So there's going to be three built-in days where the
14  judiciary can be working on it and where the defense can be working
15  on it with their clients, with the idea that we would then come back
16  on Tuesday, in either an 802 session or an 803 session, to try to
17  answer any questions that the court may have left after whatever
18  order you issue and so we can work out where logistically the parties
19  think we are.
20        I think we're both -- we're all going to -- I think the
21  defense and the prosecution are certainly going to be in
22  agreement -- or we're going to get to agreement before we're there on
23  Tuesday to be able to answer all of those questions.

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

1       I note that in bin Amin and bin Lep's case, they were all

2   present together and then they went through some of the issues

3   jointly and then some of the issues that were specific to the

4   accused.

5       And we believe that we have -- if we have those three days

6   between Wednesday, Thursday, and Friday after we dedicate the next

7   four days to just going through these things, that we should be able

8   to get these pleas entered by Friday, at least for the last three, if

9   Mr. Bin'Attash and Mr. Hawsawi definitely want to do it.  I think

10  that's still a question up in the air.

11      So that would be our preferred plan.  I think there is a

12  genuine desire for both the prosecution and the defense to have pleas

13  entered before we leave.

14      You know, we want to ensure that we insulate the proceedings

15  from any unlawful influence.  There's obviously a lot of attention on

16  this right now, and we do think that the faster that the pleas are

17  entered, the better we're able to insulate the commission from that.

18      So that would be our planned approach going forward,

19  understanding that it's ultimately within your discretion.

20      MJ [Col McCALL]:  I understand that.  And I do think that that

21  insulating factor, that getting through Mr. Mohammad's plea I think

22  would take a lot of -- if there is any pressure out there, take some

23  of that away.

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

1           But, look, I think the parties know I try to be pretty

2     flexible.  I will look at what is submitted to me and I'll consider

3     it.  Keep the witnesses lined up just in case and -- but I will take

4     a look at what's submitted and see if I think it's doable.

5           MTC [MR. TRIVETT]:  Yes, sir.

6           MJ [Col McCALL]:  I'll just leave it at that.

7           MTC [MR. TRIVETT]:  Thank you, sir.

8           MJ [Col McCALL]:  Mr. Ruiz, go ahead.

9           LDC [MR. RUIZ]:  Judge, just in terms of the -- I want to be

10    perfectly clear what our position is.  We defer to the commission's

11    judgment on the scheduling of these pleas, particularly with

12    Mr. al Hawsawi.

13          Mr. al Hawsawi has asked us to communicate to the commission

14    that he would prefer to try and enter the plea during this session,

15    but ultimately we defer to your judgment as to how to go about doing

16    that as well.

17          In terms of the prosecution's plan, we defer, again, to your

18    plan on that.  And as you know, sometimes when we conference things

19    with the commission, the government a lot of times will not oppose

20    but will defer, and that is a significant difference.  I just want to

21    make sure that that is where we stand ----

22          MJ [Col McCALL]:  Okay.

23          LDC [MR. RUIZ]:  ---- and we'll wait to see how you prefer to

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

1   schedule this.

2       MJ [Col McCALL]:  All right.  I appreciate that.

3           And, again, I think as soon as I can get out this -- I don't

4   know what you want to call it, a clarification -- a request for

5   clarification.  I think that will show at least what -- the issues

6   that I've seen from my initial read of the PTA.  I know they're not

7   all exactly the same, but I think the areas where I'm confused,

8   that's where there's a lot of overlap in the PTAs.

9           And so perhaps we'll also try to do maybe an 802 this

10  weekend.  I know we're all going to be working through the weekend.

11  And because, again, at that point maybe the parties will have

12  a -- they already have an idea on what the answer is to me on those

13  questions as opposed to having to go back to the convening authority

14  to get clarification and the client and then get together and to make

15  sure everybody's on the same page, which really seems to be the long

16  pole in the tent, if there is an ambiguity versus just me not

17  understanding what the parties are meaning.

18          Okay.  I appreciate, Mr. Ruiz.

19      LDC [MR. RUIZ]:  And just one final thing, Judge, while I'm

20  here, because I've heard this a number of times.  I've heard the

21  concern raised a number of times about the unlawful influence.  This

22  is not the first time that I've heard it.

23          But at least from our standpoint, we believe that the plea

UNCLASSIFIED//FOR PUBLIC RELEASE

1    agreement has been signed.  We have not been engaging in any

2    examination of the witness.  In fact, we are abstaining from that.

3    And we believe that is specific performance on that plea agreement.

4    And if it were to be somehow revoked or removed, that it would be a

5    breach of that agreement as it stands right now.

6            So in terms of that aspect, we're confident that if

7    something were to be pulled back, Mr. al Hawsawi would be entitled to

8    the benefit of the bargain, at least from a legal standpoint.

9            MJ [Col McCALL]:  Sure.

10           LDC [MR. RUIZ]:  We have certainly been very judicious on our

11   team, and I think also the parties that enter pleas in terms of

12   abstaining from speaking to the media and doing things that could

13   lead to greater visibility on this case.

14           MJ [Col McCALL]:  Right.

15           LDC [MR. RUIZ]:  Not all commission parties have done that,

16   but certainly the parties in this courtroom have done that.  There

17   have been comments that have been made publicly that we are concerned

18   about, but at least we are very sensitive to that as well.  But we do

19   believe that anything now would be a breach of Mr. al Hawsawi's

20   agreement.

21           MJ [Col McCALL]:  Understood.

22           LDC [MR. RUIZ]:  Thank you.

23           MJ [Col McCALL]:  All right.  Anything else before we bring

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

---

1  the witness in?

2          Apparently -- ah, Mr. Connell.  Just go ahead and speak up,

3  Mr. Connell, because otherwise ----

4  **[No audio feed.]**

5      MJ [Col McCALL]:  And I guess you can't speak up.

6      LDC [MR. CONNELL]:  Mic's not on.

7      MJ [Col McCALL]:  There you go.  Now I can hear you.

8      LDC [MR. CONNELL]:  Sir, I just wanted to say that our

9  position is that we -- Mr. Ruiz just eloquently articulated about

10  deferral and we defer to the parties who are involved in this.

11          We're ready to go forward with questioning next week.  I

12  understand the witnesses are still lined up.  That's great with us.

13  But we're also trying to stay out of the way.

14          So whatever the other parties need, we stand by ready to

15  support, even if that just means sitting there quietly.

16      MJ [Col McCALL]:  Understood.  I appreciate that.

17      LDC [MR. CONNELL]:  All right.  Thank you, sir.

18      MJ [Col McCALL]:  All right.  So bottom line, don't turn off

19  any of the witnesses for next week as we figure this out.

20          All right.  If we can get, speaking of witnesses, Ms. Jocys

21  in here.

22  **[Pause.]**

23      MJ [Col McCALL]:  And if we can get the RHR screen pulled up

---

UNCLASSIFIED//FOR PUBLIC RELEASE