ORAL ARGUMENT SCHEDULED FOR JANUARY 28, 2025
**Case No. 25-1009**

---

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

IN RE: UNITED STATES,

*Petitioner.*

_____

On petition for a writ of mandamus from a decision of the
Court of Military Commission Review

_____

**CORRECTED**
**Joint Appendix**
**Volume 2 of 2**
_____

Walter B. Ruiz                     Michel Paradis
Suzanne M. Lachelier               Gary Sowards
Sean M. Gleason                    Denny LeBoeuf
Maj. Kerry A. Mawn, JA, USAF       Delphine Lourtau
Maj. Patrick C. Tipton, JA, USAF   Nicholas McCue
Military Commission Defense        Gabriela McQuade
Organization                       Melanie Partow
1620 Defense Pentagon              Maj. Michael Leahy, USAF
Washington, DC 20301-1620          Maj. Elspeth Theis, USAF
                                   LT William Xu, JAGC, USN
*Counsel for Respondent,*          Military Commission Defense
*Mustafa Al Hawsawi*               Organization
                                   1620 Defense Pentagon
                                   Washington, DC 20301-1620

                                   *Counsel for Respondent,*
                                   *Khalid Sheikh Mohammed*

Matthew Engle
William Montrose
Tasnim Motala
Marian Messing
Ediwn Perry
Anisha Gupta
Daniel Goldberg
Austin Ridgeway
Military Commission Defense
Organization
1620 Defense Pentagon
Washington, DC 20301-1620

*Counsel for Respondent,*
*Walid bin Attash*

Matthew G. Olsen
Assistant Attorney General
for National Security

Brian H. Fletcher
Principal Deputy Solicitor
General

Mark R. Freeman
Melissa N. Patterson
Attorney, Appellate Staff
Civil Division, Room 7259
U.S. Department of Justice
950 Pennsylvania Ave. NW
Washington, D.C.  20530
(202) 514-1201

*Counsel for Petitioner*

# TABLE OF CONTENTS
## VOLUME 1

AE 004 (MAH)................................................................1

AE 926A (GOV), Attachments D .................................2

AE 926A (GOV), Attachment E ...................................3

AE 926 (AAA Sup), Attachment B ...............................4

AE 926 (AAA 2nd Sup), Attachment K (excerpt) .........8

AE 926 (AAA 2nd Sup), Attachment R ......................11

AE 926 (AAA), Attachment D .....................................26

AE 555 (AAA), Attachment E .....................................27

AE 555 (AAA), Attachment F .....................................28

AE 555EEE ...............................................................29

AE 889D (4th Am) ......................................................62

AE 899........................................................................64

AE 899A (GOV) / AE 901B (GOV) ............................68

AE 901E (GOV) ..........................................................76

AE 902A (GOV)...........................................................81

AE 902B (GOV)...........................................................84

AE 902L (GOV)...........................................................87

AE 926, Attachment I..................................................90

AE 926, Attachment Z.................................................91

AE 950BBB ................................................................92

AE 950CCC ................................................................97

AE 950CCC ..............................................................103

Tr 20805 - 20806, 11 Sep 18 ...................................109

Tr 20897 - 20898, 12 Sep 18 ...................................111

Tr 20903, 12 Sep 18 .................................................113

Tr 21174, 13 Nov 18 .................................................114

Tr 21188, 13 Nov 18 .................................................115

i

Tr 21203, 13 Nov 18 ............................................................................116

Tr 21317, 13 Nov 18 ............................................................................117

Tr 21331 - 21332, 13 Nov 18 ...............................................................118

Tr 21360, 13 Nov 18 ............................................................................120

Tr 21363, 13 Nov 18 ............................................................................121

Tr 21594, 15 Nov 18 ............................................................................122

Tr 21605, 15 Nov 18 ............................................................................123

Tr 21863 - 21866, 15 Nov 18 ...............................................................124

Tr 36758 - 36760, 25 Sep 23 ................................................................128

Tr 36762, 25 Sep 23 .............................................................................131

Tr 36868, 25 Sep 23 .............................................................................132

Tr 36870, 25 Sep 23 .............................................................................133

Tr 42393, 27 Feb 24 .............................................................................134

Tr 42937 - 42938, 4 Mar 24 .................................................................135

Tr 44293- 44295, 17 Apr 24 .................................................................137

Tr 45780 - 45782, 1 May 24 .................................................................140

Tr 49312, 1 Aug 24 ..............................................................................143

Tr 49317 - 49319, 1 Aug 24 .................................................................144

Tr 49421 - 49322, 1 Aug 24 .................................................................147

Tr 49479 - 49487, 7 Aug 24 .................................................................149

Tr 49509, 7 Aug 24 ..............................................................................158

Tr 49579, 7 Aug 24 ..............................................................................159

Tr 49585 - 49597, 8 Aug 24 .................................................................160

Tr 49797 - 49798, 16 Sep 24 ................................................................173

Tr 49944 - 49951, 17 Sep 24 ................................................................175

Tr 50424 - 50425, 20 Sep 24 ................................................................183

Tr 50517 - 50518, 23 Sep 24 ................................................................185

Tr 50548 - 50551, 23 Sep 24 ................................................................187

Tr 50555 - 50556, 23 Sep 24 ................................................................191

Tr 51079 - 51080, 8 Nov 24 ................................................................193

Tr 51642 - 51644, 8 Jan 25 ................................................................195

Email, "Status Update and Setting of Deadlines for PTAs," 20 Jul 23 ................198

Email "Update on Pre-Trial Negotiations and Setting of Final Deadline," 8 Sep 23 ................................................................200

AE 926 (AAA), Attachment B ................................................................202

Letter to VFMs ................................................................203

TJAGLCS Crim. Law Digital Deskbook, ch. 15 ................................................................205

Tr. 8-9, 15 May 12 ................................................................216

Tr 49311 - 49324, 1 Aug 24 ................................................................218

Tr 49416 - 49422, 2 Aug 24 ................................................................232

## VOLUME 2

AE 959 (AAA) ................................................................239

AE 630 (KSM Sup) ................................................................354

Tr 51684 - 51685, 8 Jan 25 ................................................................406

Tr 49325 - 49326, 1 Aug 24 ................................................................408

Tr 49413 - 49415, 2 Aug 24 ................................................................410

Tr 49423, 2 Aug 24 ................................................................413

Tr 49501, 7 Aug 24 ................................................................414

Tr 49759, 9 Aug 24 ................................................................415

Tr 51683 - 51694. 8 Jan 25 ................................................................416

United States v. Al-Nashiri, AE 467CCC ................................................................428

Email "Proposed Stipulations of Fact," 18 May 2022 ................................................................478

Senator Ted Cruz, Statement, 6 Sept. 23 ................................................................481

AE 926A (GOV)................................................................483

AE 926 (AAA 2nd Sup), Attachment K (excerpt). ................................................................498

SecDef Memo, 25 Nov. 2025 ................................................................501

AE 926 (AAA), Attachment X ................................................................502

McConnell Remarks on Support for Israel, Justice for Terrorists................................................................505

# CHRONOLOGICAL INDEX
# BY DOCUMENT TYPE

**Military Commission Pleadings & Exhibits**

AE 004 (MAH) ................................................................................ 1

AE 555 (AAA), Attachment E ........................................................ 27

AE 555 (AAA), Attachment F ........................................................ 28

AE 555EEE ............................................................................... 29-61

AE 630 (KSM Supp) ............................................................... 354-405

AE 899 Docket Order ................................................................ 64-67

AE 899A (GOV) / AE 901B (GOV) .......................................... 68-75

AE 889D (4th Amend) .............................................................. 62-63

AE 901E (GOV) ....................................................................... 76-80

AE 902A (GOV) ....................................................................... 81-83

AE 902B (GOV) ....................................................................... 84-86

AE 902L (GOV) ....................................................................... 87-89

AE 926, Attachment B ................................................................ 202

AE 926, Attachment D ................................................................. 26

AE 926, Attachment I .................................................................. 90

AE 926, Attachment X ........................................................... 502-504

AE 926, Attachment Z .................................................................. 91

AE 926 (AAA 2nd Sup), Attachment K ................................... 498-500

AE 926A (GOV) .................................................................... 483-497

AE 926A (GOV), Attachments D & E ......................................... 2-3

AE 926A (AAA Sup), Attachment B .......................................... 4-7

AE 926A (AAA Sup), Attachment R (excerpt) .......................... 11-25

AE 950BBB .......................................................................... 92-96

AE 950CCC ........................................................................ 97-102

AE 959 (AAA) .................................................................... 239-353

## Record of Trial (excerpts)

Tr 8 - 9, 15 May 12................................................................216-217

Tr 20805 - 20806, 11 Sep 18 ................................................109-110

Tr 20897 - 20898, 12 Sep 18 .................................................111-112

Tr 20903, 12 Sep 18 ....................................................................113

Tr 21174, 13 Nov 18 ...................................................................114

Tr 21188, 13 Nov 18 ...................................................................115

Tr 21203, 13 Nov 18 ...................................................................116

Tr 21317, 13 Nov 18 ...................................................................117

Tr 21331 - 21332, 13 Nov 18 ..............................................118-119

Tr 21360, 13 Nov 18 ...................................................................120

Tr 21363, 13 Nov 18 ...................................................................121

Tr 21594, 15 Nov 18 ...................................................................122

Tr 21605, 15 Nov 18 ...................................................................123

Tr 21863 - 21866, 15 Nov 18 ..............................................124-127

Tr 36758 - 36760, 25 Sep 23 ...............................................128-130

Tr 36762, 25 Sep 23 ....................................................................131

Tr 36868, 25 Sep 23 ....................................................................132

Tr 36870, 25 Sep 23 ....................................................................133

Tr 42393, 27 Feb 24 ....................................................................134

Tr 42397 - 42938, 4 Mar 24 ................................................135-136

Tr 44293 - 44295, 17 Apr 24 ...............................................137-139

Tr 45780 -45782, 1 May 24 .................................................140-142

Tr 49312, 1 Aug 24 .....................................................................143

Tr 49317 - 49319, 2 Aug 24 ................................................144-146

Tr 49421 - 49322, 2 Aug 24 ................................................147-148

Tr 49311- 49324, 1 Aug 24 .................................................218-231

Tr 49416- 49422, 2 Aug 24 .................................................232-238

Tr 49479 - 49487, 7 Aug 24 ................................................149-157

Tr 49501, 7 Aug 24 ...................................................................................414

Tr 49509, 7 Aug 24 ...................................................................................158

Tr 49579, 7 Aug 24 ...................................................................................159

Tr 49585 - 49597, 8 Aug 24 ......................................................... 160-172

Tr 49759, 9 Aug 24 ...................................................................................415

Tr 49797 - 49798, 16 Sep 24 ....................................................... 173-174

Tr 49944 - 49951, 17 Sep 24 ....................................................... 175-182

Tr 50424 - 50425, 20 Sep 24 ....................................................... 183-184

Tr 50517 - 50518, 23 Sep 24 ....................................................... 185-186

Tr 50548 - 50551, 23 Sep 24 ....................................................... 187-190

Tr 50555 - 50556, 23 Sep 24 ....................................................... 191-192

Tr 51079 - 51080, 8 Nov 24 ......................................................... 193-194

Tr 51642 - 51644, 8 Jan 25 ........................................................... 195-197

Tr 51683 - 51694, 8 Jan 25 ........................................................... 416-427

## Miscellaneous

TJAGLCS Crim Law Digital Deskbook, ch. 15 ............................................ 205-215

Email, "Proposed Stipulations of Fact," 18 May 2022 ................................. 478-480

Email, "Status Update and Setting of Deadlines for PTAs," 20 Jul. 2023 .... 198-199

*United States v. Al-Nashiri*, AE 467CCC ...................................................... 428-477

Senator Ted Cruz, Statement, 6 Sep 23 ......................................................... 481-482

Email, "Update on Pre-Trial Negotiations and Setting of Final Deadline,"
    8 Sept. 2023 ............................................................................................ 200-201

McConnell Remarks on Support for Israel, Justice for Terrorists.........................505

Letter to VFMs ........................................................................................ 203-204

Secretary of Defense Memorandum to BG Escallier, 25 Nov 25 ........................501

MILITARY COMMISSIONS TRIAL JUDICIARY,
GUANTANAMO BAY, CUBA

| | |
|---|---|
| UNITED STATES OF AMERICA | **AE 959 (AAA)** |
| v. | **Mr. al Baluchi's Motion to Dismiss** |
| KHALID SHAIKH MOHAMMAD, WALID MUHAMMAD SALIH MUBARAK BIN 'ATTASH, ALI ABDUL-AZIZ ALI, MUSTAFA AHMED ADAM AL HAWSAWI | Due to the Secretary of Defense's Interference with the Convening Authority's Discretion |
| | 23 August 2024 |

1. <u>**Timeliness:**</u> This motion is timely filed.[1]

2. <u>**Relief Sought:**</u> Mr. al Baluchi respectfully requests that the military commission dismiss the charges in the instant case or, in the alternative, dismiss the capital referral.

3. <u>**Burden of Proof:**</u> The defense bears the initial burden to raise the issue of unlawful command influence.[2] Once the issue has been raised, the burden shifts to the government. A more detailed description of the unlawful influence framework in the military commissions can be found in AE 343C Ruling.

4. <u>**Facts:**</u>

      a.       On 21 August 2023, the Secretary of Defense ("SECDEF") appointed Ms. Susan Escallier as the Convening Authority in this case.[3] Within that memorandum of appointment, the

---

[1] *See* Military Commissions Trial Judiciary Rule of Court (RC) 3.7.c.(1).

[2] Defense need only demonstrate "some evidence." *See United States v. Biagese*, 50 M.J. 143, 150 (C.A.A.F. 1999).

[3] Attachment B.

**JA.240**

Secretary of Defense stated, "Ms. Escallier shall exercise her independent legal discretion with regard to judicial acts and other duties of the Convening Authority."[4]

b.      On 31 July 2024, the government notified the defense that the Convening Authority, Ms. Escallier, had signed pre-trial agreements with Mr. Mohammad, Mr. bin 'Atash, and Mr. al Hawsawi.

c.      On that same day, Trial Counsel sent a letter to the "Families of the September 11, 2001 Victims" explaining that, "[d]uring the July/August 2024 session of the Commission, Khalid Shaikh Mohammad, Walid Bin 'Attash, and Mustafa al Hawsawi entered into pre-trial agreements in this case with the Convening Authority."[5]

d.      A few minutes after the letter was sent, the Department of Defense published a Media Release announcing that "The Convening Authority for Military Commissions, Susan Escallier, has entered into pretrial agreements with Khalid Shaikh Mohammad, Walid Muhammad Salih Mubarak Bin 'Attash, and Mustafa Ahmed Adam al Hawsawi, three of the co-accused in the 9/11 case."[6]

e.      On 1 August 2024, in an open session of the military commission, Trial Counsel announced that the Convening Authority had reached a pre-trial agreement with Mr. Mohammad, Mr. bin 'Atash, and Mr. al Hawsawi.[7]

---

[4] *Id.*

[5] AE 926 (AAA 2nd Sup) Supplement to AE 926 (AAA) Mr. al Baluchi's Motion to Dismiss All Charges for Unlawful Influence by Members of Congress, Attachment B.

[6] AE 926 (AAA 2nd Sup), Attachment C.

[7] Unofficial/Unauthenticated Transcript of 1 August 2024 at 49312-13.

f.      On 2 August 2024, the government filed under seal the entirety of the pre-trial agreement for Mr. Mohammad,[8] Mr. bin 'Atash,[9] and Mr. al Hawsawi.[10] Later that day, the military commission issued a Trial Conduct Order regarding the above noted Notices.[11]

g.      After business hours on 2 August 2024, the Department of Defense issued a brief media release stating: "Secretary Austin signed a memo reserving for himself the specific authority to enter into pre-trial agreements with the accused in the 9/11 military commission cases. In addition, as the superior convening authority, the Secretary has also withdrawn from the pre-trial agreements that were signed in those cases."[12]

h.      The SECDEF's Memorandum was addressed to Susan Escallier, Convening Authority for Military Commissions, regarding "Authority to Enter into Pre-Trial Agreements in *United States v. Khalid Shaik Mohammad et al*."[13] The Secretary of Defense stated, "I have determined that, in light of the significance of the decision to enter into pre-trial agreements with the accused in the above-referenced case, responsibility for such a decision should rest with me as the superior convening authority under the Military Commissions Act of 2009. Effective

---

[8] AE 955 (GOV) Government Notice of Under Seal Filing.

[9] AE 956 (GOV) Government Notice of Under Seal Filing.

[10] AE 957 (GOV) Government Notice of Under Seal Filing.

[11] AE 955A Notice of Under Seal Trial Conduct Order.

[12] AE 926 (AAA 2nd Sup), Attachment O.

[13] AE 926 (AAA 2nd Sup), Attachment P. The memorandum applied to all five defendants in the case, collectively and individually: "Authority to Enter into Pre-Trial Agreements in *United States v. Khalid Shaikh Mohammad et al. (United States v. Khalid Shaikh Mohammad; United States v.Walid Muhammad Salih Mubarak Bin 'Attash; United States v. Mustafa Ahmed Adam Al Hawsawi; United States v. Ramzi Binalshibh; and United States v. Ali Abdul Aziz Ali)"*

immediately, I hereby withdraw your authority in the above-referenced case to enter into a pre-trial agreement and reserve such authority to myself."[14]

5.    **Law and Argument:**

On 2 August 2024, the SECDEF unraveled years of plea negotiations involving Mr. al Baluchi by illegally withdrawing Convening Authority Susan Escallier's authority to enter into a pre-trial agreement with Mr. al Baluchi and others. By this unprecedented action, the SECDEF acted contrary to long-standing military principles insulating the independence and discretion of subordinate convening authorities from command influence by their superiors. As a result, the Convening Authority no longer has authority to exercise one of her core judicial functions: the negotiation of a pre-trial agreement with Mr. al Baluchi. The impaired independence of the Convening Authority requires dismissal of the charges.

a.   **A longstanding principle of military justice prohibits a superior convening authority from interfering with the discretion of a subordinate convening authority.**

It has long been a canon of military jurisprudence that "command influence is the mortal enemy of military justice,"[15] and one aspect of preventing command influence is the judicial independence of convening authorities. In his treatise *Military Law and Precedents*, Colonel William Winthrop explained the importance of insulating a convening authority from interference by superiors: "Whether and how far the proceedings and sentence, or any part of the same, shall be approved, and is a subject wholly within the discretion of such officer [ordering the court]. As to this he is invested by the Article with the sole authority, and cannot therefore be

---

[14] *Id.*

[15] *See United States v. Thomas,* 22 M.J. 388, 393 (C.M.A. 1986).

directed either by the President or other superior."[16] This core principle of subordinate convening authority independence has endured over the following century.

After World War II, the armed forces sought to reform military justice, including command influence, in light of the lessons of America's largest mobilization to date. First on the list of issues the U.S. War Department Advisory Committee on Military Justice (the "Vanderbilt Committee") sought to address in 1946 was "the checking of command control."[17] Indeed, in its introduction, the Committee stated that the military justice "system broke down" as a result of two issues—one of which was "the denial to the courts of independence of action in many instances by the commanding officers who appointed the courts and reviewed their judgments, and who conceived it the duty of the command to interfere for disciplinary purposes."[18]

The Vanderbilt Committee went on to say that the Army had taken no steps to prohibit such influence and that, by ignoring the issue, the Army's attitude was "completely wrong and subversive to morale."[19] The Vanderbilt Committee then prescribed steps to "guard against the breakdown of the system."[20] These recommendations became what we recognize today as statutory and regulatory prohibitions against unlawful influence, found throughout military justice authorities: "it is improper and unlawful for *any person* to attempt to influence the action of an appointing or reviewing authority . . . in reaching its verdict or pronouncing sentence."[21] Indeed,

---

[16]    William Winthrop, *Military Law and Precedents* 635 (1920), *available at* https://www.jagcnet.army.mil/Sites/trialjudiciary.nsf/homeContent.xsp?documentId=563824A9F16305F585257B48006745EE.

[17] *See* Attachment C (the Vanderbilt Report) at 6.

[18] *Id.* at 3.

[19] *Id.* at 7.

[20] *Id.*

[21] *Id.* at 7-8 (emphasis added).

any violation of that guideline would "be considered conduct of a nature to prejudice military discipline and to bring discredit upon the military service in violation of Article of War 96."[22]

Two years later, Congress passed the Selective Service Act of 1948, which contained a rider referred to as the "Elston Act" amending the Articles of War. These amendments were effectively a precursor to the Uniform Code of Military Justice. The Elston Act amended Art. 88 of the Articles of War to read:[23]

> "ART. 88. UNLAWFULLY INFLUENCING ACTION OF COURT.—No authority appointing a general, special, or summary court-martial nor any other commanding officer, shall censure, reprimand, or admonish such court, or any member thereof, with respect to the findings or sentence adjudged by the court, or with respect to any other exercise, by such court or any member thereof, of its or his judicial responsibility. No person subject to military law shall attempt to coerce or unlawfully influence the action of a court-martial or any military court or commission, or any member thereof, in reaching the findings or sentence in any case, or the action of an appointing or reviewing or confirming authority with respect to his judicial acts."

At the time of the Elston Act, "there was considerable activity and agitation by veterans' organizations and bar associations for Congress to take some action to preclude 'Command control' in courts-martial proceedings."[24] It became such a hot issue in current affairs that there was even an ABC Radio broadcast interview of Brigadier General Samuel T. Ansell, Acting Judge Advocate General during World War I, discussing it.[25]

---

[22] *Id.* at 8.

[23] *See* Attachment D.

[24] *See* Report to Honorable Wilber M. Brucker, Sec'y of the Army by The Comm. on The Uniform Code of Military Justice Good Order and Discipline in the Army (the "Powell Report") (1960). Available at https://maint.loc.gov/rr/frd/Military_Law/Powell-report.html.

[25] *See* Attachment E (ABC Transcript). Brigadier General Ansell was a strong proponent of divorcing military justice from command control.

6

Due in part to that political pressure, the Secretary of Defense appointed another committee (the "Morgan Committee") to review the military justice rules. Professor Morgan, the chair of the committee, worked extensively to gather recommendations to Congress which led to the enactment of the Uniform Code of Military Justice, where Article 37, U.C.M.J., came into existence in a more familiar form.[26]

> **ART. 37. Unlawfully influencing action of court.**
>
> No authority convening a general, special, or summary court-martial, nor any other commanding officer, shall censure, reprimand, or admonish such court or any member, law officer, or counsel thereof, with respect to the findings or sentence adjudged by the court, or with respect to any other exercise of its or his functions in the conduct of the proceeding. No person subject to this code shall attempt to coerce or, by any unauthorized means, influence the action of a court-martial or any other military tribunal or any member thereof, in reaching the findings or sentence in any case, or the action of any convening, approving, or reviewing authority with respect to his judicial acts.

Then, in 1959, then-Secretary of the Army Wilber Brucker established a new committee, placing Lieutenant General Herbert Powell at the helm (the "Powell Committee"). According to Secretary Brucker's letter of instruction to LTG Powell, Secretary Brucker believed that because the U.C.M.J. had been in effect for eight years, "a comprehensive survey of the effectiveness and the equity of the Code in the application of military justice within the Department of the Army" was warranted.[27] Not coincidentally, around that same time, appellate courts decided a panoply of cases where command influence was at issue.[28] These cases included *United States v.*

---

[26] Manual for Courts-Martial, United States (1951 ed.) [MCM], app. 2, Art. 37 at 426.

[27] Powell Report at 249.

[28] Powell Report at 253-61 (collecting cases); *see also United States v. Carter*, 9 U.S.C.M.A. 108, 114 (1958) (internal citations omitted) (stating the "evil lies in military superiors or their representatives aiming influence at officers selected for courts; or in the prosecution injecting command policy into trials; or in those situations which it was apparent the court had been

7

**JA.246**

*Hawthorne*,[29] which later became the basis for R.C.M. 306(a).

The Powell Committee wrote a report to Secretary Brucker discussing the effectiveness and improvement needed in the U.C.M.J. In that report, the Powell Committee reiterated the need to protect against command influence, stating "the interests of discipline[30] do not require that [the Commander] have any power to interfere with the independent judgement of persons who are by law responsible for judicial actions."[31] The Committee then went on to list several acts it considered to be illegal command influence.

For purposes of this motion, the most important form of unlawful command influence the Powell Committee identified is interference with the discretion of subordinate convening authorities. The Powell Committee described this form of unlawful command influence as the following:[32]

> c. To direct or suggest that a subordinate commander who is required to dispose of a case or recommend disposition perform such duties in a manner which restricts the subordinate's exercise of discretion under the Uniform Code of Military Justice.

But the alarms about command influence didn't stop there. Even after passage of the Military Justice Act of 1968, critics considered Congressional action mere "half-steps against unlawful command influence."[33]

---

influenced by policy directives").

[29] *United States v. Hawthorne*, 7 C.M.A. 293, 299 (C.M.A. 1956).

[30] It is important to note that the military commissions do not serve the same goal of "good conduct and discipline" as do courts-martial. Nonetheless, Congress decided to include prohibitions against unlawful influence in the Military Commissions Act of 2009.

[31] Powell Report at 10.

[32] Powell Report at 13.

[33] *See generally, e.g., The Military Justice Act of 1968: Congress Takes Half Steps Against Unlawful Command Influence,* 18 Cath. U. L. Rev. 429 (1969).

Enacted in 1984 as the Rules for Court-Martial took on their modern format,[34] the President enshrined in R.C.M. 306(a) the longstanding principle that a superior convening authority may withhold disposition authority from a subordinate over cases as a whole: "A superior commander may withhold the authority to dispose of offenses in individual case, types of cases, or generally."[35] This language was repeated verbatim in R.C.M. 401(a)[36] and eventually found its way into R.M.C. 401(a).[37] The language of R.C.M. 401(a), R.C.M. 306(a), and R.M.C. 401(a) expresses the military justice principle that, "Each commander has independent discretion to determine how charges will be disposed of, except to the extent that that commander's authority has been withheld by superior competent authority."[38]

R.C.M. 306(a) also made explicit the companion principle to a superior convening authority's authority to withhold disposal authority over cases: if the superior convening authority chooses not to withhold disposal authority from a subordinate, the superior convening authority may not impair the independence of the subordinate convening authority. R.C.M. 306(a) (1984) stated that principle as, "A superior commander may not limit the discretion of a subordinate commander to act on cases over which the authority has not been withheld."[39] The Discussion

---

[34] Executive Order 12473, 49 Fed. Reg. 17152 (Apr. 23, 1984).

[35] R.C.M. 306(a) (1984).

[36] R.C.M. 401(a) has remained the same from 1984 to the present. It provides, "Only persons authorized to convene courts-martial or to administer nonjudicial punishment under Article 15 may dispose of charges. A superior competent authority may withhold the authority of a subordinate to dispose of charges in individual cases, types of cases, or generally."

[37] R.M.C. 401(a) provides, "Only the Secretary of Defense or an officer or official of the United States designated by the Secretary for the purpose to convene military commissions may dispose of charges. A superior competent authority may withhold the authority of a subordinate to dispose of charges in individual cases, types of case, or generally."

[38] R.C.M. 401(a), Discussion.

[39] R.C.M. 306(a) (1984).

explained that R.C.M. 306(a) effectuates the principle that, "Each commander in the chain of command has independent, yet overlapping discretion to dispose of offenses within the limits of that officer's authority."[40]

The cases cited in the Analysis of R.C.M. 306(a)[41] illustrate the rule. In *United States v. Hawthorne*, a superior commander issued a policy requiring harsher treatment for repeat offenders, and a subordinate commander followed it.[42] The Court of Military Appeals reversed the conviction because the "commanding general [sought] to curb the power granted by the Uniform Code to the accused's immediate commander."[43] "In sum, the policy directive directly tended to control the judicial processes rather than merely attempting to improve the discipline of the command."[44] *Hawthorne* held, and R.C.M. 306(a) codified, that a superior can issue policies, but cannot lawfully interfere with the exercise of judicial independence by a subordinate convening authority, especially in a specific case.

*United States v. Hardy*[45]—also a foundation of R.C.M. 306(a) cited in the Analysis[46]—is even more explicit about illegal command influence on a subordinate convening authority. In *Hardy*, a subordinate convening authority ordered a special court-martial, and a superior convening authority ordered the subordinate to withdraw the charges from the special court-

---

[40] *Id.*

[41] Manual for Courts-Martial, United States (1984 ed.) [MCM], app. 21, Analysis of Rules for Courts-Martial [R.C.M. 306] at A21-18.

[42] *United States v. Hawthorne*, 7 C.M.A. 293, 299 (C.M.A. 1956).

[43] *Id.*

[44] *Id.*

[45] 4 M.J. 20 (C.M.A. 1977).

[46] Manual for Courts-Martial, United States (1984 ed.) [MCM], app. 21, Analysis of Rules for Courts-Martial [R.C.M. 306] at A21-18.

10

martial.[47] The Court of Military Appeals held that although the subordinate convening authority could withdraw the charges from the special court-martial, "This action may be taken *only when directed by the convening authority*, who may give such a direction either on *his own initiative or on application made to him*."[48] The court concluded:

> Thus, it is clear that when a subordinate commander properly exercises the statutory discretion entrusted to him, and convenes a special court-martial and refers a specific case thereto for trial, only that convening authority may effect the withdrawal of that case from that court, and his action in doing so must result from his *own* decision made pursuant either to his *own initiative* or to *application* made to him for such action. His action in withdrawing a specific case from a court to which it already properly had been referred must not be the result of a superior's *order* to do so pursuant to the *superior's* decision. We believe that to tolerate otherwise would permit that superior commander, in a specific case and after-the-fact, to influence directly the action of the subordinate convening authority with respect to the latter's judicial acts already properly taken in that case, in contravention of Article 37(a) of the Code.[49]

Thus, under the long-standing military justice principle of subordinate independence, a superior convening authority can act, but cannot limit the discretion of the subordinate convening authority to act, especially "in a specific case and after-the-fact."[50]

---

[47] *Id.* at 21.

[48] *Id.* at 22 (emphasis in original).

[49] *Id.* (emphasis in original).

[50] *Id.*

11

**JA.250**

Most recently, Congress emphasized the commitment to the principle that a superior commander may not interfere with the discretion of a subordinate commander by importing the language of R.M.C. 306(a) back into Article 37, U.C.M.J. After appellate courts overturned a significant number of military justice cases due to unlawful command influence and after the prevalence of sexual assault within the ranks continued, a House subcommittee decried unlawful command influence within the context of sexual assault cases.[51] Following a key hearing, Congress in 2020 amended Article 37, U.C.M.J., to codify R.C.M. 306(a), prohibiting superiors from limiting or directing a subordinate's exercise of authority where the superior has not withheld that authority.

Article 37(d)(2), U.C.M.J., now states the same principle that R.M.C. 306(a)—not to mention Colonel Winthrop—did, in even stronger terms. "Except as provided in paragraph (1) or as otherwise authorized by this chapter, a superior convening authority or commanding officer may not limit the discretion of a subordinate convening authority or officer to act with respect to a case for which the subordinate convening authority or officer has authority to dispose of the offenses."[52] R.C.M. 104(d)—an analogue to R.M.C. 401(a)—in the new 2024 Manual for Courts-Martial (2024 ed.) mirrors this language.[53]

---

[51] *See generally, e.g.*, Examining the Role of the Commander in Sexual Assault Prosecutions: Hearing Before the Subcomm. on Military Personnel of the Comm. on Armed Serv. House of Representatives. 116th Cong. (2019), *available at* https://www.congress.gov/116/chrg/CHRG-116hhrg36885/CHRG-116hhrg36885.pdf.

[52] Art. 37(d)(2), U.C.M.J.

[53] R.C.M. 104(d) (2024) states:

1) A superior convening authority or commanding officer may withhold the authority of a subordinate convening authority or officer to dispose of offenses in individual cases, types of cases, or generally.

(2) Except as provided in paragraph (d)(1) of this rule or as otherwise authorized

12

The legacy of concern with the independence of subordinate convening authorities emphasizes the iniquity of the SECDEF's action on the evening of 2 August 2024. Not only did he contravene rules prohibiting his action, he contravened decades of efforts by Congress, the President, and the services to protect the independence of subordinate convening authorities.[54]

### b. The SECDEF violated the long-standing principle of subordinate convening authority independence by impairing the discretion of the Convening Authority to negotiate a Pre-Trial Agreement with Mr. al Baluchi.

The rich history behind—and consistent emphasis on—the independence of subordinate convening authorities should have alerted the SECDEF to the importance of allowing Ms. Escallier, in her capacity as the Convening Authority, to act independently. It did not. Indeed, the SECDEF has now fully inserted himself into a protected realm of the Convening Authority's duties: the ability to negotiate a fair pre-trial agreement. In doing so, he has permanently and irreparably damaged the independence of the Convening Authority, requiring dismissal of the charges against Mr. al Baluchi.

In the Regulation for Trial by Military Commission (RTMC), the SECDEF established the Convening Authority as the primary, albeit subordinate, convening authority for military commissions. The 2009 Military Commissions Act gives the Convening Authority—as the SECDEF designee—the authority to convene military commissions.[55] RTMC 2-3(a)(1)

---

under the UCMJ, a superior convening authority or commanding officer may not limit the discretion of a subordinate convening authority or officer to act with respect to a case for which the subordinate convening authority or officer has the authority to dispose of the offenses.

[54] The SECDEF also acted in contravention of his own initial order appointing Ms. Escallier. *See* Att. B.

[55] 10 U.S.C. § 948h; *see Al Bahlul v. United States*, 967 F.3d 858, 868 (D.C. Cir. 2020) (*Bahlul V*).

13

establishes that the first duty of the regulatory Convening Authority is to "[d]ispose of charges (*see* R.M.C. 401)."[56] R.M.C. 401(a), of course, implements the general military justice rule that a superior convening authority may withhold cases from a subordinate—not pieces of cases.

The negotiation of pre-trial agreements is a core judicial function of the Convening Authority as originally established by regulation. In general, RTMC 12-1 authorizes the Convening Authority to enter pre-trial agreements unless "such authority is withheld by a superior competent authority." R.M.C. 705(a), cited in RTMC 12-1, provides that, "Subject to such limitations as the Secretary may prescribe, an accused and the Convening Authority may enter into a pretrial agreement in accordance with this rule." In fact, RTMC 12-3 authorizes *only* the Convening Authority—not a superior authority—to withdraw from a pre-trial agreement.

At first glance, the idea of Secretarial limitations seems to be in tension with the critical element of subordinate convening authority independence with respect to cases within their authority. While the SECDEF can "transmit" referred charges from the convening authority to himself[57] and can withdraw charges at any time before findings are announced,[58] nothing in military commissions law or regulation permits the SECDEF to alter or reverse specific actions taken by a subordinate convening authority in a case remaining at her disposal. In other words, the military commissions rule is the same as the court-martial rule:[59] a superior convening

---

[56] The Convening Authority also has nineteen other regulatory duties. *See* RTMC 2-3(3)(a)(2)-(19).

[57] R.M.C. 601(f); *see also Bahlul v. United States*, 77 F.4th 918, 926 n.2 (D.C. Cir. 2023) (*Bahlul VII*) (describing R.M.C. 601(f) as one of the detailed ways the SECDEF has exercised authority over Convening Authority).

[58] R.M.C. 604(a).

[59] *See* 10 U.S.C. 949a(a); *Bahlul V*, 967 F.3d at 866; *In re Al Nashiri*, 835 F.3d 110, 122-23 (D.C. Cir. 2016).

authority may take over a case in its entirety, but it must otherwise respect the independence of a subordinate convening authority.[60]

The SECDEF "maintains a degree of oversight and control over the Convening Authority's work through policies and regulations"[61] rather than by *ad hoc* intrusions into her independence. The SECDEF can "exercise [the] authority to regulate and to oversee the conduct of the Convening Authority in detailed ways"[62] through the SECDEF's "power to prescribe procedures and rules of evidence governing military commissions" and "post-trial procedures" in accordance with § 949a(a).[63] The D.C. Circuit lists R.M.C. 601(f), permitting the SECDEF to "transmit" referred charges to themselves, as an example of how the SECDEF can regulate the Convening Authority's conduct in a detailed way.[64] These policies and regulations can include the limitations mentioned in R.M.C. 705(a), at least prior to referral and the tender of an offer.[65] Here, however, the SECDEF chose not to enact any changes to the R.M.C. or RTMC; instead, he acted "in a specific case and after-the-fact"[66] to limit the Convening Authority's discretion.

At the same time, § 949(a)(2) specifically protects the Convening Authority against unauthorized influence by the Secretary of Defense.[67] This statute protects the Convening

---

[60] *See, e.g.*, R.C.M. 401(c)(2)(B) Discussion ("Except when directed to forward charges, a subordinate commander may not be required to take any specific action to dispose of charges.").

[61] *Bahlul V*, 967 F.3d at 872.

[62] *Id.*

[63] *Id.*

[64] *Bahlul VII,* 77 F.4th at 926 n.2.; *see also Bahlul V*, 967 F.3d at 872.

[65] *See* RTMC 12-1 ("The decision to accept or reject a PTA offer submitted by an accused is within the sole discretion of the Convening Authority who referred the case to trial.).

[66] *United States v. Hardy*, 4 M.J. 20, 22 (C.M.A. 1977).

[67] "No person may attempt to coerce or, by any unauthorized means, influence . . . the action of any convening . . . authority with respect to their judicial acts."

JA.254

Authority even from the awesome power of removal based on her judicial acts.[68] In other words, § 949(a)(2) prevents any person—even the Secretary of Defense—from telling the Convening Authority how to accomplish her judicial functions, including the negotiation of pre-trial agreements.

The only direct authority on this question in military commissions is the single, largely gratuitous, sentence in *Bahlul VI* that, "The Secretary of Defense may limit the convening authority's discretion in pretrial agreements."[69] In addition to R.M.C. 705(a), the C.M.C.R. relied on *United States v. Allen*,[70] which provides meaning and context to the C.M.C.R.'s single sentence.

*Allen* perfectly illustrates the difference between promulgated regulations which govern subordinate convening authority and illegal interference with subordinate convening authority discretion. "In R.C.M. 705(a) the President authorized the service secretaries to prescribe limitations on a convening authority's discretion to enter into pretrial agreements with accused. The Secretary of the Navy pursuant to such authority promulgated § 0129 JAGMAN in which he limited the authority of convening authorities to enter into pretrial agreements with those accused whose cases involved national security matters."[71] The court recognized a potential problem with this regulation, but avoided the issue because the regulation did not actually affect

---

[68] *Bahlul V*, 967 F.3d at 872; *see also Bahlul VII,* 77 F.4th at 927 ("Finally, we explained that 'the Convening Authority is removable at will by the Secretary,' except that 'no person may attempt to coerce or, by any unauthorized means, influence . . . the action of any convening, approving, or reviewing authority with respect to his judicial acts.'") (citations omitted).

[69] *Bahlul v. United States*, 603 F. Supp. 3d 1151, 1158 (C.M.C.R. 2022) (*Bahlul VI*).

[70] *United States v. Allen*, 31 M.J. 572, 594-95 (N.M.C.M.R. 1990) (*en banc*), *aff'd*, 33 M.J. 209 (C.M.A. 1991).

[71] *Id.* at 594.

16

the subordinate convening authority.[72]

The *Allen* court drew a sharp contrast between generally applicable regulations and the impairment of discretion in any particular case. It explained, "Although the Secretary may limit the jurisdiction of those officers having inherent authority to convene courts-martial . . . he could not interfere with their exercise of jurisdiction once a case came within their jurisdiction."[73] "Thus, the discretion of a convening authority may be limited, but once he is entitled to exercise discretion that exercise must be without interference."[74] The court held that "the superior of a convening authority[] may issue directives and announce policies for adherence by subordinates as long as those directives do not require the convening authority to abdicate his independent judgment while performing his court-martial responsibilities."[75]

The *Allen* court noted that prior courts of military review and the Court of Military Appeals have distilled six factors, which, when applied, can indicate that a superior authority has unlawfully influenced a subordinate authority.[76] These factors are: 1) timing of the contact (proximity to the accused's case), 2) the individual who made the contact, 3) the type of contact, 4) the content of the contact, 5) who was contacted, and 6) the reasonable likelihood of prejudice to the accused at trial.[77] It noted that even if one particular factor does not indicate unlawful command influence, "a combination of factors might be sufficient for such a finding."[78] In the

---

[72] *Id.* at 595.

[73] *Id.* at 592.

[74] *Id.* at 591.

[75] *Id.* at 593.

[76] *Id.* at 592.

[77] *Id.* at 592 (internal citations omitted).

[78] *Id.* at 590.

17

instant case, these factors overwhelmingly demonstrate command influence.

The "contact" here is the 2 August 2024 memorandum issued by the SECDEF. The head of the Department of Defense took it upon himself to, one day after three of Mr. al Baluchi's co-defendants entered pre-trial agreements memorandum, issue a wide-reaching public statement declaring that the Convening Authority no longer had the power to exercise on of her core judicial functions. Besides the President of the United States holding a press conference, no greater public statement by any more important public figure in this case could have occurred. The prejudice to Mr. al Baluchi cannot be denied: he cannot now receive a fair negotiation for a pretrial agreement with any party—neither the convening authority nor the prosecution who negotiates with the power of the convening authority.

Finally, R.M.C. 401(a), read on its own or in conjunction with long-standing court-martial principles, only permits withholding authority over the entire case, not interference with distinct Convening Authority powers. "[A]s long as the regulations remain operative, the [SECDEF] denies himself the right to sidestep the [CA] or dictate its decision in any manner."[79] The SECDEF's decision to withdraw only the power to negotiate pre-trial agreements violates the core protection of subordinate convening authorities from influence from any person, including superior convening authorities. The only remedy at this point is for the military commission to dismiss this case because the Secretary of Defense has illegally impaired the Convening Authority's discretion to resolve the case through pre-trial agreement.

---

[79] *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 267 (1954); *see also United States v. Nixon*, 418 U.S. 683, 696 (1974) ("[I]t is theoretically possible for the Attorney General to amend or revoke the regulation defining the Special Prosecutor's authority. But he has not done so."); *Massachusetts Fair Share v. L. Enf't Assistance Admin.*, 758 F.2d 708, 711 (D.C. Cir. 1985 ("[T]he procedures established for administration of the Urban Crime Prevention Program foreclosed unilateral action by LEAA's Administrator.").

18

**JA.257**

6. **Request for Additional Witnesses:**

    a. Secretary of Defense Lloyd J. Austin, III

    b. Rita Davis, DoD Office of General Counsel

    c. Caroline Krass, DoD Office of General Counsel

    d. Susan Escallier, Convening Authority

    e. Jennifer Smith, Acting Legal Advisor to the Convening Authority

7. **Certificate of Conference:**

The defense has conferred with the government concerning this motion. The government opposes the requested relief.

8. **Request for Oral Argument:**

The defense requests oral argument.

9. **Attachments:**

    A. Certificate of Service, dated 23 August 2024

    B. Memorandum Designating Susan Escallier as Convening Authority, dated 21 August 2023

    C. Report of the U.S. War Department Advisory Committee on Military Justice, dated 13 December 1946

    D. Conference Report to Selective Service Act of 1948

    E. Transcript of ABC Interview of General Samuel T. Ansell, JAG, U.S. Army

**JA.258**

Very respectfully,

//s//
JAMES G. CONNELL, III
Learned Counsel

//s//
ALKA PRADHAN
Defense Counsel

//s//
RITA J. RADOSTITZ
Detailed Defense Counsel

//s//
DEFNE OZGEDIZ
Detailed Defense Counsel

//s//
JENNIFER JOSEPH
LT, JAGC, USN
Detailed Military Defense Counsel

*Counsel for Mr. al Baluchi*

20

# Attachment A

**JA.260**

**<u>CERTIFICATE OF SERVICE</u>**

I certify that on the 23rd day of August, 2024, I electronically filed the foregoing document

with the Clerk of the Court and served the foregoing on all counsel of record by email.

   //s//
JAMES G. CONNELL, III
*Learned Counsel*

# Attachment B

**JA.262**



**SECRETARY OF DEFENSE**
1000 DEFENSE PENTAGON
WASHINGTON, DC 20301-1000

AUG 2 1 2023

MEMORANDUM FOR DEPUTY SECRETARY OF DEFENSE
    SECRETARIES OF THE MILITARY DEPARTMENTS
    CHAIRMAN OF THE JOINT CHIEFS OF STAFF
    UNDER SECRETARIES OF DEFENSE
    CHIEFS OF MILITARY SERVICES
    GENERAL COUNSEL OF THE DEPARTMENT OF DEFENSE
    ASSISTANT SECRETARIES OF DEFENSE

SUBJECT:  Designation of Susan Escallier as Convening Authority for Military Commissions

    Pursuant to chapter 47A of title 10, U.S.C., section 948h, Susan Escallier is designated as Convening Authority for Military Commissions. This designation is effective October 8, 2023, and will continue until a new Convening Authority is designated. As Convening Authority, and in accordance with applicable Rules for Military Commissions, the Regulation for Trial by Military Commission, and judicial orders, Ms. Escallier shall receive legal advice relating to these military commissions solely from an appropriately designated Legal Advisor to the Convening Authority and members of the appropriately designated Legal Advisor's staff as necessary. Ms. Escallier shall exercise her independent legal discretion with regard to judicial acts and other duties of the Convening Authority.

    The designation of Lieutenant Colonel Jeffrey D. Wood as Convening Authority dated April 17, 2020, is rescinded effective October 8, 2023, due to Lieutenant Colonel Wood's voluntary departure from this position.

cc:
Legal Advisors to the Convening Authority
  for Military Commissions
Chief Prosecutor, Office of the Chief Prosecutor
Chief Defense Counsel, Military Commissions
  Defense Organization
Chief Judge, Military Commissions Trial Judiciary

OSD006777-23/CMD008818-23

# Attachment C

**JA.264**



JA.265

#2642735

Law Division
The Army Library

KF
7620
.A88
1946

TO THE HONORABLE

THE SECRETARY OF WAR

REPORT OF

U. S. WAR DEPARTMENT

ADVISORY COMMITTEE ON MILITARY JUSTICE

13 December 1946

JA.266

FRANKLIN S. PEIRCE
CHIEF, LAW DIVISION
THE ARMY LIBRARY

TABLE OF CONTENTS

| | | Page No. |
|---|---|---|
| I. | INTRODUCTION ...................................................... | 1 |
| II. | GENERAL RECOMMENDATIONS ........................................... | 4 |
| | 1. Greater emphasis upon operation of the Army system of Justice ...................................................... | 4 |
| | 2. Substantial enlargement of Army legal department, the Judge Advocate General's Department................ | 6 |
| III. | SPECIFIC RECOMMENDATIONS ......................................... | 6 |
| | A. The checking of command control ........................... | 6 |
| | 1. Forbid exercise of influence ........................... | 7 |
| | 2. Prohibit reprimand ...................................... | 8 |
| | 3. Inform courts as to sentence duty ...................... | 8 |
| | 4. Law member and defense counsel ......................... | 8 |
| | 5. Final review in J.A.G.D. ............................... | 8 |
| | 6. J.A.G.D. to appoint courts ............................. | 9 |
| | 7. Power of command to extend clemency .................... | 10 |
| | 8. Judge advocates to be independent of chain of command .. | 10 |
| | 9. Promotion of judge advocates ........................... | 10 |
| | 10. Special courts-martial ................................. | 10 |
| | B. Discrimination in officer punishment ...................... | 11 |
| | 1. Amendment of AW 104 to include officers ................ | 11 |
| | 2. Trial of officers by special courts .................... | 11 |
| | 3. Reduction of officers to the ranks in wartime .......... | 11 |
| | 4. Amendment of AW 85 ..................................... | 12 |
| | C. Enlisted men and courts-martial ........................... | 12 |
| | 1. Broaden instruction ................................... | 12 |
| | 2. Advertise open sessions of courts ...................... | 12 |
| | 3. Remove bar against enlisted men serving on courts ...... | 12 |
| | D. Summary courts ........................................... | 13 |
| | E. Preliminary investigations ............................... | 13 |
| | F. Additional recommendations ............................... | 13 |
| | 1. Amendment of AW 43 as to votes to convict .............. | 13 |
| | 2. Repeal of AW 44, 87, 88, and 91 because now obsolete ... | 13 |
| | 3. Amendment of AW 92 as to punishment for rape ........... | 13 |
| | 4. Discretionary dishonorable discharge upon sentence over six months ................................... | 13 |
| | 5. Blue discharge ........................................ | 13 |
| | 6. Adopt Federal rule of evidence as to entry in due course of business ............................... | 13 |
| IV. | RECOMMENDATIONS FOR FURTHER STUDY IN WAR DEPARTMENT ........... | 14 |

JA.268

u.s. War Dept. Advisory Committee on Military  KM
TO THE HONORABLE                   Justice.              8500
THE SECRETARY OF WAR:                                    .U588
                                                         R4
## REPORT OF ADVISORY COMMITTEE ON MILITARY JUSTICE      1946

## I.   INTRODUCTION

On 25 March 1946, this Committee was appointed by War Department Memoran-

dum No. 25-46, reading as follows:

Memo 25-46

MEMORANDUM)                              WAR DEPARTMENT
No. 25-46 )                    Washington 25, D. C., 25 March 1946

### WAR DEPARTMENT ADVISORY COMMITTEE
### ON MILITARY JUSTICE

1.  An Advisory Committee, whose membership has been nominated by the
American Bar Association, is established in the Office of the Secretary of War
to consist of the following members:

> Mr. Arthur T. Vanderbilt, Newark, New Jersey, Chairman
> Mr. Justice Alexander Holtzoff, Washington, D. C., Secretary
> Mr. Walter P. Armstrong, Memphis, Tennessee
> Honorable Frederick E. Crane, New York, New York
> Mr. Joseph W. Henderson, Philadelphia, Pennsylvania
> Mr. William T. Joyner, Raleigh, North Carolina
> Mr. Jacob M. Lashly, St. Louis, Missouri
> U. S. Circuit Judge Morris A. Soper, Baltimore, Maryland
> Mr. Floyd E. Thompson, Chicago, Illinois

2.  The function of the Committee will be to study the administration of
military justice within the Army and the Army's courts-martial system, and to
make recommendations to the Secretary of War as to changes in existing laws,
regulations, and practices which the Committee considers necessary or appro-
priate to improve the administration of military justice in the Army.

3.  The Committee is to have full freedom of action in the accomplishment
of its mission and is authorized to hold such hearings and call such witnesses
as it may deem desirable, and to call upon the Office of the Under Secretary of
War, The Judge Advocate General, and any other appropriate agency of the War De-
partment for information or assistance needed in the conduct of its activities.

(AG 334 (22 Mar 46))

BY ORDER OF THE SECRETARY OF WAR:

OFFICIAL:                                   DWIGHT D. EISENHOWER
  EDWARD F. WITSELL                         Chief of Staff
  Major General
  The Adjutant General

1

**JA.269**

Since March 25, 1946 the members of this Committee have been engaged in studies, investigations, and hearings. We have availed ourselves of voluminous statistical and result studies by the Judge Advocate General's Department, including a two-volume History of the Branch Office, The Judge Advocate General, European Theater, and by the General Board, United States Forces, European Theater. We have studied other material furnished at our request.

At full committee hearings in Washington, we have heard the Secretary of War, the Under Secretary of War, the Chief of Staff of the Army, the Commander of the Army Ground Forces, The Judge Advocate General, the Assistant Judge Advocate General, and a number of Generals, Lieutenant Generals, Major Generals, Brigadier Generals, Colonels, and representatives of five Veterans' organizations.

We have received and have examined and digested hundreds of letters. We have had numerous personal interviews. We have received, and have digested, 321 answers to mimeographed questionnaires from officers of all grades, enlisted men and civilians.

We have held widely advertised regional public hearings at New York, Philadelphia, Baltimore, Raleigh, Atlanta, Chicago, St. Louis, Denver, San Francisco, and Seattle. At those hearings there was adduced testimony reported in 2,519 pages of transcript.

At all times we have received complete cooperation from the officials of the War Department and from the officers of the Army. There has been no attempt to restrict our inquiry. There has been no attempt to prevent officers from expressing their individual views with complete frankness. And the views of officers have differed sharply on many points. The Committee has had a free hand.

As the result of this general survey, and particularly as the result of regional hearings and personal interviews, it is thought that the Committee is now able to respond to the invitation of the Secretary of War. That invitation was doubtless provoked by public criticism of the Army system of military justice, and by the desire of the War Department to profit by its experience and introduce desirable improvements, as indeed it did in a similar situation after the First World War. The approach of this committee must of necessity be critical since we have been asked to suggest "changes in the existing laws, regulations, and practices" for the improvement of the administration of military justice in the Army; and our report may seem an ungracious reflection upon military leaders who have won a great victory for the American people. We can only say that we speak in answer to the Army's request and that we join our countrymen in general acclaim of the Army's achievement; and especially on behalf of the thousands of young lawyers who served in the Army courts and to a far greater extent on the field of battle, we express our profound obligation to the brilliant generalship that led to the successful outcome.

We desire to make it clear at the outset that our findings are not based on the testimony of convicted men or their friends. Complaints from that source were considered by the committee headed by former Justice Owen J. Roberts

who examined court-martial sentences for severity after the war and in many instances reduced them. Our information comes from general officers, staff judge advocates and in large part from men who served as members of the courts and as counsel for the respective parties. Many of them are known by us to be young men of unquestioned character and ability, who have become or will become leaders of the legal profession in the future, the sort of men upon whom a greatly expanded army must rely in time of war and who, in giving their testimony, had no grievances to air or desire to impair or destroy the existing system but were moved to offer sympathetic and constructive suggestions for its upbuilding. We append as an excellent example of their suggestions a copy of a letter received from a Committee on Courts-Martial of the Chicago Bar Association.

Almost without exception our informants said that the Army system of justice in general and as written in the books is a good one; that it is excellent in theory and designed to secure swift and sure justice; and that the innocent are almost never convicted and the guilty seldom acquitted. With these conclusions the Committee agrees. We were struck by the lack of testimony as to the conviction and punishment of innocent men. This is doubtless true because, speaking in general terms, the system is designed to accord a fair trial. It includes a preliminary investigation to determine whether a formal charge should be laid; the formulation of the charge in precise terms in case a prosecution is needed; the appointment of a general court by the commander of the division, consisting of at least five officers of whom one must be a law member with the qualifications of an experienced lawyer, all sworn to give a fair and impartial trial to the accused; the appointment of counsel for the prosecution and the defense; an automatic review of the judgement of the court by the appointing authority, after receiving the advice of his staff judge advocate, who may set aside a verdict of guilty or reduce a sentence but not increase it; and finally an additional automatic review in the more important cases in the Judge Advocate General's Department. It cannot be doubted that such a system is capable of speedy action and the safeguarding of rights of the accused.

The Committee noted, however, amongst the constructive critics of the system, a surprising lack of enthusiasm for its operation. On the contrary there was often a disquieting absence of respect for the operation of the system in its tremendous expansion under the impact of war. There was considerable indignation at some of the current and all too frequent breakdowns. The general comment was that the system laid down in the Manual for Courts-Martial of the Army was not followed as closely as it should have been and that the system not infrequently broke down because of two things: (1) a failure on the part of the Army to foresee the needs of its system of military justice and a reluctance to utilize available men of legal skill so that the courts were frequently staffed with incompetent men; (2) the denial to the courts of independence of action in many instances by the commanding officers who appointed the courts and reviewed their judgements, and who conceived it the duty of the command to interfere for disciplinary purposes.

The result, in the opinion of many of the witnesses, was that although the innocent were not punished, there was such disparity and severity in the impact of the system on the guilty as to bring many military courts into

3

disrepute both among the law-breaking element and the law-abiding element, and a serious impairment of the morale of the troops ensued where such a situation existed. The leading and most frequently occurring criticisms which we have heard are listed here:

1. There was an absence of sufficient attention to and emphasis upon the military justice system, and lack of preliminary planning for it.

2. There was a serious deficiency of sufficiently qualified and trained men to act as members of the court or as officers of the court.

3. The command frequently dominated the courts in the rendition of their judgment.

4. Defense counsel were often ineffective because of (a) lack of experience and knowledge, or (b) lack of a vigorous defense attitude.

5. The sentences originally imposed were frequently excessively severe and sometimes fantastically so.

6. There was some discrimination between officers and enlisted men, both as to the bringing of charges and as to convictions and sentences.

7. Investigations, before referring cases to trial, were frequently inefficient or inadequate.

These criticisms were testified to at each of the regional hearings by numerous witnesses and were repeated so frequently in the correspondence and answers to the questionnaires received by the Committee as to indicate a definite pattern of defects in the actual operation of the court-martial system. The Committee is of the opinion that these criticisms are well founded and reflect actual breakdowns in the operation of the system. It can and should receive correction; and the Committee has given consideration to recommendations to this end.

## II. GENERAL RECOMMENDATIONS

Our first recommendations are general:

1. We recommend that the Secretary of War, the General Staff, and the Army place greater emphasis upon the operation of the Army system of justice.

The impression which the Committee got in all of its hearings was that for one reason or another the Army system of justice was pushed well into the background, not only in wartime but in prewar peacetime. Nearly every witness, including almost all of the generals, testified that there was a very great lack of officers properly trained in courts-martial duty.

It was clearly proven that, frequently, officers with no legal training were used as law members, trial judge advocates or defense counsel of general

4

courts; and yet it is perfectly clear that there were available to the Army a sufficient number of competent men with legal training to have staffed all of the courts everywhere. The failure to produce these legally trained men for court members or officers was due primarily to failure to make proper plans for the courts. Indeed high ranking officers have expressed a reluctance to make use of civilian trained lawyers in the Army system. We were told that more than 25,000 lawyers applied for commissions in the Judge Advocate General's Department, but the applications were not received with favor. At the beginning of the war the Army was relying on the hope, which proved illusory, that some 500 judge advocates in the Officers' Reserve Corps would prove sufficient. The Judge Advocate General's School was established February 6, 1942, but the Officers' Candidate School was not activated until March, 1943, and while the schools did good work they were insufficient to fill the need. It is quite certain that the Army planning organization very badly underestimated the number of legally trained men needed in the Judge Advocate General's Department.

The starving of the Army's legal branch and other evidence convince us that high Army circles did not properly evaluate the importance of the system of justice to be established in a large army drafted from the American people; and that this oversight occurred the more easily because of the traditional fear of Army men that adherence to legal methods, even in courts-martial, would impede the military effort in time of war. A high military commander pressed by the awful responsibilities of his position and the need for speedy action has no sympathy with legal obstructions and delays, and is prone to regard the courts-martial primarily as instruments for enforcing discipline by instilling fear and inflicting punishment, and he does not always perceive that the more closely he can adhere to civilian standards of justice, the more likely he will be to maintain the respect and the morale of troops recently drawn from the body of the people.

Some of the critics of the Army system err on the other side and demand the meticulous preservation of the safeguards of the civil courts in the administration of justice in the courts of the Army. We reject this view for we think there is a middle ground between the viewpoint of the lawyer and the viewpoint of the general. A civilian entering the army must of course surrender many of the safeguards which protect his civilian liberties. The Army commander must be ready to retain all of the safeguards which are consistent with the operation of the army and the winning of the war. The civilian must realize that in entering the army he becomes a member of a closely knit community whose safety and effectiveness are dependent upon absolute obedience to the high command; and that for his own protection, as well as for the safety of his country, army justice must be swift and sure and stern. He must realize the truth of what was well said by Lord Birkenhead in commenting on the British system of military justice that "where the risks of doing one's duty is so great, it is inevitable that discipline should seek to attach equal risks to the failure to do it."

On the other hand the commander of an American army must realize that he is dealing with men whose initiative, ingenuity, and independent self-respect have made them the best soldiers in the world. Nothing can be worse for their morale than the belief that the game is not being played according to the rules

5

in the book, the written rules contained in the Articles of War and the Manual of Courts-Martial. The foundation stone of the soldier's morale must be the conviction that if he is charged with an offense, his case will not rest entirely in the hands of his accuser, but that he will be able to present his evidence to an impartial tribunal with the assistance of competent counsel and receive a fair and intelligent review. He is an integral part of the army, and the army courts are his system of justice. Everything that is practicable should be done to increase his knowledge of the system and to strengthen his respect for it, and if possible, to make him responsible in some particular for its successful operation. These "justice" considerations are important to a modern peacetime army as well as to a wartime army. As our outlook upon world affairs and our concepts of military service have broadened, National Defense has become a matter of concern to every citizen. The nearer our approach to universal military service the greater is the need to emphasize the military justice system. We believe that the special recommendations subsequently made herein will, if adopted, aid in improving the system.

    2.  We recommend a substantial enlargement of the Army legal department, the Judge Advocate General's Department. We recommend an increase in the number of technicians in the administration of the Army system of justice.

    The witnesses before our Committee were almost unanimous in this general recommendation. Almost all said that they observed a real need for more lawyers in the administration of the Army system of justice. The Judge Advocate General's Department needs more lawyers, more clerks, more reporters and more statisticians.

    Nearly every witness said that it would be desirable, if practicable, to have with every general court a law member, a trial judge advocate, and defense counsel, who are trained lawyers and members of the Judge Advocate General's Department. We will refer later to the personnel problem involved. Here we make the general recommendation for substantial enlargement of the Department.

    In time of war, the problem of securing adequately trained experienced and competent trial lawyers should present no great difficulty. In the last war the shortage of lawyers was due to two things: (a) the Army did not seek enough lawyers, and (b) many of the very best trained lawyers preferred to go into the line and did not wish to disclose the fact of their law experience. In meeting this situation cooperation between the army and leaders of the legal profession may be of real assistance. Certainly the legal profession could assist the War Department in the selection of properly qualified young lawyers and the Army would be clothed with ample authority to assign them to the duties for which they are best qualified.

<u>III. SPECIFIC RECOMMENDATIONS</u>

<u>A. The checking of command control</u>

    The Committee is convinced that in many instances the commanding officer who selected the members of the courts made a deliberate attempt to influence

6

their decisions. It is not suggested that all commanders adopted this practice but its prevalence was not denied and indeed in some instances was freely admitted. The close association between the commanding general, the staff judge advocate, and the officers of his division made it easy for the members of the court to acquaint themselves with the views of the commanding officer. Ordinarily in the late war a general court was appointed by the major general of a division from the officers in his command, and in due course their judgment was reviewed by him. Not infrequently the members of the court were given to understand that in case of a conviction they should impose the maximum sentence provided in the statute so that the general, who had no power to increase a sentence, might fix it to suit his own ideas. Not infrequently the general reprimanded the members of a court for an acquittal or an insufficient sentence. Sometimes the reproof was oral and sometimes in writing by way of what the Army has come to know as a "skin-letter." For example, one lieutenant general of unquestioned capacity voluntarily testified that he wrote a stinging letter of rebuke to the members of a court who had imposed a sentence of five years upon a soldier who deserted his division while in training in the United States. The general was incensed because the sentence was not twenty-five years and considered it his duty to chastise the court for extreme leniency.

There were instances in which counsel were appointed to defend an accused who possessed little competence for the task, especially when compared with that of the prosecuting officer; and there were instances in which it was believed that the well-known attitude of the commander minimized the independence and vigor of the defense. There is no doubt that defendants' counsel were frequently incompetent and the tendency of the commander in certain units to influence the courts led not unreasonably to the suspicion that a competent and vigorous defense was not desired. Communications received in answer to questionnaires from generals, judge advocates, and enlisted men produced the following results in answer to the question, "To what extent are court-martials under the domination of convening authority?": Of forty-nine generals, fourteen replied that the courts were dominated and thirty-five that they were seldom dominated. Of forty-five judge advocates, seventeen replied that the courts were dominated and twenty-eight that they were seldom dominated. Of twenty-nine enlisted men, twenty-two replied that the courts were dominated and seven that they were seldom dominated.

So far as the committee is informed, no steps have been taken in the Army to check or prohibit commanding officers in the exercise of their power and influence to control the courts. Indeed the general attitude is expressed by the maxim that discipline is a function of command. Undoubtedly there was in many instances an honest conviction that since the appointing authority was responsible for the welfare and lives of his men, he also had the power to punish them, and consequently the courts appointed by him should carry out his will. We think that this attitude is completely wrong and subversive of morale; and that it is necessary to take definite steps to guard against the breakdown of the system at this point by making such action contrary to the Articles of War or regulations and by protecting the courts from the influence of the officers who authorize and conduct the prosecution. To this end we recommend:

1. The Manual for Courts-Martial, United States Army, should provide that it is improper and unlawful for any person to attempt to influence the

7

action of an appointing or reviewing authority or the action of any court-
martial, general, special, or summary, in reaching its verdict or pronouncing
sentence, except persons connected with the work of the court, such as mem-
bers of the court, attorneys, and witnesses; and this prohibition should be
made expressly applicable to the appointing or reviewing authority. It
should be stated that any violation will be considered conduct of a nature
to prejudice military discipline and to bring discredit upon the military
service in violation of Article of War 96.

2. The Manual should also contain an express prohibition against the
reprimand of the court or its members in any form. The reprimand sometimes
given a jury by a judge in a civil court for an erroneous verdict furnishes
no parallel or excuse for the present Army practice.  The jury upon its
discharge returns to the body of the people, but the members of a court-martial
remain in the service subject to the will of superior officers as to promo-
tions, assignments to duty, and transfers.  The statement on page 74 of the
Manual that the reviewing authority may properly advise members of a court
by letter of his nonconcurrence in an acquittal should be expunged.  It is
a relic of the power formerly possessed by the reviewing authority to return
a record of trial to the court for reconsideration of findings of not guilty.
This power was taken away in the amendment of the Articles of War and regu-
lations after the First World War and the spirit of the repeal should be
respected.

These recommendations are not intended to alter the duty or authority
of the command to instruct the officers and enlisted men in respect to the
court-martial system and its operation.

3. The Manual should contain a statement that it is the duty of courts-
martial to exercise their own judgment in imposing sentences and that they
should not pronounce sentences which they know to be excessive, relying
on the reviewing authority to reduce them.

4. It should be a jurisdictional requirement that the law member and
the defense counsel of a general court-martial shall be trained lawyers and
commissioned officers detailed by the Judge Advocate General's Department.
It should be required that the law member be actually present throughout
the trial. The ruling of the law member on legal questions, except as to the
sufficiency of the evidence, should be binding on the court. An adverse
ruling by the law member on the sufficiency of the evidence would result in
an acquittal and this question should therefore be left to the whole court
subject to the subsequent automatic review.

It should be made mandatory that the defense counsel should always be a
lawyer. It is unfair to the accused to  assign a layman as defense counsel
when the trial judge advocate is a lawyer. The authority appointing the
court should designate defense counsel but the right of the accused to
select his own counsel should not be disturbed. There should always be
available a list of all lawyers connected with the command to which the
accused belongs, who should be given the privilege of selecting defense
counsel from the list, if available, to act in preference to or in associ-
ation with the defense counsel designated by the appointing authority.

5. The final review of all general court-martial cases should be placed
in the Department of the Judge Advocate General and every such review should be

8

made by The Judge Advocate General or by the Assistant Judge Advocate General
for a theater of operations, or by such board or boards as shall be designated
by The Judge Advocate General or the Assistant. This reviewing authority
shall have the power to review every case as to the weight of the evidence, to
pass upon the legal sufficiency of the record and to mitigate, or set aside,
the sentences and to order a new trial. This recommendation relates not only
to checking command control but also importantly to the correction of excessive
and fantastic sentences and to the correction of disparity between sentences.

In order to make this recommendation effective, Article of War 50 1/2
should be amended. In its present form it is almost unintelligible. It
should be rewritten and the procedure prescribed should be made clearer and
more definite. There seems to be no good reason why cases in which dis-
honorable discharge is suspended should not be reviewed in the same way as are
cases in which it is not suspended.

6. The need to preserve the disciplinary authority of the command and
at the same time to protect the independence of the court can be met in the
following manner. The authority of the division or post commander to refer
a charge for prompt trial to a court appointed by a judge advocate should be
absolute. The commander should, of course, be furnished with a judge advocate
to advise him with reference to the disposition of the charge. The right of
the command to control the prosecution, and to name the trial judge advocate,
who should be a trained lawyer, should be retained. The Judge Advocate Gen-
eral's Department, however, should become the appointing and reviewing au-
thority independent of the command. For this purpose the present organization
of the Judge Advocate General's Department may be sufficient and the power to
select and review its judgment should normally rest with the Staff Judge
Advocate at Army level, so that the members of the court may be selected from
a wider area and the perennial problem of disparity of sentences in similar
cases may be at least partially solved. It may be best in certain instances
to place the authority on a higher level, or in case of war or in case of
units established at a distance from the command, to delegate the authority
to a division or smaller unit. We believe that the flexibility of such a
system will aid in the solving of many problems and will permit the establish-
ment of permanent courts or traveling courts if they be found desirable.
Article of War 8 should be amended to accomplish this purpose.

We realize that the officers of a division or command may have a special
understanding of local conditions and be best qualified to try local offenders
and also that officers must not be appointed to courts-martial duties if,
in the opinion of the commander, they are unavailable. These requirements may
be met by the establishment of a panel of available officers by the commander,
subject to change from time to time, from which the selection of members of
the court may be made. The determination of the commander as to availability
must, of course, be final. It is not meant that the selection of the members
of the courts-martial shall be confined to the division or command in which
the offense occurs.

We have no fear that this arrangement will impair the proper authority or
influence of the commander. The absolute right to refer the change for speedy

trial and to control the prosecution will satisfy the demands of discipline. Further than that the command should not go. The present Articles of War do not contemplate that the commander shall control the action of the courts. The members of the court take an oath under Article of War 19 to well and truly try and determine, according to the evidence, the matters submitted to them without partiality, favor, or affection, according to the rules and articles for the government of the armies of the United States. The right to fix the penalty in case of conviction is specifically lodged in the court and the surrender of this power to the commander is an act which the court has no legal right to perform, and the commander no legal justification to require.

The need for the prompt appointment of a court and a speedy trial when the command refers a charge for trial must be recognized. Moreover, the deterrent effect of punishment must not be overlooked and the need for severe sentences under conditions prevailing in an army in a state of war cannot be denied. But there is no reason to think that the members of the Judge Advocate General's Department will not be keenly alive to all these necessities. They will be army men selected and trained by army men. In time of war they will be in the field in close association with the command and cognizant of all the considerations of safety and success which influence the command itself. The time is past when a court-martial might be deemed merely as an advisory council to the commander. The court-martial, as conceived by the Articles of War, is an independent tribunal; and if the commander controls the prosecution, the appointment and functioning of the court may be safely left to the legal department of the Army.

7. The special understanding that officers of a division or command have of local conditions lead us also to recommend that the general or other officer who referred the case for trial should have the power to mitigate, suspend, or set aside the sentence. In order to effectuate this recommendation the record should be first sent by the court to the officer who referred the case for trial so that he may have an opportunity to act upon the sentence and it should be his duty to act promptly and forward the record to the reviewing authority for final action. The power of the command in this respect should be limited to the question of clemency.

8. The members of the Judge Advocate General's Department should be governed as to promotions, efficiency reports and specific duty assignments in the chain of command of the Judge Advocate General's Department and not by the commanding officer of the organizations in which they may be serving.

9. In order to overcome the difficulty of securing and holding trained lawyers in the Judge Advocate General's Department in time of peace, it is specifically recommended that they be afforded the same privileges regarding promotion as is now afforded to the other professions whose personnel are at present on a separate promotion list and that necessary legislation to effect this be initiated without delay, in order that the proposed enlargement of the department may be coordinated with these new privileges.

10. Special courts-martial should be governed as far as practicable by the same requirements as general courts-martial.

## B. Discrimination in officer punishment

A great deal of testimony which we have heard tended to show that officers were not prosecuted as consistently or punished as severely as enlisted men. The critics did not always understand the difficulties of the situation or appreciate the severity of the punishment inflicted upon an officer by the imposition of a fine or the loss of promotion or reduction in rank, and the devastating effect of this punishment upon his career. Nevertheless, we are convinced that in some instances and in some areas there was foundation for the complaint and it was a general source of criticism among the troops and seriously impaired their morale.

In general, we believe that officers would be less likely to offend if they were subjected to a greater extent to the deterrent influence of punishment which in army circles is deemed so effective in dealing with enlisted men.

In particular, we make the following recommendations:

1. Article of War 104 should be amended to provide: (a) that warrant officers, flight officers, and field officers shall be punishable thereunder; (b) that the punishment shall be imposed by an officer with the rank not less than that of Brigadier General or by an officer who has general court-martial jurisdiction under Article of War 8; (c) that the maximum fine be increased to one-half month's pay for each of three months.

The right of the officer to demand a court-martial and to appeal to the next higher commander should of course be preserved.

2. The trial of officers by special courts should be authorized in order to bridge the gap between punishment under Article 104 and punishment by a general court. The existence of that gap was given by many witnesses as the reason why officers did not receive more punishment. The only court punishment available was that imposed by general court after trial and, in many instances, such a trial was considered too drastic. We see no adequate reason why an officer should not be tried by special court. Some witnesses took the position that an officer should not be tried unless conviction was to be followed by dismissal from the service, since a convicted officer is no good to the service. Records of general court-martial officer trials and conviction do not bear out that conclusion. In the European Theater there were 1737 officers tried, 1396 were convicted. Of those convicted 74 per cent were not dismissed from the service but were retained in the service and, presumably, continued to render valuable military service.

Information should be given out as to the use of reprimand and Article of War 104; in order that the impression, that officers are not punished for offenses for which enlisted men are punished, may be corrected.

3. In time of war a general court-martial should be authorized in its discretion to inflict as officer punishment, loss of commission, and reduction to the ranks. In numerous instances officers would prefer it and we see no reason why this should not be left to the discretion of the general court.

11

4. Article of War 85 should be amended so that it will read as follows:

"Art. 85. Drunk on Duty. Any person subject to military law who is found drunk on duty shall be punished as a court-martial may direct."

The purpose of this amendment is to eliminate a motive for the unwarranted acquittal of an officer charged with drunkenness on duty. As the article is now written an officer convicted of drunkenness in time of war, must be sentenced to dismissal.

## C. Enlisted men and courts-martial

We have already stressed the fact that courts-martial perform an absolutely necessary disciplinary function and that good discipline presupposes just treatment. If the trials are conducted in such a way or punishment of such severity is imposed as to create a feeling among the troops that courts-martial are arbitrary and unjust, the disciplinary effect will be impaired or destroyed. It is necessary not only that the system function fairly but that its fairness be recognized by the men in the service. To this end we make the following recommendations:

1. Special emphasis should be placed upon the education and instruction of enlisted men with respect to Army justice. The Articles of War should not only be read; they should be explained. The instructions should not be confined to Articles relating to punishment of enlisted men, but should include the Articles dealing with the rights and the protection of enlisted men, such as Articles of War 24, 97, and 121.

Further, the nature and the function of general courts-martial, special courts-martial, summary courts-martial, and company punishment should be explained. The enlisted man should be taught that army discipline and army courts-martial are necessary for his comfort, protection and safety; and that the Army judicial system is not something for use against him, but something which works for him.

2. The sessions of general, special and summary courts should not only be open (except where security or social policy reasons require otherwise), but they should be bulletined so that the attendance of spectators be encouraged. Special effort should be made to conduct army courts with impressive decorum.

3. Qualified enlisted men should be eligible to serve as members of general and special courts-martial and should be appointed thereon to the extent that in the discretion of the appointing authority, it seems desirable to do so. We realize that there is a sharp division of opinion on the subject. The generals and commissioned officers generally are divided as to the desirability of the proposal, while a preponderant majority of the enlisted men favor it. Those opposed to it contend that since the movement of qualified men in the Army is upward, the appointment of enlisted men will lower the quality of the courts and give rise to personal antagonism and recrimination in army units when enlisted men participate in the conviction and sentence of their fellows. We think, however, that some improvement of the morale of the enlisted men may

12

follow from increasing their knowledge of the functioning of the Army system of justice, their confidence in its operation and their feeling of responsibility for the enforcement of Army discipline.

### D. Summary courts.

We recommend that summary court officers should be selected from captains or officers of field grade, if available, and that the selection of junior and inexperienced officers for this purpose should be avoided. If necessary, summary court officers should be appointed from a larger area or a larger unit than is at times done at present.

The accused should be allowed to have counsel of his own selection before a summary court, if he so requests, but the appointment of counsel should not be required.

### E. Preliminary Investigations.

· The provision of Article of War 70, that no charge will be referred to a general court-martial for trial until after a thorough, impartial investigation thereof shall be made, should be enforced. Trained and mature officers should be regularly assigned to carry on preliminary investigations under this Article; and this function should be regarded as part of their regular duties. While legal training is not indispensable for this purpose, it is preferable that either a lawyer or an officer with investigative experience should be assigned to this work.

### F. Additional Recommendations.

1. Article of War 43 should be amended so as to state clearly and unambiguously the number of votes necessary to convict.

2. **Articles of War 44, 87, 88 and 91 should be repealed because they are now obsolete.**

3. Article of War 92 should be amended so as to provide that a person convicted of rape shall suffer death or such punishment as a court-martial may direct.

4. The present mandatory requirement contained in the Manual for Courts-Martial, 1928, page 96, that a sentence of imprisonment of an enlisted man for over six months must be accompanied by dishonorable discharge should be abolished and in lieu thereof it should be provided that a dishonorable discharge in such a case is discretionary with the general court.

5. There should be introduced an additional type of discharge; namely, a discharge for unfitness similar to a so-called "blue discharge" in order that a sentence of dishonorable discharge should be reserved for exceptionally grave and heinous offenses.

6. The rules governing the admissibility of documentary evidence should be liberalized, particularly with reference to the admission of entries made in the usual course of business. We recommend the elimination of the confusing reference to personal knowledge and the adoption of the rule now prevalent in the Federal courts.

**JA.281**

<u>IV.  RECOMMENDATION FOR FUTURE STUDY IN WAR DEPARTMENT</u>

It is recommended that a Board of Officers be constituted to consider other advisable changes in the Articles of War and in the Manual of Courts-Martial and that such study be a continuous process so that further changes may be made as the need for them appears to develop.  Suggestions were made to the Committee which interested it very much but involved questions that the Committee does not now feel qualified to decide.  Among the things to which we think the War Department should give further serious consideration are:

a.  The enlargement of the authority of commanding officers under Article 104 to extend punishment to enlisted men.  To this is tied the further suggestion of increasing the power, authority, and dignity of the summary court and providing that summary court officers must be of field grade.  We think that the balancing of the advantages of the diminution of summary court trials against the danger of abuse by new and untried company commanders can only be done by officers of the Army.  We recommend that they consider the trial of this experiment.

b.  The elimination of all mandatory minimum punishments specified in the Articles of War or regulations so as to give wider discretion in passing sentences.

c.  The creation of permanent, general courts-martial for territorial units to be used as rotating courts wherever practicable and wherever experience proves it desirable.

d.  The taking of depositions at the earliest possible moment in time of war, subject to the limitation that defendant must have counsel and that both sides have notice of the taking of the deposition and an opportunity to participate in it.

e.  Amendment of Article of War 25 to contain a final proviso following the present proviso which permits the defense to introduce depositions in a capital case, the new proviso to read as follows:

"Provided, further, that a deposition may be read in evidence by the prosecution in any case in which the death penalty is authorized by law but is not mandatory, whenever the appointing authority shall have directed that the case be treated as not capital, and in such case a sentence of death may not be adjudged by the court-martial."

f.  The removal of the statute of limitations on prosecution for absence without leave occurring in time of war.

g.  Provision that all courts-martial should announce their findings as soon as reached and, in case of conviction, should hear arguments of counsel on questions of sentence and that upon reaching a determination as to sentence, should announce the sentence.

h.  Provision in the Manual defining what portions of unofficial record of general court-martial and of the reviewing authority shall be available to inspection of defense counsel.

14

JA.282

i.  Provision that upon direction of the law member there shall be included in the transcript of record of every general court-martial the opening statements and/or closing arguments of counsel where the precise position of either party is not sufficiently emphasized in the record.

j.  The extension of the doctrine of condonation where a soldier is committed to actual combat with knowledge of the pending charge.

### CONCLUSION

There is attached to this report (a) a document consisting of 30 pages with a 14 page appendix entitled "A summary of constructive criticisms received by the War Department's Advisory Committee on Military Justice," and (b) a document consisting of 71 pages entitled "Topical Outline - Compilation of Answers - Generals, Judge Advocates, Enlisted Men."

It is hoped that our report will help to improve the administration of Military Justice and increase its beneficial effect upon the discipline and morale of the men in the Army.

Respectfully submitted,

Arthur T. Vanderbilt

Alexander Holtzoff

Walter P. Armstrong

Frederick E. Crane

Joseph W. Henderson

W. T. Joyner

Jacob M. Lashly

Morris A. Soper

13 December 1946                              Floyd E. Thompson

15



**Attachment D**

*U.S. Congress. Conference Committee, 1918.*

| 80TH CONGRESS 2d Session | HOUSE OF REPRESENTATIVES | REPORT No. 2438 |
|---|---|---|

## SELECTIVE SERVICE ACT OF 1948

JUNE 19, 1948.—Ordered to be printed

Mr. ANDREWS of New York, from the committee of conference, submitted the following

## CONFERENCE REPORT

[To accompany S. 2655]

The committee of conference on the disagreeing votes of the two Houses on the amendment of the House to the bill (S. 2655) to provide for the common defense by increasing the strength of the armed forces of the United States, including the reserve components thereof, and for other purposes, having met, after full and free conference, have agreed to recommend and do recommend to their respective Houses as follows:

That the Senate recede from its disagreement to the amendment of the House and agree to the same with an amendment as follows:

In lieu of the matter proposed to be inserted by the House amendment insert the following:

### TITLE I

SECTION 1. (a) This Act may be cited as the "Selective Service Act of 1948".

(b) The Congress hereby declares that an adequate armed strength must be achieved and maintained to insure the security of this Nation.

(c) The Congress further declares that in a free society the obligations and privileges of serving in the armed forces and the reserve components thereof should be shared generally, in accordance with a system of selection which is fair and just, and which is consistent with the maintenance of an effective national economy.

(d) The Congress further declares, in accordance with our traditional military policy as expressed in the National Defense Act of 1916, as amended, that it is essential that the strength and organization of the National Guard, both Ground and Air, as an integral part of the first line defenses of this Nation, be at all times maintained and assured.

To this end, it is the intent of the Congress that whenever Congress shall determine that units and organizations are needed for the national

H. Rept. 2438, 80-2——1

2        SELECTIVE SERVICE ACT OF 1948

*security in excess of those of the Regular components of the Ground Forces and the Air Forces, and those in active service under this title, the National Guard of the United States, both Ground and Air, or such part thereof as may be necessary, together with such units of the Reserve components as are necessary for a balanced force, shall be ordered to active Federal service and continued therein so long as such necessity exists.*

*(e) The Congress further declares that adequate provision for national security requires maximum effort in the fields of scientific research and development, and the fullest possible utilization of the Nation's technological, scientific, and other critical manpower resources.*

### AUTHORIZED PERSONNEL STRENGTHS

*Sec. 2. Notwithstanding any other provision of law, the authorized active duty personnel strength of the armed forces, exclusive of personnel of the reserve components on active duty for training purposes only, officer candidates, personnel of the armed forces employed in the Selective Service System, and persons paid under the appropriations for the Naval Reserve and the Marine Corps Reserve, is hereby established as follows: (1) Of the Army of the United States, eight hundred thirty-seven thousand plus one hundred ten thousand one-year enlistees; (2) of the Navy, including the Marine Corps, the present authorized statutory strength of six hundred sixty-six thousand, eight hundred and eighty-two, plus thirty-six thousand one-year enlistees; and (3) of the Air Force of the United States, five hundred two thousand plus fifteen thousand one-year enlistees. The strength herein established for each of the armed forces shall mean the daily average number of persons on active duty therein during the fiscal year.*

### REGISTRATION

*Sec. 3. Except as otherwise provided in this title, it shall be the duty of every male citizen of the United States, and every other male person residing in the United States, who, on the day or days fixed for the first or any subsequent registration, is between the ages of eighteen and twenty-six, to present himself for and submit to registration at such time or times and place or places, and in such manner, as shall be determined by proclamation of the President and by rules and regulations prescribed hereunder.*

### TRAINING AND SERVICE

*Sec. 4. (a) Except as otherwise provided in this title, every male citizen of the United States, and every other male person residing in the United States, who is between the ages of nineteen and twenty-six, at the time fixed for his registration, or who attains the age of nineteen after having been required to register pursuant to section 3 of this title, shall be liable for training and service in the armed forces of the United States. Any citizen of a foreign country, who is not deferrable or exempt from training and service under the provisions of this title (other than this subsection), shall be relieved from liability for training and service under this title if, prior to his induction into the armed forces, he has made application to be relieved from such liability in the manner prescribed by and in accordance with rules and regulations prescribed by the President; but any person who makes such application shall thereafter be debarred from becoming a citizen of the United States. The President*

UB343
.A5 4480
copy 3

SELECTIVE SERVICE ACT OF 1948                3

is authorized from time to time, whether or not a state of war exists, to select and induct into the armed forces of the United States for training and service in the manner provided in this title such number of persons as may be required to provide and maintain the personnel strengths (other than one-year enlistee personnel strengths) of the respective armed forces authorized by section 2 of this title.

No person shall be inducted for training and service under this title unless and until he is acceptable to the armed forces for such training and service and his physical and mental fitness for such training and service has been satisfactorily determined under standards prescribed by the Secretary of Defense.

No persons shall be inducted for such training and service until adequate provision shall have been made for such shelter, sanitary facilities, water supplies, heating and lighting arrangements, medical care, and hospital accommodations, for such persons, as may be determined by the Secretary of Defense to be essential to public and personal health.

The persons inducted into the armed forces for training and service under this title shall be assigned to stations or units of such forces. Persons inducted into the land forces of the United States pursuant to this title shall be deemed to be members of the Army of the United States; persons inducted into the naval forces of the United States pursuant to this title shall be deemed to be members of the United States Navy or the United States Marine Corps, as appropriate; and persons inducted into the air forces of the United States pursuant to this title shall be deemed to be members of the Air Force of the United States.

No person, without his consent, shall be inducted for training and service under this title, except as otherwise provided herein, after he has attained the twenty-sixth anniversary of the day of his birth.

(b) Each person inducted under the provisions of subsection (a) shall serve in the armed forces for a period of twenty-one consecutive months, unless sooner discharged in accordance with standards and procedures prescribed by the Secretary of Defense.

(c) (1) Under the provisions of applicable laws and regulations any person between the ages of nineteen and twenty-six shall be offered an opportunity to enlist in the Regular Army for a period of service equal to that prescribed in subsection (b) of this section.

(2) Any enlisted member of any reserve component of the Armed Forces may, during the effective period of this Act, apply for a period of service equal to that prescribed in subsection (b) of this section and his application shall be accepted: Provided, That his services can be effectively utilized and that his physical and mental fitness for such service meet the standards prescribed by the head of department concerned: And provided further, That active service performed pursuant to this section shall not prejudice his status as such member of such reserve component.

(3) The passing requirement for the General Classification Test shall be fixed at seventy points.

(d) (1) Each person who hereafter is inducted, enlisted, or appointed (except a person enlisted under subsection (g) of this section) and serves for a period of less than three years in one of the armed forces and meets the qualifications for enlistment or appointment in a reserve component of the armed force in which he serves, shall be transferred to a reserve component of such armed force, and until the expiration of a period of five years after such transfer, or until he is discharged from such reserve component, whichever occurs first, shall be deemed to be a member of such

4        SELECTIVE SERVICE ACT OF 1948

*reserve component and shall be subject to such additional training and service as may now or hereafter be prescribed by law for such reserve component: Provided, That any such person who completes at least twenty-one months of service in the armed forces and who thereafter serves satisfactorily (1) on active duty in the armed forces under a voluntary extension for a period of at least one year, which extension is hereby authorized, or (2) in an organized unit of any reserve component of any of the armed forces for a period of at least thirty-six consecutive months, shall, except in time of war or national emergency declared by the Congress, be relieved from any further liability under this subsection to serve in any reserve component of the armed forces of the United States, but nothing in this subsection shall be construed to prevent any such person, while in a reserve component of such forces, from being ordered or called to active duty in such forces.*

*(2) Each person who hereafter is enlisted under the provisions of subsection (g) of this section and who meets the qualifications for enlistment or appointment in a reserve component of the armed forces shall, upon discharge from such enlistment under honorable conditions, be transferred to a reserve component of the armed forces of the United States and shall serve therein for a period of six years or until sooner discharged. Each such person shall, so long as he is a member of such reserve component, be liable to be ordered to active duty, but except in time of war or national emergency declared by the Congress no such person shall be ordered to active duty, without his consent and except as hereinafter provided, for more than one month in any year. In case the Secretary of the Army, the Secretary of the Navy, or the Secretary of the Air Force determines that enlistment, enrollment, or appointment in, or assignment to, an organized unit of a reserve component or an officers' training program of the armed force in which he served is available to, and can without undue hardship be filled by, any such person, it shall be the duty of such person to enlist, enroll, or accept appointment in, or accept assignment to, such organized unit or officers' training program and to serve satisfactorily therein for a period of four years. Any such person who fails or refuses to perform such duty may be ordered to active duty, without his consent, for an additional period of not more than twelve consecutive months. Any such person who enlists or accepts appointment in any such organized unit and serves satisfactorily therein for a period of four years shall, except in time of war or national emergency declared by the Congress, be relieved from any further liability under this subsection to serve in any reserve component of the armed forces of the United States, but nothing in this subsection shall be construed to prevent any such person, while in a reserve component of such forces, from being ordered or called to active duty in such forces. The Secretary of Defense is authorized to prescribe regulations governing the transfer of such persons within and between reserve components of the armed forces and determining, for the purpose of the requirements of the foregoing provisions of this paragraph, the credit to be allowed any person so transferring for his previous service in one or more reserve components.*

*(e) With respect to the persons inducted for training and service under this title there shall be paid, allowed, and extended the same pay, allowances, pensions, disability and death compensation, and other benefits as are provided by law in the case of other enlisted men of like grades and length of service of that component of the armed forces to which they are assigned. Section 3 of the Act of July 25, 1947 (Public Law 239,*

*Eightieth Congress), is hereby amended by deleting therefrom the follow-ing: "Act of March 7, 1942 (56 Stat. 143–148, ch. 166), as amended". The Act of March 7, 1942 (56 Stat. 143–148), as amended, is hereby made applicable to persons inducted into the armed forces pursuant to this title.*

*(f) Nothing contained in this or any other Act shall be construed as forbidding the payment of compensation by any person, firm, or corpora-tion to persons inducted into the armed forces of the United States for training and service under this title, or to members of reserve components of such forces now or hereafter on any type of active duty, who, prior to their induction or order to active duty were receiving compensation from such person, firm, or corporation.*

*(g) Subject to the authorized one-year enlistee active duty personnel strengths established by section 2 of this title for the respective armed forces, the Secretaries of the Army, the Navy, and the Air Force are authorized and directed to accept enlistments for periods of one year in the Army of the United States, the United States Navy or the United States Marine Corps, and the Air Force of the United States, respectively, from among qualified male persons between the ages of eighteen and nineteen.*

*(h) No person who is enlisted in the Army of the United States under the provisions of subsection (g) shall be permanently assigned to duty at any place outside of the continental limits of the United States; and no person who is enlisted under the provisions of such subsection in the United States Navy, the United States Marine Corps, or the Air Force of the United States shall be assigned to duty at any naval or air force installation which is located on land outside of the continental limits of the United States.*

*SELECTION*

*Sec. 5. (a) The selection of persons for training and service under section 4 shall be made in an impartial manner, under such rules and regulations as the President may prescribe, from the persons who are liable for such training and service and who at the time of selection are registered and classified, but not deferred or exempted: Provided, That in the selection of persons for training and service under this title, and in the interpretation and execution of the provisions of this title, there shall be no discrimination against any person on account of race or color: Provided further., That in the classification of registrants within the jurisdiction of any local board, the registrants of any particular registra-tion may be classified, in the manner prescribed by and in accordance with rules and regulations prescribed by the President, before, together with, or after the registrants of any prior registration or registrations; and in the selection for induction of persons within the jurisdiction of any local board and within any particular classification, persons who were registered at any particular registration may be selected, in the manner prescribed by and in accordance with rules and regulations prescribed by the President, before, together with, or after persons who were registered at any prior registration or registrations.*

*(b) Quotas of men to be inducted for training and service under this title shall be determined for each State, Territory, possession, and the District of Columbia, and for subdivisions thereof, on the basis of the actual number of men in the several States, Territories, possessions, and the District of Columbia, and the subdivisions thereof, who are liable for such training and service but who are not deferred after classification,*

6                SELECTIVE SERVICE ACT OF 1948

*except that credits shall be given in fixing such quotas for residents of such subdivisions who are in the armed forces of the United States on the date fixed for determining such quotas. After such quotas are fixed, credits shall be given in filling such quotas for residents of such subdivisions who subsequently become members of such forces. Until the actual numbers necessary for determining the quotas are known, the quotas may be based on estimates, and subsequent adjustments therein shall be made when such actual numbers are known. All computations under this subsection shall be made in accordance with such rules and regulations as the President may prescribe.*

#### DEFERMENT AND EXEMPTIONS

*SEC. 6. (a) Commissioned officers, warrant officers, pay clerks, enlisted men, and aviation cadets of the Regular Army, the Navy, the Air Force, the Marine Corps, the Coast Guard, the Coast and Geodetic Survey, and the Public Health Service; cadets, United States Military Academy; midshipmen, United States Navy; cadets, United States Coast Guard Academy; members of the reserve components of the armed forces, the Coast Guard, and the Public Health Service, while on active duty; and foreign diplomatic representatives, technical attachés of foreign embassies and legations, consuls general, consuls, vice consuls, and other consular agents of foreign countries who are not citizens of the United States, and members of their families, and persons in other categories to be specified by the President, residing in the United States, and who have not declared their intention to become citizens of the United States, shall not be required to be registered under section 3 and shall be relieved from liability for training and service under section 4 (b).*

*(b) (1) No person who served honorably on active duty between September 16, 1940, and the date of enactment of this title for a period of twelve months or more, or between December 7, 1941, and September 2, 1945, for a period in excess of ninety days, in the Army, the Air Force, the Navy, the Marine Corps, the Coast Guard, the Public Health Service, or the armed forces of any country allied with the United States in World War II prior to September 2, 1945, shall be liable for induction for training and service under this title, except after a declaration of war or national emergency made by the Congress subsequent to the date of enactment of this title.*

*(2) No person who served honorably on active duty between September 16, 1940, and the date of enactment of this title for a period of ninety days or more but less than twelve months in the Army, the Air Force, the Navy, the Marine Corps, the Coast Guard, the Public Health Service, or the armed forces of any country allied with the United States in World War II prior to September 2, 1945, shall be liable for induction for training and service under this title, except after a declaration of war or national emergency made by the Congress subsequent to the date of enactment of this title, if—*

*(A) the local board determines that he is regularly enlisted or commissioned in any organized unit of a reserve component of the armed force (or Coast Guard) in which he served, provided such unit is reasonably accessible to such person without unduly interrupting his normal pursuits and activities (including attendance at a college or university in which he is regularly enrolled), or in a reserve component (other than in an organized unit) of such armed*

SELECTIVE SERVICE ACT OF 1948         **7**

force or the Coast Guard in any case in which enlistment or commission in an organized unit of such armed force or the Coast Guard is not available to him; or

(B) the local board determines that enlistment or commission in a reserve component of such armed force or the Coast Guard is not available to him or that he has voluntarily enlisted or accepted appointment in an organized unit of a reserve component of an armed force other than the armed force in which he served or in the Coast Guard.

Nothing in this paragraph shall be deemed to be applicable to any person to whom paragraph (1) of this subsection is applicable.

(3) No person who after the date of enactment of this title is honorably discharged upon the completion of a period of three years or more of active duty in the Army, the Air Force, the Navy, the Marine Corps, the Coast Guard, or the Public Health Service, shall be liable for induction for training and service under this title, except after a declaration of war or national emergency made by the Congress subsequent to the date of enactment of this title.

(4) No person who is honorably discharged upon the completion of an enlistment pursuant to section 4 (c) or section 4 (g) shall be liable for induction for training and service under this title, except after a declaration of war or national emergency made by the Congress subsequent to the date of enactment of this title.

(5) For the purposes of computation of the periods of active duty referred to in paragraphs (1), (2), or (3) of this subsection, no credit shall be allowed for—

(A) periods of active duty training performed as a member of a reserve component pursuant to an order or call to active duty solely for training purposes;

(B) periods of active duty in which the service consisted solely of training under the Army specialized training program, the Army Air Force college training program, or any similar program under the jurisdiction of the Navy, Marine Corps, or Coast Guard;

(C) periods of active duty as a cadet at the United States Military Academy or United States Coast Guard Academy, or as a midshipman at the United States Naval Academy, or in a preparatory school after nomination as a principal, alternate, or candidate for admission to any such academies; or

(D) periods of active duty in any of the armed forces while being processed for entry into or separation from any educational program or institution referred to in paragraphs (B) or (C).

(c) (1) Persons who, on the effective date of this title, were members of organized units of the federally recognized National Guard, the federally recognized Air National Guard, the Officers' Reserve Corps, the Regular Army Reserve, the Air Force Reserve, the Enlisted Reserve Corps, the Naval Reserve, the Marine Corps Reserve, the Coast Guard Reserve, or the Public Health Service Reserve, shall, so long as they continue to be such members and satisfactorily participate in scheduled drills and training periods as prescribed by the Secretary of Defense, be exempt from training and service by induction under the provisions of this title, but shall not be exempt from registration unless on active duty.

(2) (A) In any case in which the Governor of any State determines and issues a proclamation to the effect that the authorized strength of any organized unit of the National Guard of his State cannot be maintained

JA.292

**8**          SELECTIVE SERVICE ACT OF 1948

by the enlistment or appointment of persons referred to in subsection 6 (b) (2) or persons who are not liable for training and service under this title, any person who prior to attaining the age of eighteen years and six months enlists or accepts appointment in any such organized unit shall be deferred from training and service under this title so long as he continues to serve satisfactorily as a member of such organized unit.

(B) Except as provided in subsection (b) or clause (A) of this paragraph, no person who shall become a member of a reserve component after the effective date of this title shall thereby be exempt from registration or training and service by induction under the provisions of this title.

(d) (1) Any person who, on the effective date of this title, is enrolled in the advanced course, senior division, Reserve Officers' Training Corps or the Air Reserve Officers' Training Corps, or is a member of the Naval Reserve Officers' Training Corps and has entered upon the junior or senior year, or is a midshipman, United States Naval Reserve, shall be deferred from induction for training and service under this title until the completion or termination of the course of instruction and so long as he continues in a regular or reserve status upon being commissioned, but shall not be exempt from registration.

(2) Within such number as may be prescribed by the Secretary of Defense any person who, (A) on or after the effective date of this title, is selected for enrollment or continuance in the senior division, Reserve Officers' Training Corps, or the Air Reserve Officers' Training Corps, or the Naval Reserve Officers' Training Corps, or who, on or after the effective date of this title, is appointed a midshipman, United States Naval Reserve, and (B) agrees, in writing, to accept a commission if tendered and to serve, subject to call by the Secretary of the Army, the Secretary of the Air Force, or the Secretary of the Navy, respectively, not less than two years on active duty after receipt of a commission, shall be deferred from induction for training and service under this title until after completion or termination of the course of instruction and so long as he continues in a regular or reserve status upon being commissioned, but shall not be exempt from registration.

(e) Fully qualified and accepted aviation cadet applicants of the Army, Navy, or Air Force who have signed an agreement of service shall, in such numbers as may be designated by the Secretary of Defense, be deferred, during the period covered by the agreement but not to exceed four months, from induction for training and service under this title but shall not be exempt from registration.

(f) The Vice President of the United States; the governors of the several States, Territories, and possessions, and all other officials chosen by the voters of the entire State, Territory, or possession; members of the legislative bodies of the United States and of the several States, Territories, and possessions; judges of the courts of record of the United States and of the several States, Territories, possessions, and the District of Columbia shall, while holding such offices, be deferred from training and service under this title in the armed forces of the United States.

(g) Regular or duly ordained ministers of religion, as defined in this title, and students preparing for the ministry under the direction of recognized churches or religious organizations, who are satisfactorily pursuing full-time courses of instruction in recognized theological or divinity schools, or who are satisfactorily pursuing full-time courses of instruction leading to their entrance into recognized theological or divinity schools in which they have been preenrolled, shall be exempt from training and service (but not from registration) under this title.

SELECTIVE SERVICE ACT OF 1948          **9**

(h) *The President is authorized, under such rules and regulations as he may prescribe, to provide for the deferment from training and service under this title in the armed forces of the United States of any or all categories of persons whose employment in industry, agriculture, or other occupations or employment, or whose continued service in an office (other than an office described in subsection (f)) under the United States or any State, Territory, or possession, or the District of Columbia, or whose activity in study, research, or medical, scientific, or other endeavors is found to be necessary to the maintenance of the national health, safety, or interest: Provided, That no person within any such category shall be deferred except upon the basis of his individual status. The President is also authorized, under such rules and regulations as he may prescribe, to provide for the deferment from training and service under this title in the armed forces of the United States (1) of any or all categories of persons in a status with respect to persons dependent upon them for support which renders their deferment advisable, and (2) of any or all categories of those persons found to be physically, mentally, or morally deficient or defective. For the purpose of determining whether or not the deferment of any person is advisable, because of his status with respect to persons dependent upon him for support, any payments of allowances which are payable by the United States to the dependents of persons serving in the armed forces of the United States shall be taken into consideration, but the fact that such payments of allowances are payable shall not be deemed conclusively to remove the grounds for deferment when the dependency is based upon financial considerations and shall not be deemed to remove the ground for deferment when the dependency is based upon other than financial considerations and cannot be eliminated by financial assistance to the dependents. The President is also authorized, under such rules and regulations as he may prescribe, to provide for the deferment from training and service under this title in the armed forces of the United States of any or all categories of persons who have wives or children, or wives and children, with whom they maintain a bona fide family relationship in their homes. No deferment from such training and service shall be made in the case of any individual except upon the basis of the status of such individual. There shall be posted in a conspicuous place at the office of each local board a list setting forth the names and classifications of those persons who have been classified by such local board.*

(i) (1) *Any person who, while satisfactorily pursuing a full-time course of instruction at a high school or similar institution of learning, is ordered to report for induction under this title prior to his graduation from such school or institution, shall, upon the facts being presented to the local board, have his induction under this title postponed (A) until the time of his graduation therefrom, or (B) until he attains the twentieth anniversary of his birth, or (C) until he ceases satisfactorily to pursue such course of instruction, whichever is the earliest. The induction of any such person shall not be postponed under this paragraph beyond the date so determined.*

(2) *Any person who, while satisfactorily pursuing a full-time course of instruction at a college, university, or similar institution of learning, is ordered to report for induction under this title, shall, upon the facts being presented to the local board, have his induction under this title postponed (A) until the end of such academic year or (B) until he ceases satisfactorily to pursue such course of instruction, whichever is the earlier. Nothing in this paragraph shall be deemed to preclude the President*

H. Rept. 2438, 80–2——2

10        SELECTIVE SERVICE ACT OF 1948

*from providing, by regulations prescribed under subsection (h) of this section, for the deferment from training and service of any category or categories of students for such periods of time as he may deem appropriate.*

*(j) Nothing contained in this title shall be construed to require any person to be subject to combatant training and service in the armed forces of the United States who, by reason of religious training and belief, is conscientiously opposed to participation in war in any form. Religious training and belief in this connection means an individual's belief in a relation to a Supreme Being involving duties superior to those arising from any human relation, but does not include essentially political, sociological, or philosophical views or a merely personal moral code. Any person claiming exemption from combatant training and service because of such conscientious objections whose claim is sustained by the local board shall, if he is inducted into the armed forces under this title, be assigned to noncombatant service as defined by the President, or shall, if he is found to be conscientiously opposed to participation in such noncombatant service, be deferred. Any person claiming exemption from combatant training and service because of such conscientious objections shall, if such claim is not sustained by the local board, be entitled to an appeal to the appropriate appeal board. Upon the filing of such appeal, the appeal board shall refer any such claim to the Department of Justice for inquiry and hearing. The Department of Justice, after appropriate inquiry, shall hold a hearing with respect to the character and good faith of the objections of the person concerned, and such person shall be notified of the time and place of such hearing. The Department of Justice shall, after such hearing, if the objections are found to be sustained, recommend to the appeal board that (1) if the objector is inducted into the armed forces under this title, he shall be assigned to noncombatant service as defined by the President, or (2) if the objector is found to be conscientiously opposed to participation in such noncombatant service, he shall be deferred. If after such hearing the Department of Justice finds that his objections are not sustained, it shall recommend to the appeal board that such objections be not sustained. The appeal board shall, in making its decision, give consideration to, but shall not be bound to follow, the recommendation of the Department of Justice together with the record on appeal from the local board. Each person whose claim for exemption from combatant training and service because of conscientious objections is sustained shall be listed by the local board on a register of conscientious objectors.*

*(k) No exception from registration, or exemption or deferment from training and service, under this title, shall continue after the cause therefor ceases to exist.*

*(l) Notwithstanding any other provisions of law, no person between the ages of eighteen and twenty-one shall be discharged from service in the armed forces of the United States while this title is in effect because such person entered such service without the consent of his parent or guardian.*

*(m) No person shall be relieved from training and service under this title by reason of conviction of a criminal offense, except where the offense of which he has been convicted may be punished by death, or by imprisonment for a term exceeding one year.*

*(n) In the case of any registrant whose principal place of employment is located outside the appeal board area in which the local board having jurisdiction over the registrant is located, any occupational deferment made under subsection (h) of this section may, within five days after*

SELECTIVE SERVICE ACT OF 1948    11

such deferment is made, be submitted for review and decision to the appeal board having jurisdiction over the area in which is located the principal place of employment of the registrant. Such decision of the appeal board shall be final unless modified or changed by the President, and such decision shall be made public.

(o) Where one or more sons or daughters of a family were killed in action or died in line of duty while serving in the armed forces of the United States, or subsequently died as a result of injuries received or disease incurred during such service, the sole surviving son of such family shall not be inducted for service under the terms of this title.

### ACTIVE DUTY FOR CERTAIN MEMBERS OF RESERVE COMPONENTS

SEC. 7. Notwithstanding any other provision of law or of this title, the President is hereby authorized to order into the active service of the armed forces of the United States, without their consent and for a period not to exceed twenty-one consecutive months each, members (other than those exempted or deferred from training and service under the provisions of section 6 (c)) of any or all reserve components of the armed forces of the United States who shall have had less than ninety days' continuous active service in the armed forces of the United States, exclusive of periods of active training duty. No member of the National Guard of any State, Territory, or the District of Columbia shall be ordered into the active service of the armed forces of the United States under this section unless the governor of such State or Territory, or the Commanding General of the District of Columbia National Guard in the case of a member of the District of Columbia National Guard, has consented to the ordering into active service of the armed forces of the United States of members of the National Guard of his State, Territory, or District, as the case may be, in accordance with such program or programs as may have been mutually agreed upon. Nothing in this section shall be construed to repeal or abridge any existing law which authorizes the ordering of members of reserve components of the armed forces into active service.

### BOUNTIES; SUBSTITUTES; PURCHASES OF RELEASE

SEC. 8. No bounty shall be paid to induce any person to enlist in or be inducted into the armed forces of the United States: Provided, That the clothing or enlistment allowances authorized by law shall not be regarded as bounties within the meaning of this section. No person liable for training and service in such forces shall be permitted or allowed to furnish a substitute for such training and service; no substitute as such shall be received, enlisted, enrolled, or inducted into the armed forces of the United States; and no person liable for training and service in such forces under section 4 shall be permitted to escape such training and service or be discharged therefrom prior to the expiration of his period of such training and service by the payment of money or any other valuable thing whatsoever as consideration for his release from such training and service or liability therefor.

### SEPARATION FROM SERVICE; REEMPLOYMENT RIGHTS

SEC. 9. (a) Any person inducted into the armed forces under this title for training and service, who, in the judgment of those in authority over him, satisfactorily completes his period of training and service under

12     SELECTIVE SERVICE ACT OF 1948

section 4 (b) shall be entitled to a certificate to that effect upon the completion of such period of training and service, which shall include a record of any special proficiency or merit attained. In addition, each such person who is inducted into the armed forces under this title for training and service shall be given a physical examination at the beginning of such training and service, and upon the completion of his period of training and service under this title, each such person shall be given another physical examination and, upon his written request, shall be given a statement of physical condition by the Secretary concerned: *Provided, That such statement shall not contain any reference to mental or other conditions which in the judgment of the Secretary concerned would prove injurious to the physical or mental health of the person to whom it pertains.*

(b) In the case of any such person who, in order to perform such training and service, has left or leaves a position (other than a temporary position) in the employ of any employer and who (1) receives such certificate, and (2) makes application for reemployment within ninety days after he is relieved from such training and service or from hospitalization continuing after discharge for a period of not more than one year—

(A) if such position was in the employ of the United States Government, its Territories, or possessions or political subdivisions thereof, or the District of Columbia, such person shall—

(i) if still qualified to perform the duties of such position, be restored to such position or to a position of like seniority, status, and pay; or

(ii) if not qualified to perform the duties of such position by reason of disability sustained during such service but qualified to perform the duties of any other position in the employ of the employer, be restored to such other position the duties of which he is qualified to perform as will provide him like seniority, status, and pay, or the nearest approximation thereof consistent with the circumstances in his case;

(B) if such position was in the employ of a private employer, such person shall—

(i) if still qualified to perform the duties of such position, be restored by such employer or his successor in interest to such position or to a position of like seniority, status, and pay; or

(ii) if not qualified to perform the duties of such position by reason of disability sustained during such service but qualified to perform the duties of any other position in the employ of such employer or his successor in interest, be restored by such employer or his successor in interest to such other position the duties of which he is qualified to perform as will provide him like seniority, status, and pay, or the nearest approximation thereof consistent with the circumstances in his case,

unless the employer's circumstances have so changed as to make it impossible or unreasonable to do so;

(C) if such position was in the employ of any State or political subdivision thereof, it is hereby declared to be the sense of the Congress that such person should—

(i) if still qualified to perform the duties of such position, be restored to such position or to a position of like seniority, status, and pay; or

SELECTIVE SERVICE ACT OF 1948     **13**

(ii) if not qualified to perform the duties of such position by reason of disability sustained during such service but qualified to perform the duties of any other position in the employ of the employer, be restored to such other position the duties of which he is qualified to perform as will provide him like seniority, status, and pay, or the nearest approximation thereof consistent with the circumstances in his case.

(c) (1) Any person who is restored to a position in accordance with the provisions of paragraph (A) or (B) of subsection (b) shall be considered as having been on furlough or leave of absence during his period of training and service in the armed forces, shall be so restored without loss of seniority, shall be entitled to participate in insurance or other benefits offered by the employer pursuant to established rules and practices relating to employees on furlough or leave of absence in effect with the employer at the time such person was inducted into such forces, and shall not be discharged from such position without cause within one year after such restoration.

(2) It is hereby declared to be the sense of the Congress that any person who is restored to a position in accordance with the provisions of paragraph (A) or (B) of subsection (b) should be so restored in such manner as to give him such status in his employment as he would have enjoyed if he had continued in such employment continuously from the time of his entering the armed forces until the time of his restoration to such employment.

(d) In case any private employer fails or refuses to comply with the provisions of subsection (b) or subsection (c) (1), the district court of the United States for the district in which such private employer maintains a place of business shall have power, upon the filing of a motion, petition, or other appropriate pleading by the person entitled to the benefits of such provisions, specifically to require such employer to comply with such provisions and to compensate such person for any loss of wages or benefits suffered by reason of such employer's unlawful action: Provided, That any such compensation shall be in addition to and shall not be deemed to diminish any of the benefits of such provisions. The court shall order speedy hearing in any such case and shall advance it on the calendar. Upon application to the United States district attorney or comparable official for the district in which such private employer maintains a place of business, by any person claiming to be entitled to the benefits of such provisions, such United States district attorney or official, if reasonably satisfied that the person so applying is entitled to such benefits, shall appear and act as attorney for such person in the amicable adjustment of the claim or in the filing of any motion, petition, or other appropriate pleading and the prosecution thereof specifically to require such employer to comply with such provisions: Provided, That no fees or court costs shall be taxed against any person who may apply for such benefits: Provided further, That only the employer shall be deemed a necessary party respondent to any such action.

(e) (1) Any person who is entitled to be restored to a position in accordance with the provisions of paragraph (A) of subsection (b) and who was employed, immediately before entering the armed forces, by any agency in the executive branch of the Government or by any Territory or possession, or political subdivision thereof, or by the District of Columbia, shall be so restored by such agency or the successor to its functions, or by such Territory, possession, political subdivision, or the District of

14          SELECTIVE SERVICE ACT OF 1948

*Columbia. In any case in which, upon appeal of any person who was employed immediately before entering the armed forces by any agency in the executive branch of the Government or by the District of Columbia, the United States Civil Service Commission finds that—*

*(A) such agency is no longer in existence and its functions have not been transferred to any other agency; or*

*(B) for any reason it is not feasible for such person to be restored to employment by such agency or by the District of Columbia, the Commission shall determine whether or not there is a position in any other agency in the executive branch of the Government or in the government of the District of Columbia for which such person is qualified and which is either vacant or held by a person having a temporary appointment thereto. In any case in which the Commission determines that there is such a position, such person shall be restored to such position by the agency in which such position exists or by the government of the District of Columbia, as the case may be. The Commission is authorized and directed to issue regulations giving full force and effect to the provisions of this section insofar as they relate to persons entitled to be restored to positions in the executive branch of the Government or in the government of the District of Columbia, including persons entitled to be restored under the last sentence of paragraph (2) of this subsection. The agencies in the executive branch of the Government and the government of the District of Columbia shall comply with such rules and regulations and orders issued by Commission pursuant to this subsection. The Commission is authorized and directed whenever it finds, upon appeal of the person concerned, that any agency in the executive branch of the Government or the government of the District of Columbia has failed or refuses to comply with the provisions of this section, to issue an order specifically requiring such agency or the government of the District of Columbia to comply with such provisions and to compensate such person for any loss of salary or wages suffered by reason of failure to comply with such provisions, less any amounts received by him through other employment, unemployment compensation, or readjustment allowances: Provided, That any such compensation ordered to be paid by the Commission shall be in addition to and shall not be deemed to diminish any of the benefits of such provisions, and shall be paid by the head of the agency concerned or by the government of the District of Columbia out of appropriations currently available for salary and expenses of such agency or government, and such appropriations shall be available for such purpose. As used in this paragraph, the term "agency in the executive branch of the Government" means any department, independent establishment, agency, or corporation in the executive branch of the United States Government.*

*(2) Any person who is entitled to be restored to a position in accordance with the provisions of paragraph (A) of subsection (b) and who was employed, immediately before entering the armed forces, in the legislative branch of the Government, shall be so restored by the officer who appointed him to the position which he held immediately before entering the armed forces. In any case in which it is not possible for any such person to be restored to a position in the legislative branch of the Government and he is otherwise eligible to acquire a status for transfer to a position in the classified (competitive) civil service in accordance with section 2 (b) of the Act of November 26, 1940 (54 Stat. 1212), the United States Civil Service Commission shall, upon appeal of such person, determine whether or not*

SELECTIVE SERVICE ACT OF 1948          15

there is a position in the executive branch of the Government for which he is qualified and which is either vacant or held by a person having a temporary appointment thereto. In any case in which the Commission determines that there is such a position such person shall be restored to such position by the agency in which such position exists.

(3) Any person who is entitled to be restored to a position in accordance with the provisions of paragraph (A) of subsection (b) and who was employed, immediately before entering the armed forces, in the judicial branch of the Government, shall be so restored by the officer who appointed him to the position which he held immediately before entering the armed forces.

(f) In any case in which two or more persons who are entitled to be restored to a position under the provisions of this section or of any other law relating to similar reemployment benefits left the same position in order to enter the armed forces, the person who left such position first shall have the prior right to be restored thereto, without prejudice to the reemployment rights of the other person or persons to be restored.

(g) (1) Any person who, subsequent to the date of enactment of this title and while it is in effect, enlists in the armed forces of the United States (other than in a reserve component) or the Coast Guard (other than in a reserve component) for not more than three years shall, if such enlistment is his first enlistment in the armed forces or the Coast Guard subsequent to the date of enactment of this title, be entitled, upon the expiration of his enlistment (including any extension thereof by law but not including any voluntary extension thereof) or upon his discharge under honorable conditions prior to the expiration thereof, to all the reemployment rights and other benefits provided for by this section in the case of inductees.

(2) Any person who, subsequent to the effective date of this title and while it is in effect, enters upon active duty in the armed forces of the United States, the Coast Guard, or the Public Health Service in response to an order or call to active duty shall, upon his relief from active duty under honorable conditions, be entitled to all of the reemployment rights and benefits provided by this section in the case of inductees, if he is relieved from active duty not later than three years after the date of entering upon active duty or as soon after the expiration of such three years as he is able to obtain orders relieving him from active duty.

(h) The Secretary of Labor, through the Bureau of Veterans' Reemployment Rights, shall render aid in the replacement in their former positions of persons who have satisfactorily completed any period of active duty in the armed forces of the United States, the Coast Guard, or the Public Health Service. In rendering such aid, the Secretary shall use the then existing Federal and State agencies engaged in similar or related activities and shall utilize the assistance of volunteers.

(i) Any person inducted into the armed forces for training and service under this title shall, during the period of such service, be permitted to vote in person or by absentee ballot in any general, special, or primary election occurring in the State of which he is a resident, whether he is within or outside such State at the time of such election, if under the laws of such State he is otherwise entitled so to vote in such election; but nothing in this subsection shall be construed to require granting to any such person a leave of absence or furlough for longer than one day in order to permit him to vote in person in any such election. No person inducted into, or enlisted in, the armed forces for training and service under this

16                SELECTIVE SERVICE ACT OF 1948

*title shall, during the period of such service, as a condition of voting in any election for President, Vice President, electors for President or Vice President, or for Senator or Member of the House of Representatives, be required to pay any poll tax or other tax or make any other payment to any State or political subdivision thereof.*

*(j) The Secretaries of Army, Navy, or Air Force shall furnish to the Selective Service System hereafter established a report of separation for each person separated from active duty.*

### THE SELECTIVE SERVICE SYSTEM; CONSTRUCTION; CIVILIAN EMPLOYEES

*SEC. 10 (a) (1) There is hereby established in the executive branch of the Government an agency to be known as the Selective Service System, and a Director of Selective Service who shall be the head thereof.*

*(2) The Selective Service System shall include a national headquarters, at least one State headquarters in each State, Territory, and possession of the United States, and in the District of Columbia, and the local boards, appeal boards, and other agencies provided for in subsection (b) (3) of this section.*

*(3) The Director shall be appointed by the President, by and with the advice and consent of the Senate. The Director shall receive compensation at the rate of $12,500 per year.*

*(4) The functions of the Office of Selective Service Records (established by the Act of March 31, 1947) and of the Director of the Office of Selective Service Records are hereby transferred to the Selective Service System and the Director of Selective Service, respectively. The personnel, property, records, and unexpended balances (available or to be made available) of appropriations, allocations, and other funds of the Office of Selective Service Records are hereby transferred to the Selective Service System. The Office of Selective Service Records shall cease to exist upon the taking of effect of the provisions of this title: Provided, That, effective upon the termination of this title and notwithstanding such termination in other respects, (A) the said Office of Selective Service Records is hereby reestablished on the same basis and with the same functions as obtained prior to the effective date of this title, (B) said reestablished Office shall be responsible for liquidating any other outstanding affairs of the Selective Service System, and (C) the personnel, property, records, and unexpended balances (available or to be made available) of appropriations, allocations, and other funds of the Selective Service System shall be transferred to such reestablished Office of Selective Service Records.*

*(b) The President is authorized—*

*(1) to prescribe the necessary rules and regulations to carry out the provisions of this title;*

*(2) to appoint, upon recommendation of the respective governor or comparable executive official, a State director of the Selective Service System for each headquarters in each State, Territory, and possession of the United States and for the District of Columbia, who shall represent the governor and be in immediate charge of the State headquarters of the Selective Service System; to employ such number of civilians, and to order to active duty with their consent and to assign to the Selective Service System such officers of the selective-service section of the State headquarters and headquarters detachments and such other officers of the federally recognized National Guard of the United States or other armed forces personnel (including personnel*

SELECTIVE SERVICE ACT OF 1948          17

of the reserve components thereof), as may be necessary for the administration of the national and of the several State headquarters of the Selective Service System;

(3) to create and establish within the Selective Service System civilian local boards, civilian appeal boards, and such other civilian agencies, including agencies of appeal, as may be necessary to carry out its functions with respect to the registration, examination, classification, selection, assignment, delivery for induction, and maintenance of records of persons registered under this title, together with such other duties as may be assigned under this title. He shall create and establish one or more local boards in each county or political subdivision corresponding thereto of each State, Territory, and possession of the United States, and in the District of Columbia. Each local board shall consist of three or more members to be appointed by the President from recommendations made by the respective governors or comparable executive officials: Provided, That an intercounty local board consisting of at least one member from each component county or corresponding subdivision may be established for an area not exceeding five counties or political subdivisions corresponding thereto within a State or comparable jurisdiction when the President determines, after considering the public interest involved and the recommendation of the governor or comparable executive official or officials, that the establishment of such local board area will result in a more efficient and economical operation. Any such intercounty local board shall have within its area the same power and jurisdiction as a local board has in its area. No member of any local board shall be a member of the armed forces of the United States, but each member of any local board shall be a civilian who is a citizen of the United States residing in the county or political subdivision corresponding thereto in which such local board has jurisdiction, and each intercounty local board shall have at least one member from each county or political subdivision corresponding thereto included within the intercounty local board area. Such local boards, under rules and regulations prescribed by the President, shall have the power within their respective jurisdictions to hear and determine, subject to the right of appeal to the appeal boards herein authorized, all questions or claims with respect to inclusion for, or exemption or deferment from, training and service under this title, of all individuals within the jurisdiction of such local boards. The decisions of such local board shall be final, except where an appeal is authorized and is taken in accordance with such rules and regulations as the President may prescribe. There shall be at least one appeal board for each State. Appeal boards within the Selective Service System shall be composed of civilians who are citizens of the United States and who are not members of the armed forces. The decision of such appeal boards shall be final in cases before them on appeal unless modified or changed by the President. The President, upon appeal or upon his own motion, shall have power to determine all claims or questions with respect to inclusion for, or exemption or deferment from training and service under this title, and the determination of the President shall be final. No person who is a civilian officer, member, agent, or employee of the Office of Selective Service Records, or the Selective Service System, or of any local board or appeal board or other agency of such Office or System, shall be excepted from registration or de-

H. Rept. 2438, 80-2——3

18          SELECTIVE SERVICE ACT OF 1948

ferred or exempted from training and service, as provided for in this
title, by reason of his status as such civilian officer, member, agent,
or employee;

(4) to appoint, and to fix, in accordance with the Classification
Act of 1923, as amended, the compensation of, such officers, agents,
and employees as he may deem necessary to carry out the pro-
visions of this title: Provided, That the compensation of employees
of local boards and appeal boards may be fixed without regard to the
Classification Act of 1923, as amended: Provided further, That any
officer on the active or retired list of the armed forces, or any reserve
component thereof with his consent, or any officer or employee of any
department or agency of the United States who may be assigned or
detailed to any office or position to carry out the provisions of this
title (except to offices or positions on local boards or appeal boards
established or created pursuant to section 10 (b) (3)) may serve in
and perform the functions of such office or position without loss of or
prejudice to his status as such officer in the armed forces or reserve
component thereof, or as such officer or employee in any department
or agency of the United States;

(5) to utilize the services of any or all departments and any and all
officers or agents of the United States, and to accept the services of all
officers and agents of the several States, Territories, and possessions,
and subdivisions thereof, and the District of Columbia, and of private
welfare organizations, in the execution of this title;

(6) to purchase such printing, binding, and blankbook work
from public, commercial, or private printing establishments or
binderies upon orders placed by the Public Printer or upon waivers
issued in accordance with section 12 of the Printing Act approved
January 12, 1895, as amended, and to obtain by purchase, loan, or
gift such equipment and supplies for the Selective Service System,
as he may deem necessary to carry out the provisions of this title,
with or without advertising or formal contract;

(7) to prescribe eligibility, rules, and regulations governing the
parole for service in the armed forces, or for any other special service
established pursuant to this title, of any person convicted of a violation
of any of the provisions of this title;

(8) subject to the availability of funds appropriated for such
purpose, to procure such space as he may deem necessary to carry
out the provisions of this title and Public Law 26, Eightieth Congress,
approved March 31, 1947, by lease pursuant to existing statutes,
except that the provisions of the Act of June 30, 1932 (47 Stat. 412),
as amended by section 15 of the Act of March 3, 1933 (47 Stat. 1517;
40 U. S. C. 278a), shall not apply to any lease entered into under the
authority of this title;

(9) subject to the availability of funds appropriated for such pur-
poses, to determine the location of such additional temporary installa-
tions as he may deem essential; to utilize and enlarge such existing
installations; to construct, install, and equip, and to complete the
construction, installation, and equipment of such buildings, struc-
tures, utilities, and appurtenances (including the necessary grading
and removal, repair or remodeling of existing structures and in-
stallations) as may be necessary to carry out the provisions of this
title; and, in order to accomplish the purpose of this title, to acquire
lands, and rights pertaining thereto, or other interests therein, for

SELECTIVE SERVICE ACT OF 1948    19

temporary use thereof, by donation or lease and to prosecute construction thereon prior to the approval of the title by the Attorney General as required by section 355, Revised Statutes, as amended;

(10) subject to the availability of funds appropriated for such purposes, to utilize, in order to provide and furnish such services as may be deemed necessary or expedient to accomplish the purposes of this title, such personnel of the armed forces and of Reserve components thereof with their consent, and such civilian personnel, as may be necessary. For the purposes of this title, the provisions of section 14 of the Federal Employees' Pay Act of 1946 (Public Law 390, Seventy-ninth Congress) with respect to the maximum limitations as to the number of civilian employees shall not be applicable to the Department of the Army, the Department of the Navy, or the Department of the Air Force.

(c) The President is authorized to delegate any authority vested in him under this title, and to provide for the subdelegation of any such authority.

(d) In the administration of this title, gifts of supplies, equipment, and voluntary services may be accepted.

(e) The Chief of Finance, United States Army, is authorized to act as the fiscal, disbursing, and accounting agent of the Director in carrying out the provisions of this title.

(f) The Director is authorized to make final settlement of individual claims, for amounts not exceeding $50, for travel and other expenses of uncompensated personnel of the Office of Selective Service Records, or the Selective Service System, incurred while in the performance of official duties, without regard to other provisions of law governing the travel of civilian employees of the Federal Government.

*EMERGENCY MEDICAL CARE*

SEC. 11. Under such rules and regulations as may be prescribed by the President, funds available to carry out the provisions of this title shall also be available for the payment of actual and reasonable expenses of emergency medical care, including hospitalization, of registrants who suffer illness or injury, and the transportation, and burial, of the remains of registrants who suffer death, while acting under orders issued under the provisions of this title, but such burial expenses shall not exceed $150 in any one case.

*PENALTIES*

SEC. 12. (a) Any member of the Selective Service System or any other person charged as herein provided with the duty of carrying out any of the provisions of this title, or the rules or regulations made or directions given thereunder, who shall knowingly fail or neglect to perform such duty, and any person charged with such duty, or having and exercising any authority under said title, rules, regulations, or directions who shall knowingly make, or be a party to the making, of any false, improper, or incorrect registration, classification, physical or mental examination, deferment, induction, enrollment, or muster, and any person who shall knowingly make, or be a party to the making, of any false statement or certificate regarding or bearing upon a classification or in support of any request for a particular classification, for service under the provisions of this title, or rules, regulations, or directions made pursuant thereto, or who

20                    SELECTIVE SERVICE ACT OF 1948

*otherwise evades or refuses registration or service in the armed forces or any of the requirements of this title, or who knowingly counsels, aids, or abets another to refuse or evade registration or service in the armed forces or any of the requirements of this title, or of said rules, regulations, or directions, or who in any manner shall knowingly fail or neglect or refuse to perform any duty required of him under or in the execution of this title, or rules, regulations, or directions made pursuant to this title, or any person or persons who shall knowingly hinder or interfere or attempt to do so in any way, by force or violence or otherwise, with the administration of this title or the rules or regulations made pursuant thereto, or who conspires to commit any one or more of such offenses, shall, upon conviction in any district court of the United States of competent jurisdiction, be punished by imprisonment for not more than five years or a fine of not more than $10,000, or by both such fine and imprisonment, or if subject to military or naval law may be tried by court martial, and, on conviction, shall suffer such punishment as a court martial may direct. No person shall be tried by court martial in any case arising under this title unless such person has been actually inducted for the training and service prescribed under this title or unless he is subject to trial by court martial under laws in force prior to the enactment of this title. Precedence shall be given by courts to the trial of cases arising under this title, and such cases shall, upon request of the Attorney General, be advanced on the docket for immediate hearing.*

*(b) Any person (1) who knowingly transfers or delivers to another, for the purpose of aiding or abetting the making of any false identification or representation, any registration certificate, alien's certificate of non-residence, or any other certificate issued pursuant to or prescribed by the provisions of this title, or rules or regulations promulgated hereunder; or (2) who, with intent that it be used for any purpose of false identification or representation, has in his possession any such certificate not duly issued to him; or (3) who forges, alters, or in any manner changes any such certificate or any notation duly and validly inscribed thereon; or (4) who, with intent that it be used for any purpose of false identification or representation, photographs, photographs, prints, or in any manner makes or executes any engraving, photograph, print, or impression in the likeness of any such certificate, or any colorable imitation thereof; or (5) who has in his possession any certificate purporting to be a certificate issued pursuant to this title, or rules and regulations promulgated hereunder, which he knows to be falsely made, reproduced, forged, counterfeited, or altered; or (6) who knowingly violates or evades any of the provisions of this title or rules and regulations promulgated pursuant thereto relating to the issuance, transfer, or possession of such certificate, shall, upon conviction, be fined not to exceed $10,000 or be imprisoned for not more than five years, or both. Whenever on trial for a violation of this subsection the defendant is shown to have or to have had possession of any certificate not duly issued to him, such possession shall be deemed sufficient evidence to establish an intent to use such certificate for purposes of false identification or representation, unless the defendant explains such possession to the satisfaction of the jury.*

NONAPPLICABILITY OF CERTAIN LAWS

*Sec. 13. (a) Nothing in section 109 or 113 of the Criminal Code (U. S. C., title 18, secs. 198 and 203), in section 190 of the Revised Statutes*

(U. S. C., title 5, sec. 99), in section 19 (e) of the Contract Settlement Act of 1944 (U. S. C., title 41, sec. 119 (e)), or in the second sentence of subsection (a) of section 9 of the Act of August 2, 1939 (53 Stat. 1148), entitled "An Act to prevent pernicious political activities", as amended, shall be deemed to apply to any person because of his appointment under authority of this title or the regulations made pursuant thereto, as an uncompensated official of the Selective Service System, or as an individual to conduct hearings on appeals of persons claiming exemption from combatant or noncombatant training because of conscientious objections.

(b) All functions performed under this title shall be excluded from the operation of the Administrative Procedure Act (60 Stat. 237) except as to the requirements of section 3 of such Act.

(c) In computing the lump-sum payments made to Air Force reserve officers under the provisions of section 2 of the Act of June 16, 1936, as amended (U. S. C., title 10, sec. 300a), and to reserve officers of the Navy or to their beneficiaries under section 12 of the Act of August 4, 1942, as amended (U. S. C., title 34, sec. 850k), no credit shall be allowed for any period of active service performed from the effective date of this title to the date on which this title shall cease to be effective. Each such lump-sum payment shall be prorated for a fractional part of a year of active service in the case of any reserve officer subject to the provisions of either such section, if such reserve officer performs continuous active service for one or more years (inclusive of such service performed during the period in which this title is effective) and such active service includes a fractional part of a year immediately prior to the effective date of this title, or immediately following the date on which this title shall cease to be effective, or both.

#### CIVIL RELIEF

SEC. 14. Notwithstanding the provisions of section 604 of the Act of October 17, 1940 (54 Stat. 1191), and the provisions of section 4 of the Act of July 25, 1947 (Public Law 239, Eightieth Congress), all of the provisions of the Soldiers' and Sailors' Civil Relief Act of 1940, as amended, including specifically article IV thereof, shall be applicable to all persons in the armed forces of the United States, including all persons inducted into the armed forces pursuant to this title, the Coast Guard, or the Public Health Service, until such time as the Soldiers' and Sailors' Civil Relief Act of 1940, as amended, is repealed or otherwise terminated by subsequent Act of the Congress: Provided, That, with respect to persons inducted into the armed forces while this title is in effect, wherever under any section or provision of the Soldiers' and Sailors' Civil Relief Act of 1940, as amended, a proceeding, remedy, privilege, stay, limitation, accounting, or other transaction has been authorized or provided with respect to military service performed while such Act is in force, such section or provision shall be deemed to continue in full force and effect so long as may be necessary to the exercise or enjoyment of such proceeding, remedy, privilege, stay, limitation, accounting, or other transaction.

#### NOTICE OF TITLE; VOLUNTARY ENLISTMENTS

SEC. 15. (a) Every person shall be deemed to have notice of the requirements of this title upon publication by the President of a proclamation or other public notice fixing a time for any registration under section 3.

(b) It shall be the duty of every registrant to keep his local board informed

22          SELECTIVE SERVICE ACT OF 1948

*as to his current address and changes in status as required by such rules and regulations as may be prescribed by the President.*

*(c) If any provision of this title, or the application thereof to any person or circumstance, is held invalid, the remainder of the title, and the application of such provision to other persons or circumstances, shall not be affected thereby.*

*(d) Except as provided in section 4 (c) or section 4 (g), nothing contained in this title shall be construed to repeal, amend, or suspend the laws now in force authorizing voluntary enlistment or reenlistment in the armed forces of the United States, including the reserve components thereof, except that no person shall be accepted for enlistment after he has received orders to report for induction and except that, whenever the Congress or the President has declared that the national interest is imperiled, voluntary enlistment or reenlistment in such forces, and their reserve components, may be suspended by the President to such extent as he may deem necessary in the interest of national defense.*

### DEFINITIONS

*SEC. 16. When used in this title—*

*(a) The term "between the ages of eighteen and twenty-six" shall refer to men who have attained the eighteenth anniversary of the day of their birth and who have not attained the twenty-sixth anniversary of the day of their birth; and other terms designating different age groups shall be construed in a similar manner.*

*(b) The term "United States", when used in a geographical sense, shall be deemed to mean the several States, the District of Columbia, Alaska, Hawaii, Puerto Rico, and the Virgin Islands.*

*(c) The term "armed forces" shall be deemed to include the Army, the Navy, the Marine Corps, and the Air Force.*

*(d) The term "district court of the United States" shall be deemed to include the courts of the United States for the Territories and possessions of the United States.*

*(e) The term "local board" shall be deemed to include an intercounty local board in the case of any registrant who is subject to the jurisdiction of an intercounty local board.*

*(f) The term "Director" shall be deemed to mean the Director of the Selective Service System.*

*(g) (1) The term "duly ordained minister of religion" means a person who has been ordained, in accordance with the ceremonial, ritual, or discipline of a church, religious sect, or organization established on the basis of a community of faith and belief, doctrines and practices of a religious character, to preach and to teach the doctrines of such church, sect, or organization and to administer the rites and ceremonies thereof in public worship, and who as his regular and customary vocation preaches and teaches the principles of religion and administers the ordinances of public worship as embodied in the creed or principles of such church, sect, or organization.*

*(2) The term "regular minister of religion" means one who as his customary vocation preaches and teaches the principles of religion of a church, a religious sect, or organization of which he is a member, without having been formally ordained as a minister of religion, and who is recognized by such church, sect, or organization as a regular minister.*

SELECTIVE SERVICE ACT OF 1948    **23**

*(3)  The term "regular or duly ordained minister of religion" does not include a person who irregularly or incidentally preaches and teaches the principles of religion of a church, religious sect, or organization and does not include any person who may have been duly ordained a minister in accordance with the ceremonial, rite, or discipline of a church, religious sect or organization, but who does not regularly, as a vocation, teach and preach the principles of religion and administer the ordinances of public worship as embodied in the creed or principles of his church, sect, or organization.*

*(h)  The term "organized unit", when used with respect to a reserve component, shall be deemed to mean a unit in which the members thereof are required satisfactorily to participate in scheduled drills and training periods as prescribed by the Secretary of Defense.*

*(i)  The term "reserve components of the armed forces" shall, unless the context otherwise requires, be deemed to include the federally recognized National Guard of the United States, the federally recognized Air National Guard of the United States, the Officers' Reserve Corps, the Regular Army Reserve, the Air Force Reserve, the Enlisted Reserve Corps, the Naval Reserve, and the Marine Corps Reserve, and shall include, in addition to the foregoing, the Coast Guard Reserve and the Public Health Service Reserve when serving with the armed forces.*

### TERMINATION OF TITLE

*Sec. 17. (a)  Except as provided in this title, all laws and parts of laws in conflict with the provisions of this title are hereby suspended to the extent of such conflict for the period in which this title shall be in force.*

*(b)  All of the provisions of this title, except the provisions of section 2, the second sentence of section 4 (a), section 4 (b), sections 4 (d), 4 (e), 4 (f), 9, 10 (a) (4), 10 (b) (10), 13 (c), 14, and 17 (b), shall become inoperative and cease to apply on the second anniversary of the date of enactment of this title or on such earlier date as may be specified in a joint resolution of the two Houses of Congress for that purpose, except as to offenses committed prior to such date.*

*(c)  There are hereby authorized to be appropriated, out of any money in the Treasury not otherwise appropriated, such sums as may be necessary to carry out the provisions of this title.*

### UTILIZATION OF INDUSTRY

*Sec. 18. (a)  Whenever the President after consultation with and receiving advice from the National Security Resources Board determines that it is in the interest of national security for the Government to obtain prompt delivery of any articles or materials the procurement of which has been authorized by the Congress exclusively for the use of the armed forces of the United States, or for the use of the Atomic Energy Commission, he is authorized, through the head of any Government agency, to place with any person operating a plant, mine, or other facility capable of producing such articles or materials an order for such quantity of such articles or materials as the President deems appropriate. Any person with whom an order is placed pursuant to the provisions of this section shall be advised that such order is placed pursuant to the provisions of this section. Under any such program of national procurement, the President shall recognize the valid claim of American small business to participate in such contracts,*

24          SELECTIVE SERVICE ACT OF 1948

in such manufactures, and in such distribution of materials, and small
business shall be granted a fair share of the orders placed, exclusively for
the use of the armed forces or for other Federal agencies now or hereafter
designated in this section.  For the purposes of this section, a business
enterprise shall be determined to be "small business" if (1) its position in
the trade or industry of which it is a part is not dominant, (2) the number
of its employees does not exceed 500, and (3) it is independently owned
and operated.

(b) It shall be the duty of any person with whom an order is placed
pursuant to the provisions of subsection (a), (1) to give such order such
precedence with respect to all other orders (Government or private) there-
tofore or thereafter placed with such person as the President may pre-
scribe, and (2) to fill such order within the period of time prescribed by
the President or as soon thereafter as possible.

(c) In case any person with whom an order is placed pursuant to the
provisions of subsection (a) refuses or fails—

    (1) to give such order such precedence with respect to all other
    orders (Government or private) theretofore or thereafter placed with
    such person as the President may have prescribed;

    (2) to fill such order within the period of time prescribed by the
    President or as soon thereafter as possible as determined by the
    President;

    (3) to produce the kind or quality of articles or materials ordered; or

    (4) to furnish the quantity, kind, and quality of articles or
    materials ordered at such price as shall be negotiated between such
    person and the Government agency concerned; or in the event of
    failure to negotiate a price, to furnish the quantity, kind, and
    quality of articles or materials ordered at such price as he may
    subsequently be determined to be entitled to receive under sub-
    section (d);

the President is authorized to take immediate possession of any plant,
mine, or other facility of such person and to operate it, through any
Government agency, for the production of such articles or materials as
may be required by the Government.

(d) Fair and just compensation shall be paid by the United States (1)
for any articles or materials furnished pursuant to an order placed under
subsection (a), or (2) as rental for any plant, mine, or other facility of
which possession is taken under subsection (c).

(e) Nothing contained in this section shall be deemed to render in-
applicable to any plant, mine, or facility of which possession is taken
pursuant to subsection (c) any State or Federal laws concerning the
health, safety, security, or employment standards of employees.

(f) Any person, or any officer of any person as defined in this section
who willfully fails or refuses to carry out any duty imposed upon him
by subsection (b) of this section shall be guilty of a felony and, upon
conviction thereof, shall be punished by imprisonment for not more than
three years, or by a fine of not more than $50,000, or by both such im-
prisonment and fine.

(g) (1) As used in this section—

(A) The term "person" means any individual, firm, company, asso-
ciation, corporation, or other form of business organization.

(B) The term "Government agency" means any department, agency, independent establishment, or corporation in the Executive branch of the United States Government.

(2) For the purposes of this section, a plant, mine, or other facility shall be deemed capable of producing any articles or materials if it is then producing or furnishing such articles or materials or if the President after consultation with and receiving advice from the National Security Resources Board determines that it can be readily converted to the production or furnishing of such articles or materials.

(h) (1) The President is empowered, through the Secretary of Defense, to require all producers of steel in the United States to make available, to individuals, firms, associations, companies, corporations, or organized manufacturing industries having orders for steel products or steel materials required by the armed forces, such percentages of the steel production of such producers, in equal proportion deemed necessary for the expeditious execution of orders for such products or materials. Compliance with such requirement shall be obligatory on all such producers of steel and such requirement shall take precedence over all orders and contracts theretofore placed with such producers. If any such producer of steel or the responsible head or heads thereof refuses to comply with such requirement, the President, through the Secretary of Defense, is authorized to take immediate possession of the plant or plants of such producer and, through the appropriate branch, bureau, or department of the armed forces, to insure compliance with such requirement. Any such producer of steel or the responsible head or heads thereof refusing to comply with such requirement shall be deemed guilty of a felony and upon conviction thereof shall be punished by imprisonment for not more than three years and a fine not exceeding $50,000.

(2) The President shall report to the Congress on the final day of each six-month period following the date of enactment of this Act the percentage figure, or if such information is not available, the approximate percentage figure, of the total steel production in the United States required to be made available during such period for the execution of orders for steel products and steel materials required by the armed forces, if such percentage figure is in excess of 10 per centum.

*SAVING PROVISION*

Sec. 19. Nothing in this title shall be deemed to amend any provision of the National Security Act of 1947 (61 Stat. 495).

*EFFECTIVE DATE*

Sec. 20. This title shall become effective immediately; except that unless the President, or the Congress by concurrent resolution, declares a national emergency after the date of enactment of this Act, no person shall be inducted or ordered into active service without his consent under this title within ninety days after the date of its enactment. The Secretary of the Army, for the Army and the Air Force, and the Secretary of the Navy, for the Navy and Marine Corps, are hereby authorized and directed to initiate and carry forward an intensified voluntary enlistment campaign in an effort to obtain the required personnel strengths.

H. Rept. 2438, 80–2——4

JA.310

26          SELECTIVE SERVICE ACT OF 1948

### TITLE II

SEC. 201. *The Articles of War (41 Stat. 787 to 811, as amended) are hereby amended as follows:*

*Article 1 is amended to read as follows:*

"(a) *The word 'officer' shall be construed to refer to a commissioned officer.*

"(b) *The word 'soldier' shall be construed as including a noncommissioned officer, a private, or any other enlisted man or woman.*

"(c) *The word 'company' shall be construed as including a troop, battery, or corresponding unit of the ground or air forces.*

"(d) *The word 'battalion' shall be construed as including a squadron or corresponding unit of the ground or air forces.*

"(e) *The word 'cadet' shall be construed to refer to a cadet of the United States Military Academy.*"

SEC. 202. *Article 2, subparagraph (a), is amended to read as follows:*

"(a) *All officers, warrant officers, and soldiers belonging to the Regular Army of the United States; all volunteers, from the dates of their muster or acceptance into the military service of the United States; and all other persons lawfully called, drafted, or ordered into, or to duty or for training in, the said service, from the dates they are required by the terms of the call, draft, or order to obey the same;*"

SEC. 203. *Article 4 is amended to read as follows:*

"ART. 4. WHO MAY SERVE ON COURTS-MARTIAL.—*All officers in the military service of the United States, and officers of the Marine Corps when detached for service with the Army by order of the President, shall be competent to serve on courts-martial for the trial of any persons who may lawfully be brought before such courts for trial.*

"*All warrant officers in the active military service of the United States and warrant officers in the active military service of the Marine Corps when detached for service with the Army by order of the President, shall be competent to serve on general and special courts martial for the trial of warrant officers and enlisted persons, and persons in this category, shall be detailed for such service when deemed proper by the appointing authority.*

"*Enlisted persons in the active military service of the United States or in the active military service of the Marine Corps when detached for service with the Army by order of the President, shall be competent to serve on general and special courts martial for the trial of enlisted persons when requested in writing by the accused at any time prior to the convening of the court. When so requested, no enlisted person shall, without his consent, be tried by a court the membership of which does not include enlisted persons to the number of at least one third of the total membership of the court.*

"*When appointing courts-martial the appointing authority shall detail as members thereof those officers of the command and when eligible those enlisted persons of the command who, in his opinion, are best qualified for the duty by reason of age, training, experience, and judicial temperament; and officers and enlisted persons having less than two years' service shall not, if it can be avoided without manifest injury to the service, be appointed as members of courts-martial in excess of minority membership thereof. No person shall be eligible to sit as a member of a general or special court-martial when he is the accuser or a witness for the prosecution.*"

SELECTIVE SERVICE ACT OF 1948                    27

SEC. 204. *Article 5 is amended to read as follows:*

"ART. 5. GENERAL COURTS-MARTIAL.—*General courts-martial may consist of any number of members not less than five.*"

SEC. 205. *Article 6 is amended to read as follows:*

"ART. 6. SPECIAL COURTS-MARTIAL.—*Special courts-martial may consist of any number of members not less than three.*"

SEC. 206. *Article 8 is amended to read as follows:*

"ART. 8. GENERAL COURTS-MARTIAL.—*The President of the United States, the commanding officer of a Territorial department, the Superintendent of the Military Academy, the commanding officer of an Army group, an Army, an Army corps, a division, a separate brigade, or corresponding unit of the Ground or Air Forces, or any command to which a member of the Judge Advocate General's Department is assigned as staff judge advocate, as prescribed in article 47, and, when empowered by the President, the commanding officer of any district or of any force or body of troops may appoint general courts-martial; but when any such commander is the accuser or the prosecutor of the person or persons to be tried, the court shall be appointed by superior competent authority, and may in any case be appointed by superior authority when by the latter deemed desirable.*

"*The authority appointing a general court-martial shall detail as one of the members thereof a law member who shall be an officer of the Judge Advocate General's Department or an officer who is a member of the bar of a Federal court or of the highest court of a State of the United States and certified by the Judge Advocate General to be qualified for such detail: Provided, That no general court-martial shall receive evidence or vote upon its findings or sentence in the absence of the law member regularly detailed. The law member, in addition to his duties as a member, shall perform the duties prescribed in article 31 hereof and such other duties as the President may by regulations prescribe.*"

SEC. 207. *Article 9 is amended to read as follows:*

"ART. 9. SPECIAL COURTS-MARTIAL.—*The commanding officer of a district, garrison, fort, camp, station, or other place where troops are on duty, and the commanding officer of an Army group, an Army, an Army corps, a division, brigade, regiment, detached battalion, or corresponding unit of Ground or Air Forces, and the commanding officer of any other detached command or group of detached units placed under a single commander for this purpose may appoint special courts-martial; but when any such commanding officer is the accuser or the prosecutor of the person or persons to be tried, the court shall be appointed by superior authority, and may in any case be appointed by superior authority when by the latter deemed desirable.*"

SEC. 208. *Article 11 is amended to read as follows:*

"ART. 11. APPOINTMENT OF TRIAL JUDGE ADVOCATES AND COUNSEL.—*For each general or special court-martial the authority appointing the court shall appoint a trial judge advocate and a defense counsel, and one or more assistant trial judge advocates and one or more assistant defense counsel when necessary: Provided, That the trial judge advocate and defense counsel of each general court-martial shall, if available, be members of the Judge Advocate General's Department or officers who are members of the bar of a Federal court or of the highest court of a State of the United States: Provided further, That in all cases in which the officer appointed as trial judge advocate shall be a member of the Judge Advocate General's Department, or an officer who is a member of the bar of a Federal court*

28    SELECTIVE SERVICE ACT OF 1948

*or of the highest court of a State, the officer appointed as defense counsel shall likewise be a member of the Judge Advocate General's Department or an officer who is a member of the bar of a Federal court or of the highest court of a State of the United States: Provided further, That when the accused is represented by counsel of his own selection and does not desire the presence of the regularly appointed defense counsel or assistant defense counsel, the latter may be excused by the president of the court: Provided further, That no person who has acted as member, trial judge advocate, assistant trial judge advocate or investigating officer in any case shall subsequently act in the same case as defense counsel or assistant defense counsel unless expressly requested by the accused: Provided further, That no person who has acted as member, defense counsel, assistant defense counsel, or investigating officer in any case shall subsequently act in the same case as a member of the prosecution: Provided further, That no person who has acted as member, trial judge advocate, assistant trial judge advocate, defense counsel, assistant defense counsel, or investigating officer in any case shall subsequently act as a staff judge advocate to the reviewing or confirming authority upon the same case.*

SEC. 209. *Article 12 is amended to read as follows:*

"ART. 12. GENERAL COURTS-MARTIAL.—*General courts-martial shall have power to try any person subject to military law for any crime or offense made punishable by these articles, and any other person who by the law of war is subject to trial by military tribunals: Provided, That general courts-martial shall have power to adjudge any punishment authorized by law or the custom of the service including a bad-conduct discharge.*"

SEC. 210. *Article 13 is amended to read as follows:*

"ART. 13. SPECIAL COURTS-MARTIAL.—*Special courts-martial shall have power to try any person subject to military law for any crime or offense not capital made punishable by these articles: Provided, That the officer competent to appoint a general court-martial for the trial of any particular case may, when in his judgment the interests of the service so require, cause any case to be tried by a special court-martial notwithstanding the limitations upon the jurisdiction of the special court-martial as to offenses herein prescribed.*

*"Special courts-martial shall not have power to adjudge dishonorable discharge or dismissal, or confinement in excess of six months, nor to adjudge forfeiture of more than two-thirds pay per month for a period of not exceeding six months: Provided, That subject to approval of the sentence by an officer exercising general court-martial jurisdiction and subject to appellate review by The Judge Advocate General and appellate agencies in his office, a special court-martial may adjudge a bad-conduct discharge in addition to other authorized punishment: Provided further, That a bad-conduct discharge shall not be adjudged by a special court-martial unless a complete record of the proceedings of and testimony taken by the court is taken in the case.*

SEC. 211. *Article 14 is amended to read as follows:*

"ART. 14. SUMMARY COURTS-MARTIAL.—*Summary courts-martial shall have power to try any person subject to military law, except an officer, a warrant officer, or a cadet, for any crime or offense not capital made punishable by these articles: Provided, That noncommissioned officers shall not, if they object thereto, be brought to trial before a summary court-martial without the authority of the officer competent to bring them to trial before a special court-martial: Provided further, That the President*

SELECTIVE SERVICE ACT OF 1948    **29**

*may, by regulations, except from the jurisdiction of summary courts-martial any class or classes of persons subject to military law.*

*"Summary courts-martial shall not have power to adjudge confinement in excess of one month, restriction to limits for more than three months, or forfeiture or detention of more than two-thirds of one month's pay."*

SEC. 212. *Article 16 is amended to read as follows:*

*"ART. 16. PERSONS IN THE MILITARY SERVICE—HOW TRIABLE.— Officers shall be triable only by general and special courts-martial and in no case shall a person in the military service, when it can be avoided, be tried by persons inferior to him in rank. No enlisted person may sit as a member of a court-martial for the trial of another enlisted person who is assigned to the same company or corresponding military unit.*

*"No person subject to military law shall be confined with enemy prisoners or any other foreign nationals outside of the continental limits of the United States, nor shall any defendant awaiting trial be made subject to punishment or penalties other than confinement prior to sentence on charges against him."*

SEC. 213. *Article 22 is amended to read as follows:*

*"ART. 22. PROCESS TO OBTAIN WITNESSES.—Every trial judge advocate of a general or special court-martial and every summary court-martial shall have power to issue the like process to compel witnesses to appear and testify which courts of the United States having criminal jurisdiction may lawfully issue; but such process shall run to any part of the United States, its Territories, and possessions. Witnesses for the defense shall be subpenaed, upon request by the defense counsel, through process issued by the trial judge advocate, in the same manner as witnesses for the prosecution."*

SEC. 214. *Article 24 is amended to read as follows:*

*"ART. 24. COMPULSORY SELF-INCRIMINATION PROHIBITED.—No witness before a military court. commission, court of inquiry, or board, or before any officer conducting an investigation, or before any officer, military or civil, designated to take a deposition to be read in evidence before a military court, commission, court of inquiry, or board, or before an officer conducting an investigation, shall be compelled to incriminate himself or to answer any question the answer to which may tend to incriminate him or to answer any question not material to the issue or when such answer might tend to degrade him.*

*"The use of coercion or unlawful influence in any manner whatsoever by any person to obtain any statement, admission or confession from any accused person or witness, shall be deemed to be conduct to the prejudice of good order and military discipline, and no such statement, admission, or confession shall be received in evidence by any court-martial. It shall be the duty of any person in obtaining any statement from an accused to advise him that he does not have to make any statement at all regarding the offense of which he is accused or being investigated, and that any statement by the accused may be used as evidence against him in a trial by court-martial."*

SEC. 215. *Article 25 is amended to read as follows:*

*"ART. 25. DEPOSITIONS—WHEN ADMISSIBLE.—A duly authenticated deposition taken upon reasonable notice to the opposite party may be read in evidence before any military court or commission in any case not capital, or in any proceeding before a court of inquiry or a military board, if such deposition be taken when the witness resides, is found, or is about to go beyond the State, Territory, or district in which the court,*

30        SELECTIVE SERVICE ACT OF 1948

*commission, or board is ordered to sit, or beyond the distance of one hundred miles from the place of trial or hearing, or when it appears to the satisfaction of the court, commission, board, or appointing authority that the witness, by reason of age, sickness, bodily infirmity, imprisonment, or other reasonable cause, is unable to, or, in foreign places, because of nonamenability to process, refuses to, appear and testify in person at the place of trial or hearing: Provided, That testimony by deposition may be adduced for the defense in capital cases: Provided further, That a deposition may be read in evidence in any case in which the death penalty is authorized by law but is not mandatory, whenever the appointing authority shall have directed that the case be treated as not capital, and in such a case a sentence of death may not be adjudged by the court-martial: And provided further, That at any time after charges have been signed as provided in article 46, and before the charges have been referred for trial, any authority competent to appoint a court-martial for the trial of such charges may designate officers to represent the prosecution and the defense and may authorize such officers, upon due notice, to take the deposition of any witness, and such deposition may subsequently be received in evidence as in other cases."*

SEC. 216. *Article 31 is amended to read as follows:*

"ART. 31. METHOD OF VOTING.—*Voting by members of a general or special court-martial upon questions of challenge, on the findings, and on the sentence shall be by secret written ballot. The junior member of the court shall in each case count the votes, which count shall be checked by the president, who shall forthwith announce the result of the ballot to the members of the court. The law member of a general court-martial or the president of a special court-martial, shall rule in open court upon interlocutory questions, other than challenge, arising during the proceedings: Provided, That unless such ruling be made by the law member of a general court-martial, if any member object thereto, the court shall be cleared and closed and the question decided by a majority vote, viva voce, beginning with the junior in rank: And provided further, That any such ruling made by the law member of a general court-martial upon any interlocutory question other than a motion for a finding of not guilty, or the question of accused's sanity, shall be final and shall constitute the ruling of the court; but the law member may in any case consult with the court, in closed session, before making a ruling, and may change any ruling made at any time during the trial. It shall be the duty of the law member of a general or the president of a special court-martial before a vote is taken to advise the court that the accused must be presumed to be innocent until his guilt is established by legal and competent evidence beyond a reasonable doubt, and that in the case being considered if there is a reasonable doubt as to the guilt of the accused, the doubt shall be resolved in the accused's favor and he shall be acquitted; if there is a reasonable doubt as to the degree of guilt, the finding must be in a lower degree as to which there is no such doubt; that the burden of proof to establish the guilt of the accused is upon the Government."*

SEC. 217. *Article 36 is amended to read as follows:*

"ART. 36. DISPOSITION OF RECORDS—SPECIAL AND SUMMARY COURTS-MARTIAL.—*After having been acted upon by the officer appointing the court, or by the officer commanding for the time being, the record of each trial by special court-martial and a report of each trial by summary court-martial shall be transmitted to the headquarters of the officer exercising general court-martial jurisdiction over the command, there to be filed in the office of the staff judge advocate: Provided, however, That*

SELECTIVE SERVICE ACT OF 1948          31

*each record of trial by special court-martial in which the sentence, as approved by the appointing authority, includes a bad-conduct discharge, shall, if approved by the officer exercising general court-martial jurisdiction under the provisions of article 47, be forwarded by him to The Judge Advocate General for review as hereinafter in these articles provided. When no longer of use, records of summary courts-martial may be destroyed as provided by law governing destruction of Government records.''*

*SEC. 218. Article 38 is amended to read as follows:*

*''ART. 38. PRESIDENT MAY PRESCRIBE RULES.—The President may, by regulations, which he may modify from time to time, prescribe the procedure, including modes of proof, in cases before courts-martial, courts of inquiry, military commissions, and other military tribunals, which regulations shall, insofar as he shall deem practicable, apply the principles of law and rules of evidence generally recognized in the trial of criminal cases in the district courts of the United States: Provided, That nothing contrary to or inconsistent with these articles shall be so prescribed: Provided further, That all rules and regulations made in pursuance of this Article shall be laid before the Congress.''*

*SEC. 219. Article 39 is amended to read as follows:*

*''ART. 39. AS TO TIME.—Except for desertion or absence without leave committed in time of war, or for mutiny or murder, no person subject to military law shall be liable to be tried or punished by a court-martial for any crime or offense committed more than two years before arraignment of such person: Provided, That for desertion in time of peace, rape or for any crime or offense punishable under articles 93 and 94 of this code the period of limitations upon trial and punishment by court-martial shall be three years: Provided further, That the period of any absence of the accused from the jurisdiction of the United States, and also any period during which by reason of some manifest impediment the accused shall not have been amenable to military justice, shall be excluded in computing the aforesaid periods of limitation: Provided further, That this article shall not have the effect to authorize the trial or punishment for any crime or offense barred by the provisions of existing law: And provided further, That in the case of any offense the trial of which in time of war shall be certified by the Secretary of the Department of the Army to be detrimental to the prosecution of the war or inimical to the Nation's security, the period of limitations herein provided for the trial of the said offense shall be extended to the duration of the war and six months thereafter.''*

*SEC. 220. Article 43 is amended to read as follows:*

*''ART. 43. DEATH SENTENCE—WHEN LAWFUL; VOTE ON FINDINGS AND SENTENCE.—No person shall, by general court-martial, be convicted of an offense for which the death penalty is made mandatory by law, nor sentenced to suffer death, except by the concurrence of all the members of said court-martial present at the time the vote is taken, and for an offense in these articles expressly made punishable by death; nor sentenced to life imprisonment, nor to confinement for more than ten years, except by the concurrence of three-fourths of all the members present at the time the vote is taken. Conviction of any offense for which the death sentence is not mandatory and any sentence to confinement not in excess of ten years, whether by general or special court-martial, may be determined by a two-thirds vote of those members present at the time the vote is taken. All other questions shall be determined by a majority vote.''*

*SEC. 221. Article 44 is amended to read as follows:*

*''ART. 44. OFFICERS—REDUCTION TO RANKS.—When a sentence to dismissal may lawfully be adjudged in the case of an officer the sentence*

32          SELECTIVE SERVICE ACT OF 1948

may in time of war, under such regulations as the President may pre-
scribe, adjudge in lieu thereof reduction to the grade of private."

SEC. 222.  Article 46 is amended to read as follows:

"ART. 46.  CHARGES; ACTION UPON.—

"a.  SIGNATURE; OATH.—Charges and specifications must be signed by
a person subject to military law, and under oath either that he has personal
knowledge of, or has investigated, the matters set forth therein and that the
same are true in fact, to the best of his knowledge and belief.

"b.  INVESTIGATION.—No charge will be referred to a general court-
martial for trial until after a thorough and impartial investigation thereof
shall have been made.  This investigation will include inquiries as to
the truth of the matter set forth in said charges, form of charges, and what
disposition of the case should be made in the interest of justice and dis-
cipline.  The accused shall be permitted, upon his request, to be repre-
sented at such investigation by counsel of his own selection, civil counsel
if he so provides, or military if such counsel be reasonably available,
otherwise by counsel appointed by the officer exercising general courts
martial jurisdiction over the command.  At such investigation full
opportunity shall be given to the accused to cross-examine witnesses against
him if they are available and to present anything he may desire in his
own behalf, either in defense or mitigation, and the investigating officer
shall examine available witnesses requested by the accused.  If the charges
are forwarded after such investigation they shall be accompanied by a
statement of the substance of the testimony taken on both sides.

"c.  FORWARDING CHARGES; DELAYS; SERVICE OF CHARGES.—When a
person is held for trial by general court martial, the commanding officer
will, within eight days after the accused is arrested or confined, if prac-
ticable, forward the charges to the officer exercising general court-martial
jurisdiction and furnish the accused a copy of such charges.  If the same
be not practicable, he will report to superior authority the reasons for
delay.  The trial judge advocate will cause to be served upon the accused
a copy of the charges upon which trial is to be had, and a failure so to
serve such charges will be ground for a continuance unless the trial be
had on the charges furnished the accused as hereinbefore provided.  In
time of peace no person shall, against his objection, be brought to trial
before a general court martial within a period of five days subsequent
to the service of charges upon him."

SEC. 223.  Article 47 is amended to read as follows:

"ART. 47.  ACTION BY CONVENING AUTHORITY.—

"a.  ASSIGNMENT OF JUDGE ADVOCATES; CHANNELS OF COMMUNICA-
TION.—All members of the Judge Advocate General's Department will be
assigned as prescribed by The Judge Advocate General after appropriate
consultations with commanders on whose staffs they may serve, and The
Judge Advocate General or senior members of his staff will make frequent
inspections in the field in supervision of the administration of military
justice.  Convening authorities will at all times communicate directly
with their staff judge advocates in matters relating to the administration
of military justice, and the staff judge advocate of any command is
authorized to communicate directly with the staff judge advocate of a
superior or subordinate command, or with The Judge Advocate General.

"b.  REFERENCE FOR TRIAL.—Before directing the trial of any charge
by general court-martial the convening authority will refer it to his staff
judge advocate for consideration and advice; and no charge will be referred

SELECTIVE SERVICE ACT OF 1948    33.

to a general court-martial for trial unless it has been found that a thorough and impartial investigation thereof has been made as prescribed in the preceding article, that such charge is legally sufficient to allege an offense under these articles, and is sustained by evidence indicated in the report of investigation.

"c. ACTION ON RECORD OF TRIAL.—Before acting upon a record of trial by general court-martial or military commission, or a record of trial by special court-martial in which a bad-conduct discharge has been adjudged and approved by the authority appointing the court, the reviewing authority will refer it to his staff judge advocate or to The Judge Advocate General for review and advice; and no sentence shall be approved unless upon conviction established beyond reasonable doubt of an offense made punishable by these articles, and unless the record of trial has been found legally sufficient to support it.

"d. APPROVAL.—No sentence of a court-martial shall be carried into execution until the same shall have been approved by the convening authority: Provided, That no sentence of a special court-martial including a bad-conduct discharge shall be carried into execution until in addition to the approval of the convening authority the same shall have been approved by an officer authorized to appoint a general court-martial.

"e. WHO MAY EXERCISE.—Action by the convening authority may be taken by an officer commanding for the time being, by a successor in command, or by any officer exercising general court-martial jurisdiction.

"f. POWERS INCIDENT TO POWER TO APPROVE.—The power to approve the sentence of a court-martial shall include—

    "(1) the power to approve or disapprove a finding of guilty and to approve only so much of a finding of guilty of a particular offense as involves a finding of guilty of a lesser included offense;

    "(2) the power to approve or disapprove the whole or any part of the sentence; and

    "(3) the power to remand a case for rehearing under the provisions of article 52."

SEC. 224. Article 48 is amended to read as follows:

"ART. 48. CONFIRMATION.—In addition to the approval required by article 47, confirmation is required as follows before the sentence of a court-martial may be carried into execution, namely:

"a. By the President with respect to any sentence—

    "(1) of death, or

    "(2) involving a general officer:

Provided, That when the President has already acted as approving authority, no additional confirmation by him is necessary;

"b. By the Secretary of the Department of the Army with respect to any sentence not requiring approval or confirmation by the President, when The Judge Advocate General does not concur in the action of the Judicial Council;

"c. By the Judicial Council, with the concurrence of The Judge Advocate General, with respect to any sentence—

    "(1) when the confirming action of the Judicial Council is not unanimous, or when by direction of The Judge Advocate General his participation in the confirming action is required, or

    "(2) involving imprisonment for life, or

    "(3) involving the dismissal of an officer other than a general officer, or

34    SELECTIVE SERVICE ACT OF 1948

"(4) involving the dismissal or suspension of a cadet;

"d. By the Judicial Council with respect to any sentence in a case transmitted to the Judicial Council under the provisions of article 50 for confirming action."

SEC. 225. *Article 49 is amended to read as follows:*

"ART. 49. POWERS INCIDENT TO POWER TO CONFIRM.—*The power to confirm the sentence of a court-martial shall be held to include—*

"a. The power to approve, confirm, or disapprove a finding of guilty, and to approve or confirm so much only of a finding of guilty of a particular offense as involves a finding of guilty of a lesser included offense;

"b. The power to confirm, disapprove, vacate, commute, or reduce to legal limits the whole or any part of the sentence;

"c. The power to restore all rights, privileges, and property affected by any finding or sentence disapproved or vacated;

"d. The power to order the sentence to be carried into execution;

"e. The power to remand the case for a rehearing under the provisions of article 52."

SEC. 226. *Article 50 is amended to read as follows:*

"ART. 50. APPELLATE REVIEW.—

"a. BOARD OF REVIEW; JUDICIAL COUNCIL.—*The Judge Advocate General shall constitute, in his office, a Board of Review composed of not less than three officers of the Judge Advocate General's Department. He shall also constitute, in his office, a Judicial Council composed of three general officers of the Judge Advocate General's Department: Provided, That the Judge Advocate General may, under exigent circumstances, detail as members of the Judicial Council, for periods not in excess of sixty days, officers of the Judge Advocate General's Department of grades below that of general officer.*

"b. ADDITIONAL BOARDS OF REVIEW AND JUDICIAL COUNCILS.—*Whenever necessary, the Judge Advocate General may constitute two or more Boards of Review and Judicial Councils in his office, with equal powers and duties, composed as provided in the first paragraph of this article.*

"c. BRANCH OFFICES.—*Whenever the President deems such action necessary, he may direct The Judge Advocate General to establish a branch office, under an Assistant Judge Advocate General who shall be a general officer of The Judge Advocate General's Department, with any distant command, and to establish in such branch office one or more Boards of Review and Judicial Councils composed as provided in the first paragraph of this article. Such Assistant Judge Advocate General and such Board of Review and Judicial Council shall be empowered to perform for that command under the general supervision of The Judge Advocate General, the duties which The Judge Advocate General and the Board of Review and Judicial Council in his office would otherwise be required to perform in respect of all cases involving sentences not requiring approval or confirmation by the President: Provided, That the power of mitigation and remission shall not be exercised by such Assistant Judge Advocate General or by agencies in his office, but any case in which such action is deemed desirable shall be forwarded to The Judge Advocate General with appropriate recommendations.*

"d. ACTION BY BOARD OF REVIEW WHEN APPROVAL BY PRESIDENT OR CONFIRMING ACTION IS REQUIRED.—*Before any record of trial in which there has been adjudged a sentence requiring approval or confirmation by the President or confirmation by any other confirming authority is sub-*

SELECTIVE SERVICE ACT OF 1948          35

mitted to the President or such other confirming authority, as the case may be, it shall be examined by the Board of Review which shall take action as follows:

"(1) In any case requiring action by the President, the Board of Review shall submit its opinion in writing, through the Judicial Council which shall also submit its opinion in writing, to the Judge Advocate General, who shall, except as herein otherwise provided, transmit the record and the Board's and Council's opinions, with his recommendations, directly to the Secretary of the Department of the Army for the action of the President: Provided, That the Judicial Council, with the concurrence of the Judge Advocate General shall have powers in respect to holdings of legal insufficiency equal to the powers vested in the Board of Review by subparagraph (3) of this paragraph.

"(2) In any case requiring confirming action by the Judicial Council with or without the concurrence of the Judge Advocate General, when the Board of Review is of the opinion that the record of trial is legally sufficient to support the sentence it shall submit its opinion in writing to the Judicial Council for appropriate action.

"(3) When the Board of Review is of the opinion that the record of trial in any case requiring confirming action by the President or confirming action by the Judicial Council is legally insufficient to support the findings of guilty and sentence, or the sentence, or that errors of law have been committed injuriously affecting the substantial rights of the accused, it shall submit its holding to the Judge Advocate General and when the Judge Advocate General concurs in such holding, such findings and sentence shall thereby be vacated in accord with such holding and the record shall be transmitted by the Judge Advocate General to the appropriate convening authority for a rehearing or such other action as may be proper.

"(4) In any case requiring confirming action by the President or confirming action by the Judicial Council in which the Board of Review holds the record of trial legally insufficient to support the findings of guilty and sentence, or the sentence, and the Judge Advocate General shall not concur in the holding of the Board of Review, the holding and the record of trial shall be transmitted to the Judicial Council for confirming action or for other appropriate action in a case in which confirmation of the sentence by the President is required under article 48a.

"e. ACTION BY BOARD OF REVIEW IN CASES INVOLVING DISHONORABLE OR BAD-CONDUCT DISCHARGES OR CONFINEMENT IN PENITENTIARY.— No authority shall order the execution of any sentence of a court-martial involving dishonorable discharge not suspended, bad-conduct discharge not suspended, or confinement in a penitentiary unless and until the appellate review required by this article shall have been completed and unless and until any confirming action required shall have been completed. Every record of trial by general or special court-martial involving a sentence to dishonorable discharge or bad-conduct discharge, whether such discharges be suspended or not suspended, and every record of trial by general court-martial involving a sentence to confinement in a penitentiary, other than records of trial examination of which is required by paragraph d of this article, shall be examined by the Board of Review which shall take action as follows:

"(1) In any case in which the Board of Review holds the record of trial legally sufficient to support the findings of guilty and sentence,

36                     SELECTIVE SERVICE ACT OF 1948

and confirming action is not by the Judge Advocate General or the Board of Review deemed necessary, the Judge Advocate General shall transmit the holding to the convening authority, and such holding shall be deemed final and conclusive.

"(2) In any case in which the Board of Review holds the record of trial legally sufficient to support the findings of guilty and sentence, but modification of the findings of guilty or the sentence is by the Judge Advocate General or the Board of Review deemed necessary to the ends of justice, the holding and the record of trial shall be transmitted to the Judicial Council for confirming action.

"(3) In any case in which the Board of Review holds the record of trial legally insufficient to support the findings of guilty and sentence, in whole or in part, and the Judge Advocate General concurs in such holding, the findings and sentence shall thereby be vacated in whole or in part in accord with such holding, and the record shall be transmitted by the Judge Advocate General to the convening authority for rehearing or such other action as may be appropriate.

"(4) In any case in which the Board of Review holds the record of trial legally insufficient to support the findings of guilty and sentence, in whole or in part, and the Judge Advocate General shall not concur in the holding of the Board of Review, the holding and the record of trial shall be transmitted to the Judicial Council for confirming action.

"f. APPELLATE ACTION IN OTHER CASES.—Every record of trial by general court-martial the appellate review of which is not otherwise provided for by this article shall be examined in the Office of the Judge Advocate General and if found legally insufficient to support the findings of guilty and sentence, in whole or in part, shall be transmitted to the Board of Review for appropriate action in accord with paragraph e of this article.

"g. WEIGHING EVIDENCE.—In the appellate review of records of trials by courts-martial as provided in these articles the Judge Advocate General and all appellate agencies in his office shall have authority to weigh evidence, judge the credibility of witnesses, and determine controverted questions of fact.

"h. FINALITY OF COURT-MARTIAL JUDGMENTS.—The appellate review of records of trial provided by this article, the confirming action taken pursuant to articles 48 or 49, the proceedings, findings, and sentences of courts-martial as heretofore or hereafter approved, reviewed, or confirmed as required by the Articles of War and all dismissals and discharges heretofore or hereafter carried into execution pursuant to sentences by courts-martial following approval, review, or confirmation as required by the Articles of War, shall be final and conclusive, and orders publishing the proceedings of courts-martial and all action taken pursuant to such proceedings shall be binding upon all departments, courts, agencies, and officers of the United States, subject only to action upon application for a new trial as provided in article 53."

SEC. 227. Article 50½ is rescinded.

SEC. 228. Article 51 is amended to read as follows:

"ART. 51. MITIGATION, REMISSION, AND SUSPENSION OF SENTENCES.—

"a. AT THE TIME ORDERED EXECUTED.—The power of the President, the Secretary of the Department of the Army, and any reviewing authority

SELECTIVE SERVICE ACT OF 1948          37

to order the execution of a sentence of a court-martial shall include the power to mitigate, remit, or suspend the whole or any part thereof, except that a death sentence may not be suspended. The Judge Advocate General shall have the power to mitigate, remit, or suspend the whole or any part of a sentence in any case requiring appellate review under article 50 and not requiring approval or confirmation by the President, but the power to mitigate or remit shall be exercised by the Judge Advocate General under the direction of the Secretary of the Department of the Army. The authority which suspends the execution of a sentence may restore the person under sentence to duty during such suspension; and the death or honorable discharge of a person under suspended sentence shall operate as a complete remission of any unexecuted or unremitted part of such sentence.

"*b. SUBSEQUENT TO THE TIME ORDERED EXECUTED.—*

"*(1) Any unexecuted portion of a sentence other than a sentence of death, including all uncollected forfeitures, adjudged by court-martial may be mitigated, remitted or suspended and any order of suspension may be vacated, in whole or in part, by the military authority competent to appoint, for the command, exclusive of penitentiaries and the United States disciplinary barracks, in which the person under sentence may be, a court of the kind that imposed the sentence, and the same power may be exercised by superior military authority or by the Judge Advocate General under the direction of the Secretary of the Department of the Army: Provided, That no sentence approved or confirmed by the President shall be mitigated, remitted, or suspended by any authority inferior to the President: And provided further, That no order of suspension of a sentence to dishonorable discharge or bad conduct discharge shall be vacated unless and until confirming or appellate action on the sentence has been completed as required by articles 48 and 50.*

"*(2) The power to suspend a sentence shall include the power to restore the person affected to duty during such suspension.*

"*(3) The power to mitigate, remit or suspend the sentence or any part thereof in the case of a person confined in the United States disciplinary barracks or in a penitentiary shall be exercised by the Secretary of the Department of the Army or by the Judge Advocate General under the direction of the Secretary of the Department of the Army.*"

SEC. 229. Article 52 is amended to read as follows:

"ART. 52. REHEARINGS.—*When any reviewing or confirming authority disapproves a sentence or when any sentence is vacated by action of the Board of Review or Judicial Council and the Judge Advocate General, the reviewing or confirming authority or the Judge Advocate General may authorize or direct a rehearing. Such rehearing shall take place before a court-martial composed of members not members of the court-martial which first heard the case. Upon such rehearing the accused shall not be tried for any offense of which he was found not guilty by the first court-martial, and no sentence in excess of or more severe than the original sentence shall be enforced unless the sentence be based upon a finding of guilty of an offense not considered upon the merits in the original proceeding.*"

SEC. 230. Article 53 is amended to read as follows:

"ART. 53. PETITION FOR NEW TRIAL.—*Under such regulations as the President may prescribe, the Judge Advocate General is authorized, upon*

38          SELECTIVE SERVICE ACT OF 1948

*application of an accused person, and upon good cause shown, in his
discretion to grant a new trial, or to vacate a sentence, restore rights,
privileges, and property affected by such sentence, and substitute for a
dismissal, dishonorable discharge, or bad conduct discharge previously
executed a form of discharge authorized for administrative issuance, in
any court-martial case in which application is made within one year
after final disposition of the case upon initial appellate review: Provided,
That with regard to cases involving offenses committed during World War
II, the application for a new trial may be made within one year after
termination of the war, or after its final disposition upon initial appellate
review as herein provided, whichever is the later: Provided, That only one
such application for a new trial may be entertained with regard to any
one case: And provided further, That all action by the Judge Advocate
General pursuant to this article, and all proceedings, findings, and sen-
tences on new trials under this article, as approved, reviewed, or confirmed
under articles 47, 48, 49, and 50, and all dismissals and discharges
carried into execution pursuant to sentences adjudged on new trials and
approved, reviewed, or confirmed, shall be final and conclusive and orders
publishing the action of the Judge Advocate General or the proceedings
on new trial and all action taken pursuant to such proceedings, shall be
binding upon all departments, courts, agencies, and officers of the United
States."*

SEC. 231. *Article 70 is amended to read as follows:*

"ART. 70. CHARGES; ACTION UPON, UNNECESSARY DELAY.—*When
any person subject to military law is placed in arrest or confinement
immediate steps will be taken to try the person accused or to dismiss the
charge and release him. Any officer who is responsible for unnecessary
delay in investigating or carrying the case to a final conclusion shall be
punished as a court-martial may direct.*"

SEC. 232. *Article 85 is amended to read as follows:*

"ART. 85. DRUNK ON DUTY.—*Any person subject to military law,
who is found drunk on duty, shall be punished as a court-martial may
direct.*"

SEC. 233. *Article 88 is amended to read as follows:*

"ART. 88. UNLAWFULLY INFLUENCING ACTION OF COURT.—*No
authority appointing a general, special, or summary court-martial nor
any other commanding officer, shall censure, reprimand, or admonish
such court, or any member thereof, with respect to the findings or sentence
adjudged by the court, or with respect to any other exercise, by such court
or any member thereof, of its or his judicial responsibility. No person
subject to military law shall attempt to coerce or unlawfully influence the
action of a court-martial or any military court or commission, or any
member thereof, in reaching the findings or sentence in any case, or the
action of an appointing or reviewing or confirming authority with respect
to his judicial acts.*"

SEC. 234. *Article 89 is amended to read as follows:*

"ART. 89. GOOD ORDER TO BE MAINTAINED AND WRONGS RE-
DRESSED.—*All persons subject to military law are to behave themselves
orderly in quarters, garrison, camp, and on the march, and any person
subject to military law who commits any waste or spoil, or wrongfully
destroys any property whatsoever or commits any kind of depredation or
riot, shall be punished as a court-martial may direct. Any commanding
officer who, upon complaint made to him refuses or omits to see repara-
tion made to the party injured, insofar as the offender's pay shall go*

SELECTIVE SERVICE ACT OF 1948          39

*toward such reparation, as provided for in article 105, shall be dismissed from the service, or otherwise punished, as a court-martial may direct."*

Sec. 235. *Article 92 is amended to read as follows:*

*"Art. 92. Murder—Rape.—Any person subject to military law found guilty of murder shall suffer death or imprisonment for life, as a court-martial may direct, but if found guilty of murder not premeditated, he shall be punished as a court-martial may direct.   Any person subject to military law who is found guilty of rape shall suffer death or such other punishment as a court-martial may direct: Provided, That no person shall be tried by court-martial for murder or rape committed within the geographical limits of the States of the Union and the District of Columbia in time of peace."*

Sec. 236. *Article 93 is amended to read as follows:*

*"Art. 93. Various Crimes.—Any person subject to military law who commits manslaughter, mayhem, arson, burglary, housebreaking, robbery, larceny, perjury, forgery, sodomy, assault with intent to commit any felony, assault with intent to do bodily harm with a dangerous weapon, instrument, or other thing, or assault with intent to do bodily harm, shall be punished as a court-martial may direct: Provided, That any person subject to military law who commits larceny or embezzlement shall be guilty of larceny within the meaning of this article."*

Sec. 237. *Article 94 is amended to read as follows:*

*"Art. 94. Frauds Against the Government.—Any person subject to military law who makes or causes to be made any claim against the United States or any officer thereof, knowing such claim to be false or fraudulent;  or*

*"Who presents or causes to be presented to any person in the civil or military service thereof, for approval or payment, any claim against the United States, or any officer thereof, knowing such claim to be false or fraudulent; or*

*"Who enters into any agreement or conspiracy to defraud the United States by obtaining, or aiding others to obtain, the allowance or payment of any false or fraudulent claim; or*

*"Who, for the purpose of obtaining, or aiding others to obtain, the approval, allowance, or payment of any claim against the United States or against any officer thereof, makes, or uses, or procures, or advises the making or use of, any writing or other paper knowing the same to contain any false or fraudulent statements; or*

*"Who, for the purpose of obtaining, or aiding others to obtain, the approval, allowance, or payment of any claim against the United States or any officer thereof, makes or procures, or advises the making of, any oath to any fact or to any writing or other paper knowing such oath to be false; or*

*"Who, for the purpose of obtaining, or aiding others to obtain, the approval, allowance, or payment of any claim against the United States or any officer thereof, forges or counterfeits, or procures, or advises the forging or counterfeiting of any signature upon any writing or other paper, or uses, or procures, or advises the use of any such signature, knowing the same to be forged or counterfeited; or*

*"Who, having charge, possession, custody, or control of any money or other property of the United States, furnished or intended for the military service thereof, knowingly delivers, or causes to be delivered, to any person having authority to receive the same, any amount thereof less than that for which he receives a certificate or receipt; or*

40                SELECTIVE SERVICE ACT OF 1948

*"Who, being authorized to make or deliver any paper certifying the receipt of any property of the United States furnished or intended for the military service thereof, makes or delivers to any person such writing, without having full knowledge of the truth of the statements therein contained and with intent to defraud the United States; or*

*"Who steals, embezzles, knowingly and willfully misappropriates, applies to his own use or benefit, or wrongfully or knowingly sells or disposes of any ordnance, arms, equipment, ammunition, clothing, subsistence stores, money, or other property of the United States furnished or intended for the military service thereof: Provided, That any person, subject to military law, who commits larceny or embezzlement with respect to property of the United States, furnished or intended for the military service thereof, or with respect to other property within the purview of this article, steals said property within the meaning of this article; or*

*"Who knowingly purchases or receives in pledge for any obligation or indebtedness from any soldier, officer, or other person who is a part of or employed in said forces or service, any ordnance, arms, equipment, ammunition, clothing, subsistence stores, or other property of the United States, such soldier, officer, or other person not having lawful right to sell or pledge the same; or*

*"Who enters into any agreement or conspires to commit any of the offenses aforesaid;*

*"Shall, on conviction thereof, be punished by fine or imprisonment, or by such other punishment as a court martial may adjudge, or by any or all of said penalties. If any person, being guilty of any of the offenses aforesaid or who steals or fails properly to account for any money or other property held in trust by him for enlisted persons or as its official custodian while in the military service of the United States, receives his discharge or is dismissed or otherwise separated from the service, he shall continue to be liable to be arrested and held for trial and sentence by a court martial in the same manner and to the same extent as if he had not been so separated therefrom."*

SEC. 238. *Article 104 is amended to read as follows:*

*"Art. 104. Disciplinary Powers of Commanding Officers.—Under such regulations as the President may prescribe, the commanding officer of any detachment, company, or higher command, may, for minor offenses, impose disciplinary punishments upon persons of his command without the intervention of a court-martial, unless the accused demands trial by court-martial.*

*"The disciplinary punishments authorized by this article may include admonition or reprimand, or the withholding of privileges, or extra fatigue, or restriction to certain specified limits, or hard labor without confinement or any combination of such punishments for not exceeding one week from the date imposed; but shall not include forfeiture of pay or confinement under guard; except that any officer exercising general court-martial jurisdiction may, under the provisions of this article, also impose upon a warrant officer or officer of his command below the rank of brigadier general a forfeiture of not more than one-half of his pay per month for three months.*

*"A person punished under authority of this article, who deems his punishment unjust or disproportionate to the offense, may, through the proper channel, appeal to the next superior authority, but may in the meantime be required to undergo the punishment adjudged. The com-*

SELECTIVE SERVICE ACT OF 1948          41

manding officer who imposes the punishment, his successor in command, and superior authority shall have power to mitigate or remit any unexecuted portion of the punishment. The imposition and enforcement of disciplinary punishment under authority of this article for any act or omission shall not be a bar to trial by court-martial for a serious crime or offense growing out of the same act or omission, and not properly punishable under this article; but the fact that a disciplinary punishment has been enforced may be shown by the accused upon trial, and when so shown shall be considered in determining the measure of punishment to be adjudged in the event of a finding of guilty."

SEC. 239. Article 108 is amended to read as follows:

"ART. 108. SOLDIERS—SEPARATION FROM THE SERVICE.—No enlisted person, lawfully inducted into the military service of the United States, shall be discharged from said service without a certificate of discharge, and no enlisted person shall be discharged from said service before his term of service has expired, except in the manner prescribed by the Secretary of the Department of the Army, or by sentence of a general or special court-martial."

SEC. 240. Article 110 is amended to read as follows:

"ART. 110. CERTAIN ARTICLES OF WAR TO BE READ OR EXPLAINED.—Articles 1, 2, 24, 28, 29, 54 to 97, inclusive, 104 to 109, inclusive, and 121 shall be read or carefully explained to every soldier at the time of his enlistment or muster in, or within six days thereafter, and shall be read or explained once every six months to the soldiers of every garrison, regiment, or company in the service of the United States. And a complete text of the Articles of War and of the Manual for Courts-Martial shall be made available to any soldier, upon his request, for his personal examination."

SEC. 241. Article 116 is amended to read as follows:

"ART. 116. POWERS OF ASSISTANT TRIAL JUDGE ADVOCATE AND OF ASSISTANT DEFENSE COUNSEL.—An assistant trial judge advocate of a general or special court-martial shall be competent to perform any duty devolved by law, regulation, or the custom of the service upon the trial judge advocate of the court. An assistant defense counsel shall be competent likewise to perform any duty devolved by law, regulation, or the custom of the service upon counsel for the accused."

SEC. 242. Article 117 is amended to read as follows:

"ART. 117. REMOVAL OF CIVIL SUITS.—When any civil or criminal prosecution is commenced in any court of a State of the United States against any officer, soldier, or other person in the military service of the United States on account of any act done under color of his office or status, or in respect to which he claims any right, title, or authority under any law of the United States respecting the military forces thereof, or under the law of war, such suit or prosecution may at any time before the trial or final hearing thereof be removed for trial into the district court of the United States in the district where the same is pending in the manner prescribed by law, and the cause shall thereupon be entered on the docket of such district court, which shall proceed as if the cause had been originally commenced therein and shall have full power to hear and determine said cause."

SEC. 243. Section 1 of article 121 is amended to read as follows:

"ART. 121. COMPLAINTS OF WRONGS.—Any officer or soldier who believes himself wronged by his commanding officer, and, upon due application to such commander, is refused redress, may complain to the officer

42          SELECTIVE SERVICE ACT OF 1948

*exercising general court-martial jurisdiction over the officer against whom
the complaint is made. That officer shall examine into said complaint
and take proper measures for redressing the wrong complained of; and
he shall, as soon as possible, transmit to the Department of the Army
a true statement of such complaint, with the proceedings had thereon."*

Sec. 244. *This title shall become effective on the first day of the
eighth calendar month after approval of this title.*

Sec. 245. *All offenses committed and all penalties, forfeitures, fines,
or liabilities incurred prior to the effective date of this title, under any
law embraced in or modified, changed or repealed by this title, may be
prosecuted, punished, and enforced in the same manner and with the
same effect as if this title had not been passed.*

Sec. 246. *Section 8 of the National Defense Act, as amended (10
U. S. C. 61), is amended to read as follows:*

*"*Sec. 8. Judge Advocate General's Corps.—*The Judge Advocate
General's Corps shall consist of one Judge Advocate General with the
rank of major general, one assistant with the rank of major general,
three officers with the rank of brigadier general, and an active list com-
missioned officer strength to be determined by the Secretary of the Depart-
ment of the Army, but such strength shall not be less than 1½ per centum
of the authorized active list commissioned officer strength of the Armed
Services of the National Military Establishment who are subject to the
Articles of War, and in addition warrant officers and enlisted men in
such numbers as the Secretary of the Department of the Army shall
determine."*

Sec. 247. *Regular Army officers shall be permanently appointed by
the President, by and with the advice and consent of the Senate, in the
Judge Advocate General's Corps in the commissioned officer grades of
major general, brigadier general, colonel, lieutenant colonel, major,
captain, and first lieutenant. The names of commissioned officers of
the Judge Advocate General's Corps below the grade of brigadier general
shall be carried on the Judge Advocate's promotion list. The Judge
Advocate's promotion list shall be established by entering thereon the
names of the officers concerned without change in their order of precedence
on the existing promotion list. The authorized numbers in each of the
several grades in the Judge Advocate's promotion list shall be prescribed
by the Secretary of the Department of the Army, but the numbers thus
authorized shall not exceed the following percentages of the total strength
authorized for that list: 8 per centum in the grade of colonel; 14 per
centum in the grade of lieutenant colonel; 19 per centum in the grade
of major; 23 per centum in the grade of captain; and 36 per centum in
the grade of first lieutenant: Provided, That numbers may be authorized
for any grade in lieu of authorization in higher grades: Provided further,
That this provision shall not operate to require a reduction in permanent
grade of any officer now holding permanent appointment.*

*Officers whose names are carried on the Judge Advocate's promotion list
shall be promoted to the several grades as now or hereafter prescribed for
promotion-list officers generally and the authorized numbers
in grades below colonel on such list shall be temporarily increased from
time to time in order to give effect to the promotion system now or hereafter
prescribed by law for promotion-list officers.*

*Within the authorized strength of the Judge Advocate General's Corps
additional officers may be appointed by transfer of qualified officers from
other branches of the Army, by appointment of Reserve judge advocates*

SELECTIVE SERVICE ACT OF 1948        43

*or qualified civilian graduates of accredited law schools. Those originally appointed in the Regular Army in the Judge Advocate General's Corps shall be credited with an amount of service for the purpose of determining grade, position on promotion list, permanent-grade seniority, and eligibility for promotion as now or hereafter prescribed by law.*

*SEC. 248. The Judge Advocate General shall, in addition to such other duties as may be prescribed by law, be the legal adviser of the Secretary of the Department of the Army and of all officers and agencies of the Department of the Army; and all members of the Judge Advocate General's Corps shall perform their duties under the direction of the Judge Advocate General.*

*SEC. 249. Notwithstanding any other provisions of law, the Judge Advocate General, the Assistant Judge Advocate General and general officers of the Judge Advocate General's Corps shall be appointed by the President, by and with the advice and consent of the Senate, from among such positions by the Secretary of the Department of the Army. Upon the appointment of an officer to be the Judge Advocate General or Assistant Judge Advocate General with the rank of major general, he shall at the same time if not then holding permanent appointment in such grade be appointed a permanent major general of the Regular Army.*

And the House agree to the same.

> W. G. ANDREWS,
> W. STERLING COLE,
> GEORGE J. BATES,
> CARL VINSON,
> PAUL J. KILDAY,
> CARL T. DURHAM,
> *Managers on the Part of the House.*

> CHAN GURNEY,
> LEVERETT SALTONSTALL,
> WAYNE MORSE,
> MILLARD E. TYDINGS,
> HARRY F. BYRD,
> *Managers on the Part of the Senate.*

### STATEMENT OF THE MANAGERS ON THE PART OF THE HOUSE

The managers on the part of the House at the conference on the disagreeing votes of the two Houses on the amendment of the House to the bill (S. 2655) to provide for the common defense by increasing the strength of the armed forces of the United States, including the reserve components thereof, and for other purposes, submit the following statement in explanation of the effect of the action agreed upon by the conferees and recommended in the accompanying conference report:

#### AUTHORIZED PERSONNEL STRENGTHS

Senate bill: Army, 790,000 plus 110,000 one-year trainees.
House amendment, 837,000.
Senate bill: Navy (including Marine Corps), 666,882, plus 36,000 one-year trainees.
House amendment, 666,882.
Senate bill: Air Force, 453,000 plus 15,000 one-year trainees.
House amendment, 502,000.
The conference agreement provides for authorized active-duty personnel strengths for the armed forces as follows:
Army, 837,000 plus 110,000 one-year enlistees.
Navy (including Marine Corps), 666,882 plus 36,000 one-year enlistees.
Air Force, 502,000 plus 15,000 one-year enlistees.

#### ENLISTMENT OF ALIENS

The Senate bill authorized the Secretary of the Army until June 30, 1950, to accept enlistments in the Regular Army, for periods of not less than 5 years, of not more than 25,000 qualified aliens between the ages of 18 and 35. The House amendment contains no comparable provision. The conference agreement eliminates the provision for enlistment of aliens.

#### REGISTRATION

The Senate bill provided for the registration of male persons between the ages of 18 and 26, and contained no specific provision authorizing registration by age groups. The House amendment provided for the registration of male persons between the ages of 18 and 31, and specifically authorized the President to provide for registration by age groups. The conference agreement adopts the provisions of the Senate bill with respect to registration.

#### LIABILITY OF ALIENS FOR SERVICE

The Senate bill provided that citizens of a foreign country should be relieved from liability for training and service upon application for such relief, but provided that any person who sought relief should

44

SELECTIVE SERVICE ACT OF 1948          **45**

thereafter be debarred from becoming a citizen of the United States. The House amendment excluded from liability for service those aliens who have not declared their intentions to become citizens of the United States. The conference agreement adopts the provisions of the Senate bill with respect to liability for training and service of aliens but insuring that properly deferrable aliens may be relieved from liability for induction without debarment from citizenship.

### MORATORIUM ON INDUCTIONS

The House amendment contained provisions prohibiting inductions under the act until the President proclaims not earlier than 75 days after the date of enactment (1) that a sufficient number of persons is on active service in the armed forces to maintain an adequate national defense, and (2) that a sufficient number of such persons cannot, in his judgment, be attained by voluntary enlistment and by voluntary request for call to active duty. The amendment did not delay the registration, classification, et cetera, of persons. The amendment further provided that upon the issuance of such a proclamation the provisions authorizing induction should come into effect but that no person should be inducted prior to 90 days after the date of enactment of the legislation. The amendment further provided that no induction should be made before January 31, 1949 and that no induction should be made after that date unless the President found that the requisite manpower strengths could not be obtained or maintained by an intensified voluntary enlistment campaign which was directed to be carried out. The amendment further provided for original enlistments in the armed forces for periods of 2 years and for reenlistments for periods of either 1 or 2 years.

The Senate bill contained no provisions comparable to those described in the preceding paragraph.

The conference agreement requires that involuntary inductions under the act be delayed for 90 days after the date of its enactment unless the President, or the Congress by concurrent resolution, declares a national emergency after the date of enactment of the act. The conference agreement requires the armed forces to initiate and carry on an intensified voluntary-enlistment campaign in an effort to obtain the required personnel strength.

### PERIOD OF SERVICE

The Senate bill provided that persons inducted under the legislation should serve for a period of 24 consecutive months. The House amendment provided that persons inducted should serve for a period of 12 months. The conference agreement provides that persons inducted shall serve for a period of 21 consecutive months.

### SPECIAL CALLS FOR DOCTORS AND DENTISTS

The Senate bill provided for the special registration and calling for service of members of the medical and dental professions and allied specialist categories who have not attained the age of 45. It established an order of priority for the induction of persons in medical and dental categories and contained provisions designed to prevent the

46    SELECTIVE SERVICE ACT OF 1948

induction or call to active duty for more than 1 month in any calendar year of any doctor of medicine or dental surgery, established, in his profession in the community in which he resides, if the local board determined that the health of the community in which he resides would be unduly jeopardized as a result of his induction or service on active duty.

The House amendment contained no provisions providing for the special registration of and calling for service of persons in medical and dental categories.

The conference agreement eliminates the provisions of the Senate bill providing for the special registration and calling for service of persons in medical and dental categories.

#### SHORT-TERM ENLISTMENTS

The House amendment contained a provision requiring the acceptance of enlistments in the Regular Army of persons between the ages of 19 and 26 for enlistment periods equal to the periods of service required of inductees. The Senate bill contained no comparable provision. The conference agreement includes the provision of the House amendment relative to enlistments in the Regular Army.

#### ARMY GENERAL CLASSIFICATION TEST SCORE

The House amendment contained a provision prohibiting the establishment of a passing score on the Army general classification test higher than 70 points. The Senate bill contained no comparable provision. The conference agreement provides that the passing score on the Army general classification test shall be 70 points.

#### ONE-YEAR TRAINEES

The Senate bill contained provisions providing for the enlistment in the Army, Navy, and Air Force for 1-year periods of limited numbers of qualified male persons between the ages of 18 and 19. Persons enlisting for the period of 1 year would, upon completion of their enlistments, be transferred to the Reserve components for periods of 6 years and would be under strong compulsion to accept assignment to organized units of the Reserve components or to officer-training programs of the armed forces.

The House amendment also provided for the enlistment in the Army, Navy, and Air Force for 1-year periods of qualified male persons between the ages of 18 and 19 but placed no limit on the number who could be so enlisted. The House amendment, while providing for the transfer of such persons to Reserve components for periods of 6 years, did not impose any compulsion upon them to join organized units of the reserve components.

The conference agreement adopts the provisions of the Senate bill relative to enlistments for 1-year periods of persons between the ages of 18 and 19.

#### DEFERMENTS AND EXEMPTIONS

The Senate bill exempted from liability for induction those persons who served for more than 18 months, either in the armed forces of the United States or allied countries, between September 16, 1940,

SELECTIVE SERVICE ACT OF 1948    47

and the date of enactment. It also provided for the exemption of those veterans who served for more than 90 days between December 7, 1941, and September 2, 1945. The Senate bill provided that those veterans who served for 90 days or more but less than 18 months in the period September 16, 1940, to the date of enactment should be exempt from liability for induction if they should be determined by the local board to have taken on certain reserve obligations. The House amendment provided for the exemption of those veterans who served for 12 months or more subsequent to September 16, 1940, and also provided for the exemption of those veterans who have been awarded the Purple Heart or any badge, award, or decoration evidencing exceptional valor, bravery in combat, or continued service in combat. The House amendment also provided for the exemption from liability for induction of those veterans who served for 90 days or more but less than 12 months subsequent to September 16, 1940, if the local boards should determine that they had assumed certain Reserve obligations which might be assumed without interrupting their normal pursuits and activities.

The conference agreement is that veterans with 12 months or more of service shall be exempt from induction. It was further agreed that veterans who served between Pearl Harbor Day and VJ-day for more than 90 days shall be exempt.

The conference agreement also was that veterans with less than 12 months of service shall be exempt if they assume certain reserve obligations which might be assumed without interrupting their normal pursuits and activities.

The Senate bill provided for the exemption from liability for service of those persons who joined the National Guard before attaining the age of 18½ only in cases in which the governor of the State determined that the strength of the National Guard could not be attained by the registration of persons not liable for training and service under the bill. The House amendment provided for the exemption from liability for training and service of all persons joining organized units of the Reserve components, which participate in scheduled drills and training periods throughout the year, if such persons join before attaining the age of 18½. The House amendment also provided for the deferment of persons who, at any time prior to the date they are ordered to report for induction, join Reserve components and who serve in such components for a total period of 6 years during which they satisfactorily participate in scheduled drills and training periods.

The conference agreement adopts the provisions of the Senate bill with respect to the matters discussed in this paragraph.

Both the Senate bill and the House amendment contained exemptions for a limited number of persons enrolling in the Reserve officers training programs of the armed forces subsequent to the effective date of the legislation. The Senate bill conditioned such exemption upon those persons agreeing to serve, after being commissioned, for a period of 2 years. The House amendment conditioned the exemption upon an agreement to serve, after being commissioned, for a period of time equal to the period of service of inductees.

The conference agreement requires persons who are deferred from induction while undergoing training in the Reserve officers training programs to agree to serve on active duty for a period of 2 years.

48                SELECTIVE SERVICE ACT OF 1948

The Senate bill provided for the exemption from training and service of regular or duly ordained ministers of religion and of theological and pretheological students. The House amendment broadened this exemption to include Christian Science readers and practitioners and those persons who have been recognized by the officials of their church, synagogue, or sect as having given definite and acknowledged intention of entering into full-time religious work.

The conference agreement adopts the provisions of the Senate bill with respect to exemption of ministers and theological and pretheological students, for the reason that it was felt that to include any specific sect or religion by name in this provision would logically compel the inclusion of many others or, by interpretation, indicate that other such sects would be excluded were the original House provisions accepted.

The Senate bill specifically provided the President with authority to defer from induction those persons whose activity in study, research, or medical or scientific endeavors was found to be necessary to the maintenance of the national health, safety, or interest. The House amendment, although giving the President sufficient authority to defer such persons, contains no specific provisions relating to such persons.

The conference agreement adopts the specific provisions of the Senate bill with respect to deferment of those whose activities in study, research, or medical or scientific endeavors are found to be necessary to the maintenance of the national health, safety, or interest.

CONSCIENTIOUS OBJECTORS

The Senate bill provided that those conscientious objectors who were found to be opposed to participation in noncombatant service should be assigned to work of national importance under immediate civilian direction. The bill extended to persons who might be so assigned and who might suffer disability or death while performing such work the benefits of the Employees Compensation Act of September 7, 1916. The House amendment provided that conscientious objectors found to be opposed to participation in noncombatant service should be deferred from induction for service under the legislation.

The conference agreement adopts the provisions of the House amendment providing for the deferment from induction of those conscientious objectors who are found to be opposed to participation in noncombatant service.

SOLE SURVIVING SON EXEMPTION

The House amendment added a provision to the effect that where one or more members of a family have been killed in action or died in line of duty while serving in the armed forces of the United States, the sole surviving son of such family should not be inducted for service under the legislation. The Senate bill contained no comparable provision. The conference agreement adopts the provision of the House amendment with a clarifying amendment.

SELECTIVE SERVICE ACT OF 1948        49

#### PROVISIONS WITH RESPECT TO HEALTH AND MORALS

The House amendment contained a provision requiring that the training under the act be administered and carried out on the highest possible moral, religious, and spiritual plane. It also prohibited the maintenance, within distances specified by the Secretary of Defense, of any military installation utilized for training purposes of any house of ill fame or place of entertainment constituting a public nuisance. The conference agreement eliminates the provisions of the House amendment because of the fact that the conferees determined that the act of May 15, 1946 (60 Stat. 182), had made permanent the provisions of the act of July 11, 1941 (55 Stat. 583), which contains substantially the same provisions with respect to prohibition of prostitution within the vicinity of military and naval establishments as does the provision of the House amendment.

#### REEMPLOYMENT RIGHTS

The Senate bill provided that persons completing their periods of service under the act and securing restoration to their former positions in accordance with the terms of the act should be restored without loss of seniority. The bill contained a declaration by the Congress to the effect that persons so restored should be restored in such manner as to give them the status in their employment which they would have enjoyed if they had continued in their employment continuously. The Senate bill contained detailed provisions with respect to the enforcement of the reemployment rights of Federal Government employees and gave the Civil Service Commission the power to issue necessary rules, regulations, and orders to assure that the restoration rights would be effective. It contained no specific provisions with respect to court proceedings for restoration to positions in the Federal Government. The Senate bill designated the Secretary of Labor, acting through the Bureau of Veterans Reemployment Rights, as the Federal official to render aid to veterans in obtaining restoration to their former employment. The bill also contained a provision authorizing and requesting the President to formulate and recommend to Congress plans for the rehabilitation and retraining of veterans serving after the date of enactment of the legislation.

The House bill provided that those restored to positions pursuant to the terms of the act should be entitled to all promotions, increases in pay, vacation rights, and accumulations of seniority to which they would have been entitled if they had been working in their old positions during their periods of service. The House amendment, unlike the Senate bill, did not specifically prohibit the lay-off, within 1 year after his restoration, of a person restored to employment under the provisions of the legislation. The House amendment also contained detailed provisions with respect to the restoration to their positions of those veterans who held positions under the Federal Government prior to the beginning of their periods of service. These detailed provisions included specific authority for such persons to obtain court orders requiring their restoration to positions under the Federal Government. The House amendment designated the Director of

50          SELECTIVE SERVICE ACT OF 1948

Selective Service as the Federal official charged with the duty of rendering aid to veterans in obtaining restoration to their former positions.

The conference agreement adopts the language of the Senate bill with respect to reemployment rights, except that (1) the provision of the Senate bill authorizing and requesting the President to formulate and recommend to Congress plans for the rehabilitation and retraining of veterans was eliminated, and (2) the provision of the House amendment deleting the prohibition against lay-offs of restored veterans was adopted.

### CRIMINAL PROVISIONS

The Senate bill provided specific penalties for those forging or altering certificates issued under the act and for persons possessing or using any such forged or altered certificates. The House amendment contained no comparable provisions. The conference agreement adopts the provisions of the Senate bill with respect to this matter.

### LUMP-SUM PAYMENTS TO RESERVE FLYING OFFICERS

The Senate bill contained a provision having the effect of preventing Reserve flying officers from obtaining the lump-sum payments of $500 per year for the periods of active duty which they might perform during the time the legislation would be effective. The House amendment contained no comparable provision. The conference agreement adopts the provisions of the Senate bill with respect to lump-sum payments.

### UTILIZATION OF INDUSTRY

The Senate provisions with respect to the placement of mandatory orders for articles and materials required that mandatory orders be placed by the President only after receiving advice from the National Security Resources Board. The bill authorized the placement of mandatory orders to obtain articles or materials for the use of the armed forces of the United States or the Atomic Energy Commission.

The provisions of the House amendment relating to the placement of mandatory orders differed considerably in wording but not so much in substance from the corresponding provisions of the Senate bill. The House amendment authorized the President, through the Secretary of Defense, to place mandatory orders only for products or materials required by the armed forces. The House amendment contained a provision, which had no counterpart in the Senate bill, empowering the President to require producers of steel to make available to manufacturers having orders for steel products or steel materials required by the armed forces the necessary steel to enable such manufacturers to execute their orders. It provided for enforcing compliance with the allocation of steel by authorizing the President to take possession of the plants of steel producers failing to comply with the required allocations. The amendment further required the President to report to the Congress at the end of each 6 months' period the percentage of steel production in the United States required in the execution of orders for steel products and steel materials for the armed forces, if such requirement was in excess of 10 percent of production.

SELECTIVE SERVICE ACT OF 1948    51

The conference agreement adopts the provision of the House amendment empowering the President to require producers of steel to make steel available to persons having orders from the armed forces for materials requiring steel products or materials in their manufacture. The conference agreement otherwise adopts the provisions of the Senate bill with respect to mandatory orders.

### MILITARY JUSTICE

The Senate bill contained provisions incorporating the substance of the bill H. R. 2575, as previously passed by the House during this Congress, revising the Articles of War and making changes in the status of the Judge Advocate General's Department of the Army. The House bill contained no comparable provisions. The conference agreement incorporates the provisions of H. R. 2575 with respect to military justice, together with certain clarifying amendments.

W. G. ANDREWS,
W. STERLING COLE,
GEORGE J. BATES,
CARL VINSON,
PAUL J. KILDAY,
CARL T. DURHAM,
*Managers on the Part of the House.*

○

JA.336

**Attachment E**

**JA.337**

OFFICE OF THE SECRETARY OF DEFENSE

March 1, 1949

Memo. for    Professor Morgan

Mr. Larkin thought you might be
interested in reading the attached.

Louise Spilman

48 5762

*For Prof. Morgan.*    5 (?)

ON TRIAL (ABC)

Question:  Should courts martial procedures be reformed?

Judge:  General Samuel T. Ansell, Washington Attorney, former
Judge Advocate General, US Army

Ansell:  The issue in peril is whether or not the courts martial
procedure in  our Armed Forces should be changed.  Although this
question has been argued at length by men within the Armed Services,
since the last war the issue has been hotly debated in Congress,
and by such distinguished organizations as the American Bar Associa-
tion.  More recently Mr. Forrestal, the Secretary of Defense, has
appointed a special committee to study the issue and the results
of this study have been submitted to Congress.  This is an issue
which is of concern to all Americans; we therefore place it on trial
before you.  The fundamental point of disagreement between the
parties in this court is whether or not courts martial should be
divorced from what the services call the chain of command.  Stated
otherwise the question is whether those who sit as judges in courts
martial trials and the defense attorneys who defend the accused
should be independent of the officer who is responsible for bringing
the charges.  Is it necessary to remove the judges from under the
control of the commanding officer in order to give them the necessary
independence and freedom to judge fairly?  Would such a change bring
about greater confidence in our system of military justice by those
in the services and the American public?  Would such breaking up of
the commanding officer's authority destroy the effectiveness of the
supervision and undermine the military effectiveness of the services
Now let us proceed with the testimony, cross-examination of the
witnesses for and against such reforms.  The court will recognize

the counsel for the affirmative, ERNEST W. GIBSON, Governor of the State of Vermont, who has formerly served as a US Senator from Vermont, and who was on active duty through the war as an officer of our Army.

GIBSON:  Your honor, I'll call as my witness GEORGE H. SPIEGELBERG, NY attorney, Chairman of the American Bar Association's special committee on military justice, and a veteran of both World Wars. Mr. Spiegelberg, will you tell us what is a court martial and who are subject to and affected by it?

SPIEGELBERG:  The court martial is the court before which all persons in the service are brought for trial, from the most petty offense to the most serious.  Those who are brought before it are all members of the armed services, the Army, the Navy, the Air Force, the Coast Guard, and those accompanying the services.  A conservative estimate of the number presently affected by court martial who are citizens of this country would exceed two million.  In time of war of course the number is greatly increased and in the last war, over fifteen million American citizens were subject to court martials.

GIBSON:  How up to date is our present military law?

SPIEGELBERG:  Our present military law is not at all up to date.  It is based substantially on British military law of the 18th century. It was framed to an army of mercenaries; for an army which the Duke of Wellington in 1811 described in the following words "None but the worst description of men enter the regular service, the scum of the earth who have all enlisted to drink".  Today's system of military justice is as inapplicable to the citizen army of the US as the remarks of the Duke were and are to the men who are in the services.

- 2 -

GIBSON: Now what is the chief defect in existing military law?

SPIEGELBERG: The chief defect in existing military law today is that the commanding officer appoints the prosecutor; he appoints the defense counsel; he appoints the court; and he reviews the sentence of that court. The court consists exclusively of officers chosen from his command, officers who are absolutely subject to his disposition, who look to him for pay, for promotion, for quarters, and for efficiency ratings. He is completely able to dominate any court and infrequently did so.

GIBSON: Do you believe that strict discipline is essential in the Army?

SPIEGELBERG: I most certainly do Governor.

GIBSON: Now is the power that you have mentioned were taken from the commanding officer some people say it would have a bad effect on discipline. What do you say to that?

SPIEGELBERG: I say that the rule is just the contrary. Discipline is preserved by giving the commanding officer power to prefer or refer the charges, giving him the right to appoint the prosecutor in order to assure a speedy trial, and giving him the right to review for clemency. If you give him more than that you destroy morale. There is no doubt that in the last war any number of men in the service felt and with some good reason that they had no opportunity for a fair trial when they were hailed before a court martial constituted as I have outlined.

GIBSON: Now is we take the power to appoint the court away from command, who would you have appoint the court?

- 3 -

SPIEGELBERG: I would have the JAG appoint the court. He is a member of the same army as the commander. He is as anxious to win the war as the commanding officer, and in his hands you could get a court that would not be dominated by command and that would decide the case in accordance with the issues and not in accordance with the wishes of the commanding officer.

GIBSON: Do you think any such move would interfere with the desire of winning the war?

SPIEGELBERG: I certainly do not.

GIBSON: I have no further question, your honor.

ANSELL: Counsel for the negative in this case is JOHN HARLAN AMON, NY attorney, who served during the war as a colonel of the Army, and prosecutor at the Nuernberg Trials. Do you wish to cross-examine the witness Colonel Amon?

AMON: I do your honor. Col. Spiegelberg do you agree that the ultimate function of an army is to defend the country and win wars, and that any proposed changes in army procedure should be kept secondary to this aim?

SPIEGELBERG: I most decidedly do.

AMON: Do you also agree that the practice of courts appointed by commands dates back to at least 1776 and probably to the Fifth Amendment of the Constitution?

SPIEGELBERG: I believe that that is what I testified under direct examination Col. Amon.

AMON: I believe that it is but I wish to make sure that you were in agreement with me. In connection with the study of this problem made by you and your committee am I correct in assuming that you sought the views of military experts?

- 4 -

SPIEGELBERG:  Well, we personally didn't but we had the benefit of

such views as expressed in a number of studies that were made since

the end of World War II.

AMON:  Col. Spiegelberg did you consult Gen. Eisenhower?

SPIEGELBERG:  No.

AMON:  Did you have the benefit of his views?

SPIEGELBERG:  I know perfectly well what his views are.

AMON:  Is that why you did not consult him perhaps?

SPIEGELBERG:  No.  Great as my admiration for General Eisenhower

with respect to court martial procedures, he undoubtedly takes

the line of the high brass which is to retain the prerequisites

which they have always enjoyed.

AMON:  And by high brass you mean what?

SPIEGELBERG:  I mean the high command from division commanders up.

AMON:  Weren't you brass in this last war?

SPIEGELBERG:  No, I think I just missed it; if I had gotten the

star I'd agree with you.

AMON:  Well brass really means staff officers as distinguished from

line officers does it not?

SPIEGELBERG:  That is an interpretation that apparently is yours

and one that I can't say I can agree with.

AMON:  It came from the British didn't it colonel?

SPIEGELBERG:  I think originally it did and I think actually it

comes from the scrambled eggs that used to be worn on the visors

of caps of high officers.

AMON:  Suppose you tell us what Eisenhower's views are as you under-

stand them?

- 5 -

SPIEGELBERG:  As I understand them General Eisenhower says that command should control courts because the administration of justice in the Army is a question of command function necessary in order to insure discipline.  I say that that is not the fact, that the insurance of discipline is gained in the manner I outlined in the direct, and the provision of justice or a fair trial for enlisted men is not a necessary function of command.

AMON:  Did you also consult General Bradley?

SPIEGELBERG:  No.

AMON:  Did you have the benefit of his view?

SPIEGELBERG:  No, but I am sure that they accord with those of General Eisenhower.

AMON:  And did you consult the Secretary of War (sic) Judge Patterson?

SPIEGELBERG:  Very briefly.

AMON:  And you are familiar with his views?

SPIEGELBERG:  His views and mine are completely opposed.

AMON:  Don't you think that these three men are experts on this particular problem and have the best interests of our country and our army at heart?

SPIEGELBERG:  I'll have to divide your question into two.  I haven't any doubt that General Eisenhower and General Bradley have the best interests of our country at heart.  I seriously question whether they are experts in the field of military law.  Judge Patterson is certainly an expert in the field of military law but I happen to think that his view is incorrect and in that I am backed by more than four fifths ....(bickering).

- 6 -

AMON: Don't you think that one of the basic grounds of their objection was that the proposed separation was impracticable on an organizational basis?

SPIEGELBERG: No, I don't think so. It has never been tried, and so you can say it is impracticable.

AMON: I was asking about the views of these experts?

SPIEGELBERG: Of their view is to keep in command all the possible power they can. I happen to think this is a power that is in no way necessary to command.

AMON: And isn't it also their view that power would be built up in JAG under your plan which would make it a bureaucratic agency which would not be satisfactory for our army discipline or army organization?

SPIEGELBERG: I have never seen a staff, any staff in the Army that was not a bureaucracy and I speak with experience.

AMON: This certainly would make the JAG the most bureaucractic division in the army would it not?

SPIEGELBERG: No I can't agree with that at all.

AMON: Your witness.

ANSELL: The audience who are now a jury in this court, have heard the testimony and cross examination of Mr. Spiegelberg, the witness for the affirmative in the issue of: Should the courts martial procedures be reformed? The court will recognize Colonel Amon, Counsel for the negative.

AMON: I will call as my witness Mr. Frederick Bernay Weiner, Washington attorney, a colonel in the US Army, and a former Judge Advocate in the Pacific and Caribbean Theaters of Operations.

AMON: Colonel Weiner please state briefly your military experience
that might bear on the matters under discussion here.

WEINER: I had over four and half years active duty in the Army,
most of that time as a Judge Advocate. I've written some books
and articles on the subject and I've carried on extensive litiga-
tion in the courts involving questions of military law.

AMON: On the basis of your own study and experience do you regard
the proposal to separate military courts and military command to
be a desirable or a practical one?

WEINER: I regard it as utterly impractical because it fails to
take into account the basic difference between an army and a
civilian society.

AMON: And do you consider that this impracticability is based upon
the differences between an army and a civilian society and if so
will you explain?

WEINER: Yes, sir. First of all the objects are entirely different.
The object of a civilian society is to make people live together
in peace and reasonable habits. The object of an army is to win
wars not just fight them, but win them. They don't pay off on
price in a war. And therefore an army has got to be so organized
that it will lead men obediently against the enemy to their deaths
if necessary. Now that may be a brutal and unpleasant fact but
we'd better face it for it underscores and underlines the impracti-
cability of this proposal.

AMON: How would you resolve the issue insofar as the present
separation proposal is concerned?

- 8 -

WEINER: Well sir, the present proposal does something that we have never done and that the founders (unintelligible). The founders recognized the guarantees appropriate for a civilian would be inappropriate for persons in uniform. Thus sailors and soldiers don't have the guarantee of jury trials. A great many acts which are rights in the civil community become military offenses in the armed services, for instance the right to strike becomes mutiny; quitting a job becomes desertion. The concept of the separation of powers which is of course basic in our civilian government doesn't work in an army and never has worked.

AMON: Have you personally ever witnessed any actual instance where court martial jurisdiction was separated from command and if so tell us how it worked out?

WEINER: Well sir, in the South Pacific, in most of the areas there the Island Commander had court martial jurisdiction over all personnel on the island although he didn't command, the air or services elements. The result was that the air or service commanders could not bring their people to trial without the concurrence of somebody outside the chain of command, and when the Island Commanders reviewed the records of trial and found evidences of improper practices or irregularities they had no power to correct them. It just didn't work at all.

AMON: So in practical operation it just didn't work out?

WEINER: Yes, sir, that's correct.

AMON: Do you know whether the courts have ever passed upon the question of the separation of court martial jurisdiction in command and if so what was the decision?

- 9 -

WEINER: Yes sir, the courts have passed on it. And the Court
of Claims and the Supreme Court held that the power to appoint
courts was an inherent attribute of command. They held that the
President had the power to appoint courts martials even in the
absence of the statutes because they said that to take that power
away from him would practically defeat his constitutional powers
as Commander in Chief of the Army and Navy.

AMON: Thank you very much.

ANSELL: The jury has had the direct examination of the witness of
the negative in this case. This court now calls upon the counsel
for the affirmative Gov. Gibson for cross examination.

GIBSON: You stated that you have been four and a half years in
the army mostly in the Judge Advocate's Department?

WEINER: Yes Sir.

GIBSON: And most of that time you were in the prosecuting end of
the Judge Advocates Dept?

WEINER: No sir, I was Staff Judge Advocate. I was the advisor to
the commanding general on matter of the reference of cases for trial
and on the action to be taken after they were reviewed.

GIBSON: You referred to the court martial procedures in the South
Pacific. You were there and I was there.

WEINER: But you were with a division......

GIBSON: It is perfectly true isn't it that during combat those who
were charged with a court martial offense from our division were
sent back to an island in the rear while we continued on fighting;
that is so isn't it?

WEINER: I don't know if it is or not sir.

GIBSON: And the trial was carried on there and justied was meted
out wasn't it?

- 10 -

WEINER: I don't know whether those cases were sent back or whether they were held until the division was ready to try the people themselves.

GIBSON: Well I thought you were over as the chief advisor in the Judge Advocate's Division to the Commanding General in that area?

WEINER: I guess I was too far back, Governor. When I got to some of these islands there wasn't much fighting.

GIBSON: You would say that it wasn't a fact that actually during the early days of war in the South Pacific, on Guadalcanal, New Georgia, Bouganville, that when men were charged with a court martial offense they were sent to a rear island, while the troops continued fighting and were tried by the island command?

WEINER: I don't know whether that is a fact or not?

GIBSON: And you never heard any complaints about that procedure if it took place did you?

WEINER: I have no information about that at all because what I saw was just the opposite. The divisions tried their own people. If they were engaged in combat they waited until combat had subsided. I know that that was the case on Okinawa when I was there for the invasion.

GIBSON: You know of occasions don't you, Col. Weiner, where the commanding generals have told their general court martials exactly what they wanted them to find in the nature of a verdict, or what sentences they wanted imposed?

WEINER: I have heard of such instances but since the first of this month they have been specifically prohibited by the 88th Article of War.

- 11 -

GIBSON:  That is the army and you then do realize that that pro-
cedure in World War II was wrong?

WEINER:  And Congress stopped it.

GIBSON:  And it took an Act of Congress to solve that, wasn't that
so?  But they still can, the commanding general still can, mark
down the efficiency rating of an officer for any reason he may see
fit, if he is on a general court and the general court doesn't do
what the commanding general says?

WEINER:  I think that would be a violation of the 88th Article of
War.

GIBSON:  Is their any way that such an act could be prevented?

WEINER:  There is no practical way in which you can prevent an
abuse of power.  All power can be abused if placed in unworthy
hands, that does not mean, sir, that the powers should not be
placed in some hands.

GIBSON:  Is it perfectly possible to place it in the hands of an
independent general court created by a theater commander to try his
people in divisions in a given area over which the commanding
general of a division would have no jurisdiction?

WEINER:  Well the Articles of War have always provided for that,
that a superior authority can reserve the appointment of courts
to himself.

GIBSON:  Isn't it true that the British Army, which has been a
model for discipline, have now removed the handling of the general
courts martials from the armed services and placed it under the
Lord Chaplain (sic)/Chancellor (?)?.

WEINER:  I've heard that there is a proposal to that effect, but I
haven't been informed that it had been adopted.  The proposal is
pending just as your proposal is pending.

GIBSON: Do you believe it is right for a commanding general to rule his officers by fear?

WEINER: I would say that about 90% of the personnel don't have to be ruled by fear but there is always a small minority in any group that you've got to rule with a whip whether it is a civilian society or not.

GIBSON: I just have one or two more questions. You will agree won't you that an independent judiciary, independent court system is the very backbone of democracy?

WEINER: Not of the military, not of the army of a democracy. It never has been. Why even in your own state, governor, they've had courts appointed by command since the first militia law in 1797.

GIBSON: I think you're quite wrong.

WEINER: No, if you look up the Militia Law of 1797 in the compiled laws of 1804 and look in Section 31 of that law you'll find that the governor and the brigade commanders are (have ?) appointed courts martial over Vermont Militia. Answering your question--I don't think that the American people, as reflected in the views of constitutions and statutes have ever regarded as un-American, or improper, a different system of courts for military organization than they adopted for their civilian society.

GIBSON: That wasn't the question I asked you....Are you aware that 15 commanding generals that were interrogated as to whether or not they had influenced courts and told them what to do, what sentences to give, fully and frankly and freely admitted that they had managed their courts in that manner?

WEINER: I hadn't know that, but they can't do it any more since the amendment to the 88th Article of War.

- 13 -

GIBSON: But it would still be perfectly possible for those fifteen, or any general, wouldn't it, to mark down the efficiency rating of an officer that he didn't like, who had maybe rendered a verdict that he didn't like or had given a sentence he didn't like, or could have transferred out of his command?

WEINER: It is always possible for anybody in any army to violate rules and regulations.

ANSELL: .....Now we will hear counsel deliver the summation of their cases. Colonel Amon may we have the summation of your case for the negative.

AMON: Col. Weiner has contended that the proposed changes in court martial procedures with particular reference to command control of court martial are undesirable and impracticable on an army organizational basis. He has pointed out that the ultimate function of an army is to defend the country and win wars, and that all proposed changes in army procedure must be kept secondary to this aim. Colonel Weiner has detailed certain basis and essential differences between military and civilian society which make it undesirable and impracticable to operate both on the same basis. He suggests that these differences must have been in the minds of the framers of the Constitution of the US when the right of trial by jury of persons in the armed forces was excluded from the Fifth Amendment and that they have been reflected by legislative enactment dating back to 1776. Furthermore Colonel Weiner in support of his position has detailed the results of personal experience with the problems of the South Pacific during World War II. In biref it was found impossible and impracticable to run an army on the basis of the

- 14 -

separation of these powers. Colonel Weiner has further considered
that the proposed recommendations would set up an entirely new and
independent division of the Army which would be answerable to
neither the commanding general nor even to the Sec. of War, and
that any such bureaucratic system within the Army would defeat its
own end.

ANSELL: Now we shall hear the summation of the case for the affirma-
tive by Governor Gibson.

GIBSON: Any system of justice that allows opportunity for one who
appoints the court to reprimand, to remove, or to punish in any way,
by marking down an efficiency rating, the member of a court who
renders that verdict or a sentence which he dislikes simply isn't
rendering justice. It is pure dictatorship. If I as Governor of
Vermont could remove any judge with whom I disagreed I would be a
dictator. Independent justice is the foundation stone of freedom.
The present courts martial system may look all right to some who
live midst the maze of government bureaus in Washington but to we
simple people living in rural America it is simply horribly wrong.
I speak as one who as a law member of a general court was told what
decision our court should render. I resented it then and I resent
it now. If the trial of Cardinal Mindzenty was infamous, if it was
a trial of a kangaroo court, then so are all the trials of a general
courts martial....... (discussion as to time) We prefer to see
justice meted out by general courts not appointed by the commanding
general. To argue that the present system of injustice is necessary
to win a war can't stand the test of logic. It is inhuman. It is
un-American and it is dangerous.

ANSELL: Ladies and gentlemen of the jury you have heard the

- 15 -

testimony of the expert witnesses and the argument of distinguished counsel on the question: Should the court martial procedure be reformed. This issue is before our Congress. I want to emphasize that this issue directly affects many millions of our citizens, all those who are in the armed forces and their families and those selected to be in the services at a future time. It is wrong to think that a court martial system affects only those who get into trouble. A just and effective administration is the concern of all Americans. You will please consider these matters.

14 Feb. 1949          10:30 PM          Cyl 1 to 4          JM

- 16 -

JA.354

**MILITARY COMMISSIONS TRIAL JUDICIARY**
**GUANTANAMO BAY, CUBA**

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>KHALID SHAIKH MOHAMMAD, WALID MUHAMMAD SALIH MUBARAK BIN 'ATTASH, RAMZI BIN AL SHIBH, ALI ABDUL-AZIZ ALI, MUSTAFA AHMED ADAM AL HAWSAWI | **AE 630 (KSM Sup)**<br><br>**Mr. Mohammad's Supplement**<br>To AE 630 (KSM)<br>Mr. Mohammad's Motion to Suppress Letterhead Memorandum Statements Because the Government Cannot Demonstrate by a Preponderance of the Evidence that They Were Voluntarily Given<br><br>8 February 2024 |

1. **Timeliness**

    Mr. Mohammad's supplement to AE 630 (KSM)[1] is timely filed.[2]

2. **Overview**

    In AE 524-47 (RUL)(GOV), the Commission ordered Mr. Mohammad to file a

supplement to his motion to suppress the Letterhead Memorandum (LHM) statement.[3]  The

Commission further ordered that the supplemented motion "address both voluntariness and the

---

[1] AE 630 (KSM) Mr. Mohammad's Motion to Suppress Letterhead Memorandum Statements Because the Government Cannot Demonstrate by a Preponderance of the Evidence that They Were Voluntarily Given, filed 10 May 2019.

[2] *See* AE 630-18 (RUL)(KSM) RULING Mr. Mohammad's Motion for Leave to File Out of Time the Supplement to His Motion to Suppress the Letterhead Memorandum Statements, dated 1 February 2024.

[3] *See* AE 524-47 (RUL)(GOV)/ AE 628-16 (RUL)(GOV)/ AE 630-14 (RUL)(GOV)/AE 631-2 (RUL)(GOV)/ AE 632-10 (RUL)(GOV)/ AE 791-2 (RUL)(GOV) RULING Government Motion For Extension of Time to Comply With Trial Conduct Order, Defense Motions to Suppress Letterhead Memoranda Statements, Paragraphs 3.a.-b, dated 15 November 2023, at 2, Paragraph 5.c.

issues raised in AE 524LL[4] and AE 524LLL[5]."[6]  Accordingly, Mr. Mohammad will address each subject in turn.

a. <u>**Voluntariness**</u>

Mr. Mohammad respectfully submits that controlling constitutional and statutory law requires suppression of his LHM statement because it was taken in violation of the Supreme Court's holding in *Miranda v. Arizona*, 384 U.S. 436 (1966), and was involuntary within the meaning of the Due Process Clause.  At the time Mr. Mohammad filed his suppression motion in response to the Commission's order in AE 524LLL, it was based on the limited ground that the LHM statement was not "voluntary" within the meaning of Military Commission Rules of Evidence (M.C.R.E.) 304(a)(2)(B)(ii).[7]  The government's response[8] advanced the overarching proposition that "the MCA—specifically 10 U.S.C. §948r and MCRE 304, which was duly promulgated under 10 U.S.C. §949a" provided the *only* authority for Mr. Mohammad to challenge the admission of the LHM.[9]  In reply, Mr. Mohammad noted the unsettled scope of the directive in AE 524LLL to file a suppression motion "based on voluntariness,"[10] and proceeded on the understanding that the broader issues of the United States Constitution's applicability to these proceedings would be "left for another day."[11]

---

[4] AE 524LL Ruling, Mr. al Baluchi's Motion to Dismiss, or in the Alternative, to Compel the Government to Produce Witnesses for Interview Government Notice of Proposed Protective Order, dated 17 August 2018.

[5] AE 524 LLL Ruling Government Motion to Reconsider and Clarify AE 524LL, Ruling, dated 3 April 2019.

[6] AE 524-47 (RUL)(GOV) at 2, Paragraph 5.c.

[7] AE 630 (KSM) at 1-2.

[8] AE 630C (GOV), Government Response To Mr. Mohammad's Motion to Suppress Letterhead Memorandum Statements Because the Government Cannot Demonstrate by a Preponderance of the Evidence that They Were Voluntarily Given, filed 24 May 2019.

[9] *Id*. at 16.

[10] AE 524LLL at 11, Paragraph 6.a(1).  *See* AE 524PPP (KSM) Mr. Mohammad's Motion to Reconsider the Ruling in AE 524LLL, filed 6 May 2019, at 10-11.

[11] AE 630E (KSM) Mr. Mohammad's Reply to AE 630C (GOV), filed 4 June 2019, at 5-6.

Lest the future litigation of such issues be foreclosed by the government's contention that 10 U.S.C. § 948r supplants the Bill of Rights in these proceedings, and in light of the current evidentiary record, Mr. Mohammad demonstrates below that the government's restrictive legal analysis is incorrect.  To the contrary, 10 U.S.C. § 948r expressly incorporates the Fifth and Eighth Amendments into the military commission proceedings through the provisions in 10 U.S.C. § 948r(a), prohibiting statements obtained by torture or cruel, inhuman or degrading treatment; and by through § 948r(b), prohibiting compelled self-incrimination.  Accordingly, the explicit holdings of the Untied States Supreme Court requiring explicit rights advisements prior to any custodial interrogation, and the due process prohibition against involuntary interrogations require the suppression of the LHM.

### b.  AE 524LL and AE 524LLL Issues

It is evident at this stage in the proceedings that the Commission's holding in AE 524LL was prescient rather than "premature."  The passage of time provided by AE 524LLL to determine the government's willingness "to further ease restrictions upon further Defense investigation, to enter into meaningful stipulations, or to produce RDI witnesses during upcoming suppression hearings," has shown a stubborn lack of progress on any front.

First, the government continues to embrace and, indeed, escalate the intentionally chilling threats against defense that led to AE 524 in the first place.

Second, recent history demonstrates the government's continued bad faith manipulation of evidence while delaying and resisting disclosure of clearly material information.[12]

---

[12] *See*, *e.g.*, AE 929 (KSM) Mr. Mohammad's Motion to Compel Discovery Regarding 13 October 2023 Discovery, filed 2 February 2024, at 2, 4-5 (summarizing the government's delay in producing discovery ordered by the Commission in the AE 779 series until after relevant witnesses had testified, and the bad-faith suggestion that the defense could or should have questioned those witnesses about information contained therein).

Third, the current record, supplemented by witness testimony, demonstrates that the government will not and – equally important – cannot provide contemporaneous information necessary to effectively litigate the issue.  Among other reasons is that, by design, the government inquisitors ignored and suppressed evidence of Mr. Mohammad's torture and the degree to which it continued to influence him at the time of the LHM interviews.   The LHM interviewers intentionally failed to explore Mr. Mohammad's description of himself as a "Slave" and the effects of his black site "torture," which he illustrated by reference to scars still visible years after the most physically violent period of his captivity.

The available information was neither explored nor documented ostensibly because Mohammad "moved on" in the conversation.[13]  The reality, as confirmed by discovery and testimony from multiple witnesses is that the interviewers were instructed and primed to move on and away from such subjects.[14]  Unclassified documents show that torture was to be separately and tersely documented in another memo.[15]  Significantly, once mentioned the torture was not to be mentioned again unless the detainee *volunteered* additional comments.  Thus the interviewers neither took the initiative to elicit details nor were they even to mention the number of times the unelaborated subject was broached.  This meant that if Mr. Mohammad or any other detainee was preoccupied with instances of torture, its mention would receive a single, unelaborated notation.  This was in direct and knowing conflict with the methodology of the

---

[13] *Unofficial/Unauthenticated Transcript*, 25 September 2023, at 36752 (testimony of retired Special Agent Francis Pellegrino).

[14] *See* AE 929 (KSM) at 6 and Attachments B and D.

[15] AE 628AA (GOV) Attachment C (MEA-LHM-00001433); LHM: "During the course of the interviews, KSM made statements regarding possible allegations of mistreatment, which are further described in separate communications, numbered KSM 001 and KSM 002."

black site debriefings that recognized the value of repetitious questioning in "priming the pump" to elicit additional details with the repeated telling.[16]

Further because the due process violation directly deprives Mr. Mohammad of evidence reflecting the "richness and nuance" of his torture ordeal and its demonstrable lasting impact throughout his captivity to the present, the violation also warrants reconsideration of the Commission's ruling declining to dismiss death for hindering the penalty phase presentation.

**3. <u>Argument</u>**

The government cannot meet it burden to show the LHM statement is admissible because the record conclusively demonstrates that it was taken without the prior advisement of rights required by *Miranda* and was involuntary within the meaning of the Due Process Clause and the MCA.

**a. The LHM was obtained in violation of Mr. Mohammad's right to advisements necessary to enforce his right against compulsory self-incrimination**

The government argues that Congress intentionally removed the provisions of Article 31(b) and (d) of the Uniform Code of Military Justice (UCMJ) from the Military Commissions Act (MCA), and Article 31 thus poses no bar to the admission in military commissions of statements obtained "in the absence of a rights advisement."[17]  From that proposition, the government reasons that:

> [Mr. Mohammad's] sole source of rights in this Military Commission are, or are derived from, the 2009 MCA and *not case law interpreting constitutional provisions of the 5th or 6th Amendments.  As such, the Commission must apply the MCA—specifically 10 U.S.C. § 948r and MCRE 304, which was duly promulgated under 10 U.S.C. § 949a—to this suppression motion."[18]

---

[16] *Unofficial/Unauthenticated Transcript*, 23 January 2020, at 30788-9 (testimony of Dr. James Mitchell).

[17] AE 630C (GOV) at 15 (emphasis added).

[18] *Id*. at 16.

**JA.359**

The government is half right.  It is correct that 10 U.S.C. § 948b(d) includes articles 31(a), (b) and (d) of the UMCJ "relating to compulsory self-incrimination" among the UCMJ provisions that "shall not apply to trial by military commission under this chapter."  The exclusion of Article 31(b) and (d) is logical because, by their terms, they apply only to service members and others affiliated with the military;[19] and because they afford such individuals *broader* protection against self-incrimination than is enjoyed by defendants in civilian courts.[20]

The terms of 10 U.S.C. § 948r(a), however, expressly incorporate the protections of the Fifth, Eighth and Fourteenth Amendments in barring the admission of statements obtained by "torture or cruel, inhuman or degrading treatment" in military commissions.  In so doing, Congress explicitly intended to prohibit admission of evidence obtained through such methods "as defined by section 1003 of the Detainee Treatment Act of 2005," citing 42 U.S.C. 2000dd.[21]

In turn, 10 U.S.C. § 948r(b) explicitly prohibits "self-incrimination," defined as requiring a person "to testify against himself or herself at a proceeding of a military commission under this chapter."  Thus, as used in § 948r(b), "self-incrimination" means "compulsory self-incrimination," against which defendants in criminal proceedings are protected by the "Fifth Amendment privilege against compulsory self-incrimination," a privilege that "reflects a

---

[19] *See* 10 U.S.C.A. § 802 (§ 802. Art. 2. Persons subject to this chapter).

[20] *See*, *e.g.*, *United States v. Manuel*, 43 M.J. 282, 286 (C.A.A.F. 1995); *United States v. McGraner*, 13 M.J. 408, 414 (CMA 1982); Gilligan, "The Bill of Rights and Service Members," The Army Lawyer 3 (Dec. 1987).

[21] The definition provided in the Detainee Treatment Act, 42 U.S.C.A. § 2000dd, reads:

(d) Cruel, inhuman, or degrading treatment or punishment defined

In this section, the term "cruel, inhuman, or degrading treatment or punishment" means the cruel, unusual, and inhumane treatment or punishment prohibited by the Fifth, Eighth, and Fourteenth Amendments to the Constitution of the United States, as defined in the United States Reservations, Declarations and Understandings to the United Nations Convention Against Torture and Other Forms of Cruel, Inhuman or Degrading Treatment or Punishment done at New York, December 10, 1984.

**JA.360**

complex of our fundamental values and aspirations, and marks an important advance in the development of our liberty."[22]

As explained by the Untied States Supreme Court, the protection against being required to testify against oneself does not begin at the courthouse door. "In *Miranda*, this Court for the first time *extended the Fifth Amendment privilege* against compulsory self-incrimination to *individuals subjected to custodial interrogation* by the police."[23] The justification for recognizing this broadened scope of the Fifth Amendment privilege arose from the Court's conclusion "that compulsion is 'inherent in custodial surroundings,' and, consequently, that special safeguards were required in the case of 'incommunicado interrogation of individuals in a police-dominated atmosphere, resulting in self-incriminating statements *without full warnings* of constitutional rights.'"[24]

In finding that "detailed warnings were required to protect the privilege against compulsory self-incrimination," the Court in *Miranda* "made it clear that the basis for decision was the need to protect the fairness of the trial itself."[25] That was so because:

> Without the protections flowing from adequate warnings and the rights of counsel, 'all the careful safeguards erected around the giving of testimony, whether by an accused or any other witness, would become empty formalities in a procedure where the most compelling possible evidence of guilt, a confession, would have already been obtained at the unsupervised pleasure of the police.'[26]

Significantly, the required warnings "'are 'not themselves rights protected by the Constitution,'" but are "'instead measures to insure that the right against compulsory self-

---

[22] *Kastigar v. United States*, 406 U.S. 441, 444 (1972) (footnotes omitted).

[23] *New York v. Quarles*, 467 U.S. 649, 654 (1984) (citing *Miranda*, 384 U.S., at 460–461, 467) (emphasis added).

[24] *Beckwith v. United States*, 425 U.S. 341, 345–46 (1976) (quoting *Miranda*, 384 U.S. at 458 and 445) (emphasis added).

[25] *Schneckloth v. Bustamonte*, 412 U.S. 218, 240 (1973).

[26] *Id.* (quoting *Miranda*, 384 U.S. at 466).

incrimination [is] protected'" at the time of custodial interrogation.[27]  The required detailed

warnings need not be a verbatim recitation of the *Miranda* language so long as "other fully

effective means are devised to inform accused persons of their right of silence and to assure a

continuous opportunity to exercise it."[28]  The requirement for such protections is "a

constitutional rule that Congress may not supersede legislatively."[29]

Pursuant to this reading of the controlling law, "the failure to administer *Miranda*

warnings," or their functional equivalent, "create[d] a presumption of compulsion," and Mr.

Mohammad's LHM is inadmissible.[30]  The agents who interviewed Mr. Mohammad in January

2007 were explicitly instructed *not* to advise him of any *Miranda* rights, did not advise him of

his right to remain silent and to the assistance of counsel, and affirmatively denied him his right

to consult with counsel.  As characterized by SA Pellegrino, the "directive" he was ordered to

follow "adjusted . . . somewhat" the standard *Miranda* admonishments that he had used

throughout his career when "warning a person of their rights."[31]  In fact, rather than "adjust" the

*Miranda* warnings, the directive instructed SA Pellegrino to dispense with them entirely.[32]  The

directive explicitly and repeatedly stated: "*Other than* advisement of Miranda, interviews of the

detainees are subject to the same rules that govern FBI agents who conduct custodial interviews

in the United States"; and that "interviewing agents are *not required* to advise the detainee of the

Miranda warnings."[33]

---

[27] *Quarles*, 467 U.S. at 654 (quoting *Michigan v. Tucker*, 417 U.S. 433, 444 (1974)).

[28] *Miranda*, 384 U.S. at 444.

[29] *Dickerson v. United States*, 530 U.S. 428, 444 (2000).

[30] *Oregon v. Elstad*, 470 U.S. 298, 307 (1985).

[31] *Unofficial/Unauthenticated Transcript*, 25 September 2023, at 36774.

[32] *See* AE 630C (GOV) Attachment D at 2 (MEA-LHM-00001431) Paragraph 4 ("Conduct of the Interview").

[33] *Id*.

JA.362

Suppression of Mr. Mohammad's LHM statement therefore does not require this Military Commission to examine any other circumstances.

### b. Congress did not, and constitutionally cannot, supplant the required *Miranda* warnings in favor of a pre-*Miranda* Due Process "voluntariness" analysis

Relying on the Supreme Court's holding in *Elstad*, *ante*, the government contends that Congress did precisely what *Dickerson* said it could not do, *i.e.* "supersede legislatively"[34] the constitutional requirement for detailed warnings and, instead, authorize a pre-*Miranda* due process standard of "voluntariness" to permit introduction of custodial incriminating statements.[35]  In this instance, the government is not even half right.

*Elstad* was a post-*Miranda* case in which the Court considered whether the failure to give *Miranda* warnings when obtaining an otherwise wholly voluntary custodial statement affected the validity of a subsequent waiver of rights in response to explicit *Miranda* warnings.  Writing for the Court, Justice O'Connor explained: "It is an unwarranted extension of *Miranda* to hold that a simple failure to administer the warnings, *unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will*, so taints the investigatory process that a *subsequent voluntary and informed* waiver is ineffective for some indeterminate period."[36]

The *Elstad* Court noted that the attenuation analysis used to determine whether the effects of an earlier *coerced* statement had dissipated by the time of a subsequent statement is "inapposite" to the situation where an unwarned, but *noncoerced* confession is followed by *Miranda* warnings.[37]  In the latter situation, the "careful and thorough administration of *Miranda*

---

[34] *Dickerson*, 530 U.S. at 444.

[35] AE 630C (GOV) at 28.

[36] *Elstad*, 470 U.S. at 309 (emphasis added).

[37] *Id*. at 310.

warnings serves to cure the condition that rendered the unwarned statement inadmissible."[38]

Conversely, the failure to give *Miranda* advisements prior to *any* custodial statement, whether coerced or voluntary, creates an unrebuttable presumption that "the privilege against compulsory self-incrimination has not been intelligently exercised."[39]

Nothing in *Elstad* signaled the Court's tolerance for dispensing with *Miranda* warnings and replacing them with a fact-specific due process analysis of different time, place and the inquisitor's identity to determine whether a person in custody "made a rational and intelligent choice whether to waive or invoke his rights."[40]  The Court made clear the scope of its holding:

> The Court today in no way retreats from *the bright-line rule* of *Miranda*. We do not imply that good faith excuses a failure to administer Miranda warnings; nor do we condone inherently coercive police tactics or methods offensive to due process that render the initial admission involuntary and undermine the suspect's will to invoke his rights *once they are read to him.*[41]

The "bright-line rule of *Miranda*," of course, requires careful warnings *before all* custodial interrogations.

Similarly, as the government reasonably should know from its extensive citations to *Dickerson*,[42] the Supreme Court explicitly rejected the suggestion that anything in *Elstad* provided a reason to question the continuing constitutional vitality of the decision in *Miranda*.[43]

Likewise, while it is true that *Dickerson* said the Supreme Court "'never abandoned [the] due process jurisprudence'" that it developed *prior* to *Miranda* as a standard to "exclude confessions that were obtained involuntarily," there is nothing in *Dickerson* remotely suggesting

---

[38] *Id*. at 310-311.

[39] *Id*. at 310 (citing *New York v. Quarles*, 467 U.S. at 654, and n. 5; and *Miranda*, 384 U.S. at 457).

[40] *Id*. at 314.

[41] *Id*. at 317 (emphasis added).

[42] *See* AE 630C (GOV) at 17-18.

[43] *Dickerson*, 530 U.S. at 441.

that a totality-of-the-circumstances analysis may be used to admit a custodial statement taken in

disregard of *Miranda*.  What *Dickerson* actually said on this score was that in *Miranda*, the

Court:

> laid down "*concrete constitutional guidelines* for law enforcement agencies and courts to
> follow." Those guidelines established that the *admissibility in evidence of any statement*
> given during custodial interrogation of a suspect would *depend on whether the police*
> *provided the suspect with four warnings*. These warnings (which have come to be known
> colloquially as "Miranda rights") are: a suspect "has the right to remain silent, that
> anything he says can be used against him in a court of law, that he has the right to the
> presence of an attorney, and that if he cannot afford an attorney one will be appointed for
> him prior to any questioning if he so desires."[44]

There is therefore no basis to conclude that Congress intended to ignore the Supreme

Court's explicit holding in *Dickerson* and attempt to "supercede" *Miranda* for military

commission cases.  To the contrary, 10 U.S.C. § 948r evidently attempts to account for the

sordid history of unconscionable government conduct in this case by tracking controlling law.

Subsection 948r(a) precludes admission of statements obtained by torture or cruel, inhuman or

degrading treatment; subsection 948r(b) prohibits compulsory self-incrimination; and subsection

948r(c) requires a due process voluntariness evaluation of statements taken in compliance with

*Miranda* under circumstances that may have rendered an apparent waiver of rights involuntary.

### c. The government cannot meet its burden under a pre-*Miranda* due process analysis to show the LHM statement was "voluntary"

Even if this case remained in the legal landscape of 1965, as maintained by the

government, the exclusion of the LHM statement is equally compelled by a pre-*Miranda* due

process analysis.  The "case law interpreting constitutional provisions of the 5th or 6th

Amendments," which the government agrees "remains instructive in determining the

---

[44] *Id*. at 435 (quoting *Miranda*) (emphasis added).

voluntariness of Mr. Mohammad's statements"[45] precludes a finding of voluntariness for at least three reasons.

First, and perhaps most significantly, in holding that the requirement in *Miranda* for pre-interrogation warnings would not be retrospectively applied, the Supreme Court held that convicted defendants nevertheless could still "invoke a substantive test of voluntariness," and "[t]hat test now takes *specific account* of the *failure to advise the accused of his privilege against self-incrimination* or to *allow him access to outside assistance*."[46]  Likewise, in *Davis v. North Carolina*, 384 U.S. 737, 739 (1966), the Court explained:

> The review of voluntariness in cases in which the trial was held prior to our decisions in *Escobedo* and *Miranda* is not limited in any manner by these decisions. On the contrary, *that a defendant was not advised of his right to remain silent or* of his *right respecting counsel* at the outset of interrogation, as is now required by *Miranda*, is a *significant factor in considering the voluntariness of statements later made*.[47]

Indeed, Mr. Mohammad's counsel are unaware of any controlling decisional authority finding a custodial statement admissible where the authorities failed to advise a suspect of the right to remain silent and/or to consult counsel.  For example, in *Lyons v. Oklahoma*,[48] cited by the parties here,[49] a significant factor supporting a finding that a second confession was voluntary after sheriff's deputies had coerced an earlier confession was the fact that, in the interim, the arrestee had been warned by a prison warden "that anything he might say would be used against him and that he should not 'make a statement unless he voluntarily wanted to.'"[50]

---

[45] AE 630C (GOV) at 16.

[46] *Johnson v. New Jersey*, 384 U.S. 719, 730 (1966), abrogated on other grounds by *United States v. Johnson*, 457 U.S. 537 (1982).

[47] *Davis v. North Carolina*, 384 U.S. 737, 739 (1966).  *See, also*, *Haynes v. Washington*, 373 U.S. 503, 510—511, (1963); *Gallegos v. Colorado*, 370 U.S. 49, 54, 55: *Culombe v. Connecticut*, 367 U.S. 568, 610 (1961); *Turner v. Pennsylvania*, 338 U.S. 62, 64 (1949).

[48] *Lyons v. Oklahoma*, 322 U.S. 596 (1944).

[49] *See, e.g.*, AE 630C (GOV) at 16, 28; AE 630E (KSM) at 8.

[50] *Lyons*, 322 U.S. at 604.

**JA.366**

Here, as discussed below, the LHM interviewers were instructed to, and did withhold advice from Mr. Mohammad regarding his right to remain silent or consult with counsel, and explicitly denied him access to counsel with the explanation that he had not yet been charged in the military commissions.[51]  In so doing, the government agents violated a second constitutional right alluded to in *Davis*, *ante*: the Sixth and Eighth Amendment right to counsel in a capital case.  As held in *Escobedo v. Illinois*,[52] cited in *Davis*: "It would exalt form over substance to make the right to counsel, under these circumstances, depend on whether at the time of the interrogation, the authorities had secured a formal indictment.  Petitioner had, for all practical purposes, already been charged with murder."[53]  As with Mr. Escobedo, Mr. Mohammad was denied access to counsel at a time when "[t]he 'guiding hand of counsel' was essential to advise [him] of his rights in this delicate situation."[54]

Second, the severity, duration and wanton cruelty intentionally inflicted by government agents on Mr. Mohammad for over three and a half *years* as part of an orchestrated scheme to force him to talk is without precedent in American jurisprudence.  The government's anemic effort to concede that Mr. Mohammad's ordeal was "coercion," and then relegate the horrific details to the proverbial rearview mirror of its analysis[55] betrays an inability to find any case to suggest the

---

[51] *Unofficial/Unauthenticated Transcript*, 25 September 2023, at 36785-86 (testimony of retired FBI Special Agent Francis Pellegrino) ("[Mr. Mohammad] asked whether he would have a right to an attorney now, because he had heard that other people in GTMO had an attorney.  And we told him that he wasn't charged at that point. If he was charged, he would be provided an attorney. But at that point, he was not charged."); *Unofficial/Unauthenticated Transcript*, 3 October 2023, at 37837 (testimony of Intelligence Analyst Brian Antol) ("[Mr. Mohammad] was advised that under the military commission, until he was charged with a crime by the military commission, he did not – he was – he did not have the right to see an attorney.")

[52] *Escobedo v. Illinois*, 378 U.S. 478 (1964).

[53] *Id*. at 486.

[54] *Id*. at 485 (citing *Powell v. Alabama*, 287 U.S. 45, 69 (1932)).  *See also*, *Culombe v. Connecticut*, 367 U.S. 568, 630 (1961) finding confession involuntary where, inter alia, defendant who was "never informed of his constitutional rights," and "expressly told the police that he wanted counsel," but "his request was in effect frustrated."

[55] AE 630C (GOV) at 24-25.

coercive impact could ever "dissipate." It is notable for anyone familiar with the Report of the

Senate Select Committee on Intelligence Study of the Central Intelligence Agency's Detention and

Interrogation Program (SSCI Report) to review the facts leading to the exclusion of the confession

in *Culombe*, *ante*. There, although the Court found that "[a]ll means found fit were employed"[56]

by the police and prosecutors to coerce the defendant to confess, none of the methods reflected the

depravity exhibited by the CIA operatives here. In reviewing its due process precedents, the Court

observed:

> In approaching these decisions, we may put aside at the outset cases involving physical
> brutality, threats of physical brutality, and such convincingly terror-arousing, and otherwise
> unexplainable, incidents of interrogation as the removal of prisoners from jail at night for
> questioning in secluded places, the shuttling of prisoners from jail to jail, at distances from
> their homes, for questioning, the keeping of prisoners unclothed or standing on their feet
> for long periods during questioning. No such obvious, crude devices appear in this record.
> We may put aside also cases where deprivation of sleep has been used to sap a prisoner's
> strength and drug him or where bald disregard of his rudimentary need for food is a factor
> that adds to enfeeblement.[57]

To illustrate examples of such "terror-arousing" and "obvious, crude devices" required the Court to

cite to the fact patten in eight separate cases. None of them involved government actors who, as

here, combined *all* such devices in the torture of their captive.

Third, as demonstrated below, the record provides no factual predicate for concluding that

the "totality of circumstances" establishes a "'break in the stream of events ... sufficient to insulate

the statement from the effect of all that went before.'"[58] To the contrary, the conditions under

which Mr. Mohammad was confined for four months between September 2006 and January 2007 –

less than 10% of his incommunicado, solitary confinement – served to maintain the pervasive

---

[56] *Culombe*, 367 U.S. at 631.

[57] *Id*. at 622 (footnotes omitted).

[58] *Mohammed v. Obama*, 704 F. Supp. 2d 1, 25 (D.D.C. 2009) (quoting *Clewis v. Texas*, 386 U.S. 707, 710 (1967)).

interrogation environment to which he had been conditioned in the other black sites. Similarly, notwithstanding any hairsplitting jurisdictional labels to the contrary, there was no substantive difference between the debriefers – including their modus operandi – for whom Mr. Mohammad had been conditioned to answer questions in the other black sites, and those who continued the process at Guantanamo.

### d. Black sites

For at least 21 days, in March 2003, United States Government actors stripped Mr. Mohammad naked; forcibly sodomized him with foreign objects; shackled and suspended him while naked from the ceiling of a cold, dank and dimly-lit cell to deprive him of sleep for six and one-half days; slammed his body and head against a wall 12 to 20 times during multiple hour-long interrogation sessions, bloodying his head; deprived him of food; slapped him; brought him to the brink of death in 183 mock executions through the use of "waterboarding," a profoundly traumatic form of torture known to trigger involuntary and uncontrollable physiological sensations of drowning and during which Mr. Mohammad's torturers intentionally pooled water to occlude his mouth and nostrils and put him at risk of aspirating his own vomit;[59] and repeatedly threatened to kill his children.[60] The degree of physical and psychological torment that would have been inflicted on Mr. Mohammad – or any human being – at the hands of the government's torturers is scarcely comprehensible and certainly unprecedented in the annals of American jurisprudence. CIA torturers and their Department of Justice enablers, unable to conceal the physical scars to Mr. Mohammad's head and body or his lasting trauma, now seek to

---

[59] SSCI Report Executive Summary at 87; AE 630U (KSM) Defense Notice of Exhibits, filed 23 January 2020, Attachment B at 152, 155-56 (MEA-10024-00006148-6149; MEA-10024-00006151-6152).
[60] SSCI Report Executive Summary at 85; *Unofficial/Unauthenticated Transcript*, 27 January 2020, at 31361-62 (testimony of Dr. James Mitchell).

discount their coercive actions as being admittedly "horrible," and "distasteful," but nevertheless "irrelevant" to their custodial questioning of Mr. Mohammad in January 2007.

In contrast to the more familiar scenarios in which due process "attenuation" analyses concern the lasting coercive effects of rogue law enforcement officers' actions on the voluntariness of subsequent custodial statements, the horrific events of March 2003 were the initial, integral stage of a carefully constructed *conditioning* program designed to ensure Mr. Mohammad and other detainees would agree to talk, and "continue cooperating and debriefing," through the time he reached Guantanamo.[61]  There is thus no "break in the stream of events,"[62] from the time of Mr. Mohammad's capture through his custodial questioning 2007 simply because these were all part of the same government-designed course of coercive conditioning.

Beginning in early- to mid-2002, the principal architects of the CIA torture program, psychologists James Mitchell and John ("Bruce") Jessen, began consulting with the CIA on the construction and staffing of "captivity facilities," to create an "interrogation environment" for the duration of the program, as well as the use of what was termed "enhanced interrogation techniques" for the overly coercive phase of the conditioning.  The by-now infamous "EITs" included: forced nudity, facial slap, attention grasp, walling, sleep deprivation, dietary "manipulation," and waterboarding.[63]

In March of 2003, Mr. Mohammad was held in solitary confinement in the government's secret captivity facilities, known as "black sites," isolated from contact with anyone other than

---

[61] *Unofficial/Unauthenticated Transcript*, 30 January 2020, at 32100-102 (testimony of Dr. James Mitchell).

[62] *Clewis* at 710.

[63] *See* SSCI Report Executive Summary at 81-96 (describing the techniques used against Mr. Mohammad). Regarding the use of forced nudity and dietary manipulation, which were not among the ten techniques officially approved by the Attorney General (Memorandum for John Rizzo, Acting General Counsel of the Central Intelligence Agency, Interrogation of al Qaeda Operative, from Jay S. Bybee, dated August 1, 2002, at 2), *see* SSCI Report Executive Summary at 82, 83, and *Unofficial/Unauthenticated Transcript*, 29 January 2020, at 31791 (testimony of Dr. James Mitchell).

his torturers and staff.  Although the black sites were "grim," "cold and crude" and generally "dark," Mr. Mohammad was subjected to light "24/7," as he was throughout his three and a half years in all black sites.

Dr. Mitchell, who spent "thousands" of hours with Mr. Mohammad, described the various phases of the conditioning process.  As explained by Dr. Mitchell, the process was designed from the outset to make the detainee "voluntarily," "willingly" or by "choice" provide information to interrogators and "debriefers," as an alternative to being tortured.[64]  After a prisoner was "moved from the rendition aircraft into the facility," Dr. Mitchell conducted a "neutral assessment," or "neutral probe," in which he had "a conversation" with the prisoner to "give them the opportunity to *voluntarily* participate."[65]  At the end of the conversation, Dr. Mitchell would pose "the bridging question," that focused on what the interrogators were "interested in learning from" the detainee.[66]

Typically, the detainee was given time to ponder the question while the interrogators communicated "with headquarters" seeking "permission to use EITs or not if necessary."[67]  The detainee was then taken into an interrogation room, "stood against the walling wall, and whoever was going to do the EITs would come in, take their hood off, and ask them the bridging question to see if they would *cooperate*."[68]  "[I]f the person *chose* to involve themselves in answering the

---

[64] As Dr. Mitchell explained, "in [his] view, they're completely in control of when EITs stop because all they have to *choose to do* is provide some small snippet of information and the EITs will stop immediately." *Unofficial/Unauthenticated Transcript*, 27 January 2020, at 31210 (emphasis added).  A similar sentiment was expressed by Dr. Jessen: "at any time they *didn't want* the techniques to be applied, all they had to do is talk." *Unofficial/Unauthenticated Transcript*, 31 January 2020, at 32466-67.

[65] *Unofficial/Unauthenticated Transcript*, 29 January 2020, at 31699-701.

[66] *Id*.

[67] *Id*.

[68] *Id*. (emphasis added).

bridging question, then no EITs would be used. If they didn't, EITs would be used."[69]  In the latter event, the interrogator would pose another, or the same bridging question, and inflict EITs until the detainee "started providing information."[70]  This routine would be repeated over time until the detainee began answering questions appropriately without need for "the use of the EITs."[71]

In Mr. Mohammad's case, the interval between the initial questioning and the "move to EITs" was "a short time."[72]  According to Dr. Mitchell, "there were noncoercive techniques used first during the neutral assessment, and [Mr. Mohammad] simply *chose* not to participate."[73]  Whatever its duration, the encounter was long enough for Mr. Mohammad to attempt to resist James Mitchell's interrogation efforts, and explain that he would wait until he was taken to the United States "and get a lawyer."[74]  Dr. Mitchell bluntly responded: "That's not going to happen."[75]

For the next three weeks, Drs. Mitchell and Jessen inflicted EITs until Mr. Mohammad "started providing information that [the CIA] thought was actionable."  During this period, one of the torture techniques, the waterboard, was inflicted 183 times, including multiple instances of water "pours" lasting at least 40 seconds each.[76]  Dr. Mitchell belatedly stated in 2020 that 40

---

[69] *Id.* at 31705.

[70] *Id.*

[71] *Id.*

[72] *Id.* at 31701.

[73] *Unofficial/Unauthenticated Transcript*, 27 January 2020 at 31265-66.  The CIA's authorization of infliction of numerous EIT's without first employing non-coercive methods, and the alacrity with which the EITs were inflicted raise the question whether good faith efforts were made to forego the use of EITs.  *See* SSCI Report Executive Summary at 81-82, fn. 437.

[74] *Unofficial/Unauthenticated Transcript*, 23 January 2020, at 30763; *see* James Mitchell, Enhanced Interrogation, at 7-8 (2016).

[75] *Unofficial/Unauthenticated Transcript*, 23 January 2020, at 30763.

[76] AE 630U (KSM) Attachment B at 155-56 (MEA-10024-00006151-6152).

seconds, "I will concede is way too much water," it "[s]houldn't be done."[77]  Reports by purported medical staff documented abrasions and lesions on Mr. Mohammad's wrists, ankles and back of his head.[78]  Dr. Mitchell testified that with Mr. Mohammad, the EITs were as part of the "kind of classical conditioning" that was "used to increase the fear and dread so that the next time we give him the bridging question, he provides some information.  And that is precisely how the system worked in the -- in the -- in -- in the final outcome."[79]

Before reaching the "point of transition," away from using EITs, an "actual subject matter expert," also known as a "debriefer," would participate in interrogations, and eventually take over the debriefing once the detainee was assumed to be "out of the EIT completely."[80] During this phase of the transition with Mr. Mohammad, a debriefer sometimes would be present when an interrogator inflicted EITs, but eventually the standard procedure called for the interrogator to be present only at the beginning of the questioning and then step out of the room. Ultimately, the interrogator would enter the room briefly and leave before the debriefer entered. Through this evolution of roles, Dr. Mitchell and his associates sought to induce detainees "to adjust to the idea that *they're going to talk to whoever* it is that comes in to talk to them that's a debriefer."[81]

Because Mr. Mohammad "was a very strong, resilient man," it required the infliction of EITs for "over two weeks before we started to have talks."[82]  Then, Drs. Mitchell and Jessen began to have "fireside chats" with Mr. Mohammad and blamed "Washington" for having to

---

[77] *Unofficial/Unauthenticated Transcript*, 27 January 2020, at 31349.

[78] AE 630U (KSM) Attachment F at 201 (MEA-10024-00006197).

[79] *Unofficial/Unauthenticated Transcript*, 27 January 2020, at 31386 (testimony of Dr. James Mitchell).

[80] *Unofficial/Unauthenticated Transcript*, 29 January 2020, at 31706-07 (testimony of Dr. James Mitchell).

[81] *Id.* at 31707-08 (emphasis added).

[82] *Unofficial/Unauthenticated Transcript*, 31 January 2020, at 32466-67 (testimony of Dr. Bruce Jessen).

**JA.373**

torture him.  They told him: "You have to help us. You know, Washington's not going to accept this. . . . 'You need to work with us.'"[83]

After Mr. Mohammad's torturers eventually completed the "EIT section," he entered a new phase of compliant conditioning:

> [G]radually, over time, [Mr. Mohammad] became more and more forthcoming; starting initially by just answering the question exactly as it was asked, not going beyond it, not adding anything to it. And he explained why to me. And he would sometimes suggest questions that I should ask, which I did. And then eventually, we got past that and we could just show him a picture or show him a letter or show -- ask him a question, and we -- and we would have a conversation.[84]

According to Dr. Mitchell, the black site regimen took on an almost collegial tone:

> [E]ventually, what would end up happening is the interrogator would go in and they would say, "You're going to be -- you're going to be debriefed today from about 1030 until your prayer time, and then you're going to get another debriefing this afternoon," just to give them some structure so that they knew what was going on and they could do their obligatory prayers or their nonobligatory prayers as they chose.  Then when it was time, the guards would move the detainee to the debriefing room. The detainee would be shackled.[85]

On other occasions, "to help organize [the detainees'] time," Drs. Mitchell and Jessen themselves would personally "stop in in the morning and say, this is what you're going to do today. This is the kind of free time you have."[86]  Then, they might join the debriefing "with the debriefer and sit there and simply ask them questions."[87]  At that phase of the post-EIT conditioning, the dynamics of the questioning involving Mr. Mohammad, his torturers and the debriefer "would *resemble any custodial debriefing*."[88]

---

[83] *Unofficial/Unauthenticated Transcript*, 27 January 2020, at 31138 (testimony of Dr. James Mitchell).

[84] *Unofficial/Unauthenticated Transcript*, 30 January 2020, at 32121-22 (testimony of Dr. James Mitchell).

[85] *Unofficial/Unauthenticated Transcript*, 23 January 2020, at 30753-54 (testimony of Dr. James Mitchell).

[86] *Unofficial/Unauthenticated Transcript*, 29 January 2020, at 31712-13 (testimony of Dr. James Mitchell).

[87] *Id*.

[88] *Id*. (emphasis added).

The potential for use of EITs, however, was always at hand if the detainee did not maintain a compliant state.  Even for the detainees "in debriefing mode . . . the opportunity or the sometimes necessity or the possibility of using EITs are there."[89]  If a detainee in debriefing mode were asked about a topic he would "prefer to not talk about," Drs. Mitchell and Jessen would warn the recalcitrant captive that "Washington's not going to accept your answer and they're going to be wanting you to *go back to the hard times*, so help me."[90]  Drs. Mitchell and Jessen were "very often sent out" to black sites when detainees "were getting sideways with the site folks" and "shut down" in response to questioning.[91]  The doctors would determine "what might be done without going back to EITs [i.e., "hard times"] or standard interrogation techniques to get him to improve that."

The specter of returning "to the hard times" had "a very clear meaning" to Mr. Mohammad because Dr. Mitchell was one of three people who inflicted coercive physical techniques on him.[92]

The detainees who did not shut down were subjected to repetitious questioning from debriefers who said, in effect, "I know you've said this before, but I don't care what you said to them. I'd like to hear it again[.]"[93]  Dr. Mitchell explained:

> [T]hat happened with KSM quite a bit. It happened with others. They didn't use those exact words, but essentially what they were doing was getting them -- they were -- we -- I kind of think of it as priming the pump, right? You'd go in and you'd get them to tell you what they had told you before, and in the course of telling you what they've told you before, they remember other things, right, and that adds to the thing.[94]

---

[89] *Unofficial/Unauthenticated Transcript*, 21 January 2020, at 30242-43 (testimony of Dr. James Mitchell).

[90] *Unofficial/Unauthenticated Transcript*, 29 January 2020, at 31713 (testimony of Dr. James Mitchell) (emphasis added.)

[91] *Unofficial/Unauthenticated Transcript*, 30 January 2020, at 32083-84 (testimony of Dr. James Mitchell).

[92] *Unofficial/Unauthenticated Transcript*, 27 January 2020, at 31150 (testimony of Dr. James Mitchell).

[93] *Unofficial/Unauthenticated Transcript*, 23 January 2020, at 30788-89 (testimony of Dr. James Mitchell).

[94] *Id*.

**JA.375**

Mr. Mohammad's compliance with these demands for over three years thus reflected the achievement of the torturers' goal, as it was described by Dr. Mitchell: "The whole point of the interrogation program was so that they would be *willing to voluntarily* answer questions when a person came in to ask them those questions."[95]  Likewise, as characterized by Dr. Jessen: "The objective was to get detainees to a point where they would *willingly engage* in dialogue with the CIA analysts at some level, a level that wasn't dangerous or that wasn't angry and unproductive, but that -- that *the debriefers could -- could ask questions and the detainees could field them*."[96]

In addition to being available "to stop in and see how these guys are doing," in the event detainees became uncooperative,[97] Dr. Mitchell encouraged detainees who were about to be moved to a new black site "to cooperate with whoever they encountered in the future."[98]  He would say, in sum or substance,  "undoubtedly you're going to encounter a lot of people who are going to ask you questions and we would encourage you to be truthful with them."[99]  Dr. Mitchell recalled last seeing Mr. Mohammad in "[p]robably 2006, shortly before he was transferred to GTMO, although I don't remember exactly."[100]

### e.  There is an absence of any circumstances to establish a "break" between the black sites and the LHM statement

#### 1.  Circumstances of continued confinement

Even if the government agents were not bound by the holding in *Miranda*, the evidence affirmatively demonstrates that any superficial appearance of Mr. Mohammad's volitional

---

[95] *Unofficial/Unauthenticated Transcript*, 29 January 2020, at 31987 (emphasis added).

[96] *Unofficial/Unauthenticated Transcript*, 31 January 2020, at 32480-81 (emphasis added).

[97] *Unofficial/Unauthenticated Transcript*, 30 January 2020, at 32085 (testimony of Dr. James Mitchell).

[98] *Id*. at 31988.

[99] *Id*.

[100] *Unofficial/Unauthenticated Transcript*, 27 January 2020, at 31128.

acquiescence to the LHM questioning was not "insulated" or a "break" from, nor was it "unaffected" by "all that went before"[101] his years in the government's black sites. When the United States Government transported Mr. Mohammad to Guantanamo for debriefing by FBI and DoD CITF agents, he was held in an environment that did not differ materially from the black sites at which he had been debriefing for the CIA. Virtually every aspect of Mr. Mohammad's imprisonment in Guantanamo – the clothes he wore, the food he ate, his isolating, solitary confinement – were identical to the conditions in black sites where he was confined after the years-long EIT phase of conditioning.

Throughout Mr. Mohammad's black site confinement he was conditioned to understand that his physical and psychological health and comfort were directly tied to his cooperation with the interrogation debriefing program. Initially, he and other black site detainees had been afforded only "a baseline detention state," limited to "*basic* levels of medical care; food and drink which meets *minimum* medically appropriate nutritional and sanitary standards; clothing *and/or* a physical environment sufficient to meet basic health needs; periods of time within which detainees are free to engage in physical exercise; and sanitary facilities."[102] The black site operators made it explicit that:

> Detainee's baseline state can be *improved or lowered* to *further the efficiency of the interrogation process*. In the interrogation process, *the detainee is conditioned* that additional comforts/privileges result from enhanced cooperation, and diminished comforts/privileges result from a lack of cooperation. Any diminished conditions will be as a component of an interrogation plan for the purpose of *motivating the subject to cooperate*, and will be considered temporary until such desired cooperation results.[103]

---

[101] *Clewis*, 386 U.S. at 710.

[102] AE 630AAAA (GOV) Government Notice of Proposed Stipulation of Fact, filed 29 April 2020, Attachment C (MEA-13E-00000330-331) (emphasis added).

[103] *Id.*

**JA.377**

For example, an early concession to humane treatment was to return a detainee's clothing so that he was not subjected to the humiliation culturally inappropriate state of nudity, particularly in the presence of women.[104]  Similarly, cooperative detainees who were "no longer in the interrogation phase of exploitation," *i.e.* being subjected to EITs, were "offer[ed] another layer of available amenities" in the form of not being forced to cut their hair or beards in a manner inconsistent with their religious and cultural beliefs.[105]

By mid-2006, before the government moved Mr. Mohammad to Guantanamo, his black site "amenities" included a cell that was "equipped with a shower, tamper-proof, stainless steel toilet and sink, hot and cold running water."[106]  The cell "temperature [was] maintained at approximately 22 degrees Celsius but detainee [was] able to adjust temperature for comfort."[107]  His "cell light [was] dimmed approximately between the hours of 2200 hrs and 0900 hrs to facilitate effective detainee sleep patterns."[108]  Mr. Mohammad was "allowed to exercise in his cell at will," and was permitted to use a "physical exercise room with access to an exercise bike, weight machine, and elliptical machine for one hour three times per week."[109]  Sanitary "amenities" included the opportunity to "wash and/or shower as often as he wants in his cell," laundered clothing "at least two times per week" and laundered linens "at least once per week."[110]

---

[104] *Unofficial/Unauthenticated Transcript*, 29 January 2020, at 31791, 31797 (testimony of Dr. James Mitchell).

[105] AE 630AAAA (GOV) Attachment C (MEA-13E-00000330-331).

[106] AE 630U (KSM) Attachment F.

[107] *Id.*

[108] *Id.*

[109] *Id.*

[110] *Id.*

These conditions and "amenities" were essentially the same as those that equal, if not superior to those afforded Mr. Mohammad him at Guantanamo.[111]  Similarly, there was no appreciable difference between the food or clothing provided Mr. Mohammad.[112]  In transporting Mr. Mohammad to Guantanamo, the U.S. government subjected him to the same methods and procedures used to relocate him among black sites.[113]

Other than being provided false information about which executive branch component exercised operational control over him, Mr. Mohammad had no reason to conclude that his move to Guantanamo was anything more or less than another relocation as part of the government's torture and conditioning program.  Following the approximately two years that Mr. Mohammad was the focus of Drs. Mitchell and Jessen in the intense debriefing conditioning at Location 7, the more recent transfers among government facilities occurred on an order of 6-7 months.[114] Nothing about Mr. Mohammad's 4-month sojourn at Guantanamo before meeting the newest set of government agents in January 2007 would have registered as a significant change in the location or circumstances of his ongoing confinement, conditioning and debriefing regimen. That he was allowed to meet with representatives of the International Committee of the Red Cross (ICRC) or to write letters to his family – and inform them after nearly four years that he was alive – was fully consistent with his torturers awarding "amenities" as both an incentive to increase his cooperation and a disincentive to do anything that would risk a return to "hard times."[115]

---

[111] *See, e.g.*, *Unofficial/Unauthenticated Transcript*, 1 November 2019, at 28587, 28589 (testimony of first Camp VII Commander).

[112] *Compare, e.g.*, MEA-13E-00000330-31 and MEA-10024-00002087 (at AE 630E (KSM) Attachment D).

[113] *Compare*  MEA-13E-00000527-28 and MEA-13E-00000522,-23, (at AE 630AAAA (GOV) Attachment B at 126-128).

[114] *See* MEA-10024-00007738-7817 (AE 630AAAA (GOV) Attachment B).

[115] *See* MEA-STA-00003343-44 ("Mohammad said he thought he would not be happy if he worried about little things. When reminded that the small things did depend on his continued truthfulness and that he could go back to

**JA.379**

### 2. Government Agents' LHM Interview

The circumstances surrounding the LHM interview replicated – and thus perpetuated – what the government concedes was "a coercive environment,"[116] in which Mr. Mohammad had been "debriefed extensively,"[117] immediately before his arrival in Guantanamo. On the morning of January 12, 2007, when guards shackled and transported Mr. Mohammad to the interview room at Camp Echo II, he had no inkling that he was about to be confronted by government agents who would tell him they "needed to go through [the] questions again" that "he might have made in his previous custodial setting."[118] Mr. Mohammad's DIMS records on the date of the first LHM interrogation reflect that when he was "removed from cell," it was purportedly for the purpose of "transport off-site for a medical appointment."[119] Whether the guards affirmatively misled Mr. Mohammad or kept him in the dark as to why he was being moved, the FBI and CIDF agents had no reason to believe, and the government has been unable to offer any evidence to suggest, that the guards either informed Mr. Mohammad that he was being transported for a law enforcement interview or gave him the option to decline.[120]

Replicating the familiar debriefing routine in the black sites, the guards took Mr. Mohammad to a room at Echo II furnished with white plastic patio chairs and table, shackled his

---

'hard times,' Mohammad laughed and said he did not want that and was telling the truth.") (at AE 630AAAA (GOV) Attachment B at 294.

[116] AE 630C (GOV) at 24.

[117] *Id*. at 2.

[118] *Unofficial/Unauthenticated Transcript*, 25 September 2023, at 36779-80 (testimony of retired Special Agent Francis Pellegrino).

[119] *See* AE 630E (KSM), Attachment D (MEA-10024-000002079).

[120] *Unofficial/Unauthenticated Transcript*, 28 September 2023, at 37300 (testimony of retired special Agent Francis Pellegrino).

ankle to the floor and left him to await the arrival of his interrogators.[121]  Eventually, three men

entered the room: two FBI personnel – Special Agent Francis Pellegrino and Intelligence Analyst

Brian Antol – and Department of Defense (DoD) Criminal Investigative Task Force (CITF)

Special Agent Elmer Mason.

The selection of the inquisitors also followed the black site playbook exactly.  As Dr.

Mitchell acknowledged: "in general, the whole point of the conditioning model was to *condition

detainees to answer questions* of *debriefers* so the *right person* would have the right

information."[122]  "Debriefer" was a term synonymous with "subject matter expert."[123]

Consistent with these debriefing protocols, the LHM "directive" for conducting the interview

specified that the interviewers would be "subject matter experts on the detainees."[124]  SA

Pellegrino and his associates were part of a larger group of such government agents selected to

interview numerous prisoners in Guantanamo, and divided into smaller teams "based on what

they felt was our expertise."[125]

According to SA Pellegrino, at the agents' "initial moment of engagement," with Mr.

Mohammad, he appeared "curious as to what this was all about, who we were and why we were

there."[126]  SA Pellegrino and his cohort followed a "directive," sent "from the higher levels of

---

[121] *Unofficial/Unauthenticated Transcript*, 26 September 2023, at 36778, 36779, 36798-99; *Unofficial/Unauthenticated Transcript*, 27 September 2023, at 37064; *Unofficial/Unauthenticated Transcript*, 21 January 2020 at 30337; *Unofficial/Unauthenticated Transcript*, 24 January 2020, at 30920-22.

[122] *Unofficial/Unauthenticated Transcript*, 21 January 2020 at 30250 (emphasis added) ("Q: . . . in general, the whole point of the conditioning model was to condition detainees to answer questions of debriefers so the right person would have the right information? A. That would be one way to characterize it. It's - -it's simplistic, but yeah.").

[123] *Unofficial/Unauthenticated Transcript*, 29 January 2020 at 31706-07 (testimony of Dr. James Mitchell).

[124] AE 630C Attachment D, at 1, Paragraph 1 ("persons who will conduct the interviews.").

[125] *Unofficial/Unauthenticated Transcript*, 25 September 2023, at 36770-71 (testimony of retired Special Agent Francis Pellegrino).

[126] *Id.* at 36769.

the FBI," outlining "the method by which [they] would be conducting this interview."[127]  As the government has noted,[128] the directive, by design, instructed the agents not to give Mr. Mohammad any of the information necessary to make a knowing, intelligent and voluntary decision whether to waive his right not to incriminate himself.[129]  Adhering to the directive, SA Pellegrino simply told Mr. Mohammad that the agents were there to talk to him and ask whether he was "willing" to do so.[130]

Adhering to the directive, and as described above, SA Pellegrino and the other agents *never* warned Mr. Mohammad "prior to any questioning," or at any other time, "that he ha[d] the right to remain silent, that anything he sa[id] can be used against him in a court of law, that he ha[d] the right to the presence of an attorney, and that if he [could] not afford an attorney one w[ould] be appointed for him prior to any questioning if he so desire[d]."[131]

Indeed, the agents never offered Mr. Mohammad any explicit "advisement" of any rights. They told him what he was *not* entitled to, including counsel, and gave untruthful and evasive answers to questions Mr. Mohammad asked in an apparent attempt to evaluate his legal status and the consequences of speaking to the agents.  When Mr. Mohammad asked "if he had a right to an attorney," SA Pellegrino "did advise him at that point that *he did not have that right* because he was not yet charged in the military."[132]  Aside from being was in direct conflict with

---

[127] *Id.* at 36771, 36773-74.

[128] AE 630C Attachment D; *Unofficial/Unauthenticated Transcript*, 25 September 2023, at 36771-72.

[129] *See, supra*, paras. 3(a)-(c).

[130] AE 630C (GOV) Attachment E, Para. (4)  *See, supra*, paras. 3(a)-(c).

[131] *Miranda*, 384 U.S. at 479.

[132] *Unofficial/Unauthenticated Transcript*, 25 September 2023, at 36906.  *See* AE 630C Attachment D at 2-3 ("If the detainee asks for an attorney, the agent should inform the detainee that, since he has not been charged with a crime by the military, the detainee does not have the right to speak to an attorney and there is no attorney immediately available for consultation.").

the requirements of *Miranda*,[133] SA Pellegrino's response echoed Dr. Mitchell's curt advice that access to counsel was "not going to happen."[134]  The clear message to Mr. Mohammad was that the ground rules laid down at the beginning of the horrific "stream of events" that began in March 2003 continued to January 2007 without a "break."

The suggestion in SA Pellegrino's answer that there was any question whether Mr. Mohammad would be "charged in the military," was also disingenuous and misleading.   The entire purpose of the interview was to obtain Mr. Mohammad's incriminating statements so they could used against him in the military commission.  SA Pellegrino acknowledged that he joined a contingent of dozens of FBI agents and other personnel, as well as lawyers from various named and unnamed executive branch components, on a weeks-long trip to Guantanamo because he "assumed [Mr. Mohammad] would be indicted…."[135]  Before the interview, and as instructed by the "directive" prepared by his superiors, SA Pellegrino also met with prosecutors – including some from the current trial team – to discuss "interview strategy" and identify areas of questioning "necessary to meet the elements of the military commission offense."[136]

When Mr. Mohammad asked "whether the U.S. Supreme Court ha[d] made any decisions about those being held at GTMO," he "was advised by the interviewers that since he has yet to be charged by the U.S. military with a crime, there are no issues for the courts to hear or decide."[137]  SA Pellegrino's answer was both misleadingly evasive and untrue.  Having met with

---

[133] As noted above, the agents had an affirmative duty "[p]rior to any questioning," to warn Mr. Mohammad, inter alia, that he had "a right to the presence of an attorney, either retained or appointed."  *Miranda*, 384 U.S. 436, at 444.  Although the "the higher levels of the FBI," directed the agents to shirk their duty, the law also required that if a person who is subject to custodial interrogation "indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning."  *Id*. at 444-445.

[134] *Unofficial/Unauthenticated Transcript*, 23 January 2020, at 30763.

[135] *Unofficial/Unauthenticated Transcript*, 25 September 2023, at 36884.

[136] *Id*. at 36886.

[137] AE 630C (GOV) Attachment F at 2.

the (ICRC), Mr. Mohammad apparently had some awareness of decisions such as the Supreme

Court's holdings in *Rasul v. Bush*, 542 U.S. 466 (2004) and *Hamdan v. Rumsfeld*, 548 U.S. 557

(2006), recognizing federal court jurisdiction to entertain Guantanamo detainees' habeas corpus

petitions, including a successful challenge to an earlier iteration of the military commissions.  He

thus inquired about *any decisions*, not just one that might have affected him personally.

Following the guidance in the directive, however, SA Pellegrino misleadingly evaded the

question by saying that because no charges had been filed in *Mr. Mohammad's* case, there was

nothing for a court to decide.[138]

      In light of the decisions in *Rasul* and *Hamdan*, SA Pellegrino's answer was also flatly

wrong.  There had been plenty of "issues for the courts to hear or decide" that were of direct

importance to Mr. Mohammad.  Although SA Pellegrino testified that he was unaware of the

Supreme Court decisions, he also acknowledged that he recalled the portion of President Bush's

announcement on September 6, 2006, when the president explained that "the *Supreme Court's*

*recent decision* has impaired our ability to prosecute terrorists through military commissions and

has put into question the future of the CIA program."[139]

      SA Pellegrino repeatedly testified that his "goal was to find out whether Mr. Khalid

Shaikh Mohammad would speak to us voluntarily."[140]  SA Pellegrino and his colleagues,

however, particularly FBI Intelligence Analyst Brian Antol, did nothing to determine, document

or objectively assess any factors most relevant to assessing voluntariness.  Rather, the agents

---

[138] *See* AE 630C (GOV) Attachment D, at 2 and 3.  Although the agents were assembled for the sole purpose of obtaining statements to be used in prosecuting the detainees and instructed to "discuss their interview strategy with the assigned DoD/DOJ prosecutor" to develop "questioning necessary to meet the elements of the military commission offense," the directive further instructed: "If the detainee asks whether he is being or will be charged with a crime, the agent should tell the detainee that the agent does not make that decision."

[139] *Unofficial/Unauthenticated Transcript*, 28 September 2023, at 37308, 37309-37310 (emphasis added).

[140] *Unofficial/Unauthenticated Transcript*, 27 September 2023, at 37158.

proceeded in classic "debriefing mode," demonstrating to Mr. Mohammad that, as in the black sites, he had limited power to affect the timing of interview sessions, but he had no alternative – other than risking renewal of the "hard times" – to answering their questions.

To begin with, SA Pellegrino *told* Mr. Mohammad the agents were there to interview him and then brushed aside his polite attempt to decline.[141]  When Mr. Mohammad demurred that there were "books" of information about him and the agents could "just read it," SA Pellegrino responded by saying "come on Khalid, we want to hear it from you.  You know, we don't believe what *the CIA told us*.  We want to hear it from you."[142]  This was, of course, precisely the refrain that Mr. Mohammad heard "quite a bit" in the black sites.[143]  The debriefers would say essentially: "I know you've said this before, but I don't care what you said to them. I'd like to hear it again…."[144]  After infliction of the EITs ceased, one of the most taxing aspects of Mr. Mohammad's captivity was the incessant repetition of the debriefers' inquiries.  Mr. Mohammad was led to tell his captors that "he sometimes feels 'as if I may burst' when asked to respond to the same questions time and again."[145]

SA Pellegrino's statement that the CIA already had told the FBI interrogators the substance of the information they wanted "to hear from" Mr. Mohammad would have sounded credible under the circumstances.   Mr. Mohammad was aware that SA Pellegrino had been

---

[141] *Unofficial/Unauthenticated Transcript*, 3 October 2023, at 37822, 37823 (testimony of IA Brian Antol).

[142] *Id*. (emphasis added). *See also*, *Unofficial/Unauthenticated Transcript*, 26 September 2023, at 36940-41 (SA Pellegrino told Mr. Mohammad "it didn't matter what he told the people in the black sites," SA Pellegrino "needed him to tell me the story currently."  The agents thereby turn aside Mr. Mohammad's plea that "he had spent much time in the black sites and had gone over much of this information previously," and suggested the agents "go back and just read what was already written.")

[143] *Unofficial/Unauthenticated Transcript*, 23 January 2020, at 30788-89 (testimony of Dr. James Mitchell).
[144] *Id*.
[145] AE 630U (KSM) Attachment H (MEA-10024-00007531).

**JA.385**

investigating him even before the attacks of September 11, 2001.  At the beginning of the

interview, SA Pellegrino and IA Antol:

> [T]alked with him about the history that we, meaning the FBI, had investigating him, his
> relationship to the '93 World Trade Center bombing, his involvement in the Manila Air
> case.   And we talked about some things other than those *cases that very few people knew
> anything about*, like his involvement with a police station bombing in Croatia, so that --
> to show him that, hey, we are not just, you know, two people sitting here that didn't know
> anything about his background.  We understood a lot about him prior to 2011.   So we
> built rapport that way *to convince him that*, you know, he was -- *we were people that --
> that had worked him for a long time.*[146]

The interviewers thereby signaled that they knew what version of events Mr. Mohammad had

been tortured into disclosing, and then conditioned for three and a half years to repeat.  Mr.

Mohammad also knew the penalty for not repeating a version his captors expected to hear: "back

to 'hard times.'"[147]

In place of written *Miranda* warnings, which SA Pellegrino was "told not to read," he

said he assessed Mr. Mohammad's voluntariness by providing him "with the assurances" in

Attachment E to AE 630C (GOV) on which SA Pellegrino had "checked off the various

standards that we had to meet to make sure that the interviewee was talking to us voluntarily."[148]

The indicated form, however, contained no "standards" for evaluating voluntariness.  The only

explicit "assurance" contained in Attachment E was the dubious claim that the interviewing

agents were "*independent* of any organization that previously held the detainee."[149]  In fact, the

record unequivocally supports the conclusion that the FBI and an "organization" that held Mr.

---

[146] *Unofficial/Unauthenticated Transcript*, 2 October 2023, at 37759 (testimony of IA Brian Antol) (emphasis added).

[147] *See* MEA-STA-00003343 - MEA-STA-00003344, AE 630AAAA Attachment B at 294095.

[148] *Unofficial/Unauthenticated Transcript*, 25 September 2023, at 36905 (testimony of retired Special Agent Francis Pellegrino).

[149] AE 630C (GOV) Attachment E, at para. 1 (emphasis added).

Mohammad had worked hand in glove in pursuing the goals of the black site program.[150]  It is

also clear that the CIA controlled the FBI's access to Mr. Mohammad, the manner in which the

LHM was prepared and the reporting of instances of torture.[151]

There was even less practical assurance for a black-site survivor in being told that he was

in the "*legal* custody of the Department of Defense" and would "not be returning to the *legal*

custody of any of his previous custodians."[152]  Once of the first things Mr. Mohammad told the

interviewers was that in the new location, he was a "slave."[153]  Although SA Pellegrino had

never heard anyone in custody use that word, he did not ask Mr. Mohammad to explain what he

meant.[154]  He attributed the comment to the fact that Mr. Mohammad was incarcerated and

could not do what he wanted to do.[155]  SA Pellegrino did not ask Mr. Mohammad whether he felt

that, beyond the normal restrictions placed upon him as a prisoner, there was any restriction on

his ability to make free and voluntary decisions.[156]  Thus, despite Mr. Mohammad's distress

signal, the interviewers did nothing to assess the impact of his perceived enslaved state in the

inherently coercive custodial setting.  Shortly after Mr. Mohammad's arrival in Guantanamo (14

September 2006), a psychiatrist's progress note documented his statement that "if he was dealt

with as a detainee, he would do well.  He said if he was dealt with a slave, this would frustrate

him and be a problem."[157]  It was evident from Mr. Mohammad's comment to SA Pellegrino on

---

[150] *See* AE 824 (GOV) CORRECTED COPY, Government Motion *In Limine* to Exclude Further Evidence of FBI/CIA Cooperation Irrelevant to the Proceedings, filed 28 June 2021.

[151] *See* AE 630C (GOV), Attachment D at 4.

[152] AE 630C (GOV), Attachment E, at para. (2) (emphasis added).

[153] *Unofficial/Unauthenticated Transcript*, 26 September 2023, at 36936-37 (testimony of retired Special Agent Francis Pellegrino).

[154] *Id*.

[155] *Id*.

[156] *Id*.

[157] AE 630E (KSM) Attachment B (MEA-10024-00000773).

12 January 2007, that his sense of diminished autonomy was greater than that generally associated with incarceration under circumstances other than torture sites.

Mr. Mohammad also almost immediately broached the subject of his torture in CIA custody.[158]  Alluding to the practice of torture in Arab countries, Mr. Mohammad referred to what the CIA had done to him and pointed to his wrists.[159]   As with Mr. Mohammad's description of himself as a "slave," his interviewers did not ask for elaboration.  Rather, indicating the directive from his superiors, SA Pellegrino said "the instruction was pretty clear" that unless Mr. Mohammad volunteered additional details, the government agents were to let him move on with the conversation.[160]   Thus, the agents who allegedly employed a rapport-based interview method declined to show any interest in Mr. Mohammad's revelation of prior mistreatment and potential trauma.

Mr. Mohammad's medical records for mid-September 2006 also document the existence of scars on both wrists and ankles.  Had the interviewers chosen to examine Mr. Mohammad's wrists they would have seen clear evidence corroborating his assertion of torture, which is also confirmed by the SSCI Report.[161]  Mr. Mohammad respectfully submits that, in view of the credible evidence of torture, the government's discharge of their burden to demonstrate Mr. Mohammad knowingly and voluntarily chose to speak to the interviewers required inquiry into the potential continuing coercive impact of government mistreatment.

As mentioned above, however, SA Pellegrino did not ask Mr. Mohammad whether he felt under any continuing coercion from any source.  The government agents gave Mr. Mohammad

---

[158] *Unofficial/Unauthenticated Transcript*, 25 September 2023, at 36878-36879 (testimony of retired Special Agent Francis Pellegrino).

[159] *Id*. at 36877-36878.

[160] *Id*. at 36879.

[161] *See* SSCI Report Executive Summary at 81-96.

**JA.388**

no assurances that what had happened to him in the CIA black sites would never happen again.[162]   Nor did they tell him that by being in custody of the military, the CIA would not have access to him.[163]

Both SA Pellegrino and IA Antol were also surprisingly unfamiliar with the CIA's torture program and indifferent to the means by which it may have been a continuing source of coercive pressure for Mr. Mohammad.  Having received a cursory briefing on the EITs, neither SA Pellegrino nor IA Antol was interested in knowing whether any "techniques" had been inflicted on Mr. Mohammad, "[b]ecause it was not the purpose of our interview."[164]  Although the CIA purportedly briefed SA Pellegrino on the EITs, he did not even learn that Mr. Mohammad had been waterboarded until 2009, at the earliest – over two years after the interview.[165]

When asked if knowing of Mr. Mohammad's 183 instances of waterboarding, including the involuntary sensation of drowning, would have been relevant to assessing whether Mr. Mohammad was voluntarily speaking with him, SA Pellegrino said it would not have changed his approach in speaking with Mr. Mohammad or assessing his voluntariness.[166]

SA Pellegrino opined that it if Dr. Mitchell had threatened to cut the throats of Mr. Mohammad's children, "that would be a horrible thing to say," but "[i]t couldn't make a difference" to the assessment of whether Mr. Mohammad was voluntarily agreeing to speak.[167]

---

[162] *Unofficial/Unauthenticated Transcript*, 26 September 2023, at 36952 (testimony of retired Special Agent Francis Pellegrino).

[163] *Id*. at 40.

[164] *Unofficial/Unauthenticated Transcript*, 3 October 2023, at 37798 (testimony of IA Brian Antol).

[165] *Unofficial/Unauthenticated Transcript*, 27 September 2023, at 37137 (testimony of retired Special Agent Francis Pellegrino).

[166] *Id*. at 37140-41.

[167] *Id*. at 37158.

SA Pellegrino made no effort to compare the statements Mr. Mohammad was making in January 2007 with information in any database to which SA Pellegrino had access as a means of determining whether Mr. Mohammad was, in fact, merely repeating what he had said all before at the behest of his black site captors.[168]   Neither did SA Pellegrino ask Mr. Mohammad if the information in his statement had been freely and voluntarily given, rather than because he feared some further mistreatment from his prior custodians.[169]

> Q. And you didn't -- so specifically you didn't ask whether anybody who had him currently in custody had made any threats to him?
> A. No.
> Q. And you didn't ask whether anyone who previously had him in custody had made threats to him?
> A. Correct.[170]

SA Pellegrino nevertheless concluded that Mr. Mohammad was acting voluntarily in speaking with him based on the fact that Mr. Mohammad "understood what we were saying and that he would continue to talk, and that he negotiated the times of the discussion, the breaks we would take, when it would start, when he would leave, if he would come out, and when it was over."[171] He also mentioned Mr. Mohammad's jocular interactions with him.[172]

The conduct and attributes identified by SA Pellegrino manifested Mr. Mohammad's coping adaptation to the demands of black site interrogations and debriefing.  Notable hallmark of black site cables describing his interactions with staff are corrective behaviors in response to coercive measures and the negotiations leading to accommodation of prayer times and structured scheduling of debriefing sessions.  Thus, for example, one cable described debriefers and

---

[168] *Unofficial/Unauthenticated Transcript*, 26 September 2023, at 36968 (testimony of retired Special Agent Francis Pellegrino).

[169] *Id*. 36967.

[170] *Id*. at 36939.

[171] *Id.* at 36970.

[172] *Unofficial/Unauthenticated Transcript*, 25 September 2023, at 36799.

**JA.390**

psychologists confronting Mr. Mohammad and expressing "concerns regarding his uncooperative behavior."[173]  For several days, interviewers and psychologists conducted individual sessions with Mr. Mohammad, and then coordinated with "debriefers to redirect and improve his debriefing productivity."[174]   The improvements were described as:

> Currently he cooperates with all explicit demands associated with debriefing requests. His responses are comprehensive and detailed. He *frequently volunteers useful, novel information*. His comportment with the debriefers is respectful and appropriate. Currently interrogators and psychologists assess Mohammad *as back on track* and does not require *the use of enhanced measures* at this time.  His *comportment with debriefers is respectful* and he *engages in appropriate interludes of humor* and seriousness in response to the debriefers' dialogue. And then again he frequently volunteers useful and novel information.[175]

SA Pellegrino acknowledged that when he interviewed Mr. Mohammad in January 2007, he found him "frequently volunteering useful and novel information," his "comportment was respectful and appropriate," and he "engaged in appropriate interludes of humor."[176]  Thus, none of these descriptors was inconsistent with Mr. Mohammad being compelled or coerced to engage in conversations with government agents.

Similarly, a cable from mid-2005 describing Mr. Mohammad's adjustment and coping reported that he spent approximately an hour did spend almost an hour complaining about staff members interrupting his prayer times and requested they not do so.[177]  SA Pellegrino again acknowledged the similarities between the negotiations over the prayer schedule reported in the cable and his interactions with Mr. Mohammad in January 2007.[178]

---

[173] AE 630U (KSM) Attachment F at 99 (MEA-100-240-0006095).

[174] *Id*.

[175] *Id.* (emphasis added).

[176] *Unofficial/Unauthenticated Transcript*, 27 September 2023, at 37152.

[177] *Id*.

[178] *Id*. at 37153.

**JA.391**

### f. AE 524LL and AE 524LLL Issues

As framed by the Commission, the issue underlying AE 524LL is the "tension between the Defense's ability to conduct independent investigation and equal access to witnesses and evidence and the government's need to prevent disclosure of classified information."[179]  The Commission found the government's proposed protective order to be flawed because it did not provide "consistent guidance for the Defense to follow," and "unreasonably chill[ed] defense efforts to persuade CIA persons to consent to an interview."[180]  Although the Commission approved an amended version of the government's proposed protective order, it found that even with the "extensive discovery" and open source RDI program information, as well as the government's proposed stipulation, the defense would not have substantially the same ability to investigate and prepare to litigate the suppression motion.[181]

In AE 524LLL, the Commission decided that its conclusion in AE 524LL (and exclusion of the LHM "for any purpose") was premature.  The Commission explained that whether the protective order allowed the defense to present the "particularity and nuance necessary to present a rich and vivid" picture of confinement for 3-4 years in the black sites "is best made after the Defense has the ability to use all tools at their disposal."[182]  In particular, the Commission noted that it "is not yet fully known" the extent to which the government is willing "to further ease

---

[179] AE 524LL RULING, Ruling Mr. al Baluchi's Motion to Dismiss, or in the Alternative, to Compel the Government to Produce Witnesses for Interview; Government Notice of Proposed Protective Order, dated 17 August 2018, at 23.

[180] *Id*. at 26-27.

[181] *Id*. at 34-35.

[182] AE 534 LLL RULING Government Motion to Reconsider and Clarify AE 524LL, Ruling, dated 3 April 2019, at 10.

**JA.392**

restrictions upon further Defense investigation, to enter into meaningful stipulations, or to produce RDI witnesses during upcoming suppression hearings."[183]

The government responded to only the Commission's mention of a "stipulation," and proposed a list of procedures and standards for operating black sites.[184] The government did not ease restrictions on defense investigation or the production of RDI witnesses for the suppression hearing. The government's one concrete response to AE 524LLL – a proposed stipulation – reflects the government's overall strategy to resist the production of meaningful discovery, and restrict the defense investigation, while directing defense counsel to look to their client as the primary source of evidence in support of the suppression motion and torture-related evidence. Thus, the Notice in AE 630AAAA (GOV) invited defense counsel to propose factual stipulations "after speaking with the Accused."[185]

The Commission's more recent Trial Conduct Orders in October and November 2023 ordered the government, inter alia, to file a supplement to the proposed stipulation in AE 630AAAA (GOV). On 18 January 2024, the government filed its a 6-page "Notice" with an Attachment described as "a demonstrative supplement to its prior stipulation proposals."[186] The supplement does not include any "content," and instead "it identifies a few additional categories of content—about which the Defense is obviously aware—from which the Defense can propose content." It then refers the reader to: "Discovery within the MEA-PRG trigram, including but not limited to emails and Sametime chat communications between CIA personnel"; "The testimony of relevant witnesses, including but not limited to Dr. James Mitchell and Dr. Bruce

---

[183] *Id.*

[184] *See* AE 630AAAA (GOV).

[185] *Id.*

[186] AE 628RRRRRRR (GOV) /AE 630TTTT (GOV) /AE 631BB (GOV) / AE 632AAA (GOV) Government Notice of Demonstrative Supplement to Proposed Stipulation of Fact, filed 18 January 2024.

Jessen"; and "Content provided from the Accused, exemplified by submissions to this Commission and others" (citing to the declaration from one of Mr. Mohammad's co-defendants filed in *al Nashiri* suppression motion litigation[187]).

In sum, the government has done nothing to advance two of the three goals identified by the Commission in AE 524LLL, and precious little to address the third. It has signaled its intention to continue the course of wielding classification and national security privileges, and manipulating evidence, in service of the paramount interest to shield the CIA and many of its former and current employees and contractors from public exposure and lawful prosecution. This is part and parcel of an overall pattern of the government's classification and protective orders preventing the defense from investigating the case in a manner that satisfies the 6th and 8th Amendments and, instead, forcing counsel to proceed at their peril.

1. **Throughout this litigation, the government's classification and protective orders have continued to prevent the defense from investigating the case in a manner that satisfies the 6th and 8th Amendments.**

Since the earliest stages of this case, it has been clear to the parties and the Military Commission that the government power over classified material would pose significant hurdles to the defense:

- As explained by defense counsel in AE013III (Mohammad),[188] "The disclosure restrictions imposed by compliance with the MOU would pose major practical and relational obstacles to counsel's ability to investigate and present potentially material, exculpatory evidence. As a practical matter, the restrictions would prevent counsel from reviewing and discussing relevant discovery materials as a means of obtaining

---

[187] *See* AE 467CCC RULING Defense Motion to Suppress Custodial Statements Allegedly made by Mr. Al-Nashiri in January, February, and March 2007, dated 18 August 2023.

[188] AE 013III (Mohammad), Motion for Appropriate Relief (Defense Legal Objections to Order to Sign MOU (AE 013CCC and AE 13DDD), filed 23 January 2014.

**JA.394**

additional details and guidance from the client in conducting the investigation, including the immediate and long-term effects of particular instances of maltreatment. Restricting the discussion of such subjects impedes the very process of obtaining a coherent, contextualized narrative, and thereby understanding and presenting the abuse survivor's experience and the nature and severity of lasting effects."[189]

- In response, the government ignored the substance of the defense's legal arguments about the rights of Mr. Mohammad and their obligations to render effective representation, and insisted that "[t]his Commission should order counsel for the four defense teams to show cause within seven days as to why they should not be removed as counsel for their respective clients due to their repeated failure to comply with the Commission's order requiring them to sign the MOU to receive classified information in this case.  If defense counsel cannot show cause, the counsel should be removed from the case and substituted by properly-cleared counsel who are willing to abide by the Military Judge's orders pursuant to R.M.C. 109(b)(1)-(2); R.M.C. 109(b)(3)(A)(i)."[190]

- The government has reiterated time and again that defense counsel are subject to additional coercive mechanisms beyond the standard agreements for obtaining and maintain a security clearance: "MOUs provide necessary assurances to those in the Executive Branch who hold equities in the classified information that there is

---

[189] AE 013III (Mohammad), Motion for Appropriate Relief (Defense Legal Objections to Order to Sign MOU (AE 013CCC and AE 13DDD), filed 23 January 2014, at 6; *and see*, Declaration of David Z. Nevin, dated 23 January 2014, at AE 013III (Mohammad), Attachment B.

[190] AE 013MMM, Government Response To Motion for Appropriate Relief (Defense Legal Objections to Order to Sign MOU (AE 013CCC and AE 013DDD), filed 5 February 2014, at 2.

**JA.395**

accountability, and adequate protections and enforcement mechanisms, beyond the power of this Commission."[191]

- AE 013CCCC (Mohammad)[192] informed the Commission that defense counsel had "been advised by their Commission-mandated Defense Information Security Officer that they do not have access to the classification guidelines necessary to agree truthfully and in good faith to comply with the MOU,"[193] while simultaneously noting that very real threat that "attorney members of the defense teams who fail to 'acknowledge[]' his or her 'responsibilities' under AE013BBBB will be 'removed from the case,' as was 'requested by the Government.'"[194]

- "In this environment, signing an agreement that exposes a defense attorney to the government's announced intention to pursue administrative and criminal penalties for violating regulations of which counsel has no actual knowledge would violate counsel's duty to avoid compromising his or her ability to continue representing the client."[195]

- As Mr. Mohammad has previously noted for the Commission, "[t]he Government concedes that '[m]any of the issues that can arise in complying with the Protective Order are not intuitive to even the most seasoned National Security litigator.'" AE013PPP at 19. It has nonetheless repeatedly refused to provide counsel and our

---

[191] AE 013PPP, Government Response to Order to Show Cause, Government Motion to Protect Against Disclosure of National Security Information, filed 26 September 2014, at 14.

[192] AE 013CCCC (Mohammad) Defense Motion to Reconsider and/or Modify AE 013AAAA, *Third* Supplemental Ruling, Government Motion to Protect Against Disclosure of National Security Information and AE 013BBBB, *Third Amended* Protective Order #1 to Protect Against Disclosure of National Security Information, filed 3 August 2015.

[193] AE 013CCCC (Mohammad), at 2.

[194] AE 013CCCC (Mohammad), at 2-3 (citing AE 013AAAA at 15, n. 53).

[195] AE 013CCCC (Mohammad), at 8.

DISO with relevant Classification Guides.  See, e.g. AE054, Motion to Compel the Production of Discovery, and AE054C Order (Denying AE054)."[196]

The government, nearly ten years ago, made the rather astonishing claim that "When coupled with the five-page classification guidance previously mentioned [Classification Guidance for Information about the Central Intelligence Agency's Former Rendition, Detention, and Interrogation Program, found at AE 013RRR, Attachment B], the Commission's Third Amended Protective Order #1, is all the Defense needs, as derivative classifiers, to adequately protect the classified information that should be at issue in this case that they may receive from their client."[197]  The intervening decade of litigation over handling of information in this case, four additional protective orders – to include Protective Order #4, which gave rise to the litigation in AE 524 and the instant motions to suppress – has proven the falsity of that claim.  At the time of this filing, the government only three months ago issued its *fifth* revised classification guidance in AE 658K, which now tops out at 43 pages.[198]  Notably, in terms of the defense and the Commission's ability to digest the guidance and prepare accordingly, three of the iterations of the guidance were provided only a handful of days before the hearing session began, and the other three were issued *during* the relevant session.[199]  The Military Commission recently has

---

[196] AE 013CCCC (Mohammad), at 9.

[197] AE 013EEEE (GOV) Government Response to Defense Motion to Reconsider and/or Modify AE 013AAAA, *Third* Supplemental Ruling, Government Motion to Protect Against Disclosure of National Security Information and AE 013BBBB, *Third Amended* Protective Order #1 to Protect Against Disclosure of National Security Information, filed 13 August 2015, at 11.

[198] AE 658K (GOV) Government Notice of Revised Classification Guidelines, filed 9 November 2023, Attachment B (SECRET//ORCON/NOFORN).

[199] *See* AE 658 (GOV) Government Notice of Classification Guidance, filed 6 September 2019 (three days before the 9-27 September 2019 hearings session); AE 658A (GOV) Government Notice of Revised Classification guidance, filed 18 September 2019 (in the middle of the 9-27 September hearings session); AE 658D (GOV) Government Notice of Revised Classification Guidelines, filed 17 January 2020 (three days before the 21-31 January 2020 hearings session); AE 658F (GOV) Government Notice of Corrected Classification Guidelines, filed 21 January 2020 (on the first day of the 21-31 January 2020 hearings session); AE 658H (GOV) Government Notice of Revised Classification Guidelines, filed 1 September 2021 (five days before the 6-17 September 2021 hearings

**JA.397**

noted the risks run by offering guidance on such a short timeline.[200] The determination as to what is classified, and what questions defense counsel may ask, and on what so-called "guidance" the defense may rely, has been a consistently moving target, leaving the defense unable to render effective assistance, and always on the brink of being subject to accusations of violating rules it was not informed of until after-the-fact.

Perhaps nowhere (other than as recounted in AE 524 itself), is this *ex post facto* creation of "guidance" clearer than with regard to the testimony of the First Camp VII Commander. His testimony upon direct examination by the government to an unclassified fact in November of 2019 has given rise to, to date, 10 joint status updates over nearly 14 months, as the government attempted to coordinate additional guidance for the Camp Commander's remaining testimony.[201] What guidance the government was eventually able to offer does not as yet follow the Commission's Order "to provide the Accused with an unclassified summary of the classified facts sufficient to allow the Defense to cross-examine the first Camp VII Commander in open court regarding his opinion."[202]

---

session); and AE 658K (GOV) Government Notice of Revised Classification Guidelines, filed 9 November 2023 (during the 6-17 November 2023 hearings session).

[200] *Unofficial/Unauthenticated Transcript*, 8 Nov 2023, at 39222 et seq. (Having received new guidance that morning in advance of witness testimony, the Military Judge agreed to a longer recess to "give all the parties to digest a little bit of this guidance. … If the parties step in something based on new more restrictive guidance, then that's what happens when guidance comes out the morning of.").

[201] *See* AE 692 ORDER, GOVERNMENT ELICITED OPINION FROM FIRST CAMP VII COMMANDER, dated 23 December 2019; *and see*, AE 692Y (Gov KSM et al) Tenth Joint Status Update in Accordance with AE 690O, Interim Order, Government Elicited Opinion from First Camp VII Commander, filed 15 December 2023 (noting that compliance with the Commission's order in AE 692O requires the government to "finaliz[e] its consolidated guidance memorandum.") *Unofficial/Unauthenticated Transcript*, 11 Oct 2023, at 38941, (Trial Counsel [Mr. Trivett]: "But what I can tell you is that we're continuing to work the 658 classification guidelines. A lot of that surrounds his testimony. That's why his testimony had stopped in the middle of it. We will not have sufficient time to work that process through and get finality on any of those classified guidelines in time for him to be back here.")

[202] AE 692 ORDER, at 3; *see also*, AE 692Z (GOV) Government Notice of Classification Guidance Memorandum Pertaining to Testimony from First Camp VII Commander, filed 29 December 2023, Attachment B (classified SECRET//ORCON/NOFORN).

JA.398

Even as it reissues its guidance, the prosecution itself admits that guidance is not clear or comprehensive on its face – a fact confirmed by the installation and regular use of a "teletype" machine[203] and real-time conversations with the OCA as witnesses are examined and motions argued. Even with this live assistance, the prosecution has continued to find it necessary to stop the hearings to "seek guidance" on its own classification instructions.[204] This includes instances where Trial Counsel has questioned a witness in unclassified session, only to have the resulting public transcripts be heavily redacted.[205]

Meanwhile, as it is regularly revising its guidance[206] on topics that were known to be at issue in this litigation since its inception, the government continues to suddenly and without

---

[203] *See* AE 657A RULING Government Motion For Authorization to Install a Teletype Machine in Courtroom II, dated 10 September 2019, unsealed 10 February 2020 (*see* AE 657B / AE 735C ORDER Unsealing Prior Ex Parte Order, dated 26 February 2020); *and see*, AE 735 (AAA) Mr. al Baluchi's Emergency Motion to End Apparent Intelligence Agency Disruption of Courtroom Proceedings, filed 7 February 2020, at 3 (describing defense counsel's observation of "counsel for the government reaction to a screen in front of them in the courtroom, then alerting co-counsel to ask the military commission to cut the live feed and trigger the red light to deny public access to the proceedings.").

[204] *See, e.g.*, *Unofficial/Unauthenticated Transcript*, 15 November 2023, at 40209 ("Mr. Ryan: Your Honor, I have to ask for a break at this point to seek guidance."); *id.* at 38871-72 (MJ [Col McCall]: "…I know did [sic] want to give everyone a chance to discuss their positions on this classification issue. I don't think I need to hear from you, Mr. Trivett. … It sounds like you're going to go try and get some more guidance. And I think you get everybody's frustration.").

[205] *See, e.g.*, *Unofficial/Unauthenticated Transcript*, 5 October 2023, at 38093 (Managing Trial Counsel Mr. Trivett questioning government witness Col Jemott); 27 September 2023 at 37082 lines 16-19 or so; at 37161: "LDC [MR. SOWARDS]: Thank you, Your Honor. And just for clarification, this is a brief question or two pursuant to an **agreement with the prosecution,**" is followed by *4 pages* of heavy redactions.

[206] *Unofficial/Unauthenticated Transcript*, 14 Nov 2023, at 39894, (Trial Counsel [Mr. Ryan]): "The matters to be handled today in open court regarding audio recordings of the accused while at Camp VII have been addressed previously by the parties in terms of classification guidance…. And this has undergone a significant change. I think you've heard this, Judge, of it going from once being classified to right now being unclassified.").

*Unofficial/Unauthenticated Transcript*, 15 Nov 2023, at 40061-62 (Learned Counsel [Mr. Connell: "And the government has advised us today that their interpretation of Protective Order Number 3 is, I quote, as broad as possible, and that we are not permitted to ask questions which are designed to determine the contours of the national security privilege.").

*Unofficial/Unauthenticated Transcript*, 9 October 2023, at 38526 (Defense Counsel [Ms. Pradhan]: "And I understand that Mr. Trivett is going to explain to us in closed session what exactly the problem is with what happened this morning, but all of that leads to a chilling over what we think we can safely say in open session.")

*Unofficial/Unauthenticated Transcript*, 4 October 2023, at 38026 (Trial Counsel [Mr. Ryan]: "…we are going to invoke national security privilege but will seek further guidance." Followed by 38032 *et seq.* (upon a request for clarification from defense counsel as to whether the government is invoking national security privilege or if the instruction is in the guidance, Trial Counsel [Mr. Ryan] responded, "[W]e do not provide – we are not providing

**JA.399**

warning threaten defense counsel with administrative sanctions or worse for alleged failures to

follow previously unarticulated 'policies.'  The most recent and extreme example of this

occurred last summer, when the government demanded the return of specified documents that, it

asserted, had been "inadvertently" disclosed in discovery four and seven years before.[207]  When

counsel for Mr. al Baluchi responded to identify certain inconsistencies in the government's

request and outlining his understanding of the proper mechanism for such a request – including

making a motion to the Commission[208] – the prosecution quickly answered that it did "not view

this issue as one for the military commission to decide" and that failure to return or destroy the

documents would result in the government "notify[ing] the executive agency that has original

classification authority over the documents that you were twice informed that you are

inadvertently in possession of," at which point that agency "will then decide whether to initiate

any action against you it deems necessary to protect its classified information."[209]  Mindful of the

Commission's finding that the prosecution's duty to inform the OCA did not amount to a threat

to defense counsel,[210] Mr. Mohammad nevertheless cites to this exchange as an example of the

incredible amount of power the government wields over the information in this case, and the

corresponding ability to hamper defense counsel when told that a personal contract they have

---

specific guidance from within.  The guidance as of now, we would request that counsel provide us with notice as to the subject matter he wishes to explore, and we can identify further.").

[207] *See* Memorandum for Defense Counsel, United States v. Mohammad, et al., dated 20 July 2023, *found at* AE 911 (AAA) Mr. al Baluchi's Motion for Appropriate Relief from Government Demand to Destroy Material Evidence, dated 8 August 2023, Attachment B.

[208] *See* Memorandum for MAJ Neville Dastoor from James G. Connell, III, dated 26 July 2023, *found at* AE 911 (AAA), Attachment C.

[209] Memorandum for James Connell, Learned Defense Counsel for Ali Abdul Aziz Ali, and Edwin Perry, Defense Counsel for Khallad Bin 'Attash, dated 28 July 2023, *found at* AE 911 (AAA), Attachment D.  *See Unofficial/Unauthenticated Transcript*, 26 September 2023, at 37016 *et seq.* (including Mr. Connell's description of the effect on his defense).

[210] AE 911E RULING, Mr. al Baluchi's Motion for Appropriate Relief from Government Demand to Destroy Material Evidence, dated 13 October 2023, at 6.

signed may conflict with their client's rights and interests.[211]  The Commission's additional guidance in AE 911E[212] is helpful were this same sort of request to arise in the future, but the very nature of the government's control is that next time, it is likely to come up with a new and different way to put defense counsel in another position of conflict.

The foregoing is but a snapshot of the myriad ways in which the classification framework in this case is undefined and ever-shifting.  It is not unreasonable for defense counsel to be wary of relying on representations made by the government as to what is and is not classified or covered by an extant protective order.  Time and time again the "guidance" has changed overnight to exclude previously permissible information and activities.  Without a reliable, prospective understanding of the rules, defense counsel is rendered constitutionally incapable of providing minimally adequate representation.

While such unsettled and unreliable "guidance" produces disruptive and inconvenient delays in Commission proceedings, it is intolerable defense counsel and other team members who must work in the field under threat of administrative or criminal sanctions.

### 2. The government's intentional suppression and destruction of evidence

The emerging evidence increasingly demonstrates the government's continued bad faith manipulation of evidence while delaying and resisting disclosure of clearly material information. With regard to the litigation of the LHM statements and black site outrages in particular, the evidence further shows that the government is concealing evidence of collusion among executive

---

[211] Notably, during oral argument on the motion, the Military Judge stated his intent to avoid avoid the appearances of "threats" and "chilling effect" on the defense, to which Trial Counsel [Mr. Trivett] replied:

MTC [MR. TRIVETT]: I understand.  **We should all have a chilling effect** in dealing with classified information. I don't know that that letter that we sent back is any worse than the protective order that this commission -- that I just read stated. Right? We're all under an obligation here----
MJ [Col McCALL]: Sure .
MTC [MR. TRIVETT]: and **possible prosecution occurs at all times**.

*Unofficial/Unauthenticated Transcript*, 26 September 2023, at 37058 (emphasis added).
[212] *See* AE 911E Ruling, at 7-8.

branch components to conceal, among other things, the extent of reported torture that occurred in the black sites. Despite the government's ongoing and protracted efforts to conceal evidence sought in the AE 779 series, it is clear that the FBI and other "organizations" conspired to dissuade reporting of torture by black site victims and to suppress its documentation by government actors. The concerted efforts make all the more disingenuous the government's urging for the defense to look to "the Accused" for evidence of their abuse.

In Mr. Mohammad's case the record currently shows that LHM interviewers intentionally failed to explore Mr. Mohammad's description of himself as a "Slave" and his attempts to show them the scars of his black site torture. Moreover, the record that is currently developing shows that the failure was *intentional* and pursuant to the instructions from agency superiors and legal counsel.

The readily available information was neither explored nor documented ostensibly because Mohammad "moved on" in the conversation.[213] The reality, as confirmed by discovery is that the interviewers were instructed and primed to move on and away from such subjects. Unclassified documents show that torture was to be separately and tersely documented from the LHM. Significantly, once mentioned the torture was not to be documented again unless the detainee volunteered additional comments. Thus, the LHM interviewers neither took the initiative to elicit details nor were they even to mention the number of times the unelaborated subject was broached. This meant that if Mr. Mohammad or any other detainee was preoccupied with instances of torture, its mention would receive a single, unelaborated notation. This was in direct and knowing conflict with the methodology of the black site debriefings that recognized

---

[213] *Unofficial/Unauthenticated Transcript*, 25 September 2023, at 36752 (testimony of retired Special Agent Francis Pellegrino).

**JA.402**

the value of repetitious questioning in "priming the pump" to elicit additional details with the repeated telling.

The government's conduct suggests a due process violation within the meaning of *Youngblood*,[214] that warrants the sanction of dismissal or at least suppression of statements for all purposes as required by AE 354LL.

Moreover, because the due process violation directly deprives Mr. Mohammad of evidence reflecting "richness and nuance" of his torture ordeal and its demonstrable lasting impact throughout his captivity to the present, the violation also warrants reconsideration of the Commission's ruling declining to dismiss death for hindering the penalty phase presentation.

> It has been nearly nine decades since the United States Supreme Court admonished that: From the popular hatred and abhorrence of illegal confinement, torture and extortion of confessions of violations of the 'law of the land' evolved the fundamental idea that no man's life, liberty or property be forfeited as criminal punishment for violation of that law until there had been a charge fairly made and fairly tried in a public tribunal free of prejudice, passion, excitement and tyrannical power. Thus, as assurance against ancient evils, our country, in order to preserve 'the blessings of liberty', wrote into its basic law the requirement, among others, that the forfeiture of the lives, liberties or property of people accused of crime can only follow if procedural safeguards of due process have been obeyed.
> …..
> The rack, the thumbscrew, the wheel, solitary confinement, protracted questioning and cross questioning, and other ingenious forms of entrapment of the helpless or unpopular had left their wake of mutilated bodies and shattered minds along the way to the cross, the guillotine, the stake and the hangman's noose. And they who have suffered most from secret and dictatorial proceedings have almost always been the poor, the ignorant, the numerically weak, the friendless, and the powerless.[215]
> In *Chambers*, the arrestees were not subjected to sexual abuse, waterboarding, or walling.

It was intolerable enough that for *five days* they were subjected to interrogations, culminating in an "all night examination."[216]  For five days petitioners were subjected to interrogations

---

[214] *Arizona v. Youngblood*, 488 U.S. 51, 55 (1988).

[215] *Chambers v. Florida*, 309 U.S. 227, 236–38 (1940).

[216] *Id*.

**JA.403**

culminating in Saturday's all night examination.  The Court found that the "very circumstances surrounding their confinement and their questioning without any formal charges having been brought, were such as to fill petitioners with terror and frightful misgivings."[217]

It was to avoid such fact patterns that, a quarter century later, the Supreme Court in *Miranda* mandated constitutional warnings prior to any custodial questioning.  It is sadly remarkable that at the end of the first quarter of the twenty-first century, attorneys for the United States not only argue that *Miranda* is inapplicable, but that the admitted "coercion" inflicted on Mr. Mohammad for nearly four years does not violate the guarantees of due process.

For the reasons set forth above and in AE 630 (KSM), Mr. Mohammad respectfully submits there is no colorable question that government is unable to meet its burden to permit introduction of the LHM statements, and the motion to suppress should be granted.  Subject to further development of the record as discussed in section f.2, *ante*, Mr. Mohammad respectfully reserves the right to move for dismissal of the case or preclusion of the potential punishment of death.

**4.  List of Attachments:**

   A.  Certificate of Service, dated 8 February 2024.

Respectfully submitted,

 //s//                                                          //s//
GARY D. SOWARDS                           NICHOLAS W. McCUE
Learned Counsel                                  Lt Col, U.S. Air Force
                                                            Defense Counsel


 *Counsel for Mr. Mohammad*


---

[217] *Id*. at 239.

# ATTACHMENT A

**JA.405**

<u>**CERTIFICATE OF SERVICE**</u>

I certify that on the 8th day of February 2024, I electronically filed the foregoing document with the Clerk of the Military Commissions Trial Judiciary and delivered the foregoing on all counsel of record by email.

//s//
GARY D. SOWARDS
Learned Counsel

**JA.406**

UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT

1   trial anyway.  So that's one of our -- I wanted to flag that as soon

2   as I saw it in the first opportunity I had to stand before Your Honor

3   is that that's how we envision seeing this.

4            Now, there may be certain categories of information, like

5   with the family members, and if we do do any recordings of their

6   victim impact statements, ensuring that those are within the proper

7   scope of 1001B.

8            But I think we've all seen over the last several months

9   there is renewed interest in the prosecution of these individuals

10  that may have waned a bit over the 12 years we were in pretrial

11  litigation.

12           And the prosecution is going to need more time.  We're going

13  to need more time to go out to the victim family members.  There's

14  now hundreds of people that are now interested and on the list of

15  those who our Victim/Witness Assistance Program reaches out to on a

16  daily basis for updates that we're going to now talk to and determine

17  whether or not they do want to give any victim impact testimony,

18  whether that's in a video form, whether that's in written form.

19           And that's simply going to take us past September,

20  especially if all three of the Pretrial Agreements are accepted.  We

21  have a lot of work to do.  And having it fully complete and in the

22  bag 10 months before we're going to present it I just don't think is

23  realistic, and I think it's inconsistent with what we bargained for.

UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT

**JA.407**

UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT

1          So I wanted to carve that out right now, understanding that

2    Your Honor indicated it might not be you who makes those decisions.

3    I just wanted to put our marker out right away on that.

4          MJ [Col McCALL]:  No, I think that makes sense to put on the

5    record.  And I certainly didn't mean to imply that I see issues or

6    ambiguities with the agreement.  If I saw those, I would go ahead and

7    flag them and we'd hash them out now.  I think it's actually very

8    well crafted and pretty clear on, you know, what evidence is supposed

9    to come in and what objections are being reserved.

10          It's just I know litigation and I know how complicated this

11    case is in particular.  And so I just -- again, that's why I didn't

12    ask for an answer from the parties.  I'm not putting out any type of

13    earlier deadlines right now.  But I wanted the parties to start

14    thinking we're going to need some flexibility, I imagine, just to get

15    this to trial, because even as a guilty plea it's still complicated.

16          MTC [MR. TRIVETT]:  Yes, sir.  And, you know, we envision a

17    several-month presentation with all of this evidence to establish the

18    historical record.  That was always our intention.

19          And we committed, I think, to the 90 days prior to providing

20    certain information.  We'll recommit to that.  But the 10 months, I

21    think, is just, based on where we're at and the renewed interest, is

22    going to -- that would be pushing it.

23          MJ [Col McCALL]:  Understood.

UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT

**JA.408**

UNCLASSIFIED//FOR PUBLIC RELEASE

UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT

1  teams?

2      MTC [MR. TRIVETT]:  I think we would defer to the other

3  defense teams on this issue, sir.

4      MJ [Col McCALL]:  Mr. Sowards?

5      LDC [MR. SOWARDS]:  Yes, Your Honor.  We'd take the position

6  that during the pendency of the plea hearing and up through

7  the pretrial -- I'm sorry -- presentencing hearing that Mr. Mohammad

8  is very much a part of the case that Mr. al Baluchi is part of.  And

9  we have no objection to him being privy to the sealed agreements.  We

10 think that would probably facilitate disposition globally of the

11 case.

12      MJ [Col McCALL]:  All right.  And either Mr. Ruiz or

13 Mr. Engle?  I see the discussions going on.  So let me know if you're

14 ready to state your position, either team.

15       Mr. Engle?

16      LDC [MR. ENGLE]:  If we could just have one second?

17      MJ [Col McCALL]:  Yeah.  Take your time.

18 **[Counsel conferred.]**

19      MJ [Col McCALL]:  Mr. Ruiz?

20      LDC [MR. RUIZ]:  We concur with Mr. Sowards' position.

21      MJ [Col McCALL]:  All right.

22      LDC [MR. ENGLE]:  We also don't object to Mr. al Baluchi's

23 team having access to the document.  We would ask that the

UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT

UNCLASSIFIED//FOR PUBLIC RELEASE

**JA.409**

UNCLASSIFIED//FOR PUBLIC RELEASE

UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT

1  information not be disseminated to the public, which I think is

2  consistent with the sealing order.

3      MJ [Col McCALL]:  All right.  That's fine.

4      LDC [MR. CONNELL]:  That's what I understood, Your Honor.

5      MJ [Col McCALL]:  All right.  Looks like we're all in

6  agreement.

7      LDC [MR. CONNELL]:  Thank you.

8      MJ [Col McCALL]:  All right.  If we can get Special Agent

9  Jocys in here.

10      LDC [MR. SOWARDS]:  And, Your Honor, we're discussing a matter

11  with the government, and I may need to be excused before we recess.

12      MJ [Col McCALL]:  That's fine.

13      MTC [MR. TRIVETT]:  Would you raise your right hand?

14  **SPECIAL AGENT MARIA JOCYS, civilian, was called as a witness for the**

15  **defense, was sworn, and testified as follows:**

16      MTC [MR. TRIVETT]:  Please be seated.

17      And, for the record, please state your full name, spelling

18  your last.

19      WIT:  Maria Jocys, J-O-C-Y-S.

20      MTC [MR. TRIVETT]:  Thank you.

21      MJ [Col McCALL]:  All right.  Go ahead, Ms. Ozgediz.

22                    **[END OF PAGE]**

23

UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

**JA.410**

~~TS//ORCON/NOFORN~~

UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT

1   **[The R.M.C. 806 session was called to order at 0859, 2 August 2024.]**

2        MJ [Col McCALL]:  The commission's called to order.

3            We're in a closed session this morning to take the

4    classified testimony of (Retired) Special Agent Jocys.

5            Mr. Trivett, good morning.  Could you please identify who's

6    here on behalf of the United States in the courtroom and at the RHR

7    and whether they have the requisite clearances?

8        MTC [MR. TRIVETT]:  Yes, sir.  Good morning.  Representing the

9    United States today in this closed session in Guantanamo is myself,

10   Mr. Clay Trivett; Lieutenant Commander Robert Baxter; Ms. Nicole

11   Tate.

12           Also present from the FBI is Supervisory Intelligence

13   Analyst Kimberly Waltz, Ms. Kiana Ray, Ms. Ashley Willis.

14           Also present from the Department of Defense, Ms. Kendall

15   Ferguson.

16           At the front door manning the door is Legalman First Class

17   Trevis Howard.  Manning the back door is Mr. Rudolph Gibbs.

18           All have the requisite clearances.

19           Representing the United States today in the Remote Hearing

20   Room is Major Neville Dastoor, Colonel Joshua Bearden.  Also present

21   is Staff Sergeant Samantha Resendiz and FBI OGC counsel Chris

22   Jackson.

23           All also have the requisite clearances.

                                49413
                  UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT
                        ~~TS//ORCON/NOFORN~~

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

~~TS//ORCON/NOFORN~~

UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT

```
 1        MJ [Col McCALL]:  All right.  Thank you, Mr. Trivett.

 2         Good Morning, Major Theis.

 3        DC [Maj THEIS]:  Good morning, Your Honor.  I'm Major Elspeth

 4   Theis, United States Air Force, on behalf of Mr. Mohammad.  We have

 5   no one in the Remote Hearing Room.

 6         I have the requisite clearances.  Thank you.

 7        MJ [Col McCALL]:  All right.  Thank you.

 8         Good morning, Mr. Perry.

 9        DC [MR. PERRY]:  Good morning, Your Honor.  Edwin Perry on

10   behalf of Mr. Bin'Attash, along with Captain Marian Messing.  And we

11   do not have anyone in the RHR.

12         All of the -- we have the requisite clearances.

13        MJ [Col McCALL]:  All right.  Thank you.

14         Good morning, Mr. Connell.

15        LDC [MR. CONNELL]:  Good morning, sir.  In Courtroom 2 are

16   Rita Radostitz, Defne Ozgediz, Lieutenant Jennifer Joseph, Amy

17   Zittritsch, Ali Alnuamie, and Staff Sergeant Albert Wilson.

18         In the RHR are myself, James Connell, and Derrick Adams.

19         We all have the requisite clearances.

20        MJ [Col McCALL]:  All right.  Thank you.

21         Good morning, Mr. Ruiz.

22        LDC [MR. RUIZ]:  Good morning, Judge.  I'm here on behalf of

23   Mr. al Hawsawi, with Ms. Suzanne Lachelier, Captain Kerry Mawn,
```

UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT

~~TS//ORCON/NOFORN~~

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

~~TS//ORCON/NOFORN~~

UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT

1  Captain Patrick Tipton, Mr. Sean Gleason, and Mr. Christopher

2  Bautista, all with the requisite clearances.

3       MJ [Col McCALL]:  Thank you.

4        Anything to take up before we get the witness back on the

5  witness stand?

6        Mr. Trivett?

7       MTC [MR. TRIVETT]:  We have a proposal for the way ahead for

8  next week that we have consulted with the defense counsel on.

9       MJ [Col McCALL]:  All right.

10      MTC [MR. TRIVETT]:  If I can approach the podium, sir.

11      MJ [Col McCALL]:  Sure.

12      MTC [MR. TRIVETT]:  And I'll let Mr. Ruiz speak with more

13  specificity on this, but it's our understanding now that Mr. Hawsawi

14  would like to try to enter his plea next week as well.

15      MJ [Col McCALL]:  Let me -- well, let me stop you there.  So,

16  you know, I looked at the pretrial agreements last night, and I don't

17  see doing more than one next week.  So I don't see doing

18  Mr. Bin'Attash's acceptance of his guilty plea next week.

19       I want to focus on Mr. Mohammad's.  Later this afternoon I

20  plan on putting out a request for some clarification from the

21  government and the Mohammad defense team, with a pretty tight turn of

22  getting back clarifications on Monday, so those can then be

23  incorporated into my trial guide and the provenance inquiry that I'm

49415

UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT

~~TS//ORCON/NOFORN~~

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

~~TS//ORCON/NOFORN~~

UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT

1   for the stenographers, and I'm not sure who else maybe doesn't have

2   it at their counsel table.

3   **[Pause.]**

4       MJ [Col McCALL]:  It still looks like the stenographers'

5   screen isn't up.  If the AV people can assist with that.

6   **SPECIAL AGENT MARIA JOCYS, civilian, was called as a witness for the**

7   **defense, was previously sworn, and testified as follows:**

8       MJ [Col McCALL]:  And while they're doing that, welcome back,

9   Ms. Jocys.

10      WIT:  Thank you, sir.

11      MJ [Col McCALL]:  We'll be with you in just a second as we

12  work out this technical difficulty.

13       Ms. Ozgediz, if you want to go ahead and come up to the

14  podium.

15  **[Pause.]**

16      MJ [Col McCALL]:  All right.  I think we're good to go.

17       Go ahead, Ms. Ozgediz.

18       And, Ms. Jocys, I'll just remind you you're still under

19  oath.

20      WIT:  Yes, sir.

21                    **DIRECT EXAMINATION CONTINUED**

22  **Questions by the Civilian Defense Counsel [MS. OZGEDIZ]:**

23      Q.  Good morning and welcome back.

49423

UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT

~~TS//ORCON/NOFORN~~

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

1  expected to only a couple of days after the fact.

2            In regard to the witnesses that are present, Mr. McFadden is

3  primarily a Khallad Bin'Attash witness, right?  And we will be

4  questioning some of the relevance up front of Mr. Ali's questioning,

5  at least as to the suppression for Mr. McFadden.

6            Dr. WK5I is relevant to all four of the defense teams.

7  While Mr. Ali definitely has a legitimate reason to cross-examine

8  her, at the end of the day, so do the other defense teams.

9            And so she's about to get on a plane at some point today.

10 We need to inform her to make -- you know, in whatever way Your Honor

11 says to inform her on whether she needs to come up.

12           But we've already inconvenienced these witnesses several

13 times, not to the fault of anybody, it's just how the -- it's just

14 how the litigation wound up working out.  So that was going to be our

15 position.

16           You seem pretty solid on your position on what you wanted to

17 do, but I did want to at least rise and tell you that we think that

18 that's in the best interest of the case at this point, to freeze

19 everything right now with the litigation, let us coordinate potential

20 response to these motions that we would have ready for the

21 September/October hearings, and then the commission would know which

22 path we're going to follow.

23           MJ [Col McCALL]:  All right.  Thank you, Mr. Trivett.

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

---

1          MTC [MR. TRIVETT]:  He does, sir.

2          MJ [Col McCALL]:  All right.

3           Major Theis, good morning.

4          DC [Maj THEIS]:  Good morning, Your Honor.

5           Major Elspeth Theis, observing on behalf of Mr. Mohammad.  I

6    have the requisite clearances.  There is no one in the RHR.

7          MJ [Col McCALL]:  All right.  Thank you.

8           Good morning, Captain Messing.

9          DDC [CPT MESSING]:  Good morning, Your Honor.

10           Captain Marian Messing observing on behalf of

11   Mr. Bin'Attash, not participating because we still have an intact and

12   enforceable pretrial agreement.

13          MJ [Col McCALL]:  All right.  Thank you.

14           Good morning, Mr. Connell.

15          LDC [MR. CONNELL]:  Good morning, sir.

16           James Connell, Defne Ozgediz, and Amy Zittritsch on behalf

17   of Mr. al Baluchi.  There's no one present in the RHR.

18          MJ [Col McCALL]:  All right.  Thank you.

19          ADC [MS. LACHELIER]:  Good morning, Judge.

20           Suzanne Lachelier and Mr. Sean Gleason on behalf of

21   Mr. al Hawsawi, observing.

22          MJ [Col McCALL]:  All right.  Thank you.

23          ADC [MS. LACHELIER]:  Oh, I apologize, judge.  In the RHR, we

---

**JA.416**

1       MJ [Col McCALL]:  All right.

2       MTC [MR. TRIVETT]:  All right.  And then I just wanted to flag

3   the footnote issue right now.  I'm not going to argue it, I just

4   wanted to sort of put a line in the sand on it for the government.

5          The second most important thing for the government in

6   agreeing to these Pretrial Agreements was guaranteeing that we could

7   present all of the evidence that we thought was necessary to

8   establish a historical record of the accused's involvement in what

9   happened on September 11th.

10      MJ [Col McCALL]:  Sure.

11      MTC [MR. TRIVETT]:  That was followed only by his agreement to

12  plead guilty to all of the charges on the charge sheet as written,

13  and so we were able to accomplish that in the negotiations.  And we

14  don't envision a lot of motions to preadmit or, quite frankly, a lot

15  of objections that couldn't occur from the defense before the actual

16  presentation of the evidence, right?  So they've carved out the 1001B

17  exception for information outside the scope of mitigation, as well as

18  eventually a 403-type objection, which are all contextual,

19  right?  They're all at the time when we attempt to present it whether

20  or not that's within the scope and whether at some point it becomes

21  unduly prejudicial.

22         So we believe that most of those objections that they have

23  certainly carved out in the Pretrial Agreement have to happen at

UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT

1   trial anyway.  So that's one of our -- I wanted to flag that as soon

2   as I saw it in the first opportunity I had to stand before Your Honor

3   is that that's how we envision seeing this.

4        Now, there may be certain categories of information, like

5   with the family members, and if we do do any recordings of their

6   victim impact statements, ensuring that those are within the proper

7   scope of 1001B.

8        But I think we've all seen over the last several months

9   there is renewed interest in the prosecution of these individuals

10  that may have waned a bit over the 12 years we were in pretrial

11  litigation.

12       And the prosecution is going to need more time.  We're going

13  to need more time to go out to the victim family members.  There's

14  now hundreds of people that are now interested and on the list of

15  those who our Victim/Witness Assistance Program reaches out to on a

16  daily basis for updates that we're going to now talk to and determine

17  whether or not they do want to give any victim impact testimony,

18  whether that's in a video form, whether that's in written form.

19       And that's simply going to take us past September,

20  especially if all three of the Pretrial Agreements are accepted.  We

21  have a lot of work to do.  And having it fully complete and in the

22  bag 10 months before we're going to present it I just don't think is

23  realistic, and I think it's inconsistent with what we bargained for.

UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT

UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT

1     So I wanted to carve that out right now, understanding that

2  Your Honor indicated it might not be you who makes those decisions.

3  I just wanted to put our marker out right away on that.

4     MJ [Col McCALL]:  No, I think that makes sense to put on the

5  record.  And I certainly didn't mean to imply that I see issues or

6  ambiguities with the agreement.  If I saw those, I would go ahead and

7  flag them and we'd hash them out now.  I think it's actually very

8  well crafted and pretty clear on, you know, what evidence is supposed

9  to come in and what objections are being reserved.

10     It's just I know litigation and I know how complicated this

11  case is in particular.  And so I just -- again, that's why I didn't

12  ask for an answer from the parties.  I'm not putting out any type of

13  earlier deadlines right now.  But I wanted the parties to start

14  thinking we're going to need some flexibility, I imagine, just to get

15  this to trial, because even as a guilty plea it's still complicated.

16     MTC [MR. TRIVETT]:  Yes, sir.  And, you know, we envision a

17  several-month presentation with all of this evidence to establish the

18  historical record.  That was always our intention.

19     And we committed, I think, to the 90 days prior to providing

20  certain information.  We'll recommit to that.  But the 10 months, I

21  think, is just, based on where we're at and the renewed interest, is

22  going to -- that would be pushing it.

23     MJ [Col McCALL]:  Understood.

UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT

**JA.419**

UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT

1          MTC [MR. TRIVETT]:  All right.  Thank you, sir.

2          MJ [Col McCALL]:  All right.  Mr. Sowards.

3          LDC [MR. SOWARDS]:  Just very quickly, I wanted to join with

4    Mr. Trivett's -- in his -- what he envisions is the trial that we're

5    going to be planning to put together, and particularly the emphasis

6    on the historical record.

7          And I think, as you noted, from the something like 12 pages

8    of evidence that they've outlined that they intend to put in, but

9    also that Mr. Mohammad -- and we've said this to Mr. Trivett and to

10   particularly the victim family witness coordinators, that we envision

11   giving maximum opportunity to any victim witness, individuals, family

12   members, or survivors who are interested in being heard, irrespective

13   of how they feel about Mr. Mohammad, but we think after all this

14   time, the one thing folks who want to be heard deserve is a chance to

15   be heard.

16         What I would ask -- and I know -- I mean, and I apologize in

17   advance that I'm never quite sure how the transcript preparation and

18   dissemination with the classification restrictions and all that are,

19   but I think in fairness to Mr. Mohammad and also to this commission,

20   it is extremely important that we be able to send to the D.C. Circuit

21   what Mr. Trivett just said about the scope of this public trial that

22   we are all committed to, because ----

23         And I do not blame Mr. Trivett.  I know this is something

UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT

**JA.420**

1    he's been saddled with.  But even as we speak, I'm also eyeing the

2    clock because I have to respond to a petition for writ of mandate and

3    an emergency stay by none other than the Solicitor General's Office,

4    who are telling the D.C. Circuit that what you're trying to do and

5    what we're trying to do is shut down a public trial.  And what

6    Mr. Trivett has just told us is that that's exactly the opposite of

7    what's going on.

8         So what I would request, and perhaps I can speak with the

9    staff as soon as we recess, is the opportunity to get that transcript

10   and be able to give it as proof-positive that there is no harm to the

11   public and, if anything, it goes the other way in terms of whether

12   they should interfere with what we're doing.

13        MJ [Col McCALL]:  All right.  And I'll ask as well that that

14   be expedited.  I do know that it goes through ----

15        LDC [MR. SOWARDS]:  Sure.

16        MJ [Col McCALL]:  ---- certain reviews that it just may not be

17   possible, but I agree.  I'm not going to talk on the record.

18        LDC [MR. SOWARDS]:  Sure.

19        MJ [Col McCALL]:  I am tempted to say something, but I won't.

20   So, but yeah, I understand why you would want to make -- present that

21   to the D.C. Circuit.

22        LDC [MR. SOWARDS]:  Thank you, sir.  I appreciate it.

23        MJ [Col McCALL]:  All right.  So before we recess, then, for

**JA.421**

UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT

1   the day and await to see if we can be on the record on

2   Friday -- Mr. Connell, I see that you're in the RHR.  I know

3   Mr. Groharing is not present.  At least if I could get your

4   position -- and I know the government will probably talk with

5   Mr. Groharing -- but thoughts on the idea of potentially moving up

6   the LHM suppression hearing to next Thursday?

7        LDC [MR. CONNELL]:  Sir, my hot take is that I'm afraid that I

8   don't think we'll be able to accomplish that, and that's simply

9   because we won't have the right people in the right locations in

10  Guantanamo because of travel and the lack of a Tuesday rotator now.

11  We just can't get the right people into the right places for that.

12  But we would be ready to go on Monday of week three.

13       MJ [Col McCALL]:  Sure.

14       LDC [MR. CONNELL]:  I haven't talked to the government about

15  that, but that's -- you know, over the break we were trying to figure

16  out, can we change travel and get people to the right places?  And I

17  don't think it is possible with the resources that are available to

18  us.

19       MJ [Col McCALL]:  All right.  Understood.  But that's why I

20  asked, just to find out.

21        All right.  Any other housekeeping matters to take up?

22       LDC [MR. CONNELL]:  Sir, just ----

23       MJ [Col McCALL]:  Mr. Connell.

**JA.422**

UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT

1      LDC [MR. CONNELL]:  ---- just so I know whether to keep

2  working on that question, is it we're good for week three or is that

3  question still under debate?

4      MJ [Col McCALL]:  We're good for week three for some of it.

5  At least as things stand now, I think the Nashiri commission will

6  need the RHR for potentially three days for their witnesses, which

7  would just give us two days.

8      I know, based on the government's -- I believe it was their

9  reply, or it might have been their initial motion, but that they had

10  anticipated that the oral argument would be similar to sort of a

11  closing argument.  It would be very comprehensive.  I certainly know

12  that the briefings and the amount of evidence is -- there's quite a

13  bit of it, and so I can imagine to connect all those dots to make the

14  argument it's going to be long.

15      I just -- I wasn't sure if -- I didn't want to try to hem us

16  in on two days, break for several days, and then again, we know how

17  it is down here.  A storm is going to roll in down here or at the RHR

18  or somebody is going to get sick and then we're kicking it down the

19  road farther.  So -- but right now we are good for that third week

20  for at least a few days.

21      LDC [MR. CONNELL]:  All right.  Sir, could I make a couple of

22  observations about that?

23      MJ [Col McCALL]:  Go ahead.

**JA.423**

UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT

1          LDC [MR. CONNELL]:  The first one is I wanted to say, you

2     know, in the shifting -- and obviously there have been many reasons

3     why schedules had to be flexible, as always.  One of the -- at one

4     point there was a suggestion, we kind of thought, actually, that was

5     the direction it was going, that the argument would take place week

6     four.  That's fine with us if that's something that the military

7     commission wants to do.

8          MJ [Col McCALL]:  I think week four is completely wide open.

9     I believe we might be still double booked with the Nurjaman

10    commission.  But, again, we do have time then as well.  It's just,

11    again -- I think you know me, I'm always trying to move things

12    up ----

13         LDC [MR. CONNELL]:  Sure.

14         MJ [Col McCALL]:  ---- just to get it accomplished before

15    things go sideways on us.

16         LDC [MR. CONNELL]:  Yes, sir.  And that's the last observation

17    that I wanted to make.  I very much agree with the idea that the

18    briefing, both the two supplements from us and -- the reply from us

19    and the response from the government, were very comprehensive.

20          And, in fact, in our final reply we suggested, you know, is

21    it really -- after a 250-page response from the government and that

22    much cumulatively from -- or more from the defense, is it really

23    necessary to say all this orally?

**JA.424**

UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT

1        I just put that out there as, you know, we're on record as

2   saying that there has been a comprehensive closing argument that's

3   been made by both sides.  It was just done on paper instead of

4   orally.  So I ----

5        MJ [Col McCALL]:  Sure.

6        LDC [MR. CONNELL]:  ---- I do want to be clear that we would

7   be fine with not having an oral argument because it's all been said

8   so extensively.

9        The last thing I just wanted to ----

10       MJ [Col McCALL]:  Well, and just on that point before you move

11  on but ----

12       LDC [MR. CONNELL]:  Yes.

13       MJ [Col McCALL]:  And I appreciate your flexibility on that.

14  I believe you raised that same issue or took that position at the

15  last session.  I get it.  I think the government does want to have a

16  chance to argue.

17       And even though I think the parties know I'm not the biggest

18  fan of oral argument, I do see it being useful in this situation

19  where I certainly know the facts well.  I've spent quite a bit of

20  time delving through the evidence, the testimony, the briefings, but

21  I think it could still be useful.  So I think oral argument will be

22  good, even if just to consolidate the key points and point out what

23  counsel think is the most important evidence.

UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT

1      LDC [MR. CONNELL]:  Yes, sir.  And we're certainly prepared to

2  do that.

3          The last thing that I just wanted to note, and hopefully

4  this is a 5 percent issue, but I note that in the government's

5  application for emergency stay, they asked to stay the entire case,

6  not just the -- not just the portion of it related to pleas.  And so

7  that raised the concern for me that we might be swept into that.

8      MJ [Col McCALL]:  Well, that was -- and I appreciate you

9  raising that.  As we were talking I was thinking that that was

10  another point that I had wanted to raise, that -- I know we discussed

11  this at the last session and I asked whether the parties thought it

12  was an appropriate time to sever Mr. Ali's case from the other three,

13  and the parties' position was no, not the time, that it was clear

14  that the CMCR would not stay any Ali proceedings, but I still have

15  that concern because I noticed the same thing in the pleadings that

16  it's not clear, and I really don't want to -- for all of us to get

17  stayed and then have to go to the D.C. Circuit and try to get them to

18  let us argue the LHM.

19          Mr. Trivett, does the government have a position on that?

20      MTC [MR. TRIVETT]:  Yes, sir.  We would certainly oppose

21  severance, just until the resolution.  It looks like we're close to

22  the end on resolution.  We don't know what that resolution is going

23  to be.  The Department of Justice and the Solicitor General's Office

UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT

UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT

1  were the drafters of that brief.  I'll talk to the chief prosecutor

2  and determine what it is that we are interpreting our request to be

3  just so that's clear for all of the parties.

4      MJ [Col McCALL]:  But the government's position is that the

5  Ali LHM suppression hearing should be allowed to go forward.  It has

6  nothing to do with the issues that are before the D.C. Circuit,

7  correct?

8      MTC [MR. TRIVETT]:  I don't know -- sir, I don't want to speak

9  only because we didn't write that.  So I can confirm that for you,

10  but I would like to talk to the chief prosecutor first and we'll get

11  communication back to Mr. Sims as to what that request was.

12      MJ [Col McCALL]:  How long would it take to get that

13  confirmation?

14      MTC [MR. TRIVETT]:  I can certainly get it by this afternoon,

15  sir.

16      MJ [Col McCALL]:  All right.  Let's come back on the record,

17  then, this afternoon.  1400?

18      MTC [MR. TRIVETT]:  That's fine, sir.  And I could

19  probably -- if I learn of it earlier, I can simply send it to

20  Mr. Sims.

21      MJ [Col McCALL]:  All right.  All right.

22       Anything else, Mr. Connell?

23      LDC [MR. CONNELL]:  No, thank you, sir.

**JA.427**

UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT

1        MJ [Col McCALL]:  All right.  So the commission is in recess

2    until 1400 this afternoon.

3           We'll just rely on the -- an e-mail from you.  So what we'll

4    do is we'll go ahead and recess until Friday.  And so, again, we will

5    wait to see if we get stayed, but my intention at this point is we'll

6    be on the record at 0900 Friday and see where we're at.

7        MTC [MR. TRIVETT]:  Yes, sir.  Thank you.

8        MJ [Col McCALL]:  All right.  The commission's in recess.

9    **[The R.M.C. 803 session recessed at 1036, 08 January 2025.]**

10                          **[END OF PAGE]**

**JA.428**

## MILITARY COMMISSIONS TRIAL JUDICIARY
### GUANTANAMO BAY, CUBA

| | |
|---|---|
| | **AE 467CCC** |
| **UNITED STATES OF AMERICA** | **RULING** |
| v. | **Defense Motion** to Suppress Custodial Statements Allegedly made by Mr. Al-Nashiri in January, February, and March 2007 |
| **ABD AL RAHIM HUSSAYN MUHAMMAD AL NASHIRI** | **18 August 2023** |

1. **Procedural Background**.

a. On 17 February 2022 in AE 467, the Defense moved the Commission to suppress custodial statements made by the Accused to U.S. government officials from January to March 2007 under 10 U.S.C. § 948r. The Government opposed the motion in AE 467C on 22 March 2022. The Defense replied in AE 467F on 12 April 2022.

b. The Commission held evidentiary hearings on AE 467 from July 2022 through June 2023 and heard oral argument following the presentation of evidence on 30 June 2023 at United States Naval Station Guantanamo Bay, Cuba (NSGB).

c. Additional procedural history described in the Commission's rulings at AEs 467J, 467S, and 467SS is hereby incorporated by reference.

2. **Burden of Proof.** "When an appropriate motion or objection has been made by the defense under [Military Commission Rule of Evidence (M.C.R.E.) 304], the prosecution has the burden of establishing the admissibility of the evidence" by a preponderance of the evidence. M.C.R.E. 304(d).

**JA.429**

3. **Findings of Fact.**[1]

## I. RDI Program

a.  In the aftermath of the terrorist attacks on the United States perpetrated on 11 September 2001, the Central Intelligence Agency (CIA) developed the Rendition, Detention, and Interrogation (RDI) program to gather intelligence from suspected terrorists captured during the so-called war on terror. As a part of the RDI program, the CIA developed, with the approval of the Department of Justice (DOJ), a list of "Enhanced Interrogation Techniques" (EITs) to be used during interrogations of terrorism suspects. It was assumed that the use of such techniques would assist in the gathering of useful intelligence from terrorist operatives who were otherwise trained to resist interrogation.

b.  The EITs adopted by the CIA were based on techniques employed in a training environment in U.S. military SERE[2] training. SERE training was designed to expose U.S. military personnel to the types of coercive interrogation techniques that have been employed in the past by communist adversaries such as North Korea, the Soviet Union, and China. SERE training mimics the exploitative communist model in order to equip U.S. servicemembers with the ability to resist should they be taken captive. Service members in positions with increased risk of capture are trained at SERE schools. During the training, these service members are "captured" by course cadre performing the roles of enemy captors. Captured students are subjected to examples of harsh treatment and the use of coercive interrogation techniques by the simulated enemy while being subjected to other physical and psychological pressures.

---

[1] *See* AE 467DDD for additional classified findings of fact.
[2] "SERE" stands for Survival, Evasion, Resistance, and Escape.

2

**JA.430**

c. The goal of the communist techniques was to gain the compliance of subjects, more so than to gather useful intelligence. Instead, harsh techniques were used to extract false confessions and to create propaganda through the infliction of severe mental pain or suffering. For example, waterboarding and sleep deprivation, going back to antiquity, have been used in political or religious persecutions to elicit recantations or confessions. Such techniques do not elicit reliable information.

d. In developing the RDI program, the CIA contracted with two staff psychologists from the U.S. Air Force SERE school, Doctor James Mitchell and Doctor Bruce Jessen. During their employment at the Air Force SERE school, Drs. Mitchell and Jessen were responsible for monitoring the mental health of the cadre administering the course and the servicemembers going through the course. Both Mitchell and Jessen were highly familiar with the SERE techniques as well as the techniques used by foreign adversaries. However, neither Mitchell nor Jessen were trained interrogators.

e. The CIA employed Drs. Mitchell and Jessen to implement a program of interrogation for use on high-value detainees (HVDs) in CIA custody. The objective of the program was to service CIA intelligence requirements. In so doing, the program officers sought to put detainees in a "compliance condition"[3] and to force the detainees to answer questions from debriefers. In the event a detainee in the program was not providing the type, amount, or quality of information the agency desired, EITs would be employed — or escalated — in an attempt to extract that information.

f. In the words of Dr. Mitchell (AE 467AA), the approved EITs included:[4]

_____

[3] Unofficial/Unauthenticated Transcript of the *United States v. Nashiri* Motions Hearing dated 2 May 2022 at 16852.
[4] The use of insects and mock burial were considered for use with Abu Zubaydah, but not the Accused.

3

UNCLASSIFIED // FOR PUBLIC RELEASE

CONFIDENTIAL//NOFORN

Below are the descriptions of potential physical and psychological pressures discussed in the July 8, 2002 meeting. The aim of using these techniques is to dislocate the subject's expectations concerning how he is apt to be treated and instill fear and despair. The intent is to elicit compliance by motivating him to provide the required information, while avoiding permanent physical harm or profound and pervasive personality change.

1. Attention Grasp:
In a controlled and quick motion, grasp the individual with both hands, one on each side of the collar opening. In the same motion, draw the individual toward you.

2. Walling: The individual is stood in front of a specially constructed flexible wall. The individual's heels touch the wall. The individual is pulled forward and then quickly and firmly pushed into the wall. The head and neck are supported with a rolled hood or towel that provides a c-collar effect to help prevent whiplash. Contact with the wall is made with the individual's shoulder blades. To reduce the probability of injury, the individual is allowed to rebound from the wall.

3. Facial Hold: One open palm is placed on either side of the individual's face, fingertips well away from the individual's eyes. The goal is to hold the head immobile.

4. Facial Slap (Insult Slap): The slap is delivered with fingers slightly spread. Contact should be made with the area directly between the tip of the chin and the bottom of the corresponding earlobe. The goal of the facial slap is to induce shock and surprise, not severe pain.

5. Cramped Confinement: Individuals are placed in a confined space the dimension of which restricts movement. The container is usually dark. Individuals may be kept in larger confinement spaces for up to 18 hours, and smaller confinement boxes for one hour.

6. Wall Standing: This technique is used to induce fatigue. The individual stands approximately 4 or 5 feet from a wall, with his feet spread approximately shoulder width. With arms out stretched in front, fingers resting on the wall supporting body weight. Individuals are not allowed to move or reposition their feet or hands.

7. Stress Positions: A variety of stress positions are possible. They focus on producing mild physical discomfort from prolonged muscle use, rather than pain associated with contortions or twisting of the body. The two discussed were (1) the subject sitting on the floor with legs extended straight out in front of him with his arms raised above his head; and (2) having the subject kneel on the floor and lean back at a 45 degree angle.

8. Sleep Deprivation: Preventing sleep is intended to have the effect of reducing the subject's ability to think on his feet secondary to fatigue and to motivate him to cooperate because of the discomfort associated with sleep debt. For most people, the effects of sleep deprivation remit after one or two nights of uninterrupted sleep. In rare circumstances, individuals predisposed to psychological problems may display abreactions, but these too generally remit after the individual sleeps. The record (Guinness Book of World Records) for voluntary sleep deprivation is 205 hours with the subject showing no significant psychological problems and quick recovery after one or two days of sleep.

9. Water Board: With this procedure, individuals are bound securely to an inclined bench. Initially a cloth is placed over the subject's forehead and eyes. As water is applied in a controlled manner, the cloth is slowly lowered until it also covers the mouth and nose. Once the cloth is saturated and completely covering the mouth and nose, subject would be exposed to 20 to 40

4

UNCLASSIFIED // FOR PUBLIC RELEASE

CONFIDENTIAL//NOFORN

seconds of restricted airflow. Water is applied to keep the cloth saturated. After the 20 to 40 seconds of restricted airflow, the cloth is removed and the subject is allowed to breath unimpeded.  After 3 or 4 full breaths, the procedure may be repeated. Water is usually applied from a canteen cup or small watering can with a spout.

10: Use of Diapers: The subject appears to be very fastidious.  He spend much time cleaning himself and seems to go out of his way to avoid circumstances likely to bring him in contact with potentially unclean objects or material. He is very sensitive to situations that reflect a loss of status or are potentially humiliating. One way to leverage his concerns, while helping ensure his wound doesn't become infected with human waste when in cramped confinement is to place him in an adult diaper. If soiled, care would have to be taken to keep human waste out of his leg wound.

11. Insects: The subject appears to have a fear of insects. One possibility is to threaten to place stinging insects into the cramped confinement box with him, but instead place harmless insects. The purpose of this would be to play off his fears and increase his sense of dread and motivate him to avoid the box in the future by cooperating with the interrogator's requests.

12. Mock Burial:  The individual is placed in a cramped confinement box that resembles a coffin.  The box has hidden air holes to prevent suffocation.  The individual is moved to a prepared site where he hears digging.  The site has a prepared hole, dug in such a way that the box can be lowered into the ground and shovels of dirt thrown in on top of it without blocking the air holes or actually burying the individual.  This procedure would be used as part of a threat and rescue scenario where the "burial" is interrupted and the subject is rescued by a concerned party.  The rescuers then use the subject's fear of being returned to the people trying to bury him as a means of pressuring the subject for information.

Hope this helps.

Jim Mitchell

Sent on 8 July 2002 at 04:15:15 PM

5

g.  Using a combination of classical and operant conditioning, the interrogators intended to provoke compliance in the form of an involuntary stimulus response in the detainee following their cues. According to Dr. Jessen, the goal of the program was to deprive detainees of creature comforts to cause them to consider their dilemma and wonder if maybe they could find a way out. Essentially, the interrogator's goal was to cause detainees discomfort leading to compliance.

h.  After a determination was made that a detainee was providing enough useful information to be considered compliant and cooperative, he would be transitioned into debriefing mode. This occurred either after an interrogation or after the application of EITs, depending on the detainee's responsiveness. Once a detainee was deemed compliant, debriefers would come in to question him and to service intelligence requirements. The debriefers were not authorized to use EITs.

i.  The interrogators hoped EITs would only be necessary once; however, in practice, the techniques were used on several detainees, including the Accused, multiple times. Mitchell and Jessen believed, however, that going back to EITs after a detainee demonstrated compliance would lose a significant amount of goodwill in terms of the detainee's future compliance.

j.  Mitchell and Jessen's purpose for the EITs was to impart in the detainees a belief that the detainees themselves could end or even prevent their own suffering if they would comply and answer questions from the interrogator or debriefer. For example, Mitchell explained to the Accused that the Accused could stop the waterboarding by cooperating.

k.  After the EIT phase, detainees generally had a fear of going back into the EIT phase. Jessen described their program as creating a "contract" between the interrogators and detainees, whereby the interrogators made sure the detainees understood that they would not go back into

6

**JA.434**

EITs if they continued to cooperate and provide intelligence. The interrogators wanted the detainee to realize that he had a "pathway" whereby, if he provided even a little information, he could start to find a way out of captivity. The interrogators tried to ensure the detainees understood the contract was valid and EITs would not happen unless the detainee became non-compliant again. Therefore, the threat of a return to the EIT phase continued to dangle over the heads of detainees such as the Accused like a proverbial sword of Damocles.

    i.   The first person subjected to EITs was Abu Zubaydah, a detainee who was shot in the back during his capture and nearly died from his wounds. After receiving authorization to proceed with the EITs and allowing for some physical recovery, the CIA implemented its new program, overseen by Mitchell and Jessen, with full approval of CIA Headquarters. The plan implemented on Abu Zubaydah became the template for the plan used on the Accused. Present at the site during the implementation of the EITs on Abu Zubaydah was Federal Bureau of Investigation (FBI) Special Agent (SA) Stephen Gaudin, who participated in the interrogations. Agent Gaudin would later be part of the "clean team" tasked with taking the statement of the Accused which is before the Commission in this motion.

### II. The Accused's "Sojourn through Captivity"[5]

    a.   The Accused was captured in the United Arab Emirates in mid-October 2002.[6]

    b.   The Accused was suspected by the U.S. government of being an Al Qaeda operations planner who was involved in the 1998 East Africa Embassy bombings and the attack on the USS COLE in 2000.

---

[5] Transcript dated 14 April 2023 at 23894.

[6] U.S. Senate Select Committee on Intelligence, *Committee Study of the Central Intelligence Agency's Detention and Interrogation Program*, Executive Summary at 66 (2014) (hereinafter SSCI). As stated during oral argument, the Commission takes judicial notice of the SSCI Executive Summary with the consent of the parties.

7

**JA.435**

c.   While still in foreign custody, the Accused provided information on multiple terrorist plots including the USS COLE and *MV Limburg*, as well as plans to attack oil tankers in the Strait of Hormuz and locations in Dubai and Jeddah. This information was disseminated in CIA intelligence reports prior to the Accused's transfer to U.S. custody.[7]

d.   The Accused was rendered to U.S. CIA custody at DETENTION SITE COBALT (Location 2) in November 2002. Standard operating procedures at COBALT during this period included total darkness, standing sleep deprivation, loud music, isolation, and dietary manipulation. Dr. Jessen saw paramilitary forces there and described it as "gloomy and dark,"[8] "very unpleasant,"[9] "deplorable,"[10] and "medieval."[11] It was very cold, and detainees were shackled to metal rings mounted in concrete walls. Detainees were held naked in their cells—which Dr. Mitchell described as "like a horse stall"[12]—with only a waste bucket.

e.   Detainee Gul Rahman died of exposure at COBALT after being left overnight in cold temperatures wearing only a sweatshirt and after having been doused in cold water.

f.   When the Accused arrived at COBALT, he was placed in a cell and shackled for approximately one hour before Dr. Mitchell approached him. Mitchell then asked a guard to bring the Accused into the interrogation room, which was a small room constructed out of plywood. The room contained bright halogen lights that would shine into the Accused's face. Dr. Mitchell then removed the Accused's hood and asked the Accused, "[w]hat would you like me to know about you?" Initially, the Accused was "perfectly willing" to talk about the USS COLE but

---

[7] SSCI at 73 n.373, 187.
[8] Transcript dated 13 April 2023 at 23743.
[9] *Id.* at 23702.
[10] *Id.* at 23751.
[11] *Id.* at 23742.
[12] Transcript dated 2 May 2022 at 16824.

8

**JA.436**

refused to answer questions about future operations. Mitchell told the Accused that he wanted to hear about future threats. Mitchell told the Accused that the next time the Accused talked to someone they were going to ask him questions and if he answered those questions nothing bad would happen to him. The Accused was returned to his cell and shackled to the wall.[13]

g.  The Accused was labeled as a "typical resister"[14] and Mitchell and Jessen nicknamed him "Little Shit."[15]

h.  After only a few days at COBALT, the Accused was rendered to DETENTION SITE GREEN (Location 3), accompanied by Mitchell and Jessen. At GREEN, Abu Zubaydah was already being held and subjected to EITs. Upon his arrival at GREEN, the Accused was also interrogated using EITs, beginning with less-intrusive measures. The Accused was formally subjected to EITs during four periods: December 5–8, 2002; December 27, 2002 – January 1, 2003; and January 9–10 and 15–27, 2003.[16] The Government concedes that all statements of the Accused made during this time are inadmissible under 10 U.S.C. § 948r.

i.  Use of EITs at GREEN included cramped confinement in large and small boxes. The Accused was often left naked in the boxes for hours at a time. The larger of the boxes was approximately the size of a coffin and the smaller was slightly larger than a miniature refrigerator. The temperature of the site was cold enough that the Accused could see condensation forming on the walls of the box. Mitchell and Jessen were actually under the impression that the Accused preferred going into the boxes because it provided a break from the lights, cold, and interrogators.

---

[13] *Id.* at 16823–31.
[14] Transcript dated 13 April 2023 at 23778.
[15] Transcript dated 14 April 2023 at 23895.
[16] SSCI at 67 n.338.

9

**JA.437**

j. On day one of the "aggressive interrogation phase," the Accused said he was ready to talk. Interrogators told the Accused that "they would do whatever it takes to get the information they wanted from him." *See* AE 402, Attach. C, Cable 2. The interrogators began using EITs on the Accused, including the attention grab and walling. His clothes were ripped off him by the security team. "[The Accused] whimpered that he would do anything the interrogators wanted." *Id.* Eventually interrogators warned the Accused that he would be left alone to consider the information the interrogators were seeking, and he was told that "if he refused to cooperate, he would suffer in ways he never thought possible." *Id.* Later that day, he was forcibly shaved by security staff while the Accused "moaned and wailed." He was then locked inside of the large box at 0445 hours.

k. During the second session of day one, the Accused was pulled out of the large box at 1703 hours. He was backed against the "walling panel" in his cell, a rolled-up towel was placed around his neck, and the hood was slowly removed from his head, revealing his interrogator. His interrogator stood silent for 30 seconds, then "repeated with a hiss" that the interrogators wanted complete, accurate information from him. The Accused almost immediately again confessed to his role in the attack on the USS COLE. AE 402, Attach. C, Cable 3. When he did not provide additional information the interrogators were seeking, he was walled and placed in the small box. His interrogators were left "guardedly optimistic that the aggressive procedures may already be having an impact on [the Accused's] resistance posture." *Id.*

l. So it went for the Accused. Each time the Accused was subjected to EITs, interrogators generally concluded he was "compliant and cooperative." However, CIA

10

**JA.438**

Headquarters disagreed and instructed on-site officers to continue using EITs. When the Accused did not respond to certain questions, the interrogators escalated the measures.

m.   Eventually, Mitchell and Jessen turned, with CIA Headquarters' blessing, to the waterboard to try to obtain more information from the Accused. Waterboarding was conducted by strapping the Accused onto a medical gurney which would be angled down at a 40-degree angle at the head, such that the Accused's feet would be higher than his head. The Accused would have a neck brace put around his neck to hold his head in place. The interrogators would then cover the Accused's face with a thin piece of cotton fabric, like a towel, and pour water over the cloth for anywhere from 2–40 seconds at a time, usually starting with shorter "pours" and proceeding to longer "pours." Between pours, Mitchell would lift the cloth and talk to the Accused, then put the cloth back and the pouring would re-commence. After they reached a long pour, which may have gone on for 40 seconds, the gurney would then be lifted upright so the detainee could clear his sinuses and take at least three breaths. The interrogators would then lower the gurney and begin pouring again. This process would continue for up to fifteen minutes. The waterboarding of the Accused was administered by Mitchell with the assistance of Jessen. Mitchell conceded during his testimony that it would not have surprised him if the Accused experienced the sensation of drowning during the waterboard episodes.

n.   On one of the occasions where the Accused was subjected to waterboarding, he began to slide out of the straps onto the floor because he was too small in stature for the straps to hold him on the gurney. Mitchell described the Accused during waterboarding sessions as "anxious"[17] and "struggling."[18] Jessen described waterboarding as "visually and psychologically very

---

[17] Transcript dated 2 May 2022 at 16877.
[18] *Id.* at 16876.

11

**JA.439**

uncomfortable for all of those involved."[19] In fact, Jessen described a waterboarding session of Abu Zubaydah in which some observers in the room cried while watching the procedure.

    o.  The Accused was at GREEN for approximately three weeks. That site was also dark; there was no natural light. Temperature was manipulated to leave the Accused naked in a cold cell. Loud music was played in the cells. The cells were empty except for a waste bucket. The guards dressed in all black. The Accused was subjected to sleep deprivation. There were bars on the ceiling from which to hang detainees with their arms above their heads as part of standing sleep deprivation. Detainees were also short shackled to the floor.

    p.  Interrogations at GREEN were videotaped, but these videotapes were taped over and later destroyed by the CIA in 2005[20] out of apparent fear of their discovery during legal proceedings.

    q.  Like at COBALT, at GREEN the Accused was willing to talk about past events and information, but stated he had nothing to tell interrogators or debriefers about future plots.

    r.  In December 2002, GREEN was closed, and the Accused and Abu Zubaydah were rendered to DETENTION SITE BLUE (Location 4). BLUE included bright lights, loud music, empty cells with waste buckets, nudity, and constant monitoring.

    s.  Shortly after the Accused's arrival at BLUE, officers again judged him as compliant, cooperative, engaged, and willing to answer questions. Nevertheless, CIA Headquarters believed the Accused was withholding further actionable intelligence.

---

[19] Transcript dated 13 April 2023 at 23682.
[20] SSCI, Foreword at 4.

12

**JA.440**

t.  After multiple debriefings, officers at BLUE wrote to headquarters that the Accused was providing "logical and rational" answers and that no further enhanced measures were needed. Headquarters disagreed again.

u.  CIA officer NX2, who at times was referred to as "the New Sheriff,"[21] took over the interrogation of the Accused, supervising several interrogators who used a series of unauthorized techniques. They placed the Accused in a standing stress position with his hands above his head for approximately two-and-a-half days. They put a pistol to the Accused's head and also threatened the Accused with a power drill. They slapped the Accused multiple times on the back of the head and blew cigar smoke in his face. At least one interrogator told the Accused that the Accused's mother could be brought in and sexually abused while the Accused was forced to watch.[22] The Accused was forcibly washed and scrubbed, including his buttocks and genitals, with a stiff boar brush which was then forced into the Accused's mouth. The Accused reported to Dr. Crosby, a defense expert on torture, that he was sodomized with the brush. Additionally, the Accused was also placed in "improvised" stress positions that caused cuts and bruises.

v.  One of these stress positions involved tying the Accused's elbows together behind his back with a belt and hanging him from them. On at least one occasion, the use of this stress position caused Mitchell to intervene because he believed the Accused's shoulders might become dislocated. Mitchell also witnessed NX2 put a broomstick behind the Accused's knees, force him to kneel, and then lean back, causing him extreme pain. He also saw people lean the Accused's head against the wall and then lean their own bodies on him, putting all the weight onto the

---

[21] Transcript dated 12 April 2023 at 23429.
[22] SSCI at 70.

13

Accused's neck. According to Mitchell, NX2 was using some of these unapproved measures not for operational reasons but because the Accused refused to call NX2 "sir."[23]

w. During the use of the unapproved stress positions, Mitchell thought the CIA officers were going to hurt the Accused unnecessarily, which surprised him because the Accused was cooperating and providing useful answers. Mitchell testified that the Accused "looked like he was in pain . . . was hollering. He looked uncomfortable . . . he was in distress, that's for sure, and he was in pain."[24] Mitchell claims he unsuccessfully tried to intervene to prevent the use of unauthorized techniques against the Accused.

x. While at BLUE, the Accused was put in a debriefing phase where he was debriefed by a female analyst. Mitchell sat in on the debriefing and encouraged the Accused to cooperate, reminding the Accused that they wanted to avoid any more "hard times"[25] if he failed to cooperate.

y. Formal guidelines were promulgated in January 2003 following the death of Gul Rahman and the use of a gun and a drill to threaten the Accused.[26]

z. Also in January 2003, Jessen arrived at BLUE to conduct a psychological assessment of the Accused for continued use of EITs. Following the assessment, Jessen developed an interrogation plan which authorized the full range of measures. According to the interrogation plan, once the interrogators had eliminated the Accused's "sense of control and predictability"

[23] Transcript dated 2 May 2022 at 16662.
[24] Id. at 16663.
[25] Transcript dated 3 May 2022 at 16951.
[26] SSCI at 62.

14

**JA.442**

and established a "desired level of helplessness," they would reduce the use of EITs and return to debriefing mode.[27]

aa. CIA Headquarters approved the plan to reinstitute EITs with the Accused, beginning with shaving him, cutting off his clothes, and placing him in standing sleep deprivation[28] with his arms affixed over his head. Cables describe the Accused during subsequent interrogations as nude, standing, handcuffed, and shackled.[29]

bb. After what the Accused experienced at BLUE at the hands of NX2 and his subordinates, Jessen described the Accused as angry and more unwilling to engage in dialogue. Jessen's presence and work with the Accused ultimately convinced the Accused to go down the road of cooperation again and continue fulfilling the terms of the contract between him and his debriefers.

cc. Locations 3, 4, and 5 had bright lights, empty cells with only waste cans, shackling, stress positions, loud music, and solitary confinement. Location 5 had foreign guards and no physical pressures were used.

dd. Location 6 was a black site located at Echo II on NSGB, where the Accused was held from approximately late 2003 until early 2004. Evidence demonstrates that some detainees had access to fresh air, sunlight, socialization, and outdoor recreation for the first time at Location 6. However, it is unclear whether this was actually the case for the Accused.

---

[27] *Id.* at 71.

[28] Sleep deprivation—keeping the person awake—is used "to impact their will to continue to withhold information." Interrogators also used sleep interruption, whereby they allowed the detainee to sleep, but only for very short periods of time.

[29] *Id.* at 72.

**JA.443**

ee. Jessen conducted a "maintenance visit" with the Accused at Location 6 after an incident when the Accused made a mess in his cell and refused to clean it up. As a ploy to get the Accused to clean up the mess, Jessen had Abu Zubaydah brought to the Accused's cell and ordered him to clean up the Accused's mess. This was done to manipulate the Accused into cleaning up the mess. Because the Accused apparently felt guilty about Abu Zubaydah being forced to clean up the mess, the Accused cleaned it up himself.

ff. The purpose of maintenance visits was to remind detainees to be compliant and to provide information to debriefers when requested. Maintenance visits served as a reminder to the Accused that a failure to cooperate would breach the contract and result in the possibility of returning to the "hard times," reimplementation of the EITs. Mitchell and Jessen believed their presence alone, given they had participated in the implementation of the EITs themselves, was enough to encourage compliance. They would also monitor debriefings, sometimes coming in and out of the room. Essentially, maintenance visits were intended to extend the impact of the physical duress applied to the Accused.

gg. The Accused and other HVDs were moved out of NSGB in anticipation of the U.S. Supreme Court's potential ruling related to detainees in *Rasul v. Bush*, 542 U.S. 466 (2004).

hh. Over the years, the Accused alleged that the CIA drugged his food and complained of pain and insomnia. He occasionally undertook hunger strikes, in his words, to protest being treated like an animal. At Location 6, the CIA responded to a hunger strike by "force feeding" him rectally.[30] As described in the context of his rectal feeding, "Ensure was infused into al-Nashiri 'in a forward-facing position (Trendlenberg) with head lower than torso.'"[31] Since the

---

[30] SSCI at 100 n.584.

[31] Unlubricated rectal examinations were part of the rendition intake process.

16

early twentieth century, medical knowledge has concluded that there is no medical reason to conduct so-called "rectal feeding." Although *fluids* can be absorbed through the rectum in emergencies, food or nutrition cannot.

    ii.  After leaving NSGB in mid-2004, the Accused was rendered to DETENTION SITE BLACK (Location 7). Conditions at BLACK included solitary confinement, constant light, sleep deprivation, attention grasp, and facial hold. Detainees could earn "amenities" and had access to showers for the first time in the program, being allowed to shower once a week.

    jj.  An October 2004 psychological assessment of the Accused was used by the CIA to discuss reaching an "endgame" for the program.[32] In June 2005, the Chief of Base at DETENTION SITE BLACK suspended debriefings of the Accused because it was rare for the Accused to recognize any photographs being shown to him and the repeat debriefings often caused outbursts.[33] In July 2005, the CIA was concerned that the Accused was depressed, uncooperative, and on the "verge of a breakdown."[34]

    kk.  In late 2005 the Accused was then rendered to DETENTION SITE VIOLET (Location 8), which also included solitary confinement and bright lights. There were no EITs, as Mitchell and Jessen concluded physical pressures were no longer necessary because the contract could be maintained with emotional and psychological coercion.

    ll.  Next, in mid-2006, the Accused was rendered to DETENTION SITE ORANGE (Location 9). ORANGE was an open compound, but detainees were still held in solitary confinement. Detainees had access to a library and food choices. This is where Jessen conducted

---

[32] SSCI at 114.
[33] *Id.* at 73 n.372.
[34] *Id.* at 114.

17

**JA.445**

his last maintenance visit with the Accused sometime in 2006, the same year the Accused was transferred for the last time to Guantanamo Bay.

mm. Locations 7, 8, and 9 were an improvement compared to 3, 4, and 5. Though the detainees remained in solitary confinement with constant bright lights, they got bunks in Location 7 and a real toilet in Location 9.

nn. Over the course of the Accused's time in the RDI program, the CIA disseminated 145 intelligence reports based on his debriefings. He provided information on past plots, associates, and Al Qaeda's structure and methods.[35]

oo. The Accused was transferred to NSGB on 5 September 2006. During this time, CIA officials diagnosed the Accused with anxiety and major depressive disorder.

pp. During the entirety of his time in the black sites, the Accused had no contact with anyone that was not either an employee or agent of the United States or another detainee. The Accused never knew where he was and was essentially held in solitary confinement for the better part of four years.

qq. Between 2002 and 2006 in the RDI program, the Commission finds that the Accused was subjected by the CIA to physical coercion and abuse amounting to torture as well as living conditions which constituted cruel, inhuman, and degrading treatment.

### III. Transfer to NSGB and the Accused's 2007 Statements

a. In October 2006, after being transferred to NSGB, 14 HVDs including the Accused were allowed to meet with the International Committee of the Red Cross (ICRC). They all provided similar detailed accounts of the RDI program.[56] This was the Accused's first contact

---

[35] *Id.* at 73. *See also* AE 467F at 23 (stating the Accused was interrogated over 200 times).
[36] SSCI at 160.

18

Appellate Exhibit 467CCC (Al-Nashiri)
Page 18 of 50

**JA.446**

with a person who was not an agent or employee of the United States since he was turned over to
CIA custody in 2002.

b.  During the intervening period between September 2006 to March 2007, confinement
conditions at NSGB improved slightly. For example, the Accused was permitted joint outdoor
recreation time where he could communicate with one other detainee.[37]

c.  At least fifteen forced cell extractions (FCEs) of the Accused were conducted
between November 2006 to March 2007. *See* AE 467ZZ. Not unlike how the contract operated
in the RDI program, the guard force responded with the overwhelming physical force of FCEs to
assert control over him when the Accused was non-compliant or misbehaved in some way.

### IV. Law Enforcement Interview

a.  FBI SA Steve Gaudin, Naval Criminal Investigative Service SA Robert McFadden,
and Air Force Office of Special Investigations SA Kristen (Sendlein) Lange interviewed the
Accused at Echo II, NSGB, from 31 January to 2 February 2007. During this time, an HVD
prosecution task force was operating at NSGB with the goal of obtaining evidence for
prosecution. Multiple detainees were being interviewed by various agencies during this time.

b.  The interview team had a DOJ attorney assigned to their team. The attorney
monitored the interview and consulted with the agents on breaks.

c.  The agents reviewed intelligence products prior to the interviews in order to be able
to demonstrate to detainees that the agents knew a lot about them. Federal agents from various
organizations in the HVD prosecution task force had access to electronic systems containing
intelligence products. Although some of those products included prior statements of the Accused

---

[37] *See* AE 467DDD for additional classified relevant facts.

19

and other detainees from the RDI program, many of the reports were not attributable to specific sources.

    d.  The room where the Accused was interviewed was a holding cell adjacent to an interview area with outdoor plastic furniture. The law enforcement agents were escorted to the interview by military members whose uniforms bore no identifying insignia. There is no evidence in the record that the Accused was given a choice about whether or not he would initially meet with the agents.

    e.  Inside the interview room, the Accused was shackled to the floor, but his hands were free. The Accused, however, appeared clean, healthy, and alert.

    f.  The agents began the interview by identifying themselves by name and agency. Gaudin was the lead, but because McFadden had so much experience in the USS COLE investigation, he was co-lead on questioning. Gaudin and McFadden both were proficient in Arabic. Gaudin took notes. Sendlein also asked some questions. FBI linguist John Elkaliouby acted as the interpreter for the interview.

    g.  At the start of the interview, the agents proceeded to go through a six-point admonishment form drafted specifically by the DOJ for the Accused. AE 518. The agents were instructed to verbally go through the form with the Accused but not to place it on the table or show it to the Accused.

    h.  The agents were instructed not to read *Miranda*[38] rights to the detainees they interviewed at NSGB, which Gaudin described as "not normal."[39] However, the agents were instructed to obtain a statement that could be used in a criminal or law enforcement prosecution

---

[38] *Miranda v. Arizona*, 384 U.S. 436 (1966).
[39] Transcript dated 12 August 2022 at 19335.

20

**JA.448**

in a military court.[40] The Commission concludes that the agents were instructed not to give traditional *Miranda* warnings in order to increase the likelihood of obtaining incriminating information from detainees who were being considered for possible criminal charges and trial.

    i.  First, the agents stated they did not work for and were independent from any organization that previously held the Accused.

    j.  Second, they told the Accused he was in the legal custody of the Department of Defense (DOD) and he would not return to his previous captors. However, unbeknownst to the agents, after the 14 HVDs including the Accused arrived at NSGB in September 2006, they were held separately from other detainees and "remained under the operational control of the CIA."[41]

    k.  Third, they told the Accused that he was not required to speak with them and that his being in the custody of the DOD was not conditional upon agreeing to speak with them. They explained to him that his speaking with the interviewing agents was voluntary and that the agents were at his pleasure as to if they would speak at all, when they would speak, as well as what they would speak about. They told the Accused they were aware he may have made prior statements but that they were "not interested" in the previous questioning or his previous answers. The agents also told the Accused that any statements he made could be used in court.

---

[40] *See* AE 496 at 9, "If the detainee asks whether any prior statements can be used against the detainee at a criminal proceeding, the agent should tell the detainee that decision will be made by the court if he is charged with a crime . . . Allegations of misconduct will not be included in this LHM." *See id.* at 17, referencing "FBI policy that *Miranda* warnings generally need not be given prior to interviews of [Department of Defense] detainees held at [NSGB]."

[41] SSCI at 160.

21

**JA.449**

l. Fourth, the agents advised the Accused that the room where the interview was taking place may have been familiar[42] to him from his time in the custody of a different organization but that, even so, he was in DOD custody now.

m. Fifth, the agents asked the Accused if he was willing to answer questions. The Accused agreed to do so.

n. Lastly, the agents instructed the Accused, regarding any documents or photographs shown to him, that the agents did not care what he may have said in the past and they were only interested in his current answers.

o. The Accused acknowledged each point on the form as it was read, and Gaudin placed a checkmark next to each item on the form.

p. The agents were instructed, in the event that the Accused were to ask for an attorney, to tell him he was not entitled to one.

q. The agents did not tell the Accused that prior statements he made while in CIA custody and while being abused by the CIA interrogators could not be used against him in court.

r. The agents were instructed to include any allegations of mistreatment by detainees in a separate document recorded on a separate computer.[43]

s. During the interview, the Accused did state that he had been tortured and specifically mentioned waterboarding. He stated he had been hung from the ceiling for long periods of time, left naked to soil himself, and was submerged in water to the point he felt like he was drowning.

---

[42] The Accused was previously held in Echo II when it was a black site in 2003–2004. The FBI interview in 2007 actually occurred in the same complex—and perhaps even the same cell—where the Accused was subjected to abuses such as "rectal feeding."

[43] *See* AE 467, Attach. B; AE 467M.

22

**JA.450**

t.   The agents and the Accused shared tea and pastries during the interviews, and the Accused was permitted to and did take breaks at his discretion. The interviews lasted approximately three to six hours per day, including breaks. The atmosphere during the interviews was cordial and friendly. The Accused generally appeared to be in good spirits during the interview.

u.   Throughout the interview process, the agents continued to remind the Accused after breaks that he did not have to speak with them. The Accused was generally informed that he was "in charge" or "the boss"[44] of the interview and that he could choose what they spoke about.

v.   None of the interviews of the Accused were recorded via audio or visual means. Additionally, no transcript was made of the interview. The only recording of what happened during the interviews is the Letterhead Memorandum (LHM) prepared by the agents, summarizing what the Accused said during the interviews, as well as individual agents' notes.

w.   During the three days of interviews, the Accused directly incriminated himself, providing extensive details regarding his direct role in the conspiracy that culminated in the attack on the USS COLE.

x.   At the end of the third day of interviews, the Accused told the agents that he did not want to continue the interviews as he had nothing more to say.

### V. Combatant Status Review Tribunal

a.   The Accused's Combatant Status Review Tribunal (CSRT) took place on 14 March 2007 on Camp Delta, NSGB. The CSRT was a fact-finding proceeding held so that tribunal members could determine whether a detainee should be classified as an enemy combatant.

---

[44] Transcript dated 11 August 2022 at 18998, 19074.

23

**JA.451**

b.  The Accused was assigned a personal representative to assist him during the proceeding. The personal representative was not an attorney.

c.  The hearing took place in a prefabricated trailer with tables and chairs. Present in the room were the presiding officer, two other voting members of the tribunal, a recorder, and a court reporter. The Accused was then brought into the room with his personal representative and a translator.

d.  The Accused was advised of the following rights: the right to be present; the right to not be compelled to testify; the right to testify voluntarily either under oath or in an unsworn statement; the right to have a personal representative; the right to present evidence, including witnesses; the right to question witnesses; and the right to examine unclassified evidence.
AE 467C, Attach. M.

e.  The hearing was recorded, and a verbatim transcript of the proceeding was created.
AE 467C, Attach. M, N.

f.  The Accused appeared calm and alert at the CSRT. He was shackled, but his hands were free.

g.  The presiding officer was a judge in both his civilian and military capacities.

h.  During the open portion of the CSRT, the recorder read a summary of allegations of fact related to the Accused's suspected involvement in the attack on the USS COLE.

i.  After the allegations were read by the recorder, the Accused was offered an opportunity to make a statement. The Accused opted to have his personal representative read a prepared statement on his behalf. The Accused was offered the opportunity to take an oath to tell

24

**JA.452**

the truth, but he was advised that he was not required to do so. The Accused opted to take the Muslim oath prior to the presentation of his statement.

j.   The Accused's personal representative then read the Accused's prepared statement. It began by asserting that the Accused was "tortured into confession and once he made a confession his captors were happy and they stopped torturing him." In the statement, the Accused also asserted that he "made up stories during the torture in order to get it to stop." AE 467C, Attach. M. Thereafter, the statement responded to the individual factual allegations previously read by the recorder. As a part of the statement, the Accused denied any involvement in the USS COLE bombing. While the Accused admitted that he knew people who were involved in the USS COLE bombing, he insisted that he only had a business relationship with them and did not know what they were planning to do.

k.   Following his statement, the president of the CSRT asked the Accused about his allegations of torture. The Accused described some of the abuse he endured. After that discussion, the president asked the Accused if he was under any pressure or duress at the CSRT proceeding. The Accused answered "no, not today." *Id.*

l.   The president and other panel members proceeded to ask the Accused questions about his statement, including about the allegations that the Accused participated in the attack on the USS COLE. During the questioning the Accused admitted meeting Usama Bin Laden on many occasions, but he generally denied involvement in the conspiracy that led to the attack on the USS COLE.

m.   The open portion of the CSRT lasted for about two hours, including breaks.

25

**JA.453**

n. A subsequent, closed, classified portion of the CSRT occurred outside the presence of the Accused and his personal representative in which the Government presented further alleged evidence against the Accused without any opportunity for rebuttal.

## VI. Effects of Trauma

a. The Accused was diagnosed with Post-Traumatic Stress Disorder (PTSD) by a Rule for Military Commissions (R.M.C.) 706 sanity board in 2013,[45] as well as by defense expert Dr. Sandra Crosby in 2014.[46]

b. The Commission finds that the Accused's PTSD is likely related, at least in part, to the abuse he experienced in the RDI program.[47] There is no evidence of the Accused having ever received any treatment specifically for PTSD.[48]

c. Significant physical and psychological effects of torture can last for ten years or more.

d. If a captive faces a choice between compliance and "extreme pain or suffering, then that's not a real choice."[49] A subsequent interviewer cannot know whether the results of their interview are the product of their current questioning or prior coercion.[50]

## 4. Law & Analysis.

a. "No statement obtained by the use of torture or by cruel, inhuman, or degrading treatment [] whether or not under color of law, shall be admissible in a military commission . . . ." 10 U.S.C. § 948r(a); *see* M.C.R.E. 304(a)(1). M.C.R.E. 304(a)(2) provides:

---

[45] AE 467C, Attach. R.

[46] Dr. Crosby has previously been recognized by the Commission as an expert in the diagnosis and treatment of torture victims, as well as on the appropriate standard of medical care.

[47] *See* AE 467DDD.

[48] *See generally* AE 467WW, para. 49.

[49] Transcript dated 20 April 2023 at 24476 (testimony of Government Expert Dr. Welner).

[50] Transcript dated 16 June 2023 at 25433−34 (testimony of Defense Expert Kleinman).

26

**JA.454**

A statement of the accused may be admitted in evidence in a military commission only if the military judge finds—(A) that the totality of the circumstances renders the statement reliable and possessing sufficient probative value; and (B) that—(i) the statement was made incident to lawful conduct during military operations at the point of capture or during closely related active combat engagement, and the interests of justice would best be served by admission of the statement into evidence; or (ii) the statement was voluntarily given.

b. M.C.R.E. 304(a)(5)(A) addresses the admissibility of evidence derived from

statements obtained by torture or cruel, inhuman, or degrading treatment. It states:

Evidence derived from a statement that would be excluded under section (a)(1) of this rule may not be received in evidence against an accused who made the statement if the accused makes a timely motion to suppress or an objection, unless the military judge determines by a preponderance of the evidence that—(i) the evidence would have been obtained even if the statement had not been made; or (ii) use of such evidence would otherwise be consistent with the interests of justice.

*see also* M.C.R.E. 304(a)(5)(B); AE 335N at 8–16.

c. "A coerced confession is offensive to basic standards of justice, not because the

victim has a legal grievance against the police, but because declarations procured by torture are

not premises from which a civilized forum will infer guilt." *Lyons v. Oklahoma*, 322 U.S. 596,

605 (1944). Some interrogations can be "so inherently coercive that [their] very existence is

irreconcilable with the possession of mental freedom by a lone suspect against whom [the

government's] full coercive force is brought to bear." *Ashcraft v. Tennessee*, 322 U.S. 143, 154

(1944). "The Court's role when faced with an allegedly coerced confession is to 'enforce[] the

strongly felt attitude of our society that important human values are sacrificed where an agency

of the government, in the course of securing a conviction, wrings a confession out of an accused

against his will.'" *United States v. Karake*, 443 F.Supp.2d 8, 89 (D.D.C. 2006) (citing

*Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973).

27

**JA.455**

d. The Supreme Court recognized almost 90 years ago that statements obtained from an

accused through torture or physical coercion should not be admitted at trial. In *Brown v.*

*Mississippi*, 297 U.S. 278, 280 (1936), the Supreme Court held that it was error for the trial court

to receive into evidence statements coerced from the defendants by torture. In that case, the

defendants were mercilessly whipped by a mob that included a deputy sheriff until their backs

were "cut to pieces with a leather strap with buckles on it." *Id.* at 282. The Court went on to

further describe the defendants' ordeal as follows:

> [T]hey were likewise made by the said deputy definitely to understand that the
> whipping would be continued unless and until they confessed, and not only
> confessed, but confessed in every matter of detail as demanded by those present . . .
> When the confessions had been obtained in the exact form and contents as desired
> by the mob, they left with the parting admonition and warning that, if the defendants
> changed their story at any time in any respect from that last stated, the perpetrators
> of the outrage would administer the same or equally effective treatment.
>
> Further details of the brutal treatment to which these helpless prisoners were
> subjected need not be pursued. It is sufficient to say that in pertinent respects the
> transcript reads more like pages torn from some medieval account than a record
> made within the confines of a modern civilization which aspires to an enlightened
> constitutional government.

*Id.* The next day, two officials came "to hear the free and voluntary confession of these miserable

and abject defendants. The sheriff of the county of the crime admitted that he had heard of the

whipping, but averred that he had no personal knowledge of it." *Id.* at 283. "Nevertheless the

solemn farce of hearing the free and voluntary confessions was gone through with, and . . . used

in court to establish the so-called confessions." *Id.*[51]

---

[51] *See also Brooks v. Florida*, 389 U.S. 413 (1967), in which the Supreme Court reversed a conviction based upon a confession given by an inmate almost immediately after having been held for two weeks in a small punishment cell with no windows, no bed, little food, and with only a hole in the floor to use as a commode. The Court noted that for "two full weeks he saw not one friendly face from outside the prison, but was completely under the control and domination of his jailers." *Id.* at 414. The Court commented that "the record in this case documents a shocking display of barbarism which should not escape the remedial action of this Court." *Id.* at 415.

28

**JA.456**

e.  The Government concedes here that "the military commission should assume that
statements petitioner made while he was in U.S. -- while he was in CIA custody should be
treated as statements -- quote, statements obtained by the use of torture or by cruel, inhuman, or
degrading treatment under 10 U.S.C. Section 948r(a), which provides that such statements are
not admissible in a military commission."[52] The Government has not sought to introduce those
statements at the Accused's military commission. However, the Government argues that the
statements made by the Accused in early 2007 to law enforcement agents and to the CSRT
should be admissible at trial because they were not obtained through torture or coercion and
because the circumstances surrounding the making of those statements are sufficiently attenuated
from the taint of the abuses inflicted upon the Accused between 2002–2006.

f.  The significant distinction between *Brown* and this case is the four-year gap between
the worst of the abuses suffered by the Accused and the interviews and proceedings that led to
the statements being offered by the Government.[53] The Government's position begs the question
of whether, if the *Brown* defendants had continued to be held in jail for four years, without
access to an attorney or anyone other than members of the sheriff's department, while
periodically being paid "maintenance visits" by the mob that tortured them to remind them that
they better continue answering questions or risk a return to the "hard times," similar confessions
made to a different sheriff's deputy, with minimal rights advisement, would be sufficiently
attenuated from the torture. Having found that the Accused made incriminating statements to
CIA interrogators while being subjected to torture and cruel, inhuman, or degrading treatment,

---

[52] Transcript dated 30 June 2023 at 26684.
[53] This is not to say that all of the Accused's abuse ceased in 2003. The Accused continued to be subjected to
confinement conditions and treatment that qualify as inhuman and degrading up until 2006, long after the use of
EITs was terminated.

29

this Commission must address how long the taint of that torture and abuse lasts and under which circumstances it may be considered attenuated.

g. In *Lyons*, 322 U.S. 596, the Supreme Court addressed a case where the defendant had given an initial confession under physically coercive circumstances. Then, eleven days later, he gave another confession. In assessing the admissibility of the second confession, the Court observed, "the voluntary or involuntary character of a confession is determined by a conclusion as to whether the accused, at the time he confesses, is in possession of 'mental freedom' to confess or to deny a suspected participation in a crime." *Id.* at 602 (citing *Ashcraft*, 322 U.S. at 154). The Court also explained:

> The Fourteenth Amendment does not protect one who has admitted his guilt because of forbidden inducements against the use at trial of his subsequent confessions under all possible circumstances. The admissibility of the later confession depends upon the same test -- is it voluntary. Of course the fact that the earlier statement was obtained from the prisoner by coercion is to be considered in appraising the character of the later confession. The effect of earlier abuse may be so clear as to forbid any other inference than that it dominated the mind of the accused to such an extent that the later confession is involuntary.

*Id.* at 603.

h. In *Oregon v. Elstad*, 470 U.S. 298, 307 (1985), the Supreme Court again addressed the question of whether a second confession given by an accused was admissible at trial. However, in that case, the first confession was not the product of physical coercion. In eliciting the first confession, law enforcement officers did not inform the accused of his *Miranda* rights. The Court concluded that a prior unwarned confession that was voluntarily given did not preclude the admissibility of a subsequent voluntary confession given after a proper rights advisement. The Court cited its own ruling in *United States v. Bayer*, 331 U.S. 532, 540–541 (1947), for the proposition that "this Court has never gone so far as to hold that making a

30

**JA.458**

confession under circumstances which preclude its use, perpetually disables the confessor from making a usable one after those conditions have been removed." *Elstad*, 470 U.S. at 311.

    i.  Distinct from the instant case, *Elstad* did not deal with a situation where the initial confession was the product of coercion. Instead, the Court recognized the crucial difference between an unwarned statement and a coerced statement. The Court noted, "[w]hen a prior statement is actually coerced, the time that passes between confessions, the change in place of interrogations, and the change in identity of the interrogators all bear on whether that coercion has carried over into the second confession." *Id.* at 310. Ultimately the Court held that, "absent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion." *Id.* at 314. A subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admissibility of the earlier statement. In so holding, however, the Court acknowledged that a second confession could be considered the fruit of a previous confession that was obtained by improper means. *Id.* at 308.

    j.  The Court of Appeals for the Armed Forces has held that, "[w]here a confession is obtained at a lawful interrogation that comes after an earlier interrogation in which a confession was obtained due to *actual* coercion, duress, or inducement, the subsequent confession is presumptively tainted as a product of the earlier one." *United States v. Cuento*, 60 M.J. 106, 108–09 (C.A.A.F. 2004) (quoting *United States v. Phillips*, 32 M.J. 76, 79 (C.M.A. 1991) (emphasis in original)). If the first statement was unwarned, the absence of a "cleansing

31

warning"[54] before a subsequent statement is a factor to be considered in determining

voluntariness. *Cuento*, 60 M.J. at 109. However, the absence of a cleansing warning has

generally not been fatal to a finding that a subsequent confession was given voluntarily. *See, e.g.*,

*United States v. Brisbone*, 63 M.J. 106, 114 (C.A.A.F. 2006); *United States v. Lewis*, 78 M.J. 447

(C.A.A.F. 2019).

      k.   Mirroring the Supreme Court's holding in *Elstad*, M.C.R.E. 304(u)(4) provides:

> [i]n determining whether a statement was voluntarily given, the military judge
> shall consider the totality of the circumstances, including, as appropriate, the
> following: (A) the details of the taking of the statement, accounting for the
> circumstances of the conduct of military and intelligence operations during
> hostilities; (B) the characteristics of the accused, such as military rank, age,
> and education level; and (C) the lapse of time, change of place, or change in
> identity of the questioners between the statement sought to be admitted and any
> prior questioning of the accused.

This multi-factor inquiry addresses whether there has been a sufficient break in the stream of

events separating the coercion from the statement. *Clewis v. State of Texas*, 386 U.S. 707, 710

(1967).[55] "[L]ess traditional forms of coercion, including psychological torture, as well as the

conditions of confinement have been considered by courts in their assessment of the

voluntariness of the statements." *Karake*, 443 F.Supp.2d at 51 (citing *Brooks*, 389 U.S. at

313–15). "The critical question with respect to attenuation is not the length of time between a

previously coerced confession and the present confession, it is the length of time between the

---

[54] A "cleansing warning" serves to advise a suspect that statements they previously made cannot be used against
them in court.

[55] The test has already been applied in the context of Guantanamo Bay litigation. *See Al Rabiah v. United States*, 658
F.Supp.2d 11, 36–37 (D.D.C. 2009) (approximately two years was not long enough to dissipate coercion); *see also
Anam v. Obama*, 696 F.Supp.2d 1, 7 (D.D.C. 2010) ("The Court is particularly concerned that the interrogators at
Guantanamo relied on, or had access to, Petitioner's coerced confessions from Afghanistan.").

**JA.460**

removal of the coercive circumstances and the present confession." *Id.* at 89 (citing *Lyons*, 322 U.S. at 597).

l.    Consideration of the details of the taking of the January–February 2007 statements includes not only the specific manner in which the agents conducted the interviews in 2007, but also the totality of the circumstances surrounding the Accused's detention beginning in 2002. The Government bears the burden of producing sufficient evidence that the coercive circumstances of the Accused's confinement by the CIA from 2002 to September 2006, including the extreme abuse inflicted upon the Accused in 2002 and 2003, his continuous interrogation, continued isolation, detention, and psychological abuse, were attenuated over the course of the few short months between September 2006 to January 2007 when the law enforcement interviews were conducted. During the litigation of the motion, the Government offered no significant evidence to demonstrate that the coercive circumstances which began in October 2002 changed in any significant way through late 2006, when he was finally ostensibly turned over to the DOD.

m.    The Government concedes the Accused was tortured by the CIA. As part of the psychology-based EIT program, the Accused was conditioned through torture and other inhumane and coercive methods by trained psychologists — who also participated in the torture — to become compliant during interrogations and debriefings. This conditioning was continued through repeated maintenance visits to ensure the Accused remained compliant. Therefore, although the EITs may have ceased in 2003, the Accused was subjected to constant reminders by his original tormentors of the unwritten contract, and the fact that a failure to cooperate with debriefers upon demand could lead to a return to the "hard times." Unsurprisingly, the Accused

33

**JA.461**

continued to make statements while in CIA custody from late 2002 until September 2006. These statements, made during the course of scores[36] of interrogations and debriefings over four years, were not merely unwarned, but instead were actually coerced, with the constant looming threat of "hard times" to come if the Accused failed to live up to his end of the "contract." As in *Karake*, "here, the coercion was a product of both discrete beatings, as well as the general conditions of confinement." *See* 443 F.Supp.2d at 89. The Government has failed to establish that there was any meaningful relief from those conditions prior to the FBI interview.

n. Having found that the Accused was subjected to torture and other physical and mental abuse which created the coercive conditions in which he gave numerous incriminating statements to the CIA over four years, any subsequent statements made by the Accused are presumptively tainted by the prior statements obtained by torture. It is for the Government to prove that the statements at issue in the instant motion are sufficiently attenuated from that taint.

o. Following four years of essentially solitary confinement[57] in a series of CIA-controlled black sites—including the very location where the LHM statement was taken— the Accused was "transferred" to DOD custody in September 2006.[58] The LHM was taken four months later. Four months is a considerable amount of time; however, it is a small fraction of time compared to the years the Accused spent held incommunicado in inhumane and degrading living conditions. Surely, the Supreme Court that described the conditions in *Brooks* as

---

[36] *See supra* note 20.

[57] *See, e.g., In re Medley*, 134 U.S. 160, 167–69 (1890) ("solitary confinement bears 'a further terror and peculiar mark of infamy'"); *Davis v. Ayala*, 576 U.S. 257, 287 (2015) (Kennedy, J., concurring); *Glossip v. Gross*, 135 S. Ct. 2726, 2765 (2015) (Breyer, J., dissenting); *Gallias v. Wilkinson*, 988 F.3d 137 (2d Cir. 2021); *Porter v. Pennsylvania Dep't of Corr.*, 974 F.3d 431 (3d Cir. 2020); *Porter v. Clarke*, 923 F.3d 348 (4th Cir. 2019), as amended May 6, 2019; *Gittsonn v. Roberts*, 902 F.3d 1162 (10th Cir. 2018); *Williams v. Sec'y Pennsylvania Dep't of Corr.*, 848 F.3d 549 (3d Cir. 2017); *United States v. King*, 61 M.J. 225 (C.A.A.F. 2005).

[58] *See* Classified Addendum, AE 467DDD.

34

"barbarism," would likely struggle to find adequate words to describe what the Accused endured in this case.

p. Additionally, the Accused's conditions of confinement improved only incrementally and in small measures from the time he was in CIA custody to the time he was in DOD custody. Aside from two visits with the ICRC once he was returned to NSGB, the Accused was still held in the same location as the former CIA black site where he was previously held and subjected to forced "rectal feeding." Additionally, he was still under the complete domination and control of his captors as demonstrated by forced cell extractions and forced grooming.[59] Under those circumstances, it is difficult to conceive how the Accused would have believed that his circumstances had significantly changed or that "the contract" was not still in full effect.

q. With this backdrop, U.S. law enforcement agents arrived in January 2007 with the purpose of obtaining incriminating statements from the Accused. A prosecution team was in place and likely knew that the Accused's prior statements during the RDI program would never be admissible in any trial. The solution to that problem was to obtain new incriminating statements. To obtain new statements that could be used in court, the prosecution team came up with a rights advisement for the agents to provide to the Accused, which was carefully constructed to strike a balance between avoiding outright coercion but also leaving the Accused in the dark in several important respects. Despite demonstrating, on numerous occasions, the ability to provide a full rights advisement to other detainees in foreign countries, including during interviews of alleged Al Qaeda operatives Owhali, Badawi, and Quso,[60] the U.S.

---

[59] *See* AE 467ZZ.

[60] When Jamal Al-Badawi was interviewed by U.S. law enforcement agents, including FBI SA Ali Soufan, he was provided the standard FBI FD-395 Advice of Rights form prior to each interview. AE 327, Attach. A; AE 319MM, Tabs 47–48; Transcript dated 12 June 2023 at 24887 ("similar to our *Miranda* warnings"). When Fahd Al-Quso was

35

**JA.463**

government, including the DOJ and the CIA, chose to create a specific and limited rights advisement for the Accused. AE 518. For example, the Accused was not to be advised that he could consult counsel. That right would have to wait until after he further incriminated himself and the Government got around to charging him with crimes.[61] Additionally, the rights advisement failed in one major respect: it did not notify the Accused that his prior statements, which were obtained through torture, could not be used against him at any future trial.[62]

   r.  The Government cites to two somewhat comparable cases in *United States v. Elsheikh*, 578 F. Supp. 3d 752 (E.D. Va. 2022) and *United States v. Khweis*, 971 F.3d 453, 459-64 (4th Cir. 2020) as instances where courts did not suppress statements made by terrorism suspects to law enforcement agents after the suspects had previously given unwarned confessions during interrogations. In both cases, the primary issue was whether the men had been subjected to what amounted to two-part interviews which were designed to obtain confessions from the men before they were later read their rights and provided additional confessions, a technique rejected in *Missouri v. Seibert*. The Court in *Elsheikh*, for example, rejected the accused's

---

interviewed by NCIS SA Robert McFadden, he was also advised of his rights as set forth in the FD-395. AE 319MM, Tabs 55–56; Transcript dated 11 April 2023 at 23096–97 ("Almost like a full *Miranda* warning"). And when Mohammed Al-Owhali was interviewed by FBI SA Steve Bongardt, he was provided a printed copy of the Advice of Rights document prepared by Assistant United States Attorney Pat Fitzgerald including "full *Miranda* rights." Owhali was read the form at the beginning of each interview session. AE 482, Attach. D; AE 482M, Attach. B; AE 319MM, Tab 74; Transcript dated 11 March 2023 at 22637–38.

[61] This is not to imply that the Accused is entitled to a *Miranda* warning or that he is entitled to suppression of his statements due to the lack of such a warning. Clearly, the Military Commissions Act does not require such a warning and the Commission does not find that *Miranda* applies to unprivileged alien enemy belligerents held at NSGB while awaiting trial for alleged law of war violations. However, the nature of the rights advisement provided to the Accused by the law enforcement agents can be considered among the totality of the circumstances surrounding the January–February 2007 interviews.

[62] *See, e.g., Missouri v. Seibert*, 542 U.S. 600, 612 (2004) ("Could the warnings effectively advise the suspect that he had a real choice about giving an admissible statement at that juncture? Could they reasonably convey that he could choose to stop talking even if he had talked earlier? For unless the warnings could place a suspect who has just been interrogated in a position to make such an informed choice, there is no practical justification for accepting the formal warnings as compliance with *Miranda*, or for treating the second stage of interrogation as distinct from the first, unwarned and inadmissible statement.").

36

**JA.464**

argument, noting that "any reasonable person in Defendant's position would have readily 'appreciate[d] that the interrogations had taken a new turn.'" *Elsheikh*, 578 F. Supp. 3d at 38.

s.    *Elsheik* and *Khweis* are easily distinguishable from the instant case. Neither case involved allegations of significant abuse suffered by the accused, much less conditions or treatment that amounted to torture, during their initial interviews. Neither man was held for four years, incommunicado, in what amounted to solitary confinement. In both cases, prior to the second sets of interviews, the accused were given at least modified *Miranda* warnings, wherein they were advised of the rights to remain silent and to consult with an attorney. In *Elsheikh*, the accused was even advised that his prior statements would likely not be usable against him in court. *Id*. at 14–15. In *Khweis*, agents advised him of the right to counsel, told him his family had retained counsel for him in the United States, and told him "he did 'not need to speak with [them] today just because [he] h[ad] spoken with others in the past.'" *Khweis*, 971 F.3d at 458.

t.    While a deficient cleansing statement alone does not require suppression, it is appropriate for the Commission to consider under the totality of the circumstances surrounding the January–February 2007 interviews. As discussed above, the rights warning for the Accused was drafted with the input of the same agency that coerced the Accused and conditioned his compliance to obtain the previous statements. This rights warning was crafted to omit notice to the Accused that his prior coerced statements might not be admissible against him. The Military Commissions Act of 2006, which was in effect at the time of the 2007 interviews, did not specifically prohibit the admission of involuntary statements.[57] M.C.R.E. 304 was added after

---

[57] Pub.L. 109-366, October 17, 2006, 120 Stat 2600, § 948r(c)–(d). These provisions allowed for the admission of coerced statements without regard to voluntariness. *See also id*. at 949a(b)(2)(C) ("A statement of the accused that is otherwise admissible shall not be excluded from trial by military commission on grounds of alleged coercion or compulsory self-incrimination so long as the evidence complies with the provisions of section 948r of this title.").

37

**JA.465**

the promulgation of the Military Commissions Act of 2009.[64] The Commission is left to
conclude that the warning given to the Accused was designed to fit the rules in effect in 2007,
which were drafted with the specific intent to leave an open question as to the admission of
involuntary statements. Under these circumstances, the Commission finds that at the time of the
January–February 2007 interviews the Accused was given no reason to believe that his many
prior incriminating statements made over the years under torture or cruel, inhuman, or degrading
treatment would not eventually be used against him if he ever saw the inside of a courtroom.

u.  The Government urges the Commission to conclude that the Accused should have
been or was aware that his conditions had changed in some meaningful way. While it is true and
the Commission finds that the agents that conducted his January–February 2007 statements
treated the Accused with fairness and respect and did not subject him to any form of coercion,
this fact alone does not necessarily erase all that had come before. The Accused, having been
required to answer the questions of various debriefers over the years under the threat of return to
the "hard times." could not be expected to ascertain whether Agents Gaudin, McFadden, and
Sendlein were actually from a different agency than the one that had tortured him for years. He
was in no position to know whether Drs. Mitchell and/or Jessen were watching the interviews in
the next room and prepared to intervene with more abusive treatment should he violate the
contract. He had no reason to doubt that he might, without notice, suddenly be shipped back to a
dungeon like the ones he had experienced before. He had no real reason to know whether NX2

---

The Act also made inapplicable the portions of the Uniform Code of Military Justice relating to compulsory
self-incrimination. § 948b(d)(B). The words "voluntary" and "voluntariness" do not appear in the bill's text.
[64] 10 U.S.C. § 948r. Added Pub.L. 111-84, Div. A, Title XVIII, § 1802, Oct. 28, 2009, 123 Stat. 2580.

38

**JA.466**

lurked nearby with a pistol, a drill, or a broomstick in hand in the event he chose to remain silent or to offer versions of events that differed from what he told his prior interrogators.

v. In essence, when the agents finally provided the Accused with some form of a rights advisement, he had to ask himself whether he was willing to risk that he could say nothing, without harsh ramifications, or whether he would just continue to abide by the contract, as he was conditioned to do for several years, and repeat the same incriminating statements he had made numerous times. Given all he had experienced before and with the understanding that he had already incriminated himself numerous times in the past, the Commission is unsurprised that the Accused chose not to gamble by immediately putting his faith and trust in yet another group of U.S. officials who showed up at a former black site to "debrief" him.

w. The Government also points to statements made by the Accused after interview sessions on 1 and 2 February 2007 in arguing that the Accused knew that his situation had changed, that he had rights, and that he did not have to speak to the agents.[65] The Government notes that the Accused stated that he was "denying everything." However, a quick review of the LHM belies any suggestion that the Accused denied everything when speaking to the agents. Throughout the LHM, the Accused thoroughly implicates himself in the conspiracy that led to the attack on the USS COLE. The Accused's statement that he was denying everything may have been little more than wishful thinking or braggadocio designed to make him feel better about once again complying with the "contract" and incriminating himself to U.S. personnel.

x. The Government has a stronger argument with respect to the Accused's statements on 2 February 2007. At that time, the Accused indicated his understanding that meeting with the

---

[65] AE 467C at 6, 19, 22; see AE 467C, Attach. H, I; see AE 467DDD.

39

**JA.467**

agents was actually optional. By that time, of course, the Accused had also made clear that he understood that fact by telling the agents that he did not want to talk to them anymore. The agents documented in the LHM that they would have preferred to continue the interviews past the third day. But by the end of the third day, the Accused apparently trusted what the agents told him starting on day one, that he was not required to speak to them. Although the Commission is convinced that by the end of the third day of the interviews, the Accused understood that he was not required to speak to the agents and that he was confident that he would not suffer a return to the "hard times" by refusing to speak, the Commission cannot find that he understood that fact when the interviews began. Further, because the interviews were not recorded and the LHM does not reflect a timeline of when statements certain admissions were made, the Commission cannot assume that the incriminating statements reflected therein were only made after the Accused finally came to the realization that he could trust what Agents Gaudin, McFadden and Sendlein had told him about his right to refuse to talk.

### *Admissibility of LHM Statements*

y.  As noted previously, in determining whether an accused's will was overborne in a particular case, courts consider the totality of all the surrounding circumstances, regarding both the characteristics of the accused and the details of the interrogation. *Schneckloth*, 412 U.S. at 226–27 (listing cases). The Commission has considered, among others, the following factors in the analysis of the voluntariness of the Accused's statements to investigators in January–February 2007:

1. Youth. From the time the Accused was taken into custody until the 2007 statements

40

**JA.468**

were made, he was approximately in his late twenties to early thirties. Therefore, this factor does not weigh heavily in the evaluation.

    2. Education and intelligence. The Accused has a high school education but finished school sometime into his twenties. There is evidence in the record to suggest that he may be of below-average intelligence. However, there is also evidence suggesting that he is clever and skilled in logistics. Dr. Jessen testified the Accused may be smarter than others give him credit for. This factor does not tip the scale in either direction.

    3. Lack of rights advisement. As discussed previously, the U.S. agents who interviewed the Accused in 2007 were specifically directed not to advise the Accused that he could consult an attorney. Although he was told that he did not have to speak to the agents, the Accused had no reason to think that his prior confessions would not seal his fate in any future judicial proceedings as he was not informed that his prior statements could not be used against him. This weighs toward suppression.

    4. Length of detention. At the time of the 2007 statements, the Accused had been in U.S. government custody for over four years. For the vast majority of that time, he was held incommunicado in solitary confinement. This weighs heavily toward suppression.

    5. Repeated and prolonged nature of the questioning. Prior to the 2007 interviews, the Accused had been interrogated or debriefed somewhere between 145 to 200 times. The record indicates that, especially from 2005 on, these debriefings were repetitive and unfruitful, leading to concerns about the Accused's mental health. These interrogations were repeated over the four years of the Accused's detention. The 2007 interviews themselves took place over several days, multiple hours each day. This weighs heavily toward suppression.

41

**JA.469**

6. Use of physical punishment such as the deprivation of food or sleep. The Commission has previously addressed the horrific abuses inflicted upon the Accused during his years in CIA custody and need not belabor the point here. While the Accused was no longer experiencing most of the abuses he had previously been subjected to by 2007, he was still under the complete domination and control of the U.S. government under circumstances not entirely dissimilar to those he had experienced the previous several years. This weighs heavily toward suppression.

7. Circumstances of the statement. The circumstances of the interviews in 2007, evaluated on their own merit, were not actually coercive in nature. The agents involved in the 2007 interviews acted professionally and in no way coerced the Accused. This weighs against suppression. However, the agents, perhaps unknowingly, could not help but benefit from the terms of the contract established by the CIA and Drs. Mitchell and Jessen years before.

8. Psychological impact on the accused. This factor is perhaps the most important and weighs most heavily towards suppression. The entire goal of the RDI program and the contract created by Drs. Mitchell and Jessen was to provoke an involuntary response to stimuli which would condition compliance from the Accused. The compounding effects of the program—both physical and psychological—could not be removed by the law enforcement agents in 2007 and cannot be ignored by the Commission.

z. The Commission has carefully considered the aforementioned factors among the totality of the circumstances surrounding the 2007 LHM statements, to include the treatment of the Accused from the time his detention began in late 2002 until 2 February 2007. The Commission has also considered the limited advisement of rights given the Accused by the interviewing agents as well as the non-coercive environment of those interviews. The

42

**JA.470**

Government, although conceding the Accused was tortured during the RDI program, argues the 2007 statements were sufficiently attenuated from that mistreatment. The Commission is not convinced.

aa. Any resistance the Accused might have been inclined to put up when asked to incriminate himself was intentionally and literally beaten out of him years before. For years, the Accused was coerced and psychologically conditioned to cooperate with questioners—dozens, if not hundreds of times. To refuse to cooperate was to face the prospect once again of experiencing drowning, the fear of summary execution, days of sleeplessness while shackled naked in a cell, confinement to small boxes, forced rectal feeding, or other physical and mental abuse. Through all that, the Accused implicated himself again and again. The Commission finds that the limited changes in the Accused's circumstances from September 2006 until February 2007 were not meaningful enough to erase the effects of what came before. The change of interlocutors also means little under these circumstances as the Accused was met by numerous different debriefers over the years. From his perspective, Agents Gaudin, McFadden, and Sendlein were merely the newest faces. Further, the Government has done little to establish that the Accused's circumstances materially changed from 2003 until his arrival at NSGB in September 2006.

bb. Most, if not all, Supreme Court and U.S. Court of Appeals for the Armed Forces cases dealing with the issue of subsequent statements made following an initial unwarned or coerced statement deal with a *single* prior inadmissible statement being made before a second warned or uncoerced statement. As discussed above, here, the Accused was in U.S. custody for four years prior to the "second" statement. During those four years, the Accused was coerced and

43

**JA.471**

psychologically conditioned to cooperate with questioners—dozens of times. If there was ever a case where the circumstances of an accused's prior statements impacted his ability to make a later voluntary statement, this is such a case.[66]

cc. Considering the totality of all relevant circumstances, the Commission is most persuaded by the contract established and maintained by Drs. Mitchell and Jessen. The contract required the Accused to speak to the agents in January and February 2007. The Accused had no reason to believe the contract had lapsed. He therefore had only the Hobson's choice of refusing to talk and risking the consequences or continuing to comply and implicating himself for the 201st time. The Commission finds this to be no choice at all and cannot be confident the Accused believed he was free to remain silent on 31 January 2007.

dd. The Commission finds that the Government has not met its burden to establish that the statements made by the Accused between 31 January 2007 and 2 February 2007 were made voluntarily. Even if the 2007 statements were not *obtained by* torture or cruel, inhuman, and degrading treatment, they were *derived from* it. The Commission is not convinced that the 2007 statements would have been obtained if not for the Accused's prior experience with being tortured and abused in the RDI program. On the facts presented, the Commission does not find that the Accused should or could have reasonably believed that his circumstances had substantially changed when he was marched in to be interviewed by the newest round of U.S. personnel in late January 2007. The limited rights advisement given was insufficient to attenuate

---

[66] *See, e.g., United States v. Bayer*, 331 U.S. 532, 540 (1947) ("Of course, after an accused has once let the cat out of the bag by confessing, no matter what the inducement, he is never thereafter free of the psychological and practical disadvantages of having confessed. He can never get the cat back in the bag. The secret is out for good. In such a sense, a later confession always may be looked upon as fruit of the first."). Though *Elstad* found this theory inapplicable as to that case, it is helpful here in evaluating the totality of the circumstances.

44

the lingering taint of the torture, the psychological abuse associated with incommunicado and solitary confinement for years, and the constant threat of a return of the "hard times" if the Accused were to fail to live up to the contract.

ee. Returning to the words of the Supreme Court in *Lyons*, "the effect of the earlier abuse may be so clear as to forbid any other inference than that it dominated the mind of the accused to such an extent that the later confession is involuntary." 322 U.S. at 603. The Commission concludes that the Government has not proven by a preponderance of the evidence that the presumed taint from the prior years of physical and psychological torment was dissipated when the Accused was again confronted with interrogators in January–February 2007. Instead, the evidence supports a conclusion that the Accused did what he was trained to do: comply. Compliance is not the same as the "mental freedom" addressed by the Supreme Court in *Ashcraft*. Compliance is not enough to establish the voluntariness of the Accused's statements. The LHM statements must be suppressed pursuant to 10 U.S.C. § 948r and M.C.R.E. 304.

ff. Exclusion of such evidence is not without societal costs. However, permitting the admission of evidence obtained by or derived from torture by the same government that seeks to prosecute and execute the Accused may have even greater societal costs. Permitting admission of this evidence would greatly undermine the actual and apparent fairness of the criminal proceeding against the Accused in this case and infect the trial with unfairness sufficient to make any resulting conviction a denial of whatever process is due. *See Romano v. Oklahoma*, 512 U.S. 1, 12 (1994).

45

**JA.473**

<u>*Admissibility of CSRT Statements*</u>

gg. The Commission does not reach the same conclusion with respect to the Accused's statements made during the CSRT hearing on 14 March 2007, as the CSRT statements are distinguishable in a number of important respects. Once again, the Commission has considered the totality of the circumstances surrounding the making of the statements during the CSRT hearing on 14 March 2007, to include the Accused's experiences in CIA and DOD custody from 2002 to 2007.

hh. The crucial difference between the LHM and the CSRT statements is what happened over the course of the three days of the LHM interviews. When the Accused was brought in to talk to the agents, the Commission finds that the Accused was likely in compliance mode. He was trained to comply or face harsh consequences, so he initially complied even despite limited warnings that suggested he could refuse to talk. After all, he had little to risk by repeating what he had already said many times; he had much to risk if he refused to talk and faced a return to the "hard times." After day three of the LHM interviews, however, likely based upon the relaxed and cordial interactions between himself and the agents and the repeated reminders that he was "the boss" during the interviews, the Accused reached a point where he was willing to assert his right to terminate the interview. When he terminated the interview after three days, he presumably did so because he no longer feared unknown consequences that might follow. By the time of the CSRT hearing, the Accused knew for sure that he did not suffer any consequences for terminating the interview in early February. In other words, the Accused would have known after the LHM interviews that he had an actual choice whether or not he would speak.

46

**JA.474**

ii.  There are other substantial differences between the interview that began on 31 January 2007 and the CSRT. Where the Accused had no advance warning that he would again be debriefed at the end of January 2007, in preparation for the CSRT he was assigned a personal representative to explain the nature of the CSRT and assist during the proceeding. This would have been a clear signal to the Accused that the situation was substantially different from debriefings and interrogations he experienced with the CIA.

jj.  Among other substantial differences for the Accused were the location, the forum, the formality, and the personnel involved in the CSRT. Rather than his prior experiences of being interrogated in a cell in front of a walling wall with a towel ominously draped around his neck or while trying to avoid drowning, the CSRT was conducted as an official proceeding in a hearing room presided over by a military judge with two other military officers sitting as panel members. The Accused had a personal representative to speak for him and to assist him during the proceeding. While the personal representative was not an attorney, the availability of a representative marked a sea change in what the Accused had previously experienced and clearly signaled that the Accused had rights. Further, the personal representative was a Lieutenant Commander in the United States Navy, someone who clearly would have had significant military training and experience, as well as advanced education.

kk.  When the proceeding began, the president clearly explained the purpose of the hearing and advised the Accused that he could not be compelled to testify at the tribunal, but instead had the choice to either testify or not to testify, including the right to make an unsworn statement if he so chose. He was also advised of his right to present evidence at the hearing and to question witnesses that might testify. When asked, the Accused indicated that he understood

47

**JA.475**

the purposes of the proceeding as well as his rights. When asked if he had any questions concerning the tribunal process, he responded "[n]o."

ll.  During the hearing, the allegations were read to the Accused. The allegations referenced statements made by individuals other than the Accused, to include Mohammed Al 'Owhali and Jamal Al-Badawi, which implicated the Accused in the conspiracy to attack the USS COLE. None of the allegations read to the Accused made reference to any statements previously made by the Accused. In other words, there was no mention of the fact that the Accused had previously admitted his involvement in the USS COLE operation.

mm. Finally, when asked if he would like to make an oral statement to the Tribunal, the Accused opted to have a written statement presented by his personal representative. He was then asked if he wished to take an oath but was told that he was not required to do so. He chose to take the oath. He was even offered the option of a Muslim oath, which he accepted.

nn. Perhaps one of the most significant considerations in determining that the Accused believed by the time of the CSRT that he faced no further danger from his former interrogators came during the Accused's sworn statement, when he denied much of what he previously told interrogators and investigators from 2002 through 2007. He denied having anything to do with the bombing of the USS COLE. He also denied being a member of Al Qaeda. He denied allegations made by Al-Badawi, insisting that his interactions with Al-Badawi and others related to the USS COLE bombing were simply a business relationship in the fishing industry. The Accused further insisted that incriminating statements he made to the CIA were the product of torture. He then went on to apparently discuss the torture he endured.[67] The president then

---

[67] This portion is redacted from the transcript of the proceedings at AE 467C, Attach. H at 16 of 36.

48

**JA.476**

acknowledged the Accused's assertion that he was tortured and asked the Accused if he was "under any pressure or duress today." The Accused responded, "No. Not Today."[68]

oo. The Accused went on to answer questions from the president and the other tribunal members. Although some of his statements tend to incriminate him in certain respects, he continued to insist that he was not knowingly involved in the plan to attack the USS COLE and that he was involved only in a plan to run a fishing business.

pp. Considering the totality of the circumstances, it is clear that the Accused understood by 14 March 2007 that he had rights, to include the right not to incriminate himself further. He apparently no longer feared potential ramifications as reflected in his denial of involvement in the USS COLE operation or with Al Qaeda, along with his insistence that his admissions in the past were obtained due to torture. He was clearly informed of his right not to testify at the tribunal and indicated that he understood that right. He was also asked whether he was under duress and denied that he was. The fact that he complained of prior torture indicates that he would have been willing to reveal if he was under duress at the CSRT hearing. Further, the CSRT allegations and evidence focused not on any statement previously made by the Accused, but only on allegations made by others as well as other forms of evidence.

qq. The Commission finds, based on the totality of the circumstances, that the Accused's statements to the CSRT were made voluntarily and were not obtained through or derived from torture or any other form of coercion or abuse he was subjected to at the hands of his former captors and interrogators.

---

[68] *See* AE 467C, Attach. H at 16 of 36.

49

6. **Ruling**. The defense motion to suppress set forth in AE 467 is **GRANTED in part** and **DENIED in part.** That portion of the motion related to the LHM statements made by the Accused to investigators during the January–February 2007 interviews is **GRANTED**. That portion of the motion that seeks to suppress the Accused's statements to the CSRT is **DENIED**.

So **ORDERED** this 18th day of August 2023.

//s//
LANNY J. ACOSTA, JR.
COL, JA, USA
Military Judge

50

**JA.478**



**From:** Trivett, Clayton G CIV OSD OMC OCP (USA) ▮
**Sent:** Wednesday, May 18, 2022 2:34 PM
**To:** Gary Sowards ▮; Radostitz, Rita J CIV (USA) ▮>; Nevin, David Z VOL (USA) ▮; OSD NCR MCDO List MCDO Team Mohammad <▮>
**Cc:** Dykstra, Christopher M CIV DLSA (USA) ▮; Ryan, Edward R CIV (USA) ▮ Groharing, Jeffrey D CIV OSD OMC OCP (USA) ▮>
**Subject:** Transmittal of the Prosecution's Proposed Stipulation of Fact for Continued Pre-Trial Agreement Negotiations

Mr. Sowards, et al.

I wanted to touch base with you and assure you that, although most of the Trial Counsel are not present on Guantanamo right now, we are still working on our end toward a possible pre-trial agreement with Mr. Mohammad. Understanding that the Policy Principles have not yet been addressed by DoD, we did want to keep forward movement on the Prosecution Principles necessary for the agreement. As such, attached please find our proposed Stipulation of Fact for Mr. Mohammad. I am sending you the Word version and the Adobe PDF version (to memorialize the first draft). It was my goal to get this to you while you were still in Guantanamo so you could start socializing this with Mr. Mohammad. We spent a good deal of the last weeks drafting it.

The information was primarily culled from the charge sheet, and your client's statement made to SA Pellegrino and the CSRT (with some small amount from other discovery). As such, I don't anticipate that much of this would be objectionable, but we are willing to discuss individualized items if there are any concerns or inaccuracies that need to be addressed.

Because we are positively endorsing the sentence term offered by your client, we are also willing to continue to discuss the issues on the PTA Worksheet and this proposed Stipulation of Fact prior to the Policy Principles being answered if you feel that would be productive at this time. We can get on a VTC with you later this week or next week or if you are remaining on island, or can otherwise arrange a Teams meeting when you are back in CONUS. Just let us know.

1

**JA.479**

If it is your intention to wait until the Policy Principles are responded to, we understand that too.  Just let us know your preference.

Regards,

Clay Trivett

████████████

---

**From:** Gary Sowards ████████████████████████ >
**Sent:** Thursday, March 24, 2022 8:49 PM
**To:** Trivett, Clayton G CIV OSD OMC OCP (USA) ██████████████████████ >; Radostitz, Rita J CIV (USA) ████████████████████████ ; Nevin, David Z VOL (USA) ██████████████████████ >; OSD NCR MCDO List MCDO Team Mohammad < ████████████████████████ >
**Subject:** [Non-DoD Source] RE: Khalid Shaykh Mohammad Pre-Trial Negotiation Worksheet

Thank you Clay.

Take care,
gary

---

**From:** Trivett, Clayton G CIV OSD OMC OCP (USA) ████████████████████ >
**Sent:** Thursday, March 24, 2022 4:13 PM
**To:** Radostitz, Rita J CIV (USA) ██████████████████ ; Nevin, David Z VOL (USA) ████████████████████ >;
Gary Sowards ████████████████████ ; OSD NCR MCDO List MCDO Team Mohammad ██████████████████ >
**Subject:** RE: Khalid Shaykh Mohammad Pre-Trial Negotiation Worksheet

Team Mohammad,

Per our discussion today, attached please find the updated Worksheet with the additional evidence items we discussed.

Please use this worksheet going forward.

Regards,

Clay

---

**From:** Trivett, Clayton G CIV OSD OMC OCP (USA)
**Sent:** Wednesday, March 23, 2022 5:59 PM
**To:** Radostitz, Rita J CIV (USA) ████████████████ >; Nevin, David Z VOL (USA) ██████████████████ >;
Gary Sowards ████████████████████ ; OSD NCR MCDO List MCDO Team Mohammad
██████████████████ >
**Subject:** Khalid Shaykh Mohammad Pre-Trial Negotiation Worksheet

Team Mohammad,

**JA.480**

Attached is our negotiation worksheet for your consideration.  We were having technical difficulties all afternoon, so this is coming several hours later then we intended.  We would be happy to meet with you tomorrow to discuss (or later tonight If that would be helpful for you), and hopefully this will provide you some clarity on what we are envisioning be in a future agreement for the remaining prosecution principles, and that this document can shape the conversations going forward.  Everything is in red on the policy principles for now because those aren't OCP/CA calls, but we have now officially forwarded the policy principles to the ICP to be routed through the Pentagon.

Regards,

Clay Trivett

---

**From:** Dykstra, Christopher M CIV DLSA (USA) ███████████████ >
**Sent:** Wednesday, March 23, 2022 5:47 PM
**To:** Trivett, Clayton G CIV OSD OMC OCP (USA) ████████
**Cc:** Ryan, Edward R CIV (USA) ████████████ ; Groharing, Jeffrey D CIV OSD OMC OCP (USA) ████████████████████

**Subject:** KSM Worksheet (RESEND)

Regards,

Christopher M. Dykstra
Deputy Managing Trial Counsel
Office of the Chief Prosecutor
████████████████████

---

**From:** Dykstra, Christopher M CIV DLSA (USA)
**Sent:** Wednesday, March 23, 2022 15:41
**To:** Trivett, Clayton G CIV OSD OMC OCP (USA) ██████████████████ |>
**Cc:** Ryan, Edward R CIV (USA) █████████████ >; Groharing, Jeffrey D CIV OSD OMC OCP (USA) ████████████

**Subject:** KSM Worksheet

Regards,

Christopher M. Dykstra
Deputy Managing Trial Counsel
Office of the Chief Prosecutor
████████████████████

▦ 09.06.2023

# SEN. CRUZ ISSUES STATEMENT AFTER 9/11 DEFENDANTS' PLEA DEAL FALLS THROUGH

**WASHINGTON, D.C** – U.S. Sen. Ted Cruz (R-Texas), member of the Senate Judiciary Committee and the Senate Foreign Relations Committee, released the following statement after the Biden administration announced they have refused the plea deal offered by Khalid Sheikh Muhammed and four other 9/11 defendants. Sen. Cruz sent a letter to the Department of Defense last month urging the Biden administration to pursue the ultimate punishment for the 9/11 masterminds.

**Sen. Cruz said,** "On September 11, 2001, a group of deranged, radical Islamists carried out the worst terrorist attack in the history of the United States. They murdered 2,977 people. It was horrific—and an act of war. Khalid Sheikh Mohammed and the four other plotters who planned the 9/11 attacks are mass murderers who deserve the death penalty. Despite this, the Biden administration was prepared to give them a plea deal. That would have been outrageous. So I pressed the Department of Defense and urged the administration to support the death penalty for these monsters. The victims of those attacks have been patiently awaiting justice for over 20 years, and the Biden administration should not be standing in the way of that. Today, the Biden administration took a step in the right direction by rejecting the defendants' plea deal, and I hope we can move forward and try the murderers. I, along with millions of Americans, believe justice requires the ultimate punishment for their horrific crimes."

**BACKGROUND:**

On August 28, Sen. Cruz, along with Rep. Malliotakis (R-NY), wrote a letter to Secretary of Defense Lloyd Austin expressing their strong opposition to a potential plea deal between the Biden administration and the 9/11 defendants, and urging the administration to instead pursue the death penalty. Read the letter **here** and below.

August 28, 2023

The Honorable Lloyd J. Austin III

Secretary of Defense

1000 Defense Pentagon

Washington, D.C. 20301-1000

Dear Secretary Austin,

We write to express our disappointment regarding the news that the Department of Defense may extend a plea agreement to the masterminds of the September 11th attacks whereby the United States would spare the lives of the individuals responsible for this horrific attack, and deny the families of the victims both justice and closure. Make no mistake, any outcome short of the death penalty for the September 11th plotters would be completely unacceptable, and constitute a total failure of leadership on the part of the Department of Defense.

On September 11, 2001, terrorists took the lives of 2,977 innocent people in a series of cowardly attacks, resulting in the worst act of terror in American history. Although it took significant time and resources, the United States military and intelligence community located and captured those responsible, Khalid Shaikh Mohammed and four other plotters. These men have been detained in Guantanamo Bay since 2003, awaiting punishment for their horrific acts. The victims' families have now been patiently waiting for justice for over twenty years.

Although the news broke last year that these five men might escape trial and a death sentence through negotiated agreement, this outcome was at that time only theoretical.[1] Unfortunately, recent reporting suggests victims' family members received a letter on August 1, 2023 soliciting questions or comments about the possibility of a plea agreement allowing the accused to escape the death penalty.[2] This solicitation invariably leads to the conclusion that a plea agreement removing a death sentence is no longer speculative but is instead a possible outcome.

In addition, a set of "policy principles" connected to the ongoing plea negotiations likewise emerged last year. While ambiguous on their face, a review of Military Commissions filings and relevant reporting indicates that these principles involve high-level government official deliberations. They suggest that the decisions driving this plea agreement occur in Washington, D.C., not at the Military Commission.

Indeed, on March 28, 2023, the *New York Times* reported that "policy principles" were at issue in the pretrial agreement. The report described the policy principles as "mostly the details of how the accused would spend the rest of their lives in prison."[3] About six months earlier, the *Times* also reported that the judge presiding over the

JA.482

September 11 case canceled pretrial hearings "while prosecutors await a response from the Biden administration on a proposed plea deal that would avert a death-penalty trial for the five defendants."[4]

During his campaign for president, Joe Biden pledged to "work to pass legislation to eliminate the death penalty at the federal level, and incentivize states to follow the federal example"[5]  For example, despite Patrick Crusius' racially-targeted mass murder of 23 people at an El Paso Wal-Mart in 2019, the Department of Justice inexplicably offered him a plea agreement which allowed him to escape the death penalty.  By contrast, local El Paso prosecutors, armed with the same evidence as their federal counterparts, have promised to put the shooter on death row.[6]  The Biden Administration's decision here appears not to be based on the strength of the evidence or the wishes of the victims' families, but rather a purely political choice, designed to appease the fringe left of his party.  Unfortunately, having already injected partisan political concerns into the administration of the death penalty in civilian courts, it now appears the Biden Administration is doing the same in military tribunals.

Victims have spoken out in the media about the proposed plea bargain, indicating that they "were told, and were promised, that we would bring these people responsible to justice, and we expect that to happen[.]"[7]  These families have already been robbed of their loved ones, they should not also be robbed of the full measure of justice in this case.  The September 11th plotters are mass murderers, deserving of the ultimate punishment.  Indeed, if there are persons walking the face of the Earth who are deserving of the death penalty, it is these five men.  After over two decades of patiently waiting, the victims' families deserve closure.

For these reasons, we request that you respond to the questions below no later than September 15, 2023:

1.   Why is the administration, through your offices, not working to advance this case and allow prosecutors to try the accused?

2.   What exactly constitutes a "policy principle?"

3.   What officials are involved with "policy principle" discussions?

4.   Why has the administration delayed justice by requiring the prosecution and defense to engage in thirteen status conferences discussing the policy principles?

5.   Why is the decision to allow death as a possible sentence so difficult, given the facts of the underlying offense?

6.   Who from the Department of Justice, White House Counsel's Office, or Executive Office of the President did you, your staff, or any member of the relevant Military Commission, speak with regarding whether to seek the death penalty in this case?

Sincerely,

/s/

### 

[1] Carol Rosenberg & Charlie Savage, *Sept. 11 Prosecutors Are in Plea Talks That Could Avert a Death-Penalty Trial*, N.Y. Times (Mar. 15, 2022), **https://www.nytimes.com/2022/03/15/us/politics/gitmo-terrorism-trial.html**

[2] Ellen Knickmeyer & Jennifer Peltz, *Plea negotiations could mean no 9/11 defendants face the death penalty, the US tells families,* Associated Press (Aug. 16, 2023), **https://apnews.com/article/guantanamo-911-defendants-76fab68b1faa1a7e1634b10951258710**

[3] Carol Rosenberg, *Judge Signals Impatience a Year Into Sept. 11 Case Plea Talks*, N.Y. Times (Mar. 28, 2023), **https://www.nytimes.com/2023/03/28/us/politics/september-11-plea-deal-guantanamo.html**

[4] Carol Rosenberg, *Sept. 11 Case Awaits Biden Administration's Reply on Plea Deal*, N.Y. Times (Oct. 23, 2022), **https://www.nytimes.com/2022/10/23/us/politics/sept-11-gitmo-terrorism.html**

[5] Dakin Akone, *Biden campaigned on abolishing the federal death penalty. But 2 years in, advocates see an 'inconsistent' message*, CNN (Jan. 22, 2023), **https://www.cnn.com/2023/01/22/politics/joe-biden-federal-death-penalty-abolition/index.html**

[6] Uriel J. García, *Gunman in 2019 El Paso mass shooting receives 90 life sentences*, Tex. Tribune (July 7, 2023), **https://www.texastribune.org/2023/07/07/el-paso-mass-shooting-crusius-life-sentence/**.

[7] Scott MacFarlane, *Pentagon considering plea deals for defendants in 9/11 attacks*, CBS News (Aug. 17, 2023), **https://www.cbsnews.com/news/pentagon-considering-plea-deals-911-defendants/**

JA.483

**MILITARY COMMISSIONS TRIAL JUDICIARY**
**GUANTANAMO BAY, CUBA**

| | |
|---|---|
| UNITED STATES OF AMERICA | AE 926A (GOV) |
| v. | **Government Response**<br>To Mr. Ali's Motion to Dismiss All Charges<br>for Unlawful Influence by<br>Members of Congress |
| **KHALID SHAIKH MOHAMMAD;**<br>**WALID MUHAMMAD SALIH**<br>**MUBARAK BIN 'ATTASH;**<br>**ALI ABDUL AZIZ ALI;**<br>**MUSTAFA AHMED ADAM**<br>**AL HAWSAWI** | 22 February 2024 |

**1. Timeliness**

The Prosecution timely files this Response pursuant to Military Commissions Trial Judiciary Rule of Court 3.7.

**2. Relief Sought**

The Prosecution respectfully requests that the Commission deny the Defense motion.

**3. Burden of Proof**

As described in more detail below, the Defense has the initial burden of raising the issue of actual or apparent unlawful influence. *See United States v. Biagase*, 50 M.J. 143, 150 (C.A.A.F. 1999) (citing *United States v. Stombaugh*, 40 M.J. 208, 213 (C.M.A. 1994)).  Only after the Defense meets that standard does the burden shift to the government. *Id.*

**4. Facts**

For three weeks in March 2022, the Prosecution and Defense teams (at times with their clients present) met on various occasions on board U.S. Naval Station Guantanamo Bay to discuss potential plea agreements in *United States v. Mohammad, et al.* (the "9/11 case").

These initial meetings resulted in an agreement by the parties that they would divide the negotiations into two separate parts, eventually referred to as the "Prosecution Principles" and the "Policy Principles."  Items negotiated as "Prosecution Principles" entailed those matters over which a Convening Authority would have discretion as articulated within Rule for Military

Commissions (R.M.C.) 705, such as what charges the Accused would plead guilty to; what facts would be stipulated to; what evidence the parties would agree was admissible; what sentencing range would be provided to the members; and what motions would be waived. The Prosecution was authorized by the then-Convening Authority, Colonel Jeffrey D. Wood, to negotiate these matters on his behalf, and the Prosecution continues to negotiate in good faith with interested Defense teams on the "Prosecution Principles" to this day.

During negotiations, the Accused also sought certainty in their conditions of confinement post-conviction, various improvements to their current conditions of confinement, and immunity from further prosecution by the Department of Justice—matters outside the discretion or control of the Convening Authority. The parties agreed to refer to these provisions as "Policy Principles" because they involved policy-level decisions as opposed to those matters within the Convening Authority's discretion pursuant to R.M.C. 705.

At the end of the March 2022 session, the Defense teams jointly forwarded two documents to the Prosecution, which were titled "Joint Policy Principles" and "Overarching Principles." These documents articulated certain conditions (and the primary motivations behind the Defense requests) that the Defense teams indicated would play a significant part of any likely plea agreement, including, with respect to the Accused's continued detention, access to medical care and communications with their family members. *See* Attach. B (filed under seal by oral order of the Commission entered Feb. 21, 2024).

There were three themes inter-woven throughout the Accused's "Joint Policy Principles": (1) a desire for consistent and transparent conditions of confinement; (2) a desire for improved or modified medical and psychological care, including supplementing their medical records with additional matters from their time during the former RDI Program; and (3) a desire to have more regular contact with their families under conditions that more closely resembled the non-High Value Detainees. *Id.*

2

**JA.485**

The Prosecution noticed the defense that it had forwarded these documents to the Department of Defense (DoD) for coordination and consideration by the inter-agency. *See* Attach. C.

Regarding the "Policy Principles," the Prosecution envisioned its implementation to involve the securing of a letter from an official within DoD or the Department of Justice (with the requisite level of authority) committing to bind the United States to maintain the requested conditions of confinement of the Accused in perpetuity or, in the case of the Department of Justice, agreeing not to prosecute the Accused on any other charges known to the United States at the time of the plea. The Convening Authority would then incorporate these letters by reference into the ultimate pre-trial agreements if he was otherwise comfortable that the "Prosecution Principles" portions of the pre-trial agreements were acceptable.

While the Convening Authority was aware of the existence of the "Joint Policy Principles," neither the details of the policy requests, nor the written documents the Defense proposed, were shared with him until 9 July 2023 (only after the Prosecution assessed that there would likely not be a formal inter-agency response to the "Policy Principles" and communicated this assessment to the Defense).

On 6 September 2023, according to reports, a spokesperson for the National Security Council relayed the President's rejection of the "Policy Principles":

> The President concurred with the Secretary of Defense's recommendation not to accept the *Joint Policy Principles* that had been proposed by the 9/11 Defendants as a basis for plea negotiations. The 9/11 attacks were the single worst assault on the United States since Pearl Harbor. The President does not believe *that accepting the joint policy principles as a basis* for a pre-trial agreement would be appropriate in these circumstances. The Administration is committed to ensuring that the military commissions process is fair and delivers justice to the victims, survivors, families, and those accused of crimes.

AE 926 (AAA), Attach. EE at 8, 24 (emphases added).

Regardless, the Convening Authority remained amenable to considering pre-trial agreements based on the matters contained in the "Prosecution Principles" and R.M.C. 705,

3

**JA.486**

and the Prosecution continued to discuss pre-trial agreements with various Defense counsel following the rejection of the "Policy Principles."

On 8 October 2023, Brigadier General Susan K. Escallier, USA (Ret), succeeded Colonel Wood as Convening Authority in this case and subsequently re-authorized the Prosecution to negotiate pre-trial agreements on her behalf.

The Prosecution is still willing to positively endorse any proposed pre-trial agreement that meets its requirements on the "Prosecution Principles."

The current Convening Authority remains willing to consider proposed pre-trial agreements that are positively endorsed by the Prosecution.

The Prosecution does not dispute that the statements cited in and attached to the Defense Motion in AE 926 (AAA) were made,[1] but it does dispute that any such statement constitutes unlawful influence.[2]

5.  **Law and Argument**

In support of its assertion that members of Congress unlawfully influenced the "Biden Administration," the Defense motion cites dozens of statements by members of Congress and appends dozens of news articles covering various victim family members' views on potential pre-trial agreements.  However, the Defense fails to establish any evidence that any participant in this military commission protected from unlawful influence under the Military Commissions Act of 2009 (M.C.A.) has been unlawfully influenced, a point made more salient by the continued amenability of the Convening Authority, and the Trial Counsel acting on her behalf, to engage in pre-trial agreement negotiations.

---

[1] *See* Letter from U.S. Senator & U.S. Representative to the Secretary of Defense (Aug. 28, 2023), *in* AE 926 (AAA), Attach. X.

[2] *See* Letter from the Assistant Secretary of Defense for Legislative Affairs to U.S. Senator (Oct. 4, 2023), *in* Attach. D ("The Military Commissions Act makes the delegated Convening Authority responsible for accepting or rejecting pre-trial agreements.  It would therefore not be appropriate for the Secretary or any other supervising official to comment further."); Letter from the Assistant Secretary of Defense for Legislative Affairs to U.S. Representative (Oct. 4, 2023), *in* Attach. E (same).

4

At most the Defense have raised in AE 926 (AAA) a pre-trial publicity concern that, as set forth below, can be properly handled during the *voir dire* of the members should pre-trial agreements not be reached in this case.

### I. The M.C.A. Prohibits Both Actual and Apparent Unlawful Influence

In adjudicating unlawful influence claims, military commissions look for guidance to the case law and precedent regarding unlawful command influence (UCI) in the military justice context. *See* 10 U.S.C. § 948b(c). In *United States v. Boyce*, 76 M.J. 242, 247 (C.A.A.F. 2017), the Court of Appeals for the Armed Forces reaffirmed much of the previously developed court-martial case law on UCI and condensed it into a single, concise opinion. As the court noted in *Boyce*, there are two types of UCI that can arise in the military justice system: actual and apparent. *See id.*

Actual UCI has commonly been recognized as occurring when there is an improper manipulation of the criminal justice process that negatively affects the fair handling or disposition of a case. *See id.* (citing *United States v. Allen*, 33 M.J. 209, 212 (C.M.A. 1991)). Apparent UCI occurs when "an objective, disinterested observer, fully informed of all the facts and circumstances, would harbor a significant doubt about the fairness of the proceeding." *Id.* at 249 (quoting *United States v. Lewis*, 63 M.J. 405, 415 (C.A.A.F. 2006)).

Whether the accused is attempting to raise a claim of actual or apparent UCI, he must show facts, which if true, constitute UCI. This burden of proof on the defense is low, but it must consist of more than "mere allegation or speculation." *Id.* (citing *United States v. Salyer*, 72 M.J. 415, 423 (C.A.A.F. 2013)); *see also United States v. Allen*, 31 M.J. 572, 590 (N.M.C.M.R. 1990) ("Although we find no case that directly states what amount or type of evidence is sufficient to raise the issue, our review of precedent reveals that in each reported case the defense had some specific direct or circumstantial evidence—something other than coincidence—that some specific incident occurred that directly involved the [accused's] own trial."). "The appearance of evil is not enough to justify action by an appellate court in a particular case or, said another way,

5

'[p]roof of [command influence] in the air, so to speak, will not do.'" *United States v. Hutchins*, No. 200800393, 2018 CCA LEXIS 31, at *60 (N-M. Ct. Crim. App. Jan. 29, 2018) (quoting *Allen*, 33 M.J. at 212). In short, the quantum of evidence required to raise UCI is "some evidence." *Biagase*, 50 M.J. at 150.

Beyond presenting "some evidence" of facts which, if true, constitute actual UCI, an accused must also tie those facts to their effect on his case. Thus, to sustain a claim of actual UCI in his case, the accused must also demonstrate that he was prejudiced—namely, that the proceedings were unfair and that UCI was the cause of the unfairness. *Boyce*, 76 M.J. at 251; *Biagase*, 50 M.J. at 150.

Unlike actual UCI where prejudice to the accused is required, no such showing is required for a meritorious claim of apparent UCI. *Boyce*, 76 M.J. at 251.[3] Rather, the prejudice involved in a claim of apparent UCI is the damage to the public's perception of the fairness of the military justice system as a whole, not the prejudice to the individual accused. *Id.* "In cases involving unlawful command influence, the key to [a court's] analysis is effect [on the perception of fairness in the military justice system]—not knowledge or intent" of the government actor. *Id.*

Therefore, to sustain a claim of apparent UCI, the accused need not allege that he was prejudiced, but must demonstrate through "some evidence" beyond mere allegation or speculation that the UCI placed an "intolerable strain" on the public's perception of the military justice system because "an objective, disinterested observer, fully informed of all the facts and circumstances, would harbor a significant doubt about the fairness of the proceeding." *Id.* at 248 (internal quotation marks omitted) (citation omitted); *Biagese*, 50 M.J. at 150.

---

[3] In response to *Boyce*, Congress amended Article 37, U.C.M.J., 10 U.S.C § 837, in 2019 to require that an accused must prove actual prejudice to the accused to prevail on any claim of UCI. *See* National Defense Authorization Act for Fiscal Year 2020, Pub. L. No. 116-92, div. A, tit. V, § 532(a)(2), 133 Stat. 1198, 1359–60 (2019). After the 2019 amendment, Article 37, U.C.M.J., now provides: "No finding or sentence of a court-martial may be held incorrect on the ground of a violation of this section unless the violation materially prejudices the substantial rights of the accused." Article 37(c), U.C.M.J., 10 U.S.C. § 837(c) (2018 & Supp. IV 2022) (enacted 20 December 2019).

Only if an accused has met these requirements does the burden shift to the government to rebut the accused's allegation. Specifically, the government will then bear the burden of proving beyond a reasonable doubt that either the predicate facts proffered by the accused do not exist or the facts as presented do not constitute UCI. *Boyce* 76 M.J. at 248 (citing *Salyer*, 72 M.J. at 423). If the government meets this burden, then the accused's claim of either actual or apparent UCI will be deemed to be without merit and no further analysis will be conducted. *Id.* (citing *Salyer*, 72 M.J. at 423); *Biagase*, 50 M.J. at 151.

## II. The M.C.A. Protections Against Unlawful Influence Apply to Specific Acts Performed by Specific Actors

Similar to the Uniform Code of Military Justice (U.C.M.J.), the M.C.A. and its implementing rules and regulations expressly prohibit both actual and apparent unlawful influence. And like the U.C.M.J., the M.C.A.'s reach is limited to influence as applied to specific acts performed by delineated actors. In pertinent part, 10 U.S.C. § 949b provides:

> No person may attempt to coerce or, by any unauthorized means, influence—
> (A) the action of a military commission under this chapter, or any member thereof, in reaching the findings or sentence in any case;
> (B) the action of any convening, approving, or reviewing authority with respect to their judicial acts; or
> (C) the exercise of professional judgment by trial counsel or defense counsel.

10 U.S.C. § 949b(a)(2).

The Defense evidence fails to support that the Administration, in rejecting the "Policy Principles," acted in any capacity delineated in subparagraphs (A) through (C) (i.e., a Military Commission, a Convening Authority, or a Trial or Defense Counsel) while in the performance of any of the designated acts (i.e., the reaching of findings or sentence; judicial acts; or the exercise of professional judgment, respectively).

7

### A. The Effect, If Any, on Any Member of the Military Commission in Reaching a Finding or Sentence as a Result of Pre-Trial Publicity Is Best Addressed During *Voir Dire*

The Defense asserts that Members of Congress "deliberately orchestrate[d] pretrial publicity with the intent to influence the results in a particular case." AE 926 (AAA) at 20. The Prosecution recognizes that "even the perception that pretrial publicity has been engineered to achieve a prohibited end - regardless of the intent of those generating the media attention - may lead to the appearance of unlawful command influence." *United States v. Simpson*, 58 M.J. 368, 374 (C.A.A.F. 2003). However, prejudice to the Accused in such instances cannot be presumed, and is premature in a case that still, after almost twelve years of pre-trial litigation, does not have a trial date.

When compared with their civilian counterparts, military panels are comprised of uniquely sophisticated members. *See* 10 U.S.C. § 948i(b); R.M.C. 502. Members are easily cured of any infection they receive from public opprobrium stemming from statements they hear, and such curative impact is amplified with the passage of time. *See United States v. Calley*, 46 C.M.R. 1131, 1161 (A.C.M.R. 1973) (ruling that publicized statements by the President, various cabinet officers, and the Army Chief of Staff concerning the My Lai incident did not constitute command influence considering that the statements were made almost a year before trial; they were general in character and evidenced no design to secure the conviction of any individual; the court members indicated they had little, if any, recollection of the statements; and all members indicated they would not be influenced). Further, there is a presumption that member panels abide by the instructions they receive from the military judge. *See United States v. Reyes,* 63 M.J. 265, 267 (C.A.A.F. 2006); *see also United States v. Taylor*, 53 M.J. 195, 198–99 (C.A.A.F. 2000).

While a member's exact knowledge of the public statements made will be appropriate to pursue during *voir dire*, as discussed more below, it should not be presumed that military officers, serving their country across the globe, are paying rapt attention to every public statement of members of Congress. This is why courts almost never find presumed prejudice.

8

"[P]resumed prejudice, is rarely applicable and is reserved for extreme situations." *United States v. Gray*, 37 M.J. 730, 747 (A.C.M.R. 1992) (citing *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 554 (1976) (concluding that a capital accused could "not meet the level needed for presumed prejudice" because he failed to demonstrate that pre-trial publicity, which showed the accused's face in the local newspaper and on television while linking him to two murders and multiple rape convictions, was prejudicial and inflammatory such that it "saturated the community").

This Commission already has ruled on a pre-trial publicity motion to dismiss, and in denying the motion, found that "the impact of the publicity, statements by public figures, and academic opinions can only be accurately determined when the panel is to be seated; prior to that time any impact, real or imaginative, is speculative." AE 031BBB, Order, at 16 (Pohl, J.).[4] The Military Judge should find the same, and, as such, also find that the Defense has not met its initial burden of establishing that pre-trial publicity has given rise to the appearance of unlawful influence in this case.

### B. In Rejecting the "Policy Principles," the Administration Was Not Serving as Convening Authority with Respect to a Judicial Act

The President serves as Commander-in-Chief of the Armed Forces, but the Secretary of Defense is the only statutorily recognized Convening Authority under the M.C.A. *See* 10 U.S.C. § 948h ("Military commissions under this chapter may be convened by the Secretary of Defense or by any officer or official of the United States designated by the Secretary for that purpose."). The Secretary of Defense has delegated his authority as the Convening Authority in this case to Brigadier General Escallier (and before her, to Colonel Wood). As a result, the Secretary exercises no current convening authority over this case—the judicial acts ascribed to the Convening Authority under the law lie in the discretion of Brigadier General Escallier alone. Although the Secretary of Defense could withdraw his delegation of authority and assume responsibilities as the Convening Authority, he has not done so in this case.

---

[4] Any such determination should also include statements the Accused made or caused to be filed in this Military Commission detailing their own involvement in the September 11, 2001 attacks. *See* Attachs. F, G.

Regardless, the rejection of the "Policy Principles" by the Administration did not constitute a judicial act. The decision to accept or reject the "Policy Principles" was, by its very nature, an exercise of political prerogative—an evaluation as to matters of policy not within any judicial discretion. The Secretary of Defense, who, along with the President is responsible for the conditions of confinement for the Accused while they remain in DoD custody, had a proper role in advising the President regarding the "Policy Principles," as they centered on issues that were directly under his cognizance (e.g., future conditions of confinement, contact with family members, and future medical care). *See* Attach. B (filed under seal by oral order of the Commission entered Feb. 21, 2024).

Negotiated terms that require policy-level decisions are not "judicial acts" of the Convening Authority, and thus are not the type of acts that the doctrine of Unlawful Influence are designed to protect from influence. *See* AE 555EEE, Ruling, at 26 (Parrella, J.) (denying Mr. Ali's motion to dismiss based on alleged unlawful influence of the Convening Authority, and observing that, "[m]ere administrative, organizational and/or resource management decisions, on the other hand, do not rise to the level of 'judicial acts,' even if they may have some measure of practical impact on litigation of a particular case or cases") (citations omitted).

The Supreme Court has likewise defined "judicial acts" as being far narrower than all acts performed by a judge (or, in this case, someone performing quasi-judicial functions):

> Administering this operation [of the federal judiciary] requires many decisions in the ordinary sense of the term—decisions about such things as facilities, personnel, equipment, supplies, and rules of procedure. It would be absurd to suggest that every "final decision" on any such matter is appealable under § 1291 or reviewable in this Court under § 1254. Such administrative decisions are not the kind of decisions or orders—i.e., decisions or orders made in a judicial capacity—to which the relevant jurisdictional provisions apply.

*Ayestas v. Davis*, 138 S. Ct. 1080, 1090 (2018) (internal quotation marks and citations omitted); *see also Forrester v. White*, 484 U.S. 219, 227 (1988) ("The decided cases, however, suggest an intelligible distinction between judicial acts and the administrative, legislative, or executive functions that judges may on occasion be assigned by law to perform."); *id.* at 228 ("Administrative decisions, even though they may be essential to the very functioning of the

10

courts, have not similarly been regarded as judicial acts."); *Giron v. Chaparro*, No. 04-cv-670, 2004 U.S. Dist. LEXIS 35375, at *2 (D.N.M. Dec. 8, 2004) (observing that "[i]t is clear that not all actions of a judge are 'judicial acts' simply because they were performed by a judge"); *White v. Fraternal Order of Police*, 909 F. 2d 512, 524 (D.C. Cir. 1990) (finding a lack of judicial qualities in the absence of formal hearings or issuance of a ruling that could be enforced or appealed).

Although the Convening Authority is authorized to take certain "judicial acts"—such as referring charges, entering into pretrial agreements, reviewing records of trial, and considering clemency requests, *see* 10 U.S.C. § 948h; R.M.C. 504; R.M.C. 601; R.M.C. 705; R.M.C. 1107— the requests the Defense set forth in the "Policy Principles," even if accepted by DoD, would not be such acts. The Defense acknowledges this point by labeling these matters as "Policy Principles" for consideration by the Secretary of Defense, distinguishable from matters negotiated with the Convening Authority pursuant to R.M.C. 705.

The Regulation for Trial by Military Commission further distinguishes and anticipates the potential interplay between political, executive, and administrative decisions involving conditions of confinement and the judicial and discretionary act of negotiating and accepting a pre-trial agreement under R.M.C. 705. Paragraph 12-7, *Coordination with Commanders for Certain Purposes*, provides as follows:

> a. The Convening Authority and the accused may agree to include provisions related to the nature of confinement. Prior to reducing any such arrangement to print, the Convening Authority shall coordinate with the Commander of Joint Task Force Guantanamo (or the successor military or civilian organization tasked with responsibility for confinement of individuals subject to or sentenced by a military commission (hereinafter Successor) and receive written confirmation that such an arrangement is acceptable and will be honored. Should such an arrangement be agreeable to the Commander (or Successor), the Commander (or Successor) will return a signed writing to that effect and the Convening Authority may proceed with the PTA. Any counter-offer or adjustment to the PTA must be concurred with by the Commander (or Successor).

> b. Should, after acceptance and execution of the terms of the PTA, conditions change such that the commander (or Successor) may no longer comply with the

11

agreed upon provisions, and there are no alternatives to satisfy the PTA, the PTA shall become voidable, and the accused may elect to withdraw his plea and appeal to the highest court which last reviewed his case preceding any review conducted by the United States Supreme Court.

c. The Convening Authority may agree to make recommendations regarding the place or conditions of confinement; however, a failure to comply with the Convening Authority's recommendation does not render the PTA voidable, and is not grounds for the accused to withdraw from the PTA.

Here, the regulation specifically perceives that outside coordination regarding conditions of confinement may occur, and that such coordination is not unlawful influence. Indeed, should such coordination fail to arrive upon acceptable terms, the remedy is not one under unlawful influence but instead voidability of the agreement as may be applicable.

The Defense specifically and intentionally invited the Secretary's consideration of these policy terms, recognizing that the terms were not within the purview of the Convening Authority. It would now be manifestly unfair to find that the complex, administrative and political consideration of these policy proposals—even as occurring between branches of government—constituted unlawful influence.

### C. The Administration Was Not Serving as Trial Counsel in the Exercise of Professional Judgment

As the Defense correctly identifies, there exists some notable distinctions between the scope of the U.C.M.J.'s UCI provision, which is limited to persons "subject to" the U.C.M.J., and the M.C.A.'s unlawful influence provision, in that the M.C.A.'s provision extends to any person regardless of that person's status under either the U.C.M.J. or the M.C.A. This includes language in the M.C.A. that prohibits unlawful influence affecting "the exercise of professional judgment by trial counsel or defense counsel." 10 U.S.C. § 949b(a)(2)(C). The descriptive language of "professional judgment by trial counsel" is not found in the U.C.M.J. and was specifically placed into the M.C.A. following a request by the then-Chief Prosecutor of Military Commissions to ensure his office was independent from political influence.

The history of 10 U.S.C. § 949b illuminates why the language is different between the two statutes, and the effect these nuances were intended to have. Colonel Morris D. Davis,

USAF, while serving as Chief Prosecutor, proposed 10 U.S.C. § 949b to Congress as a "statutory guarantee of the sanctity of our prosecutorial independence."  Memorandum from Colonel Morris D. Davis, USAF, Chief Prosecutor, Office of Military Commissions, to Judge Susan J. Crawford, Convening Authority for Military Commissions, at 3 (Aug. 23, 2007), *reprinted in* BG CLYDE J. TATE II, USA, ET AL., ASSESSMENT OF THE ROLE OF THE LEGAL ADVISOR TO THE CONVENING AUTHORITY OF THE OFFICE OF MILITARY COMMISSIONS at Tab G (Sept. 17, 2007). Colonel Davis explained that he sent a letter on 9 September 2006 to Senators Lindsey Graham and John McCain, at their request, proposing that the draft Section 949b of the 2006 M.C.A. be amended to read as follows:

> No person may attempt to coerce or, by any unauthorized means, influence the action of a military commission under this chapter, or any member thereof, in reaching the findings or sentence in any case; the convening, approving, or reviewing authority *with respect to their judicial acts*; *or the exercise of professional legal judgment by trial counsel or defense counsel.*

*Id.* at 2–3 (first emphasis added).  Colonel Davis's proposed language was incorporated in Section 949b(2) of the 2006 M.C.A.  *See id.* at 3 (noting "that the language eventually included in Section 949b(2)(C) is almost word for word the language [Colonel Davis] proposed").  The language was intended to "permit [prosecutors] to exercise independent professional legal judgment free of political or other motivations." *Id.*  As an example, Colonel Davis cited the impropriety of a Deputy Secretary of Defense encouraging the Office of the Chief Prosecutor to consider the "'strategic political value' in charging terrorists prior to the election." *Id.*[5]

Here, the Prosecution can aver that it has not been unlawfully influenced and continues its willingness to positively endorse any pre-trial agreement that meets its "Prosecution Principles" requirements.

---

[5] At the time, the "DoD General Counsel [] corrected the DEPSECDEF saying the only person empowered to make those decisions was the chief prosecutor." *Id.*  In that instance, the principle of prosecutorial independence worked to stop improper political influence.

13

**JA.496**

6. **Conclusion**

There is no actual or apparent unlawful influence resulting from the Administration's consideration and ultimate rejection of the Defense-proposed "Policy Principles" even assuming that its consideration incorporated the views of Members of Congress. The Defense cannot invite the political branches into a discussion on policy principles related to pre-trial agreements and then complain when those branches decline those policies. The Defense motion should be denied.

7. **Oral Argument**

The Prosecution does not request oral argument and asserts that this issue should be resolved by the Commission on the parties' submissions alone and no oral argument need be granted. If the Commission decides to grant oral argument to the Defense, the Prosecution requests an opportunity to respond.

8. **Witnesses and Evidence**

The Prosecution will not rely on any witnesses or additional evidence to support of this motion.

9. **Additional Information**

The Prosecution has no additional information.

10. **Attachments**

A. Certificate of Service, dated 22 February 2024.

B. Defense-Proposed "Joint Policy Principles" and "Overarching Principles" (UNDER SEAL).

C. E-mail from Managing Trial Counsel to the Defense Teams, dated 23 March 2022.

D. Letter from the Assistant Secretary of Defense for Legislative Affairs to U.S. Senator, dated 4 October 2023.

E. Letter from the Assistant Secretary of Defense for Legislative Affairs to U.S. Representative, dated 4 October 2023.

14

**JA.497**

F.  D-101, "The Islamic Response to the Government's Nine Accusations," *United States v. Khalid Sheikh Mohammed, et al.*, dated 9 March 2009.

G.  Combatant Status Review Tribunal #38 Transcript for Mr. Mohammad, dated 10 March 2007.

Respectfully submitted,

_____//s//_____
Clay Trivett
Managing Trial Counsel

15

## Attorneys say Austin violated military rules in halting deal for alleged 9/11 conspirators

By Haley Britzky, CNN

⊙ 6 minute read · Updated 3:51 PM EDT, Wed August 7, 2024



Secretary of Defense Lloyd Austin holds a joint news conference at the U.S. Naval Academy on August 6, 2024 in Annapolis, Maryland. Chip Somodevilla/Getty Images

**(CNN)** — Defense counsel for the alleged 9/11 conspirators at Guantanamo Bay claimed Wednesday that a move by Defense Secretary Lloyd Austin to revoke a previously-agreed-upon plea deal violated military regulations and exposed the system as "corrupt."

"We have had an unprecedented act by a government official to pull back what was a valid agreement ... For us, it raises very serious questions about continuing to engage in a system that seems so obviously corrupt and rigged," Walter Ruiz, defense counsel for Mustafa Ahmed Adam al Hawsawi, said during a hearing at Guantanamo on Wednesday.

Wednesday's pretrial hearing, which has been scheduled for months, followed a whiplash decision by Austin to revoke a plea deal that had been announced just two days prior last week. A press release from the Pentagon originally said that the convening authority for mili

**JA.499**

commissions, Susan Escallier, had entered into pretrial agreements with Khalid Shaikh Mohammad, Walid Muhammad Salih Mubarak Bin 'Attash and Hawsawi.

The agreement was the result of more than two years of negotiations. Ruiz noted that parties, including the prosecution, had worked "for years ... in good faith" to reach the pretrial agreement, "only to have that taken away."

But the plea deal prompted a fierce backlash, including from both sides of the political aisle and some groups representing 9/11 victims who have pushed for the US government to pursue the death penalty. A short memo from Austin on Friday, which was quietly posted to the Pentagon's website, said that he was withdrawing Escallier's authority and reserving "such authority to myself."

"Effective immediately, in the exercise of my authority, I hereby withdraw from the three pre-trial agreements that you signed on July 31, 2024 in the above-referenced case," Austin said.

A senior defense official declined on Wednesday to provide specifics about any possible conversations Austin had with the White House on the plea agreement, saying only that he "exercised his own independent judgment," and that the Pentagon is "in touch with the White House every day on a variety of issues." The official also declined to comment about whether Austin was advised by the Pentagon's general counsel ahead of his decision to revoke the agreement.

The defendants' defense teams, as well as outside legal experts, argued this week that such a move was potentially unlawful and violated the military's own military commission regulations.

"What he did was illegal," Eugene Fidell, who teaches military justice at Yale University and co-founded the National Institute of Military Justice, told CNN.

One of the primary issues pointed to on Wednesday by defense counsel was a regulation laid out in the military's Manual for Military Commissions, which says the convening authority can withdraw a pretrial agreement before the accused begins "performance of promises" or if the accused does not hold up their end of the deal. Gary Sowards, a defense attorney for Mohammad, said in court that Austin did not have authority under that regulation because his client had "begun very important, substantive, specific performance."

Sowards acknowledged that motions for discovery on the issue of potential unlawful influence by Austin, which would "seek to explore how he was coerced and influenced," could take a year or two to litigate. But the issue of the Manual for Military Commissions regulation is "a simple reading of about 12 lines of text," he said, and a decision on it should be able to be expedited.

"We should not gratify the chaos that is resulting from this precipitous decision," he said.

In response, prosecutor Clayton Trivett said in court on Wednesday that the government had not yet had the chance to "work through the issues raised in these motions" and have their position "fully articulated." Sowards responded forcefully, telling the judge he was "frankly gobstruck" that the government would not have had the opportunity to "formulate and opinion or position" on whether Austin's decision abided by existing regulations.

"'We want to consult with people' — that sounds like 'we want to get our stories together,'" he said. "There is no story that says what happened on August 2 was authorized after what happened on July 31."

The senior defense official declined on Wednesday to comment on the claim that Austin violated military regulations, citing ongoing litigation, but said that the secretary "acted lawfully." The official also said that Austin and the Pentagon were surprised by the announcement of the pretrial agreement, despite acknowledging that the negotiations had been underway "for years and years and years and years."

When asked why the Pentagon would not have anticipated an eventual conclusion to those negotiations resulting in an agreement, the official said only that Austin "didn't have a lot of insight" into the negotiations and "took the independence of the convening authority very seriously."

At a news conference on Tuesday alongside Secretary of State Antony Blinken and their Australian counterparts, Austin defended his decision to revoke the agreement, saying he has "long believed that the families of the victims, our service members, and the American public deserves the opportunity to see military commission trials carried out in his case."

"I'm deeply mindful of my duty to all those whose lives were lost or changed forever on 9/11, and I fully understand that no measure of justice can ever make up for their loss. So this wasn't a decision that I took lightly," he said.

But Sowards argued Wednesday that by revoking the deal, Austin was actually doing more harm to the families.

While the terms of the pretrial agreement had not been released publicly, among them was the assurance that the detainees would answer questions by 9/11 victim family members. Sowards said family members had already "been submitting questions in good faith," and expecting answers in return as part of the deal.

Austin's actions, which threatened "total chaos," reflect a "mistaken belief" that by re

**JA.501**



**SECRETARY OF DEFENSE**
1000 DEFENSE PENTAGON
WASHINGTON, DC 20301-1000

NOV 2 5 2024

MEMORANDUM FOR SUSAN ESCALLIER, CONVENING AUTHORITY FOR MILITARY
COMMISSIONS

SUBJECT: Authority to Enter into Pre-Trial Agreements in *United States v. Abd al-Rahim Hussein Muhammed Abdu Al-Nashiri* and *United States v. Encep Nurjaman (aka Hambali)*

I have determined that, in light of the significance of the decision to enter into pre-trial agreements with the accused in the above-referenced cases, responsibility for such a decision should rest with me as the superior convening authority under the Military Commissions Act of 2009. Effective immediately, I hereby withdraw your authority in the above-referenced cases to enter into pre-trial agreements and reserve such authority to myself.

JA.502

# Congress of the United States
## Washington, DC 20515

August 28, 2023

The Honorable Lloyd J. Austin III
Secretary of Defense
1000 Defense Pentagon
Washington, D.C. 20301-1000

Dear Secretary Austin,

We write to express our disappointment regarding the news that the Department of Defense may extend a plea agreement to the masterminds of the September 11th attacks whereby the United States would spare the lives of the individuals responsible for this horrific attack, and deny the families of the victims both justice and closure. Make no mistake, any outcome short of the death penalty for the September 11th plotters would be completely unacceptable, and constitute a total failure of leadership on the part of the Department of Defense.

On September 11, 2001, terrorists took the lives of 2,977 innocent people in a series of cowardly attacks, resulting in the worst act of terror in American history. Although it took significant time and resources, the United States military and intelligence community located and captured those responsible, Khalid Shaikh Mohammed and four other plotters. These men have been detained in Guantanamo Bay since 2003, awaiting punishment for their horrific acts. The victims' families have now been patiently waiting for justice for over twenty years.

Although the news broke last year that these five men might escape trial and a death sentence through negotiated agreement, this outcome was at that time only theoretical.[1] Unfortunately, recent reporting suggests victims' family members received a letter on August 1, 2023 soliciting questions or comments about the possibility of a plea agreement allowing the accused to escape the death penalty.[2] This solicitation invariably leads to the conclusion that a plea agreement removing a death sentence is no longer speculative but is instead a possible outcome.

In addition, a set of "policy principles" connected to the ongoing plea negotiations likewise emerged last year. While ambiguous on their face, a review of Military Commissions filings and relevant reporting indicates that these principles involve high-level government official deliberations. They suggest that the decisions driving this plea agreement occur in Washington, D.C., not at the Military Commission.

---

[1] Carol Rosenberg & Charlie Savage, *Sept. 11 Prosecutors Are in Plea Talks That Could Avert a Death-Penalty Trial*, N.Y. TIMES (Mar. 15, 2022), https://www.nytimes.com/2022/03/15/us/politics/gitmo-terrorism-trial.html

[2] Ellen Knickmeyer & Jennifer Peltz, *Plea negotiations could mean no 9/11 defendants face the death penalty, the US tells families*, ASSOCIATED PRESS (Aug. 16, 2023), https://apnews.com/article/guantanamo-911-defendants-76fab68b1faa1a7e1634b10951258710

JA.503

Indeed, on March 28, 2023, the *New York Times* reported that "policy principles" were at issue in the pretrial agreement. The report described the policy principles as "mostly the details of how the accused would spend the rest of their lives in prison."[3] About six months earlier, the *Times* also reported that the judge presiding over the September 11 case canceled pretrial hearings "while prosecutors await a response from the Biden administration on a proposed plea deal that would avert a death-penalty trial for the five defendants."[4]

During his campaign for president, Joe Biden pledged to "work to pass legislation to eliminate the death penalty at the federal level, and incentivize states to follow the federal example"[5] For example, despite Patrick Crusius' racially-targeted mass murder of 23 people at an El Paso Wal-Mart in 2019, the Department of Justice inexplicably offered him a plea agreement which allowed him to escape the death penalty. By contrast, local El Paso prosecutors, armed with the same evidence as their federal counterparts, have promised to put the shooter on death row.[6] The Biden Administration's decision here appears not to be based on the strength of the evidence or the wishes of the victims' families, but rather a purely political choice, designed to appease the fringe left of his party. Unfortunately, having already injected partisan political concerns into the administration of the death penalty in civilian courts, it now appears the Biden Administration is doing the same in military tribunals.

Victims have spoken out in the media about the proposed plea bargain, indicating that they "were told, and were promised, that we would bring these people responsible to justice, and we expect that to happen[.]"[7] These families have already been robbed of their loved ones, they should not also be robbed of the full measure of justice in this case. The September 11th plotters are mass murderers, deserving of the ultimate punishment. Indeed, if there are persons walking the face of the Earth who are deserving of the death penalty, it is these five men. After over two decades of patiently waiting, the victims' families deserve closure.

For these reasons, we request that you respond to the questions below no later than September 15, 2023:

---

[3] Carol Rosenberg, *Judge Signals Impatience a Year Into Sept. 11 Case Plea Talks*, N.Y. TIMES (Mar. 28, 2023), https://www.nytimes.com/2023/03/28/us/politics/september-11-plea-deal-guantanamo.html

[4] Carol Rosenberg, *Sept. 11 Case Awaits Biden Administration's Reply on Plea Deal*, N.Y. TIMES (Oct. 23, 2022), https://www.nytimes.com/2022/10/23/us/politics/sept-11-gitmo-terrorism.html

[5] Dakin Akone, *Biden campaigned on abolishing the federal death penalty. But 2 years in, advocates see an 'inconsistent' message*, CNN (Jan. 22, 2023), https://www.cnn.com/2023/01/22/politics/joe-biden-federal-death-penalty-abolition/index.html

[6] Uriel J. García, *Gunman in 2019 El Paso mass shooting receives 90 life sentences*, TEX. TRIBUNE (July 7, 2023), https://www.texastribune.org/2023/07/07/el-paso-mass-shooting-crusius-life-sentence/.

[7] Scott MacFarlane, *Pentagon considering plea deals for defendants in 9/11 attacks*, CBS NEWS (Aug. 17, 2023), https://www.cbsnews.com/news/pentagon-considering-plea-deals-911-defendants/

**JA.504**

1. Why is the administration, through your offices, not working to advance this case and allow prosecutors to try the accused?

2. What exactly constitutes a "policy principle?"

3. What officials are involved with "policy principle" discussions?

4. Why has the administration delayed justice by requiring the prosecution and defense to engage in thirteen status conferences discussing the policy principles?

5. Why is the decision to allow death as a possible sentence so difficult, given the facts of the underlying offense?

6. Who from the Department of Justice, White House Counsel's Office, or Executive Office of the President did you, your staff, or any member of the relevant Military Commission, speak with regarding whether to seek the death penalty in this case?

Sincerely,

Ted Cruz
United States Senator, Texas

Nicole Malliotakis
Member of Congress (NY-11)

3

**JA.505**

05.08.24

# McConnell Remarks On Support For Israel, Justice For Terrorists

**'I speak with some experience in the difficulties of standing up to extreme elements of one's own political party. But the President's apparent inability to keep the most radical voices on his left flank out of the Situation Room isn't just a shameful abdication of leadership - it's dangerous.'**

**WASHINGTON, D.C.** – *U.S. Senate Republican Leader Mitch McConnell (R-KY) delivered the following remarks today on the Senate floor regarding national security priorities:*

"The attacks of October 7th brought the world face-to-face with the savage terrorists who have tried to destroy the Jewish state for decades.

"They forced us all to take a sober look at what our ally, Israel, has to defend against every single day.

"In the months since, I've insisted repeatedly that America should provide Israel the time, space, and support it needs to defeat Iran-backed terrorists and restore its security.

"And I've made it clear that the consensus of Israel's national unity war cabinet – that lasting security can only come after Hamas is defeated – ought to be our position here in America as well.

"Early on, there was reason to believe that President Biden shared this view.

"I was encouraged by his initial willingness to move quickly to transfer needed munitions to Israel, by his request for an emergency national security supplemental including urgent security assistance to Israel, and by what he called his Administration's 'ironclad' commitment to Israel's security.

"Unfortunately, we've seen then that iron bend under the heat of domestic political pressure from his party's anti-Israel base and the campus communists who decided to wrap themselves in the flags of Hamas and Hizballah.

"We've seen his Administration cave to growing demands to condition and limit assistance to our democratic ally.

"We've seen public attempts to micromanage Israel's self-defense. To constrain Israel's freedom of action.

"And a few days ago, we saw reports that the President was delaying weapons shipments to Israel, creating daylight between America and a close ally.

"As it turns out, these reports were true. And the decision to pause these shipments was withheld from Congress – we still don't know key facts.

"I speak with some experience in the difficulties of standing up to extreme elements of one's own political party.

"But the President's apparent inability to keep the most radical voices on his left flank out of the Situation Room isn't just a shameful abdication of leadership – it's dangerous.

"Failing to pass the emergency national security supplemental would have been devastating to Ukraine's defense and America's credibility. For the Administration to withhold assistance from Israel is devastating in its own right.

"At home, it will only whet the appetite of the anti-Israel Left. And abroad, it will embolden Iran and its terrorist proxies.

"There is no secret shortcut to restoring peace and security. A return to the status quo ante doesn't solve the challenge at hand.

"The status quo before October 7th was what allowed Iran the latitude to export terror across the Middle East and allowed Hamas to exploit a cease-fire to launch the attacks.

"For those who care about the humanitarian situation in Gaza – and I would count myself among those who do – the most enduring way to help the Palestinian people is to help Israel defeat Hamas.

"A return to the status quo ante will only perpetuate the conditions that have long plagued the people of Gaza, and threatened the people of Israel.  In the last week, their terrorist oppressors have struck the main humanitarian entrance to Gaza twice with mortars.

"It's time for the President to stop letting domestic political demands of the far left determine his foreign policy.

"And it's time to stop doubting the will of Israel's unity government and the overwhelming view of the Israeli people.

"A future of peace for Israelis and Palestinians is one in which Iran-backed terrorists play no part.

"Now, on a related matter…

***

"Israel knows it cannot blink in the face of savages who seek to destroy it. The same cannot be said of the Biden Administration.

"The disastrous retreat from Afghanistan… The delusion that 'over-the-horizon' counterterrorism could fill in for on-the-ground operations… And of course, an abiding fixation on releasing hardened killers from the terrorist detention facility at Guantanamo Bay so they can symbolically end the war on terror.

**JA.506**

"Negotiations between federal prosecutors and representatives of the masterminds of the September 11th massacre have been ongoing for years. The terrorists' defense has tried every trick in the book to dodge justice, from bids for transfer to U.S. soil for medical treatment to plea deals that would take a capital sentence off the table.

"Many of our colleagues have followed these proceedings with great interest. Many of us feel strongly that a terrorist mass murderer ought to get his just desserts.

"And the way this story is sometimes covered in the press, you might think there's something wrong about a U.S. senator insisting on it. So let's be clear on a couple of things:

"First, Khalid Shaikh Mohammed deserves nothing less than the death penalty. And the fact he hasn't yet received it is a disgrace.

"Second, on President Biden's watch, the terrorist threat has grown significantly while our ability to combat it has actually shrunk. Law enforcement and intelligence officials confirm the urgency of the threat to the homeland.

"We've been kicked out of the Sahel. And we are blind in Afghanistan. The President's precipitous withdrawal from Bagram Air Base led to the emptying of the terrorist detention facility there and fueled ISIS-K terrorist plots against America.

"Finally, if the President and his Attorney General let the perpetrators of the deadliest terrorist attack on American soil plead out, or cut a secret deal for better healthcare and living conditions, the Biden Administration will pay a steep political price."

###

**Related Issues: Iran, America's Military, Israel, Al Qaeda, National Security**