ORAL ARGUMENT SCHEDULED FOR JANUARY 28, 2025
**Case No. 25-1009**

---

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

IN RE: UNITED STATES,

*Petitioner.*

---

On petition for a writ of mandamus from a decision of the
Court of Military Commission Review

---

### CORRECTED
### Respondents' Brief in Opposition to
### Petitioner's Petition for a Writ Mandamus

---

Walter B. Ruiz
Suzanne M. Lachelier
Sean M. Gleason
Maj. Kerry A. Mawn, JA, USAF
Maj. Patrick C. Tipton, JA, USAF
Military Commission Defense
Organization
1620 Defense Pentagon
Washington, DC 20301-1620

*Counsel for Respondent,*
*Mustafa Al Hawsawi*

Michel Paradis
Gary Sowards
Denny LeBoeuf
Delphine Lourtau
Nicholas McCue
Gabriela McQuade
Melanie Partow
Maj. Michael Leahy, USAF
Maj. Elspeth Theis, USAF
LT William Xu, JAGC, USN
Military Commission Defense
Organization
1620 Defense Pentagon
Washington, DC 20301-1620

*Counsel for Respondent,*
*Khalid Sheikh Mohammed*

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................ 1

STATEMENT ...................................................................................................... 4

ARGUMENT ....................................................................................................... 7

    I.      STANDARD OF REVIEW. ................................................................... 7

    II.    THE GOVERNMENT HAS ADEQUATE ALTERNATIVES
    TO MANDAMUS. ........................................................................................... 8

    III.   THE SECRETARY HAD NO CLEAR AND INDISPUTABLE
    ENTITLEMENT TO WITHDRAW FROM THE PRETRIAL
    AGREEMENT IN THIS CASE. ....................................................................... 10

        A.    Neither the Secretary, nor the Convening Authority, had
             any entitlement to withdraw from the pretrial agreements
             in this case because Respondents had indisputably begun
             performance. ....................................................................................... 10

        B.    The Secretary's authority to rescind the Convening
             Authority's discretion over pretrial agreements is not clear
             and indisputable. ............................................................................... 20

    IV.   IT IS INAPPROPRIATE FOR THIS COURT TO USE ITS
    EQUITABLE POWERS TO INDEFINITELY DELAY CLOSURE IN
    A CASE THAT HAS FESTERED FOR A QUARTER-CENTURY. ............. 24

        A.    The government's need for this Court's extraordinary
             intervention arises from problems of its own making. ........................ 25

        B.    This Court's intervention is neither necessary for nor
             capable of ensuring the government obtains the relief it
             claims to desire. ................................................................................ 30

CONCLUSION ................................................................................................. 35

Certificate of Compliance with Rule 21(d) ..................................................... 36

Certificate of Service ...................................................................................... 37

# TABLE OF AUTHORITIES

*Respondents put their principal reliance on authorities marked with an* *

## Cases

*Bahlul v. United States*, 967 F.3d 858 (D.C. Cir. 2020)......................................23

*In re Al-Nashiri*, 791 F.3d 71 (D.C. Cir. 2015)..........................................9, 24, 31

*In re Flynn*, 973 F.3d 74 (D.C. Cir. 2020)....................................................7, 10, 30

*United States v. Dean*, 67 M.J. 224 (2009) ..............................................13, 14, 16

*Amadeo v. Zant*, 486 U.S. 214 (1988) ...................................................................12

*Bahlul v. United States*, 77 F.4th 918 (D.C. Cir. 2023)........................................23

*BancOhio Corp. v. Fox*, 516 F.2d 29 (6th Cir. 1975)..............................................8

*Caswell v. Morgenthau*, 98 F.2d 296 (D.C. Cir. 1938) .........................................29

*Cheney v. U.S. District Court*, 542 U.S. 367 (2004) .........................................7, 29

*Choate v. TRW* 14 F.3d 74 (D.C. Cir. 1994) .........................................................14

*Duncan Townsite v. Lane*, 245 U.S. 308 (1917) .....................................................7

*In re Al-Nashiri*, 835 F.3d 110 (D.C. Cir. 2016) .....................................................9

*In re EOP*, 215 F.3d 20 (D.C. Cir. 2000) ..............................................................10

*In re Nurjaman*, No. 23-1294, 2024 WL 32192924
    (D.C. Cir. June 28, 2024) ....................................................................................10

*In re Riggs*, 214 U.S. 9 (1909)................................................................................11

*In re Stone*, 940 F.3d 1332 (D.C. Cir. 2019)..........................................................29

*In re United States*, 872 F.2d 472 (D.C. Cir. 1989) ..............................................11

*Knable v. Wilson*, 570 F.2d 957 (D.C. Cir. 1977) ...................................................8

*Lorillard v. Pons*, 434 U.S. 575 (1978)..................................................................11

*Middendorf v. Henry*, 425 U.S. 25 (1976)..............................................................11

*NetCoalition v. SEC*, 715 F.3d 342 (D.C. Cir. 2013)............................................23

*Robbins v. Reagan*, 780 F.2d 37 (D.C. Cir. 1985) ................................................20

*Roberts v. Vance*, 343 F.2d 236 (D.C. Cir. 1964) ..................................................22

*Roche v. Evaporated Milk Ass'n*, 319 U.S. 21 (1943).......................................9, 11

*Sattazahn v. Pennsylvania*, 537 U.S. 101 (2003) ...................................................9

*U.S. ex rel. Greathouse v. Dern*, 289 U.S. 352 (1933).................................7, 24, 29

*United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954)......................22

*United States v. Fraser*, 15 USCMA 28 (CMA 1964)...........................................21

*Venezuela v. Philip Morris*, 287 F.3d 192 (D.C. Cir. 2002) .................................23

*Whitehouse v. Illinois Cent. R. Co.*, 349 U.S. 366 (1955)......................................30


**U.S. Code**

10 U.S.C. § 948b ........................................................................................11

10 U.S.C. § 948h ........................................................................................21

10 U.S.C. § 949a........................................................................................11

10 U.S.C. § 949b ........................................................................................21

10 U.S.C. § 949h .........................................................................................9

10 U.S.C. § 950g .......................................................................................2, 8


**Executive Materials**

Rule for Courts-Martial (2016 ed.) 705....................................................11, 21

Rule for Military Commission (2019 ed.) 1103 ...........................................21

Rule for Military Commission (2019 ed.) 1104 ...........................................21

Rule for Military Commission (2019 ed.) 401 .............................................21

Rule for Military Commission (2019 ed.) 601 .............................................21

Rule for Military Commission (2019 ed.) 604 .............................................21

Rule for Military Commission (2019 ed.) 704 .............................................21

Rule for Military Commission (2019 ed.) 705 ..................10, 11, 13, 16, 21, 22, 28


**Miscellaneous**

15 Williston on Contracts § 44:54 (4th ed.) ................................................11

American Bar Association, *American Bar Association Guidelines for the
Appointment and Performance of Defense Counsel in Death Penalty
Cases*, 31 Hofstra L. Rev. 913 (2003)....................................................33

*Bahlul v. United States*, Case No. 22-1097, Amicus Brief of the Chief Defense Counsel (D.C. Cir., Sept. 15, 2023) ......................................................24

Carol Rosenberg, *Accused Sept. 11 Plotters Agree to Plead Guilty at Guantánamo Bay*, N.Y. Times, July 31, 2024......................................................32

Carol Rosenberg, *Twists and Turns in Sept. 11 Plea Process Are Agonizing, Families Say*, N.Y. Times, November 22, 2024 ...............................34

Center on National Security, "Justice Delayed: The length of terrorism prosecutions (in weeks) conducted under the Military Commissions Act"......................................................................................................................32

Charlie Savage, *Fired Pentagon Official Was Exploring Plea Deals for 9/11 Suspects at Guantánamo*, N.Y. Times, February 5, 2018 .........................26

Death Penalty Information Center, "Time on Death Row"...................................33

Ellen Knickmeyer & Jennifer Peltz, *Plea negotiations could mean no 9/11 defendants face the death penalty, the US tells families*, AP, August 16, 2023..................................................................................................27

Robert Loeb, *D.C. Circuit Hears Oral Argument in Bahlul v. United States*, Lawfare Blog, March 23, 2023 .................................................................24

Ted Olson, *The 9/11 Plea Deals Should Go Forward, Washington Post*, August 14, 2024.....................................................................................................34

**INTRODUCTION**

A quarter century after the September 11th Attacks, the government and the Respondents entered a pretrial agreement to bring finality to a prosecution that has languished for sixteen years. That pretrial agreement was accepted by the Secretary of Defense's personally appointed delegee, the Convening Authority for Military Commissions ("Convening Authority"), who under the relevant statutes, regulations, and decisions of this Court, had the authority to finalize that agreement on behalf of the United States. Respondents began performing. Yet, after performance had begun, the Secretary attempted to unilaterally withdraw.

Under the Rules for Military Commission ("RMC"), which the Secretary promulgated, and which were taken near-verbatim from long-standing military law, the Secretary's attempted withdrawal was unlawful. The military commission judge detailed by the Department of Defense to preside over this case, and a unanimous panel of the Court of Military Commission Review ("CMCR"), had no trouble reaching that conclusion.

Unhappy with that result, the government asks this Court to use its extraordinary equitable powers to take the Secretary's side in an intra-branch dispute in clear disregard of rules promulgated by his predecessors and Congress. It does so, even though prevailing will result in permanently preventing any semblance of closure for those with a real stake in the outcome of this case.

1

To be entitled to such relief, the government bears the burden of showing 1) that it has no alternative means of obtaining the relief it desires, 2) that it has a clear and indisputable legal right to that relief, and 3) that this Court's equitable powers are the appropriate means by which to obtain that relief. In this Circuit, the government's mandamus petition must be dismissed if it fails to make a compelling case on any of these factors. Here, the government fails to make a colorable case on any of them.

*First*, if the government can invoke this Court's jurisdiction to resolve this issue via mandamus, it can equally invoke this Court's jurisdiction in due course, once the pleas are entered, sentences are imposed, and post-judgment review by the CMCR is either complete or waived. This Court has dismissed mandamus petitions involving far greater potential for intervening harm than the government will suffer if it must wait to petition this Court for review under 10 U.S.C. § 950g.

*Second*, the Secretary had no right, let alone a clear and indisputable right, to withdraw from Respondents' pretrial agreements. The military commission judge and the CMCR found that, under settled military law, withdrawal was prohibited by the Secretary's own rules because Respondents already had begun performance.

The government insists that this Court should reach a different result because it disagrees with the military judge's determination of facts and the lower courts' application of the relevant military law. Mandamus, however, cannot be

used to relitigate facts or mixed questions of fact and law. The government's arguments also lack merit. The record leaves no doubt that Respondents began performance, which the government both insisted upon and accepted until the Secretary's belated second thoughts.

*Third*, and finally, the government has made no showing why it is appropriate for this Court to use its equitable powers to upend the resolution of this case. The Secretary knew of and participated in Respondents' plea negotiations for years without ever taking the myriad actions within his power to either prevent or discourage the conclusion of Respondents' pretrial agreements. The military commission judge entrusted with enforcement of the law had no choice but to reject the Secretary's belated effort to disrupt the orderly resolution of this case, which is reason enough for this Court to dismiss the government's petition.

An equally straightforward reason to dismiss this petition is that it is unnecessary to achieve the government's purported goal of conducting a public trial. The pretrial agreements in this case will give the public and the government an extraordinary opportunity for a public trial; permitting presentation of virtually whatever evidence the government deems appropriate and affording victims the broad and unprecedented opportunity not just to confront the accused, but to demand answers from them, which Respondents must give.

The alternative is a trial, expected to begin at the end of this decade at the earliest, in which the government will rely on suspect evidence obtained through, at best, questionable means that will render it inadmissible or the fodder for lengthy and potentially successful appeal. That reality is why counsel for the government entered into this pretrial agreement. It is why they told the victims of the September 11th Attacks that it is "the best path to finality and justice in this case." JA.203. The government has not met its burden to show why this Court must use its equitable powers to reject that conclusion with all the costs that doing so will impose on so many. The petition should therefore be dismissed.

## STATEMENT

The United States government detained Respondents in 2003, transported them across international borders, and tortured them in several Central Intelligence Agency (CIA) run "black sites." JA.133. In 2006, the government transferred Respondents to Naval Station Guantanamo Bay. JA.312. In 2007, the Federal Bureau of Investigation ("FBI") extracted confessions from the Respondents known as the "Letterhead Memoranda" ("LHMs"). JA.128-JA.130. In 2008, the government charged Respondents before a military commission for the attacks of September 11, 2001. Despite 15 years of litigation, no trial is anticipated soon.

Negotiations for pretrial agreements began in 2017. JA.124-JA.127. On August 21, 2023, the Secretary of Defense designated Brigadier General (Ret.)

Susan Escalier as the Convening Authority for Military Commissions. JA.262. On July 31, 2024, she concluded the negotiations begun by her predecessors, and accepted the pretrial agreements pursuant to the express terms of the authority delegated to her by the Secretary under the Military Commissions Act ("MCA"), the Rules for Military Commissions ("RMC"), and the Regulation for Trial by Military Commission ("RTMC").

On August 1, 2024, counsel for the government notified the military commission that the government and three defendants ("Respondents") had entered into pretrial agreements and sought to schedule the entry of pleas for the following week. JA.219-JA.221. Counsel for the government insisted that "based on the pretrial agreements," Respondents were no longer allowed to "actively continue to participate in any of the contested litigation," including "to examine the witness." Pet.Ex.B, at 2. Respondents duly suspended their participation in on-going hearings, which included waiving the examination of a government witness then testifying on the remaining defendant's highly contested motion to suppress. Respondents also signed and submitted confessional stipulations of fact, thereby fulfilling "a material term of [the] Agreement." *Ibid*. Counsel for the government "insisted upon that course of action so that the Defense teams did not violate a material term of their agreements." Pet.Ex.A, at 26.

Then, without notice, on the eve of Respondents' scheduled guilty pleas, the Secretary took the extraordinary step of issuing an order that purported to withdraw the Convening Authority's power to enter into pretrial agreements, and to withdraw from the pretrial agreements in this case.

Respectful of the Secretary's unique role in the military commissions system, Col McCall postponed the taking of Respondents' pleas so the parties could brief whether the pretrial agreement remained in force. In a detailed decision, Col McCall concluded both that the Secretary lacked the authority to rescind the Convening Authority's power to enter into pretrial agreements and, in any event, that withdrawing from the pretrial agreements was unlawful because Respondents had begun performance.

Unhappy with this result, the Secretary directed military commission prosecutors to petition the CMCR for a writ of mandamus three weeks later. On December 30, 2024, in a unanimous decision, the CMCR upheld Col McCall's decision. Pet.Ex.B, at 17.

## ARGUMENT

### I.   STANDARD OF REVIEW

"The writ [of mandamus] is one of the most potent weapons in the judicial arsenal." *Cheney v. U.S. District Court*, 542 U.S. 367, 380 (2004). "It issues to remedy a wrong, not to promote one; to compel the performance of a duty which ought to be performed, not to direct an act which will work a public or private mischief or will be within the strict letter of the law but in disregard of its spirit." *Duncan Townsite v. Lane*, 245 U.S. 308, 311–12 (1917).

For this Court to grant such "a drastic and extraordinary remedy" as compelling Col McCall to accept the Secretary's purported withdrawal from the pretrial agreements in this case, the government bears a heavy burden:

> Under governing law, the writ of mandamus should issue only if: (1) the party seeking issuance of the writ has no other adequate means to attain the relief he desires; (2) the petitioner satisfies the burden of showing that his right to issuance of the writ is clear and indisputable; and (3) the issuing court, in the exercise of its discretion, is satisfied that the writ is appropriate under the circumstances. All three requirements must be satisfied, and the absence of any one compels denial of the writ.

*In re Flynn*, 973 F.3d 74, 78 (D.C. Cir. 2020) (en banc) (quoting *Cheney*, 542 U.S. at 380–81). The government fails to satisfy any of these exacting requirements, and granting such extraordinary relief under the facts presented demands "the doing of an idle act" that would be "prejudicial to the public interest." *U.S. ex rel. Greathouse v. Dern*, 289 U.S. 352, 360–61 (1933).

## II.   THE GOVERNMENT HAS ADEQUATE ALTERNATIVES TO MANDAMUS.

This Court's jurisdiction to resolve an intra-branch dispute is doubtful for the reasons stated in Respondents' brief in opposition to the stay. Mot.BIO, at 10-11, 18-22; *cf. BancOhio Corp. v. Fox*, 516 F.2d 29, 33 (6th Cir. 1975) ("Issuance of the writ is appropriately denied where the question of jurisdiction is factually and legally difficult."). If this Court does have jurisdiction, however, that is only because the government is correct that "[s]ection 950g does not limit the parties who can seek this Court's review, and it expressly provides ... that the government can seek review of adverse USCMCR decisions," Mot.Rep., at 3-4, or of final military commission judgements following the Respondents' waiver of CMCR review under 10 U.S.C. § 950g. Mot., at 9-10; Pet., at 10.

If the government's construction of §950g is correct, it will have the right to petition for review in this Court within a relatively short time. That is an adequate alternative to this Court's intervention via extraordinary writ. "Only where an appeal can promise no more than a clearly inadequate remedy may the remedy of mandamus be resorted to." *Knable v. Wilson*, 570 F.2d 957, 961 (D.C. Cir. 1977) (cleaned up). Under the pretrial agreement, Respondents promised to waive CMCR review. Once Respondents execute these waivers, the government can file a petition for review in this Court. If they do not, the government will be able to file a petition as soon as the CMCR completes its review.

Under any scenario, therefore, the government will be able to file a petition for review in this Court and make whatever arguments it wishes about the Secretary's authority to withdraw from these pretrial agreements. Denying mandamus does not foreclose review, it simply postpones it until after "the system has completed its work." *In re Al-Nashiri*, 835 F.3d 110, 124 (D.C. Cir. 2016).

The government complains that waiting is rife with "serious practical and legal difficulties." Stay.Rep. 4-5. Other than "double jeopardy issues," however, the government does not identify what those difficulties are or why deferring this Court's review for a short while renders the MCA's review scheme "inadequate."

The MCA, for its part, states that jeopardy does not attach until "after review of the case has been fully completed," including this Court's review. 10 U.S.C. § 949h(b); *cf. Sattazahn v. Pennsylvania*, 537 U.S. 101, 113 (2003). And "the inconvenience of requiring [the government] to undergo a trial in advance of an appellate determination of the challenge now made to the validity of the [pretrial agreement]," does not warrant extraordinary relief. *Roche v. Evaporated Milk Ass'n*, 319 U.S. 21, 30 (1943).

This Court and the Supreme Court have consistently reiterated the "bedrock principle of mandamus jurisprudence that the burdens of litigation are normally not a sufficient basis for issuing the writ." *In re Al-Nashiri*, 791 F.3d 71, 80 (D.C. Cir. 2015). This Court has adhered to this principle in capital military commission

cases, *ibid.*, in cases involving the use of evidence obtained by torture, *In re Nurjaman*, No. 23-1294, 2024 WL 3219292, at *4 (D.C. Cir. June 28, 2024); *In re Al-Nashiri*, 47 F.4th 820, 827 (D.C. Cir. 2022), in cases involving the assertion of presidential privileges against discovery, *In re EOP*, 215 F.3d 20, 23 (D.C. Cir. 2000), and in cases against former high-level Executive Branch officials that prosecutors sought to have voluntarily dismissed. *Flynn*, 973 F.3d at 79. There is no reason to deviate from that settled precedent here.

## III.   THE SECRETARY HAD NO CLEAR AND INDISPUTABLE ENTITLEMENT TO WITHDRAW FROM THE PRETRIAL AGREEMENT IN THIS CASE.

### A. Neither the Secretary, nor the Convening Authority, had any entitlement to withdraw from the pretrial agreements in this case because Respondents had indisputably begun performance.

The parties agree that the relevant portion of RMC 705(d)(4)(B) provides that, once an accused "begins performance of promises" in a pretrial agreement, neither the Secretary of Defense nor any subordinate Convening Authority may withdraw from the agreement. Col McCall found, Pet.Ex.A, at 26-27, and the CMCR agreed, Pet.Ex.B, at 17, that before the Secretary attempted to withdraw from the agreement in this case, Respondents had "begun performance." That shared conclusion is sufficient to defeat the government's claim of a clear and indisputable entitlement to relief for three equally sufficient reasons.

10

*First*, that conclusion was a finding of fact that is not reviewable via mandamus. Whether a party has performed under a contract is a hornbook question of fact. *See* 15 Williston on Contracts § 44:54 (4th ed.). And "a question of fact or of mixed law and fact ... cannot be reviewed by proceedings in mandamus." *In re Riggs*, 214 U.S. 9, 14–15 (1909); *Roche*, 319 U.S. at 30; *In re United States*, 872 F.2d 472, 479 (D.C. Cir. 1989).

*Second*, that conclusion followed the settled interpretation of identical language in Rules for Courts-Martial ("RCM") 705(d)(4)(B) by the Court of Appeals for the Armed Forces ("CAAF"), which was carried over to RMC 705 verbatim. Under this precedent, "Respondents clearly began performance of a promise contained in the pretrial agreement" Pet.Ex.B, at 17.

Not only are CAAF's decisions on questions peculiar to military law deserving of "great deference," *Middendorf v. Henry*, 425 U.S. 25, 43 (1976), Congress required the Secretary to adopt court-martial rules and procedures, absent an explicit finding, not made here, that some deviation was required by "the unique circumstances of the conduct of military and intelligence operations during hostilities." 10 U.S.C. § 949a(a)-(b); *see also id*. §948b(c). There is no reason to construe RMC 705 any differently. *Lorillard v. Pons*, 434 U.S. 575, 580 (1978). The government offers none. And even if this Court disagreed, the government's

11

entitlement to relief is, by definition, not clear and indisputable if it requires this Court to upend two decades of precedent to prevail.

*Third*, and finally, the conclusion that Respondents began performance is amply supported by the record. Col McCall found the following acts of performance:

1. Respondents signed lengthy, confessional stipulations of fact;

2. Respondents agreed to an admissible versions of the "Letterhead Memoranda"; and

3. Respondents refrained from further litigation in which their co-defendant was actively engaged.

Pet.Ex.A, at 8, 26-27.

The government states that these findings were "plain" error, by which they appear to mean that the findings were "clearly erroneous." Pet., at 8. The clearly erroneous standard "is a deferential one," however, and "if the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Amadeo v. Zant*, 486 U.S. 214, 223 (1988) (cleaned up).

Here, each finding is supported by the record. The government cites no contrary facts or authority that clearly and indisputably disturbs those findings.

1. **Signing Confessional Stipulations of Fact**

The government concedes that Respondents both agreed to and did sign a stipulations of fact, that "'failure to enter into a Stipulation of Fact'" would have been "'a breach of a material fact of [the] Agreement'", and that "entering into a factual stipulation *can* be performance of a promise in an agreement." Pet., at 16-17 (citing *United States v. Dean*, 67 M.J. 224, 228 (2009)). The only disagreement between the parties is the government's use of the word "can."

Under settled CAAF precedent interpreting the parallel provision of the RCM, from which RMC 705 was drawn verbatim, signing a stipulation of fact *is* the performance of a promise in a pretrial agreement, sufficient as a matter of law to preclude withdrawal. The CMCR relied upon CAAF's authority as persuasive, and quoted Col McCall's holding that "'here all three co-Accused have begun performance simply by entering into a Stipulation of Fact as was required by each of the three PTAs.'" Pet.Ex.B, at 17 (quoting Pet.Ex.A, at 27).

Against this authority, the government quibbles that Respondents signed the stipulations and the pretrial agreements on the same day, "*before* Convening Authority Escalier accepted the offer," and thus signing the stipulations could not constitute the fulfillment of a promise contained in the agreement. Pet., at 17 (original emphasis). This fact was before Col McCall, and the CMCR. And it was also before the CAAF in *Dean*, where the fact that the stipulation "occurred before

13

the convening authority entered into the agreement" did not affect the finding that the accused had begun performance. *Dean*, 67 M.J. at 231 (Baker, J., dissenting).

What is more, the concurrent signing of both the pretrial agreements and the stipulations of fact was itself a material term of the pretrial agreements. Pet.Ex.D, at 2-3. The stipulations were prepared by the prosecution after "weeks of drafting," JA.478, and presented to Respondents very early in the negotiations. JA.26. Respondents signed the pretrial agreement and, together with counsel for the government, signed the stipulations of fact, which established every element of the charged offenses. There was never any question that the Convening Authority would accept the stipulations of fact once signed. And the government does not – indeed, cannot – explain how Respondents could have failed to begin (and complete) one of the material promises in the pretrial agreement, when counsel for the government insisted that Respondents do precisely what they did.

The government's selective quotation from this Court's decision in *Choate v. TRW*, 14 F.3d 74, 77 (D.C. Cir. 1994) does not alter this result. This Court only held, consistent with hornbook contract law, that "a promise is an expression of intention that the promisor will conduct himself in a specified way or bring about a specified result in the future, communicated in such a manner to a promisee that he may justly expect performance and may reasonably rely thereon." *Id*., at 77 (cleaned up). Even under the most hyper-technical parsing of this (complete)

14

quotation, Respondents did precisely this, prompting reasonable reliance by the government, Respondents, and Col McCall.

These stipulations were also part-and-parcel of Respondents' separate obligations under the pretrial agreement to join the government in requesting the scheduling of the entry of pleas to occur within 45 days. Pet.Ex.D, at 18, ¶ 57. This act was of considerable value to the government, who explained to Col McCall on the record that parties wished for pleas to be entered by August 9, 2024, "to ensure we insulate the proceedings from any unlawful influence." JA.233-JA.235. Col McCall fully understood the value of promptly entering Respondents pleas would serve to insulate the government from political pressure "out there." *Ibid*.

Counsel for the government further explained how the signed stipulations of fact supported Respondents' obligation to facilitate expedition. JA.232. And Respondents joined the government in offering the stipulations of fact, "unopposed," so that they could be relied upon "to determine the Accused's guilt."

## 2. Waiving Objections to the FBI's Letterhead Memorandum

Contrary to the government's assertions, Col McCall did not hold that Respondent's mere *negotiation* of admissible versions of the Letterhead Memoranda constituted performance. Col McCall never even mentioned "red-boxed letterhead memoranda" in his findings on performance. Pet.Ex.A, at 26.

15

What Col McCall found, and the government does not dispute, is that Respondents "negotiated an acceptable version of their respective LHMs which can be offered against them in presentencing proceedings without certain objections." Pet.Ex.A, at 26. Among the objections Respondents thereby waived was the substantial and colorable claim that the Letterhead Memoranda were excludable due to Respondents' years-long torture in CIA black sites. *See* Pet.Ex.D, at 8; JA.354. If Respondents had not waived that claim, they would have examined the FBI Special Agent who testified the day the government announced the pretrial agreements. "The admissibility of the LHMs ha[d] been the subject of contested pretrial litigation for several years and ha[d] been the primary focus for the last year and a half." Pet.Ex.A at 7, and n.35. In fact, a military commission judge had already excluded the Letterhead Memorandum taken under substantially identical circumstances in the *Al-Nashiri* case as the product of torture. JA.428.

The government's only answer is that "respondents have not performed that promise," because the government has not had the opportunity to introduce the Letterhead Memoranda "into evidence." Pet., at 16. The government is wrong for at least two reasons.

*First*, RMC 705(d)(4)(B) does not require the Respondents to have *performed*, it required only that they *begin* performance of their promises. *Dean*, 67 M.J. at 227. *Second*, the government's quibble over timing conflicts with its

16

position regarding the confessional stipulations of fact. There, the government complained only that, to be a "promise," the stipulations should have been signed *after* the Convening Authority signed the agreement. Pet., at 17. Here, the government argues that even if properly signed, an agreement to permit introduction of materially incriminating statements cannot constitute the beginning of performance until the government introduces the statements into evidence. This reading of R.M.C 705(4)(b) would permit the Convening Authority to withdraw from a plea agreement "at any time" up to the close of evidence at trial. Such an absurd result is neither compelled by RMC 705, nor a common understanding of the pretrial agreements' terms.

### 3. Refraining from litigation.

The government also complains that both Col McCall and the CMCR committed plain error in finding that one of the ways Respondents began performance was by affirmatively refraining from litigation. The government insists that the pretrial agreements required Respondents "to move to withdraw all pending motions," and Respondents had not yet done so. Pet., at 18-19. It further notes that Col McCall did not make an explicit "finding that the respondents refrained from filing any motion that they otherwise would have filed." *Ibid*.

Taking the government's latter point first, Col McCall did find that, other than filing motions to schedule the plea hearings, as permitted under the pretrial

agreements, Respondents "refrained from filing motions" pursuant to their pretrial agreements. Pet.Ex.A, at 26-27. The record demonstrates several incidents, which would ordinarily have been the subject to motions practice from which Respondents refrained. See, e.g., JA.187-JA.192.

Moreover, neither Col McCall nor the CMCR rested their findings on the withdrawal of motions language in Paragraph 23 of the pretrial agreement. Rather both tribunals found that Respondents had begun performance on the affirmative representations of counsel for the government that "at this point [August 1, 2024], with the waiver of all motions from three of the four accused, they can't actively continue to participate in any of the contested litigation based on the pretrial agreement." JA.233; *see also* Pet.Ex.A, at 26; Pet.Ex.B, at 17. No defense team disputed counsel for the government's stated understanding of their obligations or that the letter and spirit of the pretrial agreements required the parties to bring contested litigation of guilt to a stop.

Contrary to the government's contention here, counsel for the government was not merely suggesting "that questioning witnesses *might* breach the agreement." Pet., at 18 (emphasis added). Counsel for the government was emphatic that it would. This understanding was shared by Col McCall, who had the benefit of being present at the scene, and characterized counsel for the government as having "insisted" the defense teams refrain from questioning so they "did not

18

violate a *material term* of their agreements." Pet.Ex.A, at 26 (emphasis added.) Indeed, Col McCall noted the abrupt cessation of litigation by "these three Accused" to suppress the Letterhead Memoranda was a "dramatic change of litigation posture," regarding an issue that had "been the subject of contested pretrial litigation for several years and ha[d] been the primary focus for the last year and a half." Pet.Ex.D, at 7 n.35, 26 n.113.

By refraining from participating in the litigation, Respondents confirmed their abandonment of all motions as an act of good faith performance of their pretrial agreements. Counsel for Mr. Hawsawi – a retired United States Navy Staff Judge Advocate, JA.1 – stated that he had engaged in "specific performance on that plea agreement." JA.237. He further expressed the belief that, from that point forward, "Mr. al Hawsawi would be entitled to the benefit of the bargain," to which Col McCall replied "[s]ure."

The conduct of Col McCall and parties in the days and months after the Secretary's attempted withdrawal further establishes that Respondents had begun performance before the Secretary's actions. Col McCall advised the parties, to ensure that there was no inadvertent breach of the pretrial agreements, that one attorney for each Respondent would be present to observe, but "not actively participate," and ordered Respondents to proceed "as governed by the pretrial agreement." JA.149, JA.152-JA.153.

After Col McCall confirmed that Respondents would proceed as "observers," but "not actively participating as we progress with the motion to suppress the letterhead memoranda for Mr. Ali's case," the proceedings continued with witness testimony, including examination of "Dr. WK5I," the government's pseudonymous witness, whom counsel for the government acknowledged was "relevant to all four of the defense teams. While Mr. Ali definitely has a legitimate reason to cross-examine her, at the end of the day, so do the other defense teams." JA.150-JA.152.

At no time, until this litigation, has the government disputed that Respondents refraining from litigation was required under the pretrial agreements. For the government to contend otherwise here is inequitable and, simply as a matter of contract law, the government is estopped from opportunistically reversing its interpretation of what the pretrial agreement required after inducing Respondents and Col McCall's reliance. *See Robbins v. Reagan*, 780 F.2d 37, 53 (D.C. Cir. 1985) (setting out the conditions for promissory estoppel).

### B. The Secretary's authority to rescind the Convening Authority's discretion over pretrial agreements is not clear and indisputable.

To be entitled to mandamus, the government must not only demonstrate that the pretrial agreements in this case were not yet binding, it must also demonstrate that the Secretary had the clear and indisputable authority to assume the powers of

the Convening Authority *ad hoc*. Nothing in the statute or the regulations authorizes the Secretary to take the action that he took in this case.

The MCA states that either the Secretary or his designee may serve as the Convening Authority for Military Commissions. 10 U.S.C. § 948h. That provision is paired with §949b(a)(2)(B), which states that the Convening Authority's "judicial acts" are committed to her sole discretion; protected from superior influence, except as provided by law. Longstanding military law, against which the MCA was enacted, has included the acceptance of pretrial agreements as within the zone of a convening authority's protected judicial acts. *See generally* RCM 705(e)(3); *United States v. Fraser*, 15 USCMA 28 (CMA 1964) (prohibiting the "injection of an actual or apparent command policy into the sentencing process" by a superior convening authority).

The RMC, for its part, identifies six circumstances where the Secretary (termed a "superior competent convening authority") is authorized to override the Convening Authority's actions. None of those circumstances are relevant here. *See* RMC 401(a); RMC 601(f); RMC 604; RMC 704(e); RMC 1103(c); RMC 1104(f). Those include the closely related decision to grant immunity. RMC 704(e). And those provisions do nothing to confer upon the Secretary the power to either override or selectively rescind the Convening Authority's "sole discretion" to enter into pretrial agreements. RMC 705(d)(3).

21

As Col McCall noted in his decision, RMC 705(a) provides the Secretary a means of prescribing limitations on the Convening Authority's discretion to accept pretrial agreements. But he must exercise that authority at the time he appoints the Convening Authority. Pet.Ex.A, at 14-15. Otherwise, whether to enter into a pretrial agreement "'is *within the sole discretion* of the Convening Authority who referred the case to trial.'" *Ibid*. (quoting RTMC 12-1) (original emphasis).

"[A]s long as the regulations remain operative," therefore, "the [Secretary] denies himself the right to sidestep the [Convening Authority] or dictate its decision in any manner." *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 267 (1954). Even assuming the Secretary could have taken some action before the Convening Authority exercised her "sole discretion" to accept the pretrial agreements in this case, "the Secretary was required to observe his own regulations." *Roberts v. Vance*, 343 F.2d 236, 239 (D.C. Cir. 1964).

The Secretary's memo purporting to withdraw the Convening Authority's power over pretrial agreements, therefore, without any explicit basis in law. Recognizing as much, the government presents this Court with complex arguments respecting the Secretary's inherent powers, the structure of the military, and the implicit balance of power within the military justice system. The answers to these questions are not dictated by the clear terms of federal statutes or this Court's precedents. Instead, the government relies upon the emanations and penumbra of

22

"powerful interlocking authorities [that] give the Secretary of Defense supervisory authority to replace [the Convening Authority] for [pretrial agreements] without taking all convening authority responsibilities from her." Pet., at 12 (quoting Pet.Ex.B, at 7). Indeed, while the CMCR was ultimately persuaded by these "powerful interlocking authorities," it candidly acknowledged that the government was unable to "cite any authority explicitly authorizing" the Secretary to take the action he took in this case. Pet.Ex.B, at 6.

That recognized lack of authority is alone sufficient to defeat mandamus. *NetCoalition v. SEC*, 715 F.3d 342, 354 (D.C. Cir. 2013) (no right to mandamus in the absence of "bind[ing]" precedent); *Venezuela v. Philip Morris*, 287 F.3d 192, 198 (D.C. Cir. 2002) (no mandamus where petitioners "identif[ied] no precedent of this court or of the Supreme Court").

If anything, the implicit structural arguments upon which the government and the CMCR relied conflict with circuit precedent, which has recognized for the past half-decade that "several of the Convening Authority's consequential powers," including the powers at issue here, "are effectively unreviewable." *Bahlul v. United States*, 967 F.3d 858, 872 (D.C. Cir. 2020); *Bahlul v. United States*, 77 F.4th 918, 928 (D.C. Cir. 2023). In making and then reaffirming that holding, the Convening Authority's unreviewable discretion to conclude a binding pretrial agreement *in this very case* was emphasized in the petitioners' briefing, at oral

23

argument, and in public commentary. *See*, *e.g.*, Robert Loeb, *D.C. Circuit Hears Oral Argument in Bahlul v. United States*, Lawfare Blog, March 23, 2023. It also formed the basis of an amicus brief filed by the Chief Defense Counsel for Military Commissions. *Bahlul v. United States*, Case No. 22-1097, Amicus Brief of the Chief Defense Counsel, at 8 (D.C. Cir., Sept. 15, 2023). At no point did the government, or this Court, suggest that this circuit precedent was qualified by the Secretary's residual "powerful interlocking authorities."

Ultimately, the government's structural arguments for why the Secretary can override his own regulations present – at best – open questions, which cannot be answered via mandamus. "What matters for [the government's] petition is that they are just that—open. Legal aporias are the antithesis of the 'clear and indisputable' right needed for mandamus relief." *Al-Nashiri*, 791 F.3d at 85–86.

## IV.   IT IS INAPPROPRIATE FOR THIS COURT TO USE ITS EQUITABLE POWERS TO INDEFINITELY DELAY CLOSURE IN A CASE THAT HAS FESTERED FOR A QUARTER-CENTURY.

"Although the remedy by mandamus is at law, its allowance is controlled by equitable principles, ... and it may be refused for reasons comparable to those which would lead a court of equity, in the exercise of a sound discretion, to withhold its protection of an undoubted legal right." *Greathouse*, 289 U.S. at 359. The government comes to this Court to vindicate the Secretary's post hoc efforts to undo a pretrial agreement that he knew had been under negotiation for years. It

24

does so without identifying a single, real-world harm that it faces if relief is not granted. And it ignores the substantial harms that delaying finality will impose.

### A. The government's need for this Court's extraordinary intervention arises from problems of its own making.

The government claims that this Court's intervention is appropriate because of the need to vindicate the "the Secretary's considered judgment about the appropriate handling of a case of unique national importance." Pet., at 21. Without gainsaying the importance of this case, it is profoundly inappropriate for this Court to vindicate the Secretary's "authority to make fundamental decisions about the handling of [these] prosecutions," *ibid*., when the Secretary did nothing to use or assert that authority for years; indeed until after he faced political blowback for failing to have done so.

There is no good faith basis for the Secretary to claim any surprise. To the contrary, plea negotiations in this case date back to 2017, when then-Secretary James Mattis designated Harvey Rishikof as Convening Authority. *See* JA.27. Rishikof's principal initiative as Convening Authority was to open plea negotiations. Those negotiations were reported up to then-Deputy Secretary of Defense, JA.32, and to the then-Assistant General Counsel, who was informed no later than September 2017 that the negotiations were "well under way." JA.114, *see also* JA.33, JA.120.

25

In October 2017, then-Secretary Mattis discussed these negotiations with then-Attorney General Jeff Sessions, who informed then-Secretary Mattis that "he wanted no deal." JA.115; *see also* JA.117-JA.119, JA.121. This led to cabinet-level meetings respecting the desirability of a pretrial agreement. *See*, *e.g.* JA.29, JA.109-JA.112, JA.116. These negotiations and the internal debate surrounding them were reported widely in the press. Charlie Savage, *Fired Pentagon Official Was Exploring Plea Deals for 9/11 Suspects at Guantánamo*, N.Y. Times, February 5, 2018. And then-Secretary Mattis effectively terminated these negotiations when he rescinded Rishikof's appointment as Convening Authority on February 3, 2018. JA.28.

Following the change in administration, guilty plea negotiations resumed, leading to joint requests to continue military commission hearings in this case throughout most of 2022 and 2023. In March 2022, the military commission judge revealed the negotiations in a public order. JA.62.

On October 13, 2022, the military commission judge ordered the government to provide an update every two weeks regarding the status of negotiations, specifically addressing progress regarding those terms "that the government believed could not be resolved by an agreement between the Convening Authority and the parties." JA.64. These terms, which related to future conditions of confinement, were termed the "policy principles" and, on December

26

16, 2022, counsel for the government informed the military commission that "Senior U.S. Government policy officials continue their discussions regarding the proposed 'policy principles.' It is anticipated that these discussions will continue for some time." JA.68.

Over the next six months, counsel for the government filed thirteen status reports, relaying, in effect, that "U.S. government officials are continuing to discuss the proposed policy principles in connection with extremely complex cases involving numerous interagency equities." JA.84. The intra-branch negotiations became so protracted that on June 14, 2023, counsel for the government requested relief from bi-weekly status reports. JA.76.

In a letter dated August 1, 2023, counsel for the government sent a letter to the victims stating notifying them of these negotiations, which led to widespread news coverage. *See* Ellen Knickmeyer & Jennifer Peltz, *Plea negotiations could mean no 9/11 defendants face the death penalty, the US tells families*, AP, August 16, 2023. On August 28, 2023, the same day the Secretary issued a media advisory announcing the appointment of BG Escallier as Convening Authority, Senator Ted Cruz and Representative Nicolle Malliotakis wrote to Secretary Austin with specific questions regarding the plea negotiations. JA.481, JA.502.

On September 6, 2023, counsel for the government provided notice that "'the Administration declines to accept the terms of the proposed joint policy

27

principles offered by the accused in the military commissions case.'" JA.87. That, in turn, returned the negotiations to counsel for the government and the Convening Authority. As recently as May 2024, Senate Minority Leader Mitch McConnell took to the floor of the Senate to publicly complain, "Negotiations between federal prosecutors and representatives of the masterminds of the September 11th massacre have been ongoing for years … if the President and his Attorney General let the perpetrators of the deadliest terrorist attack on American soil plead out …, the Biden Administration will pay a steep political price." JA.505.

The Secretary had no reason, in other words, to be "surprised" when the pretrial agreements in this case were publicly disclosed last August. JA.11-JA.25. He also had ample opportunity to intervene before the Convening Authority accepted the pretrial agreements and the Respondents began performance.

The Secretary could have stopped the negotiations as his predecessor had done in 2018. He could have acted earlier to withdraw the Convening Authority's final decision-making power over pretrial agreements, as he belatedly attempted to do. When he appointed BG Escallier as Convening Authority in August 2023, amid a pitched public debate over the plea negotiations in this case, he could have limited the scope of her delegated powers under RMC 705(a), as Col McCall suggested. He could have indicated his views respecting the "appropriate handling" of this case to BG Escallier, who remains the Convening Authority to this day.

28

And if nothing else, he could have insisted upon regular briefings respecting the status of a case of such unique national importance.

It is profoundly inappropriate for this Court to use its equitable powers to wade into an intra-branch dispute, when the Secretary's "surprise" was, at best, the product of his own failure of oversight. "Although the remedy by mandamus is at law, its allowance is controlled by equitable principles … and it may be refused for reasons comparable to those which would lead a court of equity, in the exercise of a sound discretion, to withhold its protection of an undoubted legal right." *Greathouse*, 289 U.S. at 359.

For the reasons stated above, the Secretary had no "undoubted legal right" to withdraw the pretrial agreements in this case. But even if that right was more arguable, the Secretary "slept upon his rights" for years to the prejudice of Respondents and counsel for the government, who negotiated and performed the terms of pretrial agreements in the good faith belief that the Convening Authority had the final say. *Cheney*, 542 U.S. at 379.

As this Court has held, mandamus is unavailable where a petitioner "had an adequate avenue of relief … but failed to avail [itself] of it in a timely fashion." *In re Stone*, 940 F.3d 1332, 1339 (D.C. Cir. 2019). Where the Secretary "failed to take prompt action to assert his rights, sound public policy requires a denial of the writ." *Caswell v. Morgenthau*, 98 F.2d 296, 298 (D.C. Cir. 1938).

29

**B. This Court's intervention is neither necessary for nor capable of ensuring the government obtains the relief it claims to desire.**

The issuance of the writ is also inappropriate because the injuries the government claims it will suffer in the absence of this Court's intervention "are too speculative to warrant resort to extraordinary remedies." *Whitehouse v. Illinois Cent. R. Co.*, 349 U.S. 366, 373–74 (1955); *Flynn*, 973 F.3d at 80.

The government's pleadings are circumspect about what actual harm mandamus is necessary to avoid. It claims, for example, "the government and the public will lose the opportunity for a public trial." Mot. 21. But this is not true. The pretrial agreement affords the government an unqualified right to present whatever evidence it wishes. Pet.Ex.D, at 4-8. It also accords the victims the unique opportunity to put direct questions to Respondents, that Respondents must answer truthfully and fully on pain of being in breach. Pet.Ex.D, at 12.

More broadly, under the MCA, *every* sentence must be imposed by a military jury (i.e. the "members") following a public trial. As counsel for the government represented to the military commission just recently:

> [W]e envision a several-month presentation with all of this evidence to establish the historical record. That was always our intention. … There's now hundreds of people that are now interested and on the list of those who our Victim/Witness Assistance Program reaches out to on a daily basis for updates that we're going to now talk to and determine whether or not they do want to give any victim impact testimony, whether that's in a video form, whether that's in written form.

30

JA.418-JA.419. Unlike the federal system, where sentences are computed based on guidelines, sentencing hearings in military commissions are conducted before the members, even where – as here – a defendant has agreed to a minimum sentence amounting to life imprisonment. *See* Pet.Ex.D, at 4. Furthermore, also unlike the federal system, entering a guilty plea in a military commissions will require Respondents to engage in a lengthy, public recitation of admissions to every material fact alleged against them. RMC 910(e).

The only thing that is truly at stake, therefore, is whether Respondents will face the theoretical prospect of the death penalty. But there is no "'death penalty' exception to the traditional rules of mandamus." *Cf. Al-Nashiri*, 791 F.3d at 80. And the possibility of a death sentence ever being imposed in this case is far too remote, contingent, and unlikely to warrant extraordinary relief.

At a hearing in March 2024, Col McCall discussed his plans to retire from the military. He noted that he did not anticipate extending his term as military commission judge in this case "because I don't think that we're that close to trial," citing the delays resulting from "the government decid[ing] to do this case down here, and -- with this level of complexity." JA.135. Counsel for the government, for its part, could not even propose a tentative trial date and projected any trial would likely be "pushed out to 2026." JA.134.

31

The government's projections assumed a significantly higher litigation tempo than has existed until now, as well as no further complications or delays. The government also made this projection before the six months of delay caused by the Secretary's attempted withdrawal from the pretrial agreements in this case, and the months – if not years – of litigation over the consequences of that decision that will follow if this Court grants extraordinary relief, which Col McCall noted in his ruling. Pet.Ex.B, at 29.

Even had this Court granted the government's writ the day it was filed, therefore, there is no realistic possibility of a contested trial in this case until the end of the decade. That trial is expected to last 12 to 18 months. Carol Rosenberg, *Accused Sept. 11 Plotters Agree to Plead Guilty at Guantánamo Bay*, N.Y. Times, July 31, 2024. As counsel for the government noted on the record recently, the sentencing phase alone will require nine months to a year of preparation, and is expected to span another "several months" after that. JA.418.

Assuming that a death sentence is imposed, this case will have only reached the end of its beginning. Direct post-trial review in *non-capital* military commission cases has involved an *average* of a decade of appellate litigation. Center on National Security, "Justice Delayed: The length of terrorism prosecutions (in weeks) conducted under the Military Commissions Act" (last

32

accessed January 17, 2025).[1] That does not include post-trial habeas review, a routine and often extensive phase of litigation in capital cases. *American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, 31 Hofstra L. Rev. 913, 932 (2003).

In ordinary capital cases, the time between sentencing and the imposition of any punishment is long. In ordinary capital prosecutions, which have nothing like the "level of complexity" that this case presents, an *average* interval of 220 months (or more than 18 years) stretches between the imposition of a death sentence and its execution. Death Penalty Information Center, "Time on Death Row" (last visited, January 17, 2025).[2]

The most optimistic speculation, therefore, is that Respondents' executions will not be legally possible until a half-century after September 11, 2001. Given the actuarial realities, the likelihood that the Respondents will live long enough to suffer such a punishment is so vanishingly small as to be zero.

The remote and wholly speculative nature of the possibility that death will ever be imposed is why counsel for the government told the victims, when the pretrial agreement was finalized, that "it is our collective, reasoned, and good-faith

---

[1] *Available at* https://www.centeronnationalsecurity.org/terrorism-database (Michel Paradis is a longtime fellow at the Center on National Security and contributed to the preparation of this report).

[2] *Available at* https://deathpenaltyinfo.org/death-row/death-row-time-on-death-row

judgment that this resolution is the best path to finality and justice in this case." JA.203; *see also* Ted Olson, *The 9/11 Plea Deals Should Go Forward, Washington Post*, August 14, 2024; Carol Rosenberg, *Twists and Turns in Sept. 11 Plea Process Are Agonizing, Families Say*, N.Y. Times, November 22, 2024 ("No matter whether they prefer a trial or swift resolution, relatives of victims of the attacks consider the on-again, off-again plea deal to be cruel.").

While preserving even the remotest possibility of a death sentence may be worthwhile for some, this Court's granting relief here makes it far likelier that any judgment entered following a contested trial will be vacated because the Respondents have died of natural causes before the post-trial appellate process has concluded. Granting the government extraordinary relief, in other words, gives it nothing tangible that is not otherwise available to it under the terms of its pretrial agreement in this case. And it perversely calls upon this Court's equitable powers to strip all concerned of any meaningful chance for finality and closure.

## CONCLUSION

For the foregoing reasons, the government's petition for a writ of mandamus should be dismissed.

Respectfully submitted,

Walter B. Ruiz                                  /s/     Michel Paradis
Suzanne M. Lachelier                       Michel Paradis
Sean M. Gleason                              Gary Sowards
Maj. Kerry A. Mawn, JA, USAF         Denny LeBoeuf
Maj. Patrick C. Tipton, JA, USAF      Delphine Lourtau
Military Commission Defense            Nicholas McCue
Organization                                    Gabriela McQuade
1620 Defense Pentagon                     Melanie Partow
Washington, DC 20301-1620            Maj. Michael Leahy, USAF
                                                        Maj. Elspeth Theis, USAF
*Counsel for Respondent,*                   LT William Xu, JAGC, USN
*Mustafa Al Hawsawi*                        Military Commission Defense
                                                        Organization
                                                        1620 Defense Pentagon
                                                        Washington, DC 20301-1620
                                                        michel.d.paradis.civ@mail.mil
                                                        1.703.695.4672

                                                        *Counsel for Respondent,*
                                                        *Khalid Sheikh Mohammed*

35

## CERTIFICATE OF COMPLIANCE WITH RULE 21(D)

### Certificate of Compliance with Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1. This petition complies with the type-volume limitations ordered by this Court:

☒ this petition contains 7,728 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

☐ this petition uses a monospaced typeface and contains _____ lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This petition complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

☒ this petition has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point font size and Times New Roman type style; *or*

☐ this petition has been prepared in a monospaced typeface using _____ with _____.

Dated: January 19, 2025

Respectfully submitted,

/s/ Michel Paradis
*Counsel for Respondent*

36

## CERTIFICATE OF SERVICE

I hereby certify that on January 19, 2025, a copy of the foregoing was filed electronically with the Court. Notice of this filing will be sent to all parties by operation of this Court's electronic filing system. Parties may access this filing through the Court's system.

Dated: January 19, 2025

Respectfully submitted,

/s/ Michel Paradis
*Counsel for Respondent*

37