# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued January 28, 2025           Decided July 11, 2025

No. 25-1009

IN RE: UNITED STATES OF AMERICA,
PETITIONER

———

On Petition for Writs of Mandamus and Prohibition

———

*Melissa N. Patterson*, Attorney, U.S. Department of Justice, argued the cause for petitioner. With her on the petition and the reply were *Matthew G. Olsen*, Assistant Attorney General for National Security at the time the petition was filed, *Brian H. Fletcher*, Principal Deputy Solicitor General at the time the petition was filed, *Brett A. Shumate*, Acting Assistant Attorney General, Civil Division, and *Mark R. Freeman*, Attorney. *Sarah C. Griffin*, Attorney, U.S. Department of Justice, entered an appearance.

*Michel Paradis*, Attorney, Office of Military Commissions Defense Organization, argued the cause for respondents Khalid Sheikh Mohammad and Mustafa al Hawsawi. With him on the opposition to the petition for writs of mandamus and prohibition were *Walter B. Ruiz*, Attorney, *Suzanne M. Lachelier*, Senior Attorney, *Sean M. Gleason*, Attorney, *Nicholas McCue*, Attorney, *Melanie Partow*, Attorney, *Maj. Michael Leahy, USAF*, and *Lt. William Xu, JAGC, USN*.

2

*Matthew L. Engle* argued the cause for respondent Walid Muhammad Salih Mubarak bin 'Atash. With him on the opposition to the petition for writs of mandamus and prohibition was *Edwin A. Perry*.

*Matthew S. Hellman* was on the brief for *amicus curiae* the Center for Victims of Torture in support of respondents.

Before: MILLETT, WILKINS and RAO, *Circuit Judges*.

Opinion for the Court by *Circuit Judges* MILLETT and RAO.

Opinion concurring in part and dissenting in part filed by *Circuit Judge* WILKINS.

MILLETT and RAO, *Circuit Judges*: Respondents Khalid Sheikh Mohammad, Walid Muhammad Salih Mubarak bin 'Atash, and Mustafa Ahmed Adam al Hawsawi are being tried by military commission at the United States Naval Base in Guantanamo Bay, Cuba. They are each accused of participating in the planning and execution of the terrorist attacks on September 11, 2001, which killed 2,976 people.

At the end of July 2024, each Respondent offered, and the Convening Authority overseeing their cases accepted, pretrial agreements in which Mohammad, bin 'Atash, and Hawsawi agreed to plead guilty, and the government agreed not to seek the death penalty. Ruling on Defense Motions to Schedule Entry of Pleas, *United States v. Mohammad*, Military Comm'ns Trial Judiciary No. AE 955J / AE 956J / AE 957I, at 7 (U.S. M.C.T.J. Nov. 6, 2024) ("Pretrial Agreement Order"). Each Respondent also promised, among other things, to withdraw certain motions filed in their criminal cases and to waive all waivable motions. On August 1st and 2nd—right after the

3

Convening Authority signed the agreements—Respondents stayed silent during the questioning of a witness in a suppression hearing that went forward for a non-settling co-defendant. On August 2nd, then-Secretary of Defense Lloyd J. Austin III withdrew from each of the agreements.

As relevant here, the military commission judge and the United States Court of Military Commission Review ("CMCR") refused to recognize the Secretary's withdrawal on the ground that Respondents had begun to perform under the contracts. The CMCR denied the government's petition for writs of mandamus and prohibition. The military judge then scheduled the prompt entry of Respondents' pleas. After the government's request for a stay was denied, it asked this court to issue writs of mandamus and prohibition enforcing the Secretary of Defense's withdrawal from the pretrial agreements and prohibiting the military judge from entering guilty pleas under the agreements.

While mandamus and prohibition are extraordinary forms of relief, they are warranted in this case. The Secretary of Defense indisputably had legal authority to withdraw from the agreements; the plain and unambiguous text of the pretrial agreements shows that no performance of promises had begun; the government has no adequate alternative remedy to vindicate its interests; and the equities make issuance of the writs appropriate.

**I**

**A**

The Military Commissions Act of 2009 ("Commissions Act") establishes the procedures for military commissions to try "alien unprivileged enemy belligerents for violations of the

4

law of war and other offenses triable by military commission."
10 U.S.C. § 948b(a).  Military commissions "may be convened
by the Secretary of Defense" or another federal official
designated by the Secretary.  *Id.* § 948h.  The Commissions Act
also empowers the Secretary to prescribe "[p]retrial, trial, and
post-trial procedures, including elements and modes of proof,
for cases triable by military commission[.]"  *Id.* § 949a(a).

Under that statutory authority, the Secretary of Defense
issued the Manual for Military Commissions, which is adapted
from the Manual for Courts-Martial, and contains, among other
things, the Rules for Military Commissions ("R.M.C.").

**B**

Mohammad, bin 'Atash, and Hawsawi are each charged
under the Commissions Act with seven law-of-war crimes:
attacking civilians, attacking civilian objects, murder in
violation of the law of war, destruction of property in violation
of the law of war, hijacking or hazarding a vessel or aircraft,
terrorism, and conspiracy.  10 U.S.C. § 950t(2), (3), (15), (16),
(23), (24), (29).  Congress authorized the death penalty for five
of those offenses.  *Id.* § 950t(2), (15), (23), (24), (29).

On August 21, 2023, the Secretary of Defense appointed
retired Brigadier General Susan Escallier as the Convening
Authority for military commissions.  J.A. 262.  Convening
Authority Escallier subsequently authorized the prosecuting
attorneys to discuss pretrial agreements and plea bargains with
Mohammad, bin 'Atash, and Hawsawi.  Pretrial Agreement
Order at 6.  Negotiations over the pretrial agreements at issue
here took place between October 2023 and July 2024.  *Id.*

On July 29 and 30, 2024, Mohammad, bin 'Atash, and
Hawsawi each submitted a signed "Offer for Pretrial

5

Agreement" to the Convening Authority.  Pet'r's Supp. Letter Attachment 2 ("Mohammad PTA") at 1, 20 (dated July 29, 2024); Pet'r's Supp. Letter Attachment 3 ("bin 'Atash PTA") at 1, 19 (dated July 29, 2024); Pet'r's Supp. Letter Attachment 4 ("Hawsawi PTA") at 1, 19 (dated July 30, 2024).

In those offers, each Respondent proposed to plead guilty to "all charges and specifications" against him.  Mohammad PTA ¶ 5; bin 'Atash PTA ¶ 5; Hawsawi PTA ¶ 5.  Respondents also agreed that certain Letterhead Memoranda—which summarized statements by each Respondent to the Federal Bureau of Investigation in 2007 and, for bin 'Atash, also in 2008—could be used to establish their guilt and to inform their sentencing.  Mohammad PTA ¶¶ 12(ii), 13; bin 'Atash PTA ¶¶ 12(b), 13; Hawsawi PTA ¶¶ 12(ii), 13.  In addition, Respondents offered to undergo a lengthy and public sentencing hearing in which, among other things, victims' families would be able to address and question Respondents directly and Respondents would have to answer those questions truthfully.  *See, e.g.*, Mohammad PTA  ¶ 12(xxiv).  In exchange, the government would not pursue the death penalty.  Pretrial Agreement Order at 7.  Appended to each of the offers was a lengthy and signed stipulation of fact admitted by the respective Respondent, as well as the corresponding Letterhead Memoranda.

On July 31, 2024, the Convening Authority, on behalf of the United States, accepted those offers and signed each of the pretrial agreements.  *In re Mohammad*, No. CMCR 24-001, 2024 WL 5396185, at *2 (U.S. C.M.C.R. Dec. 30, 2024).  A fourth co-defendant, Al Baluchi Aziz Ali, did not enter into a pretrial agreement.

The next day, counsel for each Respondent and for Al Baluchi attended a previously scheduled hearing before the

6

military judge. The proceeding originally had been called for
Respondents and Al Baluchi to examine an FBI witness who
was relevant to motions to suppress each defendant had
previously filed.

After the prosecution informed the military judge that
Mohammad, bin 'Atash, and Hawsawi had entered into pretrial
agreements to plead guilty, all parties agreed that the
suppression hearing would go forward only for Al Baluchi
since he had not entered into a pretrial agreement. The judge
then explained that Mohammad's, bin 'Atash's, and
Hawsawi's motions to suppress would be put on hold, so that
if the pleas were not later entered, they would then be able to
question the FBI witness in support of their still-pending
motions to suppress. Trial Tr. 49319:12–19, Aug. 1, 2024 (J.A.
226). No counsel for Mohammad, bin 'Atash, or Hawsawi
spoke at the hearing at all, other than to note their appearances
and, later, to agree that Al Baluchi should be able to see their
agreements. *Id.* at 49306:1–49412:7, 49307:1–49308:11,
49325:2–49326:6.

On August 2, 2024, examination of the witness continued
and counsel for Respondents were again present. Trial Tr.
49414, Aug. 2, 2024 (J.A. 411). At the hearing, the
government and the military judge discussed scheduling the
plea hearings as soon as possible for a number of reasons,
including to "insulate the proceedings from any unlawful
influence." Trial Tr. 49418:14–15 (J.A. 234). Counsel for
Hawsawi then expressed Hawsawi's desire to enter his plea as
soon as that day. Trial Tr. 49419 (J.A. 235). That same
attorney stated that he "had not been engaging in any
examination of the witness," which he "believe[d] … [to be]
specific performance on th[e] plea agreement." Trial Tr.
49421:1–3 (J.A. 237). Counsel for Mohammad and bin 'Atash

7

said nothing beyond entering their appearances.  Trial Tr. 49414:3–6, 9–12 (J.A. 411).

Later that same day, the Secretary of Defense announced the government's withdrawal from each of the pretrial agreements.  The Secretary explained that, "in light of the significance of the decision to enter into pre-trial agreements with the accused in the above-referenced case[s]," the "responsibility for such a decision should rest with me as the superior convening authority under the [Commissions Act]." Pretrial Agreement Order at 9; Memorandum from Secretary of Defense to Susan Escallier, Convening Authority for Military Commissions (Aug. 2, 2024) (available at https://perma.cc/4CRT-BXV7).  The Secretary then withdrew Convening Authority Escallier's authority "to enter into a pre-trial agreement" with any of the three Respondents and "reserve[d] such authority to [him]self."  Pretrial Agreement Order at 9; Memorandum from Secretary of Defense to Susan Escallier, *supra*.

## C

### 1

Respondents promptly challenged the lawfulness of the Secretary's withdrawal and asked to have the entry of their pleas promptly scheduled.  Pointing to the Rules for Military Commissions, Respondents noted that the Convening Authority "may withdraw from a pretrial agreement at any time before the accused begins performance of promises contained in the agreement[.]"  R.M.C. 705(d)(4)(B).  Respondents each argued that the Secretary lacked authority to withdraw both because (1) he had delegated his authority to manage these cases to the Convening Authority and could not revoke it after the agreements were signed, and because (2) Respondents had

8

already begun performance of promises contained in their
pretrial agreements. Specifically, Respondents argued that
they had performed by signing the stipulations of fact attached
to their Pretrial Agreement offers, agreeing to admission of the
Letterhead Memoranda, and not questioning the witness at the
Al Baluchi hearing.

**2**

The military judge ruled that the Secretary lacked the
authority to withdraw from the agreements. The judge
concluded, first, that the Secretary could "withhold" certain
powers from Convening Authority Escallier at the time of
delegation, but he could not later "withdraw" her authority to
act. Pretrial Agreement Order at 18–19. The judge added that
any assumption of authority by the Secretary could be effective
only prospectively, and so he could not unravel the Convening
Authority's prior entry into the pretrial agreements. *Id.* at 20.
To allow otherwise, the judge reasoned, would undermine the
appointed Convening Authority's independence and
"potentially raise[] the specter of unlawful influence." *Id.* at
20–21.

The military judge further ruled that the Secretary could
not pull out of the pretrial agreements because Respondents
had already begun performance of promises contained in the
pretrial agreements—namely, signing the stipulations of fact,
agreeing to the Letterhead Memoranda, refraining from cross-
examining a witness during the hearing on August 1, 2024, and
refraining from filing new motions. Pretrial Agreement Order
at 25–27.

**3**

The government filed a petition for writs of mandamus and
prohibition with the CMCR. That court agreed with the

9

government that the Secretary of Defense had the authority to act as the superior convening authority for the purpose of withdrawing from the pretrial agreements without replacing Convening Authority Escallier in her other capacities. *In re Mohammad*, 2024 WL 5396185, at *10. The court noted that the Rules for Military Commissions allow the Secretary of Defense to withhold authority from the Convening Authority to dispose of charges. *Id.* at *5 (citing R.M.C. 401(a)).

The court agreed with Respondents, however, that the Secretary could not withdraw from the pretrial agreements because they had begun performance of a promise contained in them. Specifically, the court ruled that Respondents began to perform when they refrained from cross-examining the FBI witness at the hearing on August 1, 2024. *In re Mohammad*, 2024 WL 5396185, at *11.

Following the decision of the CMCR, the government sought a continuance of the plea hearings until January 27, 2025. The military judge denied the motion and scheduled the plea hearings to begin on January 10, 2025. Ruling on Government Motion to Continue Plea Hearing, *United States v. Mohammad*, Military Comm'ns Trial Judiciary No. AE 955T / AE 956S / AE 957Q, at 1, 4 (U.S. M.C.T.J. Jan. 3, 2025).

**4**

The government then petitioned this court for an emergency administrative stay, a stay pending review, and writs of mandamus and prohibition enforcing the Secretary of Defense's withdrawal from the pretrial agreements and prohibiting the military judge from entering guilty pleas.

This court granted an administrative stay on January 9, 2025, and ordered expedited briefing and argument on the

10

petition for writs of mandamus and prohibition.  After oral argument and post-argument submissions by the parties, this court lifted the administrative stay and entered a full stay pending disposition of the government's petition.  We now grant the government's petition for writs of mandamus and prohibition.

## II

The All Writs Act allows this court to "issue all writs necessary or appropriate in aid of [our] [] jurisdiction[.]"  28 U.S.C. § 1651(a).  By the "express terms of the Act[,]" we may only "issu[e] process 'in aid of' [our] existing statutory jurisdiction; the Act does not enlarge that jurisdiction[.]" *Clinton v. Goldsmith*, 526 U.S. 529, 535–36 (1999).

We have that authority in this case.  "[O]nce there has been a proceeding of some kind that might lead to an appeal," we have jurisdiction to issue writs.  *In re al-Nashiri*, 791 F.3d 71, 76 (D.C. Cir. 2015) (quoting *In re Tennant*, 359 F.3d 523, 529 (D.C. Cir. 2004)) (formatting modified).  Our "authority is not confined to the issuance of writs in aid of a jurisdiction already acquired by appeal," but also includes "those cases which are within [our] appellate jurisdiction although no appeal has been perfected."  *Roche v. Evaporated Milk Ass'n*, 319 U.S. 21, 25 (1943).  The Commissions Act vests this court with "exclusive jurisdiction to determine the validity of a final judgment rendered by a military commission[.]"  10 U.S.C. § 950g(a). Because we have appellate jurisdiction over the underlying proceeding, we have jurisdiction to issue writs of mandamus and prohibition.  *See In re al-Nashiri*, 791 F.3d at 76.

11

### III

Mandamus and prohibition are extraordinary forms of relief that will be granted only in exceptional circumstances.[1] *See Cheney v. U.S. District Court for the District of Columbia*, 542 U.S. 367, 380 (2004) ("[Mandamus] is a 'drastic and extraordinary' remedy 'reserved for really extraordinary causes.'") (quoting *Ex parte Fahey*, 332 U.S. 258, 259–60 (1947)). Specifically, we may issue a writ of mandamus or prohibition only if (1) the petitioner's right to immediate relief is "clear and indisputable"; (2) the petitioner has "no other adequate means to attain the relief he desires"; and (3) the court, "in the exercise of its discretion," is "satisfied that the writ is appropriate under the circumstances." *United States v. Fokker Servs. B.V.*, 818 F.3d 733, 747 (D.C. Cir. 2016) (quoting *Cheney*, 542 U.S. at 380–81).

This is a rare case in which that exacting standard has been met. First, the government has demonstrated a clear and indisputable right to relief in this case. As the CMCR determined, the military judge's conclusion that the Secretary of Defense lacked the authority to withdraw the Convening Authority's delegated power and to step into her shoes to

---

[1] The extraordinary writs of mandamus and prohibition are both ancient common law prerogative writs. *See* William J. Hughes & Eugene Brown, *The Writ of Prohibition*, 26 GEO. L.J. 831, 831–32 (1938). A writ of mandamus compels action not being taken, while a writ of prohibition, as its name suggests, orders a halt to action. *See State ex rel. Bos. & M. Consol. Copper & Silver Mining Co. v. Second Jud. Dist. Ct.*, 22 Mont. 220, 231 (1899) (emphasis omitted); *see also In re Grant*, 635 F.3d 1227, 1230 n.3 (D.C. Cir. 2011). The grounds for issuing the two are "virtually identical," and "[a] petitioner need not precisely distinguish which writ he seeks." *In re Halkin*, 598 F.2d 176, 180 n.1 (D.C. Cir. 1979); *see also In re Jackson County, Mo.*, 834 F.2d 150, 151 (8th Cir. 1987).

12

manage the pretrial agreements fails as a matter of law. Such a reading would be inconsistent with the Secretary's power to superintend the disposition of charges in these cases.

The military judge also clearly erred in his determination that Respondents had begun performance of promises contained in the pretrial agreements, including by not questioning a witness. No such promise appears anywhere in the text of the pretrial agreements, and the judge did not claim to be interpreting any ambiguity in the agreements. Nor did any Respondent withdraw a pending motion or refrain from filing additional motions prior to the Secretary's withdrawal. Likewise, Respondents' submission of signed stipulations of fact and Letterhead Memoranda occurred as part of their *offers* of pretrial agreements to the Convening Authority. They were not the performance of a promise contained in the later-executed agreements.

Second, the government has shown that it has no adequate alternative avenue of relief. There is no apparent basis for the government to take either an interlocutory appeal or an effective and adequate appeal after final judgment.

Finally, given the unique and important national security interests at stake, as well as the significant public interest in the resolution of these proceedings, writs of mandamus and prohibition are appropriate.

**A**

The government has demonstrated a clear and indisputable right to relief in this case. The Secretary of Defense had full legal authority to withdraw the Convening Authority's delegated power over the pretrial agreements. Similarly, under the plain text of the pretrial agreements and the record in this

13

case, no prior performance of promises contained in those agreements prevented the Secretary's withdrawal.

**1**

Recognizing the significance of striking plea deals with Respondents—perpetrators of the September 11th attacks—Secretary Austin invoked his role "as the superior convening authority under the [Commissions Act]." Memorandum from Secretary of Defense to Susan Escallier, *supra*. He then withdrew Convening Authority Escallier's authority over the pretrial agreements, assumed that authority for himself, and withdrew from the agreements. We agree with the CMCR that the Secretary's actions were lawful because the Commissions Act designates him as the superior convening authority for military commissions. As such, he possessed the authority to wholly or partially withdraw Escallier's delegated power and step into her shoes to manage the pretrial agreements with Respondents. The military judge clearly erred in holding otherwise.

Acting under the President's direction, the Secretary of Defense has broad authority under the Commissions Act to determine the structure and procedures for military commissions. *See* 10 U.S.C. §§ 948b(b), 949a(a), 948j(a). The Commissions Act authorizes the Secretary to serve as the convening authority for military commissions. *See id.* § 948h. He may exercise this power directly or delegate it to an inferior "officer or official of the United States." *Id.*; R.M.C. 103(a)(10) (defining "[c]onvening authority" to include the Secretary or any subordinate he designates for that purpose). This delegation may occur in whole or in part, and the Secretary may prescribe limitations on a subordinate convening authority's exercise of delegated power. *See, e.g.*, R.M.C. 401(a) (providing the Secretary "may withhold the

14

authority of a subordinate to dispose of charges in individual cases, types of case[s], or generally"); R.M.C. 704(e) (recognizing the Secretary's authority to limit the convening authority's power to grant immunity).

When the Secretary designates a convening authority to act in his stead, that subordinate is an "inferior officer" subject to the Secretary's "oversight and control."[2] *Al Bahlul v. United States*, 967 F.3d 858, 872–73 (D.C. Cir. 2020). "The Secretary of Defense is responsible for the overall supervision and administration of military commissions within the [Department of Defense]." Regulation for Trial by Military Commission 1-3(a) (2011).

Secretary Austin appointed Retired Brigadier General Escallier to serve as the Convening Authority for military commissions in October 2023. As Convening Authority, Escallier was empowered to negotiate and enter into pretrial agreements with Respondents. *See* 10 U.S.C. § 949i(c); R.M.C. 705(d)(1), (3). After Escallier negotiated agreements under which Respondents would plead guilty in exchange for a promise not to seek the death penalty, Secretary Austin determined it was in the national interest to withdraw

---

[2] The Commissions Act's allocation of responsibility comports with the Secretary's designation as "head of the Department of Defense." 10 U.S.C. § 113(a)(1). In the exercise of his statutory duties, and "[s]ubject to the direction of the President," the Secretary "has authority, direction, and control over the Department." *Id.* § 113(b). To help execute his duties, the Secretary may delegate authority to his subordinates, but he remains responsible for their actions. *See id.* § 113(d) ("Unless specifically prohibited by law, the Secretary may, without being relieved of his responsibility, perform any of his functions or duties, or exercise any of his powers through, or with the aid of, such persons in, or organizations of, the Department of Defense as he may designate.").

15

Escallier's authority over the pretrial agreements and to assume that authority for himself.

The Secretary's actions were well within his statutory authority and in accordance with his responsibility to oversee his subordinates. We have recognized that, because the "[Commissions Act] includes no explicit tenure provisions," "the Convening Authority is removable at will by the Secretary." *Al Bahlul*, 967 F.3d at 872. Nothing in the Commissions Act prevents the Secretary from removing some, rather than all, of the convening authority's powers. To the contrary, no one disputes that Secretary Austin could have withheld authority over pretrial agreements when he appointed Escallier as Convening Authority or at an appropriate later time. *See* R.M.C. 401(a), 705(a). Likewise, nothing in the Commissions Act requires the Secretary to set out all limits on the delegation at the very outset at the risk of losing his superintending authority.

The Secretary's power to delegate his convening authority in part necessarily includes the power to withdraw a delegation in part. Exercising this power, the Secretary lawfully withdrew Escallier's authority over Respondents' pretrial agreements. After assuming this authority, the Secretary had the power to withdraw from the agreements. *See* R.M.C. 705(d)(4)(B) (permitting the convening authority to withdraw from an agreement under specified conditions).

We reject Respondents' arguments to the contrary. Following the lead of the military judge, Respondents maintain that the decision to withdraw from the pretrial agreements was in Convening Authority Escallier's sole discretion, and they point to the Commissions Act's prohibition against unlawful influence as evidence for this fact. *See* 10 U.S.C. § 949b(a)(2)(B) ("No person may attempt to coerce or, by any

16

unauthorized means, influence … the action of any convening … authority with respect to their judicial acts."). Respondents claim that without an explicit grant of authority to override an inferior convening authority's decision, the Secretary was bound by his delegation and by Escallier's decision.

Respondents' reliance on the unlawful influence provision is inapposite because it does not address the Secretary's *lawful* authority to withdraw his previous delegation of convening authority. Secretary Austin did not direct Escallier or seek to govern how she performed her delegated duties.[3] Instead, the Secretary withdrew Escallier's authority over the pretrial agreements, assumed that authority for himself, and independently exercised the authority to withdraw from the pretrial agreements. These actions were consistent with the Secretary's broader responsibilities, as well as with his particular statutory and regulatory authority over military commissions. The military judge's finding to the contrary was clearly and indisputably erroneous.

**2**

While the Secretary had the lawful authority to withdraw from the agreements signed by the Convening Authority, we also must decide whether the Secretary's action complied with the governing regulations. Specifically, under the Rules for Military Commissions, the convening authority may withdraw

---

[3] Respondents' arguments largely pertain to the undisputed point that Escallier had authority to enter into pretrial agreements before the Secretary withdrew this authority. Because we conclude that the Secretary's withdrawal was lawful, we have no occasion to consider whether entering into or withdrawing from pretrial agreements are "judicial acts" protected by the Commissions Act or to assess the applicability of any limits on unlawful influence.

17

from a pretrial agreement "at any time before the accused begins performance of promises contained in the agreement." R.M.C. 705(d)(4)(B) ("withdrawal regulation").

The military judge identified three ways that Respondents had begun performing promises in the pretrial agreements before the withdrawal:  (1) refraining from examining a witness and from filing motions; (2) entering into stipulations of fact with the prosecution; and (3) negotiating acceptable versions of their respective Letterhead Memoranda.

All three of those determinations are reviewed de novo in this case.  "[A] plea agreement is a contract" between the defendant and the government that is governed by the "principles of contract law[.]"  *United States v. Jones*, 58 F.3d 688, 691 (D.C. Cir. 1995); *see United States v. Munafo*, 123 F.4th 1373, 1378 (D.C. Cir. 2024); *United States v. Moreno-Membache*, 995 F.3d 249, 254 (D.C. Cir. 2021).

In contract cases, questions of law are reviewed de novo and questions of fact for clear error.  *Collins v. Pension Benefit Guaranty Corp.*, 881 F.3d 69, 72 (D.C. Cir. 2018); Restatement (Second) of Contracts § 212(2) (Am. L. Inst. 1981); 11 Richard A. Lord, Williston on Contracts § 30:1 (4th ed. 2024); 5 Timothy Murray, Corbin on Contracts § 24.1(3) (Rev. Ed. 2024).  Identifying the governing rules of contract law is a legal question reviewed de novo.  *Ram Constr. Co. v. American States Ins. Co.*, 749 F.2d 1049, 1053 (3d Cir. 1984); 11 Williston § 30:1.

Determining the meaning that should be ascribed to a contract's words—the contract's "interpretation"—is a question of law or fact depending on whether the relevant contract language is ambiguous or otherwise subject to proof

18

by extrinsic evidence. *Bennett Enters., Inc. v. Domino's Pizza, Inc.*, 45 F.3d 493, 497 (D.C. Cir. 1995); 11 WILLISTON § 30:1.

In addition, there is no dispute in this case over the applicable Rule of Military Commission governing the withdrawal from pretrial agreements. The military judge and the parties agree that the Secretary's ability to withdraw from the pretrial agreements turns on whether Respondents had "beg[un] performance of promises contained in the agreement[s.]" R.M.C. 705(d)(4)(B); *see* Pretrial Agreement Order at 25–26.

The relevant facts concerning Respondents' conduct at the August 1st and 2nd hearings are not in question. They are documented in the hearing transcript. The facts pertaining to Respondents' submission of their respective stipulations of fact and agreement to the admission of letterhead memoranda as part of their offers for pretrial agreements are also not in dispute as they appear on the face of the agreements.

What the parties disagree about, and what the military judge decided, are the applicable principles of contract law and whether Respondents' conduct constituted performance of a promise that is contained in the agreements. The former is a question of law that we review de novo. And the latter is a question of contract interpretation because it is a disagreement over what the words in the agreements mean. Our standard of review for this question turns on whether the words in the agreements are ambiguous.

Whether a contract term is ambiguous is a question of law that we review de novo. *Segar v. Mukasey*, 508 F.3d 16, 22 (D.C. Cir. 2007); *Bennett*, 45 F.3d at 497; 11 WILLISTON § 30:5. A court interprets a contract's language based on how a reasonable person would understand the contract's terms in

19

light of the whole agreement and the surrounding circumstances. *See Richardson v. Edwards*, 127 F.3d 97, 101 (D.C. Cir. 1997); *Florida East Coast Ry. Co. v. CSX Transp., Inc.*, 42 F.3d 1125, 1129 (7th Cir. 1994); 11 WILLISTON § 30:4; 2 ZACHARY WOLFE, FARNSWORTH ON CONTRACTS §§ 7.11, 7.14 (4th ed. 2025).  Contract language will be considered "ambiguous if it is reasonably susceptible [to] different constructions, but it is not ambiguous merely because the parties later disagree on its meaning." *Bennett*, 45 F.3d at 497; *see Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan*, 7 F.3d 1091, 1095 (2d Cir. 1993); 11 WILLISTON § 30:4; 5 CORBIN § 24.4(3).  If a contractual term is ambiguous, the trial court may use extrinsic evidence to make a factual finding about what meaning the parties intended.  *NRM Corp. v. Hercules Inc.*, 758 F.2d 676, 682 (D.C. Cir. 1985); 5 CORBIN § 24.4(4).  Such factual findings are reversible only for clear error.[4]

But when the contract's terms are not ambiguous, there are no questions of fact for the court to resolve.  *Collins*, 881 F.3d at 72–73; *Segar*, 508 F.3d at 22.  The court's only task is to give effect to the contract's plain language.  "[I]t is black-letter law that the terms of an unambiguous private contract must be enforced irrespective of the parties' subjective intent[.]" *Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 150 (2009); *see In re Binghamton Bridge*, 70 U.S. 51, 74–75 (1865) ("If there is no ambiguity, and the meaning of the parties can be clearly ascertained, effect is to be given to the instrument used[.]"); *Paul v. Deloitte & Touche, LLP*, 974 A.2d 140, 145 (Del. 2009); 11 WILLISTON § 30:4.  In other words, when "the plain

---

[4]  The dissenting opinion objects that we have ignored relevant extrinsic evidence in concluding that the language of the PTAs is unambiguous.  Dissenting Op. 13.  Yet the dissenting opinion points to no material evidence that our analysis has not addressed.

20

meaning of the language" in a contract is clear, "the inquiry begins and ends with the text." *Bode & Grenier, LLP v. Knight*, 808 F.3d 852, 862 (D.C. Cir. 2015).

Plea agreements in criminal cases are analyzed the same way. When there is no ambiguity in the agreement, "the interpretation of a plea agreement's terms is a pure matter of law" that we review de novo. *Jones*, 58 F.3d at 691; *Moreno-Membache*, 995 F.3d at 254; *United States v. Henry*, 758 F.3d 427, 431 (D.C. Cir. 2014).

The dissenting opinion reasons that other circuits largely review district courts' interpretations of the terms of plea agreements for clear error. Dissenting Op. 10–11. What controls here is this circuit's law that "[t]he meaning of a plea agreement … is of course reviewed *de novo*," even while factual findings are reviewed for clear error. *United States v. Pollard*, 959 F.2d 1011, 1023 (D.C. Cir. 1992). Even the dissenting opinion's preferred circuit for its reading agrees that "court[s] review[] the terms of [a] plea agreement *de novo*," while "factual determination[s] [are] reviewed for clear error." *United States v. Altamirano-Quintero*, 511 F.3d 1087, 1093, 1098 (10th Cir. 2007). So do other circuits.[5]

_____

[5] *See United States v. Estrada-Gonzalez*, 32 F.4th 607, 612–13 (6th Cir. 2022) ("[C]onsistent with common-law contract principles, we have treated the question whether an agreement's language is unambiguous as a legal issue subject to de novo review …. When interpreting that language, moreover, we have focused on how a 'reasonable person' would understand it—just as a court would with any contract.") (internal citations omitted); *United States v. Farias*, 469 F.3d 393, 397 (5th Cir. 2006) ("We review *de novo* whether the Government breached a plea agreement, accepting the district court's factual findings unless clearly erroneous."); *United States v. Mejia*, 55 F.4th 1, 7 (1st Cir. 2022) ("*Once any factual disputes are*

21

The dissenting opinion also responds that "none" of our cases have reviewed disagreement over "the scope of a contract term" in a pretrial agreement *de novo*. Dissenting Op. 11 n.2. Use of the word "scope" is puzzling because words have meanings, not scopes. If by "scope of a contract term" the dissenting opinion means the "meaning of a contract term," then the dissenting opinion is simply incorrect. *See Moreno-Membache*, 995 F.3d at 254–55 (reviewing de novo meaning of "agrees not to seek any of the adjustments"); *Henry*, 758 F.3d at 432–33 (reviewing de novo meaning of "full nature and extent of … cooperation"). If instead the dissenting opinion refers to the parties' intended meaning, then it has gone where courts cannot go when, as here, the term is unambiguous.

In this case, the pretrial agreements, which were drafted jointly by Respondents and the government, are written down in substantial detail and the relevant terms are not ambiguous. There is also no dispute about the key facts. What the parties did and said in the hours between the Convening Authority's approval of the PTAs and the Secretary of Defense's withdrawal are all recorded in court transcripts and records. As a result, the standard of review is the same as for an integrated contract with unambiguous terms. Review is de novo and the "plain language of the plea agreement" controls. *Jones*, 58 F.3d at 691; *Munafo*, 123 F.4th at 1378; *United States*

---

*resolved*, the question of whether a party breached the terms of a plea agreement is usually a question of law, which we review de novo.") (emphasis added) (citation omitted); *United States v. Tripodis*, 94 F.4th 1257, 1261, 1263 (11th Cir. 2024) (reviewing *de novo* whether the government breached a plea agreement and employing clear-error review only for "factual findings regarding the scope" of that agreement).

22

*v. Meija*, 55 F.4th 1, 7 (1st Cir. 2022); *United States v. Mondragon*, 228 F.3d 978, 980 (9th Cir. 2000).[6]

**a**

The military judge held that the Secretary of Defense could not withdraw from the pretrial agreements because Respondents began performance of a promise in the agreements when, at the August 1st and 2nd hearings, they "refrained from examining the witness(es) for pretrial motions while the Prosecution and Defense Counsel for Mr. Ali questioned those same witnesses." Pretrial Agreement Order at 26.

That was straightforward error given the plain text of the pretrial agreements and the undisputed facts in this case.

By way of reminder, under Rule of Military Commission 705(d)(4)(B), the convening authority "may withdraw from a pretrial agreement at any time before the accused begins performance of promises contained in the agreement[.]" R.M.C. 705(d)(4)(B). The type of performance by a party that can preclude withdrawal, then, must be the commencement of an action that is "promise[d]" within "the agreement" itself. *Id.*

Neither of those two criteria is met here. It is undisputed that a commitment not to question witnesses appears nowhere

---

[6] The dissenting opinion argues that the military judge made numerous factual findings that warrant clear error review. Dissenting Op. 17–19. Yet what the dissenting opinion characterizes as factual determinations are portions of the military judge's opinion where he committed *legal* error in concluding that undisputed facts rendered unambiguous language in the PTAs ambiguous. Whether contract language is ambiguous or not is a legal question that we review de novo. *Segar*, 508 F.3d at 22.

23

in the agreements' text. So it is not a "promise" that is "contained in the agreement." In holding otherwise, the military judge's conclusion cited no provision of the agreements, nor did it claim to be interpreting some ambiguous contract language. Pretrial Agreement Order at 26–28.

Respondents point to a textual commitment in their agreements to "withdraw all pending motions." Mohammad PTA ¶ 23; bin 'Atash PTA ¶ 22; Hawsawi PTA ¶ 23. Each Respondent's pretrial agreement words this promise somewhat differently, but none of those differences ultimately matter for present purposes.

Mohammad's agreement says:

Upon entry and acceptance of the Accused's guilty plea pursuant to this Agreement, the Accused knowingly, voluntarily, and expressly waives all waivable motions. The Accused further agrees not to make any future motions, except ones relating to procedural or scheduling matters, and to move to withdraw all pending motions.

Mohammad PTA ¶ 23.

Bin 'Atash's agreement similarly states:

Upon the Military Judge's acceptance of this Agreement, the Accused knowingly, voluntarily, and expressly waives all waivable motions. The Accused further agrees not to make any future motions, except ones relating to procedural, resourcing, or scheduling matters, and to move to withdraw all pending motions.

Bin 'Atash PTA ¶ 22.

24

Hawsawi's agreement says:

> Upon the entry and acceptance of my guilty plea, I knowingly, voluntarily, and expressly waive all waivable motions. Upon acceptance of this Agreement by the Convening Authority, I agree to move to withdraw all pending motions. I further agree not to make any future motions except ones pertaining to sentencing instructions, or procedural and scheduling matters.

Hawsawi PTA ¶ 23.

Declining to examine witnesses is nowhere mentioned. Respondents do not argue otherwise. Nor have they identified any ambiguous word that should be read to impose that obligation.

Respondents argue instead that refraining from questioning the FBI witness was the beginning of their performance of their promise to withdraw their motions. Mohammad & Hawsawi Br. 17–20; bin 'Atash Br. 12, 18–19. That argument cannot be reconciled with the agreements' language or with Respondents' conduct at the hearings.

*First*, as a straightforward textual matter, withdrawing a motion is a formal action in which a party informs the court, orally or in writing, that he wishes to take back from the court's further consideration a previously requested action. In simple terms, it means telling the court that a request for some type of relief is abandoned and will no longer be pursued. Moving in a legal proceeding to withdraw a motion is an affirmative action that ends any further proceedings on the proponent's motion. *See Move*, BLACK'S LAW DICTIONARY 1217 (12th ed.

25

2024) (defining "move" as to "make a motion" or "make an application (to a court)"); *id.* at 1217 (defining "motion to withdraw" as "[a]n *attorney's request* for a court's permission to cease representing a client in a lawsuit" or "[a] defendant's *formal request* for a court's permission to change the defendant's plea or strike an admission") (emphases added).

Yet in this case, no Respondent filed papers or orally requested to withdraw any motions on August 1st or 2nd, and certainly not their pending suppression motions. Nor did they inform the court that they no longer wished to prosecute or proceed with their suppression motions or any other motions. They made no formal or even informal request of the court that could amount to moving to withdraw a motion or even beginning to do so.

*Second*, quite the opposite happened. The military judge advised all three Respondents that, in light of the pretrial agreements, he would proceed that day to hear only their co-defendant Al Baluchi's motion to suppress since he had not entered into a pretrial agreement. Trial Tr. 49319:18–19, Aug. 1, 2024 (J.A. 226) (Judge McCall: "[W]e're pressing on, which is my intention with the [Al Baluchi] case."); *id.* at 49323:18–19 (J.A. 230) (Judge McCall: We will "continue on and have hearings" in Al Baluchi's case, even "if the other defense teams are not present."); *id.* at 49323:15–16 (J.A. 230) (Judge McCall: "So going forward, … we're dealing with what would be part of the [Al Baluchi] case[.]").

As for these three Respondents, the military judge explained that he would still "give that team a chance to question that witness if they can demonstrate that they actually have additional matters to present" in support of their suppression motions if the pleas were not later accepted. Trial Tr. 49319:14–16, Aug. 1, 2024 (J.A. 226). In so doing, the

26

judge likened his decision to a prior circumstance in which counsel for one Respondent was unable to be present for an argument, and the argument continued without that party's participation, subject to further questioning by the absent counsel at a later date. *Id.* at 49319:3–16 (J.A. 226). Nothing was terminated or withdrawn; Respondents' pending motions were preserved for future action.

The only person who took any action with respect to Respondents' suppression motions was the military judge. And he kept those motions alive pending further proceedings.[7]

No Respondent objected to that preservation of their pending motions or asked the court to withdraw his motion to suppress. Counsel stood silent in response to the military judge's proposal. Indeed, other than the entry of their appearances at the very beginning of the August 1st hearing, counsel for Respondents did not say a word at the proceeding about their pending suppression motions or otherwise. The only other thing they said at the hearing occurred much later in the proceedings when they stated that their co-defendant Al Baluchi should be able to see the pretrial agreements. *See* Trial Tr. 49325:8–11; *id.* at 49325:20; *id.* at 49325:22–23. In so doing, counsel for Mohammad took "the position that … Mr. Mohammad is very much a part of the case that Mr. Al Baluchi is part of." *Id.* at 49325:5–8.

To be sure, at the hearing the next day, counsel for Hawsawi stated his belief that "not … engaging in any

_____

[7] The military judge did not purport to interpret or effectuate the pretrial agreements. The judge was explicit that he had not even had an opportunity to read the agreements at the time he made those statements. Trial Tr. 49322, Aug. 1, 2024 (J.A. 148); *id.* at 49315 (J.A. 222).

27

examination of the witness" was "specific performance" of the pretrial agreement. Trial Tr. 49421:1–3 (J.A. 237). But saying so—without any accompanying action or oral request regarding the pending motions—is not the same thing as actually beginning performance of a promise to "withdraw" motions. Counsel for Hawsawi did not even mention the words "motion" or "withdraw." *Id*.

It is, in short, indisputable that Respondents did not move to withdraw their suppression motions at the hearing. Quite the opposite: They silently acquiesced in keeping them on the docket when the trial judge said he would preserve them for the time being. And those motions remained on the docket, with the full acquiescence of Respondents, at the time the Secretary withdrew from the pretrial agreements.

*Third*, Respondents point to the government attorney's statement at the August 1st hearing that, "with the waiver of all motions from three of the four accused, they can't actively continue to participate in any of the contested litigation based on the pretrial agreement[s]." Trial Tr. 49317:21–49318:1, Aug. 1, 2024 (J.A. 224–25). But the prosecutor's atextual reading of the pretrial agreements cannot change what the contract means any more than Respondents' inaction at the hearings could. And it is telling that not one of Respondents' counsel expressed agreement with the government's position or took any action that could even loosely be characterized as beginning the process of withdrawing his motion.[8]

---

[8] The dissenting opinion notes that one defense attorney stated "we see it pretty much the same way" and questioned whether Respondents "should be required to appear for the first day of each session anymore." Trial Tr. 49:318:10–13 (J.A. 225); Dissenting Op. 57. But this statement was made by counsel for Al Baluchi, who did not enter into a pretrial agreement, and concerned whether the trials

28

What matters for present purposes is that the promise in all three pretrial agreements "to move to withdraw all pending motions" is unambiguous.  It requires formal steps to be taken by Respondents that were not taken at any time prior to the Secretary's withdrawal from the agreements.  When contract language promises affirmative action by a party, silent inaction is not performance of that promise, and silent acquiescence in the court's preservation of a motion does not in any way begin to withdraw that motion.

Perhaps recognizing the frailty of Respondents' argument, the dissenting opinion tries a different tack by reasoning that Respondents' inaction at the hearings began performance of a totally different promise—the promise to "waive[] all waivable motions."   Mohammad PTA ¶ 23; bin 'Atash PTA ¶ 22; Hawsawi PTA ¶ 23; *see* Dissenting Op. 63–72.  That approach fails for three reasons.

*First*, neither Mohammad nor Hawsawi argued to this court that they performed by waiving any motions.  As a result, those two Respondents have forfeited this argument as a basis for precluding the Secretary's withdrawal.  *United States ex rel. Totten v. Bombardier Corp*., 380 F.3d 488, 497 (D.C. Cir. 2004) (stating that arguments not raised on appeal are forfeited).

*Second*, the agreements' language is plain as day:  The promise to waive all waivable motions does not even attach until Respondents' guilty pleas are entered by the military judge.   *See* Mohammad PTA ¶ 23 ("*Upon entry and acceptance of the Accused's guilty plea* pursuant to this

---

should be severed, not the meaning of Respondents' pretrial agreements.  *See* Oral Arg. Tr. 118:9–15.

29

Agreement, the Accused knowingly, voluntarily, and expressly waives all waivable motions.") (emphasis added); bin 'Atash PTA ¶ 22 ("*Upon the Military Judge's acceptance of this Agreement*, the Accused knowingly, voluntarily, and expressly waives all waivable motions.") (emphasis added); Hawsawi PTA ¶ 23 ("*Upon the entry and acceptance of my guilty plea*, I knowingly, voluntarily, and expressly waive all waivable motions.") (emphasis added). So the promise to waive motions was conditioned on a particular act that had not yet occurred when the Secretary withdrew from the agreements.

The dissenting opinion reasons that, while the entry of a guilty plea necessarily results in the waiver of all waivable motions, "an accused may still *voluntarily* waive such motions prior to pleading guilty." Dissenting Op. 69 (emphasis added). Of course. But just because one party performs prematurely does not mean that the other party's own contractual rights change if the contract was for performance at a specified time. *See* 2 WILLIAM H. PAGE, THE LAW OF CONTRACTS § 1158 (1905) ("If the contract fixes a certain time for performance, the party from whom performance is due has no right to perform before that time."); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 237 cmt. d; *Prudential Ins. Co. of Am. v. Rand & Reed Powers Partnership*, 141 F.3d 834, 836 (8th Cir. 1998) (recognizing the common law "perfect tender in time" rule to reject premature performance as performance).

*Third*, even if the plain-text timing condition were to be ignored, the waiver of motions—like their motion to withdraw—requires some express, affirmative action by Respondents. *See United States v. Avery*, 52 M.J. 496, 498 (C.A.A.F. 2000) ("[W]e have required that waiver be an affirmative action and not merely a failure to object."); *Waiver*, BLACK'S LAW DICTIONARY 1900 (defining "waiver" generally as "[t]he voluntary relinquishment or abandonment—express

30

or implied—of a legal right or advantage," "express waiver" as only one that is "voluntary and intentional," and an "implied waiver" as "evidenced by a party's decisive, unequivocal conduct reasonably inferring the intent to waive"). After all, a waiver has to be knowing and voluntary. *See Waive*, BLACK'S LAW DICTIONARY 1900 ("[T]o give up (a right or claim) voluntarily .... [T]o waive a right one must do it knowingly— with knowledge of the relevant facts."); *cf.* 13 WILLISTON § 39:14 ("[W]aiver of a contractual provision must be clearly established and will not be inferred from equivocal acts or language.").

There was no express or implied waiver by Respondents as they said and did nothing to waive their existing motions to suppress, or any other motions. Silent inaction in response to the trial court's express preservation of such motions does not even hint at a waiver. Indeed, it would be troubling to conclude that criminal defendants can waive motions protecting their constitutional rights by saying and doing nothing.

At bottom, the dissenting opinion's conclusion that motions to suppress were waived and withdrawn brushes off the military judge's express statement that the motions would be preserved and kept on a back burner until the pleas were entered. Trial Tr. 49319:14–16, Aug. 1, 2024 (J.A. 226). The dissenting opinion, in fact, agrees that those motions were never "fully withdrawn[.]" Dissenting Op. 72. Which is precisely our point. By definition, motions that are preserved on the docket by the court for potential later revival were neither waived nor withdrawn. They were, at most, postponed. While the dissenting opinion supposes that Respondents somehow *began* to waive or withdraw their motions, their total silence and complete inactivity, including acquiescence in their motions' full preservation, shows the opposite. Trying after the

31

fact to have it both ways is not performance—or the beginning of performance—of a promise in the agreements.

*Fourth*, the dissenting opinion stresses that Respondents needed only to "begin" performance of their post-plea promise to waive all waivable motions. Dissenting Op. 69. Fair enough. But neither the dissenting opinion nor Respondents explain what exactly they did to begin the waiver process. They do not claim that they were drafting filings for the court, practicing an oral statement to that effect, or even clearing their throats. Beginning performance, like the actual execution of a waiver itself, requires some identifiable action on the part of Respondents. The record here reveals nothing showing—let alone "clear[ly]" showing, *United States v. Campos*, 67 M.J. 330, 332 & n.3 (C.A.A.F. 2009) (cited in Dissenting Op. 65)—that Respondents had intentionally relinquished any motions, since the military judge expressly left their suppression motions in place.[9]

**b**

The military judge next held the Secretary's withdrawal was unlawful because, by entering into stipulations of fact that they attached to their offers of pretrial agreements,

---

[9] The military judge also determined that Respondents began to perform by "refrain[ing] from filing motions." Pretrial Agreement Order at 27. Respondents promised "not to make any future motions" in each of their agreements. Mohammad PTA ¶ 23; bin 'Atash PTA ¶ 22; Hawsawi PTA ¶ 23. But no Respondent has identified any motion they refrained from making. Hawsawi claims that he refrained from filing a motion "which would ordinarily have been the subject [of] motions practice," but that occurred almost two months *after* the Secretary withdrew from the plea agreements. *See* Mohammad & Hawsawi Br. 18 (citing court hearings from September 23, 2024).

32

Respondents began performing a promise contained in their pretrial agreements. We hold this was clear and indisputable error given the ordinary meaning of the withdrawal regulation's text, basic principles of contract law, and the plain text of the pretrial agreements.

In determining whether the Secretary was authorized to withdraw from the pretrial agreements, the decisive question is whether entering into the stipulations of fact was "begin[ning] performance" of a "promise[] contained in the [pretrial] agreement[s]." R.M.C. 705(d)(4)(B). Because pretrial agreements are interpreted in accordance with contract law, we draw on those principles to interpret the withdrawal regulation. *See United States v. Acevedo*, 50 M.J. 169, 172 (C.A.A.F. 1999).

To trigger the withdrawal regulation, there must first exist a "promise." In contract law, a promise is "a manifestation of intention to act or refrain from acting in a specified way, so made as to justify a promisee in understanding that a commitment has been made." RESTATEMENT (SECOND) OF CONTRACTS § 2(1); *see also* 1 WILLISTON § 1:2. In other words, a promise is a forward-looking commitment to engage in certain conduct in the future. *See* RESTATEMENT (SECOND) OF CONTRACTS § 55 cmt. b (explaining the definition of "promise" requires an "element of futurity"); 1 FARNSWORTH § 1.01 ("[Contract law] is … concerned with exchanges that relate to the *future* because a 'promise' is a commitment as to future behavior.").

The existence of a promise is not, however, enough to bar the convening authority from withdrawing. That promise must be contained in a pretrial agreement. Under the Rules for Military Commissions, a pretrial agreement is formed when the convening authority accepts and signs a proposed agreement

33

submitted by the accused.  R.M.C. 705(d)(3); *see also United States v. Jacques*, 5 M.J. 598, 599 (N.C.M.R. 1978) ("An agreement is 'made' when both parties, [*i.e.*], the accused … and the convening authority, have signed the written pretrial agreement.").  Before then, there exists only an "offer" from the accused to enter into a pretrial agreement, which the convening authority may accept or reject in her "sole discretion."  R.M.C. 705(d)(3).

Finally, an accused must "begin performance" of a promise contained in a pretrial agreement.  In contract law, "performance" is "[t]he successful completion of a contractual duty."  *Performance*, BLACK'S LAW DICTIONARY 1371.  And to "begin," in ordinary English, is to "[s]et about doing," "start upon," or "perform the first part of" something.  SHORTER OXFORD ENGLISH DICTIONARY 210 (5th ed. 2002).  Putting these terms together, an accused begins performance of a promise within the meaning of the withdrawal regulation when he starts to complete a forward-looking commitment contained in an executed pretrial agreement.

The record in this case clearly establishes, and the parties do not dispute, that Respondents entered into the stipulations of fact *before* their pretrial agreements were fully executed.  On July 29, 2024, Mohammad and bin 'Atash signed stipulations of fact with the military prosecutor.  The following day, Hawsawi signed his stipulation with the prosecutor.  The stipulations thus were entered into on July 29 and 30.  *See United States v. Dean*, 67 M.J. 224, 228 (C.A.A.F. 2009) (finding entry into a stipulation of fact occurred when the accused and prosecutor signed it).  Each Respondent then submitted his proposed pretrial agreement, which included the signed stipulation as an attachment, as an "[o]ffer" to Convening Authority Escallier.  On July 31st, Escallier accepted and signed the offers.  Because a pretrial agreement

34

is formed only upon the signature of both the accused and the convening authority, Respondents' pretrial agreements were fully executed on July 31, one or two days *after* Respondents entered into the stipulations of fact.

The timing of these events is fatal to Respondents' claim that they began performance of a promise contained in the pretrial agreements by signing the stipulations. At the time the stipulations were executed, there were no pretrial agreements in existence and therefore no promises "contained in the agreements" for Respondents to perform. The terms of the agreements confirm this understanding, describing each agreement with its attachments as a single "[o]ffer" that became a binding "[a]greement" upon the Convening Authority's acceptance. *See* Mohammad PTA ¶ 62; bin 'Atash PTA ¶ 56; Hawsawi PTA ¶ 59. Because the executed stipulations were attachments to the proffered pretrial agreements, they were part of the offer to the Convening Authority rather than something promised in the future under the executed agreements.

Moreover, the pretrial agreements recognize that Respondents had already agreed to the attached stipulations of fact. *See* Mohammad PTA ¶ 7 (providing that the "Accused has read and fully understands the Stipulation of Fact" and that the stipulation "is a fair and accurate summary of the facts supporting all charges and specifications to which he is pleading guilty"); bin 'Atash PTA ¶ 7 (similar); Hawsawi PTA ¶ 7 (similar). When Respondents signed the written stipulations of fact they were not (and by definition could not

35

have been) beginning "performance" of any "promise" in their pretrial agreements.[10]

Respondents point to several provisions in the pretrial agreements that supposedly reflect a promise to enter into the stipulations of fact. In particular, each agreement provides that

---

[10] Rather than ground its decision in the withdrawal regulation or contract principles, the military judge relied on *United States v. Dean*, 67 M.J. 224 (C.A.A.F. 2009). *Dean* involved a then-identical withdrawal regulation in the court-martial context. *See* Rules for Courts-Martial 705(d)(4)(B) (2008). The Court of Appeals for the Armed Forces ("CAAF") held that the convening authority could not withdraw from a pretrial agreement because the accused had begun performance of a promise by entering into a stipulation of fact before the pretrial agreement was executed. *Dean*, 67 M.J. at 227–28. Citing *Dean*, the military judge concluded that "[t]he timing of the entry of such stipulation is not the issue; the act of doing so is what begins performance." Pretrial Agreement Order at 27.

We disagree. CAAF decisions, while instructive, do not control our interpretation of the Commissions Act. *See* 10 U.S.C. § 948b(c) (providing that the Uniform Code of Military Justice generally does not apply to military commissions and that its "judicial construction," "while instructive," is "not of its own force binding on military commissions"). On this issue, we find *Dean*'s reasoning unpersuasive and its facts distinguishable. The court did not explain how its holding was consistent with the text of the withdrawal regulation or basic principles of contract law. *Cf. Dean*, 67 M.J. at 231 (Baker, J., dissenting) ("[I]t is not clear how Appellant could, as a matter of military or contract law, begin performing on a contract that had not yet been signed by the convening authority and that had not entered into force."). Moreover, the court identified several actions that counted as beginning performance, and one of those actions occurred after the pretrial agreement was finalized. *See id.* at 228. The pre-agreement entry into the stipulation of fact was therefore not necessary to the court's disposition. For these reasons, we decline to follow *Dean*.

36

the Respondent "agrees to enter into the Stipulation of Fact included as Attachment A to this Pretrial Agreement"; that "a failure to enter into a Stipulation of Fact is a breach of a material term of this Agreement"; and that the prosecution may withdraw from the agreement if the Respondent "fails to enter into the Stipulation of Fact." Mohammad PTA ¶¶ 6, 46(e); bin 'Atash PTA ¶¶ 6, 43(e); *see also* Hawsawi PTA ¶¶ 6, 44(e). Respondents argue they performed these promises by signing the written stipulations at Attachment A.

The cited provisions, however, are forward looking and cannot promise something that already occurred by the time the pretrial agreements were executed. To the extent these provisions even promise future conduct, it must be the promise that Respondents would formally enter the stipulations of fact into evidence at their plea hearings before the military judge. *See* R.M.C. 811(d), (f) (providing the parties must offer the stipulations to the military judge and he must accept them before they become binding); *Enter*, BLACK'S LAW DICTIONARY 671 ("To put formally before a court or on the record[.]"). This reading comports with other provisions in the pretrial agreements that list entry into the stipulations with other events to be performed in the future before or by the military judge. *See* Mohammad PTA ¶ 46; bin 'Atash PTA ¶ 43; Hawsawi PTA ¶ 44. As the parties agree, Secretary Austin withdrew from the pretrial agreements before the military judge convened the plea hearings. Respondents never began performance because there was no plea hearing and therefore no entry of the stipulations before the military judge.[11]

---

[11]  The dissenting opinion protests that the government did not raise this argument, but it does not dispute the plain meaning of the agreements. Dissenting Op. 38–42. Consistent with ordinary guilty

37

Respondents also stress the importance of the stipulations. They explain the stipulations contain Respondents' admissions to every element of the charged offenses, thereby "provid[ing] the Government the precise narrative of how, why, and by whom the death-eligible crimes were committed." Bin 'Atash Br. 17. This information would have aided the military judge in assessing Respondents' guilt and determining their sentences.

We recognize the stipulations of fact were an important part of negotiations between Respondents and the prosecution. Indeed, the executed stipulations are perhaps best understood as consideration Respondents offered, along with several forward-looking promises (such as agreeing to plead guilty and to enter the stipulations before the military judge), in exchange for the Convening Authority's promise not to seek the death penalty. *See Univ. S. Fla. Bd. Trs. v. United States*, 92 F.4th 1072, 1082 (Fed. Cir. 2024) (explaining a party may offer past actions along with promises of future conduct as consideration for a contract); RESTATEMENT (SECOND) OF CONTRACTS § 80. Even so, signing the pretrial agreements did not transform the stipulations of fact at Attachment A into performance of a promise in the pretrial agreements because those stipulations were executed before any contractually binding promise was

---

plea and sentencing processes, the agreements contemplate that a defendant will offer a statement of the relevant facts as part of the entry of a guilty plea and sentencing. Accordingly, as the dissenting opinion recognizes, Respondents' stipulations of fact would play multiple roles, including "in the ultimate plea hearing and sentencing." Dissenting Op. 4; *see also id*. at 20, 23; 1 FRANCIS A. GILLIGAN & FREDRIC I. LEDERER, COURT-MARTIAL PROCEDURE § 12-25-11 (5th ed. 2020) (explaining that a stipulation of fact is used to assess a guilty plea and at sentencing).

38

made.[12]  *See* RESTATEMENT (SECOND) OF CONTRACTS § 55 cmt. b ("[I]f the offeror's performance is complete at the moment of acceptance, the element of futurity required by the definition of 'promise' … is lacking.").  Nor could the signed stipulations serve as performance of the promise to enter into the stipulations before the military judge, because that entry never took place.

In light of established principles of contract law and the text of the pretrial agreements, Respondents did not begin performance of any promise contained in the pretrial

---

[12]  As Williston explains, a contract based on past and future actions "does not turn already-completed preeffective-date work into work the first party was obligated to perform, when there had been no obligation to perform it when it was performed."  4 WILLISTON § 8:13; *see also Univ. S. Fla. Bd. Trs.*, 92 F.4th at 1083 (holding that when a party offers past and future work as consideration for a contract "the already-completed … work remains not obligatory").  Whether characterized as valid past consideration, executed consideration, or consideration for a reverse unilateral contract, pre-agreement actions offered as consideration do not constitute performance of a promise contained in a later-executed contract.  *See* LEAKE & RANDALL, PRINCIPLES OF THE LAW OF CONTRACTS 30–31 (7th ed. 1921) (contrasting executed consideration, which does not involve making a promise and "is voluntary and may be withheld," with executory consideration, which does involve making a promise and is obligatory); 2 WILLISTON § 6:9 (explaining that for the typical reverse unilateral contract, "the only binding promise is made by the offeree").  Thus, under the dissenting opinion's example, when the painter finishes the front fence before the homeowner executes the contract, the homeowner is still obligated under the contract to compensate the painter for his pre-contract work.  Dissenting Op. 52.  But the act of painting the front fence was not performance of a *promise* in the contract because at the time he painted the fence, there was no contractual duty for him to perform.

39

agreements when they signed their stipulations of fact.   In concluding otherwise, the military judge clearly erred.

**c**

Finally, the military judge found that Respondents began performance by agreeing not to challenge the government's use of certain evidence during sentencing.  For several years before signing the pretrial agreements, Respondents contested the admissibility of certain "Letterhead Memoranda," which documented confessions Respondents made to the Federal Bureau of Investigation in 2007 and 2008.  The admissibility of these documents was an important subject in the negotiations over the pretrial agreements.   The parties eventually agreed that certain parts of the Letterhead Memoranda could be used against Respondents and that other "red-boxed" sections in those Memoranda would be inadmissible.   The pretrial agreements incorporated this compromise:  The government promised not to ask Respondents about the red-boxed parts of the Memoranda during sentencing and, in return, Respondents promised not to object to the admissibility of the remainder of the Memoranda. The military judge concluded that by negotiating the red-boxing, Respondents began performance of a promise in the pretrial agreements.

This finding constitutes a double error.   First, the negotiations over which parts of the Memoranda would be admissible occurred before the pretrial agreements were executed.  As with the stipulations of fact, actions taken before a binding agreement is created cannot be performance of a promise made in the agreement.  Second, the military judge failed to explain how Respondents began performance of the relevant promise to withhold objections.   Respondents promised they would not object to the government introducing

40

the agreed-upon parts of the Memoranda as evidence for sentencing purposes. But Secretary Austin withdrew from the agreements before Respondents entered their guilty pleas and before any sentencing proceedings began. The proceedings never reached the stage at which Respondents' promise would be relevant, so Respondents did not begin (and could not have begun) performance of this promise. The military judge erred in concluding otherwise.

* * * * *

Because the finding of performance by the military judge was plainly erroneous, and none of Respondents' other asserted legal barriers to the Secretary's withdrawal have merit, the government has demonstrated a clear and indisputable right to relief in this case.

**B**

In addition to demonstrating a clear and indisputable right to relief under the law, a party seeking mandamus or prohibition must establish that it has "no other adequate means to attain the relief [it] desires[.]" *Cheney*, 542 U.S. at 380 (citation omitted). A petition for a writ of mandamus or prohibition "may never be employed as a substitute for appeal." *Will v. United States*, 389 U.S. 90, 97 (1967). But if "interlocutory appeal is unavailable, and appeal after final judgment would be an inadequate form of relief[,]" mandamus or prohibition may be warranted. *Fokker Servs.*, 818 F.3d at 747.

In this case, the government has demonstrated that it has no alternative "adequate means" of enforcing its right to withdraw from these plea agreements by way of either an interlocutory or direct appeal.

41

To start, no interlocutory appeal is available. The Commissions Act allows the government to seek interlocutory review by the CMCR in only four instances. 10 U.S.C. § 950d(a). Review is available when the military judge (1) terminates a charge or specification, (2) excludes significant evidence, (3) closes proceedings to the public or accused, or (4) makes various rulings related to classified evidence. *Id.* §§ 949d(c)–(d), 950d(a). None of these circumstances apply here because the question is whether, with the cases still open and pending, the military commission will enforce three pretrial agreements and proceed to enter pleas pursuant to their terms. The absence of any interlocutory avenue for relief explains why the government pursued a petition for writs of mandamus and prohibition in the CMCR. And nothing in the Commissions Act provides for direct interlocutory review in this court at all.

Bin 'Atash argues that the government could seek interlocutory appeal now because the military judge's order rejecting the Secretary's withdrawal from the pretrial agreements "terminates proceedings of the military commission with respect to a charge or specification." *Id.* § 950d(a)(1). Specifically, he argues the order is essentially an order removing the death penalty, which—according to some circuits—the government may appeal on interlocutory review in the civilian criminal context. *See United States v. Moussaoui*, 382 F.3d 453, 462–63 (4th Cir. 2004) (collecting cases).

That argument has no purchase here. The relevant statute in the civilian criminal context allows the government to appeal an order dismissing an indictment or information "as to any one or more counts, *or any part thereof*." 18 U.S.C. § 3731 (emphasis added). The statute also expressly provides that its provisions "shall be liberally construed to effectuate its

42

purposes." *Id.* By contrast, nothing in the text of the Commissions Act authorizes interlocutory appeal from partial dismissals or provides that its terms must be liberally construed. *See* 10 U.S.C. § 950d. So at best, bin 'Atash's proposed path for review is far too tenuous to be an adequate alternative for the government.

Nor is there a reliable path to obtain effective relief after final judgment. It is well established that "in the federal jurisprudence, at least, appeals by the Government in criminal cases are something unusual, exceptional, not favored." *Carroll v. United States*, 354 U.S. 394, 400 (1957). The government cannot appeal a final criminal judgment "absent express legislative authorization to the contrary." *Arizona v. Manypenny*, 451 U.S. 232, 246 (1981); *see also United States v. Scott*, 437 U.S. 82, 84–85 (1978) ("The Court has long taken the view that the United States has no right of appeal in a criminal case, absent explicit statutory authority.").

The question in this case, then, is whether the Commissions Act authorizes the government to appeal a military commission's final judgment. Respondents point to two pathways by which the government might appeal. Neither is adequate in these circumstances.

The first proposed route goes through the CMCR. Under the Commissions Act, whenever a military commission enters a final decision that includes a finding of guilt, the convening authority must refer the case to the CMCR. 10 U.S.C. § 950c(a). The scope of review in that court, however, is statutorily limited to matters "properly raised *by the accused*." *Id.* § 950f(c) (emphasis added). The statute makes no provision for review of claims by the government.

43

Once the CMCR issues its decision, this court has exclusive jurisdiction to review that ruling. *Id.* § 950g(a). But even then, our review is statutorily confined to matters raised before the CMCR—namely, those issues raised by the accused. Again, no apparent route for the government to appeal issues not raised by the accused—such as a challenge to the entry of a guilty plea—is provided, even assuming the government can appeal at all.

The second route of review bypasses the CMCR. *See id.* § 950g(c)(2). Under the Commissions Act, defendants may waive their right to an automatic appeal to the CMCR. *Id.* § 950c(b). All three Respondents have agreed to execute such waivers in their pretrial agreements. *See* Mohammad PTA ¶ 34; bin 'Atash PTA ¶ 34; Hawsawi PTA ¶ 34. When a defendant waives appeal to the CMCR, we have jurisdiction to review directly the final judgment of the military commission. 10 U.S.C. § 950g(a)–(b).

While the Commissions Act authorizes our review under this pathway, the statute does not expressly authorize *the government* to bring an appeal after entry of final judgment. This absence is noteworthy. Congress has expressly authorized the government to appeal certain sentencing decisions in the civilian and court-martial context, but it has not made similar provision for the government in military commission cases. *Compare* 18 U.S.C. § 3742(b), *and* 10 U.S.C. § 856(d), *with* 10 U.S.C. § 950d, *and* 10 U.S.C. § 950g.

In any event, we need not—and do not—decide whether Section 950g would permit the government to appeal a military commission's final judgment directly to this court. Even if the government could overcome the presumption against prosecutorial appeals in criminal cases and invoke our jurisdiction, that alternative would still be inadequate because

44

it "would come with its own attendant risks." *See Fokker Servs.*, 818 F.3d at 749. If the government could challenge the validity of the pretrial agreements only after guilty pleas have been entered, sentences imposed, and final judgments rendered, a successful appeal could leave the government's ability to try Respondents significantly hampered.

In particular, Respondents likely would claim irredeemable prejudice from being tried after admitting to the facts of their guilt on the record and under oath during both plea and sentencing hearings. Should their pleas go forward, each of them would be "questioned under oath about the offenses and/or the Government's averment of evidence" during a plea hearing. R.M.C. 910(e).

As for sentencing, under the Commissions Act, sentences are determined not by judges, but by "members" of the commission in what would, under these pretrial agreements, be public proceedings. 10 U.S.C. § 949m(b); Trial Tr. 51686:3–15, Jan. 8, 2025 (J.A. 419). Given the scope of evidence in these cases, the government has represented, and Respondents do not dispute, that the sentencing phase trials will likely involve "a several-month presentation" that will "establish the historical record." Trial Tr. 51685:16–18, Jan. 8, 2025 (J.A. 418). As terms of their pretrial agreements, Respondents have waived most grounds for objecting to the evidence presented at these hearings. Mohammad PTA ¶ 13; bin 'Atash PTA ¶ 13; Hawsawi PTA ¶ 13.

Mohammad, for example, has agreed that the prosecution may introduce, among other things, statements he made while in custody, documentary evidence from searches, forensic testing results of any physical evidence, and victim-impact evidence. Mohammad PTA ¶ 12(ii), (viii), (xix)–(xx), (xxiii), (xxiv). For this final category, Mohammad has represented

45

through counsel that he "envision[s] giving maximum opportunity to any victim witness, individuals, family members, or survivors who are interested in being heard[.]" Trial Tr. 51686:10–12, Jan. 8, 2025 (J.A. 419). Given the magnitude of evidence likely to be presented at sentencing and their admissions of guilt, Respondents would likely claim that no subsequent trial could be fair.

In light of the daunting procedural and substantive roadblocks facing a government appeal (if any) from the entry of final judgments in these cases, the government has demonstrated that it has no reliable and "adequate" alternative avenue to obtain the relief it seeks—an opportunity to try these three Respondents and seek the death penalty. That substantial uncertainty satisfies the adequate-alternative prong of the mandamus test. *Fokker Servs.*, 818 F.3d at 749 (granting mandamus when forcing the government to appeal after final judgment carried a substantial risk that the government would be unable to re-indict the defendant).

**C**

Finally, we must determine whether the writs are "appropriate under the circumstances." *Fokker Servs.*, 818 F.3d at 750 (quoting *Cheney*, 542 U.S. at 381). "Although the remedy by mandamus [or prohibition] is at law, its allowance is controlled by equitable principles." *United States ex rel. Greathouse v. Dern*, 289 U.S. 352, 359 (1933). Considering the "totality of the circumstances," we conclude it is proper to grant the writs in this case. *In re Kellogg Brown & Root, Inc.*, 756 F.3d 754, 762 (D.C. Cir. 2014).

The military judge determined that (1) Secretary Austin lacked the power to partially withdraw the convening authority after it was delegated to Escallier, and (2) even if the Secretary

46

could assume part of the convening authority, his withdrawal from the pretrial agreements was untimely under the regulations. Both conclusions rested on clear legal error, as already explained. Correction of these errors is necessary and appropriate because of the significant national interest in the disposition of these cases, which have implications for the military chain of command under the Commissions Act and for the proper functioning of military commissions. *See Colonial Times, Inc. v. Gasch*, 509 F.2d 517, 524 (D.C. Cir. 1975) (finding mandamus appropriate to "forestall future error in trial courts" and "eliminate uncertainty" in important areas of law).

First, the prosecutions of Mohammad, bin 'Atash, and Hawsawi implicate a national interest of the highest degree. *See Nat'l Wildlife Fed'n v. United States*, 626 F.2d 917, 924 (D.C. Cir. 1980) ("[T]he exercise of discretion to issue a writ of mandamus … must be guided by the court's perception of the public interest."). Respondents are the alleged mastermind and two alleged co-conspirators behind the terror attacks of September 11, 2001, which killed nearly three thousand people on American soil. The families of the victims and the American public have a strong interest in bringing the perpetrators to justice. Congress entrusted the prosecution of these war crimes to the Secretary of Defense, under the direction and supervision of the President. In particular, the judgment about whether Respondents should face the death penalty is a grave one that requires political accountability. Failing to recognize the Secretary's overarching responsibility for the appropriate resolution of these prosecutions, the military judge barred the Secretary from reasserting a part of the convening authority that had been delegated to a subordinate. Because this case implicates the interests of the entire nation, the military judge's legal error must be corrected so the prosecutions may proceed according to the Secretary's best judgment.

47

Second, the military judge's reasoning has wide implications for the Secretary's ability to execute his legal duties. As already explained, in the Commissions Act, Congress established the Secretary of Defense as the superior convening authority for military commissions. The Secretary also has administrative authority over military commissions, which he may exercise directly or delegate at his discretion. Even when he delegates authority to a subordinate, however, he retains responsibility for the exercise of that authority and may revoke that delegation in whole or in part.

Contrary to this framework, the military judge held the Secretary could not partially withdraw his delegation of convening authority unless specifically authorized to do so. Nothing in the Commissions Act requires the Secretary to exercise all of the convening authority or none at all. The military judge's error undermines political legitimacy and accountability in the context of military commissions by placing an inferior convening authority beyond the Secretary's superintendence. Because the military judge's order imposes an "unwarranted impairment" of the Secretary in the performance of his duties in this critical national security context, mandamus and prohibition are appropriate. *Cheney*, 542 U.S. at 390.

Finally, the military judge's erroneous interpretation of the withdrawal regulation will unduly limit the ability of future convening authorities to negotiate and withdraw from pretrial agreements. The withdrawal regulation allows some flexibility for the convening authority to withdraw from a pretrial agreement before an accused begins performance of a promise in the agreement. *See* R.M.C. 705(d)(4)(B). The military judge concluded Respondents began performing promises in the pretrial agreements based on acts that occurred *before* the

48

signing of the agreements and acts that had no relation to the actual promises made. The likely consequence of this erroneous interpretation is that many, if not most, pretrial agreements will become irrevocable upon signing, thus effectively eliminating the flexibility provided by the withdrawal regulation. In addition, a rule that performance occurs at the moment the convening authority signs an agreement would obligate the Secretary of Defense to divert his attention from other matters to the close superintendence of every plea agreement, at the risk of being irrevocably bound by a subordinate's decisionmaking.[13] This would raise the stakes of entering into a pretrial agreement, which in turn could impede negotiations and frustrate the formation of such agreements. Mandamus and prohibition are warranted when a challenged decision would have "enormous practical consequences for the government's ability to negotiate future settlements." *Fokker Servs.*, 818 F.3d at 750 (quoting *United States v. Microsoft*, 56 F.3d 1448, 1456 (D.C. Cir. 1995)).

Respondents counter that issuing the writs is inappropriate because the government spent years negotiating these pretrial agreements and should not be given a second bite at the apple. Secretary Austin, they claim, had been aware of these negotiations but chose not to intervene sooner. Moreover, restarting the prosecution would result in many more years of litigation with only a speculative possibility of securing the

---

[13] Respondents argue the Secretary had other means of control and supervision at his disposal, such as prospectively limiting Escallier's power to enter into pretrial agreements or prohibiting particular terms in the agreements. *See* R.M.C. 705(a). The availability of these other tools, however, does not extinguish the Secretary's ongoing responsibility of supervision, nor does it eliminate his authority to take back the convening authority from a subordinate and exercise it himself.

49

death penalty and would postpone finality and closure for Respondents and the American public.

Although Respondents criticize the Secretary's approach, nothing in his lawful choices renders mandamus and prohibition inappropriate. The government has adequately explained that Secretary Austin delayed action to avoid an unlawful influence challenge, waiting to see what type of agreement, if any, would result from the negotiations and only then deciding whether intervention was necessary. *See* 10 U.S.C. § 949b(a)(2)(B). In these proceedings, Respondents have asserted numerous unlawful influence challenges against various government officials, including the Secretary of Defense. For example, when a former Secretary removed the convening authority in 2018, Respondents' co-defendant filed a motion to dismiss all charges for unlawful influence, arguing the termination was in retaliation for the convening authority's decisions. *See* Al Baluchi's Motion to Dismiss for Unlawful Influence, *United States v. Mohammad*, AE 555 (AAA) (U.S. M.C.T.J. Feb. 9, 2018). Although the military judge ultimately rejected this challenge, it required extensive factual findings and took nearly a year to resolve. To avoid additional litigation, Secretary Austin chose to stay his hand and allow negotiations to run their course. When he found the resulting agreements unacceptable and contrary to the public interest, he promptly reclaimed part of the convening authority and withdrew from the agreements. This was reasonable and consistent with the Secretary's responsibilities.

Having properly assumed the convening authority, the Secretary determined that the "families and the American public deserve the opportunity to see military commission trials carried out." The Secretary acted within the bounds of his legal authority, and we decline to second-guess his judgment. In light of the clear and indisputable errors committed by the

50

military judge, which implicate issues of immense national importance, we conclude that issuance of the writs is appropriate under these circumstances.

**IV**

Because the government has satisfied the stringent criteria for granting writs of mandamus and prohibition, we grant the writs, vacate the military judge's order of November 6, 2024, preventing the Secretary of Defense's withdrawal from the pretrial agreements, and prohibit the military judge from conducting hearings in which Respondents would enter guilty pleas or take any other action pursuant to the withdrawn pretrial agreements. The stay pending disposition of the petition will be dissolved in 21 days, when the order accompanying this opinion becomes effective. *See* D.C. Cir. Local Rule 41(a)(3).

*So ordered.*

WILKINS, *Circuit Judge*, concurring in part and dissenting in part:

We must decide whether the government has shown clearly and indisputably that the Military Judge at Guantanamo Bay clearly erred when he held that Respondents "beg[an] performance of promises contained in the agreement[s]" as contemplated by the Rules for Military Commissions. The plain text of the agreements, the language of the controlling regulations, the considered judgment of the Military Judge and the deference we owe him, the contract doctrines of promise and formation, and the demanding standard of review that the government must satisfy all point to one conclusion: The government did not—indeed, cannot—establish a clear and indisputable right to relief.

We have every reason to believe the opposite. The accused clearly and indisputably began performance of at least three of the many promises they made. First, Respondents agreed to enter into factual stipulations, which they began performing by signing the stipulations. Second, Respondents began performance on their promises to waive all waivable motions by refraining at a motions hearing from prosecuting a pending motion to suppress. Third, that same conduct constituted beginning performance on a promise to move to withdraw pending motions. The Military Judge, Col McCall, who has presided over September 11 proceedings for years, got it right when he found that the Secretary of Defense was prohibited by the military commission rules from reneging on the plea agreements. And the U.S. Court of Military Commission Review, reviewing the same flawed arguments the government raises here, appropriately exercised its limited authority by applying the correct standard of review and denying the writ petition.

Against that backdrop, the Court's holding is stunning. Not only does the majority believe that Respondents did *not*

2

begin performance, but it holds that the government established a clear and indisputable right to a writ of mandamus or prohibition. It does so without citing a single case, statute, or other authority that requires issuing such extraordinary relief. Instead, the Court substitutes its own gloss on contract law— which does not constrain the reach of a military rule—for the weight of authority needed to support a successful mandamus petition. And it dilutes the government's burden by failing to respect a military court's considered judgment about the application of the governing military regulation, which requires only that Respondents begin (and not complete) performance before the Secretary is precluded from withdrawing from the agreements. Settled law requires that courts like ours defer to the decisions of military courts, particularly when (like here) those courts interpret military rules. Yet such deference is conspicuously absent from the majority's opinion. No matter how high the national interest, both the governing military rule and our precedent require more.

I join sections III.A.1 and III.B of the Court's opinion, which rightly determine that the Secretary of Defense had authority to withdraw Convening Authority Escallier's ability to enter into plea agreements and that, aside from a writ of mandamus or prohibition, the government lacks an adequate and alternative means of obtaining relief. As for the rest, the majority makes a grave error. The government has not come within a country mile of proving clearly and indisputably that the Military Judge erred, much less committed clear error when he applied the withdrawal regulation. Because a writ of mandamus or prohibition should issue only if the government makes such a showing, I respectfully dissent.

3

**I.**

The facts giving rise to this dispute are highly unusual. Respondents are charged with orchestrating the deadliest terrorist attack in our nation's history. Several of the charges are capital offenses, for which the government may seek the death penalty for any guilty party. Pretrial proceedings at Guantanamo Bay have lasted for nearly two decades.

As early as May 2017, the government expressed interest in discussing the "potential for pretrial agreements" in these cases. In March 2022, a prosecutor again reached out to Respondents to "begin to negotiate whether pre-trial agreements [we]re possible." J.A. 26. About a week later, the parties indicated that negotiations were sufficiently successful to warrant vacating upcoming hearing dates to allow time for further negotiations. Among the topics of negotiation was the contents of the stipulations of fact that each Respondent would be required to enter. The government characterized the stipulations as one of "the two most important aspects of the Prosecution's willingness to endorse any pre-trial agreements in this case." J.A. 198. The government initially drafted the stipulations, and the parties rigorously bargained over their contents. *See* J.A. 232 ("We did spend a lot of time on the Stipulations of Fact."); Al Hawsawi & Mohammed Resp. to Order of Mar. 4, 2025 (Sealed), Attach. B, at B-75 to B-76 (Mar. 7, 2025), Dkt. No. 2104532.

After 27 months, the parties' negotiations culminated in written pretrial agreements ("PTAs"). In exchange for the government taking the death penalty off the table, Respondents "agreed to plead guilty to all of the charged offenses, including the murder of the 2,976 people listed in the charge sheet, and to be later sentenced by a panel of military officers." J.A. 203. Factual stipulations were appended to each PTA as Attachment

4

A, and they served as full confessions of Respondents'
involvement in planning and executing the September 11
attacks.  Mohammed and bin 'Atash signed the PTAs on July
29, 2024, and signed the factual stipulations the same day.  Al
Hawsawi signed his PTA and then the attached stipulation on
July 30.  The trial prosecutor signed each stipulation the same
day as each Respondent.  The stipulations were to play multiple
roles in the ultimate plea hearing and sentencing, including
establishing the factual basis for the guilty plea and aiding the
court at sentencing.  Within 48 hours of Mohammed and bin
'Atash's signatures, and only 24 hours of Al Hawsawi's, the
Convening Authority countersigned each of the PTAs on July
31, 2024.

The next day, August 1, the parties convened for a hearing
on a motion to suppress jointly filed by Respondents and
another co-defendant, Ammar al Baluchi.  The Military Judge
discussed potentially severing al Baluchi's case from the other
three Respondents because he had not entered into a PTA.  The
government argued that severance was unnecessary until the
court accepted the guilty pleas, but stated its position that "with
the waiver of all motions from three of the four accused,
[Respondents could not] actively continue to participate in any
of the contested litigation based on the pretrial agreement."
J.A. 224–25.  al Baluchi's attorney agreed, as did the Military
Judge.  Respondents did not question the FBI witness at the
hearing.  The hearing continued into the following day, when
Al Hawsawi's counsel indicated that he refrained from
cross-examining the witness because the PTAs required it.

After the August 2 hearing, the Defense Secretary issued a
memo withdrawing from each of the three PTAs.  *See*
Memorandum from Lloyd Austin, Sec'y of Def. to Susan
Escallier, Convening Authority for Mil. Comm'ns (Aug. 2,
2024),  https://media.defense.gov/2024/Aug/02/2003517325/-

5

1/-1/1/Secretary-of-Defense-Memorandum-for-Convening-Authority-for-Military-Commissions.pdf [https://perma.cc/T2U7USF6].    Respondents successfully challenged this change in position before the Military Judge, who entered an order scheduling the pleas pursuant to the PTAs.    Pet. for a Writ of Mandamus & Prohibition Ex. A [hereinafter Pet. Ex. A].    The government then petitioned the U.S. Court of Military Commission Review ("CMCR") for a writ of mandamus to halt the plea hearing, which that court denied.    Pet. for a Writ of Mandamus & Prohibition Ex. B [hereinafter Pet. Ex. B].    Hoping that the third time really is the charm, the government now seeks a writ from our Court, asking us to hold that these two military tribunals were incorrect and to halt the plea hearings.

## II.

I start with the burdensome standards of review—first, how we consider the Military Judge's determination that Respondents began performance, and second, what a petitioner must show to obtain mandamus relief.    Both because of the fact-laden nature of the Military Judge's ruling below, and since mandamus review is heavily circumscribed, the government must prove that exceptional circumstances warrant the extraordinary relief it requests.    The majority gives the government a free pass by getting the former standard wrong and acknowledging but not applying the latter.

At bottom, this case concerns a military judge's application of a military procedural rule.    The Military Judge applied Rule for Military Commissions ("R.M.C.") 705(d)(4)(B) ("withdrawal regulation"), which restricts the Convening Authority's power to withdraw from a PTA to "any time before the accused begins performance of promises contained in the agreement."    Pet. Ex. A at 15 (quoting R.M.C.

6

705(d)(4)(B)).  To do so, he engaged in a predominantly factual (not legal) inquiry.  He first interpreted the PTAs to determine the relevant commitments that both parties made.  He then assessed Respondents' conduct and the proceedings before him, and he held that each "began performance" of several of those promises.  *Id.* at 26.  The majority erroneously reviews every issue *de novo*.  But that standard applies only to our interpretation of the withdrawal regulation itself.  Instead, we must review the Military Judge's *application* of the Rule for clear error because it poses a mixed question of fact and law in which factual issues dominate.

Clear-error review in a typical case requires substantial deference.  But here, extraordinary deference is warranted because the government seeks to upend the Military Judge's application via a mandamus petition.  That doubly deferential posture is fortified by precedent instructing that non-military courts should extend deference to military tribunals, particularly in the interpretation of military law.  To prevail, the government must do more than establish that the Military Judge got it wrong.  It must clearly and indisputably show that the Military Judge's application of Rule 705(d)(4)(B) was clearly erroneous.  Proper application of these standards compels only one conclusion:  denying the petition.

## A.

The majority believes we review *de novo* the Military Judge's application of the withdrawal regulation.  Majority Op. 18–20.  In its view, "whether Respondents' conduct constituted [the beginning of] performance of a promise that is contained in the agreements" is merely a dispute "over what the words in the [PTAs] mean" because the government does not contest the "facts" below.  *Id.* at 18.  That conclusion is wrong.  We review for clear error the Military Judge's decisions about the scope of

7

the PTAs' promises and whether Respondents began performance of those promises because both present predominantly factual inquiries.

**1.**

Consider the several steps involved in the Military Judge's application of the Rule. He necessarily made a threshold legal determination about what the withdrawal regulation requires. Pet. Ex. A at 15–17. What did the Executive Branch intend for "begins performance of promises contained in [a PTA]" to mean in R.M.C. 705(d)(4)(B)? That, of course, implicates a legal question on review. *See Bufkin v. Collins*, 145 S. Ct. 728, 738 (2025).

But then the Military Judge had to make two other, primarily factual, determinations. First, to assess whether Respondents began performance of promises in the PTAs, he necessarily decided the existence and scope of relevant promises. That is, what conduct did the parties *intend* their contractual promises to require? Second, the Military Judge determined whether the facts before him—measured by the parties' conduct and demeanor, along with the surrounding circumstances, like the context of the negotiations and the history of the case—established that Respondents "beg[an] performance" under R.M.C. 705(d)(4)(B).

The Military Judge thus determined that performance under the PTAs "began in a number of ways." Pet. Ex. A at 26. First, performance began when "[a]ll three Accused signed lengthy confessional stipulations of fact, which could be used to establish their guilt and for the Panel Members to determine an appropriate sentence." *Id.* The "agreed-to Stipulations of Fact" became "binding" only when the Convening Authority signed the PTAs. *Id.* at 7. The Military Judge's holding that

8

Respondents "began performance" by "sign[ing] lengthy confessional stipulations of fact," *id.* at 26, necessitated an antecedent factual finding that each agreement to enter into stipulations of fact was a "promise[] contained in the [PTAs]," R.M.C. 705(d)(4)(B).  To find such a promise, he pointed to language in the PTAs that Respondents "agreed to enter, and did in fact enter, into a Stipulation of Fact with the Trial Counsel, which could be used to establish guilt and aid the Panel Members in adjudging an appropriate sentence."  Pet. Ex. A at 7 & n.33 (footnotes omitted) (citing Pet. for a Writ of Mandamus & Prohibition Ex. D ¶¶ 6–7 [hereinafter Mohammed PTA]; Pet. for a Writ of Mandamus & Prohibition Ex. E ¶¶ 6–7 [hereinafter bin 'Atash PTA]; Pet. for a Writ of Mandamus & Prohibition Ex. F ¶¶ 6–7 [hereinafter Al Hawsawi PTA]).

Second, the Military Judge held that Respondents began performance when they "refrained from examining the witness(es) for pretrial motions while the Prosecution and Defense Counsel for Mr. Ali [al Baluchi] questioned those same witnesses."  *Id.* at 26.  In support, he highlighted that the prosecutor "himself insisted upon that course of action so that the Defense teams did not violate a material term of their agreements," *id.* (footnote omitted), and observed that "Trial Counsel took the position that the waive all waivable motions provisions" precluded the accused from "examin[ing] the witness," *id.* at 8 n.41 (citation omitted); *see* Mohammed PTA ¶ 23; bin 'Atash PTA ¶ 22; Al Hawsawi PTA ¶ 23.[1]

---

[1] Al Hawsawi also argued before the Military Judge that he began performing on a promise contained in the PTA on August 2, when his counsel asked to schedule entry of his guilty plea the following week.  Pet'r 28(j) Letter, Attach. 7, at 3, 6 (Feb. 5, 2025), Dkt. No. 2099089; Al Hawsawi PTA ¶ 56 ("The parties agree to ask the military commission to schedule the entry of pleas to occur within

9

**2.**

Both determinations—about the meaning and scope of the promises in the PTAs, and second, whether Respondents began performance of a promise—present questions that we review for clear error.

**a.**

Start with the former.  "A pretrial agreement is a contract between the accused and the convening authority.  Therefore, 'we look to the basic principles of contract law when interpreting [one].'"  *United States v. Lundy*, 63 M.J. 299, 301 (C.A.A.F. 2006) (quoting *United States v. Acevedo*, 50 M.J.

---

60 days of any signed Pretrial Agreement."); *see also* Pet'r Resp. to Order of Mar. 4, 2025, at 49419:13–14 (Mar. 5, 2025), Dkt. No. 2103963 ("Mr. [A]l Hawsawi has asked us to communicate to the commission that he would prefer to try and enter the plea during this session . . . ."); Pet'r Resp. to Order of Apr. 14, 2025 (Sealed), Attach. 5, at App. 914 (Apr. 15, 2025), Dkt. No. 2111203 (Al Hawsawi first asking on August 1, 2024, "to enter his plea in the first week of the September hearings").  The Military Judge did not rule on whether Al Hawsawi or any other Respondent began performance of this promise.  *See* Pet. Ex. A at 25–28; *see also* Pet'r Resp. to Order of Apr. 14, 2025 (Sealed), Attach. 1, at App. 5 (Apr. 15, 2025), Dkt. No. 2111203 (government's representation that Mohammed requested to enter plea on August 7, 2024, and bin 'Atash requested August 8, 2024).  Nor did the CMCR reach the issue.  *See* Pet. Ex. B at 15–18.  And before this Court, Respondents did not brief the claim or suggest at oral argument that we could deny the government's petition on this alternative ground for beginning performance.  *Cf.* Al Hawsawi & Mohammed Resp. to Order of Jan. 30, 2025, at 2–3 (Jan. 30, 2025), Dkt. No. 2097662 (citing evidence of beginning performance on scheduling promises, but only in response to the Court's question).  Accordingly, I decline to decide the question in the first instance.

10

169, 172 (C.A.A.F. 1999)) (cleaned up); *see also United States v. Jackson*, 26 F.4th 994, 1000 (D.C. Cir. 2022).  And contract law requires us to discern the "objective" meaning of the parties' language as a manifestation of their intent, which "is found in the transaction and its context rather than in the law or in the usages of people other than the parties."  RESTATEMENT (SECOND) OF CONTRACTS § 212 (AM. L. INST. 1981) [hereinafter RESTATEMENT].

In criminal litigation, what parties mean and intend in plea agreements often manifests in fact-bound proceedings that occur before a trial court judge, measured by judges with real-world experience in resolving these unique "contractual" disputes.  Thus, our sister circuits largely hold that that "[w]e review the district court's interpretation of the terms of a plea agreement for clear error."  *Allen v. Hadden*, 57 F.3d 1529, 1534 (10th Cir. 1995); *see also United States v. Borders*, 992 F.2d 563, 566–67 (5th Cir. 1993) (same); *United States v. Mejia*, 55 F.4th 1, 7 (1st Cir. 2022) (same); *United States v. Fields*, 763 F.3d 443, 453 (6th Cir. 2014) (same); *United States v. Read*, 778 F.2d 1437, 1441 (9th Cir. 1985) (similar); *cf. United States v. Daniels*, 902 F.2d 1238, 1243 (7th Cir. 1990); *United States v. Halford*, 948 F.2d 1054, 1056 (8th Cir. 1991); *United States v. Tripodis*, 94 F.4th 1257, 1263 (11th Cir. 2024); *United States v. Jones*, 215 F.3d 1322 (4th Cir. 2000) (unpublished table decision).  In *Allen*, for instance, the district court interpreted the term "government" in a written plea agreement to bind only one agency (the parole commission), as opposed to all government entities.  57 F.3d at 1535.  But based on both the text of the agreement and the prosecutor's representations at a hearing, the Tenth Circuit held that the

11

district court's finding of fact as to the scope of the term was clearly erroneous. *See id.* at 1536.[2]

And in the military justice context, trial judges are required to ensure "that the written agreement encompasses all of the understandings of the parties and that the judge's interpretation of the agreement comports with their understanding of the meaning and effect of the plea bargain." *United States v. Green*, 1 M.J. 453, 456 (C.M.A. 1976); R.C.M. 910(f)(4) (discussion) ("If the plea agreement contains any unclear or ambiguous terms, the military judge should obtain clarification from the parties."); R.M.C. 901(f)(2) (discussion) (same); *see also* MANUAL FOR COURTS-MARTIAL UNITED STATES, App. 21, at A21-53 (1984) [hereinafter 1984 MCM] (R.C.M. 910(f) "conform[s] to those [procedures] prescribed in" *Green*). This is because "[j]udicial scrutiny of plea agreements at the trial level . . . provide[s] invaluable assistance to appellate tribunals by exposing any secret understandings between the parties and by clarifying on the record any ambiguities which lurk within

---

[2] The government also wrongly contends that our precedent invariably requires us to interpret plea agreements *de novo*. Pet'r Reply 15. While we frequently have reviewed disagreements regarding pretrial agreements *de novo*, *see, e.g.*, *United States v. Jones*, 58 F.3d 688, 691 (D.C. Cir. 1995); *United States v. Moreno-Membache*, 995 F.3d 249, 254 (D.C. Cir. 2021) (same); *United States v. Munafo*, 123 F.4th 1373, 1380 (D.C. Cir. 2024) (same), none of these cases involved a dispute about the scope of a contract term. Nor has the government pointed to a single Circuit case reviewing a contract *de novo* where the parties' intentions were materially in dispute. The same is true as to the government's invocation of *United States v. Dean*, which did not involve a dispute about the scope of a term in the pretrial agreement. 67 M.J. 224, 229 (C.A.A.F. 2009) ("[N]either the purpose nor the result of the military judge's inquiry in this case was to ascertain whether the parties disagreed as to a material term.").

12

the agreements." *Green*, 1 M.J. at 456; *see also United States v. Williams*, 60 M.J. 360, 363 (C.A.A.F. 2004) (recognizing "the critical role that a military judge plays during a plea colloquy in ensuring that the record reflects a clear, shared understanding by the parties of the terms of the agreement") (interpreting R.C.M. 704(d)(4)(B) (2002)).

The majority nevertheless persists in reviewing the scope of the promises *de novo* based on its conclusion that the PTAs are unambiguous and require no resort to extrinsic evidence. Majority Op. 17–21 & n.4.[3] That approach relies on dicta from *Travelers Indemnity Co. v. Bailey*, 557 U.S. 137, 150 (2009), which notes that "the terms of an unambiguous private contract must be enforced irrespective of the parties' subjective intent." *Id.* at 19. Yet simply repeating a legal proposition in the abstract cannot establish that the PTAs at issue are unambiguous. *See id.* at 19–20 (quoting *Bode & Grenier, LLP v. Knight*, 808 F.3d 852, 862 (D.C. Cir. 2015), for general proposition on a contract's plain text). Nor does the majority get any closer to its bottom line by observing that the PTAs were jointly drafted and "written down in substantial detail," which does not render them unambiguous as a matter of law. *Id.* Many contracts are jointly drafted and most, if not all, are detailed.

By insisting that the PTAs' terms are unambiguous and must be interpreted solely by reference to the terms' dictionary definitions, *see* Majority Op. 24–25, 29–30, 36; *see also infra* Section IV.A, the majority misses the forest for the trees. "[M]eaning can almost never be plain except in a context." Restatement § 212 cmt. b. Even on *de novo* review, "[a]ny

---

[3] Even if the majority were correct that its analysis targets only the Military Judge's legal conclusions, we should still deny the government's petition. *See infra* Parts III & IV.

13

determination of meaning or ambiguity should only be made in light of the relevant evidence of the situation and relations of the parties, the subject matter of the transaction, preliminary negotiations and statements made therein, usages of trade, and the course of dealing between the parties." *Id.*  Whereas the Military Judge adequately considered these circumstances, the majority neglects them.  Not only was the Military Judge right to engage with the relevant context below, but also our Court, even on *de novo* review, often "consider[s] the district court's expert vantage point" on these types of inquiries. *Cf. United States v. Adams*, No. No. 24-3005, 2025 WL 1668481, at *8 (D.C. Cir. June 13, 2025) (collecting cases).

In any event, the relevant terms of the PTAs are ambiguous when placed in their appropriate context.  We cannot properly construe the PTAs as unambiguous unless we determine "that whatever the extrinsic evidence might show, it could not change the intent of the parties as expressed in the writing."  11 RICHARD A. LORD, WILLISTON ON CONTRACTS § 30:5 (4th ed. 2024) [hereinafter WILLISTON]; 5 TIMOTHY MURRAY, CORBIN ON CONTRACTS § 24.3 (Matthew Bender & Co. 2024) [hereinafter CORBIN] ("In the usual case, an unambiguous contract leaves no room for a subjective evaluation of the parties' understanding of the terms.").  Indeed, the majority itself cites Williston's discussion of ambiguity, Majority Op. 19, but that treatise recognizes that assessing ambiguity requires a court to consider the contract *and* the surrounding circumstances, including extrinsic evidence.  11 WILLISTON § 30:5.  And even if the majority were correct that the PTAs are unambiguous, it errs by interpreting them "in a vacuum," when "the underlying goal . . . is to ascertain the intent of the parties, and the surrounding circumstances . . . may well shed light on that intent." *Id.* § 30:6.

14

As illustrated *infra* Section III.C, my disagreement with the majority's interpretation of the agreements reflects that "the language in question is subject to two reasonable interpretations."  2 E. ALLAN FARNSWORTH & ZACHARY WOLFE, FARNSWORTH ON CONTRACTS § 7.15 (4th ed. 2025) [hereinafter FARNSWORTH].  The disagreement, though, is not just between me and the majority.  Take the promise to move to withdraw from pending motions and whether the "scope" of that promise included refraining from litigating a pending motion to suppress.  The Military Judge, the government's trial prosecutor, defense counsel, and the CMCR all thought that the PTAs are best read to include such a promise.  As the closest to the actual negotiations and trial proceedings below, their views best reflect how the PTAs were drafted and accord with the way military plea agreements and criminal litigation generally is thought to work.  *See infra* Parts III and IV.  And even if the Court disagrees on the merits, that does not render the contrary interpretation, shared by most, unreasonable.

Nor do any undisputed facts, Majority Op. 18, establish that the relevant language in the PTAs is unambiguous.  We must identify the *intended effect* of what the majority calls undisputed conduct.  Thus, "[where] interpretation turns on the meanings that the parties actually attached and reasonably ought to have attached to the language of their agreement, it is indisputably a matter of fact, not of law."  FARNSWORTH § 7.17.  Stated differently, even "if the underlying facts of their interaction are not in dispute," the meaning of contract terms cannot be decided as a matter of law unless "reasonable triers of fact could only come to one conclusion based on the evidence."  5 CORBIN § 24.7.  Here, the government's petition challenges the military tribunals' construction of various promises, including by encouraging our Court to discount those courts' reading of "the accompanying course of conduct" and adopt the government's understanding of the parties' intent.

15

Pet. 18–19; *see also* Pet'r Reply 15 ("Rather than any question of historical fact, the dispute instead concerns the meaning of . . . the relevant agreement provisions."). The Court's surface-level analysis glosses over the crux of the parties' dispute, thereby artificially diminishing the applicable standard of review.

**b.**

Next consider the Military Judge's holding on the issue of beginning performance. This presents a mixed question of law and fact in which factual issues predominate, meaning that we review the Military's Judge's "final" determination for clear error. *U.S. Bank Nat'l Ass'n ex rel. CWCapital Asset Mgmt. LLC v. Vill at Lakeridge, LLC*, 583 U.S. 387, 393 (2018). Military courts take a similar approach to a materially indistinguishable inquiry: whether the government breached the terms of a PTA. *See Lundy*, 63 M.J. at 301 (noting mixed question for determining whether the government breached a contractual obligation although "[g]enerally courts look to all of the facts and circumstances for this determination, and the inquiry is generally considered a question of fact"); *see also United States v. Smead*, 68 M.J. 44, 59 (C.A.A.F. 2009) (same). The majority does not acknowledge *Lundy* or *Smead*, let alone explain why we should not follow the jurisprudence of the highest military court when enforcing a military rule.

What's true for determining "breach" applies when determining "beginning performance" under the withdrawal regulation. Both implicate contract principles, yet require a judge to assess and weigh the facts before him and the credibility of any witnesses or a party's representations, before he can determine whether a familiar and universal standard is met. The thrust of the Military Judge's inquiry on that score is predominantly factual, not legal. We review mixed questions

16

like these for clear error. *See Bufkin*, 145 S. Ct. at 739 n.3 ("Whether the determination is mixed or factual, clear-error review is appropriate because it is at least predominantly factual.").

Here, the Military Judge considered what happened at the pretrial proceedings in his courtroom, "categorize[d] the evidence based on whether it support[ed] or undermine[d] [Respondents'] claim[s]," and "compare[d] the relative strength and persuasiveness of the evidence on each side." *Id.* at 738. He necessarily assessed the credibility of the attorneys' representations and their courtroom behavior and demeanor, "addressing questions of who did what, when or where, how or why." *Vill. at Lakeridge*, 583 U.S. at 394. When the Military Judge then compared the facts against the legal definition of beginning performance, he engaged in any inquiry "as factual sounding as any mixed question gets." *Id.* at 397. The mixed question is thus predominantly factual and subject to clear-error review, requiring us to afford substantial "deference" to the Military Judge. *See Bufkin*, 145 S. Ct. at 738–39.

Our case law in the civilian context supports this approach. In *United States v. Pollard*, we held that the determination of "whether the government's [actions] violated limitations in a plea agreement . . . . presents a mixed question of law and fact in which the factual aspects usually predominate." 959 F.2d 1011, 1023 (D.C. Cir. 1992). So, too, in *United States v. Ahn*, did we apply clear-error review to "a district court's factual determinations concerning a plea agreement, *including* its determination of whether a breach occurred." 231 F.3d 26, 35 (D.C. Cir. 2000) (emphasis added); *see also United States v. Gary*, 291 F.3d 30, 33 (D.C. Cir. 2002) (same); FARNSWORTH § 8.13 (stating that determination of substantial performance is "[p]lainly" a flexible test warranting deference); *id.* § 8.17

17

(noting decision on materiality of breach is a fact question that "depend[s] on circumstances similar to those used to determine whether a performance [was] substantial"). The purpose for this principle is plain: "[T]he judge who hears the evidence and observes the demeanor of witnesses has a comparative institutional advantage over the appellate court" in ascertaining the parties' intent. *See Pollard*, 959 F.2d at 1023; *see also United States v. Jacobs*, 431 F.3d 99, 116 n.15 (3d Cir. 2005) (Aldisert, J., concurring in part and dissenting in part) ("[T]he mere existence of relevant legal standards does not automatically transform a question of fact, which is reviewed for clear error, into a mixed question of law and fact, which is reviewed *de novo*. . . . [A]s a matter of judicial allocation, trial courts are far better suited to decide whether a promise arose out of a given set of facts.").

The majority asserts that this "is a question of law that we review de novo." Majority Op. 18. It seems to rest this decision on its contention that the "relevant facts . . . are not in question." *Id.* But that observation is wrong for several reasons. For one, it altogether ignores mixed questions of law and fact, which are reviewed for clear error when (like here) they are primarily factual inquiries. *Bufkin*, 145 S. Ct. at 738–39 & n.3; *cf. Vill. at Lakeridge*, 583 U.S. at 398 ("The stock judicial method is merely to state the [legal] requirement . . . and then to do the fact-intensive job of exploring whether, in a particular case, it occurred."). For another, by painting a picture of a purely legal inquiry based on undisputed facts, the majority obscures and ultimately ignores the factual findings made by the Military Judge, such as his consideration of the trial prosecutor's characterization of the PTAs and defense counsel's courtroom conduct, which supported his ruling that Respondents began performance by refraining from litigating motions. *See* Pet. Ex. A at 8 & n.41. *De novo* review of this issue is inconsistent with military justice

18

caselaw and our related precedent, and it ignores the Military Judge's considered judgment, which was based on his encyclopedic knowledge of the proceedings below. That judgment is worth respecting here.

**B.**

Aside from the deference we owe the Military Judge over his application of R.M.C. 705(d)(4)(B), the government faces a nearly insurmountable burden because it chose to seek relief through a writ petition. For the government to prevail, it must establish that its right to relief is "clear and indisputable." *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 381 (2004) (internal quotation marks omitted). Under our standard of review, "[t]o meet the 'clear and indisputable' requirement, the plaintiff must show that the challenged action is 'plainly and palpably wrong as [a] matter of law.'" *Illinois v. Ferriero*, 60 F.4th 704, 714 (D.C. Cir. 2023) (alteration in original) (quoting *U.S. ex rel. Chi. Great W. R.R. Co. v. ICC*, 294 U.S. 50, 61 (1935)). "Accordingly, we will deny mandamus even if a petitioner's argument, though packing substantial force, is not clearly mandated by statutory authority or case law." *Id.* (cleaned up). This is a "demanding hurdle." *In re Al Baluchi*, 952 F.3d 363, 369 (D.C. Cir. 2020).

Our deferential review of a trial court's factfinding for clear error dovetails with the stringent "clear and indisputable" mandamus standard. The government bears an extremely high burden to show that the Military Judge "'indisputabl[y]' made a 'clearly erroneous assessment of the evidence.'" *In re City of New York*, 607 F.3d 923, 944 (2d Cir. 2010) (first quoting *Cheney*, 542 U.S. at 381; then quoting *Sims v. Blot*, 534 F.3d 117, 132 (2d Cir. 2008)); *see also United States v. Carrigan*, 804 F.2d 599, 604 (10th Cir. 1986) ("Had we been the triers of fact we might well have ruled differently than did the district

19

court, but we cannot say that the court's findings of fact are clearly erroneous.") (mandamus petition); *In re Rearden LLC*, 841 F.3d 1327, 1333 (Fed. Cir. 2016) (reviewing "the district court's factual findings for clear error" and applying a "particularly deferential" review given the petition for relief was "by way of mandamus") (citations omitted)); *In re Huffines Retail Partners, L.P.*, 978 F.3d 128, 131–32 (5th Cir. 2020) ("On mandamus review," we consider "whether the disputed order relies on clearly erroneous factual findings," yet "we will only grant mandamus relief when such errors produce a patently erroneous result.") (internal quotation marks omitted)); *In re Hyundai Motor Am.*, 185 F. App'x 940, 941 (Fed. Cir. 2006) (unpublished order) (mandamus petitioner must "clearly and indisputably show clear error in the district court's findings of fact").

As I detail below, *see infra* Parts III & IV, the majority's central claims boil down to a disagreement with how the highest court of appeals in the military justice system decided *United States v. Dean*, 67 M.J. 224 (C.A.A.F. 2009), which is factually indistinguishable from this case and (if respected) would require denying the government's petition. By granting the weighty remedy of mandamus under these circumstances, the majority substitutes its own read of contract principles (divorced from the criminal and military justice context) for the weight of authority from military courts, the Supreme Court, sister circuits, and our Court.

Even if the majority is right, it at most establishes that the Military Judge and the CMCR erred. But far more is required to establish an entitlement to mandamus relief. Mandamus is reserved for correcting only "*serious* errors." *O'Connell v. U.S. Conf. of Cath. Bishops*, 134 F.4th 1243, 1256 (D.C. Cir. 2025) (emphasis added) (quoting *Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 111 (2009)). As then-Judge

20

Kavanaugh explained, we deny mandamus petitions when "[n]either this Court nor any other court of appeals has" answered the question presented and there is a "substantial argument" cutting against the petitioner. *In re Khadr*, 823 F3.d 92, 100 (D.C. Cir. 2016); *see also Republic of Venezuela v. Phillip Morris, Inc.*, 287 F.3d 192, 199 (D.C. Cir. 2002) (denying relief when petitioner "identif[ies] no precedent of this court or of the Supreme Court even suggesting" its merits position is correct). Put differently, "[w]hen the court acts within its jurisdiction, the threshold showing necessary to secure a writ of mandamus is higher than mere error, even error that might lead to reversal on a direct appeal." *Carrigan*, 804 F.2d at 604; *see also In re Parish*, 81 F.4th 403, 409 (5th Cir. 2023) ("[T]he writ will not issue to correct a duty that is to any degree debatable." (quoting *United States v. Denson*, 603 F.2d 1143, 1147 n.2 (5th Cir. 1979) (*en banc*))); *United States v. Mehrmanesh*, 652 F.2d 766, 770 (9th Cir. 1981) ("Even if the trial court made an error of law . . . [that] does not render its decision subject to correction by mandamus, for 'then every interlocutory order which is wrong might be reviewed under the All Writs Act.'" (quoting *Bankers Life & Casualty Co. v. Holland*, 346 U.S. 379, 383 (1953))).

The majority offers nothing by way of precedent to show that the government is *clearly* correct and the Military Judge *clearly* erred. How, then, can it conclude that the Military Judge's decision was a "judicial usurpation of power" or a "clear abuse of discretion"? *O'Connell*, 134 F.4th at 1256 (quoting *Cheney*, 542 U.S. at 390). The failure to show why the government's theory is clear and indisputable means we must deny the petition at this threshold stage, as we routinely do in related contexts. *Cf. Pearson v. Callahan*, 555 U.S. 223, 237–44 (2009) (acknowledging in the qualified-immunity context that courts may deny claims by finding a right is not "clearly established" without first deciding whether the right

21

exists at all); *In re District of Columbia*, 792 F.3d 96, 97 (D.C. Cir. 2015) (denying petition for interlocutory review of a class action certification order under the comparable "manifest error" standard, even though the district court "noted that its critical legal conclusion was not 'free from doubt,'" because relief was not appropriate where the ruling below "was not squarely foreclosed by the applicable precedents").

By applying the wrong standard of review and failing to defer to the Military Judge's application of the withdrawal regulation, the majority doubly disrespects the work of two military courts. And it undermines settled precedent from the military justice system's highest court of appeals. *See infra* Section III.A. This effort to upend the military courts' interpretation of a military procedural rule disturbs principles of comity and separation of powers that inform how civilian courts ought to act on issues particular to the military context. The Supreme Court has repeatedly recognized "the deference that should be accorded the judgments of the carefully designed military justice system established by Congress." *Schlesinger v. Councilman*, 420 U.S. 738, 753 (1975). We have likewise observed that "the decisions of the Court of Military Appeals," the predecessor court to the Court of Appeals for the Armed Forces, "are almost always to be accorded 'great deference' by Article III courts." *Walters v. Sec'y of Def.*, 725 F.2d 107, 109 n.3 (D.C. Cir. 1983) (quoting *Middendorf v. Henry*, 425 U.S. 25, 43 (1976)). This is especially true when "[d]ealing with areas of law peculiar to the military branches." *Middendorf*, 425 U.S. at 43; *Noyd v. Bond*, 395 U.S. 683, 694 (1969) ("requir[ing] a substantial degree of civilian deference to military tribunals" when "interpret[ing] a legal tradition which is radically different from that which is common in civil courts").

22

Our deference is owed not only to military courts, but to the political branches generally. Congress established the military commissions and delegated to the Defense Secretary and the Executive Branch the authority to write its own regulations. *Cf. Loving v. United States*, 517 U.S. 748, 768 (1996) (observing "highest deference" owed to Congress "in ordering military affairs," along with "respect" and "wide discretion and authority" owed to the "President as Commander in Chief"). We owe the Military Judge's construction of this military rule, established by the President and which has no civilian analogue, due deference. Nothing about the majority's decision aligns with these principles.

\*    \*    \*

In sum, the majority makes three mistakes that, together, dilute the mandamus standard beyond recognition and warp longstanding principles of judicial review. First, it departs from clear military justice precedents, which overwhelmingly apply clear-error review to a trial court's determination about the meaning and scope of a promise in a plea agreement. The majority does so without even responding to this body of law or explaining why ignoring the military courts is warranted. Second, even if the majority were correct to decide *de novo* what *promises* are contained in the PTAs, the Court never explains why it does the same for determining whether Respondents *began performance*. This unfounded assumption—resting primarily on civilian contract law cases—flatly contradicts the Supreme Court's settled approach for predominantly factual mixed questions (reaffirmed in *Bufkin*), the military courts' analogous framework on issues of substantial performance and material breach (as in *Lundy* and *Smead*), and our Court's applicable precedent in the context of criminal plea agreements (articulated in *Pollard*, *Gary*, and *Ahn*). Still, there's more: On pure *de novo* review, the majority

23

refuses to acknowledge (let alone apply) the deference owed to military courts on issues concerning the application of military rules. We grant that deference in a typical case. But this case is atypical in countless ways, and our deference should be at its apex here, where the government seeks via a writ of mandamus or prohibition to upend the application of a military rule by two military courts that conformed with squarely applicable precedent from the highest court of appeals in the military justice system.

The upshot of two deferential standards of review and our tradition of deference to military courts is that the government must establish that the Military Judge clearly and indisputably erred on both legal and factual conclusions. The Military Judge's determination that the PTAs contained promises to enter into factual stipulations and to refrain from litigating motions are reviewed for clear error. The same clear error standard applies to the central question in this case—whether Respondents began performance. The majority sidesteps deference at every turn and treats this like a direct appeal from an Article III court. Proper application of these standards and our time-honored tradition of deference to military courts shows why the government falls well short in its quest for extraordinary relief.

## III.

The government has not shown, clearly and indisputably, that the Military Judge erred in concluding that Respondents "beg[an] performance" of the promise to enter into factual stipulations, which is plainly "contained in the agreement[s]." R.M.C. 705(d)(4)(B). To the contrary, military justice precedent, the scope of the withdrawal regulation, the text of the agreements, and principles of contract law all support the decision below.

24

**A.**

The government cannot establish a clear and indisputable right to relief because the Military Judge and the CMCR rightly relied on persuasive precedent with similar facts from the highest military court of appeals in the military justice system. In that case, *United States v. Dean*, the Court of Appeals for the Armed Forces held that an accused began performance on a PTA in part by signing a stipulation of fact *before* the convening authority accepted the agreement. 67 M.J. at 227–28.

The factual scenario presented in *Dean* is, in all relevant aspects, identical to this case. There, "[c]ontemporaneous with the Offer to Plead Guilty, Dean submitted a stipulation of fact to the convening authority which had been executed by Dean, his defense counsel and the trial counsel." *Id.* at 226. The convening authority subsequently signed the pretrial agreement. *Id.* The Court held that Dean's execution of the stipulation began performance within the meaning of Rule 705(d)(4)(B). *Id.* at 228. The Military Judge found *Dean* persuasive because it interpreted and applied the parallel courts-martial rule and involved analogous facts. Pet. Ex. A at 16–17, 26–27 & n.116.

Yet, in a footnote, the majority casts *Dean* aside as "unpersuasive" with "distinguishable" facts, Majority Op. 35 n.10, even though it relies on the case's reasoning to argue that the stipulations of fact were entered into only once the accused and the government both signed them, *id.* at 33. Specifically, the majority contends that *Dean* "did not explain how its holding was consistent with the text of the withdrawal regulation or basic principles of contract law," *id.* at 35 n.10,

25

despite *Dean*'s discussion of the plain text and drafting history of the relevant rule, 67 M.J. 227–28. And while the Court correctly notes that in *Dean*, "the court identified several actions that counted as beginning performance, and one of those actions occurred after the pretrial agreement was finalized," Majority Op. 35 n.10, the same is true here, *see infra* Part IV (concluding that Respondents began performance of other promises in the PTAs by engaging in conduct *after* both parties signed the agreements). Whatever attempt the Court (and the government) makes to distinguish *Dean*, it undermines the reasoned judgment and settled law of the highest military court on the interpretation of a military regulation governing procedure for military pleas. Although it does not bind us, *Dean* remains good law. Neither the Court of Appeals for the Armed Forces nor the Supreme Court has disturbed it. The Military Judge's reliance on this precedent was not so inapt as to constitute, clearly and indisputably, error.

In short, the majority has the test upside down. We have no power to issue the writ if the right to mandamus is not clear and indisputable, which it cannot be in absence of "bind[ing]" precedent. *See NetCoalition v. SEC*, 715 F.3d 342, 354 (D.C. Cir. 2013). And petitioners "do not come close" to showing a clear and indisputable right where they "identify no precedent of this court or of the Supreme Court" on point. *See Republic of Venezuela*, 287 F.3d at 199. Here, the petitioner not only has failed to identify any binding precedent supporting its interpretation, the most apt precedent, *Dean* (albeit non-binding), cuts squarely against it, and yet the majority

26

nonetheless grants the writ.[4]  It does so by ignoring and departing from longstanding principles of well-earned deference to our colleagues in the military justice system. Our deference should be at its zenith when military courts follow persuasive military precedent in the construction of military rules.  I am befuddled.

**B.**

We should decide this case by deferring to the military's reliance on *Dean*.  But setting deference aside, *Dean* was rightly decided.  The majority's insistence otherwise reveals a critical flaw in its approach:  By focusing exclusively on contract principles, the majority mistakes a mandamus petition concerning a withdrawal regulation for a direct appeal about contract dispute.

Rule 705(d)(4)(B) provides the logical and dispositive starting point for resolving the government's petition.  The plain meaning of "begins performance," as confirmed by the military's own construction of the term, precludes the

---

[4] The majority's erroneous application of a diluted mandamus standard cannot be saved by the government's suggestion that a "prior opinion addressing the *precise* factual circumstances or statutory provision at issue" is not required.  Pet. 11 (quoting *United States v. Fokker Servs. B.V.*, 818 F.3d 733, 749–50 (D.C. Cir. 2016)) (emphasis added).  But the reason our Court was persuaded to grant a writ in *Fokker Services* is because the district court's error was so idiosyncratic that no trial court had ever made such a ruling before, so there was no opportunity to develop any appellate precedent.  818 F.3d at 750.  The opposite is true here, where, on one hand, the Court locates no precedent applying the exact contract principle it advances today, and, on the other, the highest military justice court addressed the precise factual circumstances at issue and rejected the majority's logic.

27

government from establishing a clear and indisputable right to relief based on the stipulations.

As the majority notes, "performance" connotes "successful completion of a contractual duty." Majority Op. 33 (quoting *Performance*, BLACK'S LAW DICTIONARY (12th ed. 2024)); *see also Performance*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/performance [https://perma.cc/8DSZ-MASV] (last updated June 20, 2025) (defined as "what is required to be performed in fulfillment of a contract, promise, or obligation," or "the fulfillment of a contract, promise, or obligation"). The Court pairs this with its own definition of "begins" as when someone "starts to complete." Majority Op. 33. That definition, however, prompts more questions than it answers. What types of actions could one take to "start to" complete a contractual duty?

Fortunately, we do not write on a blank slate. Military courts and the Executive Branch have, over decades, issued guidance on how to interpret their own rules. That guidance illustrates how broadly "begins performance" was designed to sweep. In 1984, President Reagan issued a revised Manual for Courts-Martial ("MCM"), which included an updated Rules for Courts-Martial that introduced the "begins performance" threshold for when a convening authority can withdraw from a PTA. Manual for Courts-Martial, United States, 1984, 49 Fed. Reg. 17152, 17187–88 (Apr. 13, 1984); *see also* 10 U.S.C. § 836(a) (1982) (granting the President power to prescribe rules for pretrial procedure in courts-martial and military commissions). And the 1984 MCM included analysis from the Joint Service Committee on Military Justice (as required by the Department of Defense) on what "begins performance" means. *See* Review of the Manual for Courts-Martial, 50 Fed. Reg. 6166, 6167 (Feb. 14, 1985) (to be codified at 32 C.F.R. pt. 152); *About the JSC*, JOINT SERV. COMM. ON MILITARY JUST.,

28

https://jsc.defense.gov/ [https://perma.cc/3HQVAM6J] (last visited Feb. 5, 2025); 1984 MCM, App. 21, at A21-36. The analysis has been reissued in nearly every MCM since, including the version published a year before the Executive Branch incorporated the corollary Rule for Courts-Martial into R.M.C. 705(d)(4)(B), which we interpret today. *See* MANUAL FOR COURTS-MARTIAL UNITED STATES, App. 21, at A21-40 to A21-41 (2008) [hereinafter 2008 MCM].

This uncontested Executive Branch analysis insists that "begin[s] performance" encompasses "actions *pursuant to* the terms of an agreement." *Id.* at A21-41 (emphasis added). At the time "begins performance" was adopted by President Reagan's Department of Defense in the Rules for Courts-Martial, "[p]ursuant to" included "in the course of carrying out" or "in conformance to or agreement with." *Pursuant*, BLACK'S LAW DICTIONARY (5th ed. 1979). That understanding remained the same when the Department incorporated the identical provision into the Rules for Military Commissions. *See [P]ursuant to*, BLACK'S LAW DICTIONARY (9th ed. 2009) ("In compliance with; in accordance with; under;" or "[a]s authorized by; under;" or "[i]n carrying out.").

Respondents unquestionably satisfied the military's own construction of its withdrawal regulation. For one, the "terms" of the PTAs plainly include a promise to enter into stipulations; the text of each includes each Respondent's "agree[ment]" (*i.e.*, promise) "to enter into the Stipulation of Fact included as Attachment A." *E.g.*, Al Hawsawi PTA ¶ 6. Indeed, the military's own handbook for military justice practitioners (who practice under the comparable courts-martial rules) notes that a "basic component[]" of a military plea agreement is "[a] *promise* by the accused . . . to enter a confessional stipulation." J.A. 205–06 (emphasis added).

29

The only question, then, is whether by signing stipulations between 24 to 48 hours before the Convening Authority signed the PTAs, Respondents were acting "pursuant to" the fully negotiated agreements. *See* 2008 MCM at A21-41. On that score, the military's own analysis of what constitutes "the beginning of performance" answers the question dispositively in Respondents' favor. Indeed, the 1984 guidance expressly states that "providing information to Government agents" is one type of action pursuant to a PTA that constitutes the "beginning of performance." 1984 MCM at A21-36.

Aside from its analysis on the construction of "begin[ning] performance," the Executive Branch has expressed elsewhere its position that, pursuant the terms of a PTA, stipulations of fact may be executed at the time the agreement is formed. The Department of Defense's regulations for military commission trials—which provide guidance based on "the unique circumstances of the conduct of military and intelligence operations during hostilities"—allow "the Convening Authority [to] require the accused and counsel to enter into stipulations of fact or testimony *as part of the PTA*." DEP'T OF DEF., REGULATION FOR TRIAL BY MILITARY COMMISSION, at 1, ch. 12-4 (2011), https://www.mc.mil/Portals/0/2011%20Regulation.pdf [https://perma.cc/CN3T-Z3HG][hereinafter 2011 REGULATION FOR TRIAL BY MILITARY COMMISSION] (emphasis added). The regulation thus frames entry into the stipulations as "part of" the agreements themselves—not, as the majority counters, "part of the offer," *see* Majority Op. 34, or as a condition on forming the binding contract. The military's consistent view on when performance of a promise to enter into stipulations of fact can occur also appears in the military practitioners' handbook. When the courts-martial rule still prohibited a convening authority's withdrawal after an accused began performing, the handbook observed that "[p]erformance

30

w[ould] often take the form of entry into a stipulation of fact." J.A. 208. The handbook also rightly acknowledged that "[c]ourts have strictly construed this rule," *id.* (citing *Dean*, 67 M.J. 224), which is just what the Military Judge and the CMCR did here.

The Court today acknowledges none of this. Nowhere does it suggest that signing the stipulations was not "pursuant to" or "in conformance with" the plain text of the PTAs, according to which the accused agreed to enter into stipulations of fact. This action marked the beginning of performance under the promises that Respondents made. Nor does the majority contend with the military's clear understanding of what "begins performance" means under Rule 705, or the way that military judges and practitioners view stipulations utilized in PTAs. Instead, it confines its understanding of what might "begin" performance to a single dictionary definition, which it insists conforms to contract principles. Majority Op. 33. Yet the Court today fails to explain its assumption that the Executive Branch drafted Rule 705(d)(4)(B) to strictly follow the narrowest possible reading of contract principles, even when the historical record suggests otherwise. Indeed, the Executive Branch intended the rule to cover conduct beyond merely "start[ing] to complete" a contractual promise, *id.*, and instead include any "actions pursuant to" the agreement. 2008 MCM at A21-41; *cf. United States v. Koopman*, 20 M.J. 106, 110 n.3 (1985) ("Whether performance of a preexisting duty constitutes consideration for a contract is a subject over which legal scholars may dispute, but for purposes of the enforceability of a pretrial agreement in a criminal case, we do not consider such technicalities to be material."). By narrowly (and mistakenly) interpreting "begins performance," the majority dilutes the government's burden and refuses to give *Dean* the treatment it deserves. Under the governing regulation

31

and rightly decided military precedent, the government has not established its clear and indisputable right to relief.

## C.

Even on the majority's framing of the case, the government has not met its burden. The plain text of the PTAs, read against the backdrop of basic contract law principles, demonstrates that the agreements contained a promise to enter into factual stipulations, and that Respondents began performance of those promises when they so entered by signing them. Here, I explain why the majority is wrong to conclude that the PTAs lacked such promises, before turning, *see infra* Part III.D, to the majority's incorrect assessment of when Respondents' performance began.

As to Respondents' promises to enter into factual stipulations, the Military Judge did not, clearly and indisputably, commit clear error. Moreover, the Court fails entirely to grapple with the parties' course of dealing, which contravenes its read of the text, and with the Rules for Military Commissions, which contemplate that an accused may promise to enter into stipulations like those at issue here.

### 1.

There are three reasons why the plain text of the PTAs supports the Military Judge's decision below and forecloses any claim that the government clears the formidable mandamus standard.

*First*, the PTAs use promissory language to describe the requirement that Respondents enter into factual stipulations. "A promise is an expression of commitment to act in a specified way, or to bring about a specified result in the future, or to take

32

responsibility that the result has occurred or will occur, communicated [so] that the [recipient] may justly expect performance and may reasonably rely thereon." 1 CORBIN § 1:13.[5] Or, as Williston provides, "[a] 'promise' is a manifestation of intent[] to act or refrain from acting in a specified way, so made as to justify a promisee in understanding that a commitment has been made." 1 WILLISTON § 1:2; *see also* RESTATEMENT § 2 cmt. a (defining "promise" as that "which results from the promisor's words or acts of assurance, including the justified expectations of the promisee and [the] . . . legal duty which arises to make good the assurance by performance").

Here, the stipulation provisions plainly were a "promise." "The terms of a promise or agreement are those expressed in the language of the parties . . . ." RESTATEMENT § 5 cmt. a. When each of the accused signed his PTA, he manifested his assent to the promises made in the PTA, including his intent to enter into stipulations. Respondents used promissory language reflecting their commitment ("agreement") to do something ("enter into the Stipulation[s] of Fact"). Mohammed PTA ¶ 6; bin 'Atash PTA ¶ 6 (same); Al Hawsawi PTA ¶ 6 (same). That is, the accused took responsibility for something that had happened or would happen. From that assurance, the Convening Authority was justified in believing that a commitment had been made.[6]

---

[5] A full recounting of Corbin's definition illustrates why the government's reliance on our prior decision in *Choate v. TRW, Inc.*, 14 F.3d 74 (D.C. Cir. 1994), is misplaced. *See* Pet. 17. *Choate* cites an outdated (1963) version of Corbin's treatise. The current edition altered the definition of "promise" to better account for how parties negotiate and form agreements.

[6] This construction mirrors other promises in the agreement. *Compare* Mohammed PTA ¶ 6 ("[A]grees to enter into this

33

Facing the PTAs' unmistakably clear text, the majority's only response is that promises must be forward looking. *See* Majority Op. 32–33; *see also* Pet'r Reply 7–9. But that assertion gets the Court no closer to its conclusion. Corbin's acknowledgment that a promise can be "an expression of commitment . . . to take responsibility that the result *has occurred or will occur*," 1 CORBIN § 1.13 (emphasis added), squarely undermines the majority's point. In any event, the stipulation provision in the PTAs satisfies the majority's forward-looking requirement. Each PTA characterizes the promise as something Respondents will perform in the future. And the record confirms that when Respondents signed the PTAs, they had yet to sign the attached stipulations.[7] Temporally then, Respondents made a forward-looking commitment in their PTAs to enter into stipulations. By the time the Convening Authority countersigned, she knew that the accused "commit[ted] . . . to take responsibility" that entry into

_____

Stipulation of Fact."), *with id.* ¶ 5 ("[A]grees to waive his rights and offers to plead guilty to all charges and specifications."). There is no principled textual distinction between the term requiring entry into factual stipulations, *e.g.*, *id.* ¶ 6, and any other term that is indisputably a promise. Although the majority's view of the PTAs requires such a distinction, it offers none.

[7] Mohammed and bin 'Atash signed their PTAs the same day that they signed the corresponding stipulations of fact, and the record suggests Al Hawsawi did the same. *See* Mohammed PTA at 19; Mohammed Stipulation of Fact at 28 (Sealed); bin 'Atash PTA at 18; bin 'Atash Stipulation of Fact at 24 (Sealed); *see also* Pet. Ex. A at 6–7 (describing timeline of Al Hawsawi's signing). Al Hawsawi Stipulation of Fact at 30 (Sealed). The stipulations were included only as attachments to the PTAs. And the record reflects that bin 'Atash first signed the PTA and "next signed the Stipulation of Fact at Attachment A to the PTA." Pet'r 28(j) Letter filed Feb. 5, 2025, Attach. 6, at 6–7 (footnote omitted). No evidence here suggests that Mohammed or Al Hawsawi departed from the custom of first signing a document before signing its attachments.

34

stipulations "ha[d] occurred." *Id.* So far as I can tell, the majority makes no textual argument that the agreements to "enter into" stipulations were anything other than forward looking.

*Second*, reading the stipulation provision as a forward-looking promise conforms with the doctrine of contract formation, which "requires a bargain . . . [with] a manifestation of mutual assent to the exchange and a consideration." *See* RESTATEMENT § 17. Start with mutual assent, or the "willingness to make a bargain." *Id.* § 23 cmt. a. For the promise to be valid, the promisor must only assent to perform it, as "[n]either real nor apparent intention that a promise be legally binding is essential to the formation of a contract." *Id.* § 21.

Accordingly, Respondents' manifestation of assent occurred even though the Convening Authority had not yet signed the PTA. As explained by the Restatement, "two parties may sign separate duplicates of the same agreement, each manifesting assent *whether the other signs before or after him*." *Id.* § 22 cmt. a (emphasis added). Respondents manifested their assent to the promise to enter into factual stipulations by words and conduct: First they agreed to PTA language containing promissory language, and then they signed actual stipulations of fact. This manifestation of assent and order of operations confirms that the stipulation provisions were promises. *See id.* § 19 ("The manifestation of assent may be made wholly or partly by written or spoken words or by other acts or by failure to act.").

The majority holds that a promise made in a contract is not really a promise until it becomes legally binding, which cannot be squared with the Restatement's admonition that the promisor need not even "inten[d] that [the] promise be legally

35

binding" in the first place.  *See id.* § 21.   Nor does the
majority's view align with the Restatement's distinction
between promises and binding agreements.  *See id.* § 2 cmt a.
("[T]he word 'promise' is not limited to acts having legal
effect."); *see also* 1 WILLISTON § 1:2 (distinguishing between
promises without legally binding effect and those that become
binding).     The majority's rule also contradicts the
Restatement's declaration that "[m]anifestation of mutual
assent to an exchange requires that each party either make a
promise or begin or render a performance."  RESTATEMENT
§ 18.  The Restatement does not say that *only the promisee* can
manifest assent by "begin[ning] or render[ing] a performance"
of a promise in the contract.  *See id.*  Either ("each") party can
do so.  *Id.*  Thus, the majority's contention—that a promise
articulated in a contract is not a promise merely because it was
performed before the contract becomes legally binding—has
no purchase in contract law.  To find that the Military Judge
was clearly and indisputably wrong to conclude that this text
was a promise, the majority contradicts a plethora of the
foregoing blackletter contract principles.

*Third*, the plain text of the PTAs provide that "failure to
enter into" the stipulations constitutes "breach of a material
term."  *E.g.*, Mohammed PTA ¶ 6.  The very definition of a
contract is "a promise . . . for the breach of which the law gives
a remedy."  RESTATEMENT § 1.  Put differently, breach is the
failure to perform a *promise*.  Because the PTAs expressly
define the failure to enter into stipulations as breach, we have
further assurance that Respondents' agreements to enter into
stipulations were mutually intended to be promises.

**2.**

The Court's arguments to the contrary are unavailing.
Rather than a "promise," the majority says, maybe the signed

36

stipulations were "part of the offer," Majority Op. 34, or "consideration Respondents offered," *id.* at 37; *see also* Pet. 16 ("[S]igning the factual stipulations was part of the process through which the agreements were formed . . . ."). The majority's contortion of the text is a square-peg-round-hole approach that is undermined by contract law. An offer is, "[i]n the normal case[,] . . . an offer of an exchange of promises." RESTATEMENT § 24 cmt. a. "Simple examples are: 'I promise to deliver these apples if you promise to pay me $100'. . . ." FARNSWORTH § 3.13. So even if the stipulations were "part of the offer," Majority Op. 34, that does not help the majority in categorizing them as something other than promises (*i.e.*, "I promise to sign this stipulation if you promise to not seek the death penalty.").

The majority's contention that the stipulations constituted "consideration Respondents offered" fares no better. *Id.* at 37. If anything, viewing the stipulation provisions as consideration further establishes that they are promises "contained in the agreement[s]." R.M.C. 705(d)(4)(B). "Consideration" is an "element of exchange" that makes a promise legally enforceable. RESTATEMENT § 71 cmt. a. "[T]he consideration induces the making of the promise and the promise induces the furnishing of the consideration." *Id.* cmt. b. Here, the stipulation provision was unquestionably the product of a "bargained-for exchange." 3 WILLISTON § 7:2.

Respondents and the government negotiated for years over the contents of the PTAs. *Supra* Part I. The factual stipulations were, as all are in a criminal case, "bargaining chips in the hands of [the accused]." *United States v. Granik*, 386 F.3d 404, 412 (2d Cir. 2004); *United States v. Rasberry*, 21 M.J. 656, 657 (A.C.M.R. 1985) ("An accused may be required as part of his bargain to include in the stipulation, for sentencing purposes, aggravating circumstances relating to the offenses to which he

37

has pled guilty.").  Respondents admitted to planning and implementing the 9/11 terrorist attack in exchange for eliminating the death penalty as a possible sentence.  And for the government, obtaining confessions from the accused was a top priority, so much so that the prosecution willingly agreed to forebear seeking capital punishment if it received the stipulations and guilty pleas.  As the Restatement puts it, Respondents' agreements to enter into stipulations were "sought by the [government] in exchange for [the government's return] promise" to not seek the death penalty, and the agreements were "given by [Respondents] in exchange for that promise."  RESTATEMENT § 71(2).

We also know that the commitment to sign stipulations was part of valuable consideration because Respondents promised something of value in excess of what they already were legally bound to do.  *See* WILLIAM R. ANSON, PRINCIPLES OF THE LAW OF CONTRACT WITH A CHAPTER ON THE LAW OF AGENCY 126–27 (4th ed. 1924, Arthur L. Corbin ed.).  "Consideration thus [e]nsures that the promise enforced as a contract is not accidental, casual, or gratuitous, but has been uttered intentionally as the result of some deliberation, manifested by reciprocal bargaining or negotiation."  3 WILLISTON § 7:2 n.10 (quoting *Baehr v. Penn-O-Tex Oil Corp.*, 104 N.W.2d 661, 665 (Minn. 1960)).  Nothing about Respondents' agreements to enter into stipulations was accidental, casual, or gratuitous.[8]

---

[8] At argument, the government urged that the stipulation provisions are conditions precedent, not promises.  This is wrong.  "A condition precedent is either an act of a party that must be performed or a certain event that must happen before a contractual right accrues or a contractual duty arises."  13 WILLISTON § 38:7.  The text of the PTAs and contract law render the stipulation provisions promises, not conditions.  *Compare* 8 CORBIN § 30.12 (whereas

38

Perhaps recognizing the weakness in these arguments, the majority effectively concedes that the agreement to enter into stipulations was a promise as contract law defines the term. Majority Op. 36 (describing each stipulation provision "forward looking"). To account for that reality, the Court insists that the future-oriented nature of the PTAs' promises to enter into stipulations must refer to something else entirely. In the majority's telling, when Respondents agreed "to *enter into* [the] Stipulation of Fact" attached to each PTA, *e.g.*, Mohammed PTA ¶ 6 (emphasis added), the forward-looking valence of those promises applied only to their commitments to "formally enter the stipulations of fact into evidence at their

_____

"non-fulfillment of a promise" is a "breach," "non-occurrence of a condition" simply "prevent[s] the existence of a duty in the other party"), *with* Mohammed PTA ¶ 6 (failure to enter into PTA is a breach). Nothing in the PTAs states or suggests that Respondents must sign the stipulations before the Convening Authority will countersign the PTAs, as would be typical of a condition. That's true even though the stipulations use the word "condition." *See* Mohammed Stipulation of Fact (Sealed) at 1. The term "condition" does not appear in the PTAs. Rule 705(d)(4)(B) calls on us to locate "promises contained in the [PTAs]," not the characterization of those promises in collateral documents. R.M.C. 705(d)(4)(B). Moreover, the word "condition" is not dispositive. *Howard v. Fed. Crop Ins. Corp.*, 540 F.2d 695, 697–98 (4th Cir. 1976) (holding that use of "condition" to describe an obligation referred to a promise, not a condition precedent). Ultimately, "[s]tipulations should be so construed as to give effect to the intention of the parties." *United States v. Beninate*, 15 C.M.R. 98, 100 (C.M.A. 1954). Any uncertainty whether a contract creates a condition or a promise is resolved by reading the provision as a promise. 13 WILLISTON § 38:13; *see also* RESTATEMENT § 227 cmt. d; 1-7 MURRAY ON CONTRACTS § 103[C] (5th ed. 2011). Here, the parties unambiguously negotiated the stipulation provision as a promise for Respondents to perform.

plea hearings before the military judge," Majority Op. 36. Notably, the government does not advance such an argument.

This argument is wrong on multiple fronts. For one, while one legal definition of "enter" is, as the majority notes, "[t]o put formally before a court or on the record," *Enter*, BLACK'S LAW DICTIONARY (12th ed. 2024), the very next definition is "[t]o become a party to," as in "they entered into an agreement," *id.* The majority points to nothing in the PTAs to justify relying on one Black's definition and neglecting the other. It cites only paragraph 46 of Mohammed's PTA, which corresponds to paragraphs 43 and 44 of bin 'Atash's and Al Hawsawi's, respectively, to say that "other provisions in the [PTAs]" confirm "entry into stipulations" is something that happens before the military judge. Majority Op. 36. That cross-reference does little for the majority's reasoning because the cited paragraph includes events that would not occur before the military judge, like the setting aside of the plea on appeal, *e.g.*, Mohammed PTA ¶ 46g, or the accused's failure to file an appellate waiver, *id.* ¶ 46i. Further, the cited paragraph includes a catch-all provision allowing the Convening Authority to withdraw if the accused "fails to satisfy any material term of the [PTA]," *id.* ¶ 46d, which sweeps broader than promises related to events occurring before the Military Judge, such as promises not to file civil claims against the United States, *id.* ¶ 26, not to seek financial benefits from having committed these offenses, *id.* ¶ 28, and not to support hostile acts against the United States, *id.* ¶ 30.

Instead, the stipulations themselves provide that they are "knowingly and voluntarily *entered* into by the Prosecution and [each Accused]," reflecting the parties' understanding that entry was complete once both parties signed, and the stipulation became binding once the Convening Authority countersigned the PTAs. *See* Mohammed Stipulation of Fact

40

(Sealed) at 1 (emphasis added); Mohammed PTA ¶ 62. This is also consistent with common usage of the phrase "enter into" a stipulation of fact. *See Stipulation*, BLACK'S LAW DICTIONARY (12th ed. 2024) ("A voluntary agreement between opposing parties concerning some relevant point . . . <the plaintiff and defendant entered into a stipulation on the issue of liability> . . . ."). Indeed, we have observed that entry into a factual stipulation is a distinct event from the subsequent introduction of that stipulation (*i.e.*, entering it into evidence) at a proceeding. *See, e.g.*, *United States v. Harrison*, 204 F.3d 236, 242 (D.C. Cir. 2000); *cf. Andrews v. Wall*, 44 U.S. 568, 571 (1845) (noting that where salvage vessels "enter[ed] into stipulations with each other," it was a separate question as to whether the Court had jurisdiction to enforce those stipulations).[9]

Worse for the majority is that the Rules for Military Commissions adopt the opposite framing than what the majority advances. The Rules do not refer to the formal submission of stipulations to the Military Judge as "entering," but rather use the terms offer and acceptance. R.M.C. 811(d), (f). Whereas the Rules permit the convening authority's withdrawal from a PTA "before a stipulation is *accepted*" by the military judge, R.M.C. 811(d) (emphasis added), they characterize an agreed-upon but not-yet-accepted stipulation as

---

[9] This interpretation aligns with the parties' characterization of entry. For instance, the prosecution, when discussing an earlier stipulation from Mohammed on an unrelated issue, stated that if conditions were met it would "enter into [Mohammed's] proposed stipulation." Pet'r Resp. to Order of Apr. 14, 2025 (Sealed), Attach. 4, at App. 486 (Apr. 15, 2025), Dkt. No. 2111203. As did Respondents. *See, e.g.*, Pet'r Resp. to Order of Apr. 14, 2025 (Sealed), Attach. 9, at App. 46 (Apr. 15, 2025), Dkt. No. 2111203 (describing promise as executing a stipulation "agreed to and signed by the government's representative").

41

one "*entered* pursuant to a pretrial agreement," R.M.C. 705(d)(4)(A) (emphasis added). This same view is expressed (again) in the regulations for military commission trials. There, the Department of Defense details the convening authority's power to "require the accused . . . to enter into stipulations . . . as a part of the PTA," 2011 REGULATION FOR TRIAL BY MILITARY COMMISSION, at 47, not at the time the stipulation is accepted by the military judge or admitted into evidence.

Although the majority declines to engage with it, Majority Op. 34–36 & n.10, this distinction makes clear that entering into a stipulation is different than offering it to the tribunal for acceptance. In fact, paragraph 46 of Mohammed's and Al Hawsawi's PTAs (and paragraph 43 of bin 'Atash's)—the very provision the majority uses to anchor its definition of "enter into"—uses the same offer/acceptance framework to describe what happens before the Military Judge. *See* Mohammed PTA ¶ 46h (noting convening authority can withdraw from PTA upon "[f]ailure or refusal of the Military Judge to *accept* the agreed upon Stipulation of Fact") (emphasis added)); Al Hawsawi PTA ¶ 44h (same); bin 'Atash PTA ¶ 43h (same). The "agree[ment] to enter into" stipulations thus does not concern the proffer of the stipulations to, or the acceptance of the stipulations by, the Military Judge. The majority's suggestion otherwise is unmoored from the text of the agreements, the parties' statements, military rules, and contract doctrine.

At bottom, the PTAs plainly contain a promise to enter into stipulations of fact. None of the majority's arguments against that natural reading—that the signed stipulations were part of the offer, the consideration for the agreement, or a promise to offer stipulations to the military commission—clearly and indisputably establish that the Military Judge's construction of

42

the PTAs as encompassing a promise to enter into factual
stipulations was clear error. *Cf.* Pet. Ex. A at 7. The same is
true under *de novo* review that the majority believes is
appropriate.

**3.**

Two final points, left unaddressed by the majority, further
undermine its holding.

*First*, the majority's atextual understanding of the PTAs at
most suggests that the documents are ambiguous. Against the
plain language of the agreement, several areas of contract law,
and the work of two military courts, the Court stands alone in
concluding that "entering into" a stipulation means entering it
into evidence, rather than simply signing it (agreeing to it).
This alone makes clear that *even if* the majority's read is right,
the agreements involve some degree of ambiguity. *See supra*
Section II.A.2.a.

And if the PTAs are ambiguous, we look to the parties'
course of dealing, which confirms that the Military Judge
correctly read the agreements. RESTATEMENT § 223(1) ("A
course of dealing is a sequence of previous conduct between
the parties to an agreement which is fairly to be regarded as
establishing a common basis of understanding for interpreting
their expressions and other conduct."). The facts of this case
are *sui generis*: Intense negotiations over three years led to the
government principally drafting the PTAs and stipulations of
fact, after which Respondents formally "offered" the PTAs to
comply with military commission rules. *Supra* Part I. The
stipulations, per the PTAs themselves, played a crucial role in
the prosecution. They established Respondents' guilt,
provided a factual basis for the sentencing, and were necessary
for the Military Judge to ultimately accept any future guilty

43

pleas as supported by an adequate factual record. As the government's trial counsel conceded, the agreements to enter into the stipulations were one of "the two most important aspects of the Prosecution's willingness to endorse any pre-trial agreements in [the] case." J.A. 198. And he required that Respondents inform the government "by July 28 if any of the Accused [were] willing to enter into a PTA that include[d]" the stipulations. J.A. 199.

"[C]ontracts should be liberally construed so as to give them effect and carry out the intention of the parties." 11 WILLISTON § 30:9. The prosecutor never suggested or implied that the agreement to enter into stipulations was anything but a "manifestation of [Respondents'] intention to act . . . in a specified way, so made as to justify [the government] in understanding that a commitment has been made." RESTATEMENT § 2(1) (defining "promise"). Indeed, the parties bargained so intensely over the substance of the confessions that the government refused to accept the PTAs unless the agreement "to enter into" satisfactory stipulations was contained in the PTAs. *See* J.A. 198–99.

Because the Court erroneously concludes that the text of the PTAs unambiguously supports the government, *e.g.*, Majority Op. 3, it fails to acknowledge this evidence of the parties' intent, as expressed by their course of dealing. *See id.* at 19–22 (citing authority that when a contract is unambiguous, its terms "must be enforced irrespective of the parties' subjective intent"). It is further telling that the majority makes no attempt to argue that, even assuming the agreements are ambiguous, the parties' course of dealing can be reconciled with its preferred interpretation. That is because the parties' negotiations flatly contradict the Court's construction of the PTAs. We can resolve this case on the plain text of the PTAs and principles of contract law, which together require denying

44

the government's petition.  But to the extent ambiguity exists, we must look outside the four corners of the agreements, and the parties' course of dealing clarifies that the Military Judge did not clearly and indisputably commit clear error.

*Second*, the majority ignores the plain text of a neighboring provision in the Rules for Military Commissions, which confirms that the stipulation provisions are contractual promises.  Rule 705(c)(2)(A) enumerates as a "[p]ermissible term[] or condition[]" in a PTA that an accused may "promise to enter into a stipulation of fact."  As such, military courts "have long sanctioned pretrial agreements which compel an accused to stipulate with the trial counsel to the factual basis of the offenses to which he pleads guilty."  *United States v. Sharper*, 17 M.J. 803, 806 (A.C.M.R. 1984); *see, e.g.*, *United States v. Felder*, 59 M.J. 444, 445 (C.A.A.F. 2004) ("In his pretrial agreement, Appellant promised to enter into a stipulation of fact," and "made these promises in exchange for a limitation on the sentence.").  By turning a blind eye to the relevant rules at stake, the majority misses yet another indication that Respondents' agreements to enter into stipulations are promises.

\*   \*   \*

For all these reasons, the Military Judge rightly found that the PTAs contain a promise to enter into stipulations of fact.  There is no basis for concluding that he clearly and indisputably committed clear error, as is required for the government to prevail on this claim.  The majority disagrees with the Military Judge's construction of the contracts, but nowhere explains why its disagreement is so substantial that it empowers the Court to hold that the government has shown a "clear and indisputable" right to relief.  This is especially true as to arguments advanced for the first time by the majority.

45

Mandamus does not grant the Court license to inject its own arguments in support of the government's position. We review whether a petitioner has shown a clear and indisputable entitlement to relief, not whether the majority can satisfy the mandamus standard based on arguments that have not been presented.

As to the arguments actually put forward by the government, the majority fails to explain why, even if those arguments "pack[] substantial force," a writ is "*clearly mandated* by statutory authority or case law." *Ferriero*, 60 F.4th at 714 (emphasis added) (internal quotation marks omitted). While the majority states that "[t]his is a rare case in which that exacting standard has been met," Majority Op. 11, it never articulates why, assuming the government can demonstrate *some* entitlement to relief, mandamus is clearly and indisputably required.

Today's decision calls into question the wisdom of the Military Judge, despite his courtside view of the proceedings below and his expertise in interpreting military PTAs. As the PTAs' text and contract principles demonstrate, we are wrong to second-guess the Military Judge's factual findings, which the CMCR affirmed. The government has not clearly and indisputably shown that it is entitled to relief on this claim under any standard.

**D.**

Turning from the "promise" requirement to "begins performance," the government fails to show, clearly and indisputably, that the Military Judge erroneously applied Rule 705(d)(4)(B) by holding that Respondents began performance of the established promise to enter into factual stipulations. Recall that the Rule prohibits the convening authority from

46

withdrawing from a pretrial agreement once the accused "*begins* performance of promises contained in the agreement." R.M.C. 705(d)(4)(B) (emphasis added). Because bedrock contract doctrines confirm *Dean*, *see supra* Section III.A, and conform with the best reading of Rule 705(d)(4)(B), *see supra* Section III.B, Respondents began performance by signing the stipulations even under the majority's myopic and acontextual view of the case. The government thus cannot carry its burden.

To start, the majority's contract-law approach to "begin[ning] performance" breaks new ground by imposing a freestanding and unsupported temporal limitation on when an accused may start performing on a promise under Rule 705(d)(4)(B). *See* Majority Op. 33–36. Recall that this is a case about the withdrawal regulation, not a contract dispute. At its outset, when drafted by the military for the courts-martial rules, Rule 705(d)(4)(B)'s predecessor was intended to be more favorable to the accused than what a narrow view of contract law might allow. The military's analysis noted that the "begins performance" standard was "consistent" with earlier military precedent that pegged the convening authority's withdrawal power to an accused's detrimental reliance. 1984 MCM at A21-36.[10] By citing with approval, *id.*, the highest military court's decision in *Shepardson v. Roberts*, the Executive Branch intended the "beginning of performance" in the withdrawal regulation to encompass the principles of "fairness and due process," recognized in *Shepardson*, that were "*apart from* contract law" and "compel[led] the Government to abide by a [PTA] on which an accused has reasonably relied to his detriment," 14 M.J. 354, 358 (C.M.A 1983) (emphasis added). Incorporation of the "beginning of performance" standard,

---

[10] Detrimental reliance, or promissory estoppel, concerns the enforcement of promises lacking consideration, a necessary element for contract formation. *See* RESTATEMENT § 90.

47

while "consistent" with *Shepardson*'s approach, simply "provide[d] a clearer point at which the right of the convening authority to withdraw terminates." 1984 MCM at A21-36. In its effort to make this case a contract dispute, the majority fails to faithfully interpret Rule 705(d)(4)(B) or so much as acknowledge that the Rule was never intended to be coextensive with contract law.

The temporal limitation invoked by the majority has no purchase in contract law, either. *First*, hornbook contract law provides that "[p]erformances are to be exchanged under an exchange of promises if each promise is at least part of the consideration for the other and the performance of each promise is to be exchanged at least in part for the performance of the other." RESTATEMENT § 231. Respondents here did exactly that. As the majority concedes, and as outlined below, the agreements to enter into stipulations were offered as partial consideration for the government's agreement to not seek capital punishment. And, performance of the agreement to enter into stipulations—that is, the act of signing the stipulation itself after having made the promise to do so—was done in exchange for the anticipated performance of the government's end of the bargain.

*Second*, the longstanding contract doctrine of executed consideration concerns contracts premised on conduct (*i.e.*, performance) that occurs contemporaneously with formation. Settled authority on executed consideration makes clear that a promise to perform an act in the future is no different than simply performing the promised act, so long as the performance of the promised act was part of the bargained-for exchange. As one treatise articulates this principle:

> The consideration upon which a contract is
> made may be executed or executory. In the

48

former case the consideration is executed by one party in return for the promise of the other, and nothing remains to be done but to perform the promise according to its terms.  In the latter the consideration is a promise made by one party in return for the promise of the other; there are mutual promises which have to be performed on both sides, and the promise on one side may be dependent, or conditional upon the performance on the other according to the construction of the terms . . . . But the executed consideration is not a past consideration, in the sense of having been executed before the making of the promise, the execution of the consideration and the making of the promise being concurrent acts . . . .

LEAKE & RANDALL, PRINCIPLES OF THE LAW OF CONTRACTS 30–31 (7th ed. 1921); *accord* 17 C.J.S. CONTRACTS § 128 ("The consideration for a promise may be executory or executed . . . . Executed consideration . . . is some act performed or some value given at or before the time that the return promise is made.  The acceptance of executed consideration creates a binding contract . . . .").

As another treatise puts it, "[a] contract arises upon executed consideration when one of the two parties has[,] either in the act which amounts to a proposal or the act which amounts to an acceptance[,] done all that he is bound to do under the contract, leaving an outstanding liability on one side only." WILLIAM R. ANSON, PRINCIPLES OF THE LAW OF CONTRACT 82 (O. W. Aldrich ed., 1880).  Executed consideration still constitutes a promise under the agreement, notwithstanding its timing.  As Chief Justice John Marshall stated, "[a] contract executed, as well as one which is executory, contains

49

obligations binding on the parties." *Fletcher v. Peck*, 10 U.S. 87, 137 (1810). The PTAs at issue did not solely call for performance as consideration because they contained forward-looking promises. *See supra* Section III.C. Still, the doctrine helps illustrate why the Majority is wrong to contend, *e.g.*, Majority Op. 35–36 & n.10, that the timing and manner of Respondents' performance on their promises is somehow unfamiliar to contract law.

*Third*, contract law contemplates performance that occurs contemporaneously with an offer. Corbin describes a "reverse" unilateral contract as "the offer of an act for a promise." 1 CORBIN § 3.17; *cf. Hettinger v. Kleinman*, 733 F. Supp. 2d 421, 437 (S.D.N.Y. 2010) (offeree's acceptance of offeror's performance can form a binding contract); *Hampton Island Club, LLC v. B2 Creative, Inc.*, 685 S.E.2d 751, 751–52 (Ga. Ct. App. 2009); *Classic Restorations v. Bean*, 272 S.E.2d 557, 562–63 (Ga. Ct. App. 1980); *Moore v. Kuehn*, 602 S.W.2d 713, 718–19 (Miss. Ct. App. 1980). For example, "if A sends a book to B, offering to sell it at a price, and B keeps the book, either expressly or impliedly promising to pay the price, a contract is consummated by B's acceptance." 1 CORBIN § 3.17 (footnote omitted). The doctrine is not on all fours with Respondents' offer and performance, because Corbin's scenario does not involve bilateral promises made by both parties. *See also* RESTATEMENT § 55 cmt. a (noting reverse unilateral contracts involve non-promissory offers); WILLIAM L. CLARK, JR. & ARCHIBALD H. THROCKMORTON, HANDBOOK OF THE LAW OF CONTRACTS 18 (3d ed. 1914) (covering implied contracts where "[t]he doing of the work is an offer; the permission to do it, or acquiescence in its being done, is the acceptance"). Here, Respondents made forward-looking promises that the Convening Authority accepted as part of an express, executed contract. But reverse unilateral contracts nonetheless support the notion that performance can immediately precede contract

50

formation, thus further undermining the majority's insistence that "basic principles of contract law" support the government. Majority Op. 32.

At bottom, the Court rewrites the governing regulation to place dispositive weight on the timing of performance, but does not substantiate its concerns with authority. *See id.* at 33–34. The resort to selective principles of contract law ignores military precedent that rejects "such technicalities" when it concerns "the enforceability of a [PTA] in a criminal case." *Koopman*, 20 M.J. at 110 n.3. Although the majority insists that performance may occur only after an agreement is fully formed, *see* Majority Op. 34, R.M.C. 705(d)(4)(B) contains no such limitation. Yet the majority's atextual approach cites nothing for the proposition that *performance* of an indisputably forward-looking promise contained in a valid contract cannot occur after the promise is made and immediately before the agreement is executed. For example, in the Farnsworth treatise the majority cites, *id.* at 32, there are zero relevant cases cited in the section about contract law's "[c]oncern . . . with the future," FARNSWORTH § 1.01, that contravene the Military Judge's reasoning below. Williston's treatise, which the majority also cites as an endorsement of the Second Restatement's definition of "promise," Majority Op. 32, directs us to no cases that address the issues presented in this appeal. *See* 1 WILLISTON § 1:2 n.1 (citing only cases that distinguish contractual promises from illusory promises, misrepresentations, and conditions, or that otherwise adopt the Second Restatement's definition).

Instead, the Court relies on a nonbinding case about past consideration. Majority Op. 37–38 & n.12 (citing *Univ. S. Fla. Bd. Trs. v. United States*, 92 F.4th 1072, 1082 (Fed. Cir. 2024)). In this patent dispute, the Federal Circuit addressed a November 1997 agreement with an "effective period"

51

beginning in September 1997. *Univ. S. Fla. Bd. Trs.*, 92 F.4th at 1082. The court accepted for purposes of appeal that some money under the contract was used to pay for work done in April 1997. *Id.* It held that the contract included valid past consideration, but the April work was not "obligatory." *Id.* at 1082–83. That case has no relevance here. Principally, it involved "prior" work in a way that this case does not. The "past" work there occurred seven months before contract formation and four months before the agreement's "effective period." *Id.* Here, what the majority insists is "past" conduct are actions that Respondents took *after* executing their portions of the PTAs and practically contemporaneous with formation. Nor did the Federal Circuit case involve (as this one does) years of negotiation that produced an agreement containing a forward-looking promise, bargained for as part of the contract, that one side performed the same day it entered into the contract. The central tenet of the past consideration doctrine is that it applies to acts that occurred prior to, and outside of, the bargaining process. *See* 3 CORBIN § 9.1. Here, the stipulations were clearly part of the bargained-for exchange within the PTAs.

Perhaps animating the majority's concern is a fact pattern we do not confront. Had the Convening Authority *rejected* the Respondents' offers and declined to countersign the PTAs, I would agree that no performance occurred here. Without an executed contract, Respondents would have no footing to argue that merely acting in accordance with the forward-looking commitment in the *offered* PTA amounted to *performance* of a promise in a formed agreement. In that scenario, Respondents would need to prevail on a theory of detrimental reliance to prevent the Convening Authority from withdrawing from the PTAs. *See* RESTATEMENT § 90; Pet. Ex. A at 28. But that is not this case. With an executed agreement, it is illogical to say

52

Respondents did not (as the majority puts it) "start[] to complete a forward-looking commitment." Majority Op. 33.

To illustrate the majority's flawed reasoning, suppose a homeowner calls a painter and asks him for a quote to paint his front and back fences. The painter comes to the house, reviews the job, and delivers a signed contract promising to paint the front fence for $500 and the back fence for $1,000. The painter begins painting, and he finishes the front fence by the time that the homeowner signs the contract, returns it to the painter, and compliments him on the work. However, when the painter returns days later to paint the back fence, the homeowner tells the painter that he has withdrawn from the contract, does not wish for the painter to paint the back fence, and refuses to pay for the front fence. In a subsequent breach of contract action for $500, is there any doubt that the painter made a written promise in the contract to paint the front fence for $500, manifested his assent to the bargain, exchanged the promise for consideration, and performed the promise? Particularly where, as here, the homeowner manifested his assent to promise payment? The majority would say that the painter did not perform a promise contained in the signed contract by painting the front fence, but the law and common sense say otherwise.

Despite the Court's suggestion that "basic principles of contract law" require upending the decisions of two military courts, *id.* at 32, its opinion offers little by way of actual contract doctrine to support that point.[11] It submits not a single

---

[11] At first blush, one of the majority's citations seems promising for its argument. Majority Op. 38 (citing RESTATEMENT § 55 cmt. b ("[I]f the offeror's performance is complete at the moment of acceptance, the element of futurity required by the definition of 'promise' . . . is lacking.")). But this Restatement section is only applicable when divorced from context and it has no bearing here. It

53

case to bolster the sole principle justifying its holding on performance of the stipulation provision. We deny mandamus when a petitioner's argument, "though packing substantial force, is not *clearly mandated* by statutory authority or case law." *In re Al Baluchi*, 952 F.3d at 369 (cleaned up) (emphasis added). Here, the majority has not identified an example in which a court held that a promise in a fully formed contract may be "performed" only after all parties have signed the agreement. And even if such a case existed, the Court cannot explain why this practice is prohibited by R.M.C. 705(d)(4)(B), which is the law we must apply.

**E.**

Last, the government argues that if we determine that Respondents began performing on a promise to enter into stipulations, we would "effectively nullify" the convening authority's power to withdraw under R.M.C. 705(d)(4)(B). Pet'r Reply 10. In essence, the government urges that my interpretation would undermine the Rule's "practical effect," *id.*, because any accused could unilaterally begin performance before the convening authority ever has time to withdraw.

But judicial review requires courts to interpret laws as written, not to construe regulations or interpret contracts to

---

deals with "*[a]cceptance* of [n]on-promissory [o]ffers]," or, in doctrinal terms, the unilateral contract. RESTATEMENT § 55 (emphasis added); *see also* 1 WILLISTON § 1:18 ("A unilateral contract results from an exchange of a promise for an act . . . ."). For the unilateral contract paradigm to fit here, the *government* would need to accept through performance (and not promises) because as all agree, Majority Op. 2, 5, Respondents offered the PTAs. The majority never asserts as much. Nor could it, because the government clearly accepted the PTAs by responding with promises of its own.

54

satisfy the government's policy concerns. No military court has questioned *Dean*, which interpreted language identical to that contained in R.M.C. 705(d)(4)(B). 67 M.J. at 229. Now, fifteen years later, the government cannot feign surprise that the Military Judge and CMCR would follow this uncontested precedent. Nor does the government point to evidence from the preceding decade and a half to show why *Dean*'s rule is, as a matter of plain text or policy, untenable.

And, both the text and timing of the Rules for Military Commissions suggest the Executive Branch understood the practical effect of *Dean* and rejected the government's "effective nullification" argument. In 2007, the Secretary of Defense issued regulations for the recently established military commission, which prohibited the convening authority from withdrawing from a PTA after an accused "begins performance" of a promise. OFF. OF THE MIL. COMM'NS & OFF. OF THE SEC'Y OF DEF., REGULATION FOR TRIAL BY MILITARY COMMISSIONS, at ch. 12-3 (Apr. 27, 2007), https://www.mc.mil/Portals/0/Reg_for_Trial_by_mcm.pdf. Three years later, the Executive Branch issued the first Rules for Military Commissions, which retained the "begin[ning] performance" standard from the Rules for Courts-Martial and the 2007 Regulation. R.M.C. 705(d)(4)(B) (2010). Moreover, they implicitly acknowledged the Rules for Courts-Martial construction of "begins performance" as encompassing actions done "pursuant to" an agreement. *See id.* at 705(a) (citing MCM app. 3); *id.* at 102(b) (noting procedure and construction of military commission rules were "based upon" the courts-martial rules); *see also supra* Section III.B. (discussing "pursuant to" as contained in the 1984 and 2008 MCM appendices). Because the Rules for Military Commissions were explicitly "based upon" the Rules for Courts-Martial and issued just one year after *Dean,* the drafters of R.M.C. 705(d)(4)(B) knew how the highest military court construed

55

"begin[ning] performance." And the drafters consciously chose to import the exact text of R.C.M. 705(d)(4)(B) even though they rejected at least one comparable courts-martial rule—suggesting that the Executive Branch endorsed or, at a minimum, acquiesced in *Dean*'s interpretation. *Cf.* R.M.C. 703(b)(3)(B) (2010) (noting in discussion that "[t]his rule departs from the R.C.M. 703(b)(3)").

To the extent that the correct interpretation of the Rule poses practical problems, the government can amend it. It did so to the corresponding Rule for Courts-Martial after *Dean*. *See* R.C.M. 705(e)(4)(B)(i) (permitting convening authority to withdraw from pretrial agreements at any time "before *substantial* performance by the accused of promises contained in the agreement") (emphasis added)). But the government (including the Defense Department under Secretary Austin) left Rule 705(d)(4)(B) untouched. We are bound to interpret it as written.

Even under the government's preferred interpretation, the Rule hampers the convening authority's ability to withdraw. In its briefing, the government attempted to distinguish *Dean* by noting that there, "the convening authority did not attempt to withdraw until nearly a month after the agreement was entered." Pet'r Reply 10. Yet at oral argument, the government agreed that Respondents could have signed the stipulations "less than a second" after the PTAs were executed and have begun performance under the Rule, even though there, the Convening Authority would not have any meaningful opportunity to withdraw. Oral Arg. Tr. 65:3–66:22. Given that the government's own interpretation of the Rule does not mitigate its policy concerns, they carry little weight.

\*   \*   \*

56

The Military Judge's conclusion that Respondents began performing corresponded to the text and drafting history of the Rule, reasonably relied upon persuasive authority interpreting an analogous rule, and faithfully adhered to contract principles. The CMCR was right to affirm his decision. Here, the government has not shown that either court was wrong, let alone made a compelling case that the Military Judge clearly and indisputably erred. By adopting the government's position, the majority grants an extraordinary remedy when the right to relief is unclear, heavily disputed, and based on underwhelming authority.

## IV.

Finally, the government has not established a clear and indisputable right to relief because it fails to show that the Military Judge committed clear error by ruling that Respondents began performance of a promise contained in the PTAs when they refrained from questioning witnesses at a suppression hearing. As I explain, the scope of these promises is not so narrow as the majority suggests, and under any construction of the promises, Respondents began performance within the meaning of Rule 705(d)(4)(B).

## A.

The parties addressed the PTAs' impact upon the motion to suppress hearing before the Military Judge on two separate occasions. First, on July 30, the prosecutor informed the Military Judge that the agreements placed the parties "in a unique situation," given that "[p]art of those deals is waiving all motions," such that "it wouldn't necessarily be appropriate for people to continue cross-examining any of the witnesses." Pet'r Resp. to Order of Apr. 14, 2025, at App. 910 (Apr. 15,

57

2025), Dkt. No. 2111203.  The Military Judge indicated his agreement with the government's position.  *Id.*  Because the PTAs had not yet been countersigned as of this date, the parties did not finalize their course of action.

Second, on August 1, the day after both parties had executed the PTAs, the parties convened for a prescheduled hearing on motions to suppress, including those previously filed by Respondents.  *Supra* Part I.  The Military Judge and the prosecutor discussed again whether, given the PTAs, it remained appropriate for Respondents to participate in the hearing.  *Id.*  The government represented that the PTAs—specifically, a provision of the agreements requiring Respondents to "waive[] all motions"—precluded Respondents from cross-examining the witness.  *See* Pet'r Resp. to Order of Apr. 14, 2025, at App. 917 to App. 918 (Apr. 15, 2025), Dkt. No. 2111203.  None of Respondents' counsel objected.  In fact, counsel for another defendant, al Baluchi, saw "it pretty much the same way," and questioned whether Respondents "should be required to appear for the first day of each session anymore."  *Id.* at App. 918.  The Military Judge agreed, essentially ruling that waiving a motion encompasses agreeing not to question a witness at a hearing on said motion.  *See id.* at App. 919.  The CMCR, which has seen more PTAs than any judge on this Court, construed the language in the same manner.  Pet. Ex. B at 17 ("Respondents clearly began performance of a promise contained in the PTA—not to make or participate in motions . . . .").  Respondents thus refrained from cross-examining the witness testifying at the joint motion.

The most reasonable inference based on the record is that Respondents either conferred with the prosecutor before the August 1 hearing and collectively agreed on how to proceed with the substantive motion, and/or that they concurred in the government's assessment of the PTAs.  For the Court or the

58

government to suggest otherwise inverts the burden of proof at the mandamus stage. This understanding is further supported by statements made by Al Hawsawi's counsel the following day, when he informed the Military Judge (before the Secretary withdrew from the PTAs) that he understood that not "engaging in any examination of the witness" and "abstaining from that" constituted "specific performance on that plea agreement." Pet'r Resp. to Order of Mar. 4, 2025, at 49420:19–21:5 (Mar. 5, 2025), Dkt. No. 2103963; *see also* Al Hawsawi & Mohammed Resp. in Opp'n to Pet. 18, Dkt. No. 2095002 ("No defense team disputed counsel for the government's stated understanding of their obligations or that the letter and spirit of the pretrial agreements required the parties to bring contested litigation of guilt to a stop.").

From this record, the Military Judge appropriately determined that Respondents began performance of a promise contained in the agreements. So too did the CMCR. I first address the scope of the relevant promise and explain why the majority's hyper-technical reading of the PTAs misses the mark. Even assuming that the Court correctly construed the promises, Respondents began performance under the Rule. The majority's cramped interpretation of the agreements and R.M.C. 705(d)(4)(B) finds no support in those authorities' text, the criminal context, or military jurisprudence.

**B.**

A guilty plea necessarily waives a defendant's right to further factual development, even as to non-waivable motions. This foundational principle of criminal practice is why every military justice actor below—Respondents, the government, the Military Judge, and the CMCR—understood that once both parties had signed the PTAs, it would be fruitless and futile for Respondents to litigate the scope of the factual record through

59

cross-examination at a suppression hearing.  It is clear from longstanding Supreme Court and military justice precedent and the record below that, had Respondents insisted on cross-examining the witness, the government would argue that Respondents breached the PTAs.  *See* R.M.C. 705(d)(4)(B) (permitting withdrawal when accused "fail[s] . . . to fulfill any material promise or condition in the agreement").  For the Court now to suggest that refraining from questioning was not beginning performance both misapprehends the basic realities of criminal procedure and also fails to give due deference to the reasoning of these specialized tribunals in the construction of a military procedural rule.

In *United States v. Broce*, 488 U.S. 563, 571–74 (1989), the Supreme Court held that a defendant whose plea agreement was ratified by the trial court is not entitled to an evidentiary hearing or further fact development to lodge a collateral attack on the conviction, even as to a claim of double jeopardy (which is non-waivable).  It should thus be no surprise that the parties and the Military Judge all agreed that the PTAs precluded Respondents from developing the factual record through cross-examination.  Any other interpretation of the meaning of waiving all motions would indeed undermine *Broce*'s central holding.  *Cf. Joubert v. Hopkins*, 75 F.3d 1232, 1248 (8th Cir. 1996) ("[W]e are perplexed by Joubert's argument that the trial court somehow wronged him by not holding a suppression hearing when his plea was unconditional.").

The very effect of Respondents' agreement to plead guilty was to forego the factfinding process (that is, their opportunity to test and contest the record against them), rendering cross-examination at the suppression hearing inapt.  This is why the CMCR construed the PTAs' promises to mean that Respondents could not "make or participate in motions," also described as a promise "not [to] litigate or contest motions."

60

Pet. Ex. B at 17, 3. The Military Judge and the CMCR had no need to identify a precise provision of the agreements which contained a particularized promise because, as *Broce* instructs, the entire purpose of a plea agreement is to conclude litigation by taking the possibility of a trial off the table—meaning the promises in the plain text of the PTAs had that same effect. *See United States v. Jones*, 69 M.J. 294, 299 (C.A.A.F. 2011) ("An unconditional guilty plea generally waives all pretrial and trial defects that are not jurisdictional or a deprivation of due process of law."); *United States v. Dusenberry*, 49 C.M.R. 536, 540 (C.M.A. 1975) (stating that an accused who "factually admit[s] guilt by a plea of guilty and receive[s] the benefit of a possible pretrial agreement . . . waives both his right to a trial of the facts and any corresponding right to appellate review of any issues that may have been raised in that proceeding"); MIL. R. EVID. 311(e) ("[A] plea of guilty to an offense that results in a finding of guilty waives all issues under the Fourth Amendment . . . and MIL. R. EVID. 311–317 with respect to the offense, whether or not raised prior to plea.").[12]

This practical reality was reflected in the text of the agreements since, as both military tribunals recognized, Pet. Ex. A at 8 n.41; Pet. Ex. B at 3, Respondents began performance of two promises in the PTAs when they refrained from cross-examining the witness: Respondents' agreement to

---

[12] *See also United States v. Ellis*, 2008 WL 4898643, at *2 (A.F. Ct. Crim. App. Oct. 22, 2008) ("[T]rial defense counsel properly advised the appellant that he would forever waive his motion to suppress by accepting the [PTA]."); *United States v. Felicies*, 2005 WL 958397, at *4 n.4 (N-M. Ct. Crim. App. Apr. 27, 2005) (enforcing waiver of motion to suppress even though "[t]he actual [PTA] does not include a provision waiving possible motions[,]" because "appellant understood that by pleading guilty, he was agreeing to waive any Fourth Amendment issues") (citing MIL. R. EVID. 311)).

61

waive all waivable motions, and their promise to move to withdraw all pending motions, *see, e.g.*, Mohammed PTA ¶ 23.

The majority nevertheless contends that the subject matter experts below committed "straightforward error given the plain text of the pretrial agreements and the undisputed facts in this case." Majority Op. 22. The Court's sparse analysis begins and ends with its observation that "a commitment not to question witnesses appears nowhere in the agreements' text." *Id.* at 22–23. It then engages in a hyper-literal reading of the two promises identified by Respondents, applying dictionary definitions to each word (*e.g.*, "move," "withdraw," "waive") to conclude that abstention from cross-examination does not fall within those parameters. *See id.* at 24–25, 28–30. While dictionary definitions can shed light on the intended meaning of a plea agreement's text, we have repeatedly declined to rely on such extra-textual sources isolated from relevant criminal context. *See United States v. Hunt*, 843 F.3d 1022, 1028 (D.C. Cir. 2016) ("True, 'term' can mean 'condition.' But in the context of Hunt's appeal waiver, it more likely connotes 'duration.'") (citation omitted) (evaluating two competing definitions using context); *Ramsey v. U.S. Parole Comm'n*, 840 F.3d 853, 863 (D.C. Cir. 2016) (considering dictionary definitions "in the criminal context" with reference to binding caselaw construing the relevant terms). Blackletter contract law adopts the same approach. Although "[d]ictionary definitions may be of help in showing the general use of words, . . . they are not necessarily dispositive[;]" instead, "the meaning attached to a word by the parties [often] must be gleaned from its context, including all the circumstances of the transaction." Farnsworth § 7.11.

The majority never acknowledges, let alone analyzes, how motions hearings are generally handled once a plea agreement is reached, as described by the Supreme Court in *Broce*,

62

countless other military and civilian cases, *see supra*, and the commentary to Rule 705, *see supra* Section III.B. This is error, given that these practices are clearly part of the "surrounding circumstances" that the majority concedes, Majority Op. 19, are relevant to determining what the promises to waive and withdraw motions mean, and whether those promises are ambiguous, even on *de novo* review. Both the Military Judge and the CMCR took those surrounding circumstances into account, which is why they concluded, quite reasonably, that these promises meant Respondents had agreed not to litigate their motions. *See supra* Section IV.A.

In other words, simply because "[d]eclining to examine witnesses is [not] mentioned" in the text of the PTAs does not mean that Respondents made no such promise. *Cf.* Majority Op. 24. Their conduct still fell within the parameters of the promises to waive all waivable motions and to move to withdraw. And even accepting that the majority's word-by-word definitional construction of the relevant promises holds water, it is far from the only reasonable interpretation of the contract language: Two different military tribunals and the parties disagreed with its interpretation. It defies logic, then, for the majority to proclaim that these contract terms are unambiguous and thus subject to *de novo* review. *See id.* at 18–22 & n.6. In essence, the majority's reasoning is circular: It first ignores contrary interpretations of the PTAs to conclude that its reading is "straightforward" from the text, which in turn allows the Court to elide the requisite deference owed to the Military Judge's factual findings regarding the scope of ambiguous promises. *See supra* Part II. Appreciating the criminal procedural context and applying a deferential review to the Military Judge's determinations necessitates a conclusion that the PTAs encompassed a broader promise to cease litigating the pending motions to suppress,

63

including by cross-examination. So defined, Respondents undisputably performed a promise contained within the PTAs.

## C.

Even accepting the Court's narrow definition of the promises contained in the PTAs, Respondents began performance by refraining from cross-examination.

### 1.

First, Respondents began performance of their promise to waive all waivable motions when they refrained from cross-examining the witness at the suppression hearing. Each PTA encompassed such a promise. *See* Mohammed PTA ¶ 23 ("Upon entry and acceptance of the Accused's guilty plea pursuant to this Agreement, the Accused knowingly, voluntarily, and expressly waives all waivable motions."); bin 'Atash PTA ¶ 22 (similar); Al Hawsawi PTA ¶ 23 (similar). Although the majority contends that Mohammed and Al Hawsawi forfeited any argument based on this provision of the PTAs, they sufficiently defended the Military Judge's ruling on this basis in their filings here.[13]

---

[13] *See* Al Hawsawi & Mohammed Resp. in Opp'n to Pet. 5, Dkt. No. 2095002 ("Respondents duly suspended their participation in on-going hearings, which included waiving the examination of a government witness then testifying on the remaining defendant's highly contested motion to suppress."); *id.* at 18 (arguing that Military Judge's decision below rested on government representation that waiver provision barred cross-examination); *see also* bin 'Atash Resp. in Opp'n to Pet. 12, Dkt. No. 2094923 ("[P]ursuant to his promise[] . . to 'waive[] all waivable motions,' . . . Mr. bin 'Atash refrained from questioning any witnesses to support, among other things, his pending motion to suppress . . . .").

64

Recall that Rule 705(d)(4)(B) encompasses action taken *pursuant to* a promise contained in the agreement, so the text of the Rule is broader than consummated performance. To determine whether conduct is pursuant to, or in accordance with, a promise, we must understand the scope of the promise. Legal dictionaries define "waive" as "[t]o abandon, renounce, or surrender (a claim, privilege, right, etc.); to give up (a right or claim) voluntarily," or "[t]o refrain from insisting on (a strict rule, formality, etc.); to forgo." *Waive (vb.)*, Black's Law Dictionary (12th ed. 2024). One can thus "waive" an argument through forbearance, by refraining from pursuing such an argument, so long as waiver is committed knowingly and voluntarily. *See Waiver*, Ballentine's Law Dictionary (3d ed. 1969) ("[The term] implies the intentional forbearance to enforce a right, and necessarily, therefore, assumes the existence of an opportunity for choice between the relinquishment and the enforcement of the right."); *id.* (waiver may be shown by "an act *or omission*") (emphasis added)).

This understanding aligns with common usage definitions. *See Waive*, Oxford English Dictionary, https://www.oed.com/dictionary/waive_v1 [https://perma.cc/9Y9KVX3L] ("To relinquish (a right, claim, or contention) either by express declaration *or by doing some intentional act which by law is equivalent to this*; to decline to avail oneself of (an advantage); to refuse to accept (some provision made in one's favour).") (emphasis added)); *id.* ("To *refrain from insisting upon*, give up (a privilege, right, claim, etc.); to forbear to claim or demand.") (emphasis added)); *id.* ("To forbear persistence in (an action or course of action); *to refrain from pressing* (an objection, a scruple, an argument).") (emphasis added)).

Moreover, Respondents' abstention from prosecuting their pending motions was consistent with the ultimate waiver of

65

waivable motions that would accompany their formal guilty plea. *See supra* Section IV.B. Thus, to "begin[] performance" of the promise "contained in the agreement[s]" to waive all waivable motions, R.M.C. 705(d)(4)(B), Respondents had to "act[] pursuant to" their commitment to forbear from enforcing a waivable motion, 1984 MCM at A21-35 to A21-36; *see also supra* Section III.B (explaining that "pursuant to" means to act in conformance with). As the Military Judge correctly concluded when it interpreted this military procedural rule, they unquestionably did so by refraining from enforcing their right to cross-examine the witness in support of their pending motions to suppress.

Respondents' forbearance sufficed here. While "one must understand his right to object and indicate in some appropriate manner a desire to refrain from asserting that right," *United States v. Kelley*, 23 C.M.R. 48, 52 (1957), "[m]any courts have taken the position that where there is no objection and it is otherwise clear from the record that it was an intentional relinquishment of a known right, the doctrine of waiver will apply," *United States v. Campos*, 67 M.J. 330, 332 & n.3 (C.A.A.F. 2009) (collecting cases). In its waiver analysis, the Court of Appeals for the Armed Forces considers whether "defense counsel's trial strategy could . . . be considered an intentional relinquishment or abandonment" of the right at issue. *United States v. Harcrow*, 66 M.J. 154, 157–58 (C.A.A.F. 2008) (cleaned up). If "defense counsel [is] clear about her intent to refrain from questioning [a] witness," she "need not have literally told the judge that she waived the issue." *United States v. Avery*, 52 M.J. 496, 498 (C.A.A.F. 2000). Basic contract principles also reflect that forbearance can constitute performance on a promise. *See* Farnsworth § 2.04; *Hamer v. Sidway*, 27 N.E. 256 (N.Y. 1891) (prototypical consideration case, in which one party's promise to forbear from certain conduct constituted consideration, and

66

actual forbearance was performance). It is thus immaterial that "[n]o Respondent objected to that preservation of their pending motions or asked the court to withdraw [their] motion to suppress." Majority Op. 26.

Here, the execution of the PTAs, coupled with the prosecutor's representation that cross-examination was foreclosed by the agreements and Respondents' decision not to object to that representation, followed by Respondents' declining to cross-examine the available witness, demonstrates that Respondents "intentional[ly] relinquish[ed] or abandon[ed]" the right at issue, consistent with their "trial strategy" of compliance with the PTAs. *Harcrow*, 66 M.J. at 158 (quotation omitted); *cf. United States v. Bridges*, 55 M.J. 60, 65 (C.A.A.F. 2001) (Sullivan, J., concurring) (concluding that failure to cross-examine a witness did not constitute waiver where "[t]here was no stipulation" and "no strategic inaction" could be discerned). Nothing in the record suggests Respondents' lawyers made a careless or haphazard decision to not prosecute a significant and substantive pretrial motion. As the Court of Appeals for the Armed Forces has clarified, "[n]o magic words are required to establish a waiver." *United States v. Smith*, 50 M.J. 451, 456 (C.A.A.F. 1999).

True, "[c]ounsel stood silent in response to the military judge's proposal." Majority Op. 26. And while I agree that we should not endorse an across-the-board rule that "criminal defendants can waive motions protecting their constitutional rights by saying and doing nothing," *id.* at 30, we need not reach such a conclusion. Under military law, what matters is whether the evidence demonstrates "that defense counsel made a purposeful decision to agree to the" course of action. *Smith*, 50 M.J. at 456. Here, the record amply demonstrates such agreement. The clearest read of the Military Judge's decision is that he made such a finding. Pet. Ex. A at 8 & n.41, 26 &

67

n.114 (identifying Respondents' forbearance from prosecuting the motion to suppress and citing the representation made by government's trial counsel that the promise to waive waivable motions precluded the accused from contesting litigation). On review, the CMCR agreed with the Military Judge's finding. Pet. Ex. B at 17.

The majority attempts to undermine the Military Judge's understanding of the parties' intent by noting that he had not read the PTAs before the July 30 and August 1 hearings and thus "did not purport to interpret or effectuate" the agreements. Majority Op. 26 n.7. That rejoinder is not dispositive and instead confuses what happened below. The Military Judge heard the parties' representations that the PTAs contained a promise to "waive all motions," and he did not need to see a piece of paper to understand what those words meant. He was entitled to rely on the litigants' representations when expressing his view of what the PTA provision required. Furthermore, his ultimate decision was rendered following his consideration of the PTAs' text. Pet. Ex. A at 6–7 & nn.29–30 (citing PTAs). He reached that decision by citing his August 1 colloquy with the prosecutor, leaving no question about how we should understand the hearing transcript. *Id.* at 8 n.41. And the view of both military courts comports with a basic understanding of guilty pleas in the criminal and military contexts, along with the waivers of motions that accompany them. *Broce*, 488 U.S. at 569–76; *cf. Hunt*, 843 F.3d at 1028–29 ("A criminal defendant may take a district court's oral pronouncement about a written waiver at face value even if it mischaracterizes the waiver, and even if the waiver is otherwise unambiguous, . . . especially because the government made no objection and offered no clarification . . . .") (internal quotation marks omitted). The majority offers no basis to rule that this finding was clear error. The Court's attempt to debase the

68

Military Judge's statements at the suppression hearings falls flat.

The Rules for Military Commissions further support the Military Judge's conclusion. They provide that "[f]ailure by a party to raise defenses or objections or to make [pretrial] motions or requests . . . shall constitute waiver." R.M.C. 905(e). Specifically, the Rules state that where the defense has failed to move to suppress or to object to admission, "the defense may not raise the issue at a later time except as permitted by the military judge for good cause shown. Failure to so move or object constitutes a waiver of the objection." R.M.C. 304(c)(2)(A); *see also* R.M.C. 801(g) ("Failure by a party to raise defenses or objections or to make requests or motions" in a timely manner "shall constitute waiver thereof."). It is thus immaterial that Respondents did not "inform the court that they no longer wished to prosecute or proceed with their suppression motions," or that they did not make a "formal or even informal request of the court." Majority Op. 25.

That the waiver of all waivable motions was, by the terms of the PTAs, to take effect upon the court's acceptance of the guilty plea does not change this analysis. *See id.* at 29 (noting that "the promise[s] to waive motions [were] conditioned on a particular act that had not yet occurred when the Secretary withdrew from the agreements"). Of course, "[t]here is no doubt that a plea of guilty implicitly waives" a number of waivable rights. *United States v. Cowles*, 16 M.J. 467, 468 (C.M.A. 1983) (right against self-incrimination); R.M.C. 910(j) ("[A] plea of guilty which results in a finding of guilty waives any objection, whether or not previously raised, insofar as the objection relates to the factual issue of guilt of the offense(s) to which the plea was made."); R.M.C. 304(c)(5) ("[A] plea of guilty to an offense that results in a finding of guilty waives all . . . motions and objections under this rule

69

with respect to that offense regardless of whether raised prior to plea."); *see also Joubert*, 75 F.3d at 1248; *United States v. Arango*, 966 F.2d 64, 66 (2d Cir. 1992).

But while the legal effect of a guilty plea is to waive all waivable motions, an accused may still voluntarily waive such motions prior to pleading guilty. And Rule 705(d)(4)(B), as emphasized earlier, is not concerned with the completion of performance (*i.e.*, actual waiver), but rather the *beginning* of performance (*i.e.*, conduct undertaken pursuant to a promise to waive). Respondents' strategic decision to refrain from cross-examination began performance: They began "to refrain from pressing" their pending motions in anticipation of the acceptance of their guilty pleas. *See Waive*, OXFORD ENGLISH DICTIONARY (last modified Sept. 2024), https://www.oed.com/dictionary/waive_v1?tl=true [https://perma.cc/9Y9KVX3L].

The majority agrees that Respondents could voluntarily waive any motions prior to pleading guilty, Majority Op. 29, but protests that "just because one party performs prematurely does not mean that the other party's own contractual rights change if the contract was for performance at a specified time," *id.* This may very well be true under the common law of contracts. But the majority does not explain why we should read R.M.C. 705(d)(4)(B) as wholly constrained by the common law. *Cf. United States v. Burwell*, 122 F.4th 984, 994 (D.C. Cir. 2024) (rejecting government's argument that "Congress imported extortion's common law tradition wholesale into the bank robbery statute" absent any evidence of such legislative intent). Contract principles are only illuminating to the extent that they shed light on the scope of legal terms of art contained in the Rule, such as "performance" or "promise," derived from the common law. *See Scheidler v. Nat'l Org. for Women, Inc.*, 537 U.S. 393, 402 (2003) ("Absent

70

contrary direction from Congress, we begin our interpretation of statutory language with the general presumption that a statutory term has its common-law meaning."). Where drafters have expressed no intent to cabin their remedies to those available at common law, the common law does not reach from the grave to constrain the outcome.[14]  *See supra* Part III.B.

The majority (and the government) protest that "the prosecutor's atextual reading of the pretrial agreements cannot change what the contract means."  Majority Op. 27; Pet'r Reply 12–14.    In other words, they reject reliance on the government's concession before the Military Judge that Respondents' refraining from cross-examining the witness at the suppression hearing was required by the promises they made in the PTAs.  Majority Op. 27.

Yet, as shown above, there was nothing textually unanchored about the prosecutor's understanding of the waiver language in the PTAs.  Furthermore, even if this line of reasoning had some merit, it only advances the majority's

---

[14] *Prudential Insurance Co. of America v. Rand & Reed Powers Partnership*, cited by the majority, is consistent with this point.  141 F.3d 834 (8th Cir. 1998).  There, the Eighth Circuit "recogniz[ed] the common law 'perfect tender in time' rule to reject premature performance as performance" under a statutory provision, Majority Op. 29 (quoting *Prudential Ins.*, 141 F.3d at 836), but did so because the Iowa Supreme Court had reaffirmed the application of the common-law rule following the enactment of the statute, *see Prudential Ins.*, 141 F.3d at 836.  The Eighth Circuit's recognition of the common-law rule followed from its textual interpretation of the statutory provision, which it reasoned did not create any absolute rights and was thus amenable to limitation by common-law principles.  *Id.*  By contrast, here, the majority does not attempt to reconcile its contention that the common law constrains R.M.C. 705(d)(4)(B) with the plain text of the Rule.

71

conclusion as to the scope of the relevant *promise* in the PTAs. And assuming the relevant promise is as narrow as the majority suggests (*i.e.*, limited to filing a formal waiver of all waivable motions), the majority's reasoning does not undermine the Military Judge's analysis applying the Rule 705(d)(4)(B) standard to such a promise to determine whether Respondents *began performance*. It further fails to engage with what it means to "waive" a motion, which includes refraining from prosecuting a motion. Again, the scope of a promise to "waive all waivable motions" is most properly considered a question of fact, and yet the Majority fails to apply the clear error standard of review.

Similarly, the majority dismisses the statement by Al Hawsawi's counsel as insufficient to perform the promise to withdraw, *cf. id.* at 27 ("[S]aying so . . . is not the same thing as actually beginning perform[ance] . . . ."), but never explains why it was improper for the Military Judge to consider this evidence to determine whether Respondents had *begun* performing by refraining from prosecuting the motion. *See supra* Section II.A (describing trial court's unique role in assessing the conduct before him and weighing credibility). After all, as described above, to "waive" is to "refrain." The prosecutor was intimately familiar with the PTAs, and he believed that if the accused questioned the witness, they would be in breach of the agreements. Al Hawsawi's counsel represented that he refrained from questioning the witness because he understood cross-examination to be a step in furtherance of breach.

The Court also places unwarranted emphasis on the Military Judge's statement that, if the PTAs fell through, Respondents would have another chance to cross-examine the witness. *Id.* at 25–27, 30. Holding their motions in abeyance was nothing more than a trial judge wisely managing his

72

docket. Why in the world would the Military Judge immediately treat Respondents' motions as having been fully withdrawn at this juncture, so that their motion hearings would have to start all over again from the beginning, if, for some reason, their guilty pleas were not accepted at a later date? At best, we can consider the Military Judge's statement as attempting to minimize harm to Respondents if the PTAs were not eventually accepted by the court. Such mitigation efforts could weaken a detrimental reliance claim in contract, but this point has no relevance to whether Respondents began performing under Rule 705(d)(4)(B). Finally, even if we understand the Military Judge to have "kept those motions alive pending further proceedings" such that "[n]othing was terminated or withdrawn," *id.* at 26, this at most suggests Respondents may not have fully performed. But again, the proper inquiry is whether Respondents had *begun* performing. *See infra* Section IV.B.

The majority nowhere explains why it is clear and beyond dispute that the Military Judge erred in concluding that when Respondents refrained from cross-examining the witness, such inaction constituted a first step to "waive all waivable motions." Based on the text of the agreements, military justice caselaw on waiver, and the authoritative regulations, Respondents began performance of their promise to waive all waivable motions. Against this wealth of authority, I cannot join the majority's unreasoned holding to the contrary. The government has not carried its heavy burden.

**2.**

A second promise also supports the Military Judge's decision. Respondents each promised to "move to withdraw all pending motions." Mohammed PTA¶ 23; *see also* bin 'Atash PTA¶ 22 (same); Al Hawsawi PTA¶ 23 (same). Their

73

decision to forego cross-examining the witness at the suppression hearing constituted beginning performance of this promise.

Starting again with the text, the majority correctly notes that "move to withdraw" means "telling the court that a request for some type of relief is abandoned and will no longer be pursued." Majority Op. 24. More specifically, "move" means "[t]o make an application (to a court) for a ruling, order, or some other judicial action," *Move*, BLACK'S LAW DICTIONARY (12th ed. 2024), and "withdraw" means "[t]o refrain from prosecuting or proceeding with (an action)," *Withdraw*, BLACK'S LAW DICTIONARY (12th ed. 2024). To begin performance of such a promise, then, Respondents must have taken some action pursuant to seeking judicial action that would allow them to refrain from prosecuting a pending motion. By accepting the government's characterization of the PTAs, refraining from questioning the witness at the suppression hearing, and then reiterating the shared understanding of the scope of the agreements the following day, Respondents' counsel took steps towards withdrawing their pending motions to suppress by failing to prosecute them.[15] The Military Judge's conclusion was thus not clearly and indisputably erroneous.

The majority rightly notes that to *complete* performance of this promise, Respondents would likely need to make an oral or written motion. *See* Majority Op. 25 ("They made no formal

---

[15] The majority characterizes this conduct as "silent acquiescence" and "silent inaction." Majority Op. 28; *see also id.* at 27, 30. But it provides no further explanation as to why, under these particular circumstances and based on the unusual inaction and representations of various counsel, the Military Judge clearly erred in concluding that such silent acquiescence began performance.

74

or even informal request of the court that could amount to moving to withdraw a motion or even beginning to do so."). But again, Rule 705(d)(4)(B) forbids withdrawal in circumstances short of completed performance. The Court's contrary reasoning thus collapses the distinction between "begin[ning] performance" under R.M.C. 705(d)(4) and concluding performance. Such analysis is atextual because it fails to give effect to the term "begins." *Cf. Fischer v. United States*, 603 U.S. 480, 486 (2024) ("[W]e must give effect, if possible, to every clause and word of the statute.") (cleaned up)); *United States v. Hunter*, 65 M.J. 399, 402 (C.A.A.F. 2008) (applying principle to interpretation of a Rule for Courts-Martial). It also lacks support in the text and history of R.M.C. 705(d)(4). *See supra* Section III.B.1. As discussed, the Rule precludes withdrawal not only upon completed performance, but also once a party takes steps towards performing. That "Respondents' pending motions were preserved for future action" thus does not govern the applicability of R.M.C. 705(d)(4)(B). *See* Majority Op. 26.[16]

For these reasons, the government has come nowhere close to establishing, clearly and indisputably, that the Military Judge erred in concluding that Respondents began performance of

---

[16] Nor would I assign any weight to whether defense counsel used talismanic words, such as "motion" or "withdraw." *Cf.* Majority Op. 24–25. Judicial review requires us to look at the factual findings and record below and apply the law to what transpired, including by analyzing whether what happened maps on to a legal standard. *Cf. United States v. Abney*, 957 F.3d 241, 248 (D.C. Cir. 2020) ("We do not require defendants or their counsel to invoke magic words or talismanic language . . . when the party asked the court for the desired judicial action."). And here, our review of what occurred below is circumscribed by the deference we owe to the Military Judge's factual findings. *See supra* Part II.

75

promises contained in the PTAs when they refrained from cross-examining the witness at the suppression hearing.

**V.**

Against the weight of authority, the government insists there was no "promise" that Respondents began to perform. *See* Pet. 17. That view is contradicted by the parties' collective decision to write promissory language into the agreement, the parties' further agreement to frame the failure to enter stipulations as a material breach, the way both sides characterized the PTAs during negotiations, the conclusions that the Military Judge reached, and the view of the CMCR. However the promise is construed, Respondents began performance under the Rule by signing the factual stipulations. And by refraining from cross-examining a witness at the motion to suppress hearing, they similarly began performance of their promises to waive all waivable motions and to move to withdraw pending motions.

It is impossible for me to conclude that the government has shown it is clearly and indisputably entitled to relief. That demanding mandamus standard is even further out of the government's reach where the government cannot cite binding on-point precedent in support of its claims and we are constrained to reviewing for clear error both the Military Judge's finding that the PTAs encompassed the relevant promises and his application of the withdrawal regulation. But even on *de novo* review of those findings, the government has not met its burden.

I respectfully dissent.