ARGUED JANUARY 28, 2025

**UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

In re: United States of America,

*Petitioner*.

**Case No. 25-1009**

**Respondents Walid bin 'Atash and
Mustafa al Hawsawi's Motion for
Recusal and/or Disqualification of
Judge Katsas**

**Sept. 24, 2025**

Respondents Walid bin 'Atash and Mustafa al Hawsawi respectfully move for the recusal and/or disqualification of the Honorable Gregory G. Katsas from sitting as a judge in this case and taking part in the proceedings in any way, including considering their petitions for rehearing *en banc*.

Judge Katsas's recusal is required on two grounds specified in the federal disqualification statute, 28 U.S.C. § 455. First, Judge Katsas has manifested actual bias under § 455(b)(3), having "expressed an opinion concerning the merits of the particular case" in his declarations that Respondents are terrorists guilty of planning the 9/11 attacks and public conclusions about key, and potentially outcome-determinative, issues in their prosecution. Second, "his impartiality might reasonably be questioned," under § 455(a) due to his statements that would cause a reasonable person to doubt his ability to review this case without bias or

prejudice.  Upholding an appearance of impartiality is all the more important in a capital case like this one, which demands heightened reliability at all critical stages of the proceedings.  *See Caldwell v. Mississippi*, 472 U.S. 320, 340 (1985).

**I.     Judge Katsas's Recusal Is Required Under 28 U.S.C. § 455(b)(3) Because He Has Prejudged Respondents' Guilt and Major Issues Affecting the Merits of This Case.**

This Court has already held *in this case* that strikingly similar statements by a judge of the U.S. Court of Military Commission Review ("CMCR") compelled his recusal.  In *In re Mohammad*, this Court issued a writ of mandamus directing CMCR Judge Scott L. Silliman to recuse himself due to statements in which he called Respondents "'the major conspirators in the 9/11 attacks'" and referred to the "'magnitude of *what they did*.'"  866 F.3d 473, 476 (D.C. Cir. 2017) (emphasis in *In re Mohammad*).  Those statements ran afoul of § 455's analog, Rule for Military Commissions 902(b)(3), which requires recusal where a judge "has expressed an opinion concerning the guilt or innocence of the accused."  This Court could "hardly perceive how calling [Mr. Mohammad] one of the 'major conspirators in the 9/11 attacks' and referring to what he 'did' is anything *other* than the expression of an opinion concerning his responsibility for those attacks."  *In re* Mohammad, 866 F.3d at 477 (emphasis in original).

Like Judge Silliman, Judge Katsas has also "expressed an opinion that [Mr. Mohammad] is guilty of the very crimes of which he is accused."  *Id.* at 475–

477.[1]  Mr. Mohammad was the "principal architect of the September 11, 2001

attacks," then-Assistant Attorney General Katsas wrote in 2008 in support of the

continued detention of another Guantanamo detainee whose one alleged meeting

with Mr. Mohammad was cited by the government to justify that detainee's

continued detention.  Amended Factual Return at ECF p. 7, *Anam v. Obama*,

No. 1:04-CV-01194 (HHK) (D.D.C. July 29, 2009), ECF No. 538-1.[2]  The next

year, Judge Katsas, as a private citizen, gave a speech "about some of the legal

aspects of the Global War on Terror, particularly as related to detainees," from the

"perspective of a Department of Justice litigator who was involved in defending a

lot of the challenges to the detainee policies, and to a lesser extent, involved in

counseling some of the policymakers within the Executive Branch."  Gregory

Katsas, "Legal Aspects of [the] War on Terrorism," Amherst College (Apr. 4,

2009) ("Amherst Lecture"), 0:07–1:13.[3]  In that speech, former Principal Deputy

---

[1]  Not only did former Assistant Attorney General Katsas affirm the guilt of Mr. Mohammad, but also he claimed it was appropriate to subject all Arab Muslims to greater law enforcement scrutiny "given the religion and religiously motivated animus of the people who attacked us."  *Access to Justice Denied: Ashcroft v. Iqbal:  Hearing Before the Subcomm. on the Const., Civil Rights, & Civil Liberties of the H. Comm. on the Judiciary*, 111th Cong. 100 (2009), congress.gov/111/chrg/CHRG-111hhrg53090/CHRG-111hhrg53090.pdf.

[2]  Copy available at s3.amazonaws.com/propublica/assets/detention/gitmo/government_allegations_madwani.pdf.

[3]  Available at amherst.edu/media/view/116591/original/GregKatsas.mp3 [perma.cc/M86X-6FB5].

Associate Attorney General Katsas called Mr. Mohammad "the mastermind of the September 11 attacks" and a "real al Qaeda kingpin[]." *Id.* 24:41–24:48. He also averred that Respondents were among the "most dangerous members of al Qaeda in American custody—the Khalid Sheikh Mohammads of the world." *Id.* 41:23–41:30. At a 2008 hearing of the House Committee on Armed Services, then-Assistant Attorney General Katsas also opined on the guilt of Respondents' co-accused, Ramzi bin al Shibh,[4] calling him a "terrorist[]" who must be "brought to justice" via military commission for his alleged role as a "principal facilitator of the September 11 attacks." *Implications of the Supreme Court's Boumediene Decision for Detainees at Guantanamo Bay, Cuba: Administration Perspectives: Hearing Before the H. Comm. on Armed Servs.*, 110th Cong. 6 (2008).[5]

If Judge Silliman's statements about Mr. Mohammad's guilt were sufficient to meet the "daunting" mandamus standard, which required showing a "clear and indisputable" right to his recusal, *In re Khadr*, 823 F.3d 92, 100 (D.C. Cir. 2016), then Judge Katsas's equally conclusory statements about Mr. Mohammad's guilt and Respondents' dangerousness establish the necessity of his recusal under 28 U.S.C. § 455(b)(3).

---

[4]    Mr. bin al Shibh's case is currently severed pending competency proceedings. *In re Mohammad*, 762 F. Supp. 3d 1183, 1185–1186 (C.M.C.R. 2024).

[5]    Available at govinfo.gov/content/pkg/CHRG-110hhrg48893/pdf/CHRG-110hhrg48893.pdf.

4

Beyond opining on Respondents' guilt, Judge Katsas has also expressed hardened views on key issues "concerning the merits of th[is] particular case in controversy." 28 U.S.C. § 455(b)(3). "Merits" sweeps broader than the narrower concept of guilt or innocence at issue in *In re Mohammad*. For example, "opinions about the credibility of witnesses, the validity of legal theories, the culpability of the defendant, the choice of remedy, and so forth all deal[] with the merits of the action." *United States v. Microsoft Corp.*, 253 F.3d 34, 112 (D.C. Cir. 2001) (en banc) (per curiam) (concluding that district judge "breached his ethical duty under Canon 3A(6)" of the Code of Conduct for United States Judges, which, like 28 U.S.C. § 455(b)(3), bars judges from speaking publicly "on the merits of a pending or impending action"). In commenting on the rights of the accused, the proper forum for their prosecution, and whether their treatment by the CIA amounted to torture, Judge Katsas "disclosed his views on the factual and legal matters at the heart of th[is] case." *Id.* Though remarks made prior to becoming a judge do not violate the Code of Conduct for United States Judges, remarks made while Judge Katsas was an Executive Branch official come squarely within 28 U.S.C. § 455(b)(3). Moreover, even when speaking as a private citizen, Judge Katsas lent the imprimatur of a government official by noting that he was giving his remarks "from the perspective of a Department of Justice litigator who was involved in defending a lot of the challenges to the detainee policies, and to a

5

lesser extent, involved in counseling some of the policymakers within the

Executive Branch."  Amherst Lecture 0:55–1:13.

Judge Katsas has publicly argued that extending constitutional protections to

Respondents would be "absurd."  Amherst Lecture 45:40–45:42.  "[A]liens who

are not in the United States and whose only possible connection to the United

States is a desire to wage war against it[] cannot invoke Constitutional rights

against the United States," then-Principal Deputy Associate Attorney General

Katsas said at a judicial conference in 2007, referring specifically to Guantanamo

detainees.  Exhibit A (Gregory Katsas, Questionnaire for Judicial Nominees,

Attachments to Question 12(e), U.S. Senate Committee on the Judiciary, 2017

("Questionnaire Attachments")), at A-2674.[6]  Requiring "Miranda warnings for

Mr. Mohammad before his interrogation" would be a "nightmare," he told the

House Armed Services Committee the same year while advocating for prosecution

by military commission.  *Upholding the Principle of Habeas Corpus for*

*Detainees:  Hearing Before the H. Comm. on Armed Servs.*, 110th Cong. 73

(2007).[7]  Military commissions were superior to trial in federal court because of

---

[6]  Of note, this Court has yet to reach the question of whether procedural and/or
substantive protections of the Fifth Amendment's Due Process Clause apply to
Guantanamo detainees.  *Al-Hela v. Biden*, 66 F.4th 217, 222 (D.C. Cir. 2023)
(en banc).  Judge Katsas recused himself from participating in *Al-Hela*.

[7]  Available at congress.gov/110/chrg/CHRG-110hhrg45067/CHRG-
110hhrg45067.pdf.

6

the "greater risk" that Respondents would have more rights in the latter, Judge Katsas remarked as a private citizen.  Exhibit B (Questionnaire Attachments) at A-2538.[8]  "If you don't try Khalid Sheikh Mohammed by military commission, I don't know who you try," he mused.  Mark Sherman, *Terror Trials Differ in Military, Civilian Courts*, ASSOCIATED PRESS (Nov. 22, 2009).[9]

Judge Katsas has also made numerous statements about Respondents' torture by the U.S. Government.  At a 2007 House Judiciary Committee subcommittee hearing, then-Principal Deputy Associate Attorney General Katsas spoke out against "ratchet[ing] up the protections at Guantanamo Bay with respect to . . . how we treat individuals there."  *Habeus* [sic] *Corpus and Detentions at Guantanamo Bay:  Hearing Before the Subcomm. on the Const., Civil Rights, & Civil Liberties of the H. Comm. on the Judiciary*, 110th Cong. 113 (2007).[10]  "I don't think the United States has anything to be ashamed about," he added.  *Id.*  Only months

---

[8]  *See also* Amherst Lecture 1:04:10–1:04:18 ("Do you bring them into the United States?  That creates security problems.  It gives them claims to greater legal rights.").

[9]  Copy available at cantonrep.com/story/news/2009/11/22/terror-trials-differ-in-civilian/42589664007.  *See also* Amherst Lecture 1:06:33–1:07:03 ("The President, through his surrogates, is dumping on military commission prosecutions.  Don't know what else he has in mind, but there's a lot of suggestion that he wants Article III prosecutions.  And if you think that the habeas problems that I just described for detention decisions are bad, multiply that by ten, and you'll have what we would face trying to go forward with traditional criminal prosecutions.")

[10]  Available at congress.gov/110/chrg/CHRG-110hhrg36345/CHRG-110hhrg36345.pdf.

earlier, reports surfaced of Guantanamo detainees being chained by hand and foot in fetal positions for 18 hours or more, urinating and defecating on themselves. Mark Tran, *FBI Files Detail Guantánamo Torture Tactics*, THE GUARDIAN (Jan. 3, 2007), theguardian.com/world/2007/jan/03/guantanamo.usa.

In addition, Judge Katsas has lauded his former colleagues at the Department of Justice who "went about the hard and thankless and necessary task of figuring out what [interrogation] techniques" would and would not constitute torture when used by the Department of Defense and CIA. Amherst Lecture 22:28–22:39. "None of the techniques authorized for the Defense Department *or otherwise* came close to" violating the federal criminal prohibition on torture," he continued. *Id.* 23:01–23:09 (emphasis added). "The whiff of alleged bad treatment is grossly overstated at best, if not outright false," he insisted. *Id.* 1:12:19–1:12:31; *see also id.* 1:26:56–1:27:06 ( "stories of detainee mistreatment" were "overstated at best").

Judge Katsas's statements about the interrogation techniques used on Respondents stand in stark contrast to the findings of two military judges, the CMCR sitting *en banc*, and a panel of military officers who have considered the treatment of other high-value detainees in the CIA's interrogation program. In this case, the military judge concluded that Respondents' co-accused, Mr. Ali Abdul Aziz Ali, "was subjected to physical coercion and abuse amounting to torture."

8

*See United States v. Mohammad*, Appellate Exhibit 942SSSS (Ruling) at 60 (Apr. 11, 2025).[11]  Another military judge reached the same conclusion in *United States v. Al Nashiri*, *see* Appellate Exhibit 467CCC (Ruling) at 18 (Aug. 18, 2023),[12] which the CMCR, sitting *en banc*, unanimously upheld, *Untied States v. Al-Nashiri*, 764 F. Supp. 3d 1127 (C.M.C.R. 2025).  In *United States v. Khan*, after hearing testimony from Majid Khan about his years in CIA custody, seven of eight military officers on the panel urged the convening authority to grant clemency because Mr. Khan's treatment was "closer to torture performed by the most abusive regimes in modern history," "a stain on the moral fiber of America," and "a source of shame for the U.S. government."[13]

Whether Respondents were tortured goes straight to the merits of this case. It has dominated pretrial litigation in the commission over the admissibility of Respondents' confessions to law enforcement, which the prosecution has deemed "some of the most critical evidence in this case."  J.A. 122.  The military judge in this case suppressed the confessions of Respondents' co-accused, Mr. Ali, in part because "the torture of Mr. Ali is so absurdly far outside the norms of what is expected of U.S. custody preceding law enforcement questioning."  *United States*

---

[11]  Available at mc.mil/Portals/0/pdfs/KSM2/AE942SSSS(Rulingv2)).pdf.

[12]  Available at int.nyt.com/data/documenttools/ruling-in-u-s-s/63627427c1a86144/full.pdf.

[13]  *United States v. Khan*, Clemency Letter at 2, Oct. 19, 2021, available at nytimes.com/interactive/2021/10/31/us/khan-clemency-letter.html.

*v. Mohammad*, Appellate Exhibit 942SSSS (Ruling), *supra*, at 89.  Further, if the final adjudication of their pretrial agreements renders those agreements null, and the case proceeds capitally, Respondents' treatment in U.S. custody may very well convince a panel member to vote for a sentence other than death.  But even if the case proceeds otherwise, torture undoubtedly will be a centerpiece of their mitigation presentations at sentencing.

All of Judge Katsas's aforementioned statements on Respondents' guilt, their status as terrorists, their rights, the appropriateness of military commissions prosecutions, and their treatment at the hands of the United States demonstrate actual bias against Respondents in the form of "opinions concerning the merits of th[is] particular case in controversy" that require his recusal under 28 U.S.C. § 455(b)(3).

## II.    Judge Katsas's Recusal Is Required Under 28 U.S.C. § 455(a) Because His Statements About Respondents, the Commissions, and Their Treatment in U.S. Custody Create an Appearance of Bias.

"[B]oth the appearance and reality of impartial justice are necessary to the public legitimacy of judicial pronouncements and thus to the rule of law itself." *Williams v. Pennsylvania*, 579 U.S. 1, 16 (2016).  Because "bias is easy to attribute to others and difficult to discern in oneself," *id.* at 8, even an appearance of bias warrants recusal under § 455(a), which mandates recusal "in any proceeding in which [the judge's] impartiality might reasonably be questioned."  This Court has

10

not hesitated to step in and remedy an appearance of bias on the part of judges in the military commissions.  In *In re Al-Nashiri*, another capital case, this Court granted a writ of mandamus and vacated more than two years' worth of the military judge's rulings for violating Rule for Military Commissions 902(a), the commissions analog of § 455(a).  921 F.3d 224, 240–241 (D.C. Cir. 2019).  "Unbiased, impartial adjudicators are the cornerstone of any system of justice worthy of the label," this Court emphasized.  *Id.* at 233–234.  This is especially so in a capital case like this one, in which courts must be "particularly sensitive to ensure that every safeguard is observed."  *Id.* at 239 (internal quotation marks omitted).

The benchmark under § 455(a) is not "whether a judge harbors an actual, subjective bias, but instead whether, as an objective matter, the average judge in his position is likely to be neutral, or whether there is an unconstitutional potential for bias."  *Caperton v. A. T. Massey Coal Co.*, 556 U.S. 868, 881 (2009).  Stated differently, recusal is mandated when a "reasonable and informed observer would question the judge's impartiality."  *Microsoft*, 253 F.3d at 114.

Recusal cannot be excused by the presence of other non-biased members on the panel.  In *Williams*, the Supreme Court vacated a death sentence due to an appearance of partiality on the part of just one of the six members of the Pennsylvania Supreme Court.  579 U.S. at 4.  "A multimember court must not have

11

its guarantee of neutrality undermined, for the appearance of bias demeans the reputation and integrity not just of one jurist, but of the larger institution of which he or she is a part." *Id.* at 15.

Cumulatively, Judge Katsas's public comments would cause a "reasonable and informed observer" to "question the judge's impartiality." *Microsoft* 253 F.3d at 114. A warning that Mr. Mohammad and "people like that" must be "ke[pt] . . . out of our major cities," which then-Principal Deputy Associate Attorney General Katsas made to the House Armed Services Committee in 2007, *Upholding the Principle*, *supra*, at 73, and his other statements are not the ruminations of an "open mind" that is "capable of refining his views" towards Respondents and this case. *S. Pac. Commc'ns v. AT&T*, 740 F.2d 980, 991 (D.C.Cir.1984). Rather, they evince an "irrevocably closed mind" that has singled out Respondents as guilty and less worthy of rights. *See id.* at 992 (internal quotation marks omitted).

Judge Katsas's statements also reveal a disdain for counsel who represent alleged terrorists. He has reflected that, back in 2002, "[i]t hadn't really become fashionable yet for American lawyers to represent those trying to kill us." Amherst Lecture 25:19–25:26. He also stated that he "often wondered about how it is we live in a legal and political culture in which the lawyers who represent the military and intelligence operations of this country in time of war at best are ignored, at worst are vilified, if not persecuted and prosecuted, and the lawyers who represent

the people trying to kill us are put on a pedestal as heroes." *Id.* 1:13:48–1:14:23.[14]

He even suggested—citing no evidence—that attorneys representing Guantanamo

detainees never charged with any wrongdoing had conspired in the "coordinated

suicides" of certain detainees by "facilitat[ing]" their "communicating through

legal mail." *Id.* 31:27–31:43.

Judge Katsas clearly has deeply held feelings that have personally affected

his view of Respondents and the charges against them.  More than seven years

---

[14]  Immediately after making this statement, Judge Katsas related that the former
Deputy Assistant Secretary of Defense for Detainee Affairs, Charles "Cully"
Stimson, "made this point in a pretty colorful public way a couple of years ago
and not only did no one rally to his defense but he was forced out of his job for
even saying that."  Amherst Lecture 1:14:23–1:14:40.  Judge Katsas was
referring to the interview Mr. Stimson gave in January 2007 in which he said,
"[S]omebody asked, 'Who are the lawyers around this country representing
detainees down there?' and you know what, it's shocking."  He went on to list
more than a dozen of the "major law firms in this country" representing
Guantanamo detainees in federal habeas cases.  He then said, "I think, quite
honestly, when corporate CEOs see that those firms are representing the very
terrorists who hit their bottom line back in 2001, those CEOs are going to make
those law firms choose between representing terrorists or representing reputable
firms, and I think that is going to have major play in the next few weeks.  And
we want to watch that play out."  Neil A. Lewis, *Official Attacks Top Law
Firms Over Detainees*, N.Y. TIMES (Jan. 13, 2007),
nytimes.com/2007/01/13/washington/13gitmo.html.  Public backlash was swift.
Approximately one week later, Mr. Stimson apologized:  "Regrettably, my
comments left the impression that I question the integrity of those engaged in
the zealous defense of detainees in Guantánamo.  I do not."  Sarah Abruzzese,
*Pentagon Aide Regrets Stance on Law Firms for Detainees*, N.Y. TIMES (Jan.
18, 2007), nytimes.com/2007/01/18/washington/18gitmo.html.  Judge Katsas
has never publicly expressed regret for his statements about lawyers who
represent Guantanamo detainees.

after September 11, 2001, Judge Katsas became audibly emotional when discussing the attacks, saying, "Sorry, I lived through it." *Id.* 6:43–6:47.  In light of Judge Katsas's other remarks, an objective person hearing the audio recording of this statement would reasonably believe his feelings about the case are so strong that he may succumb to the "possible temptation" "not to hold the balance nice, clear and true." *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 822 (1986); *Tumey v. Ohio*, 273 U.S. 510, 532 (1927).

To sum up, Judge Katsas's litany of statements prejudging Respondents' guilt, their dangerousness, issues central to the merits of their case, and their counsel's advocacy, as well as his strong emotional reaction to the crimes of which they are accused, create an appearance of bias that is incompatible with the fair administration of justice.  "Appearance [of bias] may be all there is, but that is enough" to disqualify a judge.  *Microsoft*, 253 F.3d at 115.  This is true where the stakes are merely money, *id.*, and even more true when it is a matter of life and death.  *See Al-Nashiri*, 921 F.3d at 239 ("In no proceeding is the need for an impartial judge more acute than one that may end in death.").  Judge Katsas's recusal therefore is required under 28 U.S.C. § 455(a).

## CONCLUSION

If ever there were a case in which a judge has demonstrated an inability to dispense justice "faithfully and impartially," 28 U.S.C. § 453, it is this one.

Accordingly, Respondents bin 'Atash and al Hawsawi respectfully move for his recusal and/or disqualification from sitting as a judge in this case and taking part in the proceedings in any way, to include disposing of his petition for rehearing this case *en banc*.

Respectfully submitted,

*Counsel for Respondent Mr. bin 'Atash*

/s/
MATTHEW L. ENGLE
Learned Counsel

/s/
EDWIN A. PERRY
Detailed Defense Counsel

/s/
WILLIAM R. MONTROSS Jr.
Detailed Defense Counsel

/s/
ANISHA P. GUPTA
Detailed Defense Counsel

/s/
TASNIM MOTALA
Detailed Defense Counsel

/s/
DANIEL M. GOLDBERG
Lieutenant Colonel, JA, USA
Detailed Military Defense Counsel

/s/
MARIAN D. MESSING
Captain, JA, USAR
Detailed Military Defense Counsel

/s/
AUSTIN W.R. RIDGEWAY
Lieutenant, JAGC, USN
Detailed Military Defense Counsel

*Counsel for Respondent Mr. al Hawsawi*

/s/                                             /s/
WALTER B. RUIZ                                  SUZANNE M. LACHELIER
Learned Counsel                                 Detailed Defense Counsel

/s/                                             /s/
SEAN M. GLEASON                                 NICHOLE K. TIMMRECK
Detailed Defense Counsel                        Major, JA, USAF
                                                Detailed Military Defense Counsel

16

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

1. This motion for recusal and/or disqualification complies with the word-volume limit of Fed. R. App. P. 27(d)(2)(A) because, excluding parts exempted by Fed. R. App. P. 32(f):

   This motion contains 3,427 words.

2. This motion for recusal and/or disqualification complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because:

   This motion has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

   /s/
   MATTHEW L. ENGLE
   Learned Counsel for Mr. bin 'Atash
   Dated:  Sept. 24, 2025

## CERTIFICATE OF SERVICE

I certify that on September 24, 2025, this motion for recusal and/or disqualification and its exhibits were served via this Court's CM/ECF system on all counsel who appear for the parties.

/s/
EDWIN A. PERRY
Counsel for Mr. bin 'Atash
Military Commissions Defense Organization
1620 Defense Pentagon
Washington, D.C. 20301-1620
edwin.a.perry5.civ@mail.mil
703-571-0670

# Exhibit A



1    THE ASSOCIATION OF THE FEDERAL BAR    A-2668

2        OF THE STATE OF NEW JERSEY

3

4        TRANSCRIPT OF PROCEEDINGS

5

6            THE

7        THIRTY-FIRST ANNUAL

8    UNITED STATES JUDICIAL CONFERENCE

9    FOR THE DISTRICT OF NEW JERSEY

10

11    LITIGATION IN AN AGE OF TERRORISM

12    THE GUANTANAMO CASES AND YOUR

13        RIGHTS IN TIME OF WAR

14            and

15        CIVILITY IN THE COURTS:

16    VIEWS OF THE BENCH AND BAR

17

18

19        Mayfair Farms

20    West Orange, New Jersey

21

22        March 22, 2007

23

24

25    Reported by Stanley B. Rizman, C.S.R.





**Rizman Rappaport Dillon&Rose,LLC**
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

**2**

1    MR. POPLAR: My name is Carl Poplar. I'm
2  the President of the Association of the Federal Bar
3  for the District of New Jersey. I'd like to welcome
4  you all to our 31st Annual Judicial Conference.
5        We're all very fortunate in the practice
6  in the District of New Jersey. There may be other
7  districts in the country that rival us for the quality
8  of our judges and civility and professionalism that we
9  conduct ourselves in within the district. But there
10  is none -- there is no other district that does what
11  we do here in New Jersey.
12        For the years that I've practiced in this
13  district, I've come to recognize that we have a very
14  special cultural -- culture of just doing it right.
15        One of the benefits of programs like this
16  is it gives us an opportunity to meet and greet our
17  sisters and brothers who practice in the federal court
18  and also meet and greet our judges.
19        Thanks to Judge Brown there is going to
20  be a January meeting. So all or most of our judges
21  will be present today. When our judges are not
22  sitting here and behind the barrier called the bench
23  or wearing the robes and we have a chance to meet and
24  greet with them, we find that most of them, if not all
25  of them, are pretty decent people.

**3**

1        (Laughter.)
2        MR. POPLAR: Larry Lustberg, who is the
3  coordinator for the program this morning and moderator
4  of the first panel yesterday was on his feet
5  delivering a summation in a multi-month trial so we
6  went -- I would like to extend special thanks to
7  Larry.
8        The first program that we have is
9  extraordinarily current, extraordinarily interesting.
10  The speakers, I understand, have a great background in
11  the type of information they have.
12        We have a luncheon afterwards. We have a
13  very entertaining speaker, very substantive speaker.
14  We'll talk more about that later. But because of the
15  time, I'd like to get started with the first panel.
16        I'd like to introduce Larry Lustberg.
17        (Applause.)
18        MR. LUSTBERG: Hi, everybody.
19        May it please the Court -- wait. That
20  was yesterday. This is -- our first panel today is on
21  litigation in an age of terrorism.
22        Particularly the Quantanamo experience
23  and how all of our rights are at stake in connection
24  with the litigation and the advocacy that is ongoing
25  in that area.

**4**

A-2669

1        We are extremely fortunate to have an
2  exceptional panel here today. I'm going to try to
3  keep this an informal and lively debate. And,
4  hopefully, we will leave some time at the end for
5  questions from everybody. But I think we all know
6  that after 9/11/2001, the landscape of the law and of
7  Constitutional law in particular was altered and
8  perhaps altered forever.
9        Whether that is a good thing or a bad
10  thing, whether we've properly balanced constitutional
11  rights and tradition.
12        Can you hear?
13        On the one hand, with national security
14  on the other is the purpose of our -- is the purpose
15  of our discussion today and we have people -- we are
16  very fortunate to have people from both sides of the
17  debate.
18        I want to quickly introduce them to you
19  before we get started. Directly to my left is Greg
20  Katsas. Greg has been an adversary of mine in a
21  number of these cases and is one of the absolute
22  smartest lawyers I've ever had the privilege and honor
23  to have worked with again.
24        Greg is a principal deputy to the third
25  ranking official, the Associate Attorney General in

**5**

1  the Department of Justice. In that capacity he has
2  supervised all or almost all of the relevant appeals
3  on the questions that have arisen from challenges to
4  administration positions regarding civil liberties in
5  the wake of 9/11 and in particular he was most
6  recently counsel in the case that is now pending on
7  petition for certiorari to the United States Supreme
8  Court of the D.C. Circuit's decision in either
9  Boumedienne v. Bush or Al-Odah versus Bush, however
10  you caption it, which held, in essence, that the
11  Congress could curtail the habeas corpus rights of
12  Quantanamo detainees.
13        To his left is my new friend. Lieutenant
14  Commander William Kuebler. Lieutenant Kuebler is from
15  the JAG. He graduated -- I should have given Greg's
16  pedigree. Good Harvard Law School graduate who
17  clerked for Judge -- late Judge Becker, a friend and
18  dear colleague of all of ours, and for Justice Thomas
19  on the Supreme Court.
20        Lieutenant Kuebler is in the JAG Corps
21  and is currently assigned to the Office of Chief
22  Defense Counsel in the Office of the Military
23  Commission in Washington, D.C.
24        Lieutenant Kuebler has been an
25  outspoken -- he has represented a detainee under very

2 (Pages 2 to 5)

**Rizman
Rappaport
Dillon&Rose,LLC**
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650  Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

A-2670

**Page 6**

1  difficult circumstances. This sometimes happens for
2  those of us who do this work. Even though we're
3  providing essential legal counsel, we're not
4  necessarily wanted or loved and he can tell you some
5  of his stories in that regard. But he has been an
6  outspoken advocate of maximum rights for detainees who
7  are facing these military commissions and processes.
8  He's an articulate and an experienced speaker.
9      To my right is my friend, Bahar Azmy,
10  professor at Seton Hall Law School. Bahar, with whom
11  I've had the opportunity to work on many occasions,
12  was the second person to my knowledge to have gone to
13  Quantanamo in an effort to meet and to represent a
14  detainee there, Guttierez, who wasn't able to be here
15  today -- who was working for us at Gibbons at the time
16  was the first. That detainee, whose name was -- what
17  is it?
18      MR. BAHAR: Mubat Kurnaz.
19      MR. LUSTBERG: Mubat Kurnaz was a German
20  national of Turkish decent.
21      After a number of years of advocacy Bahar
22  obtained his freedom. He has been released from
23  Quantanamo. Bahar has continued his advocacy working
24  on the many appellate issues that have arisen that
25  address questions of scope of habeas review, the

**Page 7**

1  meaning of the suspension clause and the retention of
2  our Constitutional rights in this day and age.
3      He's -- he runs the Constitutional
4  Civil Litigation Clinic at Seton Hall and teaches
5  constitutional law focusing on civil rights cases in
6  such areas as human trafficking, predatory lending,
7  and the like. An extraordinary attorney.
8      And to his right is Andrew McCarthy. Mr.
9  McCarthy is a former Assistant U.S. Attorney from the
10  Southern District of New York where he prosecuted the
11  terrorism case with regard to the 1993 World Trade
12  Center bombing. Since that time he's no longer
13  practicing law but is the Director of the Center for
14  Law and Counterterrorism at the Foundation for the
15  Defense of democracies, which is an independent
16  nonprofit organization in Washington dedicated to
17  defeating terrorism and promoting freedom. He is,
18  again, outspoken with respect to many of the issues
19  that confront us today. He believes that we should --
20  that the balancing should weigh more heavily in favor
21  of national security than civil liberties although I
22  don't want to characterize his position and I think
23  guarantees that will, in any event, have a very lively
24  debate here today.
25      I thought that -- for all of you who

**Page 8**

1  don't do this work -- and our firm has been proud to
2  do this work since its inception. I've been involved
3  in the civil liberties work around 9/11 issues since
4  9/12.
5      Judge Gibbons, as some of you may know,
6  my colleague and mentor in life, argued the Rasul case
7  which initially established the right of detainees to
8  seek habeas relief. But foremost -- we've been
9  involved as amicus or as litigants in cases ever
10  since. We've represented three detainees. Two of
11  whom are released and can talk a little bit about that
12  experience but that's not what I'm going to do.
13      I thought, though, for all of you that it
14  would be useful, at the outset, to just get a
15  five-minute primer on where the law is and how it has
16  evolved in that regard. For that I will turn it over
17  to Bahar and then comment to Greg about that.
18      We will start about learning a little bit
19  about the applicable law with respect to these issues.
20  Bahar.
21      MR. AZMY: So, a little bit of background
22  about Quantanamo and the status of the legal cases
23  there. Everybody in Quantanamo has been designated an
24  enemy combatant by the President. And about the 750
25  or so who have passed through Guantanamo and the 430

**Page 9**

1  detainees still there only ten have been charged with
2  any kind of crime or charged with the violation of the
3  laws of war and designated for trial by military
4  commissions will remain; the balance the President
5  claims the unilateral authority to detain indefinitely
6  until he believes the war on terrorism is over.
7      And it's one of those detainees, in that
8  group, Mubat Kurnaz, that I represented. So why
9  Guantanamo. I think having visited there five times
10  it is one of the strangest, in my view, most harrowing
11  places on earth.
12      I think Guantanamo was the choice driven
13  more by policy than law. That is, the administration
14  sought to find a place specifically outside the
15  jurisdiction of the United States courts. There is a
16  memo from December 2001 by an officer and counsel in
17  the Justice Department which specifically argues that
18  among the various places Guantanamo would be ideal for
19  situating America detention policy because it would be
20  outside the jurisdiction of the United States courts
21  and preserve, quote, the system that has been
22  developed, unquote.
23      I think that system is one in which the
24  administration wanted to conduct sort of endless
25  indefinite interrogations of terrorist suspects. And

3 (Pages 6 to 9)



**Rizman**
**Rappaport**
**Dillon&Rose**, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

10

1  what the courts do to that system -- why it wanted to
2  avoid the jurisdiction of the U.S. courts is because
3  with courts come lawyers and lawyers stop
4  interrogations and lawyers, I think, also inject
5  something that is the sort of central enemy of
6  Quantanamo -- The central concern of military planners
7  there, which is called hope. And so with that in mind
8  in 2002 a number of habeas corpus petitions were
9  brought in the District Court in D.C., the District
10  Court dismissed those petitions for lack of
11  jurisdiction.
12        It was affirmed by the D.C. Circuit and
13  the Supreme Court, of course, in the Rasul case in the
14  June of 2004 argued by Judge Gibbons held that
15  Guantanamo was sort of effectively United States
16  territory under the jurisdiction and control of the
17  United States and that, therefore, detainees could
18  file petitions for habeas corpus to challenge the
19  lawfulness of the detentions and remanded to the
20  district courts to hear those petitions on the merits.
21        It was at that point that I and a number
22  of other attorneys filed habeas petitions on behalf of
23  clients whose families have been waiting for the
24  Supreme Court adjudication.
25        At that point we had expected that we

11

1  would have sort of full habeas hearings. It is not an
2  Article III criminal trial but very basic procedural
3  and substantive hearings under -- to determine whether
4  or not there was sufficient legal or factual basis for
5  the detention.
6        In response to these petitions which were
7  consolidated, there were 65 -- the government did, I
8  think, two things. First, they instituted what are
9  called Combatant Status Review tribunals in Guantanamo
10  in order to, quote, sort of confirm the enemy
11  combatant status of the detainees and sort of operated
12  as a substitute to the writ. And they also moved to
13  dismiss the petition.
14        The argument was that Rasul was merely
15  sort of a narrow jurisdictional holding that
16  authorized detainees to file petitions. But that with
17  those petitions detainees had no substantive rights
18  whatsoever under the Constitution or under sort of
19  habeas corpus -- the common law of habeas corpus.
20        That position was rejected by one
21  District Court judge, Judge Green, and accepted by a
22  different District Court judge, Judge Leon. Judge
23  Green's decision, which I'm most familiar with because
24  my case was consolidated there, held that detainees --
25  that Rasul had a sort of substantive component to it.

12                                              A-2671

1  That detainees enjoyed sort of very basic fundamental
2  due process rights to challenge their detentions and
3  connected the Rasul rights to the rights laid out in
4  the Hamdi case. So she concluded detainees basically
5  had a right to see the evidence against them, a right
6  to counsel and a right to an impartial decision maker.
7        She concluded these processes in place at
8  Guantanamo -- these military hearings were
9  insufficient as a matter of due process and that
10  decision was sort of immediately stayed and appealed
11  to the D.C. Circuit and there were a number of rounds
12  of briefing argued by Mr. Katsas and the decision was
13  delayed because in the interim Congress passed the
14  Detainee Treatment Act, which stripped the courts of
15  habeas jurisdiction for the detainees.
16        The Hamdi decision ruled that that Act
17  only applied to prospective petitions and, therefore,
18  our petitions could proceed.
19        Then Congress in October of '06 passed
20  the Military Commissions Act which, again, purported
21  to strip the courts of habeas jurisdiction and to do
22  so more explicitly to pending cases. And the D.C.
23  Circuit recently in Al-Odah and Boumediennne, the
24  consolidated cases, held that that was permissible and
25  that did not violate Article I, Section 9 of the

13

1  Constitution which prohibits suspension of the writ of
2  habeas corpus unless there is rebellion or invasion
3  and those decisions have been appealed or petitions
4  for Cert. have been filed with the request for
5  expedition by the Supreme Court so it could hear it
6  this term.
7        MR. LUSTBERG: Thanks, Bahar.
8        I'm going to ask Greg to speak about that
9  same sort of legal evolution from the prospective of
10  the government. Not that I'm saying that Bahar's
11  presentation was the least bit skewed.
12        (Laughter.)
13        MR. LUSTBERG: But there might be
14  different ways of looking at that same legal history.
15        MR. KATSAS: Let me begin just by
16  taking -- quibbling a little bit with Larry's
17  statement at the outset that the legal landscape was
18  altered by the -- these various cases post 2001 that
19  we're discussing.
20        When we first looked at the challenges
21  presented by the terrorist attacks, the President made
22  a very fundamental decision which drove both
23  operations and the government's legal response. And
24  that fundamental decision was to treat these attacks
25  not simply as crimes calling for law enforcement

4 (Pages 10 to 13)



**Rizman**
**Rappaport**
**Dillon&Rose,**LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

14

1 response but as acts of war. And that has operational
2 consequences because you don't simply call in the FBI
3 to investigate crimes. You call in the United States
4 military to hunt down the people who did this --
5 committed those atrocities on this country.
6 It also has legal consequences because
7 although, frankly, none of us was particularly
8 familiar with this as of September 2001 looking at
9 what were the issues on our radar screen at the time.
10 There is, in fact, a well -- a well established law of
11 war and the fundamental decision of the President to
12 treat these attacks as acts of war and to trigger the
13 law of armed conflict has now been upheld and
14 confirmed by both of the other branches.
15 Both by Congress, which authorized the
16 use of military force shortly after September 11 and
17 by the Supreme Court in the Hamdi decision which
18 upheld the use of war powers with respect to these
19 detainees.
20 So that aspect of this, it seems to me,
21 is now well settled. Once we're in a law of war
22 framework there is a settled law. We looked at this
23 late 2001, early 2002, looking at with respect to
24 detainees the kinds of things that nations have done
25 during war throughout human history; namely, capturing

15

1 enemy combatants, detaining them, interrogating them
2 and trying them for war crimes.
3 We had what we thought was quite solid
4 precedent for each aspect of that with respect to
5 detention. We had a World War II era precedent called
6 Johnson versus Eisentrager that held that aliens
7 outside United States territory, which describes all
8 of the aliens at Guantanamo -- and I'll drop a
9 footnote about the status of Guantanamo and come back
10 to that in a few minutes -- aliens outside sovereign
11 U.S. territory, the Supreme Court said don't have
12 statutory rights to habeas corpus; don't have
13 Constitutional rights to habeas corpus under the
14 suspension clause and don't have Fifth Amendment
15 rights.
16 So there seemed to be no Constitutional
17 impediment to detaining enemy combatants and, indeed,
18 the laws of war and the practices of war had
19 authorized that throughout American history and that
20 is the basis on which this country could hold two
21 million enemy combatants during World War II.
22 Critics of the administration like to say
23 "without charges."
24 Well, that's true. We didn't charge any
25 of the German or Japanese POWs. But the justification

16

A-2672

1 for detaining enemy combatants has always been not to
2 inflict criminal punishment but simply to prevent
3 people from returning to the battlefield during the
4 course of ongoing hostilities.
5 So the detention aspect of things seem to
6 us quite well established. With respect to
7 interrogation and treatment of detainees, we started,
8 of course, with a bedrock limitation that under both
9 federal criminal statutes and United States Treaty
10 commitments the United States will not torture and the
11 President made explicitly clear in all of the relevant
12 military orders that that was out of bounds.
13 But with respect to interrogations,
14 generally, one can obviously have a robust
15 interrogation program that doesn't rise anywhere near
16 the level of torture. And when one is confronting an
17 enemy like Al Queda that seems particularly important
18 because you need to prevent every attack before it
19 happens.
20 And if you miss one, then there is
21 another September 11. And the -- that's the
22 operational urgency. The legal justification, as I
23 said, no torture was an unquestioned rule throughout
24 this. But the legal source of much more heightened
25 protection for wartime detainees, of course, is the

17

1 Geneva Convention. The Geneva Convention applies.
2 One simply cannot have an interrogation program where
3 the rule is name, rank and serial number, full stop,
4 and the Justice Department looked at the Geneva
5 Convention and concluded that -- not that it was wrong
6 in any way but that it simply didn't apply by its
7 terms for at least three independent reasons.
8 First, the convention most -- most
9 provisions in the convention provide only to covered
10 conflicts which are defined by treaty as conflicts
11 between two signatory nations. So United States
12 versus Germany was covered because each nation is
13 signatory to the convention and the basic logic of the
14 treaty is you secure heightened protections for your
15 soldiers at the cost of providing heightened
16 protections to enemy soldiers and all of that
17 presupposes that one fights by the laws of war which
18 include, most significantly, perhaps, not targeting
19 civilians.
20 Well, of course, Al Queda doesn't do
21 that. They exist for the very purpose of violating
22 those principles. They are not a signatory to the
23 Geneva Convention and we had what we thought was a
24 very strong basis for saying that the conflict, United
25 States versus Al Queda, was not a covered conflict

5 (Pages 14 to 17)



Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

A-2673

**18**

1  and, therefore, not subject to Geneva on that basis.
2  Even apart from that, we thought that Al
3  Queda detainees would not be entitled to prisoner of
4  war protections because even in covered conflicts
5  POWs, themselves, have to follow the laws of war.
6  Wear a uniform, carry arms openly, be subject to a
7  command structure.  Not target civilians.  All of
8  those things.
9  Al Queda terrorists respect none of those
10  rules and so we thought they would not be entitled to
11  the heightened protective POW provisions on that
12  independent ground as well.
13  Finally, there is a controversy about a
14  catch-all provision in the Geneva Convention called
15  Common Article III which applies only to conflicts
16  that are not of an international character.  It
17  triggers -- it triggers procedural requirements for
18  doing war crimes prosecutions.  It triggers treatment
19  requirements that are less protective than the POW
20  rules but, nonetheless, independent freestanding
21  requirements.
22  We looked at that and thought that when
23  there was a lot of treaty history suggesting that the
24  ratifiers of the treaty were concerned with civil
25  wars.  Those are wars not of international conflict

**19**

1  and the President concluded that when he ordered the
2  United States military forces halfway across the world
3  to Afganastan to route out Taliban and Al Queda
4  detainees that seemed pretty international.
5  On that basis we thought Common Article
6  III of the Geneva Convention didn't apply.  Of those
7  three propositions, the only one that's been called in
8  question is the third one.
9  The Supreme Court in Hamdi came out the
10  other way on Common Article III.  Congress stepped in
11  and responded by defining the treaty standard ways
12  which we thought were manageable.  Subject to that
13  skirmish the basic proposition that you don't have the
14  kind of typical POW -- name, rank and serial number --
15  regime that effectively shuts down interrogations that
16  have allowed the military to weed out the senior
17  leadership of Al Queda and prevent, Lord knows, how
18  many plots from being hatched.
19  I'm very comfortable with the legal and
20  operational justifications for that approach to the
21  treatment issue.  And, finally, with respect to the
22  war crimes prosecutions, military commissions have
23  prosecuted war crimes throughout American history.
24  George Washington did it in the
25  Revolutionary War.  FDR did it in World War II and the

**20**

1  President, in creating military commissions for war
2  crimes prosecutions, basically dusted off the old
3  World War II precedents and procedures and modeled the
4  present day prosecutions on those procedures.
5  So we thought we had very sound -- very
6  sound legal framework under the laws of war to support
7  all aspects of detainee operations that the Defense
8  Department undertook in connection with the war.
9  We have had -- as mentioned, we've had
10  litigation in the Hamdi case on military commission
11  prosecutions.  The Supreme Court in Hamdi decided that
12  military commissions prosecutions have to
13  presumptively follow the laws -- the same procedures
14  as courts-martial procedures that the military uses
15  when prosecuting one of its own.  We didn't think that
16  was justified by history or the structure of the
17  Uniform Code of Military Justice.
18  But, in any event, the Court rendered
19  that holding and Congress promptly overruled it.  Made
20  clear that military commission procedures are
21  different from court-martial procedures, codified a
22  set of military commission procedures for the first
23  time in American history.  They are more protective of
24  detainee rights than the historical baseline.  But at
25  the same time they accommodate the administration's

**21**

1  most urgent concerns about, for instance, protecting
2  classified information, permitting use of hearsay
3  evidence which might not sound like a big deal.  But
4  if you think of the proof problems in this context --
5  if you don't have that accommodation, you are sort of
6  summoning people from the battlefield in Afghanistan
7  to come home and testify, yes, I was there and I
8  personally saw John Smith with the rifle or whatever.
9  So we have a highly codified system now
10  for military commission prosecutions.  More protective
11  than ever before but, nonetheless, accommodating to a
12  large extent -- not to a complete extent our principal
13  security concerns.
14  And, finally, back on the detention
15  issues.  The Supreme Court in Rasul did overrule the
16  statutory holding of Johnson versus Eisentrager.  I
17  think it is fair to say that Rasul is a little bit
18  ambiguous on the consequences for Constitutional
19  rights.
20  The explicit holding of the case is
21  limited to the habeas statute.  We think that doesn't
22  undercut the constitutional holding in Rasul and a lot
23  of cases -- sorry -- in Eisentrager and in a lot of
24  cases before it and after it to the effect that aliens
25  outside of the United States have no Constitutional

6 (Pages 18 to 21)

**Rizman**
**Rappaport**
**Dillon&Rose,**LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

22

1  rights. We prevailed on that basis in the D.C.
2  Circuit last month.
3       The other ambiguity with Rasul is whether
4  the court's reasoning is or is not limited to
5  Guantanamo. Parts of the opinion seem specific to
6  Guantanamo. Parts of it seem more general. But I
7  would like to disagree with the suggestion that Rasul
8  effectively held that Guantanamo was sovereign United
9  States territory.
10      Justice Kennedy, in his separate
11 concurrence, would have pretty much said that. We
12 think that is incorrect under the terms of the
13 governing leases and treaties with Cuba which preserve
14 sovereignty to Cuba. We think that is a fair
15 description of the reality at Guantanamo which is that
16 the United States can do one and only one thing on
17 that piece of land and that is run a military base.
18      We couldn't put a civilian agency down
19 there. We couldn't lease the land to the Ritz
20 Carlton. We couldn't sell the land. If there were
21 minerals on the land, we couldn't exploit them. We
22 can run a military base pursuant to the terms of a
23 treaty and a lease. And it would be shocking to think
24 that a court could effectively annex for the United
25 States territory of another sovereign against the

23

1  wishes of the branch that conducts foreign policy.
2       So we don't think that the majority in
3  Rasul did that. They treated Guantanamo as
4  extraterritorial and they talked about the
5  extraordinary territorial scope of habeas corpus at
6  common law which was the fair justification for
7  extending habeas.
8       But, in any event, Congress has also
9  overruled that aspect of Rasul and we are very
10 comfortable taking the position consistent with 60
11 years of settled law that aliens who are not in the
12 United States and whose only possible connection to
13 the United States is a desire to wage war against it,
14 cannot invoke Constitutional rights against the United
15 States.
16      MR. LUSTBERG: An equally neutral view of
17 things.
18      (Laughter.)
19      MR. LUSTBERG: I'm going to allow Bahar a
20 couple of minutes to rebut that. We're not going to
21 have an appellate argument here. You all can
22 appreciate each of these many issues that Greg has
23 touched on have been the subject of volumes of
24 briefing, dozens of Law Review articles, tons of Op Ed
25 pieces and discussions like this all around the

24

A-2674

1  country.
2       That's why it is so good we're having it
3  here in New Jersey today. I do want to give
4  Lieutenant Commander Kuebler, first, a chance to talk
5  about one of the issues that Greg talked about. That
6  was the issue of military commissions and whether it
7  is that view it is, in fact, the case that the
8  military commissions as constituted and which he is
9  practicing before and you can talk about your
10 particular case as well as more generally are, in
11 fact, more protective of rights than historically has
12 been the case and, indeed, whether they are
13 sufficiently protective of detainees rights.
14      LIEUTENANT COMMANDER KUEBLER: Thank you,
15 Larry.
16      First of all, good morning. Thank you
17 for allowing me the opportunity to be here. As Larry
18 indicated, I'm a defense attorney with the Office of
19 Military Commissions in Washington, D.C.
20      I've had the pleasure of being with the
21 Office for about a year and a half now and being
22 assigned to represent two Guantanamo Bay detainees
23 Hassan Al-Ashrabi, a Saudi national, and from the
24 beginning of my time there and most recently within
25 the last month or so I've been assigned to

25

1  represent -- one of the attorneys assigned to
2  represent Omar Kadr, who is a Canadian detainee who is
3  over the age of 15, after allegedly killing a U.S.
4  soldier in a fire fight in Afghanistan.
5       I'd just like, if I may -- I don't want
6  to necessarily rebut Greg's very eloquent statement of
7  the Military Commission's position. But I'd like to
8  walk you through, I think, how that legal model looks
9  from the perspective of somebody representing a
10 Guantanamo Bay detainee charged with offenses before a
11 Military Commission.
12      What you have is the starting point --
13 actually, let's back up -- by detainees, Mr.
14 Al-Ashrabi and Mr. Kadhr. One is what I'd like to
15 call sort of a post-paradigm-shift detainee and the
16 other one is what I like to call a pre-paradigm-shift
17 detainee. "Paradigm shift" referring to this movement
18 after 9/11 to, you know, reclassify terrorists as
19 nationalists. Three problem iterations as opposed to
20 law enforcement problems.
21      And so I've had a chance to sort of see
22 my clients', you know, rights under a couple of
23 separate legal issues. So, you know, with respect to
24 the, you know, sort of the -- and I should have said
25 this at the outset, but I think it's already evident

7 (Pages 22 to 25)



Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

26

1  that I have to say this because I'm here in uniform.
2  My remarks do not reflect the position of the
3  Department of Defense or the United States Government.
4      (Laughter.)
5      LIEUTENANT COMMANDER KUEBLER:  And so
6  what this model looks like is you start from the
7  position I've got a client and he's got rights.  You
8  know, Article III, Section 2 of the Constitution talks
9  about withholding a jury trial in the case of criminal
10  cases.
11      The Sixth Amendment of the United States
12  Constitution begins in all criminal prosecutions.  And
13  you're met with this argument:  Well, this is a war.
14      And let me just sort of footnote that for
15  a second.  There are two separate foreign conflicts
16  that get sort of mish-mashed together when we talk
17  about this stuff, and I think the government does this
18  intentionally.  There is and was an armed conflict in
19  Afghanistan where you've got soldiers on a battlefield
20  shooting each other in what -- you know, I can't
21  imagine any reasonable person taking the position it's
22  not an armed conflict and the laws of war apply and no
23  one disputes that.
24      You've got this other issue out there of
25  whether or not we are, quote-unquote, at war with the

2X

1  borrow concepts from the customary law of war and see  A-2675
2  that they apply to your client and the organization of
3  which he's a part.  Even though the law of war doesn't
4  apply to what we're doing because it is a totally
5  different type of armed conflict.
6      And so what you have is this cherry-
7  picking and this very clever legal slight-of-hand to
8  get you to in the ultimate conclusion that the
9  President can do whatever he wants and, moreover, he
10  can now even sort of -- there's a box, if you will, in
11  which he has unlimited freedom and then, moreover, he
12  gets to decide where-- you know, how big the box is
13  and who's in the box and who's outside the box.  And,
14  you know, that's the problem that we face here.  The
15  law applies when it's convenient.  The law doesn't
16  apply when it's inconvenient.  And that's just --
17  that's my sort of post-traumatic stress disorder
18  kicking in.
19      (Laughter)
20      LIEUTENANT COMMANDER KUEBLER:  Hearing
21  this argument from the government over the last year
22  and a half -- anyway, my involvement with the military
23  commissions has been confined primarily to sort of
24  the, you know, the issue of what I'd like to say the
25  role of the lawyer is in this process.

27

1  organization, you know, the so-called non-state actor
2  of Al Queda.  And that is a novel legal proposition
3  and there is not the body of historic precedent to
4  suggest that the President's war powers are triggered
5  in the fashion that the government says with respect
6  to that type of armed conflict, if you want to call it
7  that.  So those two things get conflicted depending
8  upon, you know, what the point is that the government
9  is trying to make.
10      You take this initial position.  My
11  client has rights and it is a war.
12      Okay.  Well, then the laws of war apply,
13  okay?
14      My client has rights under the laws of
15  war he should be treated as a POW.  He should have the
16  protection of the laws of war.  And then you are met
17  with the argument:  It's an armed conflict unlike no
18  other.  And so then Geneva doesn't apply.  The
19  traditional laws of war don't apply.  And so all the
20  protections you have for the laws of war are not
21  applicable, either.  Okay.
22      Then where does that leave us?
23      Well, we're going to charge your client
24  with offenses under the laws of war because we're
25  going to borrow concepts from Geneva; we're going to

29

1      I was assigned to represent, Hassan
2  Al-Ashrabi, a Saudi national in November of 2005.  He
3  was one of the second batch of detainees that was
4  charged with offenses to be tried by the military
5  commission.    I went down to Guantanamo
6  Bay and was met with the unhappy news that my client
7  did not want to meet with me.  And, apparently, the
8  only decision that a Guantanamo Bay detainee gets or
9  is allowed to make is whether he wants to meet with
10  his defense lawyer.  So when he says I don't want to
11  meet with then Lieutenant Commander Kuebler, that
12  decision is respected.
13      (Laughter.)
14      LIEUTENANT COMMANDER KUEBLER:  And so I
15  did not meet with him for several months.  It was
16  quite a process figuring out how to develop a
17  relationship of trust with this fellow.  And it
18  included, you know, going to see his family in Saudi
19  Arabia and arranging for a telephone call to Saudi
20  Arabia from Guantanamo Bay and trying to convince him
21  to work with me.
22      The reason it was an issue was because,
23  the previous Military Commission system -- well, I
24  guess we can call it Military Commissions 2.0, which
25  was the, you know, was the first system that went

8 (Pages 26 to 29)

**Rizman**
**Rappaport**
**Dillon&Rose,**LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

30

1  forward in October 2004 and was stopped by Judge
2  Robertson's Order enjoining proceedings in the Handi
3  case and then there was Military Commission 2.0, which
4  was the second round which occurred in the winter and
5  spring of last year and now we're on, of course, post
6  MCA, 'm on Military Commission 3.0.
7       During that renumeration process the
8  accused was not allowed to represent himself.  And
9  that was part of the, I think, a larger strategy
10  employed by the government to have a trial system that
11  would essentially exclude a defendant as much as
12  possible without making the thing look like a complete
13  farce.
14       And so what you had was a system in which
15  not only did the detainee not have the right to see
16  evidence but could actually be thrown out of the
17  courtroom if the government wanted to introduce
18  classified evidence.  That just was half of it.
19       What you didn't see the way the
20  government gained the process to have house
21  conferences, chambers conferences with counsel and,
22  avoid having to close the proceedings at all, but I
23  digress.
24       Mr. Al-Ashrabi did not have the right to
25  self-representation.  I was forced to represent him.

31

1  He was forced to accept me as his lawyer whether he
2  wanted that or not.
3       And so I spent the last year or so sort
4  of working through the ethical and professional issues
5  that would arise in that situation and ultimately
6  advocating and, hopefully, ultimately successfully for
7  his right to terminate my representation and to
8  represent himself in a manner consistent with Ferretta
9  v. California, which is the leading Supreme Court case
10  on the subject.  So that's my background.  And then
11  within the last month or so, as I said, I've been
12  involved in the Cotter case.  And I'll turn it back to
13  you.
14       MR. LUSTBERG:  Thank you.
15       You've heard now from two people.  Bahar
16  and from Lieutenant Commander Keubler, Professor Azmy
17  and Lieutenant Commander Keubler about the role that
18  lawyers have been playing in this process.  As
19  everyone, I think, is aware, that issue of the
20  appropriateness of lawyers working on behalf of
21  detainees and whether particular consequences should
22  or could be visited upon those lawyers and their law
23  firms as a result of that kind of work and, also, on
24  the other side, even what the appropriateness of
25  military counsel such as Lieutenant Commander Kuebler

32

1  working on behalf of detainees has been A-2676 of
2  great debate and official statement over the last
3  couple of months.
4       I wonder if you wouldn't -- I know that's
5  something that you've also discussed and I wonder if
6  you would comment on that for the audience.  And don't
7  hesitate to be a little controversial if you want to.
8       MR. MC CARTHY:  Thank very much for
9  inviting me here today.  It is a pleasure to be here.
10  There has been a lot of controversy about not only
11  whether lawyers ought to work on these cases, but
12  whether it's appropriate to comment on that.  I think
13  it's absolutely appropriate for lawyers to work on
14  these cases.  And I don't -- I don't regard this,
15  having been intimately involved with this when it
16  was -- when the Justice Department was not just
17  appointing us here but was actually the entirety of
18  this in the 1990s.  There, obviously, is a significant
19  legal aspect to this.  But I don't think essentially
20  what we're dealing with is a legal problem.  I think
21  it's mostly a national security problem.
22       But to the extent that it has an
23  important legal aspect, I think the bar does itself
24  credit by representing people and certainly the
25  military people who are charged to represent these

33

1  defendants are doing their duty.
2       Where I part company with the lawyers is
3  that I really don't see that it's inappropriate for
4  people to comment on this and say that they would not
5  be represented by lawyers who voluntarily lend their
6  legal skills to the enemy in wartime.
7       I don't think the government ought to be
8  taking an official position on that and I think that
9  was the problem, mainly, with the Defense Department's
10  spokesman who sort of spoke out of turn on that.
11       But I don't -- you know, I don't think
12  it's inappropriate to feel that way, and, obviously,
13  if's not inappropriate to feel that way, I don't think
14  it ought to be the sort of thing that people can't
15  comment on.
16       Obviously, there's people who feel
17  exactly the other way.  Who feel that the most
18  patriotic thing that lawyers can do is represent what
19  they feel to be the values that make America America.
20       And for that reason they regard taking on
21  the representation of the enemy combatants as a duty
22  and an exhibition of patriotism at the highest level.
23       I don't subscribe to that view of the
24  world, but I don't think it's a frivolous one.  I
25  certainly respect the people who have gone down and

9 (Pages 30 to 33)



Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650  Fax: (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

A-2677

**Page 34**

1  done that work, particularly without being compensated
2  for it a great deal.
3      I just want to make a couple of other
4  comments on what I've heard thus far. I'm always
5  baffled to hear the cherry-picking argument that
6  Lieutenant Commander Kuebler made because I think the
7  Geneva Convention argument that's made on behalf of
8  people who are pushing the lawyers to work for the
9  detainees is the height of cherry-picking. There's at
10  least two players, maybe three but at least two, in
11  the Common Articles of the Geneva Convention. It's
12  called common Articles because they are in each of the
13  four different Geneva Conventions. There are at least
14  two places where it says that if there are disputes
15  under the Convention, that they're supposed to be
16  worked out diplomatically among the nations who are
17  signatories to the Convention.
18      They are not legal disputes. They are
19  not cognizable claims that can be raised in the courts
20  of the signatory nations. And I think it would be
21  quite surprising to those people who were the nations
22  who signed off on Geneva back in 1949 or thereabouts
23  to learn that the rights there that are spoken
24  about -- even if you got past all the things that Greg
25  said about qualifying for Geneva rights under the

**Page 35**

1  terms of the Conventions. I think it would be quite
2  surprising to them, to the signatories, that what they
3  were writing were actually rights that could be
4  asserted in court as legal claims against the
5  countries who were signing off.
6      The people who are pushing for Geneva
7  rights for the combatants, I think want to, you know
8  cherry-pick the rights but leave aside all the parts
9  of the treaty that suggest that these are not legal
10  claims in the first place. But I do agree with
11  Lieutenant Commander Kuebler that it's -- this is a
12  different kind of war and it challenges our system in
13  a way that it hasn't been challenged before.
14      I was -- I guess we're in an evolution.
15  I was involved in these cases back when, as I said,
16  they were entirely dealt with by the criminal justice
17  system and was able to see up close and personal how
18  trying to treat a national-security problem as a legal
19  problem makes it very difficult to protect national
20  security.
21      That's how -- one story that I tell from
22  time to time. I'm, I hope, the only person in this
23  room who is a pen pal of Osama Ben Laden. About a
24  week before the terrorism trial that I tried in 1995
25  began, I had to turn over, pursuant to a Court Order,

**Page 36**

1  a list of unindicted co-conspirators.
2      You know, the Justice Department has
3  rules about who can get mentioned and who -- who can
4  be identified by name in a charging instrument which
5  is why you see all these "Co-conspirator A and entity
6  B and that sort of thing that you see in indictments
7  from time to time.
8      Obviously, that's not enough information
9  for a defense lawyer to plan a defense at trial. So
10  it's a common thing, particularly in conspiracy cases,
11  for the government to be ordered to turn over to the
12  defense prior to trial the names of the people and
13  entities who might be alleged during the course of the
14  trial to be co-conspirators. We turned that list over
15  to our defendants. Very quickly it was in the hands
16  of an Al Queda operative by the name of Ali Mohammed
17  who promptly made sure that the list was delivered to
18  Osama Ben Laden who was then in the Sudan.
19      If you think about it, a list of
20  unindicted co-conspirators is a very valuable thing
21  for an enemy to have, any entity, but particularly an
22  enemy in wartime. Many people who are on a list like
23  that are innocent actors. They are people who haven't
24  been charged because they have ambiguous connections
25  with people who have been charged and, you know, they

**Page 37**

1  may be entirely innocent connections.
2      We just don't know enough about it. And
3  other people who are on the list are people who are
4  actual authentically bad actors. In this case
5  actually terrorists who haven't been charged either
6  because they're beyond the reach of the government to
7  apprehend or because the government hasn't yet put
8  together enough admissible evidence to charge and
9  convict them in court. And giving that kind of
10  information out to the other side, particularly the
11  enemy in wartime, essentially identifies them for all
12  the hot numbers and are who might have a problem
13  which, when they go to school on it, has a grave risk
14  of compromising both sources of intelligence and
15  methods of gathering intelligence. And that's exactly
16  what Al Queda did with our list.
17      They went to school on it and tried to
18  figure out who the informants were or how it was that
19  we knew about people that they were surprised to learn
20  that we knew about. Indeed, this was the end of 1994
21  and Osama Ben Laden was actually on that list. We
22  didn't know a whole lot about him at the time. Back
23  then I think it was probably the first official
24  mention of him in a court document or in an official
25  government document.

10 (Pages 34 to 37)

**Rizman
Rappaport
Dillon&Rose,**LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650  Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

38

1     Given the type of due process that we
2 want to give as a nation to criminal defendants is
3 something that is very worthy and ought to be done in
4 99.9 percent of the cases. But giving it to the enemy
5 in wartime is, in a word, nuts, because the underlying
6 assumption of our criminal justice system is that we
7 would prefer the government to lose. We'd rather see
8 a guilty person walk away than run the risk of
9 convicting an innocent person. That's our system. It
10 is the envy of the world and I think it ought to be.
11     But if you accept it when we're at war
12 and when we have an authentic national security
13 crisis, then it's essential that government wins
14 because it's the government that protects the system
15 that all of the rights that we revere are dependent.
16     So I don't think that you can treat this
17 threat with the underlying assumption of the criminal
18 justice system.
19     Now, that doesn't necessarily mean that
20 doing it the way we're doing it now is the right way.
21 And I think part of the -- the biggest part of the
22 problem that we have is that we have what Lieutenant
23 Commander Kuebler called "a novel type of war" and we
24 have two familiarity paradigms. We have a criminal
25 justice paradigm and a law-of-war paradigm. They are

39

1 familiar ones.
2     It's a natural human instinct to try to
3 go with what's familiar when you have a problem, but I
4 don't think they are a good fit necessarily for the
5 kind of novel conflict that we have.
6     And while I think it's laudable that
7 Congress has stepped up to the plate with the Detainee
8 Treatment Act and the Military Commissions Act, there
9 is more that has to be done going forward. Because
10 anybody who has followed this conflict, whether from a
11 legal aspect or any other aspect, knows that it may be,
12 a generational challenge and we may be at this war for
13 a very, very long time. And the only way that we're
14 going to succeed -- and success really is getting
15 intelligence and preventing the next attack.
16     The only way that we're going to succeed
17 in it is if we induce our allies, the nations where --
18 whether they're allies or borderline friendly nations.
19 The places where Al Queda operates. We need them to
20 cooperate with us.
21     And even if the system that we've
22 constructed here, the military commission system, the
23 detention system -- even if it is completely
24 satisfactory under our laws and under our
25 Constitutional system -- and I agree with Greg about

40

A-2678

1 that it doesn't do us a lot of good if other nations
2 won't cooperate with us. If they think that it's too
3 much of an executive branch show, it's too
4 unilateral-- it, doesn't have sufficient checks and
5 balances. They are not going to extradite captured
6 terrorists. And if you don't have a system where
7 they'll cooperate with us, you're basically
8 outsourcing your national security, which is also
9 unacceptable.
10     So I think we need to really grapple with
11 a better way for us to do this going forward. That
12 doesn't mean what we're doing with the GITMO people is
13 violative of our law. I don't think it is at all.
14 But I think going forward it is important that
15 Congress step up to the plate and try to form a system
16 that our allies will cooperate with, that serves our
17 military necessity, but also affords people at least
18 the minimum amount of rights that you need to accord
19 people to make the trials and the detention worthy of
20 our system and our aspirations, et cetera.
21     MR. LUSTBERG: Bahar, how do you respond?
22 Now you've heard twice what we're at war. And because
23 we're at war, forget about our fundamental rights; the
24 entire existence of our nation is at stake. And so,
25 therefore, there has to be at least some compromising

41

1 of our due process freedoms, our procedural
2 protections and the Constitutional provisions that
3 otherwise would govern in a straightforward criminal
4 case.
5     MR. AZMY: I agree that at this time of
6 war we have to think carefully about particular
7 balance, but also not to lose sight of the sort of
8 basic fundamental principles that animate us as a
9 country, which is the rule of law.
10     And here let me, sort of, jump off and
11 take on and quibble a bit with a couple of comments
12 that Greg and Andy made. First, Greg, you know,
13 suggested that in World War II we held 2,000 enemy
14 combatants in the United States. German and Italian
15 prisoners --
16     MR. LUSTBERG: Two million.
17     MR. AZMY: Two million. Sorry, but, of
18 course, they weren't enemy combatants. They were
19 prisoners of war, which is to say they were subject to
20 law. And in Guantanamo there is no law.
21     And we talk sort of frequently about, you
22 know, the rule of law and what does that mean. I
23 think one way to think about is the opposite. Without
24 law there is only willpower, discretion and frequently
25 violence. And that's what is going on in Guantanamo

11 (Pages 38 to 41)



**Rizman Rappaport Dillon&Rose,LLC**
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650 Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

42

1  and that's what the sort of central objection to many
2  of the lawyers who represent detainees is. To inject
3  some sort of check on executive discretion.
4        Here is where I would quibble with Andy.
5  I don't think anyone again is talking necessarily
6  about a criminal trial subject to all of the
7  protections of due process in an Article III court,
8  either a military commission or in the case of habeas
9  corpus a basic summary hearing, sometimes on the
10  papers. Sort of a basic factual determination to make
11  sure we have the right person.
12        We talk about habeas, sort of another --
13  there is a sort of notion that it is sort of a
14  frivolous process. But we are not talking about
15  collateral attack on prior state convictions. We're
16  talking about the most fundamental writ, the most
17  fundamental check on arbitrary government that we've
18  inherited from the Magna Carta, which simply requires
19  that the jailer demonstrate that we have the right
20  person and that's sort of a critical point I, also,
21  and one I want to pick up on.
22        Greg talked also about the laws of war.
23  And I agree, not surprisingly, with the Lieutenant
24  that the cherry picking is more on the administration
25  side.

43

1        Let me give you a couple of examples. It
2  may be true that the laws of war authorize the
3  detention of enemy combatants until the war on terror
4  is over. But that sort of grant of power to hold
5  enemy combatants for some period of time comes with a
6  limitation, that is some basic status determination on
7  the battlefield, to make sure we have the right
8  person.
9        And, historically, that is the what
10  United States has done, including in Vietnam where
11  there was the same question about who's a civilian and
12  who's combatant.
13        Sort of another example where the
14  administration has cherry picked is to conclude that
15  people can be outside of the criminal process in
16  military tribunals, which is fine, authorized by the
17  laws of war. But the laws of war and international
18  law put constraints on what those kind of trials can
19  look like, which the administration had ignored prior
20  to Handi.
21        Regarding the Geneva Conventions and
22  their applicability to this population, I think this
23  is really important -- there is a sort a of legal and
24  factual and historical problem with Greg's analysis.
25        The legal one is, I think, that it wasn't

44

1  a legal determination that the Geneva Convention
2  shouldn't apply to this population. I mean, it was a
3  policy-driven one in order to conduct the
4  interrogation in Quantanamo free of any kinds of
5  restraints. And I think that's why, initially, the
6  administration backed away from its position that it
7  didn't apply to the Taliban.
8        I think the deep factual problem with it,
9  and, sort of, Greg engaged in this a lot, is to
10  presume all of these people are terrorists. That is a
11  presumption we're sort of not entitled to make one
12  case.
13        My client's case completely explodes. My
14  client is not only innocent but the United States knew
15  he was innocent in 2002. Nevertheless, they sort of
16  manufactured reasons for his detention. And the
17  military has concluded this. This sort of -- I think
18  if General Dunlevy went to Afghanistan to wonder and
19  to ask, because we hadn't done status determinations
20  in Afganistan why are your bringing about these Mickey
21  Mouse detainees, CIA reported in a 2002 report
22  concluded that many of these detainees were victims of
23  circumstance, simply in the wrong place at the wrong
24  time, and sort of concluded that they were all Al
25  Queda is a fundamental flaw.

45

1        A colleague of mine made a study. Mark
2  Dehbeaux at Seton Hall, looking Department of Defense
3  data about these detainees. How many people are Al
4  Queda fighters according to the Department of Defense
5  data?
6        Eight percent. Fifty-five percent,
7  according to his data, did not even -- were not even
8  alleged to have engaged in a hostile act. Those 55
9  percent are there because of associations with various
10  levels of attenuation. Groups that the United States
11  considers hostile to the United States. And that list
12  includes 72 groups. The level of attenuation that can
13  get you in Guantanamo at a time is really remarkable
14  and how that might have happened.
15        Well, you know, there was considerable
16  chaos after September 11th and the invasion of
17  Afghanistan and there was another 86 percent of the
18  detainees were not picked up by the United States but,
19  were, rather, handed over to the United States by the
20  Northern Alliance or the Pakistan government at a time
21  in which the United States was dropping bounty fliers
22  announcing bounties all over Afghanistan.
23        I think Donald Rumsfeld said we're
24  going -- "they're going to fall over Afganistan like
25  snow flakes in Chicago in December." And sure enough,

12 (Pages 42 to 45)

**Rizman Rappaport Dillon&Rose,**LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650  Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

46

1  he picked up a lot of false names.
2       So that's all the -- sort of process. I
3  don't think anyone strategically or legally thinks
4  that someone who has no connection whatsoever to
5  terrorism should be in Guantanamo and should be
6  subject completely to the discretion of the Executive.
7       And that's all this process is, from my
8  perspective, is to ferret out the innocent from the
9  guilty. And I think you know -- I take in my clients
10  case -- the Commander in Guantanamo, Harry Harris, was
11  asked by the German press after my client was
12  released, and it certainly demonstrated that a number
13  of -- in a number of ways that he had no connections
14  whatsoever to terrorism. Harris said, "Everyone there
15  is a terrorist. Everyone there is an enemy
16  combatant." Simply not accepting the possibility of
17  innocence.
18       And I think that sort of denies the
19  central -- really, the central narrative of America
20  law; that is, the government can make mistakes and
21  that innocent people can get swept up in those
22  mistakes; and that there needs to be some process to
23  prevent arbitrary detention of people who don't
24  deserve to be detained.
25       MR. LUSTBERG: I'm going to give each

47

1  person a couple of minutes to just comment on each
2  other's position. And the way this is going, you can
3  see that each person says something that the next
4  person disagrees with. Brilliantly set up panel.
5       (Laughter.)
6       MR. LUSTBERG: I'll not going to share
7  with you my views of this. But anybody who knows me
8  knows those.
9       In any event, Greg, why don't you comment
10  on what Bahar just said? And in particularly, the
11  factual -- what he said were the facts that would seem
12  to demonstrate that, indeed, a number of people, maybe
13  even a majority, at Guantanamo are innocent and
14  shouldn't there be a reasonable system in place that
15  the government endorses, embraces and condones who
16  decides who should be there and who shouldn't.
17       MR. KATSAS: Thanks, Larry.
18       There is a reasonable system in place.
19  And every detainee at Guantanamo has been through a
20  Combatant Status Review tribunal, a military tribunal
21  established to determine whether or not that
22  individual is an enemy combatant.
23       That process was set up to adjudicate
24  status precisely for the reasons Bahar says with
25  respect to a population of about 500 detainees which

48

A-2680

1  had been winnowed down from a population over
2  10,000 battlefield captures in Afghanistan, and so on.
3       Of the 10,000, only about 750 were even
4  sent to Guantanamo. Of the 750, about 250 were
5  released by the Defense Department before there was
6  Supreme Court intervention or the highly formalized
7  CSRT process. Of the 500 remaining, there were status
8  determinations which resulted in about 40 detainees
9  being released.
10       I think the fact that that number is a
11  relatively low percentage of the population is what
12  one would expect given that the population was
13  winnowed from more than 10,000 to fewer than 500.
14       On the other hand, I think that there
15  were 40 or so detainees released through the process.
16  It is very good evidence of the good faith with which
17  it was conducted.
18       After the Combatant Status Review
19  tribunals, every detainee is entitled to another
20  annual hearing at which the detainee, the detainee's
21  supporters, the detainee's lawyers, the detainees home
22  government can produce any new evidence that bears on
23  whether the detainee should continue to be detained.
24       Let's think about a for a minute. Think
25  about what happens in a garden-variety criminal

49

1  conviction in this country. Right -- there is no --
2  there is no Constitutional or other right to have a
3  periodic re-review every year of whether the
4  conviction was, in fact, correct based on new
5  evidence. That is what DOD provides right now to
6  every single detainee at Guantanamo. So the notion
7  that there -- these people are just there on a whim I
8  think is not supportable.
9       With respect to the robustness of the
10  procedures. I think Bahar said, "Yeah, it's fine to
11  apply the law of war framework but we need to have
12  some kind of quick status determination; it can be run
13  by the military, but it should be consistent with what
14  the military has done in the past."
15       Now, the CSRT tribunals -- not only are
16  they consistent with what the military has done in the
17  past, but their procedures are more robust than the
18  military has ever applied with respect to status
19  determinations.
20       The genesis of the Combatant Status
21  Review tribunals was the Rasul and Handi decisions
22  which, you know, Rasul extended habeas at Guantanamo.
23  Hamdi addressed the extent of the process that would
24  be constitutionally permissible to detain an American
25  citizen in this country as an enemy combatant.

13 (Pages 46 to 49)

**Rizman Rappaport Dillon&Rose, LLC**
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrcrcsr.com

50

A-2681

1   That's, obviously, a much tougher case for the
2   government, a citizen in this country.
3        In that context the Supreme Court
4   strongly hinted that a good enough military process
5   was the process established in what's called Army
6   Regulation 190-8, which sets out a battlefield-like
7   process for making the very sorts of status
8   determinations that Bahar is discussing.
9        The Combatant Status Review tribunals
10  were deliberately made more protective of detainee
11  rights than Army Regulation 190-8, which the Supreme
12  Court all but said would be good enough to justify the
13  detention of citizens in this country.
14       If it's good enough for a citizen in this
15  country, it is more than sufficient with respect to
16  aliens held outside the United States.
17       MR. LUSTBERG: We started ten minutes
18  late, so we're going to go five to ten minutes longer.
19  I know that the break is very important to this
20  conference, so we won't go any longer than that.
21       Bill, can you respond to the argument
22  that the process that is in place, whether it be
23  currently in the military commissions, the CSRTs, the
24  reviews are, in fact, more protective of rights? And
25  maybe you can comment on -- more able to ferret out

52

1   Secondly, with respect to the
2   insufficiency of the seizure process. The military
3   review process. Let me answer that in two steps.
4   Number one -- and, again, this is very important to
5   see the -- I hate to throw Greg under the bus. But
6   the administration slight of hand at work here.
7        If you talk about battlefield captures in
8   Afganistan. Well, again, if you accept their
9   definition of a battlefield, which is this asymmetric
10  anti-terrorist out there -- not the battlefield which
11  you and I think of when we think of a battlefield,
12  which are soldiers fighting each other in some sort of
13  recognizable zone of armed conflict.
14       So when we talk about captures in
15  Afganistan, we're not just talking about soldiers you
16  know, taking under arms, you know, in combat or at
17  combat. We're talking about people who were arrested
18  in cafes, mosques, book stores, people arrested in
19  Pakistan, in private residences. Some of the
20  Boumedienne litigation that Greg was involved in were
21  actually taken in custody from governmental custody in
22  Bosnia.
23       So, again, there was no war with Al
24  Queda. We called that the battlefield for purposes of
25  applying this new paradigm.

51

1   the truth than what the military has done in the past
2   and what you think is appropriate.
3        LIEUTENANT COMMANDER KUEBELER: Yes,
4   thank you.
5        Just a couple of quick points. First of
6   all, just to wrap up or to give my two cents addition
7   to the cherry-picking.
8        Before 9/11 our government's position in
9   the Tothidge case in Yugoslavia that the protections
10  of Common Article III applied in all conflict all
11  times regardless of how characterized.
12       The U.S. Government has taken the
13  position that the protections of Additional Protocol
14  1, Article 75 thereof, are customary international law
15  binding at a minimum in the absence of any other more
16  protective position. These are positions that we took
17  as a nation before 9/11. It is tough to -- I taught
18  our young Judge Advocates when they went to school,
19  the Army Judge Advocate General school or Naval
20  Justice school. As a friend of mine recently
21  commented, "You have to go back in the archives to
22  find that stuff now."
23       That was certainly the position that we
24  had previously taken. This idea there is this lawless
25  zone or lawless armed conflict that is new.

53

1        So when, you know, you look at that and
2   say, okay, is this process sufficient? And you ask
3   that question in the context of this new type of war,
4   new type of armed conflict, what you have is not the
5   executive branch or executive branch officials like
6   the military making determinations of combatant
7   status; enemy status, based upon traditional
8   recognizable categories -- the guy over there with the
9   rifle who just shot at me, I think we are all
10  comfortable with saying, "Yes, the military or
11  Executive branch can make that kind of determination
12  unilaterally. We are willing to trust it."
13       But when you have this determination
14  where enemy combatant status is a function of ones
15  participation in what is essentially a criminal
16  enterprise -- well, the way we traditionally make that
17  determination in this country is through a criminal
18  trial. And so when you -- you know, you get this
19  argument about, you know, the protections being more
20  robust than which we traditionally afforded enemy
21  combatants. Yes, that's traditional enemy combatants.
22       When compared to what we afford to
23  suspected criminal defendants, that is absurd. These
24  seizure proceedings -- I won't go into details. I
25  should say Professor Amdy's colleague is Professor

14 (Pages 50 to 53)

**Rizman
Rappaport
Dillon&Rose,** LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

54

1 Denbo has done an excellent study of the seizures.
2      When that is the frame of reference, it
3 is clear this process comes nowhere near the
4 protections we traditionally afford to these folks.
5      And let me make one final point. I think
6 there is almost tremendous agreement in principle on
7 this panel. It appears that the one empty chair here
8 is a true pre-thinker who thinks that the traditional
9 criminal justice process as it existed before 9/11 is
10 sufficient to deal with the threat to the country in
11 international terror.
12      I mean, I don't think any of us
13 subscribes to that point of view. And I think we all
14 agree with the proposition that it would be
15 appropriate to sit down and see whether you want to
16 engage in this discussion. Is it a war? Is it not a
17 war?
18      Certainly, everyone would agree that, you
19 know, departures or deviations from the normal
20 criminal process are appropriate. The question is
21 what departures, how much, what's necessary, what's
22 not necessary.
23      And if we had that discussion in, you
24 know, the fall of 2001 in designing military
25 commissions or the spring of 2002, I think we'd be in

55

1 a totally different situation than we are in today.
2 We didn't.
3      Instead, the Executive branch went out
4 and said: We don't need to have that discussion with
5 Congress; we can rely upon our understanding of the
6 President's war powers and the law of war and go out
7 make a whole bunch of decisions about detention and
8 interrogation without getting prior authorization from
9 Congress.
10      And so now we find that there is a legal
11 regime that applies and Congress is forced to act --
12 forced to act. And we have a system that is
13 designed around existing cases with existing
14 evidence. And we know that if we adopt a certain rule
15 on hearsay, we're going to not be able to convict a
16 certain number of people. If we adopt a different
17 rule on hearsay, then we will.
18      So, you know, this whole notion of the
19 rule of law where you have standards that, you know,
20 that you know are ahead of time and you apply them to
21 cases as they come up, we've turned that on its head.
22      And so now we have a system that we are
23 designing for a particular class of people in
24 particular cases and we're coming to certain
25 conclusions and answers about these questions of where

56

A-2682

1 do you depart from the normal process that we, I
2 think we would come to if we had this discussion, you
3 know, five years ago.
4      And so, for example, we're talking about
5 necessity. It's like if we need to interrogate people
6 because we need intelligence, there's a ticking time
7 bomb or there is some sort of a terrorist time plot
8 that's ongoing and we need intelligence and we can't
9 worry about Miranda; we can't worry about Article
10 3(b), et cetera.
11      Well, you know, to the extent we need to
12 design a new rule, let's design that rule. I mean,
13 you know, if we go back and do the research and it
14 turns out military law already accounts for that
15 situation -- there's a fairly well established body of
16 military precedent that says that if you're conducting
17 an interrogation for intelligence purpose, Article
18 31(b), Miranda, Tempe -- being Tempe the case that
19 applies Miranda in the military system doesn't apply
20 and you can conduct that interrogation; you get that
21 information, get that intelligence; use it however you
22 want, statements are admissible; you're good to go.
23      But instead of applying that rule, we
24 decided these are people without rights, conduct
25 interrogations for purely law enforcement purposes and

57

1 there are no rules that apply and we can use that
2 information. So we can't go back and undo that.
3      If we sort of try to come to that million
4 course now and have a system that says intelligence
5 interrogations are okay, no rights or warnings are
6 necessary, but when interrogations are for law
7 enforcement purposes we have to do something. If we
8 elect that rule today, we can't convict the people we
9 have there at Guantanamo.
10      And I think there are a number of
11 particular examples that you can, you know, state when
12 you go through the trial rights, speedy trial,
13 compulsory process, confrontation, et cetera, we've
14 already made the decision. We've created the
15 necessity. And so now we have to create a system ex
16 post facto and we have to rely upon the decisions
17 we've already made.
18      I mean, it wouldn't be the decision we
19 would made five years, or we'd have to let the people
20 go. It's like it's a horrible position and all, you
21 know, Greg can do and folks do who created this
22 process can do: Well, we weren't doing anything
23 different; it was a war; it was like any other war.
24 and they have to, sort of, create this mantra of, you
25 know, we made decisions based on existing precedent

15 (Pages 54 to 57)



Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650  Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

58

1  instead of recognizing as I think I would -- and
2  certainly Mr. McCarthy based on his statement that
3  this is something new -- it was something new; it
4  called for new sets of rules, a new regime. It should
5  have had that discussion a while ago. Now we have
6  this conundrum in Guantanamo. Do we violate our
7  fundamental notion of the rule of law and go ahead
8  with the process as it is or do we take the
9  consequences of poor decision making and that is where
10 we are.
11      MR. LUSTBERG: Andy, I'm going to let --
12 although it kills me, I'll let you have the last word.
13      (Laughter.)
14      MR. LUSTBERG: Tell us in the series of
15 court decisions that people have in their packets and
16 what you've heard, have we struck the right balance?
17      MR. MC CARTHY: Well, what I think is
18 missing from the discussion today is -- I think we've
19 been proceeding along the lines of what I would regard
20 as false assumptions, which is that we're in a legal
21 black hole and that people have been stripped of basic
22 rights.
23      We talked at the very beginning about
24 habeas rights and whether our enemy combatants in
25 custody qualify for them. Whether they didn't.

59

1  Whether those rights have been stripped away from
2  them.
3      I think it is important to note and we
4  really haven't talked about this at all. The courts
5  aren't completely stripped of habeas jurisdiction
6  either by any of the decisional law that happened or,
7  certainly, by what Congress has done.
8      Instead what has happened is habeas
9  jurisdiction has been channeled into one court, the
10 D.C. Circuit Court of Appeals.
11      Now, the Military Commissions Act, and I
12 guess more specifically the Detainee Treatment Act,
13 don't talk in the language or assign a label of habeas
14 corpus to what is going to go on in the D.C. Circuit.
15 But in point of fact, what the statutes say is that
16 the challenges that people can raise in that forum run
17 along two tracks.
18      One of them, fundamentally, is the
19 detainees will be able to challenge whether they're
20 detention proceedings or they're military commissions
21 comported with the laws or the rules that have been
22 set up by the military for the conduct of those
23 proceedings.
24      But the second track that they're allowed
25 to raise claims on is to contend that their detentions

60

1  were the result of their military commission trial
2  violates the Constitution and the laws of the United
3  States.
4      Now, if Congress had called that habeas
5  corpus, it wouldn't be -- it couldn't be habeas corpus
6  any more than it already is because what you get in
7  habeas corpus precisely is a right to challenge
8  whether you are protected or the result of your trial
9  is a violation of the laws and the Constitution of the
10 United States.
11      The unfortunate thing about this, and I
12 continue to subscribe to the idea that we ought to be
13 thinking more innovatively about what this conflict
14 looks like years out. But just dealing in the here
15 and now with what we have, the unfortunate thing, I
16 think, is that we haven't -- we've been in a -- in
17 sort of a litigation paralysis and nothing has run
18 through the system.
19      And I would suggest that we ought to
20 give, with respect to the GITMO people -- at least
21 give this system a chance to work. These cases will
22 go through GITMO and they eventually, probably sooner
23 rather than later, are going to make their way to the
24 D.C. Circuit Court of appeals where all of the types
25 of claims you have heard made today can actually be

61

1  raised in that court and in that forum.
2      And if anything could be seen since the
3  Supreme Court's cases in 2004 is clear, the federal
4  courts are likely to take these challenges very
5  seriously and give them the serious consideration that
6  they merit. And some of those cases, undoubtedly,
7  will make their way -- at least one or two of them
8  will make their way from the D.C. Circuit Court to the
9  Supreme Court.
10      I would challenge the notion that we're
11 in this legal black hole, to begin with. I don't
12 think we are. We've actually been a revolutionary
13 development. The two million or so prisoners of war
14 that we held in the history of United States -- none
15 of them have had a systematic opportunity or access to
16 the United States courts. So I think we ought to give
17 this process a chance to work.
18      But also even if we said that we're
19 heading for a legal black hole in the sense of, you
20 know, people not being -- not being covered by the
21 Constitution, not being covered by the Geneva
22 Convention, I realize that is the nub of our dispute
23 up here.
24      Observing that that's true is not
25 tantamount to saying that detainees shouldn't have any

16 (Pages 58 to 61)

Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650  Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

62

1  rights. It's the same thing as reading a will and
2  saying that somebody is not covered in it.
3      What I think we're arguing is that there
4  are -- I think there are these frameworks and
5  particularly Geneva is a sort of opt-in framework.
6  You have to conduct yourself in a way that qualifies
7  for protections. If you don't qualify for them, that
8  doesn't mean that you shouldn't have any protections.
9      But what we're talking about at that
10  point is institutional competence. How do you want
11  these protections to be brought?
12      And I would suggest that institutional
13  regularity and procedural regularity is a matter that
14  Congress ought to take on and figure out. And we
15  don't really want it to be done by courts on an ad hoc
16  basis stretching these principles that really don't
17  apply because they want to avoid the possibility of a
18  legal black hole.
19      So I think we want Congress to handle it.
20      MR. LUSTBERG: I want to, of course,
21  thank all these panelists. I hope this has given you
22  just a sense of the scope -- the breath of the issues
23  that are presented by the issues that -- by
24  Quantanomo, indeed, by all of the civil liberties
25  challenges that have arisen in the wake of 9/11,

63

1  although we've really focused on Quantanomo here
2  today.
3      In doing that, I think what you can see
4  is that the argument is complicated and that they're
5  being made by people who are very, very intelligent
6  and, indeed, brilliant and are very committed to their
7  positions.
8      And, really, that's a credit to our
9  system of laws and to the good faith of everyone who
10  is involved. Certainly, there are passions on both
11  sides. And I hope this has just given you a sense of
12  that, which is all we can do today. Obviously, we
13  could continue this debate for hours are days. That
14  is what goes on.
15      I want to thank the panel -- some of them
16  who have traveled quite a distance to be here.
17      (Applause.)
18      MR. LUSTBERG: Thank you all for your
19  attention. I know when I usually come to these, I
20  usually outside by now. I appreciate your time.
21      MR. POPLAR: Prior to 9/11 we have been
22  history on this topic of your rights in time of war.
23  the Second World War, the Civil War, the suspense of
24  habeas corpus in the Milgan case. The Second World
25  War and the detention of the Japanese Americans and

64

A-2684

1  prosecution of eight German saboteurs in a bizarre
2  Supreme Court proceeding. And now we're witness to
3  history with what has transpired in Guantanamo.
4      What we have witnessed today are the
5  people that are making history on each side. I'm
6  really honored to be in their presence because we've
7  had Professor Azmy and Lieutenant Commander Keubler on
8  one side and Deputy Attorney General Katsas and Mr.
9  McCarthy on the other side.
10      It is a great segue into our next program
11  on professionalism because their views are so
12  dramatically different but yet they're professional.
13  That is a great statement of how we deal with issues
14  in this country.
15      We're going to take a 10-minute break.
16      Hurry on back and we'll have another
17  program.
18      (Recess.)

65

1      MR. POPLAR: Larry goes back. We're
2  about to start the second half of the program.
3      Before we do, I'd like to call Doug
4  Alberts to say a few words for the New Jersey
5  Historical Society, a very vibrant -- a very
6  functional organization which is part of our District
7  Community right now.
8      MR. ALBERTS: Thank you.
9      (Applause.)
10      MR. ALBERTS: I try to be part of vibrant
11  organizations as a rule.
12      Thank you, Carl, and the Association of
13  the Federal Bar, for this opportunity to present a
14  brief report on the activities of the District Court's
15  Historical Society.
16      Since its creation in 1984, the Society
17  has enjoyed steady growth of membership and expansion
18  of its programs. Currently we have over 250 members
19  and member firms and a year-round calendar of
20  activities.
21      Last year the Society published the
22  first-ever written history of the United States
23  District Court. This book, which is still available,
24  is now in its second printing and has been nominated
25  for an award by the State Historic Commission.

17 (Pages 62 to 65)



Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650  Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

66

1    Last fall we sponsored a judicial
2  reception where our members got to meet with the
3  judicial personnel and their staffs in the Newark
4  Courthouse.
5      We sponsored an admission to the Supreme
6  Court in Washington for 19 of our members. We
7  sponsored two admission ceremonies for newly-admitted
8  attorneys where over 200 new attorneys were sworn into
9  the practice before both the State and Federal Court.
10     Currently, we have two major projects
11 underway; one in the Trenton courthouse under the
12 leadership of Magistrate Judge Hughes and others where
13 we are redesigning the lighting and other efforts to
14 highlight the Charles Ward murals that are there.
15     These are the first murals designed,
16 created and installed under the W.P.A.'s Public Works
17 Art Project in 1935.
18     We are a lead sponsor of that effort and
19 an October 2007 community-wide program is planned
20 around those works.
21     The Newark project is underway to
22 redesign the lighting of the Lady Justice sculpture in
23 the Great Hall and to recreate two murals there that
24 were designed for installation in one of the
25 courtrooms and subsequently lost. Mike Meisel and

67

1  Judge Hochberg are leading us in that project and the
2  Spring 2008 program is planned around those works.
3      But more immediately and more exciting is
4  the May 11th event that we have planned, the First
5  Annual Chairman's Ball. This is a purely social event
6  for our friends and supporters. It will be held at
7  the magnificent Jasna Colona Clubhouse in Princeton.
8  It is an evening of dancing and dining and purely an
9  opportunity for us as a Society to say "thank you" to
10 those who have supported our work over the last 20
11 years.
12     So we appreciate the work that all of you
13 who are members of the Society put in, our judicial
14 advisors, particularly Chief Judge Brown for his
15 support, and on behalf of our Chairman, Don Robinson,
16 and our Board of Directors thank you for your
17 continued support of the Society and the Association
18 of the Federal Bar thank you for this opportunity to
19 give this update on our efforts.
20     (Applause.)
21     MR. POPLAR:  I'd now like to introduce
22 someone who doesn't need introduction. Former Federal
23 District Court Judge Stephen Orlofsky, now lawyer
24 extraordinaire.
25     (Applause.)

68                                              A-2685

1      MR. ORLOFSKY:  "Lawyer extraordinare" is
2  a description I've never heard Carl Poplar apply to me
3  before. However, I'll take it.
4      As in the famous words of Chief Judge
5  Gerry, "Not only is it an honor and a privilege to be
6  here today at Mayfair Farms," it is a grand
7  inconvenience.
8      (Laughter)
9      MR. ORLOFSKY:  Those of us who have
10 traveled from the Southern District really enjoyed the
11 time we spent waiting to make a left turn into Mayfair
12 Farms.
13     (Laughter.)
14     MR. ORLOFSKY:  Having said that, let's
15 get right into a discussion of professionalism. With
16 the exception of me, of course, we have a very
17 distinguished panel this morning.
18     To my left we have the Honorable Joseph
19 A. Greenaway, Jr., Ron Riccio, former Dean of Seton
20 Hall Law School and a member and Chair of the
21 Commission on Professionalism and the Honorable Robert
22 B. Kugler, United States District Court in Camden.
23     To my right we have Carl Poplar, our
24 President of our Association. We are also delighted
25 to have with us Professor Paula Franzese, the Peter W.

69

1  Rodino Professor of Law at the Seton Hall University
2  School of Law. And last but certainly not least, Rich
3  Badolato, who is the current Chair of the New Jersey
4  Commission on Professionalism.
5      We have distributed materials, which I'm
6  sure you have all perused by now, dealing with the
7  various codes of professionalism that have been
8  adopted throughout the United States and including the
9  New Jersey Code of Professionalism.
10     We neglected to include the Rules of
11 Professionalism which are incorporated by reference
12 into the Local Rules of the United States District
13 Court for the District of New Jersey.  Local Rule
14 103.1(c) has adopted the American Bar Association's
15 Section of Litigation Guidelines which were adopted in
16 August 1998 and may be found in Appendix R to the
17 Local Rules.
18     Generally, the Rules of Professionalism
19 which have been adopted throughout the United States
20 by this Court, by the New Jersey Supreme Court and in
21 other jurisdictions as well, deal with four areas of
22 professionalism; relationships with clients,
23 relationships with other lawyers, relationships with
24 the Court and judges, relationships with lawyers and
25 others.

18 (Pages 66 to 69)



**Rizman
Rappaport
Dillon&Rose,**LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

**70**

1  Since we have -- by the way, I would be
2  remiss if I didn't mention that Magistrate Judge
3  Hedges, who was originally scheduled to be on the
4  panel this morning, could not be here.
5  Relationships between lawyers and judges.
6  Since we have the benefit of two distinguished members
7  of the District Court here, let me begin with Judge
8  Kugler, who I know has had some experience in this
9  area.
10  Judge Kugler, have you encountered Rambo
11  and Ramba in your courtroom? If so, how have you
12  dealt with them?
13  JUDGE KUGLER: I have. I think we all
14  have.
15  JUDGE THOMPSON: I can't hear you.
16  MR. POPLAR: May I say the sound system
17  does not appear to be working very well. So please
18  keep your voices up.
19  JUDGE KUGLER: I bet we could find some
20  place in South Jersey that has a sound system that
21  works.
22  MR. POPLAR: We could.
23  (Laughter.)
24  JUDGE KUGLER: The answer to your
25  question is yes, I have. More than once -- can

**71**

1  anybody hear me?
2  More than once I've had problems with
3  lawyers in court. It's funny reflecting on it right
4  now. I think the three worst offenders that I had
5  were all out-of-state counsel admitted pro hac vice.
6  How to deal with it? I think a series of
7  warnings, incrementally more and more serious
8  warnings. I remember one lawyer from Pennsylvania who
9  I kept warning to stop his behavior, which was very
10  disruptive, stamping his feet, yelling, raising his
11  voice. I finally, just threw -- literally threw him
12  out of the courtroom and told him he could not appear
13  for the rest of the day until he calmed down and made
14  his local counsel continue the trial in front of the
15  jury.
16  It is a difficult problem. Fortunately,
17  it doesn't happen very frequently. I think the way to
18  deal with it is to start slow and just keep warning
19  them and warning them and warning them and giving them
20  an opportunity to change their behavior. When they
21  don't, I think it is incumbent upon the judge to do
22  something about it.
23  MR. ORLOFSKY: Judge Greenaway, have you
24  encountered Rambo and Ramba in your courtroom?
25  JUDGE GREENAWAY: We're going to adjourn

**72**

1  and move to South Jersey now.  **A-2686**
2  (Noise from microphone.)
3  MR. ORLOFSKY: Judge, you screwed it up
4  again.
5  JUDGE GREENAWAY: Now we're like in an
6  echo chamber.
7  Obviously, the first thing you do is turn
8  their microphone off.
9  (Laughter.)
10  JUDGE GREENAWAY: No one can hear them
11  then and then there is no problem.
12  I have to say, earnestly, that I haven't
13  encountered the problem very often in my tenure. I
14  don't really employ the warnings that Judge Kugler, I
15  think judiciously, uses. I have maybe one sidebar.
16  Tell them this really isn't going to happen and then
17  the one time that I did have a problem, I went back to
18  sidebar and I said "You will -- like your clients,
19  you'd like to win. But I will embarrass you in front
20  of the jury if this happens again."
21  That was the end of it. It may seem a
22  little heavy handed, I know. I think it is the best
23  and most effective way to handle incivility quickly.
24  MR. ORLOFSKY: Thank you, Judge
25  Greenaway. I may hesitate to call upon you again --

**73**

1  (Laughter.)
2  MR. ORLORSKY: -- until I have more
3  control over the microphone in front of you.
4  Mr. Poplar, what about lawyers'
5  relationships with lawyers? You were fond of telling
6  me how you're a simple country lawyer. You keep
7  telling juries that for 30 years. You're fond of
8  telling me that and how large law firms take advantage
9  of you in a variety of different ways.
10  Tell us about some of your experiences,
11  particularly with respect to requests for extension of
12  times -- extension of time to answer or do other
13  things or conduct at depositions.
14  MR. POPLAR: I find every day that I have
15  a difficult lawyer-adversary to deal with. I find in
16  the big firms sometimes they inundate you with papers
17  that are unreasonable in requesting continuances in a
18  greater degree than it ever happened before.
19  I think that there is a value to being
20  unprofessional. I think there is a value to being
21  discourteous because there seems to be no remedy for
22  it. It makes it very, very difficult to litigate.
23  As recently as yesterday a large
24  Philadelphia firm refused to grant a postponement for
25  a matter of -- a deposition on Monday which we got

19 (Pages 70 to 73)


**Rizman Rappaport Dillon&Rose,** LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650  Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdccsr.com

A-2687

74

1  involved in yesterday. It will be postponed. It
2  won't happen, but there was no need for the
3  contention.
4          I got three or four letters this week
5  from lawyers absolutely provocative. When I was
6  young, it would bother me. Now I really don't even
7  read the letters very carefully. It is a deterrence
8  to continuing in cases.
9          How do you resolve that? You can't
10  resolve it amongst lawyers. It goes on and on and on.
11  Maybe it is a way of making money.
12          Does it happen more in the big firms than
13  the small firms? I think so because I think there is
14  a need for young lawyers to show how tough they are.
15          How do you resolve it? I simply don't
16  know. I know when you go to the Court, they do a
17  Band-Aid and not a fix. It is a problem. It is a
18  huge problem.
19          As far as lawyers being intemperate. I
20  represented, I think, two of those three cases Judge
21  Kugler had. One of the cases he revoked an
22  out-of-state lawyer's pro hac vice. It was appealed
23  to Judge Orlofsky. I think the judge reversed Judge
24  Kugler on a technicality. In any event, that was a
25  huge sanction.

75

1          MR. ORLOFSKY: "Technicality" was a
2  decision by Judge Barry in the Third Circuit which
3  mandated a reversal.
4          (Laughter.)
5          MR. ORLOFSKY: And Judge Kugler and I
6  both understand that point. Mr. Poplar apparently
7  does not.
8          (Laughter.)
9          MR. POPLAR: The revocation of an
10  out-of-state state lawyer's pro hac admission is a
11  significant problem because it will impact upon that
12  lawyer's application for pro hac admission in other
13  cases in other districts.
14          In another case, if I can recall, I think
15  the judge imposed a financial penalty. I don't know
16  why $40,000 sticks in my mind. I know it was a pretty
17  substantial amount of money. I think it was vacated.
18  And then what he did, appropriately, is he brought the
19  local lawyer in, who was a very capable lawyer. I
20  think that he in some way segued the local lawyer to
21  become the primary lawyer in the case in a very
22  effective avuncular manner. I think that is what
23  judges have to do sometimes.
24          But I don't know how you deal with the
25  failure -- the day-to-day communication with young

76

1  lawyers. It has to come from the senior lawyers in
2  the firm. It is a culture that we have in our
3  practice right now.
4          MR. ORLOFSKY: Mr. Badalato, as Chair of
5  the Commission on Professionalism, I'm sure that you
6  are aware of the problems about which Carl just spoke.
7          What does the Commission on
8  Professionalism try to do about those kind of things?
9          MR. BADALATO: First to address the
10  question that Carl raised with respect to the young
11  lawyers. I know in our firm and I know a lot of the
12  big firms we establish our own culture. We mentor.
13  We teach our young folks what it is to be civil, what
14  it is to be professional and we do not tolerate that
15  kind of conduct.
16          So I think it has to start with the home
17  team. Just like a family. You have to have your
18  parents involved. It is up to us to do that.
19          As for the Commission, the Commission, as
20  you know, was established eleven years ago and is a
21  joint effort by the New Jersey State Bar Association,
22  the Supreme Court and the three law schools and we're
23  a very active Commission.
24          Here are some of the things we have done.
25  And it is an awareness, and aspirational type of

77

1  venture, but it has worked. Our statistics in the
2  last three years show that in the courts in the state
3  of New Jersey there has been diminished -- diminished
4  conduct that is unprofessional. I'm not sure about
5  how we do with the transactional matters, but we're
6  trying to address that as a Commission.
7          But some of the things that we have done,
8  both myself and Charles Hollenbeck, our Executive
9  Director, appeared at the ABA in Chicago last year.
10  We were on a panel and we discussed this. We're one
11  of 30 states that has a commission, Georgia being the
12  first about 15 years ago, and we're well-recognized as
13  having a very sophisticated commission.
14          The National Association -- the skills
15  and methods course for new lawyers. A
16  professionalism seminar is given and a component of
17  that is professionalism. Each year we tutor and
18  mentor over 2000 lawyers.
19          The Administrative Law Judges had a
20  participation by us last year. Former Chief Judge
21  Bissell was one of the participants -- that was a home
22  run -- where we addressed the unique issues facing
23  Administrative Law Judges.
24          At the request of the Supreme Court, the
25  Commission teamed with ICLE to devise an ethics and

20 (Pages 74 to 77)

**Rizman**
**Rappaport**
**Dillon&Rose,**LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrsr.com

A-2688

**78**

1  professionalism seminar required by all in-house
2  counsel seeking limited licenses to practice in New
3  Jersey. To date we have had four seminars. We have
4  two to go and we've reached over 1200 in-house
5  counsel.
6      The Superior Court judges, which we call
7  the young baby judges, the Municipal Court judges,
8  receive seminars by us. I participated in them
9  myself. They're well received.
10      We have also developed a model seminar
11  for all County Bar Associations that can be used.
12  We're in the process with the Mason Gross School in
13  Rutgers in developing a DVD on ethics and
14  professionalism which will be available.
15      And, finally, we continue to recognize
16  the accomplishments of good lawyers on a positive
17  basis with our annual professionalism Lawyer of the
18  Year Award. Every County Bar, specialty Bar,
19  participates in that. We've had 100 percent
20  recognition by lawyers. And, of course, the overall
21  Daniel Ahern Award recognizes the career achievement
22  and commitment of the high standard of lawyers. It is
23  a very active commission. We're working on it. We've
24  seen improvement.
25      I do recommend everybody at their own

**80**

1  Certainly at the head of a classroom, at
2  the head of a courtroom, we possess tremendous power
3  to make the weather. So what is it that we are
4  demonstrating with our choice of words? What is it
5  hat we are demonstrating with our body language, with
6  our demeanor, with our level of preparedness, with our
7  own expectations for ourselves with regard to
8  punctuality?
9      For that matter I attempted to find that
10  while sticks are sometimes warranted, carrots tend to
11  work better. So I will always make a point of noting
12  the examples of civility, of professionalism, of
13  preparedness, of excellence that are demonstrated in
14  and out of the classroom.
15      And I'll do that in class. Actually
16  stopping to pause and commend a particular student.
17  I'll also do that outside of class, sending an
18  e-mail, sending a handwritten note.
19      If you treat people as they are capable
20  of becoming because the inherent tendency for civility
21  I am convinced, resides not just in some of us, but in
22  all of us. In some it just needs to be drawn out a
23  bit more. To the extent that we are guided, then, by
24  what we admire, rather than what repels us, we really
25  have the opportunity to be the change that we want to

**79**

1  firms address the problems and I don't think we'll see
2  some of the stuff that Carl has elaborated on.
3      MR. ORLOFSKY: Thank you.
4      Paula, what are the law schools doing
5  about teaching professionalism?
6      MS. FRANZESE: Yeah. We're mindful of it
7  all the time. Mindful that it certainly starts with
8  us.
9      At the start of every semester I share
10  with my students an excerpt from Goethe who had
11  written centuries ago, "I have come to the frightening
12  conclusion that I am the decisive element. It's my
13  mood that tends to make the weather because with each
14  word, with each gesture I have the unique capacity,
15  the inherent power to make a life either miserable or,
16  alternatively, glad. I can always choose to humiliate
17  or, alternatively, to transcend."
18      Here is the kicker:
19      "If we treat people as they are, we make
20  them worse. If we treat them as they are capable of
21  becoming, we help them to become just that."
22      I challenge my students to become the
23  aspiration statement and I like to think that I assist
24  by setting norms and appropriate baseline standards of
25  expectations for what it means to be a professional.

**81**

1  see in the profession.
2      MR. ORLOFSKY: Thank you.
3      Dean Riccio, as a former Law School Dean,
4  academic and now a practicing lawyer again, how does
5  one reconcile the duty to zealously represent one's
6  client with professionalism?
7      MR. RICCIO: I think you have to be
8  guided by principles of professionalism and your own
9  sense of integrity.
10      I think, perhaps. The best way for me to
11  answer your question, Steve, is to ask a couple of
12  questions and then give you my reaction to them.
13      The first is: Is more being done today
14  to promote civility and professionalism than there was
15  10 or 15 years ago?
16      I think, after listening to Paula and
17  Rich and knowing of my own experience, the answer is
18  clearly yes, there's quite a bit being done. And
19  you'll see issues of civility and professionalism
20  cropping up in judicial opinions. You will see issues
21  of professionalism and civility being integrated not
22  only into formal law school events, but also into
23  courses that get taught.
24      There is hardly a course in law school
25  where you can't, during one or more classes, integrate

21 (Pages 78 to 81)


**Rizman**
**Rappaport**
**Dillon&Rose,** LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650 • Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

A-2689

**Page 82**

1  into the subject matter the importance of not just the
2  RPCs, but also the importance of civility and
3  professionalism. And, certainly, the Bar -- this
4  event is an example of the attention that is being
5  paid to the issue.
6      But having said that and acknowledging
7  that a lot has been done, you know, can more be done?
8  And I think that answer is, unfortunately, not only
9  more can be done, but more has to be done.
10     I suppose if we went around this room and
11  asked each of you to recount experiences that you've
12  have had, perhaps, in the last month dealing with
13  matters of civility and professionalism, you'd
14  probably all can tell one or more stories of your
15  experiences, whether it is an extension of time, a
16  continuance, a service of papers, disparagements in
17  briefs, communications with adversaries, unreturned
18  phone calls, nonsense at depositions, document
19  demands, discovery requests, motion practice, et
20  cetera.
21     I could go on and on. And all of you,
22  I'm sure, can tell us stories that are not going to
23  make the legal profession Hall of Fame for civility
24  and professionalism.
25     The problem that I see is that while the

**Page 83**

1  efforts are out there being made to promote awareness
2  to professionalism and civility, I'm questioning
3  whether or not we are really reaching the audience
4  that needs to be reached.
5      I doubt, seriously, that anybody in the
6  audience today needs to hear from any of us about the
7  importance of civility and professionalism. But I
8  know there are thousands of lawyers out there who
9  could benefit from an hour's worth of listening to
10  what civility and professionalism entails and perhaps
11  could benefit about it.
12     I just want to say one other thing. That
13  is: Why do I think it is important for all of us to
14  spend time thinking about civility and
15  professionalism? I think it turns on what, when I
16  became a lawyer, I believed the profession was.
17     I believed when I was told it was a noble
18  profession, that it really was a noble profession.
19  And I believed it was a noble profession then and
20  still do now because what we do as lawyers is
21  different than what business people do. We are
22  service oriented. We serve people who are in need.
23     Our primary motivation is not supposed to
24  be to make money. It is supposed to be to provide a
25  service for persons who have a need for our skills and

**Page 84**

1  abilities.
2      If we are going to be a noble profession,
3  then I think that its got to be dignified. It doesn't
4  have to be phony or false, but it got to be
5  respectful, courteous, principles of loyalty,
6  integrity, fairness, honesty, understanding,
7  compassion. These are qualities that don't always
8  necessarily show up in the RPCs but show up in the way
9  in which we behave as people first and then as lawyers
10  second.
11     Probably, the most important reason I
12  think civility and professionalism are so important is
13  because the public's confidence in what we do as
14  lawyers is, from all of the surveys I've seen, at an
15  all-time low. That low confidence is not just in the
16  legal profession in terms of lawyers, but judges as
17  well.
18     I don't know how many of you witnessed
19  the Anna Nicole Smith episode in Florida and the
20  behavior of the judge down there. In my estimation,
21  that did more damage for public confidence in the
22  legal profession than 25 of these conferences could
23  do.
24     So I think that we really have to be
25  sensitive about public confidence in what we do as

**Page 85**

1  lawyers in our legal profession. Because at the end
2  of the day, what the judges decide doesn't mean a darn
3  thing unless it is legitimate. Unless the public is
4  going to look at it and they're going to have respect
5  for it and they're going to say we're going to obey it
6  not because the judges have the power of the purse and
7  the sword. We're going to obey it because it is
8  well-reasoned, it is honest and it has a moral force
9  and a moral sanction to it. If we behave like clowns,
10  whether it's on the judiciary or the bench, then we're
11  going to get the respect that clowns get.
12     MR. ORLOFSKY: There is a perception, I
13  think, among lawyers who behave unprofessionally that
14  somehow that by behaving professionally they would
15  compromise or prejudice the interest of their clients.
16     Rich, what is your reaction to that
17  concept?
18     MR. BADALATO: I'm not sure. Just repeat
19  for me again because I lost that, what you said.
20     MR. ORLOFSKY: I think the point is that
21  many lawyers behave unprofessionally and in an
22  obnoxious way because they think that serves their
23  client's interest in a more effective way than
24  behaving in a professional manner would be.
25     For example, granting someone an

22 (Pages 82 to 85)

**Rizman Rappaport Dillon & Rose, LLC**
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650  Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

86

1 extension of time to answer.
2     MR. BADALATO: And I think that a lot of
3 this is carried on by what we see. I try cases. You
4 think the jury has an idea that what they see on
5 television on some of these shows and some of these
6 judge shows is the way it's really done. But, again,
7 it all comes back to the firms.
8     If the firms are mentoring and teaching,
9 if the law schools are mentoring and teaching, the
10 young people will follow the good example and they
11 will not be allowed to do things like Carl said; not
12 grant an extension.
13     It's ridiculous getting into a case and
14 not giving someone the first time they call -- "Of
15 course, you can adjourn the deposition on Monday;
16 let's work out another date."
17     I mean, that's just absurd. But it is
18 fostered a lot by the O.J. trial. This last episode
19 with the Nicole Smith and what people and young
20 lawyers see on TV that they think that that's the way
21 to go in there, with a gun-slinging operation, and
22 that just simply is not the case.
23     MR. ORLOFSKY: Rich, how do you think
24 unprofessional conduct plays in front of a jury?
25     MR. BADALATO: I think, from my talking

87

1 to judges and having tried cases for over 40 years, it
2 plays very poorly. I think the jurors pick it up. I
3 don't think they're impressed at all. I think they
4 like the people that are articulate and courteous at
5 all times, standing up when the jury comes in;
6 addressing the Court in a caring way even if you
7 really are angry with the judge's decision, not
8 displaying a temper, but holding it back. Maybe
9 talking to him in chambers.
10     I think it plays very poorly. My
11 experience is that there is very bad results with poor
12 conduct.
13     MR. ORLOFSKY: Carl, what is your view of
14 that issue?
15     MR. POPLAR: I agree with Richard. As
16 recently as last year I was doing a case -- and I
17 think the evidence was reasonably substantial -- in a
18 criminal matter.
19     A young prosecutor from Washington was
20 just disrespectful of me during the trial. I think
21 that caused me to bond with the jury. I thought that
22 alienated the jury.
23     I don't know -- it was a case before
24 Judge Kugler. I don't know if he picked up on that.
25     MR. ORLOFSKY: Do you think he picked up

88

                         A-2690

1 on that?
2     JUDGE THOMPSON: Give us an example.
3     MR. POPLAR: Example of the disrespect?
4     JUDGE THOMPSON: Yes.
5     MR. POPLAR: I can recall asking the
6 young man if I could borrow an exhibit that he used on
7 direct that I wanted to use on cross and he threw it
8 at me.
9     I, sort of, had this poker face because I
10 was applauding this stuff. I thought it was a great
11 thing for me.
12     Then he would make faces and be surly
13 with me and I thought it was -- I thought it was good
14 for my ability to bond with the jury. Unrelated to
15 anything I was doing.
16     MR. ORLOFSKY: Judge Kugler, do you have
17 a comment on that?
18     MR. KUGLER: Not on Carl's case because
19 his client awaits sentencing.
20     (Laughter.)
21     JUDGE KUGLER: Anyway --
22     MR. POPLAR: On a minor count. The major
23 count we went home on.
24     JUDGE KUGLER: The whole area of how a
25 jury reacts to unprofessional conduct by a lawyer? I

89

1 think a lot depends on the tone that the judge sets in
2 the courtroom. I think the jury follows the judge's
3 lead. If the judge makes it clear that it is not
4 acceptable conduct, the jury will follow the judge.
5 That is why I think the judges have to be very careful
6 about not putting up with that and putting an end to
7 it very quickly.
8     I think Carl and Richard are both
9 absolutely correct. If the jury understands it is
10 unacceptable, the jury is going to hold it against the
11 person perpetrating that kind of conduct. They tell
12 me all the time that they do. They don't like these
13 lawyers. It is pretty clear.
14     MR. ORLOFSKY: Judge Greenaway, how do
15 you think unprofessional conduct plays with a jury?
16     JUDGE GREENAWAY: I'm not going --
17     MR. ORLOFSKY: Don't touch the microphone
18 please.
19     (Laughter.)
20     JUDGE GREENAWAY: I hesitate even to
21 touch the base.
22     I think that my experience speaking with
23 jurors after a trial is that they -- they're always
24 taken aback by unprofessionalism and discourtesy --
25 any kind of discourteous act among lawyers.

23 (Pages 86 to 89)



**Rizman Rappaport Dillon & Rose, LLC**
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

90

1　I don't know that, as Carl alluded to, it
2　might influence them one way or the other. It
3　certainly doesn't sit well with them. I don't think
4　it plays out in their ultimate decision making. It's
5　part of the take-away that they have from the
6　experience.
7　　But I want to pick up on something that
8　Professor Franzese picked up -- mentioned earlier.
9　That is that we, each of us, in the profession, is
10　responsible for either the growth of professionalism
11　or the growth of discourtesy.
12　　Whether it is how we train and address in
13　our chambers interns, law clerks or at the law firms,
14　summer associates and young associates, and so forth.
15　We each can play an important part in that.
16　　I really think that it's the pressure
17　that practitioners feel, particularly when they come
18　from out of state -- they think -- into New Jersey.
19　They think they got to be these -- I think you used
20　the term "Rambos." I never figured out why they
21　thought that would be to their advantage. I haven't
22　found it as much intrastate as I have found it
23　interstate, particularly the state across the river.
24　　MR. ORLOFSKY: Which river?
25　　(Laughter.)

91

1　　MR. ORLOFSKY: Let me share with you, if
2　I may, some of my experiences in speaking with jurors
3　after trials and their reactions to unprofessional or
4　discourteous conduct by lawyers.
5　　They don't like it. I think it is not
6　just disrespect to an adversary. It is disrespect to
7　a witness. It is disrespect to the Court. People are
8　offended by it.
9　　While I have no way of measuring what
10　impact it has on the verdict, I think to a certain
11　extent it does influence how they view the
12　presentation by a particular lawyer in a courtroom.
13　　If the lawyer is unprofessional, if the
14　lawyer is rude, the lawyer is discourteous to
15　witnesses or his or her adversary, I think the jury
16　ultimately will at least have less credibility or that
17　lawyer will have less credibility with the jury, so to
18　speak, than a lawyer who behaves in a professional
19　manner.
20　　I think Rich Badolato mentioned this. I
21　think the touchstone of this is for those who are
22　senior members of the Bar is to mentor our younger
23　colleagues and make sure that they understand that
24　there is no inconsistency between representing one's
25　client zealously and behaving professionally or

92

1　courteously to a court and an adversary.
2　And I think that is important. I think it's important
3　for them to understand that professionalism does pay.
4　It does not put you at a disadvantage with your Court
5　-- with the Court or the jury and your client.
6　　I mean, many clients will come to you --
7　and I've had this experience and I'm sure others
8　have -- and say: "Well, we want you to be very
9　aggressive." As if they'd need to tell me that.
10　"We don't want you to grant any extensions. We want
11　them to understand that this is -- this is all-out war
12　and we want you to bury them." That is something that
13　a lawyer has to deal with.
14　　And I'm going to -- and I think one of
15　the toughest things that a lawyer has to do today in
16　today's competitive world is to -- is learning to say
17　no to a client.
18　　Rich, what is your view of that? I'm
19　sure you have encountered that.
20　　MR. BADALATO: I think you have to have
21　the guts to put the aspirational goals of the
22　profession ahead of the money.
23　　A lot of times we know that if sometimes
24　you are presented with that with a general counsel,
25　they're going to go elsewhere. But if that's not

93

1　consistent with the way your firm and the way your
2　practice is, I think you just have to say: Hey. This
3　is the way we do it. We've gotten great results;
4　we'll do everything we can zealously, but we'll not
5　play by rules that we don't believe in.
6　　If you're up front about it, that's it.
7　　I think too many people today are afraid
8　to lose the work and, consequently, they cave into
9　that.
10　　I was appointed by Judge Waugh -- and the
11　case is on trial right now -- as a Special Master. He
12　chose me because I was the head of the Commission on
13　Professionalism. It was a war between a Philadelphia
14　firm and a New Jersey firm. And I did the best I
15　could. They spent a ton of money for me trying to do
16　the best I could. No matter what I did, they were at
17　each other and appealed it to Judge Waugh. He just
18　was just tearing his hair out. It was all driven by
19　incredible sums of money that was generated by this
20　insanity.
21　　That is something we have to be aware of.
22　　MR. ORLOFSKY: Judge Kugler, what's your
23　reaction to that? Have you encountered that in the
24　courtroom? Have you seen that kind of behavior?
25　　JUDGE KUGLER: Yeah. Unfortunately, you

24 (Pages 90 to 93)

**Rizman Rappaport Dillon & Rose, LLC**
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650  Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

94

1    do.  Fortunately, not very frequently.
2         MR. ORLOFSKY:  What do you do, for
3    example, if ultimately a lawyer or a law firm that has
4    behaved unprofessionally or overzealously files a fee
5    petition?
6         JUDGE KUGLER:  Fee petitions are very
7    difficult in the Third Circuit.  The judge's -- mine
8    and I know most judges I know, obvious reaction to
9    those kind of fee petitions, there is something
10   terribly wrong about this.  It is too much.  Because
11   this was a lot of wasted time.
12        It is not that easy to do.  You have to
13   go through it line by line.  It's very difficult in
14   the Third Circuit precedent to just say:  Well, I
15   wouldn't have spent this much time on that.
16        And lawyers shouldn't spend this much
17   time on that.  It's a -- fee petition is not a good
18   way to attack that problem.
19        MR. ORLOFSKY:  How do you think judges
20   should address the problem?
21        JUDGE KUGLER:  Well --
22        MR. ORLOFSKY:  Do you think they should
23   address it in opinions that they publish?
24        MR. KUGLER:  Well, we do address it in
25   opinions that we publish.  I know I made a reference

95

1    to some of my opinions to the Code of Professionalism.
2    Although it's aspirational only and not to be used for
3    disciplinary matters or litigation purposes, I,
4    nevertheless, refer to that.
5         If it's particularly egregious and some
6    kind of penalty needs to be assessed -- I know you've
7    done it.  I've done it.  I think we have all done it.
8    Requiring lawyers to attend some kind of CLE course on
9    professionalism.  I don't know it does much good.  But
10   I don't know what else we're supposed to do.
11        I think the Dean and Carl had a good
12   point.  Looking out over this room, there is not one
13   of you in this room, I don't think, who would refuse
14   to grant a continuance if asked by an adversary.
15        This is not really the audience for the
16   problem.  I think you're all here to find out what you
17   should do when you're faced with these kinds of Rambo
18   lawyers and what kind of remedies you have for that.
19   I don't think we need to teach many of you anything
20   about professionalism.
21        So it's a difficult problem.  I'm not so
22   sure the courts are the answer.  I know a lot of you
23   try to get the judges involved in this.  We get all
24   kinds of correspondence that goes back and forth
25   between lawyers.  Nasty stuff.  Name-calling stuff.

96

A 2692

1    I'm not so sure what you expect us to do about it.
2         Carl and Steve alluded earlier to this
3    Third Circuit opinion by Judge Barry.  It's Seldana
4    versus K-Mart.  It makes it exceedingly difficult for
5    the courts to impose any kind of sanctions for
6    behavior that occurs at a deposition and not in front
7    of a judge.  It is a very difficult problem.
8         Obviously, you look to us for help.
9    We'll try to do what we can do.  Please understand
10   there is not a lot we can do.
11        MR. ORLOFSKY:  Judge Kugler, what about
12   this practice so many lawyers engage in of copying a
13   Court on correspondence that they send to their
14   adversary?  Is that appreciated?
15        JUDGE KUGLER:  No.
16        (Laughter.)
17        JUDGE KUGLER:  Frankly, it's counter
18   productive.  I characterize these things -- it's name
19   calling.
20        And, of course, it always generates -- it
21   doesn't always.  With good lawyers it doesn't generate
22   any response.  But, invariably, it generates a
23   response from the adversary who then writes to me and
24   says:  Well, no, I didn't start this, you know, she
25   started it and she is a no good.  It goes on and on.

97

1    It goes on and on.  There is no end to it.
2         I'm not there.  I don't know what's going
3    on.  I don't know who's generating this.
4         When I was a Magistrate Judge, I used to
5    get them on the phone to find out what the crux of the
6    problem is so it didn't get any further down the road
7    or any worse.  But, no, it is not appreciated because
8    I'm not sure what it is you expect me to do about your
9    problem.
10        MR. ORLOFSKY:  Judge Greenaway, what's
11   your view on that?
12        JUDGE GREENAWAY:  That is really the key
13   to the problem.
14        MR. ORLOFSKY:  Don't touch the
15   microphone.
16        JUDGE GREENAWAY:  That's really a key to
17   the problem.  What is it you that you want us to do
18   when we get letters, as Judge Kugler just alluded to.
19   I basically get folks immediately on the phone.
20        But the worst is when either in those
21   letters or however it's relayed to the Court, there
22   are allegations of untruths.  That's about as pleasant
23   as I can put it.  And I have no idea, earnestly, what
24   you want us to do.
25        My general response is:  Look, you're all

25 (Pages 94 to 97)

**Rizman**
**Rappaport**
**Dillon&Rose,** LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650  Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

A-2693

**98**

1 officers of the Court. If you tell me something,
2 unless there's some proof positive to the contrary,
3 I'm going to believe it.
4      And, you know, in the context of sort of
5 judge-lawyer relationships, we can't possibly try to
6 figure out which one of you is lying. I mean, that's
7 just -- it's just not what we should be engaged in.
8 And, you know, that's part of the frustration.
9      Judge Kugler and Dean Riccio talked
10 about, you know, what sort of what is the past taught
11 us, what's happened over the last ten to 15 years?
12      I'd say in my time on the bench now,
13 there have been many fewer Rule 11 motions for
14 sanctions generally, which I think is, obviously,
15 a good thing. But I think that litigants are finding
16 that judges really are loathe to grant those kinds of
17 motions because it really is getting back to what
18 we've been alluding to. And that is figuring out
19 which lawyer is telling the truth on a particular
20 matter, which is just -- it is not pleasant and it
21 puts the Court really in an impossible situation.
22      MR. ORLOFSKY: What about -- since you
23 raised the question, Judge Greenaway, what about
24 motions for sanctions? Is that an effective way to
25 deal with the problem?

**99**

1      JUDGE GREENAWAY: From the Court's
2 standpoint, it is effective only in that it makes it
3 stop. The problem between or among the lawyers on
4 that particular matter stop because you'll either hear
5 it and resolve it or you'll address it in some way.
6      Generally, the way that I address it is
7 to get the attorneys either on the phone or in for a
8 conference or on the record and basically resolve
9 whatever it is that is the problem that led to the
10 motion.
11      I really couldn't tell you the last time
12 I dealt with a motion like that on the merits because
13 I tried to get it handled short of the grant or denial
14 of the motion.
15      MR. ORLOFSKY: Judge Kugler, how do you
16 handle motions for sanctions? And do you think it is
17 an effective way to handle with the problem?
18      JUDGE KUGLER: I agree with Judge
19 Greenaway. It does put an end to the dispute that's
20 been ongoing because it gives the Court a chance to
21 get the lawyers in before the Court to find out what
22 is going on. Frankly, to lecture the lawyers to knock
23 it off and to do what good professional and civil
24 lawyers do and have done for centuries in this
25 country. So it puts an end to the problem.

**100**

1      I think all judges hate motions for
2 sanctions more than any other motion. I think it's
3 worse than a motion for counsel fees.
4      As tedious as they are, we hate having to
5 deal with these problems. We wish we didn't have to
6 deal with these problems. To sanction a lawyer is an
7 incredibly serious matter. We're all aware of the
8 affect it could have on people's careers and their
9 futures. So we're very reluctant to do it.
10      We don't like to see them. We don't look
11 for them. We don't encourage them. It does get the
12 job done sometimes.
13      MR. ORLOFSKY: Mr. Poplar, what is your
14 view of sanctions motions?
15      MR. POPLAR: I think they're made. I
16 think most of the time they're frivolous. I think it
17 is provocative. I think they're made frequently and
18 granted infrequently.
19      How about the extreme case? I think we
20 are talking about two types of cases. The extreme
21 unprofessionalism and the not so extreme but insidious
22 unprofessionalism.
23      I have been hired a couple of times over
24 the years by lawyers to deal with a thug adversary
25 because they were not comfortable or they were

**101**

1 disabled in dealing with the thug adversary. It works
2 with a thug.
3      One case with regard to sanctions we
4 ended up having hearings in the federal court and I
5 didn't think the judge got it. The judge was sitting
6 there, federal judge, with a stone face and listening
7 to this very difficult lawyer from a large firm. And
8 then the judge wrote an opinion and assessed a $90,000
9 penalty against him. So he did get it. The judge did
10 get it.
11      But that is the extreme case. It doesn't
12 happen.
13      Jeff had his hand up.
14      MR. ORLOFSKY: Jeff.
15      MR. GREENBAUM: I don't like sanctions
16 motions. What do you do, following up on Judge
17 Kugler's comment -- when you believe you're the
18 victim? You've been very courteous to your adversary,
19 not Rambo, but he doesn't make clients -- unilaterally
20 denies depositions, ignores the discovery end date.
21 Then, when you, finally, get to the point where you
22 can't take it anymore and write a letter, you sound
23 like you're the crybaby; you're the one who is whining
24 and is not professional.
25      How do you deal with that situation?

26 (Pages 98 to 101)

**Rizman Rappaport Dillon&Rose, LLC**
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650  Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

102

1    MR. ORLOFSKY: Before I ask Judge Kugler
2  to rule on something that is not before him and give
3  you an adversary opinion, let me say all of us have
4  been in that situation. And I think the way to deal
5  with it is, first, to be patient; second, to create an
6  appropriate record. And when you reach the tipping
7  point, and that's really a matter of judgment, then I
8  think you have to go to the Magistrate Judge or the
9  District Judge for some relief.
10      Now, in most cases, you know, you may be
11  going to the magistrate court, but if it's for a
12  matter of scheduling you may be going before the
13  Magistrate Judge to address those questions. And I
14  think our magistrate judges are sophisticated enough
15  to understand what's going on. But that's a difficult
16  problem. It is not one that is easily resolvable.
17  It's really a judgment call on your part. And you'll
18  also have, you know your client with you looking over
19  your shoulder and pressuring you to do something about
20  it.
21      So, Judge Kugler, now that I've answered
22  the question, what's your view of that?
23      (Laughter.)
24      JUDGE KUGLER: It takes incredible
25  patience, which I think is part of your professional

103

1  responsibility, is to be incredibly patient. And I
2  think, as much as it pains me, I agree with Steve
3  about it gets --
4      MR. ORLOFSKY: Did you get that down,
5  Stan?
6      THE REPORTER: Yes.
7      JUDGE KUGLER: -- it gets to a tipping
8  point where you have to enlist the aid of, probably,
9  the Magistrate Judge to get the thing back on
10  schedule.
11      I don't think it does you any good to
12  write to the Court in a whiny way and say: This
13  person is being mean to me.
14      Just say: Look, factually -- very
15  neutral -- say: I've scheduled depositions on these
16  days; this lawyer has canceled each and every one of
17  them; judge, we need to get this thing back on
18  scheduling; we may need an Order compelling
19  depositions and we need a conference.
20      Leave it at that. That is the best we can
21  hope for.
22      MR. ORLOFSKY: Judge Greenaway, do you
23  want to comment?
24      JUDGE GREENAWAY: No.
25      (Laughter.)

104

1      MR. ORLOFSKY: What I like; a short

A-2694

2  succinct answer.
3      It's a real problem, but one has to
4  balance the issues of professionalism with one's duty
5  to one's client.
6      And Jeff raises a valid point. When is
7  enough enough? And that's really a judgment call.
8  When you do go in -- when you do go in before the
9  Magistrate Judge or the District Judge, you have to be
10  able to present a pretty compelling record. So it is
11  important for you to document it.
12      Now, in terms of scheduling. Obviously,
13  the magistrate judges have -- in this district have
14  fairly regular scheduling conferences. So you'll be
15  in before them every 90 days or so and there will be
16  scheduling orders in place and you're expected to
17  comply with the deadline.
18      So, you know in most cases those issues
19  are going to come before the Magistrate Judge in the
20  first instance, and that's the point, the opportunity,
21  if you will, to make your point.
22      One of the areas of professionalism that
23  isn't often addressed, although it is certainly in
24  every Code of Professionalism that has been adopted in
25  this court and in other courts are courts -- judges'

105

1  duties to lawyers. Okay. So this is kind of a
2  sensitive subject, but it's worth -- I think worth
3  airing in this District where the judges have a fairly
4  collegial relationship with the Bar and the Bar is
5  collegial with the Court and with each other.
6      Judge Kugler, what about that, the
7  Court's obligations to lawyers? What is your view of
8  that?
9      JUDGE KUGLER: I think we all take it
10  very seriously, obviously. I think it was a great
11  idea to put this in this litigation conduct
12  guidelines. If you look at the other ones in your
13  package from all the various states, you're not going
14  to see many that refer to the judges' responsibilities
15  to the lawyers and the litigants. It's just New
16  Jersey and in the Seventh Circuit that have adopted
17  that. Ours is based on the Seventh Circuit one.
18      But it's a difficult problem. Maybe we
19  ought to get into a discussion as to what you, the
20  lawyers, should do when you have a problem with a
21  judge and how to get that resolved. I don't know if
22  you want to get into that at this point.
23      MR. ORLOFSKY: Well, we're talking about
24  professionalism. It is part of our Code of
25  Professionalism.

27 (Pages 102 to 105)



**Rizman Rappaport Dillon & Rose, LLC**
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

—106—

1 So, I don't -- Mr. Poplar, what about
2 that? You've been victimized by many judges,
3 including me. How do you deal with it?
4 (Laughter.)
5 MR. ORLOFSKY: I don't mean with me. You
6 whined a lot.
7 MR. POPLAR: There is no way to deal with
8 the inappropriate judge.
9 It is not a problem -- and it's not a a
10 problem -- a huge problem in our district, but it's a
11 a problem in the state court. Not most judges, but
12 some judges are terrible. Most judges are capable.
13 But what do you do with -- everybody
14 knows who the terrible judge is. The Assignment Judge
15 knows, the lawyers know and he or she just continues
16 to be terrible.
17 And what happens if you complain?
18 There is no place to complain. Just a
19 little antedote.
20 MR. ORLOFSKY: Anecdote.
21 MR. POPLAR: Thank you, sir.
22 MR. ORLOFSKY: Take antedote. Antedote
23 will not appear in the transcript.
24 MR. POPLAR: It will. Stanley will
25 protect me. Stanley protects the record.

—107—

1 There was a judge in the State Court
2 system who was very, very difficult. It was abusive
3 of lawyers, local lawyers, North Jersey lawyers. The
4 Supreme Court knew it. The Administrative Office knew
5 it. The appellate court knew it.
6 And, ultimately, there was an appellate
7 court decision excoriating the judge, but the opinion
8 was published just after the judge had retired from
9 the bench and the judge had been difficult for a
10 number of years. What do you do?
11 I have no idea. I don't know how to
12 answer that question.
13 MR. ORLOFSKY: Rich, any thoughts on that
14 problem?
15 MR. BADALATO: Before you segue into
16 that, I just want to mention two states.
17 You said what do we do about getting to
18 the audience of people that are not here and conduct
19 themselves right? Both Oklahoma and Texas have a
20 component to continuing to practice each year that
21 everybody has to take a mandatory refresher course
22 every three years in professionalism and ethics.
23 That is just part of it. So you're going
24 to get everybody. If you don't go, you can't practice
25 law.

—108—

A-2695

1 As to the question of what we do with
2 respect to this last issue.
3 I'm not sure. I really am not. I just
4 don't know the answer to it. Maybe Paula has some
5 ideas on it.
6 MS. FRANZESE: Thanks.
7 MR. ORLOFSKY: I'm saving the tough
8 questions for Paula.
9 MS. FRANZESE: Go ahead.
10 MR. ORLOFSKY: What is your view on this
11 issue?
12 MS. FRANZESE: Now, I think that --
13 ultimately, we've got to be relentless in our capacity
14 to expect more and to make -- frame out loud what
15 those expectations are.
16 Several common themes have been emerging.
17 One is that we don't practice -- none of us serve in a
18 vacuum. And we tend to serve a culture that for a
19 very long time has tended to confuse kindness with
20 weakness.
21 We serve a world that tends to
22 misconstrue the graciousness, the gentleness, for
23 somehow a concession of sorts when, in fact, it's
24 quite the contrary. And I think we know that. The
25 people in this room model that. Graciousness --

—109—

1 civility is to be expected from the strong.
2 And all of the posturing that we've been
3 talking like about, those Rambo-type tactics, tend to
4 be a show of weakness or, at the bottom, a real fear
5 factor that is being demonstrated. But throughout,
6 whether it is with a judge or, alternatively, an
7 adversary, I don't think the antedote to the less than
8 civil is ever more than the -- more in kind.
9 I have something on my bulletin board
10 from Martin Luther King, Jr. who said that "We lose
11 all morally persuasive authority with anyone who can
12 discern our underlying contempt."
13 So as soon as we make that contempt
14 plain, we have lost, I think, a certain modicum of our
15 dignity and our own power.
16 What can judges do? Be out there as the
17 standard bearers, as the leaders, taking about the
18 issue to the organized Bar; teaching about the issue
19 in the law school classrooms, modeling the series of
20 baseline expectations at every opportunity, making
21 plain the standards at the very start of the
22 proceedings and throughout. Going out of the way to
23 commend and salute, congratulate in the presence of
24 clients the gracious, the professional, the
25 high-minded, the excellence that does abound in our

28 (Pages 106 to 109)


**Rizman
Rappaport
Dillon&Rose,**LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

A-2696

110

1  midst.
2      If what we move towards is what we tend
3  to talk about most and if what expands is what we tend
4  to think about the most, then we've got to be talking
5  more about this thing more about this and acting more
6  about this.
7      MR. ORLOFSKY:  Richard.
8      MR. BADALATO:  I just want to tell you
9  that just yesterday the Conference of Presiding Judges
10  is looking over a proposal from the Commission on
11  Professionalism of adding a component wherein, much
12  like the lawyers, when a lawyer acts out in poor
13  conduct, that can be reported to the County Bar, which
14  then goes to the Assignment Judge, who brings them in,
15  et cetera.
16      We're asking the Court to consider a
17  similar procedure for state court judges because the
18  biggest problem is lawyers don't want to blow the
19  whistle for fear of reprisal.  So the confidentiality
20  factor is that they would report it to the County Bar.
21  They would have a little investigation, report it to
22  the Assignment Judge on an anonymous basis --
23  confidential basis with no ethical problems or
24  anything.
25      The judge would be brought in and it

111

1  would be discussed about his or her conduct.
2  Hopefully, if we could get that, he could isolate some
3  of these judges and get decisions before they retire.
4      MR. RICCIO:  Steve, if I could weigh in
5  on this for a second?
6      Implicit in your question is that the
7  judge is not behaving appropriately and is doing so
8  intentionally.  If it is a repetitive situation -- if
9  it is an egregious situation, it is one thing.  If it
10  is intemperance, impatience, perhaps not as attentive
11  to an argument as he or she should be, it is perhaps
12  because the judge doesn't even understand that he or
13  she is not behaving as you would hope that he or she
14  would behave.
15      I think in situations like that, if
16  you're an effective lawyer and not a potted plant, you
17  say something to the judge and you do it in a
18  respectful, honest and open way.
19      At least in my experience, when I've had
20  judges who were not giving the attention to the case
21  either to the extent or in the manner that I hoped it
22  would be given, I would in a very professional and
23  gentle but, nevertheless, hopefully, effective way let
24  the judge know that I don't think you're doing what
25  you are supposed to be doing.

112

1      And in my experience, when you make that
2  presentation with most judges who care about what they
3  do as judges, they will perk up.
4      MR. ORLOFSKY:  Well, that is a good
5  point.
6      Of course, what Ron doesn't mention is
7  that it takes a lot of courage to do that.  It is not
8  easy to do that sometimes, for all the obvious
9  reasons.
10      Mr. Poplar.
11      MR. POPLAR:  But this difference between
12  a young lawyer in front of an intemperate judge, and
13  so on, with the stature of Ron Riccio before an
14  intemperate judge and speaking out, what does the
15  young lawyer do?
16      If you walk into the courthouse, there
17  are, maybe, 50 young lawyers in the courtroom and
18  there are ten senior lawyers in the courtroom.  The
19  young lawyers can't stand up to an intemperate judge.
20  They just can't do it.
21      MR. ORLOFSKY:  We have about a minute or
22  two left before we have to conclude.
23      Does anyone in the audience have a
24  question or comment they wish to share?
25      MR. BAIN:  So many years ago there was an

113

1  editorial in The New Jersey Lawyer.  It suggested that
2  maybe the federal bench should be subject to peer
3  review similar to the state courts, as mentioned
4  before.  That may require an amendment to the
5  Constitution.  A decision of two panels of the D.C.
6  Court of Appeals that -- if they had been put together
7  would have held that any disciplinary action taken
8  against a federal judge could be only impeachment.
9      I suggest to you maybe we should consider
10  some sort of peer review.
11      MR. ORLOFSKY:  Judge Kugler, any
12  thoughts?
13      JUDGE KUGLER:  You do have peer reviews
14  for Magistrate Judges and Bankruptcy Judges because
15  they come up for reappointment at the end of the term.
16      There have been Bankruptcy Judges,
17  Magistrate Judges -- I am happy to say never in New
18  Jersey, but in other states, who were denied
19  reappointment because of the opposition of the Bar.
20      If that happens to Article III judges --
21  you need to amend the Constitution.  There is a
22  statute where you can file a formal complaint against
23  an Article III federal judge which goes to the Court
24  of Appeals.  The Chief Judge reviews it.  He or she
25  could dismiss it or refer it to a hearing.  Then you

29 (Pages 110 to 113)



Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

A-2697

**114**

1  can appeal that to the Circuit Council, which is all
2  the active members of the Court of Appeals in that
3  Circuit.
4          Whether there is an appeal for that is
5  unclear at the moment. They do have statutory
6  authority to take certain actions short of removing a
7  federal judge from office. You can't do that except
8  by impeachment.
9          There is a process out there. There was
10  a lot of controversy out there about the process.
11  Under pressure from the Congress, Chief Justice
12  Rehnquist appointed a commission headed by Justice
13  Breyer, who issued a report last year, while Chief
14  Justice Roberts was the Chief, which is on line at the
15  Supreme Court website if you want to read it. It does
16  review the whole process of discipline against federal
17  judges and gets into some cases that caused a lot of
18  controversy and makes recommendations as to what else
19  should be done. But there is a formal process you can
20  use.
21          MR. BAIN: That is the statute that the
22  D.C. Court of Appeals, if you had combined two panels,
23  held unconstitutional.
24          JUDGE KUGLER: I understand.
25          MR. POPLAR: The process has to be an

**116**

1  is really incumbent upon the senior lawyers to drill
2  into the younger lawyers that Rambo litigation is
3  losing litigation.
4          If it is all about winning or a lot about
5  winning, Rambo litigation, 98 percent of the time
6  blows up on the younger lawyer, blows up on the lawyer
7  as opposed to his winning. You lose the ability to
8  get the close call from the judges if you go into the
9  judge's face. You lose the ability to get the close
10  call from the jury if you're disrespectful and
11  discourteous.
12          If you take the low road with a witness,
13  the jury will take the low road with your client and
14  you will lose the ability to deal with your adversary.
15          When a problem occurs during the trial
16  where somebody inevitably stumbles, which happens,
17  then if you have been in somebody's face, they'll do
18  to you what you've been doing to them.
19          So it has to be drilled into a lawyer by
20  our senior lawyers that Rambo litigation in the long
21  run blows up on you and that's the reason you don't do
22  it.
23          MR. ORLOFSKY: Thank you, gentlemen.
24          Any other comments?
25          (Applause.)

**115**

1  informal process where there is senior lawyers and
2  senior judges can speak to the judge where there is an
3  issue.
4          JUDGE KUGLER: We have that. Chief Judge
5  Brown -- every Chief Judge, we ever had in this
6  district, to my knowledge, has offered to intervene.
7  To have that kind of a problem that falls short of a
8  violation of the Code of Judicial Conduct and just
9  having a demeanor-type issue with a judge -- you can
10  go talk to the Chief Judge of the District who has
11  offered his or her services.
12          I know Judge Thompson did. Judge Gerry
13  did. Judge Bissell did. And you can go talk to the
14  Chief Judge who will, after listening to you, if he or
15  she thinks it is appropriate, will talk to the judge
16  about the problem.
17          MR. ORLOFSKY: Do we have time for one
18  more comment?
19          Joe Hayden.
20          MR. HAYDEN: The great thing about panels
21  like this is we're all reminded of truths which we
22  know but somehow fade away.
23          Getting back to where we started. There
24  is a difference between aggressive litigation and
25  aggressive trial tactics and Rambo trial tactics. It

**117**

1          MR. ORLOFSKY: One moment, please.
2          Mr. Goldstein, that round of applause was
3  not for you.
4          (Applause.)
5          MR. BRUCE GOLDSTEIN: You never know.
6          What Joe said -- there is a phrase that
7  you're preaching to the choir. The concept is
8  pointless because everybody here understands the rule.
9  But the fundamental concept that preaches to the choir
10  is that we then preach to the choir we preach to,
11  which was exactly what Joe was saying.
12          That is why the essence of this program
13  is trying to really imbue with our own colleagues or
14  young lawyers and adversaries there is another way to
15  litigate. It more effective and it can be, actually,
16  much more successful.
17          MR. ORLOFSKY: Thank you, Bruce.
18          We're out of time. I want to thank you
19  all for your attention.
20          (Applause.)
21          MR. POPLAR: We have lunch downstairs.
22  We have an interesting speaker.
23          Lunch will be ready to serve. You do not
24  have to wait.
25          See you downstairs in five or ten

30 (Pages 114 to 117)



**Rizman Rappaport Dillon & Rose, LLC**
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7589   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

118

1  minutes.

A-2698

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650  Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

| A | | | |
|---|---|---|---|
| ABA 77:9 | 78:16 | adversaries 82:17 | 52:23 |
| aback 89:24 | accord 40:18 | 117:14 | Alberts 65:4,8,10 |
| abilities 84:1 | according 45:4,7 | adversary 4:20 | Ali 36:16 |
| ability 88:14 116:7 | accounts 56:14 | 91:6,15 92:1 | alienated 87:22 |
| 116:9,14 | accused 30:8 | 95:14 96:14,23 | aliens 15:6,8,10 |
| able 6:14 35:17 | achievement 78:21 | 100:24 101:1,18 | 21:24 23:11 |
| 50:25 55:15 | acknowledging | 102:3 109:7 | 50:16 |
| 59:19 104:10 | 82:6 | 116:14 | allegations 97:22 |
| abound 109:25 | across 19:2 90:23 | advisors 67:14 | alleged 36:13 45:8 |
| about 3:14 8:11,17 | act 12:14,16,20 | advocacy 3:24 | allegedly 25:3 |
| 8:18,19,22,24 | 39:8,8 45:8 | 6:21,23 | Alliance 45:20 |
| 13:8 15:9 18:13 | 55:11,12 59:11 | advocate 6:6 51:19 | allies 39:17,18 |
| 21:1 23:4 24:5,5 | 59:12 89:25 | Advocates 51:18 | 40:16 |
| 24:9,21 26:9,17 | acting 110:5 | advocating 31:6 | allow 23:19 |
| 31:17 32:10 | action 113:7 | affect 100:8 | allowed 19:16 29:9 |
| 34:24,25 35:23 | actions 114:6 | affirmed 10:12 | 30:8 39:24 86:11 |
| 36:3,19 37:2,19 | active 76:23 78:23 | afford 53:22 54:4 | allowing 24:17 |
| 37:20,22 39:25 | 114:2 | afforded 53:20 | alluded 90:1 96:2 |
| 40:23 41:6,21,23 | actor 27:1 | affords 40:17 | 97:18 |
| 42:6,12,14,16,22 | actors 36:23 37:4 | Afganistan 19:3 | alluding 98:18 |
| 43:11 44:20 45:3 | acts 14:1,12 | Afganistan 26:19 | all-out 92:11 |
| 47:25 48:3,4,8 | 110:12 | 44:20 45:24 52:8 | all-time 84:15 |
| 48:24,25 52:7,14 | actual 37:4 | 52:15 | almost 5:2 54:6 |
| 52:15,17 53:19 | actually 25:13 | Afghanistan 21:6 | along 58:19 59:17 |
| 55:7,25 56:4,9,9 | 30:16 32:17 35:3 | 25:4 44:18 45:17 | already 25:25 |
| 58:23 59:4 60:11 | 37:5,21 52:21 | 45:22 48:2 | 56:14 57:14,17 |
| 60:13 62:9 65:2 | 60:25 61:12 | afraid 93:7 | 60:6 |
| 71:22 73:4,10 | 80:15 117:15 | after 4:6 6:21 | altered 4:7,8 13:18 |
| 76:6,8 77:4,12 | ad 62:15 | 14:16 21:24 25:3 | alternatively |
| 79:5 83:6,11,14 | adding 110:11 | 25:18 45:16 | 79:16,17 109:6 |
| 84:25 89:6 93:6 | addition 51:6 | 46:11 48:18 | although 7:21 14:7 |
| 94:10 95:20 96:1 | Additional 51:13 | 81:16 89:23 91:3 | 58:12 63:1 95:2 |
| 96:11 97:8,22 | address 6:25 76:9 | 107:8 115:14 | 104:23 |
| 98:10,22,23 | 77:6 79:1 90:12 | afterwards 3:12 | always 16:1 34:4 |
| 100:19,20 | 94:20,23,24 99:5 | again 4:23 7:18 | 79:16 80:11 84:7 |
| 102:19 103:3 | 99:6 102:13 | 12:20 42:5 52:4 | 89:23 96:20,21 |
| 105:6,23 106:1 | addressed 49:23 | 52:8,23 72:4,20 | Al-Ashrabi 24:23 |
| 107:17 109:3,17 | 77:22 104:23 | 72:25 81:4 85:19 | 25:14 29:2 30:24 |
| 109:18 110:3,4,5 | addressing 87:6 | 86:6 | Al-Odah 5:9 12:23 |
| 110:5,6 111:1 | adjourn 71:25 | against 12:5 22:25 | ambiguity 22:3 |
| 112:2,21 114:10 | 86:15 | 23:13,14 35:4 | ambiguous 21:18 |
| 115:16,20 116:4 | adjudicate 47:23 | 89:10 101:9 | 36:24 |
| 116:4 | adjudication 10:24 | 113:8,22 114:16 | Amdy's 53:25 |
| absence 51:15 | administration 5:4 | age 1:11 3:21 7:2 | amend 113:21 |
| absolute 4:21 | 9:13,24 15:22 | 25:3 | amendment 15:14 |
| absolutely 32:13 | 42:24 43:14,19 | agency 22:18 | 26:11 113:4 |
| 74:5 89:9 | 44:6 52:6 | aggressive 92:9 | America 9:19 |
| absurd 53:23 | administration's | 115:24,25 | 33:19,19 46:19 |
| 86:17 | 20:25 | ago 56:3 58:5 | American 15:19 |
| abusive 107:2 | Administrative | 76:20 77:12 | 19:23 20:23 |
| academic 81:4 | 77:23 107:4 | 79:11 81:15 | 49:24 69:14 |
| accept 31:1 38:11 | admire 80:24 | 112:25 | Americans 63:25 |
| 52:8 | admissible 37:8 | agree 35:10 39:25 | amicus 8:9 |
| acceptable 89:4 | 56:22 | 41:5 42:23 54:14 | among 9:18 34:16 |
| accepted 11:21 | admission 66:5,7 | 54:18 87:15 | 85:13 89:25 99:3 |
| accepting 46:16 | 75:10,12 | 99:18 103:2 | amongst 74:10 |
| access 61:15 | admitted 71:5 | agreement 54:6 | amount 40:18 |
| accommodate | Admistrative | ahead 55:20 58:7 | 75:17 |
| 20:25 | 77:19 | 92:22 108:9 | analysis 43:24 |
| accommodating | adopt 55:14,16 | Ahern 78:21 | Andrew 7:8 |
| 21:11 | adopted 69:8,14 | aid 103:8 | Andy 41:12 42:4 |
| accommodation | 69:15,19 104:24 | airing 105:3 | 58:11 |
| 21:5 | 105:16 | Al 16:17 17:20,25 | Anecdote 106:20 |
| accomplishments | advantage 73:8 | 18:2,9 19:3,17 | angry 87:7 |
| | 90:21 | 27:2 36:16 37:16 | animate 41:8 |
| | | 39:19 44:24 45:3 | Anna 84:19 |

| annex 22:24 |
|---|
| announcing 45:22 |
| annual 1:7 2:4 |
| 48:20 67:5 78:17 |
| anonymous 110:22 |
| another 16:21 |
| 22:25 42:12 |
| 43:13 45:17 |
| 48:19 64:16 |
| 75:14 86:16 |
| 117:14 |
| answer 52:3 70:24 |
| 73:12 81:11,17 |
| 82:8 86:1 95:22 |
| 104:2 107:12 |
| 108:4 |
| answered 102:21 |
| answers 55:25 |
| antedote 106:19 |
| 106:22,22 109:7 |
| anti-terrorist |
| 52:10 |
| anybody 39:10 |
| 47:7 71:1 83:5 |
| anymore 101:22 |
| anyone 42:5 46:3 |
| 109:11 112:23 |
| anything 57:22 |
| 61:2 88:15 95:19 |
| 110:24 |
| anyway 28:22 |
| 88:21 |
| anywhere 16:15 |
| apart 18:2 |
| apparently 29:7 |
| 75:6 |
| appeal 114:1,4 |
| appealed 12:10 |
| 13:3 74:22 93:17 |
| appeals 5:2 59:10 |
| 60:24 113:6,24 |
| 114:2,22 |
| appear 70:17 |
| 71:12 106:23 |
| appeared 77:9 |
| appears 54:7 |
| appellate 6:24 |
| 23:21 107:5,6 |
| Appendix 69:16 |
| applauding 88:10 |
| applause 3:17 |
| 63:17 65:9 67:20 |
| 67:25 116:25 |
| 117:2,4,20 |
| applicability 43:22 |
| applicable 8:19 |
| 27:21 |
| application 75:12 |
| applied 12:17 |
| 49:18 51:10 |
| applies 17:1 18:15 |
| 28:15 55:11 |
| 56:19 |
| apply 17:6 19:6 |
| 26:22 27:12,18 |
| 27:19 28:2,4,16 |

Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650  Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

44:2,7 49:11
55:20 56:19 57:1
62:17 68:2
applying 52:25
56:23
appointed 93:10
114:12
appointing 32:17
appreciate 23:22
63:20 67:12
appreciated 96:14
114:20
apprehend 37:7
approach 19:20
appropriate 32:12
32:13 51:2 54:15
54:20 79:24
102:6 115:15
appropriately
75:18 111:7
appropriateness
31:20,24
Arabia 29:19,20
arbitrary 41:17
46:23
archives 51:21
area 3:25 70:9
88:24
areas 7:6 69:21
104:22
argued 8:6 10:14
12:12
argues 9:17
arguing 62:3
argument 11:14
23:21 26:13
27:17 28:21 34:5
34:7 50:23 53:19
63:4 111:11
arise 31:5
arisen 5:3 6:24
62:25
armed 14:13 26:18
26:22 27:6,17
28:5 51:25 52:13
53:4
arms 18:6 52:16
Army 50:5,11
51:19
around 8:3 23:25
55:13 66:20 67:2
82:10
arranging 29:19
arrested 52:17,18
Art 66:17
Article 1:12 12:25
18:15 19:5,10
26:8 42:7 51:10
51:14 56:9,17
113:20,23
articles 23:24
34:11,12
articulate 6:8 87:4
aside 35:8
asked 46:11 82:11
95:14

asking 88:5 110:16
aspect 14:20 15:4
16:5 23:9 32:19
32:23 39:11,11
aspects 20:7
aspiration 79:23
aspirational 76:25
92:21 95:2
aspirations 40:20
asserted 35:4
assessed 95:6
101:8
assign 59:13
assigned 5:21
24:22,25 25:1
29:1
Assignment
106:14 110:14
110:22
assist 79:23
Assistant 7:9
Associate 4:25
associates 90:14
90:14
Association 1:1
2:2 65:12 67:17
76:24 76:21
77:14
associations 45:9
78:11
Association's
69:14
assumption 38:6
38:17
assumptions 58:20
asymmetric 52:9
atrocities 14:5
attack 16:18 39:15
42:15 94:18
attacks 13:21,24
14:12
attempted 80:9
attend 95:8
attention 63:19
82:4 111:20
117:19
attentive 111:10
attenuation 45:10
attorney 4:25 7:7
7:9 24:18 64:8
attorneys 10:22
25:1 66:8,9 99:7
audience 32:6 83:3
83:6 95:15
107:18 112:23
August 69:16
authentic 38:12
authentically 37:4
authority 9:5
109:11 114:6
authorization 55:8
authorize 43:2
authorized 11:16
14:15 15:19
43:16

available 65:23
78:14
avoid 10:2 30:22
62:17
avuncular 75:22
awaits 88:19
award 65:25 78:18
78:21
aware 31:19 76:6
93:21 100:7
awareness 76:25
83:1
away 38:8 44:6
59:1 115:22
Azmy 6:9 8:21
31:16 41:5,17
64:7

**B**

B 1:25 36:6 68:22
baby 78:7
back 15:9 21:14
25:13 31:12
34:22 35:15
37:22 51:21
53:13 57:2 64:16
65:1 72:17 86:7
87:8 95:24 98:17
103:9,17 115:23
backed 44:6
background 3:10
8:21 31:10 19
bad 4:9 37:4 87:11
Badalato 76:4,9
85:18 86:2,25
92:20 107:15
110:8
Badolato 69:3
91:20
baffled 34:5
Bahar 6:9,10,18
6:21,23 8:17,20
13:7 23:19 31:15
40:21 47:10,24
49:10 50:8
Bahar's 13:10
BAIN 112:25
114:21
balance 9:4 41:7
58:16 104:4
balanced 4:10
balances 40:5
balancing 7:20
Ball 67:5
Band-Aid 74:17
Bankruptcy
113:14,16
bar 1:1,16 2:2
32:23 65:13
67:18 69:14
76:21 78:11,18
78:18 82:3 91:22
105:4,4 109:18
110:13,20
113:19

barrier 2:22
Barry 75:2 96:3
base 22:17,22
89:21
based 49:4 53:7
57:25 58:2
105:17
baseline 20:24
79:24 109:20
basic 11:2 12:1
17:13 19:13 41:8
42:9,10 43:6
58:21
basically 12:4 20:2
40:7 97:19 99:8
basis 11:4 15:20
17:24 18:1 19:5
22:1 62:16 78:17
110:22,23
batch 29:3
battlefield 16:3
21:6 26:19 43:7
48:2 52:7,9,10
52:11,24
battlefield-like
50:6
Bay 24:22 25:10
29:6,8,20
bearers 109:17
bears 48:22
became 83:16
Becker 5:17
become 75:23
79:21,22
becoming 79:21
80:20
bedrock 16:8
before 4:19 16:18
21:11,24 24:9
25:10 35:13,24
48:5 51:8,17
54:9 65:3 66:9
68:3 73:18 87:23
99:21 102:12,12
104:8,15,19
107:15 111:3
112:13,22 113:4
began 35:25
begin 13:15 61:11
70:7
beginning 24:24
58:23
begins 26:12
behalf 10:22 31:20
32:1 34:7 67:15
behave 84:9 85:9
85:13,21 114:14
behaved 94:4
behaves 91:18
behaving 85:14,24
91:25 114,1,13
behavior 74:9,20
84:20 93:24 96:6
behind 2:22
being 19:18 24:20
24:21 34:1 48:9

53:1
61:20,20,21 63:5
73:19,20 74:19
77:11 81:13,18
81:21 82:4 83:1
103:13 109:5
believe 93:5 98:3
101:17
believed 83:16,17
83:19
believes 7:19 9:6
Ben 35:23 36:18
37:21
bench 1:16 2:22
85:10 98:12
107:9 113:2
benefit 70:6 83:9
83:11
benefits 2:15
best 72:22 81:10
93:14,16 103:20
bet 70:19
better 40:11 80:11
between 17:11
70:5 91:24 93:13
95:25 99:3
112:11 115:24
beyond 37:6
big 21:3 28:12
73:16 74:12
76:12
biggest 38:21
110:18
Bill 50:21
binding 51:15
Bissell 77:21
115:13
bit 8:11,18,21
13:11,16 21:17
41:11 80:23
81:18 92:25
bizarre 64:1
black 58:21 61:11
61:19 62:18
blow 110:18
blows 116:6,6,21
board 67:16 109:9
body 27:3 56:15
80:5
bomb 56:7
bombing 7:12
bond 87:21 88:14
book 52:18 65:23
borderline 39:18
borrow 27:25 28:1
88:6
Bosnia 52:22
both 4:16 13:22
14:14,15 16:8
37:14 63:10 66:9
75:6 77:8 89:8
107:19
bother 74:6
bottom 109:4
Boumedienne 5:9
12:23 52:20



**Rizman Rappaport Dillon&Rose, LLC**
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

bounds 16:12
bounties 45:22
bounty 45:21
box 28:10,12,13,13
branch 23:1 40:3
  53:5,5,11 55:3
branches 14:14
break 50:19 64:15
breath 62:22
Breyer 114:13
brief 65:14
briefing 12:12
  23:24
briefs 82:17
brilliant 63:6
Brilliantly 47:4
bringing 44:20
brings 110:14
brothers 2:17
brought 10:9
  62:11 75:18
  110:25
Brown 2:19 67:14
  115:5
Bruce 117:5,17
bulletin 109:9
bunch 55:7
bury 92:12
bus 52:5
Bush 5:9,9
business 83:21

C

cafes 52:18
calendar 65:19
California 31:9
call 14:2,3 25:15
  25:16 27:6 29:19
  29:24 65:3 72:25
  78:6 86:14
  102:17 104:7
  116:8,10
called 2:22 10:7
  11:9 15:5 18:14
  19:7 34:12 38:23
  50:5 52:24 58:4
  60:4
calling 13:25 96:19
calls 82:18
calmed 71:13
Camden 68:22
came 19:9
Canadian 25:2
canceled 103:16
capable 75:19
  79:20 80:19
  106:12
capacity 5:1 79:14
  108:13
caption 5:10
captured 40:5
captures 48:2 52:7
  52:14
capturing 14:25
care 112:2

career 78:21
careers 100:8
careful 89:5
carefully 41:6 74:7
caring 87:6
Carl 2:1 65:12
  68:2,23 76:6,10
  79:2 86:11 87:13
  89:8 90:1 95:11
  96:2
Carlton 22:20
Carl's 88:18
carried 86:3
carries 80:10
carry 18:6
Carta 42:18
CARTHY 32:8
  58:17
case 5:6 7:11 8:6
  10:13 11:24 12:4
  20:10 21:20 24:7
  24:10,12 26:9
  30:3 31:9,12
  37:4 41:4 42:8
  44:12,13 46:10
  50:1 51:9 56:18
  63:24 75:14,21
  86:13,22 87:16
  87:23 88:18
  93:11 100:19
  101:3,11 119:20
cases 1:12 4:21 7:5
  8:9,22 12:22,24
  13:18 21:23,24
  26:10 32:11,14
  35:15 36:10 38:4
  55:13,21,24
  60:21 61:3,6
  74:8,20,21 75:13
  86:3 87:1 100:20
  102:10 104:18
  114:17
catch-all 18:14
categories 53:8
caused 87:21
  114:17
cave 93:8
Center 7:12,13
central 10:5,6 42:1
  46:19,19
cents 51:6
centuries 79:11
  99:24
ceremonies 66:7
Cert 13:4
certain 55:14,16
  55:24 91:10
  109:14 114:6
certainly 32:24
  33:25 46:12
  51:23 54:18 58:2
  59:7 63:10 69:2
  79:7 80:1 82:3
  90:3 104:23
certiorari 5:7
cetera 40:20 56:10

57:13 82:20
  110:15
Chairman 67:15
chair 54:7 68:20
  69:3 76:4
Chairman's 67:5
challenge 10:18
  12:2 39:12 59:19
  60:7 61:10 79:22
challenged 35:13
challenges 5:1
  13:20 35:12
  59:16 61:4 62:25
chamber 72:6
chambers 30:21
  87:9 90:13
chance 2:23 24:4
  25:21 60:21
  61:17 99:20
change 71:20
  80:25
channeled 59:9
chaos 45:16
character 18:16
characterize 7:22
  96:18
characterized
  51:11
charge 15:24
  27:23 37:8
charged 9:1,2
  25:10 29:4 32:25
  36:24,25 37:5
charges 15:23
charging 36:4
Charles 66:14 77:8
check 42:3,17
checks 40:4
cherry 28:6 42:24
  43:14
cherry-pick 35:8
cherry-picking
  34:5,9 51:7
Chicago 45:25
  77:9
Chief 5:21 67:14
  68:4 77:20
  113:24 114:11
  114:13,14 115:4
  115:5,10,14
choice 9:12 80:4
choir 117:7,9,10
choose 79:16
chose 93:12
CIA 44:21
Circuit 10:12
  12:11,23 22:2
  59:10,14 60:24
  61:8 75:2 94:7
  94:14 96:3
  105:16,17 114:1
  114:3
Circuit's 5:8
circumstance
  44:23
circumstances 6:1

citizen 49:25 50:2
  50:14
citizens 50:13
civil 5:4 7:4,5,21
  8:3 18:24 62:24
  63:23 76:13
  99:23 109:8
civilian 22:18
  43:11
civilians 17:19
  18:7
civility 1:15 2:8
  80:12,20 81:14
  81:19,21 82:2,13
  82:23 83:2,7,10
  83:14 84:12
  109:1
claims 9:5 34:19
  35:4,10 59:25
  60:25
class 55:23 80:15
  80:17
classes 81:25
classified 21:2
  30:18
classroom 80:1,14
classrooms 109:19
clause 7:1 15:14
CLE 95:8
clear 16:11 20:20
  54:3 61:3 89:3
  89:13
clearly 81:18
clerked 5:17
clerks 90:13
clever 28:7
client 26:7 27:11
  27:14,23 28:2
  29:6 44:14 46:11
  81:6 88:19 91:25
  92:5,17 102:18
  104:5 116:13
clients 10:23 25:22
  46:9 69:22 72:18
  85:15 92:6
  101:19 109:24
client's 44:13
  85:23
Clinic 7:4
close 30:22 35:17
  116:8,9
clowns 85:9,11
Clubhouse 67:1
Code 20:17 69:9
  95:1 104:24
  105:24 115:8
codes 69:7
codified 20:21
  21:9
cognizable 34:19
collateral 42:15
colleague 5:18 8:6
  45:1 53:25
colleagues 91:23
  117:13
collegial 105:4,5

Colona 67:7
combat 52:16,17
combatant 8:24
  11:9,11 43:12
  46:16 47:20,22
  48:18 49:20,25
  50:9 53:6,14
combatants 15:1
  15:17,21 16:1
  33:21 35:7 41:14
  41:18 43:3,5
  53:21,21 58:24
combined 114:22
come 2:13 10:3
  15:9 21:7 55:21
  56:2 57:3 63:19
  76:1 79:11 90:17
  92:6 104:19
  113:15
comes 43:5 54:3
  86:7 87:5
comfortable 19:19
  23:10 53:10
  100:25
coming 55:24
command 18:7
Commander 5:14
  24:4,14 26:5
  28:20 29:11,14
  31:16,17,25 34:6
  35:11 38:23
  46:10 51:3 64:7
commend 80:16
  109:23
comment 8:17
  32:6,12 33:4,15
  47:1,9 50:25
  88:17 101:17
  103:23 112:24
  115:18
commented 51:21
comments 34:4
  41:11 116:24
commission 5:23
  20:10,20,22
  21:10 25:11 29:5
  29:23 30:3,6
  39:22 42:8 60:1
  65:25 68:21 69:4
  76:5,7,19,19,23
  77:6,11,13,25
  78:23 93:12
  110:10 114:12
commissions 6:7
  9:4 12:20 19:22
  20:1,12,24;6,8
  24:19 28:23
  29:24 39:8 50:23
  54:25 59:11,20
Commission's
  25:7
commitment 78:22
commitments
  16:10
committed 14:5
  63:6

**Rizman
Rappaport
Dillon&Rose, LLC**
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

common 11:19
18:15 19:5,10
23:6 34:11,12
36:10 51:10
108:16
communication
75:25
communications
82:17
Community 65:7
community-wide
66:19
company 33:2
compared 53:22
compassion 84:7
compelling 103:18
104:10
compensated 34:1
competence 62:10
competitive 92:16
complain 106:17
106:18
complaint 113:22
complete 21:12
30:12
completely 39:23
44:13 46:6 59:5
complicated 63:4
comply 104:17
component 11:25
77:16 107:20
110:11
comported 59:21
compromise 85:15
compromising
37:14 40:25
compulsory 57:13
concept 85:17
117:7,9
concepts 27:25
28:1
concern 10:6
concerned 18:24
concerns 21:1,13
concession 108:23
conclude 43:14
112:22
concluded 12:4,7
17:5 19:1 44:17
44:22,24
conclusion 28:8
79:12
conclusions 55:25
concurrence 22:11
condones 47:15
conduct 2:9 9:24
44:3 56:20,24
59:22 62:6 73:13
76:15 77:4 86:24
87:12 88:25 89:4
89:11,15 91:4
105:11 107:18
110:13 111:1
115:8
conducted 48:17
conducting 56:16

conducts 23:1
conference 1:8 2:4
50:20 99:8
103:19 110:9
conferences 30:21
30:21 84:22
104:14
confidence 84:13
84:15,21,25
confidential
110:23
confidentiality
110:19
confined 28:23
confirm 11:10
confirmed 14:14
conflict 14:13
17:24,25 18:25
26:18,22 27:6,17
28:5 39:5,10
51:10,25 52:13
53:4 60:13
conflicted 27:7
conflicts 17:10,10
18:4,15 26:15
confront 7:19
confrontation
57:13
confronting 16:16
confuse 108:19
congratulate
109:23
Congress 5:11
12:13,19 14:15
19:10 20:19 23:8
39:7 40:15 55:5
55:9,11 59:7
60:4 62:14,19
114:11
connected 12:3
connection 3:23
20:8 23:12 46:4
connections 36:24
37:1 46:13
consequences 14:2
14:6 21:18 31:21
58:9
consequently 93:8
consider 110:16
113:9
considerable 45:15
consideration 61:5
considers 45:11
consistent 23:10
31:8 49:13,16
93:1
consolidated 1:7
11:24 12:24
conspiracy 36:10
constituional 4:10
constituted 24:8
Constitution 1:18
13:1 26:8,12
60:2,9 64:21
113:5,21
constitutional 4:7

7:2,3,5 15:13,16
21:18,22,25
23:14 39:25 41:2
49:2
constitutionally
49:24
constraints 43:18
constructed 39:22
contempt 109:12
109:13
contend 59:25
contention 74:3
context 21:4 50:3
53:3 98:4
continuance 82:16
95:14
continuances
73:17
continue 48:23
60:12 63:13
71:14 78:15
continued 6:23
67:17
continues 106:15
continuing 74:8
107:20
contrary 98:2
108:24
control 10:16 73:3
controversial 32:7
controversy 18:13
32:10 114:10,18
conundrum 58:6
convenient 28:15
convention 17:1,1
17:5,8,9,13,23
18:14 19:6 34:2
34:11,15,17 44:1
61:22
Conventions 34:13
35:1 43:21
convict 37:9 55:15
57:8
convicting 38:9
conviction 49:1,4
convictions 42:15
convince 29:20
convinced 80:21
cooperate 39:20
40:2,7,16
coordinator 3:3
copying 96:12
Corps 5:20
corpus 5:11 10:8
10:18 11:19,19
13:2 15:12,13
23:5 42:9 59:14
60:5,5,7 63:24
correct 49:4 89:9
correspondence
95:24 96:13
cost 17:15
Cotter 31:12
Council 114:1
counsel 5:6,22 6:3
9:16 12:6 30:21

31:25 71:5,14
78:2,5 92:24
100:3
count 88:22,23
counter 96:17
Counterterrorism
7:14
countries 35:5
country 2:7 14:5
15:20 24:1 41:9
49:1,25 50:2,13
50:15 53:17
54:10 64:14 73:6
99:25
County 78:11,18
110:13,20
couple 23:20 25:22
32:3 34:3 41:11
43:1 47:1 51:5
81:11 100:23
courage 112:7
course 10:13 16:4
16:8,25 17:20
30:5 36:13 41:18
57:4 62:20 68:16
77:15 78:20
81:24 86:15 95:8
96:20 107:21
112:6
courses 81:23
court 2:17 3:19 5:8
5:19 10:9,10,13
10:24 11:21,22
13:5 14:17 15:11
19:11,11,18
21:15 22:24 31:9
35:4,25 37:9,24
42:7 48:6 50:3
50:12 58:13 59:9
59:10 60:24 61:1
61:8,9 64:2
65:23 66:6,9
67:23 68:22
69:13,20,20,24
70:7 71:3 74:16
76:22 77:24 78:6
78:7 87:6 91:7
92:1,4,5 96:13
97:21 98:1,21
99:20,21 101:4
102:11 103:12
104:25 105:5
106:11 107:1,4,5
107:7 110:16,17
113:6,23 114:2
114:15,22
courteous 84:5
87:4 101:18
courteously 92:1
courthouse 66:4
66:11 112:16
courtroom 30:17
70:11 71:12,24
80:2 89:21 91:2
93:24 112:17,18
courtrooms 66:25

courts 1:1 27:25
9:20 10:1,2,3,20
12:14,21 34:19
59:4 61:4,16
62:15 77:2 95:22
96:5 104:25,25
113:3
courts-martial
20:14
court's 22:4 61:3
65:14 99:1 105:7
court-martial
20:21
covered 17:9,12,25
18:4 61:20,21
62:2
Co-conspirator
36:5
co-conspirators
36:1,14,20
create 57:15,24
102:5
created 57:14,21
66:16
creating 20:1
creation 65:16
credibility 91:16
91:17
credit 32:24 63:8
crime 9:2
crimes 13:25 14:3
15:2 18:18 19:22
19:23 20:2
criminal 11:2 16:2
16:9 26:9,12
35:16 38:2,6,17
38:24 41:3 42:6
43:15 48:25
53:15,17,23 54:9
54:20 87:18
crisis 38:13
critical 42:20
Critics 15:22
cropping 81:20
cross 88:7
crux 97:5
crybaby 101:23
CSRT 48:7 49:15
CSRTs 50:23
Cuba 22:13,14
cultural 2:14
culture 2:14 76:2
76:12 108:18
current 3:9 69:3
currently 5:21
50:23 65:18
66:10
curtail 5:11
custody 52:21,21
58:25
customary 28:1
51:14
C.S.R 1:25

D



Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

damage 84:21
dancing 67:8
Daniel 78:21
darn 85:2
data 45:3,5,7
date 78:3 86:16
  101:20
day 7:2 20:4 71:13
  73:14 85:2
days 63:13 103:16
  104:15
day-to-day 75:25
deadline 104:17
deal 21:3 34:2
  54:10 64:13
  69:21 71:6,18
  73:15 75:24
  92:13 98:25
  100:5,6,24
  101:25 102:4
  106:3,7 116:14
dealing 32:20
  60:14 69:6 82:12
  101:1
dealt 35:16 70:12
  99:12
Dean 68:19 81:3,3
  95:11 98:9
dear 5:18
departure 4:3,17 7:24
  32:2 63:13
December 9:16
  45:25
decent 2:25 6:20
decide 28:12 85:2
decided 20:11
  56:24
decides 47:16
decision 5:8 11:23
  12:6,10,12,16
  13:22,24 14:17
  14:17 29:8,12
  57:14,18 58:9
  75:2 87:7 90:4
  107:7 113:5
decisional 59:6
decisions 13:3
  49:21 55:7 57:16
  57:25 58:15
  111:3
decisive 79:12
dedicated 7:16
deep 44:8
defeating 7:17
defendant 30:11
defendants 33:1
  36:15 38:2 53:23
defense 5:22 7:15
  20:7 24:18 26:3
  29:10 33:9 36:9
  36:9,12 45:2,4
  48:5
defined 17:10
defining 19:11
definition 5:12
degree 73:18

delayed 12:13
deliberately 50:10
delighted 68:24
delivered 36:17
delivering 3:5
demands 82:19
demeanor 80:6
demeanor-type
  115:9
democracies 7:15
demonstrate 42:19
  47:12
demonstrated
  46:12 80:13
  109:5
demonstrating
  80:4,5
Denbeaux 45:2
Denbo 54:1
denial 99:13
denied 113:18
denies 46:18
  101:20
depart 56:1
Department 5:1
  9:17 17:4 20:8
  26:3 32:16 36:2
  45:2,4 48:5
Department's 33:9
departures 54:19
  54:21
dependent 38:15
depending 27:7
depends 89:1
deposition 73:25
  86:15 96:6
depositions 73:13
  82:18 101:20
  103:15,19
deputy 4:24 64:8
describes 15:7
description 22:15
  68:2
deserve 46:24
design 56:12,12
designated 8:23
  9:3
designed 55:13
  66:15,24
designing 54:24
  55:23
desire 23:13
details 53:24
detain 9:5 49:24
detained 46:24
  48:23
detainee 5:25 6:14
  6:16 12:14 20:7
  20:24 25:2,10,15
  25:17 29:8 30:15
  39:7 47:19 48:19
  48:20,23 49:6
  50:10 59:12
detainees 5:12 6:6
  8:7,10 9:1,7
  10:17 11:11,16

11:17,24 12:1,4
  12:15 14:19,24
  16:7,25 18:17
  19:4 24:13,22
  25:13 29:3 31:21
  32:1 34:9 42:2
  44:21,22 45:3,18
  47:25 48:8,15,21
  59:19 61:25
detainee's 48:20
  48:21
detaining 15:1,17
  16:1
detention 9:19
  11:5 15:5 16:5
  21:14 39:23
  40:19 43:3 44:16
  46:23 50:13 55:7
  59:20 63:25
detentions 10:19
  12:2 59:25
determination
  42:10 43:6 44:1
  49:12 53:11,13
  53:17
determinations
  44:19 48:4 49:19
  50:8 53:6
determine 11:3
  47:21
deterrence 74:7
develop 29:16
developed 9:22
  78:10
developing 78:13
development
  61:13
deviations 54:19
devise 77:25
difference 112:11
  115:24
different 11:22
  13:14 20:21 28:5
  34:13 35:12 55:1
  55:16 57:23
  64:12 73:9 83:21
difficult 6:1 35:19
  71:16 73:15,22
  94:7,13 95:21
  96:4,7 101:7
  102:15 105:18
  107:2,9
dignified 84:3
dignity 109:15
digress 30:23
diminished 77:3,3
dining 67:8
diplomatically
  34:16
direct 88:7
Directly 4:19
Director 7:13 77:9
Directors 67:16
disabled 101:1
disadvantage 92:4
disagree 22:7

disagrees 47:4
discern 109:12
disciplinary 95:3
  113:7
discipline 114:16
discourteous 73:21
  89:25 91:4,14
  116:11
discourteously
  90:11
discovery 82:19
  101:20
discretion 41:24
  42:3 46:6
discussed 32:5
  77:10 111:1
discussing 13:19
  50:8
discussion 4:15
  54:16,23 55:4
  56:2 58:5,18
  68:15 105:19
discussions 23:25
dismiss 11:13
  113:25
dismissed 10:10
disorder 28:17
disparagements
  82:16
displaying 87:8
dispute 61:22
  99:19
disputes 26:23
  34:14,18
disrespect 88:3
  91:6,6,7
disrespectful
  87:20 116:10
disruptive 71:10
distance 63:16
distinguished
  68:17 70:6
distributed 69:5
district 1:9 2:3,6,9
  2:10,13 7:10
  10:9,9,20 11:21
  11:22 65:6,14,23
  67:23 68:10,22
  69:12,13 70:7
  102:9 104:9,23
  105:3 106:10
  115:6,10
districts 2:7 75:13
document 37:24
  37:25 82:18
  104:11
DOD 49:5
doing 2:14 18:18
  28:4 33:1 38:20
  38:20 40:12
  57:22 63:3 79:4
  87:16 88:15
  111:7,24,25
  116:18

done 14:24 34:1
  38:3 39:9 43:10
  44:19 49:14,16
  51:1 54:1 59:7
  62:15 76:24 77:7
  81:13,18 82:7,7
  82:9,9 86:6 95:7
  95:7,7 99:24
  100:12 114:19
doubt 83:5
Doug 65:3
down 14:4 19:15
  22:18 29:5 33:25
  48:1 54:15 71:13
  84:20 97:6 103:4
downstairs 117:21
  117:25
dozens 23:24
dramatically
  64:12
drawn 80:22
drill 116:1
drilled 116:19
driven 9:12 93:18
drop 15:8
dropping 45:21
drove 13:22
due 12:2,9 38:1
  41:1 42:7
Dunkey 44:18
during 14:25
  15:21 16:3 30:7
  36:13 81:25
  87:20 116:15
dusted 20:2
duties 105:1
duty 33:1,21 81:5
  104:4

DVD 78:13
D.C 5:8,23 10:9,12
  12:11,22 22:1
  24:19 59:10,14
  60:24 61:8 113:5
  114:22

E
each 15:4 17:12
  23:22 26:20
  34:12 46:25 47:1
  47:3 52:12 64:5
  77:17 79:13,14
  82:11 90:9,15
  93:17 103:16
  105:5 107:20
earlier 90:8 96:2
early 14:23
earnestly 72:12
  97:23
earth 9:11
easily 102:16
easy 94:12 112:8
echo 72:6
Ed 23:24
editorial 113:1
effect 21:24

Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

effective 72:23
75:22 85:23
98:24 99:2,17
111:16,23
117:15
effectively 10:15
19:15 22:8,24
effort 6:13 66:18
76:21
efforts 66:13 67:19
83:1
egregious 95:5
eight 45:6 64:1
Eisentrager 15:6
21:16,23
either 5:8 27:21
37:5 42:8 59:6
79:15 90:10
97:20 99:4,7
111:21
elaborated 79:2
elect 57:8
element 79:12
eleven 76:20
eloquent 25:6
elsewhere 92:25
embarrass 72:19
embraces 47:15
emerging 108:16
employ 72:14
employed 30:10
empty 54:7
encountered 70:10
71:24 72:13
92:19 93:23
encourage 100:11
end 4:4 37:20
72:21 85:1 89:6
97:1 99:19,25
101:20 113:15
ended 101:4
endless 9:24
endorses 47:15
enemy 8:24 10:5
11:10 15:1,17,21
16:1,17 17:16
33:6,21 36:21,22
37:11 38:4 41:13
41:18 43:3,5
46:15 47:22
49:25 53:7,14,20
53:21 58:24
enforcement 13:25
25:20 56:25 57:7
engage 54:16
96:12
engaged 44:9 45:8
98:7
enjoining 30:2
enjoyed 12:1 65:17
68:10
enlist 45:18
enough 36:8 37:2
37:8 45:25 50:4
50:12,14 102:14

104:7,7
entails 83:10
enterprise 53:16
entertaining 3:13
entire 40:24
entirely 35:16 37:1
entirety 32:17
entities 36:13
entitled 18:3,10
44:11 48:19
entity 36:5,21
envy 38:10
episode 84:19
86:18
equally 23:16
era 15:5
essence 5:10
117:12
essential 6:3 38:13
essentially 30:11
32:19 37:11
53:15
establish 76:12
established 8:7
14:10 16:6 47:21
56:15 56:16 76:20
estimation 84:20
et 40:20 56:10
57:13 82:19
110:15
ethical 31:4 110:23
ethics 77:25 78:13
107:22
even 6:2 18:2,4
28:3,10 31:24
34:24 39:21,23
45:7,7 47:13
46:11 48:18 74:6
87:6 89:20
111:12
evening 67:8
event 7:23 20:18
23:8 47:9 67:4,5
74:24 82:4
events 81:22
eventually 60:22
ever 4:22 8:9
21:11 49:18
73:18 109:8
115:5
every 16:18 47:19
48:19 49:3,6
73:14 78:18 79:9
103:16 104:15
104:24 107:22
109:20 115:5
everybody 3:18
4:5 8:23 78:25
106:13 107:21
107:24 117:8
everyone 31:19
46:14,15 54:18
63:9
everything 93:4
evidence 12:5 21:3
30:16,18 37:8

48:16,22 49:5
55:14 87:17
evident 25:25
evolution 13:9
35:14
evolved 8:16
ex 57:15
exactly 33:17
37:15 117:11
example 43:13
56:4 82:4 85:25
86:10 88:2,3
94:3
examples 43:1
57:11 80:12
exceedingly 96:4
excellence 80:13
109:25
excellent 54:1
except 114:7
exception 68:16
exceptional 4:2
excerpt 79:10
exciting 67:3
exclude 30:11
excoriating 107:7
executive 40:3
42:3 46:6 53:5,5
53:11 55:2 77:8
exhibit 88:6
exhibition 53:22
exist 17:21
existed 54:9
existence 40:24
existing 55:13,13
57:25
expands 110:3
expansion 65:17
expect 48:12,96:1
97:8 108:14
expectations 79:25
80:7 108:15
109:20
expected 10:25
104:16 109:1
expedition 13:5
experience 3:22
8:12 70:8 81:17
87:11 89:22 90:6
92:7 111:19
112:1
experienced 6:8
experiences 73:10
82:14,15 91:2
explicit 21:20
explicitly 12:22
16:11
explodes 44:13
exploit 22:21
extend 3:6
extended 49:22
extending 23:7
extension 73:11,12
82:15 86:11,12
extensions 92:10
extent 21:12,12

32:22 49:23
56:11 80:23
91:11 111:21
extradite 40:5
extraordinare
67:24 68:1
extraordinarily
3:9,9
extraordinary 7:7
23:5
extraterritorial
23:4
extreme 100:19,20
100:21 101:11
extremely 4:1
e-mail 80:18

F
face 28:14 88:9
101:6 116:9,17
faced 95:17
faces 88:12
facing 6:7 77:22
fact 14:10 24:7,11
48:10 49:4 50:24
59:15 108:23
facto 57:16
factor 109:5
110:20
facts 47:11
factual 11:4 42:10
43:24 44:8 47:11
factually 103:14
fade 115:22
failure 75:25
fair 21:17 22:14
23:6
fairly 56:15 104:14
105:3
fairness 84:6
faith 48:16 63:9
fall 45:24 54:24
66:1
falls 115:7
false 46:1 58:20
84:4
Fame 82:23
familiar 11:23
14:8 39:1,3
familiarity 38:24
families 10:23
family 29:18 76:17
famous 68:4
far 34:4 74:19
farce 30:13
Farms 1:19 68:6
68:12
fashion 27:5
favor 7:20
FBI 14:2
FDR 19:25
fear 109:4 110:19
federal 1:1 2:2,17
16:9 61:3 65:13
66:9 67:18,22

101:4,7 102:2,8
113:23 114:7,16
fee 94:4,6,9,17
feel 33:12,13,16,17
33:19 90:17
fees 100:3
feet 3:4 71:10
fellow 29:17
ferret 46:8 50:25
Ferretta 31:8
few 15:10 65:4
fewer 48:13 98:13
Fifth 15:14
Fifty-five 45:6
fight 25:4
fighters 45:4
fighting 52:12
fights 17:17
figure 37:18 62:14
98:6
figured 90:20
figuring 29:16
98:18
file 10:18 11:16
113:22
filed 10:22 13:4
files 94:4
final 54:5
finally 18:13 19:21
21:14 71:11
78:15 101:21
financial 75:15
find 2:24 9:14
51:22 55:10
70:19 73:14,15
80:9 95:16 97:5
99:21
finding 98:15
fine 43:16 49:10
fire 25:4
firm 8:1 73:24
76:2,11 93:1,14
93:14 94:3 101:7
firms 31:23 65:19
73:8,16 74:12,13
76:12 79:1 86:7
86:8 90:13
first 3:4,8,15,20
6:16 11:8 13:20
17:8 20:22 24:4
24:16 29:25
35:10 37:23
41:12 51:5 66:15
67:4 72:7 76:9
77:12 81:13 84:9
86:14 102:5
104:20
first-ever 65:22
fit 39:4
five 9:9 50:18 56:3
57:19 117:25
five-minute 8:15
fix 74:17
flakes 45:25
flaw 44:25
fliers 45:21



Rizman
Rappaport
Dillon&Rose,LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

A-2704

Florida 84:19
focused 63:1
focusing 7:5
folks 54:4 57:21
  76:13 97:19
follow 18:5 20:13
  86:10 89:4
followed 39:10
following 101:16
follows 89:2
fond 73:5,7
footnote 15:9
  26:14
force 14:16 85:8
forced 30:25 31:1
  55:11,12
forces 19:2
foreign 23:1 26:15
foremost 8:8
forever 4:8
forget 40:23
form 40:15
formal 81:22
  113:22 114:19
formalized 48:6
former 7:9 67:22
  68:19 77:20 81:3
forth 90:14 95:24
fortunate 2:5 4:1
  4:16
Fortunately 71:16
  94:1
forum 59:16 61:1
forward 30:1 39:9
  40:11,14
fostered 86:18
found 69:16 90:21
  90:22
Foundation 7:14
four 34:13 69:21
  74:4 78:3
frame 54:2 108:14
framework 14:22
  20:6 49:11 62:5
frameworks 62:4
frankly 14:7 96:17
  99:22
Franzese 68:25
  79:6 90:8 108:6
  108:9,12
free 44:4
freedom 6:22 7:17
  28:11
freedoms 41:1
freestanding 18:20
frequently 41:21
  41:24 71:17 94:1
  100:17
friend 5:13,17 6:9
  51:20
friendly 39:18
friends 67:6
frightening 79:11
frivolous 33:24
  42:14 100:16
from 4:5,16 5:3,14

6:22 7:9 9:16
  13:9 16:3 18:2
  19:18 20:21 21:6
  24:23 25:9 26:6
  27:25 28:1,21
  29:20 31:15,16
  35:21 36:7 39:10
  42:18 44:6 46:7
  46:8 48:1,13
  52:21 54:19 55:8
  56:1 58:18 59:1
  61:8 68:10 71:8
  72:2 74:5 76:1
  79:10 83:6,9
  84:14 86:25
  87:19 90:5,18
  96:23 99:1 101:7
  105:13 107:8
  109:1,10 110:10
  114:7,11 116:8
  116:10
front 71:14 72:19
  73:3 86:24 93:6
  96:6 112:12
frustration 98:8
full 11:1 17:3
function 53:14
functional 65:6
fundamental 12:1
  13:22,24 14:11
  40:23 41:8 42:16
  42:17 44:25 58:7
  117:9
fundamentally
  59:18
funny 71:3
further 97:6
futures 100:9

____ G ____
gained 30:20
garden-variety
  48:25
gathering 37:15
general 4:25 22:6
  44:18 51:19 64:8
  92:24 97:25
generally 16:14
  24:10 69:18
  98:14 99:6
generate 96:21
generated 93:19
generates 96:20,22
generating 97:3
generational 39:12
genesis 49:20
Geneva 17:1,1,4
  17:23 18:1,14
  19:6 27:18,25
  34:7,11,13,22,25
  35:6 43:21 44:1
  61:21 62:5
gentle 111:23
gentlemen 116:23
gentleness 108:22

George 19:24
Georgia 77:11
German 6:19
  15:25 41:14
  46:11 64:1
Germany 17:12
Gerry 68:5 115:12
gesture 79:14
gets 28:12 29:8
  103:3,7 114:17
getting 39:14 55:8
  86:13 98:17
  107:17 115:23
Gibbons 6:15 8:5
  10:14
GITMO 40:12
  60:20,22
give 24:3 38:2 43:1
  46:25 51:6 60:20
  60:21 61:5,16
  67:19 81:12 88:2
  102:2
given 5:15 38:1
  48:12 62:21
  63:11 77:16
  111:22
gives 2:16 99:20
giving 37:9 38:4
  71:19 86:14
  111:20
glad 79:16
go 37:13 39:3
  50:18,20 51:21
  53:24 55:6 56:13
  56:22 57:2,12,20
  58:7 59:14 60:22
  74:16 78:4 82:21
  86:21 92:25
  94:13 102:8
  104:8,8 107:24
  108:9 115:10,13
  116:8
goals 92:21
goes 63:14 65:1
  74:10 95:24
  96:25 97:1
  110:14 113:23
Goethe 79:10
going 2:19 4:2
  8:12 13:8 23:19
  23:20 27:23,25
  27:25 29:18 39:9
  39:14,16 40:5,11
  40:14 41:25
  45:24,24 46:25
  47:2,6 50:18
  55:15 58:11
  59:14 60:23
  64:15 71:25
  72:16 82:22 84:2
  85:4,4,5,5,7,11
  89:10,16 92:14
  92:25 97:2 98:3
  99:22 102:11,12
  102:15 104:19
  105:13 107:23

109:22
Goldstein 117:2,5
gone 6:12 33:25
good 4:9 5:16 24:2
  24:16 39:4 40:1
  48:16,16 50:4,12
  50:14 56:22 63:9
  78:16 86:10
  88:13 94:17 95:9
  95:11 96:21,25
  98:15 99:23
  103:11 112:4
gotten 93:3
govern 41:3
governing 22:13
government 11:7
  13:10 26:3,17
  27:5,8 28:21
  30:10,17,20 33:7
  36:11 37:6,7,25
  38:7,13,14 42:17
  45:20 46:20
  47:15 48:22 50:2
  51:12
governmental
  52:21
government's
  13:23 51:8
gracious 109:24
graciousness
  108:22,25
graduate 5:16
graduated 5:15
grand 68:6
grant 43:4 73:24
  86:12 92:10
  95:14 98:16
  99:13
granted 100:18
granting 85:25
grapple 40:10
grave 37:13
great 3:10 32:2
  34:2 64:10,13
  66:23 88:10 93:3
  105:10 115:20
greater 73:18
Green 11:21
Greenaway 68:19
  71:23,25 72:5,10
  72:25 89:14,16
  89:20 97:10,12
  97:16 98:23 99:1
  99:19 103:22,24
GREENBAUM
  101:15
Green's 11:23
greet 2:16,18,24
Greg 4:19,20,24
  8:17 13:8 23:22
  24:5 34:24 39:25
  41:12,12 42:22
  44:9 47:9 52:5
  52:20 57:21
Greg's 5:15,25:6
  43:24

Gross 78:12
ground 18:12
group 9:8
groups 15:10,12
growth 65:17
  90:10,11
Guantanamo 1:12
  8:25 9:9,12,18
  10:15 11:19 12:8
  15:8,9 22:5,6,8
  22:15 23:3 24:22
  25:10 29:5,8,20
  41:20,25 45:13
  46:5,10 47:13,19
  48:4 49:6,22
  57:9 58:6 64:3
guarantees 7:23
guess 29:24 35:14
  59:12
guided 80:23 81:8
guidelines 69:15
  105:12
guilty 38:8 46:9
gun-slinging 86:21
guts 92:21
Guttierez 6:14
guy 53:8

____ H ____
habeas 5:11 6:25
  8:8 10:8,18,22
  11:1,19,19 12:15
  12:21 13:2 15:12
  15:13 21:21 23:5
  23:7 42:8,12
  49:22 58:24 59:5
  59:8,13 60:4,5,7
  63:24
hac 71:5 74:22
  75:10,12
hair 93:18
half 24:21 28:22
  30:18 65:2
halfway 19:2
Hall 6:10 7:4 45:2
  66:23 68:20 69:1
  82:23
Hamdi 12:4,16
  14:17 19:9 20:10
  49:19,23
hand 4:13 48:14
  52:6 101:13
handed 45:19
  72:22
Handi 30:2 43:20
  49:21
handle 62:19
  72:23 99:16,17
handled 99:13
hands 36:15
handwritten 80:18
happen 71:17
  72:16 74:2,12
  101:12
happened 45:14

**Rizman
Rappaport
Dillon&Rose,**LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

59:6,8 73:18
98:11
happens 6:1 16:19
48:25 72:20
106:17 113:20
116:16
happy 113:17
hardly 81:24
Harris 46:10,14
harrowing 9:10
Harry 46:10
Harvard 5:16
Hassan 24:23 29:1
hat 80:5
hatched 19:18
hate 52:5 100:1,4
having 9:9 24:2
30:22 32:15
68:14 77:13 82:6
87:1 100:4 101:4
115:9
Hayden 115:19,20
head 55:21 80:1,2
93:12
headed 114:12
heading 61:19
hear 4:12 10:20
13:5 34:5 70:15
71:1 72:10 83:6
99:4
heard 31:15 34:4
40:22 58:16
60:25 68:2
hearing 28:20 42:9
48:20 113:25
hearings 11:1,3
12:8 101:4
hearsay 21:2 55:15
55:17
heavily 7:20
heavy 72:22
Hedges 70:3
height 34:9
heightened 16:24
17:14,15 18:11
held 5:10 10:14
11:24 12:24 15:6
22:8 41:13 50:16
61:14 67:6 113:7
114:23
help 91:25 96:8
her 91:15 111:1
115:11
hesitate 32:7 72:25
89:20
Hey 93:2
Hi 3:18
high 78:22
highest 33:22
highlight 66:14
highly 21:9 48:6
high-minded
109:25
him 29:15,20
30:25 37:22,24
71:11,12 87:9

101:9 102:2
himself 30:8 31:8
hinted 50:4
hired 100:23
historic 27:3 65:25
historical 20:24
43:24 65:5,15
historically 24:11
43:9
history 13:14
14:25 15:19
18:23 19:23
20:16,23 61:14
63:22 64:3,5
65:22
hoc 62:15
Hochberg 67:1
hold 15:20 43:4
89:10
holding 11:15
20:19 21:16,20
21:22 87:8
hole 58:21 61:11
61:19 62:18
Hollenbeck 77:8
home 21:7 48:21
76:16 77:21
88:23
honest 85:8 111:18
honesty 84:6
honor 4:22 68:5
Honorable 68:18
68:21
honored 8:1 64:6
hope 10:7 35:22
62:21 63:11
103:21 111:13
hoped 111:21
hopefully 4:4 31:6
111:2,23
horrible 57:20
hostile 45:8,11
hostilities 16:4
hot 37:12
hours 63:13
hour's 83:9
house 30:20
huge 74:18,25
106:10
Hughes 66:12
human 7:6 14:25
39:2
humiliate 79:16
hunt 14:4
Hurry 64:16

I

ICLE 77:25
idea 51:24 60:12
86:4 97:23
105:11 107:11
ideal 9:18
ideas 108:5
identified 36:4
identifies 37:11

it's 33:13
ignored 43:19
ignores 101:20
II 15:5,21 19:25
20:3 41:13
III 11:2:18:15 19:6
19:10 26:8 42:7
51:10 113:20,23
imagine 26:21
imbue 117:13
immediately 12:10
67:3 97:19
impart 75:11
91:10
impartial 12:6
impatience 111:10
impeachment
113:8 114:8
impediment 15:17
Implicit 111:6
importance 82:1,2
83:7
important 16:17
32:23 40:14
43:23 50:19 52:4
59:3 83:13 84:11
84:12 90:15 92:2
92:2 104:11
impose 96:5
imposed 75:15
impossible 98:21
impressed 87:3
improvement
78:24
inappropriate
33:3,12,13 106:8
inception 8:2
incivility 72:23
include 17:18
69:10
included 29:18
includes 45:12
including 43:10
69:8 106:3
inconsistency
91:24
inconvenience
68:7
inconvenient
28:16
incorporated
69:11
incorrect 22:12
incredible 93:19
102:24
incredibly 100:7
103:7
incrementally 71:7
incumbent 71:21
116:1
indeed 15:17 24:12
37:20 47:12
43:17 51:14
54:11
indefinite 9:25
indefinitely 9:5
independent 7:15

17:7 18:12,20
indicated 24:18
indictments 36:6
individual 47:22
induce 39:17
inevitably 116:16
inflict 16:2
influence 90:2
91:11
informal 4:3 115:1
informants 37:18
information 3:11
21:2 36:8 37:10
56:21 57:2
infrequently
100:18
inherent 79:15
80:20
inherited 42:18
initial 27:10
initially 8:7 44:5
inject 10:4 42:2
innocence 46:17
innocent 36:23
37:1 38:9 44:14
44:15 46:8,21
47:13
innovatively 60:13
insanity 93:20
insidious 100:21
installation 66:24
installed 66:16
instance 21:1
104:20
instead 55:3 56:23
58:1 59:8
instinct 39:2
instituted 1,1:8
institutional 62:10
62:12
instrument 36:4
insufficiency 12:9
insufficient 12:9
integrate 81:25
integrated 81:21
integrity 81:9 84:6
intelligence 37:14,
37:15 39:15 56:6
56:8,17,21 57:4
intelligent 63:5
intemperance
111:10
intemperate 74:19
112:12,14,19
intentionally 26:18
111:8
interest 85:15,23
interesting 3:9
117:22
interim 12:13
international
18:16,25 19:4
43:17 51:14
54:11
interns 90:13
interrogate 56:5

interrogate 115:1
interrogation 16:7
16:15 17:2 44:4
55:8 56:17,20
interrogations
9:25 10:4 16:13
19:15 56:25 57:5
57:6
interstate 90:23
intervene 115:6
intervention 48:6
intimately 32:15
intrastate 90:22
introduce 3:16
4:18 30:17 67:21
introduction 67:22
inundate 73:16
invariably 96:22
invasion 13:2
45:16
investigate 14:3
investigation
110:21
inviting 32:9
invoke 23:14
involved 8:2,9
31:12 32:15
35:15,52:20
63:10 74:1 76:18
95:23
involvement 28:22
in-house 78:1,4
isolate 111:2
issue 19:21 24:6
26:24 28:24
29:22 31:19 82:5
87:14 108:2,11
109:18,18 115:3
115:9
issued 114:13
issues 6:24,7:18
8:3,19 14:9
21:15 23:22 24:5
25:23 31:4 62:22
62:23 64:13
77:22 81:19,20
104:4,18
Italian 41:14
iterations 25:19

J

JAG 5:15,20
jailer 42:19
January 2:20
Japanese 15:25,
63:25,
Jasna 67:7
Jeff 101:13,14
104:6
Jersey 1:2,9,20 2:3
2:6,11,24:3 65:4
69:3,9,13,20
70:20 72:1 76:21
77:3 78:3 90:18
93:14 105:16

Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

107:3 113:1,18
job 100:12
Joe 115:19 117:6
  117:11
John 21:8
Johnson 15:6
  21:16
joint 76:21
Joseph 68:18
Jr 68:19 109:10
judge 2:19 5:17,17
  8:5 10:14 11:21
  11:21,22,22,22
  30:1 51:18,19
  66:12 67:1,14,23
  68:4 70:2,7,10
  70:13,15,19,24
  71:21,23,25 72:3
  72:5,10,14,24
  74:20,23,23,23
  75:2,5,15 77:20
  84:20 86:6 87:24
  88:2,4,16,21,24
  89:1,3,4,14,16
  89:20 93:10,17
  93:22,25 94:6,21
  96:3,7,11,15,17
  97:4,10,12,16,18
  98:9,23 99:1,15
  99:18,18 101:5,5
  101:6,8,9,16
  102:1,8,9,13,21
  102:24 103:7,9
  103:17,22,24
  104:9,9,19 105:6
  105:9,21 106:8
  106:14,14 107:1
  107:7,8,9 109:6
  110:14,22,25
  111:7,12,17,24
  112:12,14,19
  113:8,11,13,23
  113:24 114:7,24
  115:2,4,4,5,9,10
  115:12,12,13,14
  115:15
judges 2:8,18,20
  2:21 69:24 70:5
  75:23 77:19,23
  78:6,7,7 84:16
  85:2,6 87:1 89:5
  94:8,19 95:23
  98:16 100:1
  102:14 104:13
  104:25 105:3,14
  106:2,11,12,12
  109:16 110:9,17
  111:3,20 112:2,3
  113:14,14,16,17
  113:20 114:17
  115:2 116:8
judge's 87:7 89:2
  94:7 116:9
judge-lawyer 98:5
judgment 102:7,17
  104:7

judicial 1:8 2:4
  66:1,3 67:13
  81:20 115:8
judiciary 85:10
judiciously 72:15
jump 41:10
June 10:14
juries 73:7
jurisdiction 9:15
  9:20 10:2,11,16
  12:15,21 59:5,9
jurisdictional
  11:15
jurisdictions 69:21
jurors 87:2 89:23
  91:2
jury 26:9 71:15
  72:20 86:4,24
  87:5,21,22 88:14
  88:25 89:2,4,9
  89:10,15 91:15
  91:17 92:5
  116:10,13
just 2:14 8:14
  13:15 25:5 26:14
  28:16 30:18
  32:16 34:3 37:2
  47:1,10 49:7
  51:5,6 52:15
  53:9 60:14 62:22
  63:11 71:11,18
  76:6,17 79:21
  80:21,22 82:1
  83:12 84:15
  85:18 86:17,22
  87:20 91:6 93:2
  93:17,18 94:14
  97:18 98:7,7,20
  103:14 105:15
  106:15,18 107:8
  107:16,23 108:3
  110:8,9 112:20
  115:8
justice 5:1,18 9:17
  17:4 20:17 22:10
  32:16 35:16 36:2
  38:6,18,25 51:20
  54:9 66:22
  114:11,12,14
justification 15:25
  16:22 23:6
justifications
  19:20
justified 20:16
justify 50:12

K

Kadhr 25:14
Kadr 25:2
Katsas 4:20 12:12
  13:15 47:17 64:8
keep 4:3 70:18
  71:18 73:6
Kennedy 22:10
kept 71:9

Keubler 31:16,17
  64:7
key 97:12,16
kicker 79:18
kicking 28:18
killing 25:3
kills 58:12
kind 9:2 19:14
  31:23 35:12 37:9
  39:5 43:18 49:12
  53:11 76:8,15
  89:11,25 93:24
  94:9 95:6,8,18
  96:5 105:1 109:8
  115:7
kindness 108:19
kinds 14:24 44:4
  91:5 117:24 98:16
King 109:10
knew 37:19,20
  44:14 107:4,4,5
  22:21
knock 99:22
know 4:5 8:5
  25:18,22,23,24
  26:8,20 27:1,8
  28:12,14,24
  29:18,25 32:4
  33:11 35:7 36:2
  36:25 37:2,22
  41:12,22 45:15
  46:9 49:22 50:19
  52:16,16 53:1,18
  53:19 54:19,24
  55:14,18,19,20
  56:3,11,13 57:11,
  57:21,25 61:20
  63:19 70:8 72:22
  74:16,16 75:15
  75:16,24 76:11
  76:11,20 82:7
  83:8 84:18 87:23
  87:24 90:1 92:23
  94:8,8,25 95:6,9
  95:10,22 96:24
  97:2,3 98:4,8,10
  102:10,18
  104:18 105:21
  106:15 107:11
  108:4,24 111:24
  115:12,22 117:5
knowing 81:17
knowledge 6:12
  115:6
knows 19:17 39:11
  47:7,8 106:14,15
KUEBELER 51:3
Kuebler 5:14,14
  5:20,24 24:4,14,
  26:5 28:20 29:11
  29:14 31:25 34:6
  35:11 38:23
Kugler 68:22 70:8
  70:10,13,19,24
  72:14 74:21,24
  75:5 87:24 88:16
  88:18,21,24

93:22,25 94:6,21
  94:24 96:11,15
  96:17 97:18 98:9
  99:15,18 102:1
  102:21,24 103:7
  105:6,9 113:11
  113:13 114:24
  115:4
Kugler's 101:17
Kurnaz 6:18,19
  9:8
K-Mart 96:4

L

label 59:13
lack 10:10
Laden 35:23 36:18
  37:21
Lady 66:22
laid 12:3
land 22:17,19,20
  22:21
landscape 4:6
  13:17
language 59:13
  80:5
large 21:12 73:8
  73:23 101:7
larger 30:9
Larry 3:2,7,16
  24:15,17 47:17
  65:1
Larry's 13:16
last 22:2 24:25
  28:21 30:5 31:3
  31:11 32:2 58:12
  65:21 66:1 67:10
  69:2 77:2,9,20
  82:12 86:18
  87:16 98:11
  99:11 108:2
  114:13
late 5:17 14:23
  50:18
later 3:14 60:23
laudable 39:6
Laughter 3:1
  13:12 23:18 26:4
  28:19 29:13 47:5
  58:13 68:8,13
  70:23 72:9 73:1
  75:4,8 88:20
  89:19 90:25
  96:16 102:23
  103:25 106:4
law 4:6,7 5:16 6:10
  7:5,13,14 8:15
  8:19 9:13 11:19
  13:25 14:10,13
  14:21,22 23:6,11
  23:24 25:20 28:1
  28:3,15,15 31:22
  40:13 41:9,20,20
  41:22,24 43:18
  46:20 49:11

51:14 55:6,19
  56:14,25 57:6
  58:7 59:6 68:20
  69:1,2 73:8
  76:22 77:19,23
  79:4 81:3,22,24
  86:9 90:13,13
  94:3 107:25
  109:19
lawfulness 10:19
lawless 51:24,25
laws 9:3 15:18
  17:17 18:5 20:6
  20:13 26:22
  27:12,14,16,19
  27:20,24 29:24
  42:22 43:2,17,17
  59:21 60:2,9
  63:9
lawyer 28:25
  29:10 31:1 36:9
  67:23 68:1 71:8
  73:6 75:19,19,20
  75:21 78:17 81:4
  83:16 88:25
  91:12,13,14,14
  91:17,18 92:13
  92:15 94:3 98:19
  100:6 101:7
  103:16 110:12.
  111:16 112:12
  112:15 113:1
  116:6,6,19
lawyers 4:22 10:3
  10:3,4 31:18,20
  31:22 32:11,13
  33:2,5,18 34:8
  42:2 48:21 69:23
  69:24 70:5 71:3
  73:4,5 74:5,10
  74:14,19 76:1,1
  76:11 77:15,18
  78:16,20,22 83:8
  83:20 84:9,14,16
  85:1,13,21 86:20
  89:13,25 91:4,;
  94:16 95:8,18,25
  96:12,21 99:3,21
  99:22,24 100:24
  105:1,7,15,20
  106:15 107:3,3,3
  110:12,18
  112:17,18,19
  115:1 116:1,2,20
  117:14,
lawyer's 74:22
  75:10,12
lawyer-adversary
  73:15
law-of-war 38:25
lead 66:18 89:3
leaders 109:17
leadership 19:17
  66:12
leading 31:9 67:1
learn 34:23 37:19

Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

learning 8:18
92:16
lease 22:19,23
leases 22:13
least 13:11 17:7
34:10,10,13
40:17,25 60:20
61:7 69:2 91:16
111:19
leave 4:4 27:22
35:8 103:20
lecture 99:22
led 99:9
left 4:19 5:13
68:11,18 112:22
legal 6:3 8:22 11:4
13:9,14,17,23
14:6 16:22,24
19:19 20:6 25:8
25:23 27:2 28:7
32:19,20,23 33:6
34:18 35:4,9,18
39:11 43:23,25
44:1 55:10 58:20
61:11,19 62:18
82:23 84:16,22
85:1
legally 46:3
legitimate 85:3
lend 33:5
lending 7:6
Leon 11:22
less 18:19 91:16,17
109:7
let 13:15 26:14
41:10 43:1 52:3
54:5 57:19 58:11
58:12 70:7 91:1
102:3 111:23
letter 101:22
letters 74:4,7
97:18,22,1
let's 25:13 48:24
56:12 68:14,
86:16,
level 16:16 33:22
45:12 80:6
levels 45:10
liberties 5:4 7:21
8:3 62:24
licenses 78:2
Lieutenant 5:13
5:14,20,24 24:4
24:14 26:5 28:20
29:11,14 31:16
31:17,25 34:6,
35:11 38:22
42:23 51:3 64:7
life 8:6 79:15
lighting 66:13,22
like 2:3,15 3:6,15
3:16 7:7 15:22
16:17 21:3 22:7
23:25 25:5,7,14
25:16 26:6 28:24
30:12 36:22

43:19 45:24 53:5
56:5 57:20,23
60:14 65:3 67:21
72:5,18,19 76:17
79:23 85:9 86:11
87:4 89:12 91:5
99:12 100:10
101:15,23 104:1
109:3 110:12
111:15 115:21
likely 61:4
limitation 16:8
43:6
limited 21:21 22:4
78:2
line 94:13,13
114:14
lines 58:19
list 36:1,14,17,19
36:22 37:3,16,21
45:11
listening 81:16
83:9 101:6
115:14
literally 71:11
litigants 8:9 98:15
105:15
litigate 73:22
117:15
litigation 1:11 3:21
3:24 7:4 20:10
52:20 60:17
69:15 95:3
105:11 115:24
116:2,3,5,20
little 8:11,18,21
13:16 21:17 32:7
72:22 106:19
110:21
lively 4:3 7:23
loathe 98:16
local 69:12,13,17
71:14 75:19,20
107:3
logic 17:13
long 39:13 108:19
116:20
longer 7:12 50:18
50:20
look 30:12 43:19
53:1 85:4 96:8
97:25 100:10
103:14 105:12
looked 13:20 14:22
17:4 18:22
looking 13:14 14:8
14:23 45:2 95:12
102:18 110:10
looks 25:8 26:6
60:14
Lord 19:17
lose 38:7 41:7 93:8
109:10 116:7,9
116:14
losing 116:3
lost 66:25 85:19

109:14
lot 18:23 21:22,23
32:10 37:22 40:1
44:9 46:1 76:11
82:7 86:2,18
89:1 92:23 94:11
95:22 96:10
106:6 112:7
114:10,17 116:4
loud 108:14
loved 6:4
low 48:11 84:15,15
116:12,13
loyalty 84:5
lunch 117:21,23
luncheon 3:12
Lustberg 3:2,16,18
6:19 13:7,13
23:16,19 31:14
40:21 41:16
46:25 47:6 50:17
58:11,14 62:20
63:18
Luther 109:10
lying 98:6

M
m 30:6
made 13:21 16:11
20:19 34:6,7
36:17 41:12 45:1
50:10 57:14,17
57:19,25 60:25
63:5 71:13 83:1
94:25 100:15,17
magistrate 66:12
70:2 97:4 102:8
102:11,13,14
103:9 104:9,13
104:19 113:14
113:17
Magna 42:18
magnificent 67:7
mainly 33:9
major 66:10 88:22
majority 23:2
47:13
make 27:9 29:9
33:19 34:3 40:19
42:10 43:7 44:11
46:20 53:11,16
54:5 55:7 60:23
61:7,8 68:11
79:13,15,19 80:3
80:11 82:23
83:24 88:12
91:23 101:19
104:21 108:14
109:13 112:1
maker 12:6
makes 35:19 73:22
89:3 96:4 99:2
114:18
making 30:12 50:12
53:6 58:9 64:5

74:11 90:4
109:20
man 88:6
manageable 19:12
mandated 75:3
mandatory 107:21
manner 31:8 75:22
85:24 91:19
111:21
mantra 57:24
manufactured
44:16
many 6:11,24 7:18
19:18 23:22
36:22 42:1 44:22
45:3 84:18 85:21
92:6 93:7 95:19
96:12 98:13
105:14 106:2
112:25
March 1:22
Mark 45:1
Martin 109:10
Mason 78:12
Master 93:11
materials 69:5
matter 12:9 62:13
73:25 80:9 82:1
87:18 93:16
98:20 99:4 100:7
102:7,12
matters 77:5 82:13
95:3
maximum 6:6
may 2:6 3:19 8:5
25:5 37:1 39:11
39:12 43:2 67:4
69:16 70:16
72:21,25 91:2
102:10,12
103:18 113:4
maybe 34:10 47:12
50:25 72:15
74:11 87:8
105:18 108:4
112:17 113:2,9
Mayfair 1:19 68:6
68:11
MC 32:8 58:17
MCA 30:6
McCarthy 7:8,9
58:2 64:9
mean 38:19 40:12
41:22 44:2 54:12
56:12 57:18 62:8
85:2 86:17 92:6
98:6 103:13
106:5
meaning 7:1
means 79:25
measuring 91:9
meet 2:16,18,23
6:13 29:7,9,11
29:15 66:21
meeting 2:20
Meisel 66:25

member
68:20
members 65:18
66:2,6 67:13
70:6 91:22 114:2
membership 65:17
memo 9:16
mention 37:24
70:2 107:16
112:6
mentioned 20:9
36:3 90:8 91:20
113:3
mentor 8:6 76:12
77:18 91:22
mentoring 86:8,9
merely 11:14
merit 61:6
merits 10:20 99:12
met 26:13 27:16
29:6
methods 37:15
77:15
Mickey 44:20
microphone 72:2,8
73:3 89:17 97:15
midst 110:1
might 13:13 21:3
36:13 37:12
45:14 90:2
Mike 66:25
Milgan 63:24
military 5:22 6:7
9:3 10:6 12:8,20
14:4,16 16:12
19:2,16,22 20:1
20:10,12,14,17
20:20,22 21:10
22:17,22 24:6,8
24:19 25:7,11
28:22 29:4,23,24
30:3,6 31:25
32:25 39:8,22
44:17 47:20
49:13,14,16,18
50:4,23 51:1
52:2 53:6,10
54:24 56:14,16
56:19 59:11,20
59:22 60:1
million 15:21
41:16,17 57:3
61:13
mind 10:7 75:16
mindful 79:6,7
mine 4:20 45:1
51:20 94:7
minerals 22:21
minimum 40:18
51:15
minor 88:22
minute 48:24
112:21
minutes 15:10
23:20 47:1 50:17



Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

50:18 118:1
Miranda 56:9,18
  56:19
misconstrue
  108:22
miserable 79:15
mish-mashed
  26:16
miss 16:20
missing 58:18
mistakes 46:20,22
model 25:8 26:6
  78:10 108:25
modeled 20:3
modeling 109:19
moderator 3:3
modicum 109:14
Mohammed 36:16
moment 114:5
  117:1
Monday 73:25
  86:15
money 74:11 75:17
  83:24 92:22
  93:15,19
month 22:2 24:25
  31:11 82:12
months 29:15 32:13
mood 79:13
moral 85:8,9
morally 109:11
more 3:14 7:20
  9:13 12:22 16:24
  20:23 21:10 22:6
  24:10,11 39:9
  42:24 48:13
  49:17 50:10,15
  50:24,25 51:15
  53:19 59:12 60:6
  60:13 67:3,3
  70:25 71:2,7,7
  73:2 74:12 80:23
  81:13,25 82:7,9
  82:9,14 84:21
  85:23 100:2
  108:14 109:8,8
  110:5,5,5 115:18
  117:15,16
moreover 28:9,11
morning 3:3 24:16
  68:17 70:4
mosques 52:18
most 2:20,24 5:5
  9:10 11:23 17:8
  17:8,18 21:1
  24:24 33:17
  42:16,16 72:23
  84:11 94:8
  100:16 102:10
  104:18 106:11
  106:12 110:3,4
  112:2
mostly 32:21
motion 82:19
  99:10,12,14
  100:2,3

## N

motions 98:13,13
  98:17,24 99:16
  100:1,14 101:16
motivation 83:23
Mouse 44:21
move 72:1 110:2
moved 11:12
movement 25:17
Mubat 6:18,19 9:8
much 16:24 22:11
  30:11 32:8 40:3
  50:1 54:21 90:22
  94:10,15,16 95:9
  103:2 110:11
  117:16
multi-month 3:5
Municipal 78:7
murals 66:14,15
  66:23
myself 77:8 78:9

name 2:1 6:16
  17:3 19:14 36:4
  36:16 96:18
namely 14:25
names 36:12 46:1
Name-calling
  95:25
narrative 46:19
narrow 11:15
Nasty 95:25
nation 17:12 38:2
  40:24 51:17
national 4:13 6:20
  7:21 24:23 29:2
  32:21 35:19
  38:12 40:8 77:14
nationalists 25:19
national-security
  35:18
nations 14:24
  17:11 34:16,20
  34:21 39:17,18
  40:1
natural 39:2
Naval 51:19
near 16:15 54:3
necessarily 6:4
  25:6 38:19 39:4,
  42:5 84:8
necessary 54:21,22
  57:6
necessity 40:17
  56:5 57:15
need 16:18 39:19
  40:10,18 49:11
  55:4 56:5,6,8,11
  67:22 74:2,14
  83:22,25 92:9
  95:19 103:17,18
  103:19 113:21
needs 46:22 80:22
  83:4,6 95:6
neglected 69:10

## O

neutral 23:16
  103:15
never 68:2 90:20
  113:17 117:5
nevertheless 44:15
  95:4 111:23
new 1:2,9,20 2:3,6
  2:11 5:13 7:10
  24:3 48:22 49:4
  51:25 52:25 53:3
  53:4 56:12 58:3
  58:3,4,4 65:4
  66:8 69:3,9,13
  69:20 76:21 77:3
  77:15 78:2 90:18
  93:14 105:15
  113:1,17
Newark 66:3,21
newly-admitted
  66:7
news 29:6
next 39:15 47:3
  64:10
Nicole 84:19 86:19
noble 83:17,18,19
  84:2
Noise 72:2
nominated 65:24
none 2:10 14:7
  18:9 61:14
  108:17
nonetheless 18:20
  21:1
nonprofit 7:16
nonsense 82:18
non-state 27:1
normal 54:19 56:1
norms 79:24
North 107:3
Northern 45:20
note 59:3 80:18
nothing 60:17
noting 80:11
notion 42:13 49:6
  55:18 58:7 61:10
novel 27:2 38:23
  39:5
November 29:2
nowhere 54:3
nub 61:22
number 4:21 6:21
  10:8,21 12:11
  17:3 19:14 46:12
  46:13 47:12
  48:10 52:4 55:16
  57:10 107:10
numbers 37:12
nuts 38:5

obey 85:5,7
objection 42:1
obligations 105:7
obnoxious 85:22
Observing 61:24

obtained 6:22
obvious 94:8 112:8
obviously 16:14
  32:18 33:12,16
  36:8 50:1 63:12
  72:7 96:8 98:14
  104:12 105:10
occasions 6:11
occurred 30:4
occurs 96:6 116:15
October 12:19
  30:1 66:19
off 20:2 34:22 35:5
  41:10 72:8 99:23
offended 91:8
offenders 71:4
offenses 25:10
  27:24 29:4
offered 115:6,11
office 5:21,22
  24:18,21 107:4
  114:7
officer 9:16
officers 98:1
official 4:25 32:3
  33:8 37:23,24
officials 53:5
often 72:13 104:23
okay 27:12,13,21
  53:2 57:5 105:1
Oklahoma 107:19
old 20:2
Omar 25:2
once 14:21 70:25
  71:2
one 2:15 4:13,21
  9:7,10,23 11:20
  16:14,16,20 17:2
  17:17 19:7,8
  20:15 22:16,16
  24:5 25:1,14,16
  26:23 29:3 33:24
  35:21 41:23
  42:21 43:25 44:3
  44:11 48:12 52:4
  54:5,7 59:9,18
  61:7 64:8 66:11
  66:24 71:8 72:10
  72:15,17 74:21
  77:10,21 81:5,25
  82:14 83:12 90:2
  92:14 95:12 98:6
  101:3,23 102:16
  103:16 104:3,22
  105:17 108:17
  111:9 115:17
  117:1
ones 39:1 53:14
  105:12
one's 81:5 91:24
  104:4,5
ongoing 3:24 16:4
  56:8 99:20
only 9:1 12:17
  17:9 18:15 19:7
  22:16 23:12 29:8

30:15 32:10
  35:22 39:13,16
  41:24 44:14 48:3
  49:15 68:5 81:22
  82:8 95:2 99:2
  113:8
Op 23:24
open 111:18
openly 18:6
operated 11:11
operates 39:19
operation 86:21
operational 14:1
  16:22 19:20
operations 13:23
  20:7
operative 36:16
opinion 22:5 96:3
  96:18 102:3
  107:7
opinions 81:20
  94:23,25 95:1
opportunity 2:16
  6:11 24:17 61:15
  65:13 67:9,18
  71:20 80:25
  104:20 109:20
opposed 25:19
  116:7
opposite 41:23
opposition 113:19
opt-in 62:5
Orange 1:20
order 11:10 30:2
  35:25 44:3
  103:18
ordered 19:1
  36:11
orders 16:12
  104:16
organization 7:16
  27:1 28:2 65:6
organizations
  65:11
organized 109:18
oriented 83:22
originally 70:3
Orlofsky 67:23
  68:1,9,14 71:23
  72:3,24 74:23
  75:1,5 76:4 79:3
  81:2 85:12,20
  86:23 87:13,25
  88:16 89:14,17
  90:24 91:1 93:22
  94:2,19,22 96:11
  97:10,14 98:22
  99:15 100:13
  101:14 102:1
  103:4,22 104:1
  105:23 106:5,20
  106:22 107:13
  108:7,10 110:7
  112:4,21 113:11
  115:17 116:23
  117:1,17

ORLORSKY 73:2
Osama 35:23
  36:18 37:21
other 2:6,10 4:14
  10:22 14:14
  19:10 22:3 25:16
  26:20,24 27:18
  31:24 33:17 34:3
  37:3,10 39:11
  40:1 48:14 49:2
  51:15 52:12
  57:23 64:9 66:13
  69:21,23 73:12
  75:12,13 83:12
  90:2 93:17 100:2
  104:25 105:5,12
  113:18 116:24
others 66:12 69:25
  92:7
otherwise 41:3
other's 47:2
ought 32:11 33:7
  33:14 38:3,10
  60:12,19 61:16
  62:14 105:19
ourselves 2:9 80:7
out 12:3 16:12
  19:3,9,16 26:24
  29:16 30:16
  33:10 34:16
  37:10,18 46:8
  50:6,25 52:10
  55:3,6 56:14
  60:14 62:14
  71:12 80:14,22
  83:1,8 86:16
  90:4,18,20 93:18
  95:12,16 97:5
  98:6,18 99:21
  108:14 109:16
  109:22 110:12
  112:14 114:9,10
  117:18
outset 8:14 13:17
  25:25
outside 9:14,20
  15:7,10 21:25
  28:13 43:15
  50:16 63:20
  80:17
outsourcing 40:8
outspoken 5:25
  6:6 7:18
out-of-state 71:5
  74:22 75:10
over 8:16 9:6 25:3
  28:21 32:2 35:25
  36:11,14 43:4
  45:19,22,24 48:1
  53:8 65:18 66:8
  67:10 73:3 77:18
  78:4 87:1 95:12
  98:11 100:23
  102:18 110:10
overall 78:20
overrule 21:15

overruled 20:19
  23:9
overzealously 94:4
own 20:15 76:12
  78:25 80:7 81:8
  81:17 109:15
  117:13
O.J 86:18

**P**

package 105:13
packets 58:15
paid 82:5
pains 103:2
Pakistan 45:20
  52:19
pal 35:23
panel 3:4,15,20 4:2
  47:4 54:7 63:15
  68:17 70:4 77:10
panelists 62:21
panels 113:5
  114:22 115:20
papers 42:10
  73:16 82:16
paradigm 25:17
  38:25,25 52:25
paradigms 38:24
paralysis 60:17
parents 76:18
part 28:3 30:9
  33:2 38:21,21
  65:6,10 90:5,15
  98:8 102:17,25
  105:24 107:23
participants 77:21
participated 78:8
participates 78:19
participation
  53:15 77:20
particular 4:7 5:5
  24:10 31:21 41:6
  55:23,24 57:11
  80:16 91:12
  98:19 99:4
particularly 3:22
  14:7 16:17 34:1
  36:10,21 37:10
  47:10 62:5 67:14
  73:11 90:17,23
parts 22:5,6 35:8
passed 8:25 12:13
  12:19
passions 63:10
past 34:24 49:14
  49:17 51:1,98:10
patience 102:25
patient 102:5
  103:1
patriotic 33:18
patriotism 33:22
Paula 68:25 79:4
  81:16 108:4,8
pause 80:16

pay 92:3
pedigree 5:16
peer 113:2,10,13
pen 35:23
penalty 75:15 95:16
  101:9
pending 5:6 12:22
Pennsylvania 71:8
people 2:25 4:15
  4:16 14:4 16:3
  21:6 31:15 32:24
  32:25 33:4,14,16
  33:25 34:8,21
  35:6 36:12,22,23
  36:25 37:3,3,19
  40:12,17,19
  43:15 44:10 45:3
  46:21,23 47:12
  49:7 52:17,18
  55:16,23 56:5,24
  57:8,19 58:15,21
  59:16 60:20,
  61:20 63:5 64:5
  79:19 80:19
  83:21,22 84:9
  86:10,19 87:4
  91:7 93:7 107:18
  108:25,
people's 100:8,
percent 38:4 45:6
  45:6,9,17 78:19
  116:5,
percentage 48:11
perception 85:12
perhaps 4:8,17:18
  81:10 82:12,
  83:10,11,10,11
  period 43:5
  periodic 49:3
  perk 112:3
permissible 12:24
  49:24
permitting 21:2
perpetrating 89:11
person 6:12 26:21
  35:22 38:8,9,
  42:11,20 43:8
  47:1,3,4 89:11
  103:13
personal 35:12
personally 21:8,
personnel 66:3
persons 83:25
perspective 25:9
  46:8
persuasive 109:11
perused 69:6
Peter 68:25
petition 5:7 11:13
  94:5,17
petitions 10:8,10
  10:18,20,22 11:6
  11:16,17 12:17
  12:18 13:3 94:6
  94:9
Philadelphia 73:24

93:13
phone 82:18 97:5
  97:19 99:7
phony 84:4
phrase 117:6
pick 42:21 87:2
  90:7
picked 43:14 45:18
  46:1 87:24,25
  90:8
picking 28:7 42:24
piece 22:17
pieces 23:25
place 9:14 12:7
  35:10 44:23
  47:14,18 50:22
  70:20 104:16
  106:18
places 9:11,18
  34:14 39:19
plain 109:14,21
plan 36:9
planned 66:19
  67:2,4
planners 10:6
plant 111:16
plate 39:7 40:15
play 90:15 93:5
players 34:10
playing 31:18
plays 86:24 87:2
  87:10 89:15 90:4
pleasant 97:22
  98:20
please 3:19 70:17
  89:18 96:9 117:1
pleasure 24:20
  32:9
plot 56:7
plots 19:18
point 10:21,25
  25:12 27:8 42:20
  54:5,13 59:15
  62:10 75:6 80:11
  85:20 95:12
  101:21 102:7
  103:8 104:6,20
  104:21 105:22
  112:5
pointless 117:8
points 51:5
poker 88:9
policy 9:13,19 23:1
policy-driven 44:3
poor 58:9 87:11
  110:12
poorly 87:2,10
Poplar 2:1,1 3:2
  63:21 65:1 67:21
  68:2,23 70:16,22
  73:4,14 75:6,9
  87:15 88:3,5,22
  100:13,15 106:1
  106:7,21,24
  112:10,11
  114:25 117:21

popular 35:10,22
  Arz710
  44:2 47:25 48:1
  48:11,12
position 7:22
  11:20 23:10 25:7
  26:7,7,21 27:10
  33:8 44:6 47:2'
  51:8,13,16,23
  57:20
positions 5:4 51:16
  63:7
positive 78:16 98:2
possess 80:2
possibility 46:16
  62:17
possible 23:12
  30:12
possibly 98:5
post 13:18 30:5
  57:16
postponed 74:1
postponement
  73:24
posturing 109:2'
post-paradigm-s...
  25:15
post-traumatic
  28:17
potted 111:16
POW 18:11,19
  19:14 27:15
power 43:4 79:15
  80:2 85:6 109:15
powers 14:18 27:4
  55:6
POWs 15:25 18:5
practice 2:5,17
  66:9 76:3 78:2
  82:19 93:2 96:12
  107:20,24
  108:17,
practiced 2:12
practices 15:18
practicing 7:13
  24:9 81:4
practitioners
  90:17
preach 117:10,10
preaches 117:9
preaching 117:7
precedent 15:4,5
  27:3 56:16 57:25
  94:14
precedents 20:3
precisely 47:24
  60:7
predatory 7:6
prefer 38:7
prejudice 85:15
preparedness 80:6
  80:13
presence 64:6
  109:23
present 2:21 20:4
  65:13 104:10
presentation 13:11


**Rizman**
**Rappaport**
**Dillon & Rose**, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650  Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

91:12 112:2
presented 13:21
62:23 92:24
preserve 9:21
22:13
President 2:2 8:24
9:4 13:21 14:11
16:11 19:1 20:1
28:9 68:24
President's 27:4
55:6
Presiding 110:9
press 46:11
pressure 90:16
114:11
pressuring 102:19
presume 44:10
presumption
44:11
presumptively
20:13
presupposes 17:17
pretty 2:25 19:4
22:11 75:16
89:13 104:10
prevailed 22:1
prevent 16:2,18
19:17 46:23
preventing 39:15
previous 29:23
previously 51:24
pre-paradigm-s...
25:16
pre-thinker 54:8
primarily 28:23
primary 75:21
83:23
primer 8:15
Princeton 67:7
principal 4:24
21:12
principle 54:6
principles 17:22
41:8 62:16 81:8
84:5
printing 65:24
prior 36:12 42:15
43:19 55:8 63:11
prisoner 18:3
prisoners 41:15,19
61:13
private 52:19
privilege 4:22 68:5
pro 71:5 74:22
75:10,12
probably 37:23
60:22 82:14
84:11 103:8
problem 25:19
28:14 32:20,21
33:9 35:18,19
37:12 38:22 39:3
43:24 44:8 71:16
72:11,13,17
74:17,18 75:11
82:25 94:18,20

95:16,21 96:7
97:6,9,13,17
98:25 99:3,9,17
99:25 102:16
104:3 105:18,20
106:9,10,10,11
107:14 110:18
115:7,16 116:15
problems 21:4
25:20 71:2 76:6
79:1 100:5,6
110:23
procedural 11:2
18:17 41:1 62:13
procedure 110:17
procedures 20:3,4
20:13,14,20,21
20:22 49:10,17
proceed 12:18
proceeding 58:19
64:2
proceedings 1:4
30:2,22 53:24
59:20,23 109:22
process 12:2,9
28:25 29:16 30:7
30:20 31:18 38:1
41:1 42:7,14
43:15 46:2,7,22
47:23 48:7,15
49:23 50:4,5,7
50:22 52:2,3
53:2 54:3,9,20
56:1 57:13,22
58:8 61:17 78:12
114:9,10,16,19
114:25 115:1
processes 6:7 12:7
produce 48:22
productive 96:18
profession 81:1
82:23 83:16,18
83:18,19 84:2,16
84:22 85:1 90:9
92:22
professional 31:4
64:12 76:14
79:25 85:24
91:18 99:23
101:24 102:25
109:24 111:22
professionalism
2:8 64:11 68:15
68:21 69:4,7,9
69:11,18,22 76:5
76:8 77:16,17
78:1,14,17 79:5
80:12 81:6,8,14
81:19,21 82:3,13
82:24 83:2,7,10
83:15 84:12
90:10 92:3 93:13
95:1,9,20 104:4
104:22,24
105:24,25
107:22 110:11

professionally
85:14 91:25
professor 6:10
31:16 53:25,25
64:7 68:25 69:1
90:8
program 3:3,8
16:15 17:2 64:10
64:17 65:2 66:19
67:2 117:12
programs 2:15
65:18
prohibits 13:1
project 66:17,21
67:1
projects 66:10
promote 81:14
83:1
promoting 7:17
promptly 20:19
36:17
proof 21:4 98:2
properly 4:10
proposal 110:10
proposition 19:13
27:2 54:14
propositions 19:7
prosecuted 7:10
19:23
prosecuting 20:15
prosecution 64:1
prosecutions 18:18
19:22 20:2,4,11
20:12 21:10
26:12
prosecutor 87:19
prospective 12:17
13:9
protect 35:19
106:25
protected 60:8
protecting 21:1
protection 16:25
27:16
protections 17:14
17:16 18:4 27:20
41:2 42:7 51:9
51:13 53:19 54:4
62:7,8,11
protective 18:11
18:19 20:23
21:10 24:11,13
50:10,24 51:16
protects 38:14
106:25
Protocol 51:13
provide 17:9 83:24
provides 49:5
providing 6:3
17:15
provision 18:14
provisions 17:9
18:11 41:2
provocative 74:5
100:17
public 66:16 84:21

84:25 85:3
public's 84:13
publish 94:23,25
published 65:21
107:8
punctuality 80:8
punishment 16:2
purely 56:25 67:5
67:8
purported 12:20
purpose 4:14,14
17:21 56:17
purposes 52:24
56:25 57:7 95:3
purse 85:6
pursuant 22:22
35:25
pushing 34:8 35:6
put 22:18 37:7
43:18 67:13 92:4
92:21 97:23
99:19 105:11
113:6
puts 98:21 99:25
putting 89:6,6

Q
qualifies 62:6
qualify 58:25 62:7
qualifying 34:25
qualities 84:7
quality 2:7
Quantanamo 3:22
5:12 6:13,23
8:22,23 10:6
44:4
Quantanomo
62:24 63:1
Queda 16:17 17:20
17:25 18:3,9
19:3,17 27:2
36:16 37:16
39:19 44:25 45:4
52:24
question 19:8
43:11 53:3 54:20
70:25 76:10
81:11 98:23
102:22 107:12
108:1 111:6
112:24
questioning 83:2
questions 4:5 5:3
6:25 55:25 81:12
102:13 108:8
quibble 41:11 42:4
quibbling 13:16
quick 49:12 51:5
quickly 4:18 36:15
72:23 89:7
quite 15:3 16:6
29:16 34:21 35:1
63:11 81:18
108:24
quote 9:21 11:10

quote-unquote
26:25

R
R 69:16
radar 14:9
raise 59:16,25
raised 34:19 61:1
76:10 98:23
raises 104:6
raising 71:10
Ramba 70:11
71:24
Rambo 70:10
71:24 95:17
101:19 115:25
116:2,5,20
Rambos 90:20
Rambo-type 109:3
rank 17:3 19:14
ranking 4:25
Rasul 8:6 10:13
11:14,25 12:3
21:15,17,22 22:3
22:7 23:3,9
49:21,22
rather 38:7 45:19
60:23 80:24
ratifiers 18:24
reach 37:6 102:6
reached 78:4 83:4
reaching 83:3
reaction 81:12
85:16 93:23 94:8
reactions 91:3
reacts 88:25
read 74:7 114:15
reading 62:1
ready 117:23
real 104:3 109:4
reality 22:15
realize 61:22
really 33:3 39:14
40:10 43:23
45:13 46:19 59:4
62:15,16 63:1,8
64:6 68:10 72:14
72:16 74:6 80:24
83:3,18 84:24
86:8 87:7 90:16
95:15 97:12,16
98:16,17,21
99:11 102:7,17
104:7 108:3
116:1 117:13
reappointment
113:15,19
reason 29:22 33:20
34:11 116:21
reasonable 26:21
47:14,18
reasonably 87:17
reasoning 22:4
reasons 17:7 44:16
47:24 112:9

**Rizman
Rappaport
Dillon&Rose, LLC**
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

rebellion 13:2
rebut 23:20 25:6
recall 75:14 88:5
receive 78:8
received 78:9
recently 5:6 12:23
  24:24 51:20
  73:23 87:16
reception 66:2
Recess 64:18
reclassify 25:18
recognition 78:20
recognizable 52:13
  53:8
recognize 2:13
  78:15
recognizes 78:21
recognizing 58:1
recommend 78:25
recommendations
  114:18
reconcile 81:5
record 99:8 102:6
  104:10 106:25
recount 82:11
recreate 66:23
redesign 66:22
redesigning 65:14
refer 95:4 105:14
  113:25
reference 54:2
  69:11 94:25
referring 25:17
reflect 26:2
reflecting 71:3
refresher 107:21
refuse 95:13
refused 73:24
regard 6:5 7:11
  8:16 32:14 33:20
  58:19 80:7 101:3
regarding 5:4
  43:21
regardless 51:11
regime 19:15
  55:11 58:4
regular 104:14
regularity 62:13
  62:13
Regulation 50:6
  50:11
Rehnquist 114:12
rejected 11:20
relationship 29:17
  105:4
relationships
  69:22,23,23,24
  70:5 73:5 98:5
relatively 48:11
relayed 97:21
released 6:22 8:11
  46:12 48:5,9,15
relentless 108:13
relevant 5:2 16:11
relief 8:8 102:9
reluctant 100:9

rely 55:5 57:16
remain 9:4
remaining 48:7
remanded 10:19
remarkable 45:13
remarks 26:2
remedies 95:18
remedy 73:21
remember 71:8
reminded 115:21
remiss 70:2
removing 114:6
rendered 20:18
renumeration 30:7
repeat 85:18
repels 80:24
repetitive 111:8
report 44:21 65:14
  110:20,21
  114:13
reported 1:25
  44:21 110:13
REPORTER
  103:6
represent 6:13
  24:22 25:1,2
  29:1 30:8,25
  31:8 32:25 33:18
  42:2 81:5
representation
  31:7 33:21
represented 5:25
  8:10 9:8 33:5
  74:20
representing 25:9
  32:24 91:24
reprisal 110:19
request 13:4 77:24
requesting 73:17
requests 73:11
  82:19
require 113:4
required 78:1
requirements
  18:17,19,21
requires 42:18
Requiring 95:8
research 56:13
residences 52:19
resides 80:21
resolvable 102:16
resolve 74:9,10,15
  99:5,8
resolved 105:21
respect 7:18 8:19
  14:18,23 15:4
  16:6,13 18:9
  19:21 25:23 27:5
  33:25 47:25 49:9
  49:18 50:15 52:1
  60:20 73:11
  76:10 85:4,11
  108:2
respected 29:12
respectful 84:5
  111:18

respond 40:21
  50:21
responded 19:11
response 11:6
  13:23 14:1 96:22
  96:23 97:25
responsibilities
  105:14
responsibility
  103:1
responsible 90:10
  rest 71:13
restraints 44:5
result 31:23 60:1,8
resulted 48:8
results 87:11 93:3
retention 7:1
retire 111:3
retired 107:8
returning 16:3
revere 38:15
reversal 75:3
reversed 74:23
review 6:25 11:9
  23:24 47:20
  48:18 49:21 50:9
  52:3 113:3,10
  114:16
reviews 50:24
  113:13,24
revocation 75:9
revoked 74:21
revolutionary
  19:25 61:12
re-review 49:3
Riccia 68:19 81:3
  81:7 98:9 111:4
  112:13
Rich 69:2 81:17
  85:16 86:23
  91:20 92:18
  107:13
Richard 87:15
ridiculous 86:13
rifle 21:8 53:9
right 2:14 6:9 7:8
  8:7 12:5,5,6
  30:15,24 31:7
  38:20 42:1,1,19
  43:7 49:1,2,5
  58:16 60:7 65:7
  68:15,23 71:3
  76:3 93:4,11
  107:19
rights 1:13,3,23
  4:11 5:11 6:7,2
  7:5 11:17 12:2,3
  12:3 15:12,13,15
  20:24 21:19 22:1
  23:14 24:11,13
  25:22,26:7 27:11
  27:14 34:23,25
  35:3,7,8 38:15
  40:18,23 50:11
  50:24 56:24 57:5

57:12 58:22,24
  59:1 62:1 63:22
rise 16:15
risk 37:13 38:8
Ritz 22:19
rival 2:7
river 90:23,24
Rizman 1:25
road 97:6 116:12
  116:13
Robert 68:21
Roberts 114:14
Robertson's 30:2
robes 2:23
Robinson 67:15
robust 16:14 49:17
  53:20
robustness 49:9
Rodino 69:1
role 28:25 31:17
Ron 68:19 112:6
  112:13
room 35:23 82:10
  95:12,13 108:25
round 30:4 117:2
rounds 12:11
route 19:3
RPCs 82:2 84:8
rude 91:14
rule 16:23 17:3
  41:9,22 55:14,17
  55:19 56:12,12
  56:23 57:8 58:7
  65:11 69:13
  98:13 102:2
  117:8
ruled 12:16
rules 18:10,20
  36:3 57:1 58:4
  59:21 69:10,12
  69:17,18 93:5
Rumsfeld 45:23
run 22:17,22 38:8
  49:12 59:16
  60:17 77:22
  116:21
runs 7:3
Rutgers 78:13

S
s 66:16
saboteurs 64:1
salute 109:23
same 13:9,14
  20:13,25 43:11
  62:1
sanction 74:25
  85:9 100:6
sanctions 96:5
  98:14,24 99:16
  100:2,14 101:3
  101:15
satisfactory 39:24
Saudi 24:23 29:2
  29:18,19

saving A-2712
saw 21:8
saying 13:10 17:24
  53:10 61:25 62:2
  117:11
says 27:5 29:10
  34:14 47:3,24
  56:16 57:4 96:24
schedule 103:10
scheduled 70:3
  103:15
scheduling 102:12
  103:18 104:12
  104:14,16
school 5:16 6:10
  37:13,17 51:18
  51:19,20 68:20
  69:2 78:12 81:3
  81:22,24 109:19
schools 76:22 79:4
  86:9
scope 6:25 23:5
  62:22
screen 14:9
screwed 72:3
sculpture 66:22
second 6:12 26:15
  29:3 30:4 59:24
  63:23,24 65:2,24
  84:10 102:5
  111:5
Secondly 52:1
Section 12:25 26:8
  69:15
secure 17:14
security 4:13 7:21
  21:13 32:21
  35:20 38:12 40:8
see 12:5 25:21 28:1
  29:18 30:15,19
  33:3 35:17 36:5
  36:6 38:7 47:3
  52:5 54:15 63:3
  79:1 81:1,19,20
  82:25 86:3,4,20
  100:10 105:14
  117:25
seek 8:8
seeking 78:2
seem 16:5 22:5,6
  47:11 72:21
seemed 15:16 19:4
seems 14:20 16:17
  73:21
seen 61:2 78:24
  84:14 93:24
segue 64:10 107:15
segued 75:20
seizure 52:2 53:24
seizures 54:1
Seldana 96:3
self-representati...
  30:25
sell 22:20
semester 79:9
seminar 77:16


**Rizman Rappaport Dillon & Rose, LLC**
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650  Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

78:1,10
seminars 78:3,8
send 96:13
sending 80:17,18
senior 19:16 76:1
91:22 112:18
115:1,2 116:1,20
sense 61:19 62:22
63:11 81:9
sensitive 84:25
105:2
sent 48:4
sentencing 88:19
separate 22:10
25:23 26:15
September 14:8,16
16:21 45:16
serial 17:3 19:14
series 58:14 71:6
109:19
serious 61:5 71:7
100:7
seriously 61:5 83:5
105:10
serve 83:22 108:17
108:18,21
117:23
serves 40:16 85:22
service 82:16
83:22,25
services 115:11
set 20:22 47:4,23
59:22
Seton 6:10 7:4
45:2 68:19 69:1
sets 50:6 58:4 89:1
setting 79:24
settled 14:21,22
23:11
Seventh 105:16,17
several 29:15
108:16
share 47:6 79:9
91:1 112:24
shift 25:17
shocking 22:15
shooting 26:20
short 99:13 104:1
114:6 115:7
shortly 14:16
shot 53:9
shoulder 102:19
show 40:3 74:14
77:2 84:8,8
109:4
shows 86:5,6
shuts 19:15
side 31:24 37:10
42:25 64:5,8,9
sidebar 72:15,18
sides 4:16 63:11
sight 41:7
signatories 34:17
35:2
signatory 17:11,13
17:22 34:20

signed 34:22
significant 32:18
75:11
significantly 17:18
signing 35:5
similar 110:17
113:3
simple 73:6
simply 13:25 14:2
16:2 17:2,6
42:18 44:23
46:16 74:15
86:22
since 7:12 8:2,3,10
61:2 65:16 70:1
70:6 98:22
single 49:6
sir 106:21
sisters 2:17
sit 54:15 90:3
sitting 2:22 101:5
situating 9:19
situation 31:5 55:1
56:15 98:21
101:25 102:4
111:8,9
situations 111:15
Sixth 26:11
skewed 13:11
skills 33:6 77:14
83:25
skirmish 19:13
slight 52:6
slight-of-hand
28:7
slow 71:18
small 74:13
smartest 4:22
Smith 21:8 84:19
86:19
snow 45:25
social 67:5
Society 65:5,15,16
65:21 67:9,13,17
soldier 25:4
soldiers 17:15,16
26:19 52:12,15
solid 15:3
some 4:4 6:4 8:5
40:25 42:3 43:5
43:6 46:22 49:12
52:12,19 56:7
61:6 63:15 70:8
70:19 73:10
75:20 76:24 77:7
79:2 80:21,22
86:5,5 91:2 95:1
95:5,8 98:2 99:5
102:9 106:12
108:4 111:2
113:10 114:17
somebody 25:9
62:2 116:16
somebody's
116:17
somehow 85:14

108:23 115:22
someone 46:4
67:22 85:25
86:14
something 10:5
32:5 38:3 47:3
57:7 58:3,3
71:22 90:7 92:12
93:21 94:9 98:1
102:2,19 109:9
111:17
sometimes 6:1
42:9 73:16 75:23
80:10 92:23
100:12 112:8
soon 109:13
sooner 60:22
sophisticated
77:13 102:14
sorry 21:23 41:17
sort 9:24 10:5,15
11:1,10,11,15,18
11:25 12:1,10
13:9 21:5 25:15
25:21,24 26:14
26:16 28:10,17
28:23 31:3 33:10
33:14 36:6 41:7
41:10,21 42:1,3
42:10,12,13,13
42:20 43:4,13,23
44:9,11,15,17,24
46:2,18 52:12
56:7 57:3,24
60:17 62:5 88:9
98:4,10 113:10
sorts 50:7 108:23
sought 9:14
sound 20:5,6 21:3
70:16,20 101:22
source 16:24
sources 37:14
South 70:20 72:1
Southern 7:10
68:10
sovereign 15:10
22:8,25
sovereignty 22:14
so-called 27:1
speak 13:8 91:18
115:2
speaker 3:13,13
6:8 117:22
speakers 3:10
speaking 89:22
91:2 112:14
special 2:14 3:6
93:11
specialty 78:18
specific 22:5
specifically 9:14
9:17 59:12
speedy 57:12
spend 83:14 94:16
spent 31:3 68:11
93:15 94:15

spoke 33:10 76:6
spoken 34:23
spokesman 33:10
sponsor 66:18
sponsored 66:1,5,7
spring 30:5 54:25
67:2
staffs 66:3
stake 3:23 40:24
stamping 71:10
Stan 103:5
stand 112:19
standard 19:11
78:22 109:17
standards 55:19
79:24 109:21
standing 87:5
standpoint 99:2
Stanley 1:25
106:24,25
start 8:18 26:6
65:2 71:18 76:16
79:9 96:24
109:21
started 3:15 4:19
16:7 50:17 96:25
115:23
starting 25:12
starts 79:7
state 1:2 42:15
57:11 65:25 66:9
75:10 76:21 77:2
90:18,23 106:11
107:1 110:17
113:3
statement 13:17
25:6 32:2 58:2
64:13 79:23
statements 56:22
states 1:8 5:7 9:15
9:20 10:15,17
14:3 15:7 16:9
16:10 17:11,25
19:2 21:25 22:9
22:16,25 23:12
23:13,15 26:3,11
41:14 43:10
44:14 45:10,11
45:18,19,21
50:16 60:3,10
61:14,16 65:22
68:22 69:8,12,19
77:11 105:13
107:16 113:18
statistics 77:1
stature 112:13
status 8:22 11:9,11
15:9 43:6 44:19
47:20,24 48:7,18
49:12,18,20 50:7
50:9 53:7,7,14
statute 21:21
113:22 114:21
statutes 16:9 59:15
statutory 15:12
21:16 114:5

stayed 12:10
steady 65:17
step 40:15
Stephen 67:23
stepped 19:10 39:7
steps 52:3
Steve 81:11 96:2
103:2 111:4
sticks 75:16 80:10
still 9:1 65:23
83:20
stone 101:6
stop 10:3 17:3 71:9
99:3,4
stopped 30:1
stopping 80:16
stores 52:18
stories 6:5 82:14
82:22
story 35:21
straightforward
41:3
strangest 9:10
strategically 46:3
strategy 30:9
stress 28:17
stretching 62:16
strip 12:21
stripped 12:14
58:21 59:1,5
strong 17:24 109:1
strongly 50:4
struck 58:16
structure 18:7
20:16
student 80:16
students 79:10,22
study 45:1 54:1
stuff 26:17 51:22
79:2 83:10 95:25
95:25
stumbles 116:16
subject 18:1,6
19:12 23:23
31:10 32:1 41:19
42:6 46:6 82:1
105:2 113:2
subscribe 33:23
60:12
subscribes 54:13
subsequently
66:25
substantial 75:17
87:17
substantive 3:13
11:3,17,25
substitute 11:12
succeed 39:14,16
success 39:14
successful 117:16
successfully 31:6
succinct 104:2
Sudan 36:18
sufficient 11:4
40:4 50:15 53:2
54:10



Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

sufficiently 24:13
suggest 27:4 35:9
  60:19 62:12
  113:9
suggested 41:13
  113:1
suggesting 18:23
suggestion 22:7
summary 42:9
summation 3:5
summer 90:14
summoning 21:6
sums 93:19
Superior 78:6
supervised 5:2
support 20:6 67:15
  67:17
supportable 49:8
supported 67:10
supporters 48:21
  67:6
suppose 82:10
supposed 34:15
  83:23,24 95:10
  111:25
Supreme 5:7,19
  10:13,24 13:5
  14:17 15:11 19:9
  20:11 21:15 31:9
  48:6 50:3,11
  61:3,9 64:2 66:5
  69:20 76:22
  77:24 107:4
  114:15
sure 36:17 42:11
  43:7 45:25 69:6
  76:5 77:4 82:22
  85:18 91:23 92:7
  92:19 95:22 96:1
  97:8 108:3
surly 88:12
surprised 37:19
surprising 34:21
  35:2
surprisingly 42:23
surveys 84:14
suspected 53:23
suspects 9:25
suspense 63:23
suspension 7:1
  13:1 15:14
swept 46:21
sword 85:7
sworn 66:8
system 9:21,23
  10:1,21:9 29:23
  29:25 30:10,14
  35:12,17 38:6,9
  38:14,18 39:21
  39:22,23,25 40:6
  40:15,20 47:14
  47:18 55:12,22
  56:19 57:4,15
  60:18,21 63:9
  70:16,20 107:2
systematic 61:15

T
tactics 109:3
  115:25,25
take 27:10 41:11
  46:9 58:8 61:4
  62:14 64:15 68:3
  73:8 101:22
  105:9 106:22
  107:21 114:6
  116:12,13
taken 51:12,24
  52:21 89:24
  113:7
takes 102:24 112:7
take-away 90:5
taking 13:16 23:10
  26:21 33:8,20
  52:16
Taliban 19:3 44:7
talk 3:14 8:11 24:4
  24:9 26:16 41:21
  42:12 52:7,14
  59:13 110:3
  115:10,13,15
talked 23:4 24:5
  42:22 58:23 59:4
  98:9
talking 42:5,14,16
  52:15,17 56:4
  62:9 86:25 87:9
  100:20 105:23
  109:3,17 110:4
talks 26:8
tantamount 61:25
target 18:7
targeting 17:18
taught 51:17 81:23
  98:10
teach 76:13 95:19
teaches 7:4
teaching 79:5 86:8
  86:9 109:18
team 76:17
teamed 77:25
tearing 93:18
technicality 74:24
  75:1
tedious 100:4
telephone 29:19
television 86:5
tell 6:4 35:21
  58:14 72:16
  73:10 82:14,22
  89:11 92:9 98:1
  99:11 110:8
telling 73:5,7,8
  98:19
Tempe 56:18,18
temper 87:8
ten 9:1 50:17,18
  98:11 112:18
  117:25
tend 80:10 108:18
  109:3 110:2,3
tended 108:19

tendency 80:20
tends 79:13 108:21
tenure 72:13
term 13:6 90:20
  113:15
terminate 31:7
terms 17:7 22:12
  22:22 35:1 84:16
  104:12
terrible 106:12,14
  106:16
terribly 94:10
territorial 23:5
territory 10:16
  15:7,11 22:9,25
terror 43:3 54:11
terrorism 1:11
  3:21,7:11,17 9:6
  35:24 46:5,14
terrorist 9:25
  13:21 46:15 56:7
terrorists 18:9
  25:18 37:5 40:6
  44:10
testify 21:7
Texas 107:19
thank 24:14,16
  39:14 32:8 51:4
  62:21 63:15,18
  65:8,12 67:9,16
  67:18 72:24 79:3
  81:2 106:21
  116:23 117:17
  117:18
thanks 2:19 3:6
  10:7 47:17 108:6
  33:1,5 43:22
  49:17 52:8 58:15
  59:25 60:1,23
  61:7,8 63:6 64:6
  64:11 66:3 71:20
  72:8 78:25 85:15
  85:22 90:4,21
  91:3 96:13 100:8
themes 18:6
themselves 18:5
  107:19
thereabouts 34:22
thereof 51:14
they'd 92:9
they'll 4:9,10 22:16
  30:12 33:14,18
  36:6,10,20 60:11
  60:15 62:1 72:7
  83:12 85:3 88:11
  98:15 103:9,17
  110:5 111:9
  115:20
things 11:8 14:24
  16:5 18:8 23:17
  27:7 34:24 73:13
  76:8,24 77:7
  86:11 92:4,5
  96:18
think 4:5 7:22 9:9

9:12,23 10:4
  11:8 20:15 21:4
  21:17,21 22:12
  22:14,23 23:2
  25:8,25 26:17
  30:9 31:19 32:12
  32:19,20,23 33:7
  33:8,11,13,24
  34:6,20 35:1,7
  36:19 37:23
  38:10,16,21 39:4
  40:14 41:6,23,23
  42:5 43:22,25
  44:5,8,17 45:23
  46:3,9,18 48:10
  48:14,24,24 49:8
  49:10 51:2 52:11
  52:11 53:9 54:5
  54:12,13,25 56:2
  57:10 58:1,17,18
  59:3 60:16 61:12
  61:16 62:3,4,19
  63:7 70:13 71:4
  71:6,17,21 72:15
  72:22 73:19,20
  74:13,13,20,23
  75:14,17,20,22
  76:16 79:1,23
  81:7,10,16 82:8
  83:13,15 84:3,12
  84:24 85:13,20
  85:22 86:2,4,20
  86:23,25 87:2,3
  87:3,10,17,20,25
  89:1,2,5,8,15,22
  90:3,16,18,19,19
  91:5,10,15,20,21
  92:2,2,14,20
  93:2,7 94:19,22
  95:7,11,13,16,19
  98:14,15 99:16
  100:1,2,16,16,16
  100:17,19 101:5
  102:4,8,14,25
  103:2,11 105:2,9
  105:10 108:12
  108:24 109:7,14
  110:4 111:15,24
thinking 60:13
  83:14
thinks 46:3 54:8
  115:15
third 4:24 19:8
  75:2 94:7,14
  96:3
THIRTY-FIRST
  1:7
Thomas 5:18
Thompson 70:15
  88:2,4 115:12
though 6:2 8:13
  28:3
thought 73:14 8:13
  15:3 17:23 18:2
  18:10,22 19:5,12

20:5 42:7 48:10
  88:13,13 90:21
thoughts 107:13
  113:12
thousands 83:8
threat 38:17 54:10
three 8:10 17:7
  19:7 25:19 34:10
  71:4 74:4,20
  76:22 77:2
  107:22
threw 71:11,11
  88:7
through 8:25 25:8
  31:4 47:19 48:15
  53:17 57:12
  60:18,22 94:13
throughout 14:25
  15:19 16:23
  19:23 69:8,19
  109:5,22
throw 52:5
thrown 30:16
thug 100:24 101:1
  101:2
ticking 56:6
time 1:13 3:15 4:4
  6:15 7:12 14:9
  20:23,25 24:24
  35:22,22 36:7,7
  37:22 39:13 41:5
  43:5 44:24 45:13
  45:20 55:20 56:6
  56:7 63:20,22
  68:11 72:17
  73:12 79:7 82:15
  83:14 86:1,14
  89:18 94:11,15
  94:17 98:12
  99:1 100:16
  108:19 115:17
  116:5 117:18
times 9:9 51:11
  73:12 87:5 92:23
  100:23
tipping 102:6
  103:7
today 2:21 3:20
  4:2,15 6:15 7:19
  7:24 24:3 32:9
  55:1 57:8 58:18
  60:25 63:2,12
  64:4 68:6 81:13
  83:6 92:15 93:7
today's 92:16
together 26:16
  37:8 113:6
told 71:12 83:17
tolerate 76:14
ton 93:15
tone 89:1
tons 23:24
topic 63:22
torture 16:10,16
  16:23
totally 28:4 55:1

Rizman
Rappaport
Dillon & Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Tothidge 51:9
touch 89:17,21
  97:14
touched 23:23
touchstone 91:21
tough 51:17 74:14
  108:7
tougher 50:1
toughest 92:15
towards 110:2
track 59:24
tracks 59:17
Trade 7:11
tradition 4:11
traditional 27:19
  53:7,21 54:8
traditionally 53:16
  53:20 54:4
trafficking 7:6
train 90:12
transactional 77:5
transcend 79:17
transcript 1:4
  106:23
transpired 64:3
traveled 63:16
  68:10
treat 13:24 14:12
  35:18 38:16
  79:19,20 80:19
treated 23:3 27:15
treaties 22:13
treatment 12:14
  16:7 18:18 19:21
  39:8 59:12
treaty 16:9 17:10
  17:14 18:23,24
  19:11 22:23 35:9
tremendous 54:6
  80:2
Trenton 66:11
trial 3:5 9:3 11:2
  26:9 30:10 35:24
  36:9,12,14 40:25
  53:18 57:12,12
  60:1,8 71:14
  86:18 87:20
  89:23 93:11
  115:25,25
  116:15
trials 40:19 43:18
  91:3
tribunal 47:20,20
tribunals 11:9
  43:16 48:19
  49:15,21 50:9
tried 29:4 35:24
  37:17 87:1 99:13
trigger 14:12
triggered 27:4
triggers 18:17,17
  18:18
true 15:24 43:2
  54:8 61:24
trust 29:17 53:12
truth 51:1 98:19

truths 115:21
try 4:2 39:2 40:15
  57:3 65:10 76:8
  86:3 95:23 96:9
  98:5
trying 15:2 27:9
  29:20 35:18 77:6
  93:15 117:13
Turkish 6:20
turn 8:16 31:12
  33:10 35:25
  36:11 68:11 72:7
turned 36:14
  55:21
turns 56:14 83:15
tutor 77:17
TV 86:20
twice 40:22
two 8:10 11:8
  15:20 17:11
  24:22 26:15 27:7
  31:15 34:10,10
  34:14 38:24
  41:16,17 51:6
  52:3 59:17 61:7
  61:13 66:7,10,23
  70:6 74:20 78:4
  100:20 107:16
  112:22 113:5
  114:22
type 3:11 27:6
  28:5 38:1,23
  53:3,4 76:25
types 60:24 100:20
typical 19:14

U

ultimate 28:8 90:4
ultimately 31:5,6
  91:16 94:3 107:6
  108:13
unacceptable 40:9
  89:10
unclear 114:5
unconstitutional
  114:23
under 5:25 10:16
  11:3,18,18 15:13
  16:8 20:6 22:12
  25:22 27:14,24
  34:15,25 39:24
  39:24 52:5,16
  66:11,16 114:11
undercut 21:22
underlying 38:5
  38:17 109:12
understand 3:10
  75:6 91:23 92:3
  92:11 96:9
  102:15 111:12
  114:24
understanding
  55:5 84:6
understands 89:9
  117:8

undertook 20:8
underway 66:11
  66:21
undo 57:2
undoubtedly 61:6
unfortunate 60:11
  60:15
unfortunately 82:8
  93:25
unhappy 29:6
uniform 18:6
  20:17 26:1
unilateral 9:5 40:4
unilaterally 53:12
  101:19
unindicted 36:1,20
unique 77:22
  79:14
United 1:8 5:7
  9:15,20 10:15,17
  14:3 15:7 16:9
  16:10 17:11,24
  19:2 21:25 22:8
  22:16,24 23:12
  23:13,14 26:3,11
  41:14 43:10
  44:14 45:10,11
  45:18,19,21
  50:16 60:2,10
  61:14,16 65:22
  68:22 69:8,12,19
University 69:1
unless 13:2 85:3,3
  98:2
unlike 27:17
unlimited 28:11
unprofessional
  73:20 77:4 86:24
  88:25 89:15 91:3
  91:13
unprofessionalism
  89:24 100:21,22
unprofessionally
  85:13,21 94:4
unquestioned
  16:23
unquote 9:22
unreasonable
  73:17
Unrelated 88:14
unreturned 82:17
until 9:6 43:3
  71:13 73:2
untruths 97:22
update 67:19
upheld 14:13,18
urgency 16:22
urgent 21:1
use 14:16,18 21:2
  56:21 57:1 88:7
  114:20
used 78:11 88:6
  90:19 95:2 97:4
useful 8:14
uses 20:14 72:15
usually 63:19,20

U.S 7:9 10:2 15:11
  25:3 51:12

V

v 5:9 31:9
vacated 75:17
vacuum 108:18
valid 104:6
valuable 36:20
value 73:19,20
values 33:19
variety 73:9
various 9:18 13:11
  45:9 69:7 105:13
venture 77:1
verdict 91:10
versus 5:9 15:6
  17:12,25 21:16
  96:4
very 2:5,13 3:13
  3:13 4:16 5:25
  7:23 11:2 12:1
  13:22 17:21,24
  19:19 20:5,5
  23:9 25:6 28:7
  32:8 35:19 36:15
  36:20 38:3 39:13
  39:13 48:16 50:7
  50:19 52:4 58:23
  61:4 63:5,5,6
  65:5,5 68:16
  70:17 71:9,17
  72:13 73:22,22
  74:7 75:19,21
  76:23 77:13
  78:23 87:2,10,11
  89:5,7 92:8 94:1
  94:6,13 96:7
  100:9 101:7,18
  103:14 105:10
  107:2,2 108:19
  109:21 111:22
vibrant 65:5,10
vice 71:5 74:22
victim 101:18
victimized 106:2
victims 44:22
Vietnam 43:10
view 9:10 23:16
  24:7 33:23 54:13
  87:13 91:11
  92:18 97:11
  100:14 102:22
  105:7 108:10
views 1:16 47:7
  64:11
violate 12:25 58:6
violates 60:2
violating 17:21
violation 9:2 60:9
  115:8
violative 40:13
violence 41:25
visited 9:9 31:22
voice 71:11

voices 70:18
volumes 23:23
voluntarily 33:5

W

W 68:25
wage 23:13
wait 3:19 117:24
waiting 10:23
  68:11
wake 5:5 62:25
walk 25:8 38:8
  112:16
want 4:18 7:22
  24:3 25:5 27:6
  29:7,10 32:7
  34:3 35:7 38:2
  42:21 54:15
  56:22 62:10,15
  62:17,19,20
  63:15 80:25
  83:12 90:7 92:8
  92:10,10,12
  97:17,24 103:23
  105:22 107:16
  110:8,18 114:15
  117:18
wanted 6:4 9:24
  10:1 30:17 31:2
  88:7
wants 28:9 29:9
war 1:13 9:3,6
  14:1,11,12,18,21
  14:25 15:2,5,18
  15:18,21 17:17
  18:4,5,18 19:22
  19:23,25,25 20:1
  20:3,6,8 23:13
  26:13,22,25 27:4
  27:11,12,15,16
  27:19,20,24 28:1
  28:3 35:12 38:11
  38:23 39:12
  40:22,23 41:6,13
  41:19 42:22 43:2
  43:3,17,17 49:11
  52:23 53:3 54:16
  54:17 55:6,6
  57:23,23 61:13
  63:22,23,23,25
  92:11 93:13
Ward 66:14
warning 71:9,18
  71:19,19
warnings 57:5
  71:7,8 72:14
warranted 80:10
wars 18:25,25
wartime 16:25
  33:6 36:22 37:11
  38:5
Washington 5:23
  7:16 19:24 24:19
  66:6 87:19
wasn't 6:14 43:25

Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

| | | | | |
|---|---|---|---|---|
| wasted 94:11 | weren't 41:18 | 79:14 | 76:10,13 78:7 | **3(b)** 56:10 |
| Waugh 93:10,17 | 57:22 | words 65:4 68:4 | 86:10,19 87:19 | **3.0** 30:6 |
| way 17:6 19:10 | West 1:20 | 80:4 | 88:6 90:14 | **30** 73:7 77:11 |
| 30:19 33:12,13 | we'll 3:14 64:16 | work 6:2,11 8:1,2 | 112:12,15,17,19 | **31st** 2:4 |
| 33:17 35:13 | 79:1 93:4,4 96:9 | 8:3 29:21 31:23 | 117:14 | **31(b)** 56:18 |
| 38:20,20 39:13 | we're 2:5 6:2,3 | 32:11,13 34:1,8 | younger 91:22 | |
| 39:16 40:11 | 13:19 14:21 | 52:6 60:21 61:17 | 116:2,6 | **4** |
| 41:23 47:2 53:16 | 23:20 24:2 27:23 | 67:10,12 80:11 | Yugoslavia 51:9 | **40** 48:8,15 87:1 |
| 60:23 61:7,8 | 27:24,25 28:4 | 86:16 93:8 | | **430** 8:25 |
| 62:6 70:1 71:17 | 30:5 32:20 35:14 | worked 4:23 34:16 | **Z** | |
| 72:23 74:11 | 38:11,20 39:13 | 77:1 | zealously 81:5 | **5** |
| 75:20 81:10 84:8 | 39:16 40:12,22 | working 6:15,23 | 91:25 93:4 | **50** 112:17 |
| 85:22,23 86:6,20 | 40:23 42:15 | 31:4,20 32:1 | zone 51:25 52:13 | **500** 47:25 48:7,13 |
| 87:6 90:2 91:9 | 44:11 45:23 | 70:17 78:23 | | **55** 45:8 |
| 93:1,1,3 94:18 | 50:18 52:15,17 | works 66:16,20 | **$** | |
| 98:24 99:5,6,17 | 55:15,24 56:4 | 67:2 70:21 101:1 | **$40,000** 75:16 | **6** |
| 102:4 103:12 | 58:20 61:10,18 | world 7:11 15:5,21 | **$90,000** 101:8 | **60** 23:10 |
| 106:7 109:22 | 62:3,9 64:2,15 | 19:2,25 20:3 | | **65** 11:7 |
| 111:18,23 | 65:1 71:25 72:5 | 33:24 38:10 | **0** | |
| 117:14 | 76:22 77:5,10,12 | 41:13 63:23,24 | **06** 12:19 | **7** |
| ways 13:14 19:11 | 78:12,23 79:6 | 92:16 108:21 | | **72** 45:12 |
| 46:13 73:9 | 85:5,7,10 95:10 | worry 56:9,9 | **1** | **75** 51:14 |
| weakness 108:20 | 100:7,9 105:23 | worse 79:20 97:7 | **1** 51:14 | **750** 8:24 48:3,4 |
| 109:4 | 110:16 115:21 | 100:3 | **10** 81:15 | |
| Wear 18:6 | 117:18 | worst 71:4 97:20 | **10,000** 48:2,3,13 | **8** |
| wearing 2:23 | we've 4:10 8:8,10 | worth 83:9 105:2,2 | **10-minute** 64:15 | |
| weather 79:13 | 20:9 39:21 42:17 | worthy 38:3 40:19 | **100** 78:19 | **86** 45:17 |
| 80:3 | 55:21 57:13,14 | wouldn't 32:4 | **103.1(c)** 69:14 | |
| website 114:15 | 57:17 58:18 | 57:18 60:5 94:15 | **11** 14:16 16:21 | **9** |
| weed 19:16 | 60:16 61:12 63:1 | wrap 51:6 | 98:13 | **9** 12:25 |
| week 35:24 74:4 | 64:6 78:4,19,23 | writ 11:12,13,1 | **11th** 45:16 67:4 | **9/11** 5:5 8:3 25:18 |
| weigh 7:20 111:4 | 93:3 98:18 | 42:16 | **1200** 78:4 | 51:8,17 54:9 |
| welcome 2:3 | 108:13 109:2 | write 101:22 | **15** 25:3 77:12 | 62:25 63:21 |
| well 14:10,10,21 | 110:4 | 103:12 | 81:15 98:11 | **9/11/2001** 4:6 |
| 15:24 16:6 17:20 | whatsoever 11:18 | writes 96:23 | **19** 66:6 | **9/12** 8:4 |
| 18:12 24:10 | 46:4,14 | writing 35:3 | **190-8** 50:6,11 | **90** 104:15 |
| 26:13 27:12,23 | while 39:6 58:5 | written 65:22,, | **1935** 66:17 | **98** 116:5 |
| 29:23 45:15 52:8 | 80:10 82:25 91:9 | 79:11 | **1949** 34:22 | **99,9** 38:4. |
| 53:16 56:11,15 | 114:13 | wrong 17:5 44:23 | **1984** 65:16 | |
| 57:22 58:17 | whim 49:7 | 44:23 94:10 | **1990s** 32:18 | |
| 69:21 70:17 78:9 | whined 106:6 | wrote 101:8,, | **1993** 7:11 | |
| 84:17 90:3 92:8 | whining 101:23 | **W.P.A** 66:16 | **1994** 37:20 | |
| 94:14,21,24 | whiny 103:12 | | **1995** 35:24 | |
| 96:24 105:23 | whistle 110:19 | **Y** | **1998** 69:16 | |
| 112:4 | whole 37:22 55:7 | Yeah 49:10 79:6 | | |
| well-reasoned 85:8 | 55:18 88:24 | 93:25 | **2** | |
| well-recognized | 114:16 | year 24:21 28:21 | **2** 2:6:8 | |
| 77:12 | William 5:14 | 30:5 31:3 49:3 | **2,000** 41:13 | |
| went 3:6 29:5,25 | willing 53:12 | 65:21 77:9,17,20 | **2.0** 29:24 30:3 | |
| 37:17 44:18 | willpower 41:24 | 78:18 87:16 | **20** 67:10 | |
| 51:18 55:3 72:17 | win 72:19 | 107:20 114:13 | **200** 66:8 | |
| 82:10 88:23 | winning 16:4,5,7 | years 2:12 6:21 | **2000** 77:18 | |
| were 10:8 11:6,7 | winnowed 48:1,13 | 23:11 56:3 57:19 | **2001** 9:16 13:18 | |
| 12:8,11 14:9 | wins 38:13 | 60:14 67:14 73:7 | 14:8,23 54:24 | |
| 18:24 19:12 | winter 30:4 | 76:20 77:2,12 | **2002** 10:8 14:23 | |
| 22:20 34:21 35:3 | wish 100:5 112:24 | 81:15 87:1 98:11 | 44:15,21 54:25 | |
| 35:3,5,16 37:18 | wishes 23:1 | 100:24 107:10 | **2004** 10:14 30:1 | |
| 37:19 41:18,19 | withholding 26:9 | 107:22 112:25 | 61:3 | |
| 44:22,24 45:7,18 | witness 64:2 91:7 | year-round 65:19 | **2005** 29:2 | |
| 45:19 47:11 48:3 | 116:12 | yelling 71:10 | **2007** 1:22 66:19 | |
| 48:4,7,15 50:10 | witnessed 64:4 | yesterday 3:4,20 | **2008** 67:2 | |
| 52:17,20 60:1 | 84:18 | 73:23 74:1 110:9 | **22** 1:22 | |
| 66:8,24 69:15 | witnesses 91:15 | York 7:10 | **25** 84:22 | |
| 71:5 73:5 77:10 | wonder 32:4,5 | young 51:18 74:6 | **250** 48:4 65:18 | |
| 93:16 100:25,25 | 44:18 | 74:14 75:25 | | |
| 111:20 113:18 | word 38:5 58:12 | | | |

Rizman Rappaport Dillon & Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

# Exhibit B

A-2537

4/23/12 Bolton

law

war.

det.

scope.   rationale.   history

SC — upholds, but w/ judic proc

Qs
who ?
remedy ?
other places ?
had trial ?
non-def ?

trial
mc permiss
in field
spec rules
per exec or legisl

BHO
tracked as candidate
signed MCA 10

interrog
poll **protect**

...ib on T does not prevent many firms coerc int

BHO

A-2538

policy (eg)

A. det - close GTMO

ideal venue - safe, remote, world class

need somewhere else - abroad

here - secy risks
legal probs

perceived PR upside illus - GTMO north

B. trial - 9/11 co-consp

① venue
- judges
- juries
- ctroom
- NYC

② trial
give up adv
- hearsay
- class evid

create risk (sti)
- Miranda
- 6A etichs
- Faretta

soapbox

③ later
acquit →
release
into US
it cant
repat

classify
hold here

Bivens
condit

recy
not
in
pros

(cant
isolate

C. interrog - Abdulmutallab

facts.

urgency.

decis. - crim track. Mirandize. no covert interrog.

more about interrog than trial

lost opp.
couldn't do covert even on mil track